UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Dedmon, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 4:21-cv-03371 |
| | § | |
| vs. | § | Jury Demand |
| | § | |
| Shell Exploration & Production | § | |
| Company and Shell Trading | § | |
| Services Company, | § | |
| | § | |
| *Defendants.* | § | |

---

**PLAINTIFF ROBERT DEDMON'S FIRST AMENDED COMPLAINT**

---

### INTRODUCTION

1.      This is an unlawful employment practices case. It involves a current employee and claims for race and color discrimination under (1) Title VII of the Civil Rights Act of 1964 ("Title VII") and (2) 42 U.S.C. § 1981 ("Section 1981").

2.      Title VII prohibits the use of race or skin color as a motivating factor to pay employees less — or to place or keep employees in lower-level jobs as to rank, prestige, or pay.

3.     Section 1981 guarantees all races the same rights to make and enforce contracts.  These "contracts" include the at-will employment relationship and all stages of that relationship, including pay — or placing or keeping employees in lower-level jobs as to rank, prestige, or pay.

## PARTIES

4.     Shell Exploration & Production Company is a corporation that conducts business in Texas and conducted business in Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records. Its principal office and principal place of business is in Houston, Texas, according to Texas Secretary of State records. No service of process is necessary. It has appeared in this case and filed an answer.

5.     Shell Trading Services Company is a corporation that conducts business in Texas and conducted business in Texas at the time the claims asserted herein accrued, according to Texas Secretary of State records. Its principal office and principal place of business is in Houston, Texas, according to Texas Secretary of State records. No service of process is necessary. It has appeared in this case and filed an answer.

6.     Robert Dedmon is an individual who resided in Texas at the time the claims asserted herein accrued and who continues to reside in Texas.

## JURISDICTION

7.     The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 [federal question jurisdiction]. This case was originally filed in a Texas state court. Shell Exploration & Production Company and Shell Trading Services Company (the "Shell Defendants") removed the case based on federal question jurisdiction. This amended complaint includes federal claims under Title VII and Section 1981.

8.     The Court has personal jurisdiction over each defendant because, as to each defendant, (1) the claims asserted against it arose directly from its acts and omissions in Texas, (2) its affiliations with Texas are so continuous and systematic that it is "essentially at home" in Texas — each maintains its principal office and principal place of business in Texas, and (3) it has entered a general appearance in this case and so waived any challenge to personal jurisdiction.

## VENUE

9.      Venue is proper under the Title VII special venue provision in 42 U.S.C. § 2000e-5(f)(3). This action may be, and is, brought in a judicial district in the state in which the unlawful employment practices were committed. The Shell Defendants hired Robert in Texas, still employ Robert in Texas, and committed unlawful employment practices in Texas.  And the Shell Defendants are found within this judicial district, where they both keep their headquarters.

10.      Venue is also proper under the general venue statute [28 U.S.C. § 1391]. A substantial part of the events or omissions giving rise to the asserted claims occurred in this judicial district.  The Shell Defendants are both residents of Texas and both reside in this judicial district, where they both keep their headquarters.


*remainder of page intentionally left blank*

## ABBREVIATED BACKGROUND



**Shell's scope of business and
employment policies and practices**

11.     The Shell Defendants are in the oil and gas business. They are part of a global energy trading network, from upstream supplier sourcing to downstream customer sales.

---

[1] Image from the Shell Global website [2021].

12.   The Shell Defendants are part of the Shell organization of compa-

nies.[2] They each use the Shell trade name and Shell trademark 🐚. They are

each part of the Royal Dutch Shell plc annual reports. Houston is their only

main trading and marketing location in the United States.

13.   Shell depicts its overall operational structure as follows:

**2013**



---

[2] This complaint uses *Shell* to refer to the Shell organization of companies.
Unless otherwise noted, it refers to *Shell* only when the referenced practices,
policies, information, or knowledge are believed to apply to each defendant in
whole or in part.

[3] Image from the Shell Sustainability Report [2013] hyperlinked on the Shell
United States website [2014].

**2020**



14.     Shell operations in the United States appear to involve the same employment policies and practices. Here are a couple of examples. Shell operations in the United States at some point include a United States Human Resources Policy Manual. Shell operations in the United States at some point involve a United States Compensation Team.

---

4 Image from the Shell Sustainability Report [2020] hyperlinked on the Shell United States website [2021].

## Shell's history of problems with
## bias against black employees

15.    Shell has a history of problems with bias against black employees in the United States. Consider a former black employee whose story starts with Shell in 1980 and continues with Shell for about 27 years. He says this about his start:

> At my first job [in One Shell Square], a guy walked up to me and asked me to sort his mail. I told him no, I'm not going to do that, I'm an engineer here. There are lots of black people in oil and gas with similar experiences.

His career with Shell includes assignments based in Texas, Louisiana, and California. He reaches executive level but says of his career that he has many racist experiences that test his desire to remain in the energy industry.

16.    Shell knows, or should know, about this history. The 2014 Shell Global Diversity and Inclusion brochure cites the former employee whose story we address above. But Shell does not make public any reports [if it has any] on the number of black employees at different job levels in the United States. Shell does not make public any reports [if it has any] on comparative compensation for black employees — sometimes known as pay-gap reports.

### Shell's public-facing promises



17.    As early as 2014, Shell publicly promises that, when it comes to brand image and diversity and inclusion values, "the performance matches the words."[6] At the time, the Shell Vice President for Diversity and Inclusion emphasizes accountability:

> Accountability is extremely important.   Once you've agreed to what you're going to do around [diversity and inclusion], then go and do it and make sure that there are regular reviews, discussions … [and] readjust actions and behaviors – but hold people accountable to what they say they are going to do.[7]

---

[5] Image from Shell Diversity and Inclusion brochure hyperlinked on the Shell Global website [2014].

[6] Shell Diversity and Inclusion brochure hyperlinked on the Shell Global website [2014], at 13.

[7] *Id.* at 8.

18.     Today, Shell promises: "We are working to address racial inequity."[8] Shell says:

> Protests during 2020 in the USA and other parts of the world have caused everyone to think more deeply about what diversity and inclusion means at work.  Within Shell, we have had many conversations on race and equity, how we can help address systemic injustice …[9]

So, Shell is publicly promising it is addressing racial inequality and systemic injustice that is based on race.

*remainder of page intentionally left blank*

---

[8] Shell Global website [2021], About Us, Diversity and Inclusiveness, Race and Equity.

[9] *Id.*

**Shell's pay gap for black employees at Shell UK**

| Shell UK | | |
| --- | --- | --- |
| Ethnicity declaration rate of 75% | | |
| **Mean and median pay and bonus gap** | | |
| | MEAN | MEDIAN |
| YEAR | 2020 | 2020 |
| Ethnicity Pay Gap | 8.5% | 11.8% |
| Bonus Pay Gap | 9.3% | 6.6% |

10

19.    For the first time in 2020, Shell publishes a pay-gap report for minority employees, including black employees, in the United Kingdom. The report shows disparity in both regular pay and bonus pay for Black, Asian, and Minority Ethnic groups.

20.    The most significant disparity is for black employees:

> Within the Black, Asian and Minority Ethnic groups, the pay gaps vary, and we see the highest pay gaps when comparing the average pay of Black employees with the rest of the workforce.[11]

---

10 Shell UK Diversity Pay Gap Report [2020], at 6.

11 *Id.*

Shell does not appear to have published any such report [if it has done the work and has one] for employees in the United States.

### Shell's knowledge concerning Lilly Ledbetter Act

21.     Shell knows, or should know, about the Lilly Ledbetter Fair Pay Restoration Act and the implications for pay practices and document retention policies. It has now been more than a decade since the Act became effective in 2009. The Act recognizes the reality that employers often hide pay discrimination from affected employees.

22.     The Act amends Title VII to clarify that pay discrimination — the unlawful employment practice — may occur at different points. It occurs not just when adopted, but also *each* time a person (1) *becomes subject* to the unlawful decision or practice or (2) is *affected* by the unlawful decision or practice.[12]  The latter may include each time wages, benefits, or other compensation is paid.  Any tainted paycheck.

---

[12] 42 U.S.C. § 2000e-5(e)(3)(A) ("For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.").

23.     At the time it becomes law, the Act is widely publicized to employers, human resources professionals, and employment attorneys. At the time, employers are advised to extend the length of time they retain documents about pay decisions. For example, an employer-side law firm publicly recommends that employers keep such documents for at least two years after employment ends.

### Shell's private practices: lower-level jobs and pay for black employees because of race

24.     Shell uses job grades with salary ranges for United States employees. The lower the job grade number, the higher the rank, prestige, and pay range. So, a lower *numbered* job grade is the *higher* job grade because it is higher in rank, prestige, and pay.  For example, job grade 1 is presumably the best and highest job grade.

25.     In 2014, Shell posts an open job opportunity for a Houston, Texas sales position at a job grade 5.[13]  The Shell Defendants offer a candidate this sales position at a job grade 5.  On information and belief, that job candidate is a white female.  She declines the offer.

---

[13] There is some indication in documents that the job grade may have been less than 5 — potentially a job grade 3.

26.     The Shell Defendants decide to offer the sales position to another candidate who has, among other qualifications and experience, an MBA with a focus on energy finance. This job candidate is a black male.

27.     Before making the offer, Shell Human Resources directs the hiring manager to prepare the offer at job grade 6 — *i.e.*, a downgrade in rank, prestige, and pay range.[14]  The hiring manager says no, we need to make a competitive offer.  The hiring manager asks something like: *Why are we taking the job grade down?*

28.     Shell Human Resources responds in essence along the lines of this:[15]

> Historically, we have found that people like this, people of color, minorities, struggle at being successful; so we're giving him a lower job grade; he needs to prove he is capable of handling a role of this significance or we would be setting him up for failure.

---

[14] At the time, this individual — the hiring manager for this position — is a Shell Trading Manager for Marketing, Sales, and Analytics.

[15] This is the gist of the response. It is not intended to be verbatim word-for-word.  The hiring manager uses the phrase *people of color* when talking to Robert years later.  In describing the human resources response, the hiring manager sometimes uses slightly different words or phrases that have the same meaning and the same gist.

The hiring manager tells her boss about this discussion — that a downgrade is happening because the new hire is black. Her boss thinks perhaps this is a misunderstanding, maybe she potentially misunderstood the words human resources used.

29.     So, the hiring manager follows up with Shell Human Resources to clarify and gets the same result. The hiring manager says something like this:

> I understood you wanted me to offer this at a lower-level [ranked and paying] job grade because he is black.

30.     Shell Human Resources confirms, responding along the lines of:

> Historically, minorities do not do well at Shell, so we do not want to set him up to fail by starting him at a higher [ranked and paying] job grade.

The hiring manager complies with this directive. The offer is accepted.

31.     The Shell Defendants start this MBA, who has energy finance, energy trading, real estate, and sales experience, with career handicaps and lower pay because he is black. That employee is Robert Dedmon. No one tells Robert what has happened. No one tells him that his pay is being set lower because he is black. No one tells him that his starting job is lower in pay range,

rank, and prestige because he is black.  No one tells him about these conversations between Shell Human Resources and the hiring manager.

## Shell's private practices: claimed investigations
## and hiding discrimination allegations from affected employees

32.    The hiring manager does as she is told, but she also emails an internal complaint and requests an investigation [into discriminatory pay]. Two basic practices for workplace investigations intended to comply with the law are (1) interview the affected employee(s) and (2) document the investigation. A book published in collaboration with the Society for Human Resource Management (SHRM), titled *The Essential Guide to Workplace Investigations* notes as much:



"**Ten Steps to a Successful Investigation** …

**5. Interview.** The heart of any investigation is gathering information; and, the most basic way to do that is by asking people questions. Typically, you'll have to interview the employee accused of wrongdoing, the employee who complained or was the victim, and any witnesses …

…

**9. Document the investigation.** Once your investigation is complete, you should write an investigation report that explains what you did and why …"

In short, interview and document.

33.     The Shell Defendants choose not to interview Robert about the hiring manager's report of discrimination. They choose to exclude Robert from any such investigation. They choose to not to tell him about it — even though it directly concerns him. No one consults him, informs him, or asks what he might know. The Shell Defendants choose to keep him in the dark.

34.     The hiring manager later hears the investigation is complete.  But she hears that the results cannot be disclosed.  Today, the Shell Defendants claim they cannot find any records of the complaint or an investigation.

## Shell's private practices: continuing discrimination

35.     The Shell Defendants continue to employ Robert, who is the only black employee on his sales team. The Shell Defendants hand him one of the most difficult groups of potential clients within his sales team. This group of potential clients involves tighter margins and tougher sells. Despite these obstacles, Robert is a top performer, and he has reached job grade 5.

36.     The allegations in this paragraph are on information and belief. The Shell Defendants' discriminatory pay practices include the following [in addition to the original downgrade in job rank, prestige, and pay range]:

✔comparatively lower annual salary raises

✔comparatively lower annual bonuses

✔keeping him at job grade 5 when should be at job grade 4 based on qualifications, tenure, performance, and experience; job grade 4 involves higher pay and bonus potential, as well as stock incentives

✔continuing effects in each paycheck due to prior discriminatory pay practices

### Shell's revelation of the first race-based job and pay decision

37.    In the summer of 2020 — in the wake of the George Floyd murder, national and local discussions about the harm from silence and inaction, and a Shell town hall meeting on these problems — the hiring manager decides to speak. The hiring manager tells Robert she has information that she cannot hold onto any longer.  She tells Robert what happened with his hire.  The down-grade because of his race.

### Shell's response to Equal Employment Opportunity Commission

38.    Robert timely files a charge of discrimination with the United States Equal Opportunity Commission ("EEOC").  The charge serves as a re-quest that the government investigate — here, job grade and pay practices in

which race or color play a role. The charge, among other things, expresses con-

cern over potential systemic discrimination and the need to find the root cause

for discriminatory job grade and pay practices.

39.    A Shell Human Resources Consultant submits a response to the

EEOC.  The Shell Defendants have an opportunity to make things right. To be

accountable as promised.  To match actions with words as promised. Shell Hu-

man Resources instead claims inability to verify whether the events occurred,

(1) per "record retention schedule and relevant legal requirements" and (2) be-

cause some involved individuals are no longer employed. It does not know. Yet,

it brands Robert as having made allegations that are "without merit."

### Shell's private practices:
### post-lawsuit continuing unlawful practices

40.    Robert is the only black employee on his team and remains at a job

grade 5.  The Shell Defendants know, or should know, that Robert has repeat-

edly expressed interest in a job grade increase [meaning a lower job grade with

higher rank, prestige, and pay range] and asked what it would take.  The gen-

eral response has been along the lines of *something has to open up first.*

41.     During 2021 [after this lawsuit was filed], a team member at job grade 4 leaves.  This exit leaves an open position to fill on the team.  In other words, the team is short one person. The Shell Defendants, through a supervisor, express a desire to find someone external to fill the position and ask team members for help in finding someone.

42.     Private communications, not disclosed to Robert at the time, take place with the only white employee on the team who is at job grade 5 [as opposed to job grade 4].  The Shell Defendants ultimately give that *existing* team member permission to apply for the vacant team position that left the team short one person.  No one informs Robert that he can apply to fill the spot.

43.     The Shell Defendants ultimately give that existing team member the position, which amounts to an upgrade to job grade 4.  This job upgrade still leaves the team short one person.  On information and belief, the Shell Defendants to this day claim to be interviewing people to replace that original team member who left [but with the advertised position changed to a lower-level job grade of 5].

44.     If a job grade increase, with no new hire, could "fill" the empty team spot, then the Shell Defendants should have considered Robert. And the

Shell Defendants likely would have selected Robert for the upgrade *if* the considerations involved qualifications, tenure, performance, experience, or other criteria *without* regard to race or historical race discrimination, such as job downgrades based on race.  The allegations here include the lead-up to giving the white team member a job upgrade, not just the job upgrade or any "filled" position.[16]

### COVERED EMPLOYERS AND EMPLOYEE, ADMITTED EMPLOYERS, JOINT EMPLOYERS, INTEGRATED ENTERPRISE

45.    An employee may have more than one employer under Title VII and Section 1981.  At all relevant times, the Shell Defendants were, and are, employers of Robert within the meaning of Title VII and Section 1981. As it concerns Robert and the issues involved in this case, the Shell Defendants are both employers per (1) their own admissions, (2) the relevant joint employer laws, and (3) the relevant single business enterprise laws.

---

[16] These allegations include events that happened after this lawsuit was filed. At the time of filing this amended complaint, this case is still early in the discovery process. As of the time of this filing, no party has served written discovery other than initial disclosures, and no party has scheduled any depositions. If discovery later shows that the Shell Defendants' conduct here is based on Robert's participation or opposition within the meaning of the law [such as filing a charge or filing the lawsuit], then that conduct would also be unlawful — *i.e.*, retaliation. But at this stage of the proceedings, the known information indicates a continued pattern of unlawful discrimination. And for some statutes like Section 1981, retaliation is just one form of unlawful discrimination.

46.     Defendant Shell Exploration & Production Company represented to the EEOC that it was, and is, Robert's employer.  It represented that Robert joined it as an employee on August 19, 2014.  Defendant Shell Trading Services Company is named in the employment offer letter as an employer. It is also the employer listed on IRS Forms W-2 for Robert.

47.     The Shell Defendants each exercised, and continue to exercise, sufficient control over terms and conditions of employment relevant to this case to be joint employers.  They also operate as an integrated employer as to the issues involved in this case, considering relevant management, operational control, employee management and control, and ownership.  And the conduct of each of them led to the violations of law in this case.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

48.     Robert exhausted all administrative remedies required as a prerequisite to filing this civil action. He timely filed a Charge of Discrimination with the EEOC. He timely filed this civil action within 90 days of receipt of an EEOC notice of right to sue.

## TIMELINESS

49.    In 2014, the Shell Defendants use Robert's race to set his hiring job grade at a lower pay range, rank, and prestige.  In 2020, Robert learns for the first time that his race was used to do so. Within a few months thereafter, Robert files a Charge of Discrimination with the EEOC concerning systemic and continuing violations of law.  The EEOC later notifies Robert of his right to sue. Robert timely files this civil action within 90 days of receiving that notice.

50.    This amended complaint addresses additional continuing violations of law that post-date the lawsuit. For Section 1981, those claims do not require administrative exhaustion. For Section 1981, *no* claims require administrative exhaustion. For Title VII, time remains to exhaust administrative remedies, if necessary after the prior charge, for continuing violations that took place after the lawsuit was filed.

51.    For the Title VII pay claims at issue, the Lilly Ledbetter Fair Pay Restoration Act governs the timeliness issue when it comes to the statute of limitations.  For the Section 1981 claims at issue, certain state law doctrines apply concerning the statute of limitations.  Those doctrines are addressed below.

### *Equitable Estoppel*

52.     The Shell Defendants concealed material facts. For example, the Shell Defendants make public-facing promises against race discrimination. Then they use Robert's race to set his hiring job pay range, rank, and prestige at a lower level.  They do so secretly — without telling Robert, who had a right to trust that his new employers would not discriminate based on race.

53.     The Shell Defendants assure Robert and the public-at-large that they are equal opportunity employers. When they receive from their own hiring manager a report of race discrimination that harms Robert, they actively hide the information from Robert, the affected employee.

54.     The Shell Defendants claim to have investigated its hiring manager's report of race discrimination.  But they say they cannot find even a single document concerning that report or claimed investigation.  If an investigation was done, they chose not to include Robert.  No one informed Robert of the race discrimination or race discrimination allegations.  And there was no reasonable means for Robert to discover this, as the information was under the Shell Defendants' control.

55.     The Shell Defendants kept Robert in the dark. They continued over the years to benefit from his work — but at a racially-suppressed pay rate, rank, and prestige level.  Until their hiring manager told him in 2020 what they had done.  And after that, Robert promptly asserted his rights.

### *Equitable Tolling*

56.     Equitable tolling has two elements: (1) diligent pursuit of rights and (2) extraordinary circumstances that stand in the way of doing so. Robert pursued his rights diligently. He filed an EEOC Charge of Discrimination within several months of hearing what had happened in 2014. Then filed this civil action within 90 days of the EEOC notifying him of his right to file suit. The circumstances that stood in the way, examples of which are outlined above, were all created and continued by the Shell Defendants.

### *Discovery Rule*

57.     The discovery rule has two elements: (1) the nature of the injury incurred is inherently undiscoverable [even though it may still be *possible* to discover] and (2) evidence of injury is objectively verifiable. The nature of this kind of injury — pay disparity because of race — is inherently undiscoverable

for an employee. Generally, that is so because private employers have and control the comparative pay information. They do not make that comparative information publicly available to employees. The Shell Defendants did not do so.

58.    The Shell Defendants certainly do not admit to employees company-wide that race plays a role in rank, prestige, and compensation. Instead, they claim to this group and the public that race does not play a role — that they are equal opportunity employers. The nature of the injury incurred is inherently undiscoverable given their activities in hiding it and their control over the people and information needed to discover it.  Evidence of injury itself is objectively verifiable since the claims here concern pay and job grade differences.

### *Continuing Tort Doctrine*

59.    A continuing tort involves wrongful conduct, inflicted over a period of time, that is repeated until desisted. The Shell Defendants usd Robert's race to suppress his starting pay and job grade is continuing to suppress his pay with each paycheck.  The discrimination is ongoing and being inflicted and repeated over time. As an active civil rights violation, it is a continuing tort.

### *Fraudulent Concealment*

60.    The elements of fraudulent concealment are (1) the existence of an underlying tort, (2) the defendant's knowledge of the tort, (3) the defendant's use of deception to conceal the tort, and (4) reasonable reliance on the deception. All fit here for the reasons referenced above. Here, there is an unlawful employment practice — race discrimination in employment.

61.    The Shell Defendants had knowledge of it, as it is *their* acts that are both intentional and unlawful. The Shell Defendants took active steps to conceal what they were doing—like making public-facing promises about diversity and inclusion while hiding that it used Robert's race to set his pay. It was reasonable for Robert to trust and rely on the Shell Defendants public-facing representations about being an equal opportunity employer.

### CLAIM FOR RELIEF [TITLE VII]: RACE AND COLOR DISCRIMINATION

62.    The abbreviated background and coverage allegations are incorporated here.

63.    The conduct described above shows that the Shell Defendants violated Title VII [42 U.S.C. § 2000e *et seq.*]—by using race and skin color as a

motivating factor in job grade and compensation practices. These unlawful employment practices are ongoing.

64.    As a result of the above, Shell caused harm to Robert—and likely many others whose compensation was similarly impacted.

e
## CLAIM FOR RELIEF [SECTION 1981]:
### RACE AND COLOR DISCRIMINATION

65.    The abbreviated background and coverage allegations are incorporated here.

66.    The conduct described above shows that the Shell Defendants violated 42 U.S.C. § 1981—by using race and skin color in job grade and compensation practices. These unlawful employment practices are ongoing. But for Robert's race, the Shell Defendants would have offered and paid him more for his work. Had Robert been white, the Shell Defendants would have offered and paid him more for his work. But for race, he would not have suffered the loss of a legally protected right.

67.    As a result of the above, Shell caused harm to Robert — and likely many others whose compensation was similarly impacted.

## EQUITABLE RELIEF

68.     Private plaintiffs and their counsel in unlawful employment practice cases act as private attorneys general to serve the ultimate purposes of civil rights laws, such as prevention and elimination of discrimination. There are systemic problems at Shell. So, there is a reasonable likelihood that the Shell Defendants will not comply with these civil rights laws in the future. There is a reasonable likelihood that the Shell Defendants will continue to use race and color as motivating factors in setting job grade and compensation terms of employment.

## PUNITIVE DAMAGES

69.     The Shell Defendants engaged in discriminatory practices with malice or with reckless indifference to the federally-protected rights of its employees, including Robert. The Shell Defendants knew better: they knew the law and violated it anyway. This complaint seeks punitive damages sufficient to punish the Shell Defendants and deter similar conduct in the future—in accordance with Title VII and Section 1981.

**ATTORNEYS' FEES**

70.    As a result of the Shell Defendants' conduct, Robert hired attorneys to represent him in pursuing the claims asserted in this case.  He seeks to recover reasonable attorneys' fees in connection with this case, including all appeals, pursuant to Title VII and Section 1981.

**CONDITIONS PRECEDENT**

71.    All conditions precedent to filing suit and to recovery on the asserted claims have occurred, been performed, or been waived.

**JURY DEMAND**

72.    Robert has requested, and continues to request, a jury trial on all issues triable of right or choice by a jury.

**REMEDIES REQUESTED**

73.    Robert respectfully requests the following remedies:

A.    judgment against defendants, jointly and severally, on all claims asserted herein;

B.   upon a finding that the Shell Defendants engaged in an unlawful employment practice or practices, appropriate injunctive relief prohibiting them from engaging in such unlawful employment practice(s) in the future—with the specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows;

C.   the following additional equitable relief:

(1)   requiring the Shell Defendants to adopt, and implement, procedures and policies better designed to ensure that race and color play no role in setting employee compensation or job grades—with the specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows;

(2)   requiring the Shell Defendants to conduct an audit designed to uncover pay disparities in compensation of black employees in the United States—with the specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows, and with the audit design approved by undersigned counsel or the Court or some other agreed individual or entity;

(3)   requiring the Shell Defendants to publish the results of the above audit on the Shell United States website;

(4)    requiring the Shell Defendants to provide training to all employees in the United States on discriminatory job grade and compensation decisions and related compliance—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows;

(5)    requiring the Shell Defendants to provide training to all employees in the United States on corrective measures and related compliance with the civil rights laws violated and following a pay disparity finding—with the training specifics to be tailored to the problems, deficiencies, and gaps that the evidence shows;

(6)    requiring the Shell Defendants to report on the manner of compliance with the terms of any final order for non-monetary equitable relief issued under the civil rights laws violated—with the reporting specifics to be tailored based on the evidence;

(7)    past and future lost compensation including benefits;

(8)    all further non-monetary equitable relief that may be appropriate based on the evidence;

(9)    prejudgment interest;

D.   compensation for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses— and, if and only if not those, nominal damages;

E.   punitive damages;

F.   reasonable attorneys' fees and costs, including (without limitation) reasonable expert fees;

G.   post-judgment interest as allowed by law;

H.   all other relief to which he may show himself justly entitled under law or in equity.

Respectfully submitted,

*/s/ Amy Gibson*

---

Ms. Amy E. Gibson
Attorney-in-Charge
Texas State Bar No. 00793801
Southern District Bar No. 20147
amy@gwfirm.com

Mr. David L. Wiley
Of Counsel
Texas State Bar No. 24029901
Southern District Bar No. 34134
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126

*and*

Ms. Amanda C. Hernandez
Of Counsel
Texas State Bar No. 24064411
Southern District Bar No. 1531045
amanda@ahfirm.com

AH Law, PLLC
5718 Westheimer, Suite 1000
Houston, Texas 77057
T: (713) 588-4359
F: (281) 572-5370

*Attorneys for Robert Dedmon*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on February 10, 2022, she filed the fore-going *Plaintiff Robert Dedmon's First Amended Complaint* with the United States District Court for the Southern District of Texas through the CM/ECF system, such that the Shell Defendants should be served with a copy of the filed document as follows:

**<u>VIA CM/ECF SYSTEM</u>**
Ms. Marlene C. Williams
marlene.williams@ogletree.com
Ogletree Deakins
500 Dallas Street, Suite 3000
Houston, Texas 77002
T: (713) 655-5769

*Attorneys for Shell Defendants*

*/s/ Amy Gibson*

_____
Amy E. Gibson