# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **ROBERT DEDMON,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **4:21-cv-03371** |
| **SHELL EXPLORATION &** | § | |
| **PRODUCTION COMPANY AND** | § | |
| **SHELL TRADING SERVICES** | § | |
| **COMPANY,** | § | **JURY DEMANDED** |
| **Defendants** | § | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART P.C.**

Marlene C. Williams
State Bar No: 24001872
500 Dallas Street, Suite 2100
Houston, Texas 77002-4709
(713) 655-5750
(713) 655-0020 (Fax)
marlene.williams@ogletreedeakins.com

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. ii

TABLE OF AUTHORITIES ........................................................................................ iv

MOTION FOR SUMMARY JUDGMENT .................................................................. 1

I.    NATURE AND STAGE OF THE PROCEEDINGS ........................................... 1

II.   STATEMENT OF MATERIAL FACTS .............................................................. 1

    A.  Shell Power Sales Team ............................................................................... 1

    B.  Shell's Job Grade and Compensation Policies ........................................... 2

    C.  Dedmon's Employment at Shell ................................................................. 2

        1.  2014 – The JG5 Position ................................................................... 2

        2.  2014 – The JG6 Position ................................................................... 3

        3.  2015 – Dedmon Is Promoted To JG5 .............................................. 6

        4.  2020 – Rangan Tells Dedmon Part of the Story About the 2014 Job Grade Change .................................................................. 7

        5.  2021 – A JG4 Position Opens in Dedmon's Group but He Does Not Apply and Blames His Manager for Not Encouraging Him ................... 8

III.  ISSUES PRESENTED ........................................................................................ 10

IV.  STANDARD OF REVIEW .................................................................................. 10

V.   ARGUMENTS & AUTHORITIES ..................................................................... 12

    A.  Dedmon Cannot Pursue Claims Under Title VII for the 2021 Promotion Decision Because It Has Not Been Administratively Exhausted and is Time Barred ....................................................................... 12

    B.  Dedmon's Pay Discrimination Claims Under Title VII and Section 1981 Are Barred Because They Are Untimely ...................................... 12

1.  The "Continuing Violations" Doctrine Does Not Apply .............................. 14

2.  The Lilly Ledbetter Fair Pay Act Also Does Not Revive Dedmon's Untimely Claims ........................................................... 16

3.  Equitable Doctrines Do Not Apply to Revive Dedmon's Untimely Claims ............................................................................ 18

C.  Dedmon's Pay Discrimination Claims Fail As A Matter of Law .................... 20

1.  Dedmon Does Not Have Direct Evidence of Discrimination ...................... 21

2.  Dedmon Cannot Make A Prima Facie Case of Race/Color Discrimination ................................................................................ 23

3.  Shell had a Legitimate, Nondiscriminatory Reason for the Job Grade/Pay Decision ............................................................ 24

4.  Dedmon Cannot Prove Pretext ........................................................ 24

D.  Dedmon's Failure to Promote Claim Fails as a Matter of Law ......................... 26

**VI.  CONCLUSION** ............................................................................... 29

**CERTIFICATE OF CONFERENCE** ........................................................... 30

**CERTIFICATE OF COMPLIANCE** ............................................................ 30

**CERTIFICATE OF SERVICE** .................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

**<u>Case(s)</u>**                                                                                                 **<u>Page(s)</u>**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505 (1986) ........................................................................ 11

*Auguster v. Vermillion Parish Sch. Bd.*,
    249 F.3d 400 (5th Cir. 2001) ...................................................................................... 24

*Banks v. East Baton Rouge Parish Sch. Bd.*,
    320 F.3d 570 (5th Cir. 2003) ...................................................................................... 20

*Black v. PanAmerican Labs., L.L.C.*,
    646 F.3d 254 (5th Cir. 2011) ...................................................................................... 21

*Blasingame v. Eli Lilly and Co.*,
    2013 WL 5707324 (S.D. Tex., Oct. 18, 2013) ........................................................... 21

*Boudreaux v. Swift Transp. Co., Inc.*,
    402 F.3d 536 (5th Cir. 2005) ...................................................................................... 11

*Bradley v. Phillips Petroleum Co.*,
    527 F. Supp.2d 661 ...................................................................................................... 19

*Bryant v. Compass Group USA, Inc.*,
    413 F.3d 471 (5th Cir. 2015) ...................................................................................... 25

*Caldwell v. Dretke*,
    429 F.3d 521 (5th Cir. 2005) ...................................................................................... 18

*Celestine v. Petroleos de Venezuella SA*,
    266 F.3d 343 (5th Cir. 2001) ...................................................................................... 28

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S. Ct. 2548 (1986) ................................................................. 10, 11

*Chamblee v. Miss. Farm Bureau Fed'n*,
    551 Fed. App'x. 757 (5th Cir. 2014) .......................................................................... 20

*Drew v. McGriff Ins. Serv. Inc.*,
    2024 WL 1096568 (S.D. Tex., Mar. 13, 2024) .......................................................... 20

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) ..................................................................... 11

*Foster v. United Rentals* (North America), Inc., No. 2:16-cv-114,
2018 WL 1474186 (S.D. Tex. March 9, 2018) ........................................... 13

*Hamic v. Harris County WC & ID No. 36*,
184 Fed. App'x 442 (5th Cir 2006) ............................................................ 14

*Heath v. Bd. of Supervisors for Southern Univ. and A&M College*,
850 F.3d 731 (5th Cir. 2017) ............................................................... 14, 15

*Hockman v. Westward Comm'ns, LLC*,
407 F.3d 317 (5th Cir. 2004) ..................................................................... 21

*Huckabay v. Moore*,
142 F.3d 233 (5th Cir.1998) ...................................................................... 15

*Igwe v. Menil Foundation*,
2020 WL 7024374 (S.D. Tex., Nov. 30, 2020) ..................................... 12, 14

*Li v. Univ. of Tex. Rio Grande Valley, No 7:15-cv-00534*,
2018 WL 706472 (S.D. Tex. Feb. 2, 2018) ................................................ 13

*Long v. Eastfield Coll.*,
88 F.3d 300 (5th Cir. 1996) ....................................................................... 21

*McCoy v. City of Shreveport*,
492 F.3d 551 (5th Cir. 2007) ............................................................... 20, 21

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.*,
934 F.3d 447 (5th Cir. 2019) ..................................................................... 20

*Minard v. ITC Deltacom Comm'ns, Inc.*,
447 F.3d 352 (5th Cir. 2006) ..................................................................... 18

*National Railroad Passenger Corp v. Morgan*,
536 US 101 (2002) ..................................................................................... 15

*Obasogie v. Harris Cty. Hosp. Dist.*,
2013 WL 6916246 (S.D. Tex. Dec. 31, 2013) ........................................... 11

*Okoye v. Univ. of Tex. Houston Health Science Ctr.*,
   245 F.3d 507 (5th Cir. 2001) ..................................................................... 24

*Pacheco v. Rice*,
   966 F.2d 904 (5th Cir. 1992) ..................................................................... 18

*Pegram v. Honeywell, Inc.*,
   361 F.3d 272 (5th Cir 2004) ..................................................................... 14

*Rachid v. Jack In The Box, Inc.*,
   376 F.3d 305 (5th Cir. 2004) ..................................................................... 20

*Reed v. Neopost USA, Inc.*,
   701 F.3d 434 (5th Cir. 2012) ..................................................................... 21

*Rhodes v. Guiberson Oil Tools Div.*,
   927 F.2d 876 (5th Cir.1991) ..................................................................... 18

*Shakleford v. Deloitte & Touche*,
   190 F.3d 403, n.2 (5th Cir. 1999) ................................................. 20, 26, 27

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993) ..................................................................... 20

*Stewart v. Mississippi Tramp. Comm'n*,
   586 F.3d 321 (5th Cir. 2009) ..................................................................... 14

*Taylor v. United Parcel Service*,
   554 F.3d 510 (5th Cir. 2008) ..................................................................... 23

*Teamah v. Applied Materials, Inc.*,
   715 Fed. App'x 343 (5th Cir. 2017) ..................................................................... 13

*Teemac v. Henderson*,
   298 F.3d 452 (5th Cir. 2002) ..................................................................... 18

*Tex. Dep't of Cnty. Affairs v. Burdine;*
   450 U.S. 248 (1981) ..................................................................... 20

*TIG Ins. Co. v. Sedgwick James of Wash.*,
   276 F.3d 754 (5th Cir. 2002) ..................................................................... 11

*Timberlake v. A.H. Robins Co.*,
    727 F.2d 1363 (5th Cir. 1984) ................................................................ 19

*Vadie v. Mississippi State Univ.*,
    218 F.3d 365, n.4 (5th Cir. 2000) ............................................................ 21

*Vaughn v. Woodforest Bank*,
    665 F.3d 632 (5th Cir. 2011) ................................................................ 24

*Wallace v. Methodist Hosp. Sys.*,
    271 F.3d 212 (5th Cir. 2001) ................................................................ 21

*Warren v. City of Tupelo*,
    332 Fed. App'x 176 (5th Cir. 2009) ........................................................ 28

*Washington v. Hemphill Indep. Sch. Dist., C.A.08-cv-1032009*,
    2009 WL 749198 (E.D. Tex., Mar. 19, 2009) ............................................ 26

*West v. Nabors Drilling, Inc.*,
    330 F.3d 379 (5th Cir. 2003) ................................................................ 21

*Willis v. Cleco Corp.*,
    749 F.3d 314 (5th Cir. 2014) ................................................................ 20

*Willis v. Coca-Cola Enterp.*,
    445 F.3d 413 (5th Cir. 2005) ................................................................ 28

*Willis v. Roche Biomed. Labs.*,
    61 F.3d 313 (5th Cir. 1995) ................................................................ 11

## Statutes & Rules                Page(s)

42 U.S.C. §1981 ................................................................................ passim

42 U.S.C. §2000e ........................................................................ 1, 12, 16-17

FED. R. CIV. P. 56 ........................................................................ 10, 11

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendants Shell Exploration & Production Company ("SEPC") and Shell Trading Services Company ("Shell Trading") (collectively "Shell" or "Company") file this Motion for Summary Judgment and respectfully show as follows:

### **I.**
### **NATURE AND STAGE OF PROCEEDINGS**

This is a suit for race/color pay discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* ("Title VII") and 42 U.S.C. §1981 ("Section 1981"). Plaintiff Robert Dedmon filed suit in Texas state court on September 10, 2021 and Shell timely removed. *See* Notice of Removal, Dkt. No. 1.   On February 16, 2022, Dedmon amended his complaint to assert an additional claim related to his non-selection for a job grade promotion in 2021. *See* First Amended Complaint, Dkt. No. 14.   Shell filed an Answer denying liability on all claims and asserting a number of defenses. *See* Answer and Affirmative and Other Defenses, Dkt. No. 15.

The parties have engaged in written discovery. Shell has taken Dedmon's deposition but Dedmon has not taken any depositions. Shell now files this Motion seeking dismissal with prejudice of all of Dedmon's claims.

### **II.**
### **STATEMENT OF MATERIAL FACTS**

#### **A. Shell Power Sales Team**

Shell Trading engages in the "buying and selling of crude oil, finished products and feedstocks, as well as trading oil futures." *See* Exhibit A, Webpage produced by Dedmon at Dedmon 000244. In connection with its trading operations, Shell employs a Power Sales

team that includes Originators who are responsible for conducting day-to-day transactions with commercial customers for their power needs.[1]  *See* Exhibit B, Deposition of Robert Dedmon, 24:13-16.   The Power Sales Team is a small group, generally comprising a Manager, a Team Lead, and Originators.  *See* Ex. B, 91:2-13.   There have been a number of reorganizations within the Power Sales Team during the period at issue in this case, but the overall composition of the group has remained fairly constant. *See* Ex. B, 91:2-13.

**B.  Shell's Job Grade and Compensation Policies**

Shell has an inverse job grade system, where a higher number reflects a lower job grade (*e.g.*, job grade 5 is higher than job grade 6).  *See* Ex. B, 85:17-24.  Each job grade has a compensation range with high and low ends within the range.  *See* Ex. B, 85:17-24.

**C.  Dedmon's Employment at Shell**

**1.  2014 – The JG5 Position**

In or around February 2014, Dedmon learned from Carl Williams, a senior level Originator at Shell at the time, about an open position on the Power Sales team.  *See* Ex. B, 19:21-21:6; 21:17-20; 67:21-68:1.   Dedmon had "very high level" discussions with Williams about the position and subsequently submitted an application.  *See* Ex. B, 22:14-23; 24:1-6.   Early in the recruiting process, Dedmon recalls email exchanges with "HR" indicating that the position was classified as job grade 5 ("JG5").  *See* Ex. B, 25:9-21; 28:15-19.   Dedmon made note of the job grade but did not ask any questions about it or

---

[1] Originators are also referred to as the Desk, Power Sales or Mid-Marketing.  *See* Ex. B, 76:7-77:2; 79:1-7.

compensation at the time, although his "own personal guess" was that the role would pay "maybe" between $115,000 and $120,000 annually. *See* Ex. B, 25:9-12, 41:3-11.

Dedmon subsequently interviewed for the position and was one of the "top three candidates," but ultimately did not receive an offer. *See* Ex. B, 29:16-23. Dedmon had email exchanges with Williams about his non-selection, including one in which Williams notified him that the Company extended an offer to another candidate. *See* Exhibit D, Dedmon 000805-806. Dedmon initially believed that the JG5 position was offered to "a white female," but later admitted that he only recalled "a female name" and did not know the individual's race. *See* Ex. B, 233:10-11, 233:13-234:8. Communications from Jennifer Hartnett, Sales Supervisor in the group at the time, indicate that the candidate declined because the parties could not reach an agreement on compensation. *See* Exhibit C at ShellDedmon_000706.

### 2. 2014 –The JG6 Position

In late March 2014, HR notified Hartnett that the "JG5 Power Sales position [she had] been trying to fill" had to be changed to a JG6 "to keep the balance of JG5's and 6's the same" within the Power Sales group because another employee had been recently promoted, which left "one less JG6" in the group since the position was initially posted. *Id*. Hartnett escalated the issue to one of her managers, Sri Rangan, who in turn escalated the issue to Beth Bowman and copied Teri Olmen and Megan Rozelle in HR. *Id*. In her message to Bowman, Rangan expressed concern about being able to fill the role as a JG6 based on the skillset required, as well as "inadvertently" "creating differences in JG & compensation that now becomes gender and other criteria specific for doing the same job."

*Id*.  Rangan further indicated that "[f]or example the person we want to make an offer to now is African American male" [sic].  *Id*.  Thus, it was Rangan who first raised Dedmon's race during the discussion about the job grade change, *after* HR had already notified Hartnett that the job grade was adjusted for business reasons due to changes in the department.

On April 2, 2014, Olmen responded to Rangan, explaining,

> the only available roles (currently) in Inside Sales are a JG6 in Houston and a JG6 in Calgary.  One of these was a result of a March 1 promotion, the other was a transfer to another Shell business . . . Our organizational design was to have 2 roles of the 15 in this group at JG6.  The structure still remains.  This group has already been through a formal Shell Job Evaluation, and changing the structure puts our recent severance actions at risk . . . So we do not have a current JG5 Inside Sales position open and will not be making an immediate offer at that level.  If someone leaves the organization, then we can discuss this option.

*See* Ex. C at ShellDedmon_000705.  Olmen, Harnett, Rangan, and Bowman continued to discuss the issue throughout April 2014, including the "roles & responsibilities between JG 4, 5 & 6 within Inside Sales."  *See* Ex. C at ShellDedmon_000714-716, ShellDedmon_000738-739, ShellDedmon_000744-745.  On April 22, 2014, Rangan expressed her frustration with "strict adherence to broad processes" related to job grade assignments within their group and her "discomfort in offering a job to a POC [person of color] candidate at a lower JG . . ," but agreed to work through the mandated HR processes.  *See* Ex. C at ShellDedmon_000716, ShellDedmon_000739.  After these exchanges, Rangan requested that they proceed with offering the JG6 role to Dedmon and consider him for a promotion when a JG5 role opened.  *See* Ex. C at ShellDedmon_000716,

ShellDedmon_000739.  On April 29, 2014, Rangan specifically described how the issue of job grades in the Power Sales group had been a concern "over the past year" – completely unrelated to Dedmon's application – and planned to work with HR to better assess the group.  *See* Ex. C at ShellDedmon_000744.

Following these communications, Rangan and Olmen had one-on-one discussions, including one where Rangan alleges Olmen "expressed concern around [Dedmon's] fit for the role . . . 'because historically POC candidates have struggled to succeed in Shell.'"  *See* Ex. C at ShellDedmon_000783-785.  On May 1, 2014, Rangan filed an ethics report complaining of Olmen's comments and notified Bowman.  *See* Ex. C at ShellDedmon_000753.  Notably, in summarizing her complaint to Bowman, Rangan never alleged that Olmen actually *changed* the job grade or compensation for the position because of Dedmon's race.  Olmen subsequently contacted Rangan by email to apologize for their misunderstanding and confirmed her commitment to Shell's Equal Opportunity policy.  *See* Ex. C at ShellDedmon_000802.  Olmen also notified Rangan that someone else would assume resourcing duties for the Power Sales team while the investigation into Rangan's complaint was pending.  *Id.*

In mid-June 2014, Kendra Williams ("Kendra"), Recruiter at Shell, invited Dedmon to meet again with Hartnett and her team about the open position.  *See* Ex. D at Dedmon 000838-848; *see also* Ex. B, 48:1-11, 19-21; 49:13-17.  Dedmon asked for clarification on whether he was "reapplying," and Kendra confirmed that a new application was necessary because the job was reposted after an internal evaluation.  *See* Ex. D at Dedmon 000839.  Dedmon confirmed that he was still interested in reapplying and subsequently received an

invitation to do so. *See* Ex. B, 50:8-22, 25. Dedmon recalls the invitation indicated that the job was "now a job grade 6" and he was aware when he re-applied that it was a lower job grade even though the role was the same as the previous JG5 role for which he interviewed. *See* Ex. B, 51:9-15; 52:3-7. Dedmon interviewed for the JG6 position but did not ask any questions about the job grade change at the time. *See* Ex. B, 52:8-10; 56:10-18, 20, 22.

Shell extended an offer to Dedmon for the JG6 role and "[t]hat's when [his] eyebrow was raised" about the job grade change. *See* Ex. B, 52:11-18; 59:14-17. Following his receipt of the offer, Dedmon asked about the job grade change and was told "that [he] applied for a job grade 6 role and that was the role [he was] being . . . offered." *See* Ex. B, 60:2-17. Dedmon did not follow up with any additional questions and testified that "nothing . . . would have prevented [him] from accepting the role," even though his eyebrow was raised about the job grade change. Dedmon subsequently accepted the JG6 role and started the position in August 2014. *See* Ex. B, 63:18-20; 76:3-6.

### 3. 2015 – Dedmon is promoted to JG5

Dedmon continued in the position at a JG6 for six months until approximately February 2015, when a team member left the group and a JG5 position opened. *See* Ex. B, 80:16-81:6. Dedmon was notified of the job opening and applied for the position, which he understood would be a job grade promotion. *See* Ex. B, 82:11-21. Dedmon was selected and accepted the promotion, which included an increase in compensation. *See* Ex. B, 84:10-14, 84:15-22. Dedmon did not have any problems with the job grade promotion or

compensation offer.  *See* Ex. B, 86:7-9.  The JG6 role that Dedmon formerly held was subsequently filled by someone else.  *See* Ex. B, 86:10-87:6, 13-19.

### 4.  2020 – Rangan Tells Dedmon Part of the Story About the 2014 Job Grade Change

In 2020, six years into his employment at Shell, Rangan reached out to Dedmon following a town hall meeting[2] and told him that in 2014 Olmen said "persons of color, black males, tend to historically struggle at Shell."[3]   *See* Ex. B, 113:2-11; 116:1-10. Rangan told Dedmon that "she replied back and said she was extremely uncomfortable with now reducing [Dedmon's] job grade to a job grade 6 strictly based on [his] race."[4] *See* Ex. B, 113:2-14.  According to Dedmon, Rangan told him Shell "then returned and said, well, no, no, it's not that . . .  you don't have a job grade 5 available now."[5]   *See* Ex. B, 113:2-16.  Rangan notified Dedmon that she filed an internal complaint at the time.  *See* Ex. B, 125:11-126:17.  Dedmon and Rangan had multiple conversations about the 2014 events and Dedmon eventually decided not to file an internal complaint at Shell but instead filed a charge of discrimination with the Equal Employment Opportunity Commission.  *See* Ex. B, 124:2-21.

---

[2] Shell held a town hall in the aftermath of George Floyd's death to discuss "what was going on in our country."  *See* Ex. B, 125:14-17.

[3] Shell believes that Rangan's account of Olmen's alleged statements constitutes inadmissible hearsay and reserves the right to object to them on that basis.  Shell offers them here in anticipation that Dedmon will try to rely on them to avoid summary judgment.  However, even if the Court considers them as evidence they do not establish a viable claim for Dedmon, as described herein.

[4] The 2014 correspondence clearly contradicts Rangan's description about how the decision to change the job grade unfolded.  Rangan's own communications with Olmen and others at the time show that the decision to change the job grade occurred *before* Rangan brought Dedmon's race into the discussion and *before* the alleged conversation between Rangan and Olmen that prompted Rangan's complaint.

[5] In contrast to this account, Rangan's email exchange in 2014 makes no mention of "black males" specifically and only refers to "POCs" generally.

### 5. 2021 – A JG4 position opens in Dedmon's group but he does not apply and blames his manager for not encouraging him

Throughout his employment, Dedmon has routinely "looked around for other jobs" within Shell on the Company's internal Open Resourcing site. *See* Ex. B, 95:3-100:6. However, in the decade he has worked there, Dedmon has only applied for one other position – a JG4 role in the Jet Fuel group that was posted in 2021. *See* Ex. B, 95:3-100:6. Dedmon was not selected for that JG4 role, but admitted that his manager, Michael Tickle, supported him in his efforts to seek new opportunities within Shell. *See* Ex. B, 104:20-105:1; 99:18-20.

In late 2021, while this lawsuit was pending, a JG4 position opened in Dedmon's group when one of his colleagues left. *See* Ex. B, 100:7-21; 117:17-118:6. Dedmon learned of the opening when Tickle emailed the entire team and asked for "help resourcing and finding someone that could be a good fit for our group" and to "make him aware" of any potential candidates. *See* Ex. B, 100:7-21. Michael Deley (White), one of Dedmon's colleagues who was also a JG5 at the time, applied for the job along with other candidates and was ultimately selected for the position. *See* Ex. B, 106:3-8; 265:12-25. Dedmon learned of Deley's selection when Tickle emailed the group to congratulate Deley. *See* Ex. B, 106:3-8. Dedmon was "caught off guard" because he had previously discussed his general interest in other opportunities with Tickle. *See* Ex. B, 106:9-17. However, Dedmon admits that he never talked to Tickle about a specific interest in the JG4 position that opened in his group, and he never submitted an application for the job. *See* Ex. B, 105:23-2.

Dedmon subsequently contacted Deley and Tickle.  *See* Ex. B, 106:9-17; 254:14-256:15.  Deley explained that he visited with Tickle about his interest in the JG4 position and subsequently applied.  *See* Ex. B, 257:14-259:3.  Although Dedmon tried to suggest that Deley needed Tickle's "permission" and that Tickle "encouraged" Deley to apply, he admitted that this was a bald assumption and that he had no information suggesting or confirming that Tickle actually encouraged or gave Deley permission to apply for role.  *See* Ex. B, 107:14-22; 258:11-259:3.  In fact, "as far as [Dedmon] know[s]," Deley simply took the initiative himself to pursue the role, which Dedmon did not do.  *See* Ex. B, 107:19-22.

When Dedmon spoke to Tickle, Tickle expressed that he "wasn't sure why [Dedmon] didn't apply" for the position.  *See* Ex. B, 106:7-17; 107:7; 108:3-5; 257:21-259:6.  Although Dedmon felt "betrayed" by Tickle, he admitted that Tickle never discouraged or prevented him from applying for the role in any respect, and never told him he could not apply himself.  *See* Ex. B, 102:4-9, 11-18; 107:7.

Dedmon continues to work at Shell.  *See* Ex. B, 15:7-14.  Throughout his employment, Dedmon has continued to receive annual salary increases as well as performance bonuses.  *See* Ex. B, 192:8-193:17.  His current manager, Tickle, is a JG2 or 3 and Dedmon and at least at least one of his White co-workers, Dougals Hund, are JG5s.  *See* Ex. B, 93:11-21.  For the years immediately preceding his claims in this case, Dedmon consistently earned more than at least one of his White colleagues with the same job grade classification.  *See* Exhibit C-1, Compensation Records.  For example, compensation records show that Dedmon consistently earned more than Douglas Hund between 2015 and 2019 (with the exception of 2019 when Hund made slightly more), and for several years

made as much or more than Michael Deley (for example, approximately $4,000 less than Deley in 2019 and approximately $20,000 more than Deley in 2020). *Id.*

Dedmon admits that no one has said anything derogatory about his race or color at any time during his employment at Shell. *See* Ex. B, 214:10-15. However, without any proof, he believes that Shell has a general policy against African American male employees and "by process of elimination" race is the only thing that explains his current job grade/compensation. *See* Ex. B, 312:14.

## III.
## ISSUES PRESENTED

The Court must decide if there is an issue of material fact as to whether:

1. Dedmon asserts a failure to promote claim under Title VII and whether it has been administratively exhausted;

2. Dedmon's pay discrimination claims under Title VII and Section 1981 are time barred;

3. Dedmon can prove that Shell discriminated against him based on his race with respect to a job grade/compensation decision made in 2014; and

4. Dedmon can prove that Shell failed in 2021 to give him a job grade promotion because of his race when he did not apply for role at issue.

## IV.
## STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-movant, the record shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548 (1986); FED. R. CIV. P. 56(a). "Importantly, 'the mere existence of *some* factual dispute will not defeat a motion for summary judgment;

Rule 56 requires that the fact dispute be genuine and material.'" *Obasogie v. Harris Cty. Hosp. Dist.,* 2013 WL 6916246, at *2 (S.D. Tex. Dec. 31, 2013) (quoting *Willis v. Roche Biomed. Labs.,* 61 F.3d 313, 315 (5th Cir. 1995)).  Facts are material when the resolution "might affect the outcome of the suit under the governing law . . ." *Willis v. Roche Biomed. Labs.,* 61 F.3d 313, 315 (5th Cir. 1995). Beliefs and unsubstantiated opinions are not competent summary judgment evidence.  *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir. 1994).  Similarly, "[c]onclusory allegations and denials, speculation, [and] improbable inferences . . ." are not sufficient to defeat summary judgment.  *TIG Ins. Co. v. Sedgwick James of Wash*., 276 F.3d 754, 759 (5th Cir. 2002); *see also Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Rather, to survive dismissal Dedmon must produce specific evidence upon which a jury could reasonably base a verdict in his favor on the claims asserted.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  If Dedmon fails to show a genuine issue of material fact on an essential element of his claims, summary judgment is warranted.  *Celotex,* 477 U.S. at 322.

As explained below, Shell is entitled to summary judgment because Dedmon's claims have not been administratively exhausted, are time barred, and/or otherwise fail as a matter of law because he cannot make a prima facie case or show pretext.

# V.
# ARGUMENT & AUTHORITIES

### A. Dedmon Cannot Pursue Claims Under Title VII for the 2021 Promotion Decision Because It Has Not Been Administratively Exhausted and is Time Barred

In deferral states like Texas, plaintiffs asserting employment discrimination claims under Title VII must first exhaust administrative remedies by filing a charge of discrimination within 300 days of the alleged discrimination. 42 U.S.C. §2000e-5(e). Claims that are not first filed with the EEOC in a timely manner are barred and must be dismissed. *Igwe v. Menil Foundation,* 2020 WL 7024374, **3-4 (S.D. Tex., Nov. 30, 2020).

In this case, there is no question that Dedmon's discrimination claim based on the 2021 promotion decision is barred under Title VII. Dedmon amended his complaint in February 2022 to add a claim about the 2021 JG4 job grade promotion, but he never filed a charge with the EEOC related to this issue. More than 300 days have passed and Dedmon cannot now bring a charge on that claim under Title VII. Accordingly, to the extent Dedmon relies on Title VII to assert his failure to promote claim that action is barred and should be dismissed.

### B. Dedmon's Pay Discrimination Claims Under Title VII and Section 1981 Are Barred Because They Are Untimely

As previously described, Title VII requires the filing of a charge of discrimination within 300 days of the alleged discriminatory act. Unlike Title VII, Section 1981 does not have an exhaustion requirement but claims must be filed within two or four years of the alleged discrimination, depending on whether they relate to events occurring at the time of

contract formation or later. *Teamah v. Applied Materials, Inc.,* 715 Fed. App'x 343, 346 (5th Cir. 2017). Under both statutes, Dedmon missed his filing deadlines by *many years*.

The events at the root of Dedmon's pay discrimination claims all occurred in 2014 when Shell made the decision regarding the JG6 classification. Dedmon admitted he was aware of the job grade change when it happened in 2014. In fact, he was concerned enough at the time that he specifically asked the Shell recruiter about it. Moreover, Dedmon believed for a period of time that a "white female" was previously offered the position at a higher job grade. All of this was more than sufficient to alert Dedmon that an alleged discriminatory act occurred. The fact that Dedmon learned from Rangan, six years later, that the decision was allegedly *motivated* by his race/color does not change the analysis.

For both Title VII and Section 1981, courts have consistently held that limitations starts to run when the plaintiff knows or reasonably should know that a discriminatory act occurred, not when he learns about an alleged discriminatory motive. *Li v. Univ. of Tex. Rio Grande Valley,* No 7:15-cv-00534, 2018 WL 706472, at *5 (S.D. Tex. Feb. 2, 2018) (citations omitted); *Foster v. United Rentals (North America), Inc.,* No. 2:16-cv-114, 2018 WL 1474186, at *3 (S.D. Tex. March 9, 2018). Here, Dedmon knew about the change in job grade/compensation (*i.e.*, the alleged discriminatory act) at the time the events unfolded in 2014, even if he did not learn of an alleged motive until years later. If he did not know, he reasonably should have known given all of the information available to him at the time, including: (1) his initial application for the JG5 role; (2) his belief that the JG5 role was previously offered to a "white female;" (3) his knowledge that the role was subsequently changed to a JG6; (4) his understanding that JG5 is higher than JG6; and (5) his "eyebrow

[being] raised" when he learned about the job grade change, which prompted him to question the change. On this record, Dedmon had more than enough information to alert him to the alleged discriminatory act. He should have filed a charge on his Title VII claim within 300 days of the date he learned of or was offered the lower job grade/compensation, and on his Section 1981 claim within two years of those events.[6] His failure to do so is fatal to his pay discrimination claims and summary judgment is appropriate.

### 1. The "Continuing Violations" Doctrine Does Not Apply

Dedmon advances various theories to excuse the extreme tardiness of his claims, including the "continuing violations" doctrine. The "continuing violations" doctrine revives otherwise time-barred claims when a pattern of unlawful employment conduct "manifests itself over time," with events occurring inside and outside limitations period. *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 279 (5th Cir 2004) (*quoting Frank v Xerox Corp*, 347 F.3d 130, 136 (5th Cir 2003)); *see also Hamic v. Harris County WC & ID No. 36*, 184 Fed. App'x 442, 447 (5th Cir 2006). The Fifth Circuit and this district have confirmed that the "continuing violations" doctrine most appropriately applies to harassment claims, where there is "a series of separate acts that collectively constitute one unlawful employment practice." *Stewart v. Mississippi Tramp. Comm'n,* 586 F.3d 321, 328 (5th Cir. 2009) (quoting *National Railroad Passenger Corp v. Morgan*, 536 US 101, 110-111 (2002)); s*ee also Heath v. Bd. of Supervisors for Southern Univ. and A&M College,* 850 F.3d 731, 735-36, 740-41 (5th Cir. 2017); *Igwe,* 2020 WL 7024374 at **3-4. In contrast,

---

[6] The two-year statute of limitations should apply here because the events at issue all occurred at the time of contract formation. However, the result is the same even if the longer four-year statute is applied – Dedmon still missed the deadline *by years*.

a discrete discriminatory act "occurs on the day it happen[s]" and is one in which the unlawfulness is determined by a "single occurrence." *National Railroad Passenger Corp v. Morgan*, 536 US 101, 110-111 (2002).   The Fifth Circuit has confirmed that job grade/compensation decisions like the one here are discrete occurrences that trigger the limitations clock on the day the job grade/compensation decision is made.  *See Huckabay v. Moore*, 142 F.3d 233, 238–39 (5th Cir.1998).

In his Complaint, Dedmon repeatedly refers to continuing violations and asserts that Shell "usd [sic] [his] race to suppress his starting pay and job grade and is continuing to suppress his pay with each paycheck."  *See* Amended Complaint, para. 59, Dkt. 14.  In other words, Dedmon claims that he continues to experience the *effects* of the discrete decision made in 2014, not that there are separate acts making up one violation of law. This is a critical flaw in his position and proves the "continuing violations" doctrine does not apply.  The 2014 decision to change the job grade to JG6 was a single, identifiable event that triggered the statute of limitations on the day it happened, or at the latest on the day the JG6 role was offered to Dedmon.  *See Heath,* 850 F.3d at 741-742 (5th Cir. 2017). Dedmon never identifies another alleged act, particularly one within the statute of limitations, that caused the job grade/compensation "suppression" about which he now complains.  Thus, even assuming Dedmon is still dealing with the effects of the 2014 decision, there is simply no dispute that those alleged effects are traceable to a discrete act that occurred in 2014.

Moreover, the summary judgment record shows that Dedmon received a job grade promotion and salary increase in February 2015, just six months after he started at Shell.

Dedmon was pleased with the promotion and admitted that he has no complaints about the decision to increase his job grade and salary, which put him in exactly the position he claims he should have had in 2014.  Dedmon has not identified any decision or event after 2015 that alleged caused a "suppression" in his job grade/compensation.  Thus, even assuming his starting pay and job grade were suppressed in any way in 2014 (which they were not), the 2015 promotion, which pleased Dedmon, was an intervening decision that makes the "continuing violations" argument moot and inapplicable.

Accordingly, the "continuing violations" doctrine is inapplicable and Dedmon's Title VII and Section 1981 pay discrimination claims should be dismissed as untimely.

## 2. The Lilly Ledbetter Fair Pay Act Also Does Not Revive Dedmon's Untimely Claims

Dedmon also attempts to use the Lilly Ledbetter Fair Pay Act as a basis to revive his untimely claims.  However, like the other theories, the Ledbetter law offers him no refuge.

In response to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co.*, Congress amended Title VII and a few other statutes (but not Section 1981) to adopt the paycheck accrual rule.  Under the Lilly Ledbetter Fair Pay Act of 2009 ("Ledbetter law"), the term "occurrence" was redefined to provide that "an unlawful employment practice occurs, with respect to the discrimination in compensation . . . when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation are paid, resulting in whole or in part from the original decision or other practice.  *See* 42 U.S.C. sec 2000e-

5(e)(3)(A) (Title VII).  Accordingly, an employee may pursue Title VII claims based on an "original" discriminatory compensation decision as long as they timely file a charge within 300 days of receiving pay "affected by application" of that original decision.

The paycheck accrual rule in the Ledbetter law does not help Dedmon for a number of reasons.  First, the Ledbetter law amended Title VII and other statutes, but did not amend Section 1981.  *See* Pub.L. No. 111-2, 123 Stat. 5.  Thus, to the extent Dedmon relies on it to revive his Section 1981 claims, that effort categorically fails.  Second, with respect to the limitations window on his pay discrimination claims under Title VII and Section 1981, there is no evidence that Dedmon was "affected by application" of the alleged 2014 discriminatory decision within 300 days of the date he filed his charge in 2020, or within two or four years of his lawsuit.  To the contrary, the record shows that Dedmon was promoted to a JG5 position with a salary increase in 2015, cutting off any argument that his job grade/compensation in 2020 were somehow tied to the 2014 decision.  To the extent Dedmon experienced any harm at all, that harm would have occurred only between August 2014 – when he claims he should have received the JG5 job grade/salary – and February 2015, when he got the exact job grade he wanted along with a salary increase.  This is well outside the 300-day window preceding Dedmon's 2020 Title VII charge of discrimination and the two or four-year windows for the Section 1981 claims he brought when he filed suit in 2021.  Moreover, Dedmon has not identified any decision after the 2015 promotion decision (about which he has no complaints) that affected any paychecks he received within the applicable limitations periods.  Accordingly, the Ledbetter law does not save Dedmon's

Title VII and Section 1981 pay discrimination claims and they should be dismissed for this additional reason.

### 3. Equitable Doctrines Do Not Apply to Revive Dedmon's Untimely Claims

Dedmon also invokes certain equitable theories, including estoppel, tolling, fraudulent concealment, and the discovery rule, to try to resuscitate his pay discrimination claims. Like the others, these theories do not help him.

Equitable estoppel and equitable tolling both involve assertions of concealment by the employer, but "[e]quitable tolling focuses on the employee's ignorance," while equitable estoppel focuses on the employer's conduct and the extent to which the employer induced the employee to "refrain from exercising his rights." *Rhodes v. Guiberson Oil Tools Div.*, 927 F.2d 876, 878 (5th Cir.1991). Equitable tolling should apply only in "rare and exceptional circumstances" and when the employee diligently pursues his rights. *Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002) (quoting *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998)); *see Caldwell v. Dretke*, 429 F.3d 521, 530 n. 23 (5th Cir. 2005); *see also Pacheco v. Rice*, 966 F.2d 904, 906–07 (5th Cir. 1992). "The party who invokes equitable estoppel and equitable tolling bears the burden of proof." *Teemac*, 298 F.3d at 457 (citing *Wilson v. Sec'y, Dep't of Veterans Affairs*, 65 F.3d 402, 404 (5th Cir.1995)). When the relevant facts are undisputed, a district court may deny equitable estoppel and equitable tolling as a matter of law. *See Minard v. ITC Deltacom Comm'ns, Inc.*, 447 F.3d 352, 358 (5th Cir. 2006).

Fraudulent concealment "resembles equitable estoppel" and should be applied only in limited circumstances when a defendant has a "fixed purpose" to fraudulently conceal

the facts that form the basis of the plaintiff's claims. *Timberlake v. A.H. Robins Co.,* 727 F.2d 1363, 1366 (5th Cir. 1984). In contrast, the discovery rule operates to defer "a cause of action until the plaintiff knew or, in the exercise of reasonable diligence, should have known of the facts giving rise to the cause of action." *Bradley v. Phillips Petroleum Co.,* 527 F. Supp.2d 661, 688 (quoting *Computer Assocs. Int'l v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex. 1996)). Like some of the other theories, the discovery rule is "a very limited exception to the statute of limitations" and should only be "permitted in those cases where the nature of the injury incurred is inherently undiscoverable and the evidence of the injury is objectively verifiable." *Id.* at 688. Both are questions of law when the underlying facts are undisputed. *Id.*

Here, there is no evidence that Shell concealed or misconstrued facts regarding the job grade/compensation offered to Dedmon in 2014, which is the only act at the root of his pay discrimination claims. Indeed, Dedmon admitted that he was aware of the job grade change in 2014, and was even concerned enough to ask questions about it because it "raised his eyebrow." He also testified that he believed the positions were the same and the original offer at the higher job grade was first made to a "white female." On this record, there is no question that Dedmon was completely aware of the fact that he was being offered and accepted the position at a lower job grade, which was different than what he believed had been offered to another candidate of a different race. Thus, there is no evidence that Dedmon was ignorant of the facts, that Shell did anything to induce him from exercising any rights he may have had related to the events in 2014, or that the facts were inherently undiscoverable to him in 2014 when the events transpired. The fact that Dedmon learned

about an alleged motive six years later is immaterial and offers no proof to support the application of these theories in this case. *See Drew v. McGriff Ins. Serv. Inc.,* 2024 WL 1096568 (S.D. Tex., Mar. 13, 2024)*.* Accordingly, Dedmon cannot rely on equitable estoppel, equitable tolling, fraudulent concealment or the discovery rule to revive his untimely pay discrimination claims and summary judgment is warranted for this additional reason.

### C. Dedmon's Pay Discrimination Claims Fail As A Matter of Law[7]

In the absence of direct evidence, Dedmon must prove his pay discrimination claims by circumstantial evidence using the "modified *McDonnell Douglas* approach." *Willis v. Cleco Corp.,* 749 F.3d 314, 317 (5th Cir. 2014); *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004); *Banks v. East Baton Rouge Parish Sch. Bd.,* 320 F.3d 570, 575 (5th Cir. 2003); *Chamblee v. Miss. Farm Bureau Fed'n,* 551 Fed. App'x. 757 (5th Cir. 2014). Under the McDonnell Douglas framework, Dedmon must first establish a prima facie case of discrimination. *Tex. Dep't of Cnty. Affairs v. Burdine;* 450 U.S. 248, 254 (1981); *McMichael v. Transocean Offshore Deepwater Drilling, Inc.,* 934 F.3d 447, 456 (5th Cir. 2019); *McCoy v. City of Shreveport,* 492 F.3d 551, 556-567 (5th Cir. 2007). If Dedmon makes a prima facie case, the burden shifts to Shell to articulate a legitimate, nondiscriminatory reason for its actions. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506-507 (1993); *McMichael,* 934 F.3d at 456; *McCoy,* 492 F.3d at 557. Shell's burden in this second phase is one of production, not persuasion, and involves no "credibility

---

[7] Dedmon's Title VII and Section 1981 claims are analyzed under the same evidentiary standard and burden-shifting framework. *Shakleford v. Deloitte & Touche,* 190 F.3d 403, n.2 (5th Cir. 1999).

assessment." *Black v. PanAmerican Labs., L.L.C.,* 646 F.3d 254, 259 (5th Cir. 2011); *West v. Nabors Drilling, Inc.,* 330 F.3d 379, 385 (5th Cir. 2003). Once Shell articulates a legitimate, nondiscriminatory reason, the burden shifts back to Dedmon to prove pretext. *Black,* 646 F.3d at 259; *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 439 (5th Cir. 2012); *McCoy,* 492 F.3d at 557. To show pretext, Dedmon must put forth substantial evidence to rebut each of the reasons Shell articulates and show that discrimination was the "but for" reason. *Hockman v. Westward Comm'ns, LLC,* 407 F.3d 317, 331 (5th Cir. 2004); *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 220 (5th Cir. 2001); *Long v. Eastfield Coll.,* 88 F.3d 300, 305 (5th Cir. 1996). Throughout this entire process, the ultimate burden of persuasion remains with Dedmon. *Reed,* 701 F.3d at 439; *Vadie v. Mississippi State Univ.,* 218 F.3d 365, 374, n.4 (5th Cir. 2000).

### 1. Dedmon Does Not Have Direct Evidence of Discrimination

Shell anticipates that Dedmon will point to Rangan's 2014 complaint and his 2020 discussion with her as direct evidence of discrimination. However, the record does not support that position for a number of reasons. Direct evidence exists only when there are documents or statements that show discriminatory motive on its face. *Blasingame v. Eli Lilly and Co.,* 2013 WL 5707324, **8-10 (S.D. Tex., Oct. 18, 2013). Stray remarks do not qualify as direct evidence of discrimination. *Id.* at *9. Here, Dedmon does not have any direct evidence of discrimination.

First, the summary judgment evidence shows that the job grade dispute between HR and the business group was due to business reasons unrelated to Dedmon personally. When Hartnett first notified HR in March 2014 that she wanted to fill the role as a JG5, HR

immediately notified her that there were no open JG5 positions at the time because of changes in the department that occurred after the original job posting.  Moreover, the business group and HR has extensive communications over a period of months about pre-existing issues with job grade classifications in the department.  Dedmon's identity, including his race, was not a part of HR's reasoning or any of the concerns that the business group had previously raised "over the past year."  In fact, Dedmon only came up in the discussion after Rangan expressed concern about job classifications in the department generally and "inadvertently" creating differences that were "gender or other criteria specific . . ."  Thus, it was Rangan who first raised Dedmon's race – not Olmen – and even then it was after HR had already informed the business group of the business need to change job grade classification.  Moreover, there is no summary judgment evidence that HR's initial reaction or its final decision had anything to do with Dedmon or his race, as opposed to the organizational issues that existed in the group at the time.  Indeed, numerous messages from Rangan at the time reflect her ongoing concern about how job grades were assigned in the group "over the past year," completely unrelated to Dedmon.

In addition, even assuming Olmen and Rangan discussed Dedmon's race at some point, the remarks Rangan attributes to Olmen were vague, stray remarks that did not cause a change in Dedmon's job grade/compensation.  To the contrary, the summary judgment record shows that the decision to change the job grade occurred prior to any discussions about Dedmon specifically and were due to organizational changes that had occurred within the department.  Moreover, the record demonstrates that Rangan complained that Olmen made a comment about "POCs" struggling at Shell in general, not that Olmen or

anyone else actually *changed* the job grade and compensation *because of* Dedmon's race. Thus, even if the Court accepts Rangan's characterization of her discussion with Olmen as reflected in the email messages they exchanged, the record clearly establishes that the job grade decision was made before Rangan brought Dedmon's race into the discussion and, therefore, was not tied to any comments Olmen may have made later in the process about POCs in general.  Accordingly, there is no direct evidence of race discrimination and *McDonnell Douglass* applies.

### 2.  Dedmon Cannot Make A Prima Facie Case of Race/Color Discrimination

To make a prima facie case of race/color pay discrimination, Dedmon must prove that he was a member of a protected class and was paid less than someone outside the protected class who performed substantially the same work.  *Taylor v. United Parcel Service,* 554 F.3d 510, 522 (5th Cir. 2008).  Here, there is no evidence that Dedmon was paid less than a non-African American employee who performed substantially the same work as a JG5 employee.  In fact, the summary judgment evidence shows that Dedmon regularly earned as much if not more than his White colleagues Hund and Deley.  To the extent Dedmon attempts to compare himself to employees with a higher job grade, that effort fails because there is no summary judgment proof to establish that they are sufficiently similar to Dedmon.  Moreover, to the extent Dedmon argues that he should have a higher job grade, that argument also fails because there is no evidence of any opening in his group for a JG4 position or higher, other than the one in 2021 for which he failed to apply.  Indeed, Dedmon had an opportunity to pursue an opening for a higher job grade in his group but failed to apply for the position. Thus, Dedmon cannot prove that he

was paid less than any similarly situated individuals and his pay discrimination claims fail at the prima facie stage.

### 3. Shell had a Legitimate, Nondiscriminatory Reason for the Job Grade/Pay Decision

Even if Dedmon could establish a prima facie case, his claims still fail because Shell had a legitimate, nondiscriminatory reason for its decision – that is, the evidence shows that JG6 job grade/compensation was set because of organizational issues in the group unrelated to Dedmon, he eventually received a job grade promotion and salary increase in 2015 when a JG5 role opened, and he has earned as much or more than similarly situated White colleagues in his group.  Thus, Shell has met its burden of production at this stage.

### 4. Dedmon Cannot Prove Pretext

Because Shell has articulated legitimate, nondiscriminatory reasons for its action, Dedmon can only avoid summary judgment if he shows that Shell's reasons are false or "unworthy of credence" and that Shell intentionally discriminated against him.  *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5th Cir. 2011); *Okoye v. Univ. of Tex. Houston Health Science Ctr.,* 245 F.3d 507, 514 (5th Cir. 2001).  The Fifth Circuit has explained that "[a]n employer's explanation is false or unworthy of credence if it is not the real reason for the employment action."  *Id.*  To meet his burden at this stage, Dedmon cannot rely on unsubstantiated opinions and beliefs but instead "must produce *substantial evidence* of pretext."  *Auguster v. Vermillion Parish Sch. Bd.,* 249 F.3d 400, 402-403 (5th Cir. 2001) (emphasis added). Courts have consistently held that "employment discrimination laws are 'not intended to be a vehicle for judicial second-guessing of business decisions, nor to . . .

*Defendants' Motion for Summary Judgment*                                    *Page 24*

transform the courts into personnel managers." *Bryant v. Compass Group USA, Inc.,* 413 F.3d 471, 478 (5th Cir. 2015) (citations omitted).  Thus, even if the Court disagrees with Shell's decision or how it handled a matter, it cannot find pretext without evidence suggesting that Shell's stated reasons are not credible and it had a discriminatory motive. *Id*.

Dedmon cannot meet his burden at the pretext stage because there is no evidence that Shell's proffered reasons are false or not credible, or that it intentionally discriminated against Dedmon.  To the contrary, the record shows that Shell had specific business reasons due to organizational changes for the job grade/compensation decision it made in 2014. Even if he disagrees with those reasons, Dedmon does not have any evidence that disproves them.  Moreover, Rangan's allegations about Olmen's comments do not demonstrate that Shell's reasons are false because the record conclusively shows that the decision to change the job grade was made before Rangan brought Dedmon's race into the discussion and before Olmen made the alleged comment about "POCs" at Shell in general.  Indeed, Rangan's own communications at the time reflect issues with the allocation of job grades within the group long before Dedmon joined.

In addition, Dedmon has never alleged or provided any testimony that his compensation was actually affected by the job grade change.  Although Dedmon claims that a "white female" was initially offered the position at a higher job grade, there is no evidence that she was actually offered a higher salary.  In fact, the record shows that the candidate rejected the offer because it was too low.  Further, there is no evidence that Dedmon's compensation during any viable period at issue in this case was lower than it

should have been because of his race, or even that he was earning less than any similarly situated JG6 or JG5 at the time.  Indeed, the record shows that Dedmon had a higher salary than White colleagues with the same job grade.  Finally, and perhaps most importantly, the summary judgment evidence shows that Dedmon received a promotion in 2015 when a JG5 role opened up, giving him the exact job grade/compensation he wanted when he applied the first time.  Thus, Dedmon's reliance on the events in 2014 as the basis for his pay discrimination claims is completely nullified by the fact that Shell gave him a job grade/compensation increase when a JG5 position was actually available in the group. Accordingly, Dedmon does not have proof of pretext to save his Title VII and Section 1981 pay discrimination claims from dismissal on summary judgment.

### D.  Dedmon's Failure to Promote Claim Fails as a Matter of Law

To make a prima facie case of discrimination for an alleged failure to promote, Dedmon must establish that: (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was denied the promotion; and (4) another employee of similar qualifications outside the protected class received the promotion.  *See Shackleford v. DeLoitte & Touche, LLP,* 190 F.3d 398, 406 (5th Cir. 1999).  Dedmon cannot make a prima facie case of failure promote if he never applied for the position at issue, unless he can show an application would have been futile.  *See Shackelford,* 190 F.3d at 406; *Washington v. Hemphill Indep. Sch. Dist.,* 9:08-cv-1032009, 2009 WL 749198, **6-7 (E.D. Tex., Mar. 19, 2009).  If Dedmon establishes a prima facie case, the burden shifts to Shell to articulate a legitimate, non-discriminatory reason for its actions.

*Shackelford,* 190 F.3d at 406.  Once Shell articulates a legitimate, non-discriminatory reason, the burden shifts to Dedmon to show pretext.  *Id.*

Dedmon cannot make a prima facie case on his failure to promote claim for one simple reason: he never applied for the 2021 JG4 position at issue.  Indeed, the summary judgment evidence conclusively establishes that Dedmon never submitted an application even though he was notified of the opening and eligible to apply.  Dedmon admits that no one prevented or discouraged him from applying.  Indeed, Dedmon testified that he applied for a JG4 job in another group around the same time, clearly proving that he was able to pursue other opportunities if he wanted to.  Although Dedmon blames his manager for not assisting him, there is no evidence that Dedmon's manager assisted any of the other candidates who applied for the position – including Deley who Dedmon acknowledged took the initiative to apply and was ultimately selected.    Dedmon's feelings of discouragement and his general desire that his manager should have helped him more because he previously expressed an interest in other opportunities are not enough to make a prima facie case.  *See Shackelford,* 190 F.3d at 406.

Moreover, Dedmon cannot demonstrate that an application would have been futile.  Despite his general complaints about an alleged policy against African American male employees at Shell, there is no evidence of any such policy and Dedmon admitted he only came up with the idea of such a policy by "a process of elimination."  In other words, the existence of such a policy is "speculative at best."  *Id.*  Moreover, the summary judgment evidence confirms that Dedmon was not deterred by any such policy because he actually applied for another job at Shell around the same time he failed to apply for the JG4 position

in his own group.  It is completely illogical for Dedmon to argue that an alleged policy across Shell made it futile for him to apply for the open position in his own group, but did not make it futile for him to apply for the position in the Jet Fuel group.  Accordingly, Dedmon's failure to promote claim fails at the prima face stage and should be dismissed.

Even assuming Dedmon could make a prima facie case, Shell has articulated a legitimate, nondiscriminatory reason for its decision; that is, Dedmon never applied for the position and the person selected did apply and was determined to be the most qualified. Because Shell has articulated a legitimate, non-discriminatory reason, Dedmon can survive summary judgment only if he proves pretext.  *Willis v. Coca-Cola Enterp.,* 445 F.3d 413, 420-421 (5th Cir. 2005).  To do so, Dedmon must show that Shell's reason is false and that the real reason for the promotion decision was his race.  *Id.* at 420-421.  Additionally, Dedmon must show that "no reasonable person . . . could have chosen [Deley] over him." *Warren v. City of Tupelo,* 332 Fed. App'x 176, 181 (5th Cir. 2009); *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 357 (5th Cir. 2001).

Dedmon has no evidence of pretext with respect to the promotion decision.  The record is clear that Dedmon never applied, that no one prevented him from applying (even if his manager did not encourage or help Dedmon to his satisfaction), and Shell selected a qualified candidate who actually submitted an application and pursued the position.  The fact that Dedmon may have previously spoken to his manager about pursing new opportunities does not raise a fact issue regarding pretext.  To the contrary, Dedmon's own testimony confirms that his manager, Tickle, supported him when he applied for another position and was surprised that Dedmon had not submitted an application for the open

position in his group.  Nothing in Title VII, Section 1981 or corresponding case law suggests or holds that Shell is accountable for Dedmon's failure to pursue the JG4 position under the facts presented here.  Accordingly, Dedmon has failed to show pretext and his failure to promote claim fails as a matter of law.

**VI.**

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendants respectfully request that the Court grant this Motion for Summary Judgment, dismiss Dedmon's claims in their entirety with prejudice, and grant them such other and further relief, both at law and in equity, to which they are justly entitled.

Respectfully submitted,

<u>/s/ Marlene C. Williams</u>
Marlene C. Williams
State Bar No: 24001872
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART P.C.
500 Dallas Street, Suite 3000
Houston, Texas 77002-4709
(713) 655-5750
(713) 655-0020 (Fax)
marlene.williams@ogletreedeakins.com

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF CONFERENCE</u>

I certify that counsel for the Parties conferred on this Motion on or about April 11, 2024, including to discuss the grounds for Shell's summary judgment motion.  Plaintiff's counsel clarified that Plaintiff was not pursing the 2021 failure to promote claim under Title VII.  However, Defendants have addressed that claim here out of an abundance of caution given that ambiguity in Plaintiff's Complaint.  The parties discussed Shell's other grounds for summary judgment but were not able to reach a resolution on disputed issues.

*/s/ Marlene C. Williams*
Marlene C. Williams

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this document conforms to the Court's requirements and this Court's Local Rules regarding word limits, subject to the Motion for Leave which has been filed in this matter. The length of this Motion, excluding the case caption, table of contents, table of authorities, signature block, and certificates, is 8,305 words.

*/s/ Marlene C. Williams*
Marlene C. Williams

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that September 24, 2024, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Southern District of Texas – Houston Division, using the electronic case files system of the court.  The electronic case files system sent a "Notice of Electronic Filing" to the following CM/ECF participants:

Ms. Amy E. Gibson
amy@gwfirm.com
Mr. David L. Wiley
david@gwfirm.com
Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923

Ms. Amanda C. Hernandez
amanda@ahfirm.com
AH Law, PLLC
5718 Westheimer, Suite 1000
Houston, Texas 77057


*/s/ Marlene C. Williams*
Marlene C. Williams