# Exhibit B

```
1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
2                     HOUSTON DIVISION

3
  Robert Dedmon,              )
4         Plaintiff,          )
                              )
5  VS.                        ) Civ. A. No. 4:21-cv-03371
                              )
6  Shell Exploration &        ) Jury Demand
   Production Company and     )
7  Shell Trading Services     )
   Company,                   )
8         Defendants.         )

9

10

   *********************************************************
11

12      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT DEDMON
                      APRIL 2, 2024
13

14 *********************************************************

15

16      ORAL AND VIDEOTAPED DEPOSITION OF ROBERT DEDMON,

17 produced as a witness at the instance of the Defendant

18 and duly sworn, was taken in the above styled and

19 numbered cause on Tuesday, April 2, 2024, from 9:35 a.m.

20 to 6:33 p.m., before ROBIN GROSS, CSR in and for the

21 State of Texas, reported by shorthand machine, at the

22 Offices of AH Law, PLLC, 5718 Westheimer, Suite 1000,

23 Houston, Texas, pursuant to the Federal Rules of Civil

24 Procedure and the provisions stated on the record

25 herein.
```

**NELL McCALLUM & ASSOCIATES, INC.**

1  Probably six months in, they changed names three or four

2  times.

3      Q.  Okay.  And so at some point --

4      A.  They were GDF --

5      Q.  -- they were GDF Suez?

6      A.  -- Suez, correct.

7      Q.  And so if we see GDF Suez on your resume, that's

8  referring to --

9      A.  That's Engie --

10      Q.  -- all of them?

11      A.  Yes, correct.

12          THE REPORTER:  Please let her finish her

13  complete question before you answer.

14          THE WITNESS:  Okay.

15          THE REPORTER:  Thank you.

16          THE WITNESS:  Sorry about that.

17          THE REPORTER:  Would you repeat your

18  question?

19          MS. WILLIAMS:  Yes.

20      Q.  (BY MS. WILLIAMS)  So if we see GDF Suez on your

21  resume, that's referring to Tractebel, Engie, all of

22  them --

23      A.  Correct.

24      Q.  -- collectively?

25          Okay.  In your work at -- let's start with

1  Affordable Power & Gas, did you interact with -- with

2  Shell in any capacity?

3      A.  At Affordable, yes, I was on the -- what we

4  consider the buy side of retail power.  So I was buying

5  my wholesale power from Shell and other companies who

6  had generation assets to sell.

7      Q.  Was there a particular group that you interacted

8  with at Shell in -- in your role at Affordable Power &

9  Gas?

10      A.  Yes, the sales mid-marketing group, the group I

11  joined once I joined Shell.

12      Q.  Is that the group that you currently work in

13  today as well?

14      A.  Correct.

15      Q.  Okay.  Do you recall -- during your time at

16  Affordable Power & Gas when you were interacting with

17  Shell, do you recall the names of the individuals that

18  you interacted with at Shell?

19      A.  Two in particular, Priscilla Partida and Michael

20  Tickle.

21      Q.  Okay.  What were your interactions with Priscilla

22  Partida in connection with the work that you did for

23  Affordable Power & Gas?

24      A.  So if I needed to actually buy power for my

25  customers or hedge my position, I would reach out to

1  several different companies to do that with my -- my bid

2  side, which is what I wanted to pay for it; and I would

3  see what their offer side was.  And I would ask them for

4  their offer for a particular strip of power.

5      Q.  And Priscilla Partida was the contact for --

6      A.  Or Michael --

7      Q.  -- that aspect --

8      A.  -- depending on who was available that day.

9      Q.  Okay.

10      A.  We all -- we'd chat on Instant Messenger a lot,

11  too, so whoever was available in that moment.

12      Q.  Okay.  So it was either of them for that --

13      A.  Correct.

14      Q.  -- type of work?

15      A.  Correct.

16      Q.  Okay.  Did you interact with Priscilla for

17  anything else other than what you've just described?

18      A.  If we had any kind of discrepancies on trades,

19  maybe something like that, but nothing outside of the

20  actual trade.

21      Q.  Okay.  What about with Michael, did you interact

22  with Michael for anything other than what you've

23  described?

24      A.  No.

25      Q.  And I don't know if I asked you this.  Why did

1  you leave Tractebel, Engie?

2      A.  Just better opportunity.  My career was still

3  growing.  I was able to go into more of a leadership

4  role, have my own team, and then actually fully manage a

5  position versus sharing a position.  I was actually able

6  to manage my own book of business.

7      Q.  And that's what you were able to do at Affordable

8  Power & Gas?

9      A.  Correct.

10      Q.  How did you find out about the position at

11  Shell -- well, what was the position that you applied

12  for at Shell in 2014?

13      A.  It was a job grade 5 power sales position.

14      Q.  And what was your understanding of the

15  responsibilities of that position?

16      A.  To interact with energy retailers, which was what

17  I was currently at Affordable, for all their energy

18  needs.  It could be power, natural gas, any type of

19  ancillary service, that, you know, was a part of the

20  power structure.  So anything power needs, I was able to

21  transact with the customers.

22      Q.  And the customers, by "customers" you mean --

23      A.  Energy --

24      Q.  -- companies like Affordable Power & Gas?

25      A.  Sorry.  Yes, correct.  Energy retailers.

18

1   Q.  And you referred to it as a UG-5 power sales
2   position.  Was that the actual title of the job?
3   A.  I'm not familiar with the actual title, but I am
4   familiar with the job grade and that, you know, the form
5   of the job where the -- what the industry states the job
6   is, power sales.  It's changed names in my ten years
7   probably three or four times.
8   Q.  What are some of the names that you've had -- or
9   that have changed over the ten years --
10  A.  It's been --
11  Q.  -- for this position?
12  A.  -- a power sales job, it's been mid-marketing,
13  and it's been origination.  All of the exact same role,
14  exact same tasks, just name change through a
15  reorganization or reshape.  New leadership comes in,
16  they just want to change the name of certain roles.
17  Q.  In your experience in the industry have you
18  encountered that before where that type of position at
19  different companies have different titles, that they are
20  effectively doing the same work?
21  A.  Yes.
22  Q.  Okay.  So that wasn't -- that's not something
23  peculiar to Shell in your experience?
24  A.  It's pretty standard across the industry,
25  leadership changes.  They come in and they have to make

19

1   change.  That's why they're brought in, and they change
2   names and positions.  That's probably one of the first
3   things they do.
4   Q.  In your time at Shell, your best recollection,
5   how many times has the position title changed?
6   A.  At least three.
7   Q.  And what titles have they been?
8   A.  I was originally power sales, then it became
9   mid-marketing, and now it's currently originator.
10  Q.  Has it ever gone by the title "sales rep"?
11  A.  That's kind of in quotations.  Power sales, sales
12  rep, those are pretty much the same name that we use.
13  Q.  Okay.  What about "trader," has that ever been
14  used for this position?
15  A.  No.
16  Q.  Okay.  That's a separate position?
17  A.  Not a trader, correct.
18  Q.  Okay.
19  A.  We could actually trade positions, but we're not
20  a trader.
21  Q.  Okay.  How did you learn about the power sales
22  position that you applied for in 2014?
23  A.  I was at a lunch -- Shell takes customers to
24  lunch, and I was the customer at Affordable -- just
25  discussing our relationship and some of our, you know,

20

1   long-term needs for power.  And I met Carl Williams, who
2   was an employee at Shell at the time.  We exchanged
3   information, then he reached out to me about a potential
4   opening at Shell.
5   Q.  Did you know Carl before this lunch meeting?
6   A.  No.
7   Q.  Do you recall approximately when the lunch
8   meeting was in relation to the time that he actually
9   reached out to you about the position?
10  A.  No, I don't.
11  Q.  Was it months or years?
12  A.  Months.
13  Q.  So if you applied for the position in the early
14  part of 2014, do you think that this meeting happened
15  sometime in 2013?
16  A.  It -- and I'm not for certain, probably late
17  2013.
18  Q.  Okay.  What specifically did Carl Williams tell
19  you when he reached out to you about the position?
20  A.  Over lunch, I try to discuss -- I try to be -- I
21  try to develop a relationship.  I don't try to discuss
22  work.  I think we do enough work day to day to not
23  always talk about work.  So I just opened up about, you
24  know, where I was from, what I want to do for a living,
25  family, things of that nature.

21

1   And he kind of caught on that being in power
2   sales/origination/mid-marketing was something that I
3   wanted to do.  So I'm assuming that he took note of that
4   because when he reached out, he said, "Hey, you know,
5   there's a position open at Shell.  I want you to, you
6   know, put your name in the hat for it."
7   Q.  So you expressed during this original lunch
8   meeting sometime around late 2013 that you might be
9   interested in a power sales position at some point in
10  your career?
11  A.  Correct.
12  Q.  And you guys didn't speak specifically about
13  applying to Shell at that time --
14  A.  No.
15  Q.  -- is that right?
16  A.  Correct.
17  Q.  Okay.  So some months later he then reached out
18  to you and said there's a power sales position open at
19  Shell?
20  A.  Correct.
21  Q.  Okay.  How did he reach out to you when he
22  communicated that there was a power sales position open
23  at Shell?
24  A.  Email.
25  Q.  Okay.  After that initial email, what was your

22

```
1   response?
2       A.  I believe I thanked him and he gave me the steps
3   on applying for Shell, let me know when that role
4   actually opened and was available for external
5   candidates to apply.
6       Q.  Between the meeting that you-all had sometime
7   around late 2013 and the email that you received from
8   him with the open power sales position, had you and Carl
9   Williams had any other communication in that period of
10  time?
11      A.  I don't believe so.  If we did talk, it was
12  merely, hey, how are you doing, just checking in,
13  nothing work related.
14      Q.  Did you speak to him at any time in this process
15  where he's reaching out to you about the power sales
16  position, about what the position was like or ask him
17  any questions in particular about the position?
18      A.  Very -- probably very high level.  There are some
19  email exchanges between Carl and I, but I knew what I
20  was getting myself into when it came to the role.  I had
21  been looking for a role like that clearly for a while.
22  So there was not much I needed to know about the actual
23  role and what the responsibilities were.  More so how to
24  apply at Shell versus, you know, what I was actually
25  applying for.
```

NELL McCALLUM & ASSOCIATES, INC.

23

```
1   Q.  Okay.  When you --
2       A.  The process to apply, how to apply.
3       Q.  When you say you knew what you were getting into,
4   what did you know you were getting into?
5       A.  The actual role, like the responsibilities of the
6   role.
7       Q.  And how did you know that?
8       A.  I've been in the industry for a very long time
9   and I understand, you know, the task and
10  responsibilities of someone on the sales side.  So.
11      Q.  Okay.  And so you think that you may have asked
12  him questions just about the application process; is
13  that right?
14      A.  Yeah, just how to actually apply.
15      Q.  Okay.  Did he -- do you recall any information he
16  gave you about the application process?
17      A.  I believe he sent me the location to where --
18  where I needed to go apply.
19      Q.  What do you mean by "location"?
20      A.  Where on Shell's website to apply for the job.
21      Q.  Okay.  And describe -- did you actually go to
22  that location to submit an application?
23      A.  I believe I did, yes.  I applied for it.  I'm
24  not -- I can't go back and go step by step on the
25  website, but I did apply for it.  I did.
```

NELL McCALLUM & ASSOCIATES, INC.

24

```
1       Q.  Do you have any recollection at all of what the
2   application process was like on the website when you
3   applied?
4       A.  Upload your resume, cover letter, questions about
5   your work history, education.  Pretty standard
6   information.
7       Q.  Do you recall there being a description of the
8   job on the website?
9       A.  Yes, there was a description of the job, correct.
10      Q.  What do --
11      A.  Tasks, duties, responsibilities, things of that
12  nature.
13      Q.  What do you recall about the description that was
14  on the website?
15      A.  Just the roles and responsibilities day-to-day
16  transacting with the customers for their power needs.
17      Q.  Did the -- did the email that Carl Williams sent
18  to you actually include the job description in that
19  email, or was he just notifying you that it's open, go
20  to the website?
21          MS. GIBSON:  Object to form.
22          You can answer.
23      A.  I'm not sure if it did or not.
24      Q.  (BY MS. WILLIAMS)  Okay.  Do you recall in the --
25  during your application process, do you recall seeing
```

NELL McCALLUM & ASSOCIATES, INC.

25

```
1   anything identifying in writing what the job grade was
2   for that position?
3       A.  I'm not sure at what point I saw job grade, but I
4   was aware of what the job grade was going into my
5   interview phase.
6       Q.  So you said you're not sure at what point you saw
7   the job grade?
8       A.  Correct.
9       Q.  Okay.  So you -- you recall seeing the job grade
10  somewhere, as opposed to someone telling you about the
11  job grade; is that right?
12      A.  Correct.  Because I wasn't familiar with Shell's
13  pay structure, so seeing JG 5 was something that wasn't
14  familiar to me.  So I thought I -- you know, hey, I need
15  to hold on to what this means.
16      Q.  Okay.  And what is your best recollection as to
17  when in the process you recall seeing JG 5 referenced
18  with respect to this position?
19      A.  We exchanged a lot of emails with HR over a
20  period of time.  It was at some point before my
21  interview.
22      Q.  And you said "we," HR, you and HR?
23      A.  Yeah.  I believe her name is Lisa Billington,
24  Tyler Ali, there were several HR representatives that
25  just send over standard procedure paperwork.  When you
```

NELL McCALLUM & ASSOCIATES, INC.

26

1  come for your interview, where to park, you know, where
2  to get your parking validated, things of that nature,
3  what floor to go to, how to badge in.  So that
4  communication.  It'll include all your information about
5  the job and that you're applying for it, but also
6  instructions on where to go, things like that.
7     Q.  Okay.  And I just want to clarify that you said
8  it was at some point before your interview, and you said
9  "we were exchanging emails" and I think you said HR; is
10  that right?
11     A.  Correct.
12     Q.  And by "HR," you're referring to Lisa Billington
13  and Tyler Ali; is that right?
14     A.  Correct, correct.
15     Q.  Anyone else?
16     A.  I don't believe so prior to.
17     Q.  So Lisa Billington and Tyler Ali with Shell HR
18  were your contact people in the HR department during the
19  application process?
20     A.  They were my -- correct, Shell contact, correct.
21  Now, if they were actually HR representatives, I'm not a
22  hundred percent sure of the actual title, but they were
23  my contacts.
24     Q.  Okay.
25     A.  Prior to interviewing.

27

1     Q.  You referred to them as HR.  So is it your
2  understanding they're HR or not?
3     A.  Yes, it's my understanding that they are part of
4  HR.
5     Q.  Other than Lisa Billington and Tyler Ali, and
6  then obviously we talked about Carl Williams referring
7  the position, did you communicate with anyone else
8  leading up to your interview at Shell?
9     A.  I don't believe so, no.
10     Q.  And at some point in the written communication --
11  I guess these were email communications, right?
12     A.  Correct.
13     Q.  Okay.
14     A.  Phone calls as well, they would call you --
15     Q.  Okay.
16     A.  -- or email you.
17     Q.  So you had phone calls with Lisa Billington?
18     A.  And Tyler, I believe, yes.
19     Q.  Okay.  I'm going to take it one -- you had phone
20  calls with Lisa Billington during the application
21  process in 2014?
22     A.  I believe so, yes.
23     Q.  And you had phone calls with Tyler Ali in 2014 --
24     A.  Yes.
25     Q.  -- during the application process?

28

1     A.  Yes.
2     Q.  Okay.  Were these phone calls about the things
3  that you've already described, just the logistics of
4  getting your application in and preparing for the
5  interview?
6     A.  Correct.
7     Q.  Okay.  Did you have phone calls with anyone else
8  leading up to your interview at Shell for that position?
9     A.  No -- well, Carl and I, as I stated before,
10  exchanged emails.
11     Q.  Okay.  Other than Lisa, Tyler, and Carl, did you
12  have phone calls with anyone else leading up to your
13  interview for the position?
14     A.  Not that I can remember, no.
15     Q.  And in the written communications with Lisa
16  and/or Tyler, you recall at some point seeing a
17  reference to JG 5 before you actually went in for the
18  interview; is that what your testimony is?
19     A.  Correct.
20     Q.  When you saw the JG 5 reference, did you have
21  questions about that when you initially saw it?
22     A.  Just personal questions about what it actually
23  meant.  I know several -- or all companies have their
24  different ways of explaining or labeling jobs when it
25  comes to job grades.

29

1     Q.  Did you ask them in writing, "What does JG 5
2  mean?"
3     A.  No, I didn't ask them in writing at that point,
4  no.
5     Q.  Did you ask them in a phone call, "What does JG 5
6  mean?"
7     A.  No.
8     Q.  At some point did you inquire as to the meaning
9  of JG 5?
10     A.  Yes, after I was offered the JG 6, I
11  questioned -- questioned at that point.
12     Q.  Okay.
13     A.  And that was a correspondence with Lisa.
14     Q.  Billington?
15     A.  Yes.
16     Q.  Okay.  So you went through the interview
17  process -- you saw JG 5 in an email and actually
18  completed the interview process for the JG 5 position;
19  is that right?
20     A.  Correct.
21     Q.  At some point you were not offered the JG 5
22  position; is that right?
23     A.  Correct.
24     Q.  And then later you were offered a JG 6 position;
25  is that correct?

38

1  the job, they were still in the process of hiring for that
2  position.  I was never told no, you did not get the job.
3  So.
4      Q.  (BY MS. WILLIAMS)  And when you say "never told
5  no," you mean by -- by whom?  Like --
6      A.  By Shell.
7      Q.  -- anyone at Shell?
8      A.  From Shell, correct.
9      Q.  Okay.  Wasn't there a communication between you
10 and Carl Williams where he told you that they went with
11 another candidate?  Do you recall that?
12     A.  I believe he -- that was communication about they
13 were thinking about other candidates.
14     Q.  Okay.  Okay.  So let's go back a bit.  So you --
15 you went in, you applied for the job grade 5 position,
16 you recall seeing JG 5 on some written communication
17 when you went in for your interviews.  Right?
18     A.  Yes, that's what I stated, correct.
19     Q.  Who -- with whom did you interview for the -- the
20 initial position?
21          MS. GIBSON:  Object to form.
22          You can answer.
23     A.  I may miss a person; but it was Chris Riley,
24 Michael Tickle, Jennifer Hartnett.  I may -- I may have
25 missed someone.

NELL McCALLUM & ASSOCIATES, INC.

39

1  Q.  (BY MS. WILLIAMS)  Okay.  Did you interview in
2  person with these individuals?
3      A.  Yes.
4      Q.  Did you have separate meetings with them or were
5  they all together meeting with you?
6      A.  We were all in the same conference room.
7      Q.  How long did the interview last?
8      A.  I don't recollect.
9      Q.  Did you ask them any questions about the job
10 ranking during that interview?
11     A.  No.
12     Q.  Did you ask anything about the compensation
13 during that interview?
14     A.  No.
15     Q.  Did you have any communications leading up to
16 your interview that provided any information on what the
17 expected compensation range for that position was?
18     A.  I'm not sure in the timeline of pre/post
19 interview, but there was communication about my current
20 salary and my current bonus structure.  There was
21 communication via email, yeah.
22     Q.  With whom?
23     A.  It was either Lisa or Tyler, but the email is
24 there.  So.
25     Q.  And what do you recall telling them about your

NELL McCALLUM & ASSOCIATES, INC.

40

1  then compensation --
2      A.  I believe it was --
3      Q.  -- salary and bonus?
4      A.  -- current compensation and bonus structure.
5      Q.  What was that?  What was your then compensation
6  or salary and bonus structure?
7      A.  Compensation was at 100,000 and bonus structure
8  was based on productivity, but a range of 5 to 20
9  percent, I believe, of base.  I don't recall the actual
10 percentage, but more of a commercial bonus scale.
11     Q.  As opposed to what?
12     A.  Just a standard percentage is your 5 percent
13 annually regardless.  It's based on production.  So
14 that's commercial scale.
15     Q.  And that's a percentage of?
16     A.  Base.
17     Q.  Of your base salary?
18     A.  Correct.
19     Q.  Okay.  Did you ask questions about the
20 compensation structure at Shell during your interview
21 with Chris, Michael, and Jennifer?
22     A.  No.
23     Q.  So during that meeting you had no understanding
24 at all as to what the compensation -- expected
25 compensation for that position was?

NELL McCALLUM & ASSOCIATES, INC.

41

1      A.  I didn't have a solid number on what the
2  compensation was for that role, no.
3      Q.  Did you have any type of idea of what it was?
4      A.  My own personal guess, I would say, was, you
5  know, educated guess on what this role could offer.
6      Q.  And what was that?
7      A.  Similar to what I was making or probably -- I
8  would say about a hundred fifteen, 120,000 maybe.
9  That's just my own personal understanding.  No Shell
10 documentation that said this is exactly what your salary
11 would be if you were hired.
12     Q.  Okay.  And so it was your personal guess that
13 that role -- the compensation range for that role was
14 somewhere between a hundred and fifteen and 120,000; is
15 that right?
16     A.  That was just a -- ballpark guess, correct.
17     Q.  Did you have any personal guesses about bonus
18 structure for that role?
19     A.  I had no idea if they were commercial or on
20 their -- commercial or not commercial.  I had no idea if
21 that actual desk was -- they could be assumed as trading
22 in some environments; they could not be assumed as
23 trading.  If you're assumed as trading, that means
24 you're on commercial bonus.  So that wasn't clearly --
25 or I didn't know in that moment if that was clearly

NELL McCALLUM & ASSOCIATES, INC.

1  status of your application --

2      A.  Just asking about --

3      Q.  I'm sorry.  Just --

4      A.  Okay.

5      Q.  -- let me finish.

6          Your communication with Tyler was about the

7  status of your application and interview and whether you

8  had gotten the job; is that right?

9      A.  Correct.

10     Q.  And Tyler -- you recall Tyler responding to you;

11  is that right?

12     A.  Yes.

13     Q.  But you don't recall what he said about the

14  status?

15     A.  I don't recall exactly what he said, no.

16     Q.  Do you recall him communicating to you as if you

17  were still under consideration for the position or if

18  the position was on hold?

19     A.  I don't recall the exact correspondence.

20     Q.  And then you said you talked to Carl to see, you

21  know, what the status was as well?

22     A.  Correct.

23     Q.  And what did Carl tell you?

24     A.  That they were still reviewing candidates and

25  that they hadn't hired anyone.

NELL McCALLUM & ASSOCIATES, INC.

---

1      Q.  Anything else that he told you?

2      A.  Not --

3          MS. GIBSON:  Object -- well, sorry, object

4  to form.

5          Go ahead.

6      A.  Not that I can remember, no.

7      Q.  (BY MS. WILLIAMS)  At some point in the process,

8  since you had not gotten any specific information about

9  the status of your application, did you assume that you

10  had not gotten the job?

11     A.  I didn't assume that I -- no, I did not assume

12  that because I had not heard an official word from Shell

13  that I was not employed -- or didn't get hired.

14     Q.  So from the time of your interview until the time

15  that you heard about the application process for the

16  JG 6 position, you thought that you were still under

17  consideration for the initial position?

18     A.  Yes.

19     Q.  And were you still interested in the position

20  through -- through that time?

21     A.  Yes.

22     Q.  Did it bother you that you didn't hear back about

23  anything or cause you any pause about taking the

24  position since you hadn't heard back?

25     A.  That I can remember, no, it didn't.

NELL McCALLUM & ASSOCIATES, INC.

---

48

1      Q.  And so at some point someone reached out to you

2  and notified you that they're -- that you have to come

3  in and apply for a JG 6 position; is that right?

4      A.  That I would need to reapply, re-interview for

5  the role.

6      Q.  Who communicated that to you?

7      A.  I'm not a hundred percent sure.

8      Q.  Would it -- do you recall if it was somebody like

9  Jennifer Hartnett on the business side or somebody like

10  Lisa on the HR side?

11     A.  It could have been both.

12     Q.  Do you recall how they communicated with you to

13  let you know you needed to reapply?

14     A.  Email and phone.

15     Q.  Okay.  And what do you recall about the email

16  communication?

17     A.  Pretty similar to the original email

18  communication, standard procedure about applying.

19     Q.  So you got an email communication that said

20  you're invited to apply for this new position?

21     A.  I believe so, yes.  It was the same, pretty much

22  the same setup as the first interview.

23     Q.  Were you surprised by that email?

24     A.  I can't recall actual emotion in that moment, no.

25     Q.  Were you confused?

NELL McCALLUM & ASSOCIATES, INC.

---

49

1      A.  Was not confused, no.

2      Q.  So you were expecting to get an email inviting

3  you to apply for another position at Shell?

4      A.  After --

5          MS. GIBSON:  Object to form.

6      A.  After a phone conversation about having to

7  reapply, I was definitely expecting, okay, let's go

8  through the process again.

9      Q.  (BY MS. WILLIAMS)  Okay.  So the phone

10  conversations came before the email communications about

11  the reapplying?

12     A.  I believe so, yes.

13     Q.  Okay.  What do you recall about the phone

14  conversations notifying you that you would have to apply

15  for the JG 6 position?

16     A.  That the role was essentially opening back up, to

17  reapply.

18     Q.  Did they give you any details about any -- any

19  changes to the role?

20     A.  No changes.

21     Q.  They told you there were no changes --

22     A.  No.

23     Q.  -- or they didn't share --

24     A.  They didn't share --

25     Q.  -- any details about it?

NELL McCALLUM & ASSOCIATES, INC.

1   A.  They didn't share any changes about details of

2   the role changing.

3   Q.  And you don't recall if this phone conversation

4   where you were initially told that you would have to

5   reapply was from Jennifer or Lisa or Tyler or someone

6   else?

7   A.  I don't recall.

8   Q.  And when you were notified that you'd have to

9   reapply, what was your response?

10  A.  I was going to reapply.

11  Q.  You told them that you would?  You confirmed that

12  you would?

13  A.  Correct.

14  Q.  Okay.  And then what was the next step after the

15  phone call?

16  A.  To reapply.  To reapply for the role.

17  Q.  Right.  You had to receive some invitation to

18  reapply, right?

19  A.  Correct, the same process from the original.

20  Q.  Okay.  So after the phone call, you received an

21  email inviting you to apply -- yeah, inviting you to

22  apply?

23         MS. GIBSON:  Object to form.

24         You can answer.

25  A.  Yes, I believe so, correct.

1   Q.  (BY MS. WILLIAMS)  Do you recall how soon after

2   the phone call you received the email?

3   A.  No.

4   Q.  And the email -- in the email regarding the

5   application, did it provide any details about the

6   position?

7   A.  I believe it did.  It was the same setup as the

8   original email:  You're applying for...

9   Q.  Do you recall in the email a reference to the job

10  grade?

11  A.  I believe that it was now a job grade 6 email,

12  correct.  A job -- sorry.  Job grade 6 role in the

13  email.

14  Q.  So you saw that in the email?

15  A.  I believe so.

16  Q.  Okay.  And earlier you testified that you didn't

17  ask questions about the job grade until after you were

18  offered the job grade 6.  So when you saw it initially

19  in the email, did you not ask questions about it?

20  A.  I -- I don't recollect asking questions about it

21  at that point.

22  Q.  Do you recall having any questions in your mind

23  about it at that point?

24  A.  I can't recall.

25         MS. GIBSON:  Object to form.

1   Q.  (BY MS. WILLIAMS)  I'm sorry?

2   A.  I can't recall.

3   Q.  So it's fair to say that when you applied for the

4   job -- when you got the email for the JG 6 position, you

5   were aware from the email communication that it was a

6   different job grade?

7   A.  I believe so.

8   Q.  And it didn't raise any questions or concerns for

9   you at that point?

10  A.  I can't recall.

11  Q.  I mean, is that something you think you would

12  remember, being concerned about a change --

13  A.  I was concerned about it when I was offered the

14  role.  That's when my eyebrow was raised.  So I could

15  have potentially missed it at that point or -- my

16  concern was raised when I was offered, when I actually

17  realized that this is not the job grade that I was

18  applying for.  So I could have missed it.

19  Q.  So now you think you may have missed it in the

20  original email?

21  A.  Missed it --

22         MS. GIBSON:  Object -- hang on.  Object to

23  form.

24         And I'm just going to say just watch the

25  tone.

1         Okay.  Go ahead.

2         MS. WILLIAMS:  My tone is fine.

3   Q.  (BY MS. WILLIAMS)  I'm asking --

4         MS. WILLIAMS:  Can you repeat my question,

5   please?

6         (Record read as requested.)

7   Q.  (BY MS. WILLIAMS)  So that's my question.

8   Earlier you said you saw it, you weren't concerned or

9   confused by it; and now you're saying you may have

10  missed it.  So I'm asking which one is it?

11  A.  Earlier -- can you repeat that, earlier I said

12  what now?

13  Q.  Earlier you said you recall seeing job grade 6 in

14  the email and you weren't concerned about it or confused

15  about it; and just now you said maybe you missed seeing

16  job grade 6 in the email.  So I'm asking which one is

17  it?  Did you miss it, or do you not recall seeing it but not

18  having any concern about it?

19         MS. GIBSON:  Object to form.

20  A.  I recall your questioning was about how I felt

21  about seeing it or how -- how that made me feel if I did

22  see it.  It was not a question of did I see it or I

23  didn't see it or if I missed it or not.

24         So I felt like that there was no emotion attached

25  to it when you asked that question.  So I'm not sure

54

1  what the next question even -- I mean, I'm not sure how

2  to answer that next question.

3     Q.  (BY MS. WILLIAMS)  So -- just so that the record

4  is clear, though, do you recall seeing a reference to

5  the job grade 6 in an email, as you testified to a few

6  minutes ago?

7     A.  I believe so, yes.

8     Q.  Okay.  Do you think you missed the reference to

9  the job grade 6 in the email, as you testified a few

10  minutes ago?

11     A.  I missed an opportunity to actually speak about

12  it or to bring it up.  Because if it was there, I should

13  have brought it up.

14     Q.  Okay.  So the -- for clarification, the missed

15  opportunity was you raising it when you saw it, not you

16  missing it altogether?

17     A.  Correct.

18     Q.  But in any event, you recall seeing it and you

19  went through the interview process having seen that it

20  was a job grade 6; is that right?

21     A.  From my recollection, yes.

22     Q.  And then so you went through -- once you got the

23  invitation, you submitted the same material that you

24  previously submitted?  Is that a fair --

25     A.  I -- I believe so.

55

1     Q.  Kind of summary -- summary.

2     A.  They -- they may have had it already and it could

3  have been a fast track process.  They could have --

4  they've already had all my information.  So it could

5  have been just a sign-in date, now here's your interview

6  setup.  I don't -- I can't recall that, going through

7  the same exact resume upload and name and all the

8  information.  They already had it.  So.

9     Q.  You just don't recall if you actually had to do

10  that again a second time?

11     A.  The full process, I know it was set up to do

12  that; but I'm not sure the key strokes, no.

13     Q.  Okay.  And so at some point you were invited to

14  come back in to interview; is that right?

15     A.  Correct.

16     Q.  With whom did you interview?

17     A.  I believe it was the same group.  Maybe Sri might

18  have been in that interview the second time.  I'm not a

19  hundred percent certain.

20     Q.  Okay.  So the same group would be Chris Riley,

21  Michael Tickle, Jennifer Hartnett?

22     A.  Priscilla Partida, she was part of that group.

23     Q.  Priscilla -- was Priscilla part of the group for

24  the second interview or the first or both?

25     A.  I can't recall which one she was in.

56

1     Q.  But she was in one, is your best recollection?

2     A.  Correct.

3     Q.  And then maybe Sri, you said?

4     A.  Yes.

5     Q.  Was Sri in one or both?

6     A.  One, I believe.

7     Q.  Do you recall which one?

8     A.  I believe the second one, but I -- that's just --

9  I'm not a hundred percent certain.

10     Q.  Okay.  And so how did the -- during the interview

11  with this group, did you-all have any discussions about

12  what happened during -- with the -- with the previous

13  role?

14     A.  No.  I was more focused on, again, interviewing

15  and trying to be hired at that point.

16     Q.  You didn't ask any questions about this role

17  compared to the previous role or any changes or

18  anything --

19          MS. GIBSON:  Object --

20     Q.  (BY MS. WILLIAMS) -- of that nature?

21          MS. GIBSON:  Object to form.

22     A.  Not that I recall, no.

23     Q.  (BY MS. WILLIAMS)  Did any of the Shell

24  representatives in the interview offer any explanation

25  or information or update about what had transpired since

57

1  your last interview?

2     A.  Not that I recall, no.

3     Q.  Did you have any information either from the

4  Shell representatives you interviewed with or from

5  someone else as to how many candidates were being

6  interviewed for this position?

7     A.  Not that I recall, no.

8     Q.  Was it your understanding that you were the only

9  candidate or did you believe there were others?

10     A.  I assumed that there would be others.

11     Q.  Was there anything that you recall that was

12  different about this interview compared to the first

13  interview?

14     A.  No.

15     Q.  And how did you feel about your performance

16  during the interview when you left?

17     A.  The exact same as my first.

18     Q.  Were you given an indication by any -- anyone at

19  Shell as to what the next steps would be after your

20  interview?

21     A.  Standard, we'll be in contact, we'll reach out.

22     Q.  Did they give you a time frame?

23     A.  Not that I can recall, no.

24     Q.  Did you have any followup discussions with anyone

25  after the interview?

58

1  A. Not that I can recall.

2  Q. And similarly, during the interview, did you-all

3  have any conversation specifically about the job grade

4  for the position?

5  A. Not during the interview, no.

6  Q. Did you-all -- during the interview, did you-all

7  have any discussions about the compensation range for

8  the position?

9  A. No.

10  Q. Did you have an understanding as to what the

11  compensation range would be for the position?

12  A. I can't recall, honestly.

13  Q. Did you have any personal guesses as to what the

14  compensation range would be for the position when you

15  interviewed for it?

16  A. I potentially could have, but I can't remember,

17  honestly.

18  Q. Was it more or less than what your personal guess

19  was for the previous position, or the same?

20  A. I would say around the same.

21  Q. When you left the interview, were you -- did you

22  think that if you were offered the position you would

23  accept it?

24  A. Yes.

25  Q. And what was the next step in the progression

59

1  after you completed the interview?

2  A. I'm -- my assumption is behind the scenes they

3  decided who they wanted to hire and reached out to the

4  candidate they wanted to hire. So I -- like normal

5  interviews, play the waiting game until you're

6  contacted.

7  Q. Do you recall how long you waited before you

8  heard back?

9  A. I don't.

10  Q. Was it weeks or months?

11       MS. GIBSON: Object to form.

12  A. I was hired in August, so it couldn't have been

13  too long, I mean.

14  Q. (BY MS. WILLIAMS) Do you recall who contacted

15  you to notify you -- well, you were offered the position

16  at some point, correct?

17  A. Yes.

18  Q. Do you recall who communicated the offer to you

19  initially?

20  A. I can't recall if the email was from Lisa or

21  Tyler. I received an email.

22  Q. Okay. And do you recall anything specific about

23  the email in terms of what the offer was?

24  A. It was standard job offer terms and next steps

25  of if you -- if you choose to accept, then here are the

60

1  steps to follow.

2  Q. What -- do you recall there being a reference to

3  the salary and the job grade in this communication?

4  A. I believe so. That's -- I believe that's when I

5  asked about the job grade designation.

6  Q. Okay. And what specifically did you ask?

7  A. Paraphrasing, I thought this was a job grade X.

8  It's now a job grade 6. What happened?

9  Q. What's the -- what's the X that you thought it

10  was?

11  A. I believe I might have said -- I think I said 5,

12  job grade 5. I can't recall exactly what I said.

13  Q. Okay. And what was the response that you got

14  about that?

15  A. That I applied for a job grade 6 role and that

16  was the role I'm being hired for -- or offered, not

17  hired at that point, offered.

18  Q. Who -- who communicated that to you?

19  A. I believe it was Lisa. Not a hundred percent

20  certain.

21  Q. Did you have any other questions about that?

22  A. I didn't have followup after that. I didn't, no.

23  Q. You did not follow up with any questions to her

24  after she told you that --

25  A. No. Sorry.

61

1  Q. I'm sorry.

2       -- that you applied for a 6 -- I'm sorry.

3  That -- that you applied for a 6 and that's the role

4  that's being offered, you didn't have any followup

5  questions for her after that?

6  A. No, not that I recall.

7  Q. Did you have any concerns in your mind about

8  that?

9  A. In that moment, nothing that would have prevented

10  me from accepting the role, because that's the role that

11  I was seeking out, had been seeking for quite some time.

12  Q. Okay. Well, I'm not limiting it in that respect.

13  So I understand that the concern may not have stopped

14  you from taking the job, but did you have any concern at

15  all at that time or questions about the change in the

16  job grade at that moment?

17  A. Honestly, I don't recall if I questioned myself

18  about that at that point. I know I asked her the

19  question, so. That was the concern at that point.

20  Q. Did you have an understanding at this point in

21  the process when you were offered the position that

22  there was any connection between job grade and

23  compensation?

24  A. I'm not a hundred percent certain, but I believe

25  I did at that point.

62

1    Q.  And so even though you had questions about the
2    change in the job grade and the fact that it might
3    impact compensation, you did not follow up and explore
4    what the issue was and why there was a change?
5    A.  No.
6    Q.  Why not?
7    A.  At that point in my career, I felt like that if
8    the opportunity presented itself to take on a role that
9    I've been wanting, that I would figure out what I
10   consider the rest once I got there.  I'd work my way, I
11   would get in there, you know, show them my worth, show
12   them my value, and work my way into the compensation
13   piece.  That's just, from an early age in life, that's
14   just how I was raised, to get in there and figure it out
15   once you get in there.
16   Q.  And so the fact that the lower job grade may have
17   also impacted the compensation wasn't something that
18   concerned you?
19   A.  In that moment, no.
20   Q.  At any moment at some point?
21        MS. GIBSON:  Object to form.
22        You can answer.
23   A.  Yes, that concerned me once I figured out that I
24   was racially discriminated against because of, you know,
25   job grade pay and all that.  Yeah, it became very -- a

63

1    very big concern.
2    Q.  (BY MS. WILLIAMS)  So for six years from 2014
3    until 2020, you didn't have any concerns about the
4    impact of your job grade on your compensation because
5    you were just going to get in there, work, and figure it
6    out; is that a fair --
7    A.  I wouldn't --
8    Q.  -- characterization?
9    A.  I wouldn't use -- not a fair characterization.
10   Q.  Okay.
11   A.  I wouldn't use "concern"; but you do start to
12   study and learn and understand in more detail how those
13   job grades and pay structures fluctuate.  So.
14        I wouldn't call it a concern.  I wasn't concerned
15   about my job.  I was just merely educating myself more
16   like anyone else would about how that growth structure
17   works.
18   Q.  Okay.  But when you accepted the job, you knew
19   that it was a job grade 6, correct?
20   A.  Correct.
21   Q.  You also understood that that was lower than the
22   job that you -- grade that you previously applied for,
23   correct?
24   A.  Correct.
25   Q.  You also understood that taking a job grade 6

64

1    position would have or could have an impact on your
2    compensation, correct?
3    A.  It could, correct.
4    Q.  And the fact that you were being offered a lower
5    job grade did not -- didn't cause you to raise any
6    questions within Shell about how that might impact the
7    compensation offer they were making to you?
8    A.  No.
9    Q.  When you interviewed the second time, did you
10   have any conversations with Carl Williams about what was
11   going on behind the scenes regarding this position?
12   A.  Carl and I talked about -- I mean, not -- I'm not
13   sure about detail.  I know that it was limited
14   information he probably could tell me.  So I wasn't
15   actively seeking out, hey, can you go look behind the
16   scenes; just asking for updates on what was going on.
17   So.
18   Q.  Okay.
19   A.  Wasn't asking anything, I don't believe, anything
20   direct about was I hired or was I -- was I not hired.
21   It was more, can you get some information about what's
22   going on.
23   Q.  Did he give you any information about what was
24   going on behind the scenes at any point?
25   A.  From what I call -- recall, he -- he mentioned

65

1    there were several candidates, they were still looking.
2    That's what I do remember.
3    Q.  That was before your second interview, right?
4    A.  That was during that entire interview process.
5    I'm not sure where that actually landed, but it was
6    during that process.
7    Q.  Did you have additional conversations with Carl
8    after you interviewed the second time?
9    A.  I'm not a hundred percent certain.  I may have
10   talked to Carl on the phone maybe once, but that was
11   more of just checking in.  But I don't believe we
12   discussed a lot about Shell.
13   Q.  What's Carl's race?
14   A.  He's black.
15   Q.  Did you and Carl have any conversations about his
16   experience as a black employee at Shell?
17   A.  No.
18   Q.  Did you ask him any questions about that?
19   A.  No.
20   Q.  Has he ever shared with you, since you first met
21   him in late 2013, what his experience as a black
22   employee at Shell has been like?
23   A.  Not that I recall, no.
24   Q.  Do you have any information about his experience
25   as a black employee at Shell?

66

1  A.  No, not that I recall.

2  Q.  I mean, you think you might have, you're just not

3  recalling it, or --

4  A.  I -- I don't believe I have any information about

5  Carl's experience at Shell.

6  Q.  Okay.  So he has never shared information with

7  you about his experience as a black employee at Shell;

8  is that right?

9  A.  I don't believe so, no.

10  Q.  And have you ever asked him any questions about

11  his experience as a black employee at Shell?

12  A.  I don't believe so, no.

13  Q.  Have you asked him any questions about the

14  experience of black employees generally at Shell, given

15  his work at Shell?

16  A.  No, I don't believe so.

17  Q.  Has he offered to you any information about the

18  experiences of black employees at Shell generally, based

19  on his experience there?

20  A.  I don't believe so, no.

21          MS. GIBSON:  Marlene, whenever you want,

22  whenever you get to a good point, can we take a

23  restroom --

24          MS. WILLIAMS:  Yeah, we can do that now.

25          MS. GIBSON:  Okay.

67

1          THE VIDEOGRAPHER:  The time is 10:50 a.m.,

2  and we are off the record.

3          (Recess from 10:50 a.m. to 11:06 a.m.)

4          THE VIDEOGRAPHER:  The time is 11:06 a.m.,

5  and we are back on the record.

6  Q.  (BY MS. WILLIAMS)  Mr. Dedmon, we just took a

7  short break.  You understand you're still under oath,

8  correct?

9  A.  Yes.

10  Q.  Before the break I think we were talking about

11  discussions you may or may not have had or information

12  you may or may not have gotten from Carl Williams.

13      Did you notify Carl that you got a job offer

14  after your second interview?

15  A.  I don't recall.  I know he was aware of it, but I

16  don't recall if I --

17  Q.  What was --

18  A.  -- if I told him or not --

19  Q.  I'm sorry.

20  A.  -- directly.

21  Q.  What was Carl's position at Shell during this

22  time frame --

23  A.  I believe he was --

24  Q.  I'm sorry.  Let me just clarify, during the 2014

25  time frame?

68

1  A.  I believe he was a senior level originator.

2  Q.  Did he work with Jennifer and Michael, to your

3  knowledge?

4  A.  They were all under the same umbrella.  So yes,

5  their jobs were functional amongst each other, correct.

6  Q.  As a senior level originator with -- was it your

7  understanding that Carl was doing similar work to the

8  work that you were coming in to do in power sales?

9  A.  No, he was not doing the day-to-day transacting

10  that power sales does.  Origination, in that title at

11  that point, was long-term structured deals.  So

12  developing the long-term relationship to sign a

13  structured deal, to where Shell becomes your financial

14  backing.  So now you're able to post to certain ISOs,

15  Shell is able to finance you -- finance your structure

16  and your deals.

17  Q.  What --

18  A.  So he does more of that setup of long-term deal

19  generation.

20  Q.  What's an ISO?

21  A.  Independent service operators, like ERCOT.  I

22  know a lot of folks in Texas are familiar with ERCOT.

23  Q.  Uh-huh.

24  A.  That's an ISO.

25  Q.  Okay.

69

1  A.  And you have to post collateral to ERCOT to be

2  able to deliver energy.

3  Q.  So that was his wheelhouse --

4  A.  Yes.

5  Q.  -- at the time?

6  A.  Long-term, long-term.

7  Q.  Okay.

8  A.  Correct.

9  Q.  Is Carl still with Shell?

10  A.  No.

11  Q.  Do you recall when he left?

12  A.  Shortly after I started, Carl informed me that he

13  was leaving.

14  Q.  Did he tell you why he was leaving?

15  A.  I believe he wanted to go back home to Jamaica

16  for a little bit and be more flexible with family.  He

17  didn't tell me exactly what he was going to do

18  employment-wise, but part of our conversation was just

19  generally speaking about going back home.  He's from

20  Jamaica.

21  Q.  Did he ever complain to you about anything that

22  happened to him at Shell?

23  A.  No.

24  Q.  Did you ever complain to him about anything that

25  happened to you at Shell?

74

1     A.  Multiple factors.

2     Q.  Okay.  So group performance is one of the

3  factors?

4     A.  Personal performance, revenue, overall what Shell

5  globally is accomplishing and doing.

6     Q.  Okay.  And when you say "revenue," do you mean

7  overall revenue for the company or revenue that you are

8  bringing in or your group is bringing in or something --

9  some combination of that?

10    A.  My -- my group in combination with -- Shell

11 Trading and my group -- what my group adds to Shell

12 Trading as a whole.

13    Q.  Okay.  So the revenue component, as you

14 understand it, is based on what Shell Trading brings in

15 and then what your group brings in to Shell Trading?

16    A.  Correct.

17    Q.  Okay.  Is there any assessment of your -- the

18 revenue that you specifically bring in, or does that

19 fall under your individual performance?

20    A.  We --

21        MS. GIBSON:  Object, form.

22        You can answer.

23    A.  As our group, we do document customer and revenue

24 brought in by customer; but that is a group number

25 evaluated by Shell, like, okay, what did senior

75

mid-marketing do for Shell and 2021.

2     Q.  (BY MS. WILLIAMS)  Okay.  Anything else, to your

3  knowledge, that is involved in calculating the bonus

4  component of your compensation?

5     A.  No.

6     Q.  Other than your base salary and your bonus, were

7  there any other components of compensation communicated

8  to you in the offer letter?

9     A.  Not that I recall.

10    Q.  Currently are there other parts of your

11 compensation, other than your base salary and your bonus

12 structure, that you receive at Shell?

13    A.  No compensation.  Shell offers to all employees a

14 Shell purchase -- stock purchase program, but that's not

15 compensation.  That's just an ability to buy Shell stock

16 at a discounted rate.  So that's not particular to my

17 job; but that is money that you're putting towards that

18 and receiving every year.

19    Q.  When have you been eligible to participate in the

20 stock purchase program?

21    A.  I believe I was always eligible.  I think I

22 started three or four years ago just allocating funds

23 towards that every year.  There may have been in the

24 beginning a period of time that you had to work there,

25 but I didn't start immediately with that program.  So

76

1  when I decided to do it, I was clearly eligible at that

2  point to do it.

3     Q.  Okay.  I think you started working in the power

4  sales position sometime in August of 2014; does that

5  sound right?

6     A.  Yes.

7     Q.  When you started in August 2014, to whom were

8  you reporting?

9     A.  So it's clearly levels.  I believe Michael Tickle

10 at that point was our team lead.  So if I had any

11 real-time, like, instant questions on the job, questions

12 about transacting, he was sitting in our group so he

13 would be my first point of contact.

14        Clearly Priscilla was there as well, and then it

15 was Sri and Jennifer Hartnett was the pecking order of

16 supervisor.  And then I'm not sure actually Jennifer's

17 actual title, but she was Sri's boss.

18    Q.  Okay.  So Jennifer was the senior most --

19    A.  Yes.

20    Q.  -- in the group at the time?

21    A.  Correct.

22    Q.  And then Sri reported to Jennifer?

23    A.  Yes.

24    Q.  And then Priscilla reported to --

25    A.  We all reported up at that point, but then there

77

1  was clearly pecking order on our actual -- we call it

2  the desk.

3     Q.  Okay.

4     A.  You know, just by, you know, tenure there.

5     Q.  Who was on the desk at that time?

6     A.  Michael Tickle, Jimmy Promobul, Priscilla,

7  myself, Patrick Frnka.  And Susan Smith was on our desk,

8  but she was located in Syracuse.  She works remote in

9  Syracuse.

10    Q.  Okay.  Do you recall what Jennifer's title was at

11 the time?

12    A.  I don't.

13    Q.  What about Sri's title?

14    A.  I don't recall her exact title.

15    Q.  Do you know what Jennifer's job grade was at the

16 time?

17    A.  I don't.

18    Q.  What about Sri's?

19    A.  I don't.

20    Q.  Okay.  Michael Tickle, do you recall if -- what

21 his specific title was at the time?

22    A.  He was power sales sales rep, but he was

23 designated as our team lead.  He may have put that in

24 his email, but it was not a -- I don't think it was an

25 official Shell title, but we assumed lead roles on that

78

```
desk.

 1    Q.  Do you know what his job grade was at the time?

 2    A.  No.

 3    Q.  And Jimmy, do you know what his title was?

 4    A.  Same as mine, sales.

 5    Q.  And what about his job grade?

 6    A.  No.

 7    Q.  Priscilla, do you know what her title and job

 8  grades were -- job grade were?

 9    A.  Title, same as mine, not sure about her job

10  grade.

11    Q.  Patrick?

12    A.  Same.

13    Q.  Do you know what his job grade was and what his

14  title was?

15    A.  Did not know job grade.  Title, same as mine.

16    Q.  Susan -- excuse me -- Susan Smith, do you know

17  what her title was?

18    A.  Same as mine, sales rep power sales.  And did not

19  know her job grade.

20    Q.  Okay.  Did we talk -- have we identified

21  everybody who was --

22    A.  Yes.

23    Q.  -- in the group at the time?

24    A.  Yes.
```

**NELL McCALLUM & ASSOCIATES, INC.**

79

```
 1    Q.  What was the name of the group?  How

 2  did you-all refer to yourselves within the organization?

 3    A.  I referred to us as power sales.  Some traders

 4  would say power sales.  Some traders, depending on their

 5  region, would say mid-marketing.  Even some of the old

 6  school traders who had been around a while would call us

 7  origination.

 8    Q.  Okay.  So even at this time, it was sort of

 9  people referred to it among these several different

10  names?

11    A.  Correct.

12    Q.  Okay.  What group was Carl in at the time?

13    A.  He was in the origination portion of our

14  umbrella.

15    Q.  That would have been considered a separate group

16  from your group, correct?

17    A.  Correct.  Yes.

18    Q.  And so did you have interaction with Jennifer

19  Hartnett on a regular basis during this time when you

20  started in the JG 6 role?

21    A.  Yes, we communicated.  I would say we spoke daily

22  because she would walk by and just check on us.  She

23  would, you know, have some meetings that she

24  participated with us; but yeah, I communicated with her

25  consistently.
```

**NELL McCALLUM & ASSOCIATES, INC.**

80

```
 1    Q.  Did you ever have any discussions with Jennifer

 2  Hartnett about your job grade or compensation when you

 3  started reporting to her in 2014?

 4    A.  Not that I'm aware of, no.

 5    Q.  What about Sri, did you interact with Sri

 6  regularly when you started in 2014?

 7    A.  About the same, correct, yes.

 8    Q.  And did you have any discussions with Sri about

 9  your job grade or your compensation when you started in

10  2014?

11    A.  We had discussions when the job grade changed,

12  correct.

13    Q.  When did it change?

14    A.  It was approximately six months after I started,

15  so 2015.

16    Q.  So you had communications with Sri about your job

17  grade changing?

18    A.  Yeah.  I believe she was the one who informed me

19  of the change.

20    Q.  And what did she tell you?

21    A.  Not sure verbatim, but there was a -- I believe

22  it was tagged as a promotion to job grade 5.

23    Q.  Okay.  Do you know if there was an -- an opening

24  that developed that led to this, or what the

25  circumstances were?
```

**NELL McCALLUM & ASSOCIATES, INC.**

81

```
 1    A.  I believe Jimmy moved over to the actual trade

 2  group.  So there was an opening.  And at that point it

 3  was clear what job grade became available, so what job

 4  grade Jimmy was at the point, at that moment, it was --

 5  you can assume that at that point, hey, job grade 5

 6  opened.  That means whoever left was a job grade 5.

 7    Q.  Right.  Okay.  That's your assumption?

 8    A.  Correct.

 9    Q.  Okay.  And so when Jimmy left, Sri came to you

10  and informed you of an opportunity for you to move into

11  a JG 5 role --

12    A.  Yes.

13    Q.  -- within the group?

14    A.  Correct.

15    Q.  Okay.  What did she tell you specifically,

16  though, about -- I mean, like --

17    A.  I can't remember the exact conversations we had

18  about it, but it was more of a promotion.

19    Q.  So she came to you and told you that you were up

20  for a promotion or you could apply for a promotion or

21  what would the process be?

22    A.  That there was availability for a job grade 5 and

23  that I earned -- earned that with my performance, that

24  that role could be mine.

25    Q.  And what did you tell her?  Were you interested
```

**NELL McCALLUM & ASSOCIATES, INC.**

82

```
1    in it?
2       A.  Yes.
3       Q.  And what did you tell her?
4       A.  Not sure exactly what I told her, but definitely
5    I was interested in it, that if you guys want to give me
6    that promotion, I'm not going to tell you no.
7       Q.  Did she give you any other details about the
8    position, with respect to compensation, for example?
9       A.  I'm not sure if there were compensation
10   discussions at that point.
11      Q.  At some point were there compensation
12   discussions?
13      A.  Yeah, compensation was disclosed at that point --
14   some point, because you have to go in and -- the Shell
15   process is I had to actually apply for that job grade
16   electronically and then be awarded that promotion
17   electronically.
18      Q.  And did you apply?
19      A.  Yes.  Or -- I clicked that I would accept that
20   role.  I'm not sure the actual application process on
21   that, but it is a process as well.
22      Q.  Do you recall participating in an interview for
23   that position?
24      A.  I -- honestly, I don't believe I did at that
25   point.  I believe it was just a promotion.
```

**NELL McCALLUM & ASSOCIATES, INC.**

83

```
1    Q.  So you know if other individuals were considered
2    for the position?
3       A.  I don't.
4           Sorry.  Correct, at that -- at that point, I did
5    not know that.
6       Q.  At that point --
7       A.  I had no idea if anybody was interviewing for it
8    or not.
9       Q.  Did you later learn that other people interviewed
10   for it?
11      A.  I believe it was disclosed that they had to go
12   through an interview process, I believe.  Shell standard
13   procedure, if you post a job, you have to actually
14   interview for that job.
15      Q.  You understand that to be a part of Shell's
16   procedure?
17      A.  Policy, yes, correct.  If a job is posted, it has
18   to be -- you have to interview for the job.
19      Q.  How did you learn -- you said it was disclosed
20   that you had -- from whom was that disclosed?
21      A.  Just through communication with the lawsuit
22   documentation, I believe it was -- I believe there was
23   names that people were interviewed for this role.
24      Q.  Okay.  So you're saying through information
25   you've seen in the lawsuit, you were aware that other
```

**NELL McCALLUM & ASSOCIATES, INC.**

84

```
1    individuals may have been interviewed for the role, but
2    you were not aware of that at that time?
3       A.  Correct, I wanted to make that --
4       Q.  Okay.  Okay, yes.
5       A.  -- distinction on those two.
6       Q.  Okay.  No, I appreciate that.  So at the time you
7    didn't know whether other people were being interviewed
8    and considered or not; is that right?
9       A.  Correct.
10      Q.  Okay.  Do you recall being officially offered the
11   promotion?
12      A.  I believe I had to accept it electronically, yes.
13      Q.  And you did that, correct?
14      A.  Correct.
15      Q.  Before you accepted it, were you aware of the
16   compensation for the role?
17      A.  I believe I was told before that, yes, what the
18   compensation would be.
19      Q.  And what was the compensation?
20      A.  I believe it was one fourteen.
21      Q.  That was the base salary?
22      A.  Yes.
23      Q.  Did -- did anything change about the -- was --
24   did the position also come with bonus opportunity?
25      A.  Yeah, the same bonus structure.
```

**NELL McCALLUM & ASSOCIATES, INC.**

85

```
1       Q.  Okay.  Same bonus structure, okay.
2           And did the title of the position change?
3       A.  No.  Title did not change.
4       Q.  Did any of your responsibilities change in the
5    role?
6       A.  No.
7       Q.  And then it was confirmed that it was a JG 5
8    position, correct?
9       A.  Correct.
10      Q.  Did you have any questions about the compensation
11   that was offered to you for this role?
12      A.  Not that I can recall, no.
13      Q.  Were you aware as to whether or not the $114,000
14   offer was within the range set for a JG 5 position?
15          MS. GIBSON:  Object to form.
16      A.  I don't believe I saw a range for that.
17      Q.  (BY MS. WILLIAMS)  Are you aware for that there's a
18   range --
19      A.  Yes.
20      Q.  -- for job -- there's a compensation range for
21   job grades?
22      A.  There is, yes, correct.
23      Q.  When did you become aware of that?
24      A.  Throughout my employment.
25      Q.  And so you made no inquiries to determine where
```

**NELL McCALLUM & ASSOCIATES, INC.**

86

1  the $114,000 salary increase fell for a job grade 5
2  position?
3      A.  No.
4      Q.  You were comfortable with the offer?
5          MS. GIBSON:  Object to form.
6      A.  I accepted the offer.
7      Q.  (BY MS. WILLIAMS)  Did you have problems with the
8  offer?
9      A.  No problem with the offer.
10     Q.  When you moved into the JG 5 role, what happened
11  with your JG 6 role?
12         MS. GIBSON:  Object to form.
13         You can answer.
14     A.  I believe it was reposted.
15     Q.  (BY MS. WILLIAMS)  And what do you mean by
16  reposted?
17     A.  Shell posted up the job that's available in our
18  group on their internal and external.
19     Q.  To receive applications?
20     A.  Correct.  Sorry, posted means -- yeah.
21     Q.  I just wanted to, for the record --
22     A.  Yeah, that's all right, yeah.
23     Q.  Yeah.  Okay.  Okay.  Do you know if anyone ever
24  filled the JG 6 role?
25     A.  I'm not sure who came before or after.  I believe

87

1  Raif may have filled that role at some point, but I know
2  Justin and Meredith also came into our group throughout
3  that process as well.  So I'm not sure where they landed
4  and which job grade they landed in.  I'm not a hundred
5  percent certain.  We had continued hiring over the next
6  couple years.
7      Q.  What's Justin's last name?
8      A.  Mody.
9      Q.  And Meredith?
10     A.  Lilley.
11     Q.  And Raif?
12     A.  Rucker.
13     Q.  Okay.  So you're saying that you know they
14  brought some new people in, but you don't know which of
15  these new people actually filled the JG 6 role that you
16  vacated --
17     A.  Correct.
18     Q.  -- is that right?
19     A.  Correct.
20     Q.  Okay.  I think you said that Michael Tickle was
21  the team lead during this time?
22     A.  I can't confirm if it was officially documented
23  that by Shell, but he was assumed amongst us as being
24  the team lead.
25     Q.  How long -- did he continue to be team lead for

88

1  you when you got the JG 5 role?
2      A.  Yes.
3      Q.  Did you continue to report to Jennifer Hartnett,
4  ultimately report to Jennifer Hartnett in the JG 5 role?
5          MS. GIBSON:  Object to form.
6      Q.  (BY MS. WILLIAMS)  Or did that change?
7      A.  At some point in my tenure there, Shell went
8  through another reorganization.  I'm not sure when
9  Jennifer was removed from our -- managing our group and
10  it became Chris Riley.  There were -- there were several
11  reorganizations within Shell.
12     Q.  Okay.  Just to help me sort of for the time
13  frame, from the time you started in 2014 until
14  approximately when was Jennifer the manager for the
15  group?
16     A.  I would say two to three years, maybe.
17     Q.  So do we want to say until about 2016-2017; is
18  that fair?
19     A.  That's fair.
20     Q.  And then after Jennifer moved, Chris Riley became
21  the manager for the group, somewhere around 2016 or
22  2017?
23     A.  Not exactly sure when that actually happened.
24  There were -- our group was, on paper, just moving
25  around.  We had different GMs come in, different people

89

1  come take over trading.  So the structure of our group
2  continued to change when it came to leadership.
3      Q.  By "GM" you mean general manager?
4      A.  Yeah.
5      Q.  Okay.
6      A.  Just overall GM of the North American trading
7  team.
8      Q.  Was Jennifer Hartnett a GM?
9      A.  I don't -- no, she wasn't.
10     Q.  Okay.  So GM is a higher level --
11     A.  Higher level --
12     Q.  -- than Jennifer Hartnett?
13     A.  -- yeah.  GM or that level comes in and makes
14  those decisions about who runs what group, and it could
15  range from anyone.  They could just place someone there
16  that had no -- that couldn't do our job but could
17  actually manage people, per se.
18     Q.  Uh-huh.
19     A.  So.
20     Q.  Okay.  But do you remember Chris Riley coming in
21  immediately after Jennifer Hartnett as the manager
22  for -- excuse me -- for your group?
23     A.  I believe he was next in line, yes.
24     Q.  Okay.  And so roughly between -- around
25  2016-2017; does that sound about right, if that's when

1  she left?
2      A.  From what I can remember, yes.
3      Q.  And how long was he manager of the group?
4      A.  Up until probably about a month ago Chris has, in
5  some functionality, been who we directly report to at a
6  higher level.
7      Q.  Okay.  So basically through present?
8      A.  Correct.
9      Q.  Okay.  And has Sri stayed in the group?
10      A.  Sri is no longer with Shell.
11      Q.  When did Sri left -- leave?  I'm sorry.
12      A.  Maybe 2021.  I'm not exactly sure when she left.
13  2021, '22, maybe.
14      Q.  Okay.  Who assumed Sri's role, if anyone, when
15  she left, within the group?
16      A.  I'm not sure.
17      Q.  Okay.
18      A.  No one for our group.
19      Q.  What is Michael Tickle's current role within the
20  group?
21      A.  He is our -- they call it a supervisor now.  I
22  would assume we report to him, then Chris Riley.  So he
23  doesn't -- he's removed himself from the day-to-day
24  transacting side and now just manages our group.
25      Q.  Michael does?

1      A.  Yes.
2      Q.  Okay.  Is it fair to -- and I'm just asking to
3  kind of get an accurate picture of this.  Is Michael in
4  a similar role vis-à-vis Chris Riley that Sri was to
5  Jennifer?
6      A.  It's correct to assume that, yes.
7      Q.  Okay.  That's --
8      A.  Hierarchy, yes.
9      Q.  And is there -- is there a leadership role within
10  the group under Michael currently?
11      A.  No.  It's just -- it kind of flattens out to...
12      Q.  The desk?
13      A.  The desk, correct.
14      Q.  Do you know who -- who is currently on the desk
15  now?
16      A.  Myself, Ken Ueng who is new to our team, Thomas
17  Jones who's also extremely new to our team.  And then
18  Patrick is still with our group.  Susan is with our
19  group.  Douglas Hund is with our group, Doug Hund.  Mike
20  Deley was with our group up until about, I would say,
21  three months ago.  He's kind of taken over an
22  origination role.  He still transacts with us day-to-day
23  as he moves away from it.
24      Q.  Anyone else?
25      A.  I believe that's it.  Just counting bodies, I

1  believe that's it.
2      Q.  Okay.
3      A.  Oh, sorry.  Jim Barker sits with us, too.
4      Q.  Okay.  What is your -- and I'm sorry if this is
5  in the record already, but we've talked about different
6  titles.  What is -- what is your current title
7  officially within the organization?
8      A.  We're considered originators now.
9      Q.  Okay.
10      A.  I think that's what is on Shell documentation.
11      Q.  Do you recall as of when you got that title?
12      A.  It's been about a year, maybe less than a year,
13  they changed those titles.
14      Q.  And then before that, was it still power sales
15  or --
16      A.  Mid-marketing was what it was called at that
17  point.
18      Q.  Okay.  Ken, what is Ken's title?
19      A.  We're all, I believe, originators.
20      Q.  Okay.  When you say we all --
21      A.  Like our -- our entire group is now considered
22  originators.
23      Q.  Okay.  So that's Ken, correct?
24      A.  All the -- all the folks that I listed.
25      Q.  Everybody that you --

1      A.  Yes.
2      Q.  There's no senior originator, junior originator,
3  nothing along those lines?
4      A.  I think there's a designation, but I'm not sure
5  who is what.  They would have to put that actually in
6  their email, you know, salutation to determine that.
7  I'm not sure if they have the junior or senior
8  designation.
9      Q.  Okay.  You're just not aware?
10      A.  Correct.
11      Q.  Okay.  Do you know for -- do you know Michael
12  Tickle's current job grade?
13      A.  Today I do know through this process.  I believe
14  it's a 3, 3 or a 2.
15      Q.  Okay.  Do you know the job grades for any of the
16  other individuals on the desk?
17      A.  As of today, yes, I do.
18      Q.  Okay.
19      A.  Douglas Hund is a 5.  I'm currently a 5.  Patrick
20  and Susan are 4s.  Mike Deley is a 4.  And those are the
21  ones that I do know.
22      Q.  Jim?
23      A.  I'm not sure about Jim.  Ken or Thomas, I'm not
24  sure about their job grades.
25      Q.  Okay.  You're not sure for Ken, Thomas, or Jim,

1  correct?

2     A.  Correct.

3     Q.  When did -- when did Ken start?  You said he's

4  new?

5     A.  He's not new to Shell, he's new to our group.

6     Q.  I see.  And Thomas?

7     A.  I believe Thomas is actually new to Shell.

8     Q.  Okay.

9     A.  He came in -- prior to us coming back from

10  working from home, Thomas joined our team.

11     Q.  And then Jim Barber [sic]?

12     A.  Jim has been at Shell a very long time, but I

13  believe in various groups.  So he was in the gas group

14  for a while.

15     Q.  Okay.

16     A.  Still doing gas and some of those gas folks

17  report to Michael.

18     Q.  Okay.  Since the promotion in 2014, the JG 5

19  promotion you got --

20     A.  Yes.  Early 2015.

21          MS. GIBSON:  Object.

22          MS. WILLIAMS:  I'm sorry?

23          MS. GIBSON:  Never mind.  He corrected you.

24          MS. WILLIAMS:  Okay.

25          MS. GIBSON:  I was going to object.

1      (BY MS. WILLIAMS)  Did I say 2014?

2     A.  Yes.

3     Q.  I'm sorry.  2015.  Thank you.  Sorry about that.

4          Have you applied for any other jobs at Shell?

5     A.  I applied for -- I believe it was jet fuel.  Jet

6  fuel is another commodity at Shell, a role there.

7     Q.  That's a different group?

8     A.  Correct.

9     Q.  Okay.  When did you apply -- what was the

10  position exactly?

11     A.  I think it was jet fuel operator -- I'm not sure

12  how they coded the name, but it was in the jet fuels

13  group.  It was similar job task to what I do in the

14  power side.  Not fully aligned, but my experience fit

15  that job pretty consistently when it comes to sales and

16  communicating with customers outside -- stakeholders

17  outside of Shell.

18     Q.  Okay.  When did you apply for the jet fuel

19  position?

20     A.  It was '23, I believe.  I think I have that

21  written down somewhere.

22     Q.  2023?

23     A.  Sorry.  Let me look.  I can tell you when.

24          Actually no, it was before then.  It was

25  twenty -- late '21.

1     Q.  Okay.  Who -- okay.  So how did you learn about

2  the jet fuel position?

3     A.  Just looking on Open Resourcing.

4     Q.  What is Open Resourcing?

5     A.  It's the -- it's an intranet or internal site

6  about jobs that are posted for Shell.

7     Q.  As an employee, you have, like --

8     A.  All -- all employees have access to that.

9     Q.  I'm just -- as an employee, you have access to

10  Open Resourcing to look at open jobs; is that right?

11     A.  Correct, yes.

12     Q.  And you can do that any time you want to?

13     A.  Yes.

14     Q.  And throughout your employment at Shell, you have

15  done that, it sounds, periodically?

16          MS. GIBSON:  Object to form.

17          I check periodically.

18     Q.  (BY MS. WILLIAMS)  I'm sorry?

19          MS. GIBSON:  You can answer.

20     A.  Yes, I check periodically.

21     Q.  (BY MS. WILLIAMS)  Okay.  And so in 2021 -- or

22  late 2021, you saw an opening for a jet fuel position

23  with similar responsibilities to what you do as an

24  originator, and applied for that position, right?

25     A.  Correct.

1     Q.  Since this was posted on -- is it actually posted

2  on Open resources [sic] where you can submit your

3  application through Open resources, or do you have to go

4  through a process where somebody invites you and you get

5  an email?

6     A.  You can actually -- because all your information

7  now, if you create your talent card, you can just click

8  a button and it populates all your talent information to

9  that posting and it's pretty quick to be able to apply.

10     Q.  Okay.

11     A.  It's -- go ahead.

12     Q.  So when you create a talent card, do you create

13  that for a specific position or do you create that

14  generally so that when a -- a position that you're

15  interested comes available, your talent card is there to

16  submit?

17     A.  Yeah, general information.

18     Q.  Okay.  And so the jet fuel position, you -- did

19  you actually go through the process of submitting an

20  application for that?

21     A.  Yeah, I applied through the --

22     Q.  Okay.  Through Open resources?

23     A.  Correct.

24     Q.  And then what happened with that application?

25     A.  I was never informed about -- I never received an

98

```
1    interview.  The only thing I had was a -- it's called a
2    Get to Know You.  So you figure out who works kind of in
3    that group, reach out just to have a lightweight
4    15-minute conversation about the group.  It's like a
5    pre-screening, I would say, for both sides, for me to
6    get more information outside of just reading it, to hear
7    someone talk about; and for them to get a feel for who I
8    am.  It's not an official interview by any stretch, just
9    a Get to Know You session.
10       Q.  Is it virtual or in person?
11       A.  Mine was on a call at that point because we were
12   still distancing ourselves.  We weren't doing a lot of
13   face-to-face activity.
14       Q.  Because of COVID?
15       A.  Yeah.
16       Q.  Okay.  Do you recall who you visited?
17       A.  I don't recall their name.
18       Q.  Was it one person?
19       A.  Yes, one person.
20       Q.  And it was a woman?
21       A.  Yes.
22       Q.  Okay.  Were you still interested in the job after
23   the get-together?
24       A.  Yes.
25       Q.  Okay.  And so what happened next?
```

99

```
1    A.  I'm assuming they hired someone for that role.  I
2    was -- I -- I just kind of at that point chalked it up
3    to I'm not a good fit for their group after the Get to
4    Know You.  I'm not sure what they decided, but I never
5    got an interview so I didn't -- I didn't push any
6    further.
7        Q.  Did you ever go back on Open Resourcing to see if
8    the job was still posted or what happened with the job?
9        A.  They hired someone for the job because it was no
10   longer posted.
11       Q.  So it's your understanding that if it's no longer
12   posted, that means they hired somebody, as opposed to
13   the position, for example, you know, just being closed?
14       A.  It's my understanding that when it's removed,
15   someone is hired for it.
16       Q.  Okay.  Do you know who was hired?
17       A.  No.
18       Q.  Do you have any complaints in this lawsuit about
19   not getting that position?
20       A.  Not that position, no.
21       Q.  Okay.  All right.  So we were talking about other
22   jobs that you applied for, the jet fuel.  Have there
23   been any other jobs that you've applied for since you've
24   been at Shell?
25       A.  I have not officially applied for other jobs, no.
```

100

```
1    Q.  Have you unofficially applied for other jobs?
2    A.  I've looked around for other jobs.  I have not
3    applied for any jobs.
4        Q.  What do you mean "looked around for other jobs"?
5        A.  Just looking on Open Resourcing to see what's
6    available.
7        Q.  Other than the jet fuel job, have there been
8    other jobs that you've seen on Open Resourcing that
9    you've been interested in?
10       A.  There was a job grade 4 in our group.  Once --
11   when Ryan -- actually, Ryan Kolkmann was a part of our
12   group at a point.  He left and that job grade 4 became
13   available.  It was emailed to us by Michael Tickle that
14   he wanted to replace that role and he needed our help
15   resourcing and finding someone that could be a good fit
16   for our group.  So that was a job that was -- after the
17   fact, I became aware that it was available for me to
18   actually apply, but it was encouraged and made very
19   clear to us that we should be helping find someone to
20   come into our group and not just merely replacing that
21   role with one of us.
22       Q.  Made clear by whom?
23       A.  Michael Tickle.
24       Q.  Okay.  So but you initially saw the job on Open
25   Resourcing?
```

101

```
1    A.  I didn't officially see the job on Open
2    Resourcing, no.
3        Q.  Was it on Open Resourcing, to your knowledge?
4        A.  After -- after Michael Deley received the role,
5    yes, I was made aware that it was out there to be
6    resourced.
7        Q.  So during the time that this JG 4 position was
8    posted, you had not been on Open Resourcing --
9        A.  No.
10       Q.  -- just kind of looking for possible positions?
11       A.  I was not looking daily.  It was maybe twice a
12   year.  I'm not sure how many times I looked, but I was
13   not just Googling all day for jobs.
14       Q.  Sure.  But I mean had you -- had you gone to Open
15   Resourcing when it was posted, it's a job that you could
16   have seen there, right, because it was posted there?
17       A.  Correct.
18       Q.  Okay.  Okay.  And you said that Michael
19   encouraged and made it clear that he wanted you-all to
20   find someone to bring into the group?
21       A.  Correct.
22       Q.  What did he say specifically?
23       A.  I don't have the email in front of me.  But
24   he asked for us to find someone because we were about --
25   it's like the flow of our group, the culture of our
```

1  group, he wanted someone that could be a good fit -- so

2  as he started to go through his hiring process, if we

3  had any candidates for -- to make him aware of that.

4      Q.  Okay.  Did he tell you that you could not apply

5  for the job?

6      A.  He didn't bring up me applying for the job at

7  all.

8      Q.  Did he tell you that you could not apply for the

9  job?

10         MS. GIBSON:  Object to form.

11     A.  No, he didn't directly tell me that.

12     Q.  (BY MS. WILLIAMS)  Did he indirectly tell you

13  that you could not apply for the job?

14     A.  He encouraged in the email for us to find someone

15  to apply for the job.

16     Q.  Okay.  Did he ever say, "but I don't want any of

17  you to apply for the job"?

18     A.  No, he did not say that.

19     Q.  When he initially notified you-all about, you

20  know, finding someone for the job, were you interested

21  in the job?

22     A.  I, in several -- we call them one-on-one

23  sessions, which is your meeting with your team leader or

24  supervisor, that I was interested in a job grade 4 role

25  and also a financial pay increase; and that if something

1  was available, that I was definitely -- wanted to apply

2  for it.

3      Q.  These are in one-on-ones that you had with

4  Michael?

5      A.  Correct.

6      Q.  Starting when?

7      A.  I'm not sure when they started, but we have those

8  once, probably twice a month.  So once every other week.

9  This dates back years now.

10     Q.  So just so that I'm clear, since you've reported

11  to Michael, you have had regular one-on-one meetings

12  with him once or twice a month where you-all talk about

13  what's going on, and then you're able to express

14  interest that you have in --

15     A.  Correct.

16     Q.  -- other opportunities, right?

17     A.  Correct.

18     Q.  When did you start expressing to Michael that you

19  were interested in other opportunities during these

20  one-on-one meetings?

21     A.  I would say as early as 2019, 2018, 2019.

22     Q.  And what -- how regularly would you communicate

23  this to him during the one-on-one meetings?

24     A.  I can't say with any consistency how regular I

25  did it, but I'm sure maybe three or four times out the

1  year I would bring it up.

2      Q.  Okay.  Did you mention this to him in connection

3  with specific positions or just a general desire to --

4  for another opportunity?

5      A.  A mixture of both, general desire and also just

6  something specific on my career, career development,

7  something currently in our role that I could continue to

8  grow.  So broad and general.

9      Q.  Okay.  And my question was probably not well

10  framed.

11         Were there specific job openings that caused you

12  to inquire about -- you know, with him about, you know,

13  promotion opportunities; or were you just having a

14  general conversation about progressing in your career?

15     A.  General conversation because he would bring up,

16  hey, you know, what do you want to do with your career?

17  That was pretty open across our entire group.  He would

18  tell us, "Hey, be thinking about, you know, your next

19  step or your next move."

20     Q.  And were there ever any occasions where

21  there was a specific job opening where you went to

22  Michael and said, "Hey, I want this opportunity.  Can

23  you support me in this opportunity?"

24     A.  Yes, the -- the jet fuel job, when you apply for

25  a role, your immediate supervisor will get email that

1  you actually apply for a role.

2      Q.  Okay.

3      A.  So I wanted to have the conversation about that

4  so it wouldn't be -- he wouldn't be caught off guard or

5  he wouldn't think that I was -- you know, trying to

6  leave the group, just, you know, out of the blue.  I

7  wanted to have a conversation about, again, this is what

8  I want to do with my career, this is kind of the

9  direction I'm looking in, and this is why I'm applying

10  for the role.

11     Q.  Okay.  Did he support you in your application for

12  the jet fuel position?

13     A.  I'm not sure on his end what he had to do.  He

14  was -- we had the conversation.  After that, I'm not

15  sure what he did with the information.

16     Q.  Did he say anything in your conversations with

17  him that suggested to you that he was not supportive of

18  your interest in the position?

19     A.  No.

20     Q.  What job -- and I'm sorry if I asked this.  What

21  was the job grade for the jet fuel?

22     A.  I believe it was a 4.

23     Q.  Okay.  Other than the jet fuel job, did you ever

24  have conversations with Michael Tickle about your desire

25  for other opportunities in relation to a specific

1    position that was open.

2         A.  No.

3         Q.  Okay.  And then you said you found out after the

4    fact that -- I guess you found out that Michael Deley

5    actually got the JG 4 position that Kolkmann vacated in

6    your group, right?

7         A.  Correct.  We were notified via email to

8    congratulate Michael Deley on accepting a new role.

9         Q.  Okay.  And how did you respond to that?

10        A.  I was -- I was really caught off guard because I

11   had made several attempts to let Michael Tickle know

12   that if something like that was available, that -- you

13   know, let's have a conversation about it.  And if he was

14   the hiring manager and knew that I was looking and that

15   that's something I wanted to do, we could have that

16   conversation.  And his response to me was "I wasn't sure

17   why you didn't apply."

18        Q.  So he seemed confused that -- about the fact that

19   you didn't apply?

20        A.  You can call it confusion if you -- I didn't call

21   it confusion.

22        Q.  What was it, what --

23        A.  To me --

24        Q.  -- do you call it?

25        A.  -- I felt like it was betrayal.

1         Q.  Okay.

2         A.  Because if you know, based on several

3    conversations we had, that that's exactly what I was

4    looking for, that you would have spoken up that I could

5    have actually applied for it, because -- excuse me --

6    because you were the person hiring for that role.

7         Q.  Do you know if he had any conversations with

8    Michael Deley where he spoke up to him and told him

9    directly to apply for the position?

10        A.  I don't know if they had direct conversations

11   about it, no.

12        Q.  Do you know if they had indirect conversations?

13        A.  I'm not aware of any conversations they had.

14        Q.  So you're -- you can't say that Michael Deley --

15   I'm sorry -- that Michael Tickle encouraged Michael

16   Deley to apply for that role because you're not aware if

17   that actually took place, right?

18        A.  I'm not aware of that.

19        Q.  And, in fact, Michael Deley may have just taken

20   the initiative to apply on his own, right, as far as you

21   know?

22        A.  As far as I know.

23        Q.  Did you communicate with Michael Tickle about

24   feeling betrayed after you learned that Michael Deley

25   got the position?

1         A.  My comment was "Had I known that that was an

2    option, I would have definitely applied."

3         Q.  And what did he say?

4         A.  And that was his response, like, "Hey, I'm not

5    sure why you didn't apply."

6         Q.  Okay.  Did you tell him specifically, "I think

7    you betrayed me"?

8         A.  No, I didn't tell him that specifically, no.

9         Q.  Do you think that Michael Tickle was motivated by

10   your race in connection with this position?

11        A.  I think the entire discrimination from start to

12   finish, that's just another portion of how my race

13   played a role in it.

14        Q.  Okay.  But this particular role, the 2021 role

15   that Michael -- I'm sorry -- that Ryan Kolkmann left, do

16   you think that Michael's -- Michael Tickle's behavior

17   towards you with respect to that role was because of

18   your race?

19        A.  Yes, I -- I believe that.

20        Q.  Okay.  And what makes you believe that?

21        A.  Because there was, like I said, from start to

22   finish, when I was hired at a lower job grade and the

23   pay disparity begin -- started at the beginning.  This

24   was another example of how that deception became clear.

25   It was -- he had every opportunity to inform me, after

1    me questioning and asking on several occasions about

2    this role, to disclose it; and he chose not to disclose

3    it.

4         Q.  But what about your race makes you think that he

5    didn't disclose it to you, like -- as opposed to

6    something else, for example?

7              MS. GIBSON:  Object to form.

8              You said, "What about your race"?

9         Q.  (BY MS. WILLIAMS)  What about your race do you

10   think was a part of his role, like why do you think your

11   race factored into that decision, as opposed to, for

12   example, what if he thought maybe you weren't a top

13   performer.  Is it possible he thought that and that

14   could be a reason that motivated him not to encourage

15   you to apply?

16        A.  My reasoning is because, again, start to finish,

17   Shell has shown that it's common practice to use race to

18   make decisions on jobs.

19        Q.  Okay.  And I'm not talking about common practice

20   at Shell.  I'm saying specifically with respect to your

21   relationship with Michael Tickle, what about -- what

22   about the way that he managed the decision for the JG 5

23   role makes you think that your race was a part of the

24   decision?

25        A.  My understanding and my clear -- my understanding

110

1  that Shell has a policy on how to treat African-American
2  males when it comes to employment.  So Michael Tickle is
3  a part of that Shell umbrella who is a part of that
4  policy, who is aware of how to treat African-American
5  candidates for jobs.
6      Q.  What is the Shell policy on how to treat
7  African-American -- it's just African-American males?
8      A.  Person of -- use the term "person of color
9  candidates historically struggle to succeed at Shell."
10  That is the actual phrase that's been used on several
11  occasions.
12      Q.  Are you reading from something right now?
13      A.  I'm just making sure I said it correctly.
14      Q.  On your notes?  I'm sorry.  You were reading that
15  from your notes?
16      A.  That's exactly --
17      Q.  Okay.
18      A.  -- what was said, yes.
19      Q.  Okay.  But I asked you --
20          MS. WILLIAMS:  I'm sorry.  Can you go back
21  to my question?
22          (Record read as requested.)
23      A.  I believe that there is a Shell policy.
24      Q.  (BY MS. WILLIAMS)  About how to treat
25  African-American male employees in particular?

111

1      A.  Correct.
2      Q.  And what is that policy, is what I'm
3  asking you?
4      A.  I don't have a defined written policy, but I have
5  examples after example of how I've been treated.  And
6  it's not just a rogue individual, it's not just Michael
7  Tickle, it's not just Teri Olmen.  It's a culture, it's
8  a way.
9      Q.  All right.  Well, we're going to talk about all
10  of those; but I want to know what is the policy, to your
11  understanding, as -- that Shell has about how to treat
12  African-American male employees.
13      A.  I don't have an actual policy.
14      Q.  But you said Shell has a policy, so I'm asking --
15      A.  That's what I believe --
16      Q.  I'm sorry, let me finish.  You said Shell has a
17  policy.  So I'm asking you what is your understanding of
18  what that policy is?
19      A.  I said I believe that's Shell's policy.
20      Q.  You believe it's the policy?
21      A.  Correct.
22      Q.  Okay.  You're not saying that they actually have
23  a policy?
24      A.  I believe that's Shell's policy.
25      Q.  And your belief is based on how you've been

112

1  treated?
2      A.  Correct.
3      Q.  Okay.  I want to go through --
4      A.  Can I just finish that one real quick?
5      Q.  Oh, sure.
6      A.  I've been treated and others have been treated.
7      Q.  Okay.  Who are the others -- I don't want to know
8  the specifics, I'll come back to that so the record is
9  clear.
10          But who are the others that you are aware of who
11  have been treated a certain way by Shell?
12      A.  Shawn Matthews.  Luis Lugo.  Luis, L-U-I-S.
13      Q.  And what is Shawn's race?
14      A.  Black.
15      Q.  And Shawn is a man?
16      A.  Correct.
17      Q.  And then Luis?
18      A.  Dominican.
19      Q.  Male?
20      A.  Correct.
21      Q.  Okay.  So can you tell me -- let's see, let me
22  get it right -- how you've been -- I want to know all
23  the examples of the ways that you've been treated at
24  Shell that lead you to believe that they have a policy
25  related to African-American male employees.  So let's

113

1  just -- we can go through them one by one.
2      A.  We can start from the beginning.
3      Q.  Yeah.
4      A.  After I was made aware of the discrimination, we
5  can go back into my original hiring process when Sri and
6  Jennifer posted the role of a job grade 5 and explicitly
7  stated to HR that they interviewed me as a job grade 5
8  and wanted to hire me as a job grade 5.
9          Teri Olmen then, on two occasions -- and this is
10  an email as well, stated to Sri that persons of color,
11  black males, tend to historically struggle at Shell.
12          Sri then replied back and said she was extremely
13  uncomfortable with now reducing my job grade to a job
14  grade 6 strictly based on my race.  Shell then returned
15  and said, well, no, no, it's not that, that you have
16  a -- you don't have a job grade 5 available now.  So now
17  you have a job grade 6.
18          But they also then asked for Sri to resend over
19  my qualifications and really break down and review why I
20  was qualified for a job grade 5.
21          Jennifer Hartnett then emailed my resume and then
22  read under each qualification clearly stated why I was,
23  in essence, over-qualified, more than qualified for this
24  role at job grade 5; but also noted that a white male,
25  Patrick Frnka, one month before I was going to be

114

```
1   offered the original job, was hired on with zero
2   experience.
3       Q.  Are you at a pause there?
4       A.  I'm at a pause.
5       Q.  Okay.  When you say Teri Olmen stated --
6           MS. GIBSON:  Wait.  I'm sorry.  Did -- so he
7   said he's at a pause.
8           Are you finished?
9           MS. WILLIAMS:  Well, I --
10          MS. GIBSON:  You asked a broad question.  I
11  want to make sure that --
12          MS. WILLIAMS:  Okay.  Well, let me clear the
13  record up, Amy.  Just settle down.
14      Q.  (BY MS. WILLIAMS)  With respect to the item that
15  you just identified, I want to ask a followup question
16  and then we can continue on with you identifying the
17  other things that you say you've experienced.
18          MS. GIBSON:  So I'm -- I'm going to object.
19  It was a broad question.  You asked him for everything
20  that --
21          MS. WILLIAMS:  Just object, form, and we can
22  move on.
23          MS. GIBSON:  Wait, wait.  You asked for --
24  this is different.  You asked a broad question and
25  you're interrupting his answer and going on side trails.
```

**NELL McCALLUM & ASSOCIATES, INC.**

115

```
1   I'm asking
2           MS. WILLIAMS:  I can do whatever I want in
3   the deposition.
4           MS. GIBSON:  I am asking --
5           MS. WILLIAMS:  You can ask him to pause --
6           MS. GIBSON:  I am ask --
7           MS. WILLIAMS:  -- and I can ask a followup,
8   which is what I'm doing.
9           MS. GIBSON:  No, he's -- no, if you ask a
10  broad question that calls for a long answer, he's
11  entitled --
12          MS. WILLIAMS:  He will get --
13          MS. GIBSON:  -- he has a right --
14          MS. WILLIAMS:  -- an opportunity to
15  answer --
16          MS. GIBSON:  No, he gets to do it now.
17          MS. WILLIAMS:  No, he gets to do it as I
18  conduct the deposition, Amy.
19          MS. GIBSON:  You don't get to cut him off.
20      Q.  (BY MS. WILLIAMS)  So here's what we're going to
21  do, Mr. Dedmon, I would like to ask a followup question
22  before we move on to the next item.
23      I'm not trying to cut you off or to prevent you
24  from giving your full answer.  In fact, I am very
25  interested in your full answer.
```

**NELL McCALLUM & ASSOCIATES, INC.**

116

```
1       What I wanted to know before we moved on to the
2   next category or to whatever, you know, next description
3   you're going to give, you said Teri Olmen stated in an
4   email.  Are you saying that you have seen a specific
5   email where Teri Olmen said, specifically herself, that
6   persons of color or African-American men don't do well
7   at Shell?
8       A.  No.  I stated that Sri and Teri had conversations
9   and Teri stated twice and Sri made email documentations
10  about their conversations.
11      Q.  Okay.  I wanted to just clarify that.  Okay.
12      So are you finished describing your first
13  category, or are you still describing that?
14      A.  I was just going into more detail about Teri's
15  comment.
16      Q.  Okay.
17      A.  If that is actually what you believe, where is
18  the data that supports that?
19      There was no data seen.
20      And why would you hire someone that's not going
21  to be successful because that's not what Shell does.
22  That's not what any major corporation does.  They don't
23  hire underperformers.  They use -- you just don't hire
24  underperformers.
25      Q.  Right.  Okay.
```

**NELL McCALLUM & ASSOCIATES, INC.**

117

```
1       A.  You got to give me a second here.
2       (Pause.)
3       So continuing on, when discussing or making a
4   decision to hire someone with zero experience and then
5   bringing up my qualifications and having no other
6   reason, other than not having a job grade 5 available,
7   that was very clear that it was discrimination based on
8   race.
9       Because I have an executive MBA in energy
10  finance, I was an ERCOT real-time trader, I worked for
11  two energy retailers doing 85, 90 percent of the roles
12  that this job was requiring.  That in itself leads me to
13  believe that it's purely race discrimination when you
14  now have to reapply, now you have to resubmit your
15  qualifications, now they have to dig through my resume
16  and prove that I'm qualified.
17      Q.  Okay.  Is -- do you have any other examples of
18  ways in which you believe Shell has treated you
19  differently because you're an African-American male
20  employee?
21      A.  The hiring of Mike Deley for the job grade 4 is
22  another example.  My -- my --
23      Q.  This is the one -- I'm sorry -- we just talked
24  about?
25      A.  Correct.
```

**NELL McCALLUM & ASSOCIATES, INC.**

1    Q.  Okay.  I'm sorry.  Go ahead.

2    A.  Speaking on my experience with Shell to that

3  point and then this happening as well, that's that

4  form -- that's another example.

5    Q.  Okay.  And that happened when?

6    A.  That was 2021.  Late 2021.

7    Q.  Okay.  And then the hiring issue was obviously in

8  2014, correct?

9    A.  Yes, I believe so.

10   Q.  Between 2014 and 2021, has Shell done anything

11 else that you believe suggests that they have a policy

12 of treating you differently because you're an

13 African-American man?

14   A.  Shell -- once Sri filed a formal compliant on my

15 behalf about the discrimination, Shell, from what I know

16 and from what I clearly could tell, did not properly

17 investigate.  They told Sri the case is closed and to

18 move on.

19      And if you're properly investigating

20 discrimination, the first person that should have been

21 contacted was the person who was discriminated against.

22 I was not contacted.  I was not informed.  I had no idea

23 that Shell was even doing an investigation, which leads

24 me to believe that they did not care.

25      Moving forward to my formal complaint, it being

1  dismissed as meritless and then when you read the

2  statements made about it being meritless, Shell did zero

3  due diligence.  They made a claim that I had several

4  different jobs at Shell, had been hired for several

5  different jobs.  Had they did five minutes of due

6  diligence, they would have realized that my job title

7  just changed because of Shell structure, never actually

8  changed.  I went from power sales to mid-marketing to

9  originator.  Those names changed purely off reshaping,

10 reorganization, and Shell structure.

11      And then they also made a claim that, well, these

12 people don't work here anymore, we can't contact them,

13 which also leads me to believe that you're -- you don't

14 care.  Because how hard is it for you to pick up the

15 phone and call someone?  I mean, it's 2024.  LinkedIn is

16 available with everybody's contact information on it.

17 It's not hard to find people who were part of the

18 investigation to clearly figure out what was going on.

19   Q.  And when you're -- you're referring -- you say

20 your formal complaint.  This is when you filed your EEOC

21 charge, you're referring to Shell's response to your

22 EEOC charge?

23   A.  And the lawsuit, yes.

24   Q.  And the lawsuit.  Okay.

25   A.  Yes.

1    Q.  Okay.  So here's what I have.  I've asked for you

2  to identify for me all the examples that you have as to

3  Shell treating you differently because you're an

4  African-American male employee.  You've identified the

5  hiring issue in 2014 and a lot of details around that.

6  You've identified the hiring of Michael Deley for the

7  JG 4 position in 2021, right?

8    A.  Correct.

9    Q.  And then you've just now also identified how

10 Shell responded to your lawsuit against them as being

11 another example, correct?

12   A.  And the hiring of Patrick Frnka -- sorry to cut

13 you off.

14   Q.  No, no.  I'm sorry.

15   A.  The hiring of Patrick Frnka.

16   Q.  Okay.  I'm going to come to that.

17      So that was No. 3, how Shell responded to your

18 lawsuit, correct?

19   A.  Correct.

20   Q.  And then so we're -- another example is of how

21 they have treated you differently is the hiring of

22 Patrick Frnka?  How does --

23   A.  Frnka.

24   Q.  Okay.

25   A.  F-R-N-K-A.

1    Q.  I know there are some missing vowels there.

2    A.  Yeah.

3    Q.  Okay.  And how is that -- how is that an example

4  of Shell treating you differently because you're an

5  African-American male employee?

6    A.  Patrick Frnka came from credit and scheduling

7  with zero sales experience and came in as a job grade 5.

8    Q.  When did he come in?

9    A.  About a month before, I believe, my original

10 offer, which I was never verbally offered or -- offered

11 at all.  It was based on communication with Sri that she

12 was about to offer me that job.  And that's when HR came

13 back and decisions were made to change the job grade.

14      But she made it very clear that, wait, it can't

15 be because of qualifications and experience because he

16 has all the relevant experience and we're showing you

17 why he has the relevant experience, combined with Teri's

18 comment, it makes no sense, because you just hired

19 Patrick Frnka with zero experience at the job grade that

20 was posted.

21   Q.  Okay.  So that was the fourth thing.  Any other

22 example you have of how Shell has treated you

23 differently because you're an African-American male

24 employee?

25   A.  We spoke about just the reporting, reporting side

122

1    of it.  They didn't do the right thing the first time
2    they didn't communicate with me.  They didn't encourage
3    me to -- what I now know is a 1-800 hotline.  They
4    didn't encourage RESOLVE.  They didn't talk to me.
5        Q.  When you -- you said the reporting side, what are
6    you referring to?  I'm sorry.
7        A.  Just reporting of the actual filing of my
8    complaint on Sri's behalf -- or Sri on my behalf.
9        Q.  In 2014?
10       A.  2014 and now, both occurrences.
11       Q.  What do you mean by "now"?
12       A.  My --
13       Q.  Since your lawsuit?
14       A.  My lawsuit, versus Sri's original complaint.
15       Q.  Okay.  And so you're saying that Shell treated
16   you differently as an African-American employee because,
17   on the reporting side, they didn't do what?  I'm just
18   trying to -- I'm trying to understand.  I wasn't
19   following.
20       A.  They didn't follow up.  They didn't communicate.
21   They -- they didn't encourage me to go do the -- what
22   apparently is the proper steps when you have a
23   discrimination claim.  They just ignored it.  And now
24   we're here with a lawsuit.
25       Q.  In 2014 you're talking about?

**NELL McCALLUM & ASSOCIATES, INC.**

123

1    -- they ignored it in 2014.
2        Q.  Okay.
3        A.  And then they're ignoring it now -- or they
4    ignored it up until this point.
5        Q.  Okay.  And so in 2014, it's your claim that they
6    ignored it by not following up and communicating with
7    you after Sri Rangan made her report.  Am I getting that
8    right?
9        A.  Correct.
10       Q.  Okay.  And then you're also saying that after you
11   filed the lawsuit, they additionally treated you
12   differently because they didn't follow up with you after
13   the lawsuit?
14       A.  Correct.
15       Q.  Okay.  When Sri Rangan -- we haven't -- when Sri
16   Rangan -- well, you learned about the hiring issues from
17   Sri Rangan, correct?
18       A.  Correct.
19       Q.  And, I'm sorry, I -- I was saying Sri -- I don't
20   know if you were saying "Cherie" --
21       A.  Sri.
22       Q.  Sri, okay.  We're saying the same thing?
23       A.  Yes, one syllable, Sri.
24       Q.  Okay, Sri.  You learned about that from Sri
25   Rangan, correct?

**NELL McCALLUM & ASSOCIATES, INC.**

124

1        A.  Correct.
2        Q.  When Sri told you about this -- and we'll go back
3    and talk about the details of what she said -- did you
4    report it internally to Shell?
5        A.  Can I paint the full picture --
6        Q.  Well --
7        A.  -- please, the full answer --
8        Q.  -- at some point you will be able to, but if you
9    can answer my question.  When Sri told you and shared
10   this information with you about what transpired in 2014,
11   did you report any of that internally to Shell?
12       A.  No, because Sri had already reported it.
13       Q.  Okay.  That's fine.  But you did not make your --
14   a report when you learned this information, correct?
15       A.  Not initially, no.
16       Q.  Okay.  In fact, you instead filed a charge with
17   the EEOC?
18       A.  Not right after.  It took time before that was
19   developed, yes.
20       Q.  But I mean that was your first --
21       A.  That was my first step, yes.
22       Q.  Yes.  Were you aware that you could have reported
23   it internally to Shell?
24       A.  I wasn't a hundred percent aware, nor was I
25   confident even if I had the awareness to even go that

**NELL McCALLUM & ASSOCIATES, INC.**

125

1    route.
2        Q.  Okay.  Well, I didn't ask about your confidence.
3    I'm asking are you aware that Shell has internal
4    reporting processes where you could have reported it
5    internally?
6        A.  Now I'm aware, yes.
7        Q.  You didn't know it in 2020?
8        A.  I wasn't aware of the processes.
9        Q.  In 2020 you were not aware of the processes?
10       A.  I wasn't aware of the processes.
11       Q.  Okay.  So let's talk about the conversation that
12   you had with Sri Rangan in 2020.  Tell me how that came
13   about.
14       A.  There was a Shell -- an SBNG town hall about the
15   state of what was going on.  It was pivoting towards the
16   George Floyd murder and just the energy and the, you
17   know, the makeup of what was going on in our country.
18   And we were given a forum just to speak freely about how
19   you felt.  All the employees were allowed to listen,
20   several folks spoke.  Sri actually listened in and she
21   could clearly see on the list of folks who were
22   listening in that I was on there.
23           And closer to the end of the call, she Instant
24   Messaged me and said, "Hey, Bobby, can I talk to you?"
25   And I didn't think anything of it at that point, because

**NELL McCALLUM & ASSOCIATES, INC.**

1    I was just still pretty emotional about all the

2    conversations we were having, to think that she had

3    something of that magnitude to tell me.

4         Got off that call and I called her and before she

5    can get her first -- I would say five or ten words out,

6    she was crying.  She was sobbing to where she really

7    couldn't talk to me.  So we had to pause for a little

8    bit.

9         Then she started to tell me in chronological

10   order what happened in 2014.  And one of the things that

11   really was damning -- excuse my language -- was that she

12   filed a complaint and nothing came of it.

13        She talked about me being offered -- or she was

14   in the process of submitting an offer for a job grade 5

15   for me.  She talked about what Teri Olmen said on

16   several occasions.  She talked about her complaint she

17   filed.  She talked about having to reprove that I was a

18   qualified candidate based on all my skill sets and

19   relevant experience.  And she apologized for not telling

20   me what was going on then.

21        Q.  Okay.  And then what did you tell her?

22        A.  I was really numb, honestly.  I was numb to a lot

23   of it initially and it had to settle.  But I did

24   definitely tell her I fully appreciated her telling me

25   regardless of how long it took, and that I needed some

1    time.  Because I was a lot of -- to consume in a short

2    period of time.  In one conversation it was a lot to

3    consume, because triggers started happening and you

4    start thinking back to hiring process all the way

5    through to that day you were working and what -- what's

6    been shaped, what's been -- what's been changed, what's

7    been missed, all the discrimination through that entire

8    process, like it was a lot to absorb in one

9    conversation.  So.

10        Q.  You mentioned that it was an SBNG?

11        A.  It's called Shell Black Networking Group.

12        Q.  Okay.  I just wanted to make sure I got that for

13   the record.

14        Okay.  So after the conversation with Sri Rangan,

15   did you talk to her again about this?

16        A.  We talked several times, just so I could really

17   dissolve and digest the magnitude, just so I got my

18   facts correct, just so I fully understood what she was

19   saying.  Because I didn't want to believe it.  I -- I

20   just didn't want to believe it.  So I had to continue to

21   reconfirm with her.  Like how did this happen?  How did

22   it happen?  Why wasn't I pulled into it?  I just had a

23   ton of questions of why.  And we talked I would say

24   pretty often in the beginning when she told me.

25        Q.  What do you mean, what's "in the beginning"?

1         A.  I would say the first couple weeks.

2         Q.  And did you have these phone -- were they phone

3    calls or did you have --

4         A.  Phone calls.

5         Q.  -- in-person meetings?

6         A.  Phone calls.

7         Q.  Did anybody else participate in those phone

8    calls?

9         A.  No.

10        Q.  And so it's a couple of weeks that go by where

11   the two of you are talking and you're processing this

12   information that she shared with you.  What happened --

13   what do you -- what did you do next?

14        A.  I sat on it and did a lot of soul searching on

15   what my next step was going to be.  I tried to figure

16   out, you know, what is your next move?  What do you do?

17   Do you just keep moving and, you know, take that

18   information but do nothing with it; or do you stand up

19   and really fight against very overt, very obvious racial

20   discrimination.  Had long, hard... (sniffling).

21        Excuse me.

22        MS. GIBSON:  Y'all keep going.  I'm going to

23   get Kleenex.  Okay?

24        THE WITNESS:  I have some.  I'm good.  I'm

25   good.

1         MS. GIBSON:  Are you good?  Okay.

2         A.  I had long hard conversations with my wife, with

3    my dad about this.  What am I supposed to do, assessing

4    the magnitude financially, emotionally, what my

5    trajectory could have been over the last eight years.

6    Do I show my daughters this is what it looks like, this

7    is how you defend yourself, this is how you stand up?

8         Do you -- do you fall on a sword and commit

9    career suicide?  Because, you know, once you do this,

10   the next step is you're out.  You worked so hard to get

11   to the Shells of the world and now it's going to all

12   crumble.  Did a lot of soul searching, just going how do

13   I -- how do I figure this out?

14        Q.  (BY MS. WILLIAMS)  And eventually you reached a

15   decision to pursue a claim against Shell?

16        A.  Yes.

17        Q.  Okay.  Did Sri Rangan encourage you to pursue a

18   claim against Shell?

19        A.  She supported me.

20        Q.  In what way did she support you?

21        A.  She said she would stand with me as far as I

22   wanted to take this, because she felt like nothing was

23   done and she pushed as far as she could push; and that

24   if I decided to push even further, that she would stand

25   side by side with me.

190

```
1    Q.  When was the last time you spoke to Sri Rangan?
2    A.  Around the holidays.
3    Q.  Since you filed the lawsuit, have you spoke to
4  Sri Rangan about the lawsuit?
5    A.  Yes.
6    Q.  And what have you-all -- excuse me, what have you
7  discussed about the lawsuit?
8    A.  Just the details of it and her continued support
9  for what I'm doing.
10   Q.  How has she supported you in the lawsuit?
11   A.  By being open about her experience.  And --
12   Q.  What experience, I'm sorry?
13   A.  Her experience of the -- from when she tried to
14  hire me at a job grade 5 --
15   Q.  Okay.
16   A.  -- her -- her complaint to Shell.
17   Q.  Okay.  Anything else?
18   A.  That we spoke about?
19   Q.  Uh-huh, related to the lawsuit.
20   A.  Just if I needed her to support me through trial
21  that she would definitely do that.
22   Q.  Okay.  Has she put you in touch with any other
23  individuals that she thinks might support you in your
24  lawsuit?
25   A.  No.
```

NELL McCALLUM & ASSOCIATES, INC.

191

```
1    Q.  Have you asked her specifically any individuals
2  that she thinks might support you --
3    A.  No.
4    Q.  -- in your lawsuit?
5        Since you've started at Shell, I think you said
6  you started in 2014 at a hundred thousand dollar
7  compensation; is that right?
8    A.  Yes, that's about right, yes.
9    Q.  And then in 2015, with the promotion, your
10  compensation went up to 114,000?
11   A.  Yes.
12   Q.  What's your compensation currently?
13   A.  It's right at 150,000.
14   Q.  Fifty or fifteen?
15   A.  One hundred and fifty.
16   Q.  Okay.  And is that your -- did you recently go
17  through an evaluation process earlier this year or late
18  last year?
19   A.  We have annual performance meetings with our
20  boss, yes.
21   Q.  So the 150,000 salary, is that your current 2024
22  salary?
23   A.  Yes.
24   Q.  Okay.
25   A.  That's currently what I'm getting paid.
```

NELL McCALLUM & ASSOCIATES, INC.

192

```
1    Q.  Okay.  What was your salary in 2023?
2    A.  '23, it was 2-1/2 percent less.  It's been like a
3  2, 2-1/2 percent increase as average year over year
4  maybe.  It wasn't substantially lower.  It was probably
5  146, 148, maybe.
6    Q.  Okay.
7    A.  I'm not sure what that percentage is, but.
8    Q.  Since 2014 have you consistently gotten a salary
9  increase since you've been with Shell?
10   A.  There may have been a year where there wasn't an
11  increase, but yes, it has increased since 2014.
12   Q.  Can you recall a specific year where you did not
13  get a salary increase?
14   A.  I can't recall the actual year, no.
15   Q.  And what about your bonus, did you -- and I guess
16  I want to make sure I understand sort of the timing.
17  Did you recently get a bonus?
18   A.  Yes.  Everyone gets bonuses in March.
19   Q.  Okay.  In March is the bonus for your performance
20  for the prior year?
21   A.  For '23, correct.
22   Q.  Okay.  So I'm going to refer to that as your 2023
23  bonus, even though you got it in 2024.
24   A.  That's correct.
25   Q.  Your 2023 bonus, what was it?
```

NELL McCALLUM & ASSOCIATES, INC.

193

```
1    A.  It was gross 74,000.
2    Q.  Do you -- did you get a bonus for the 2022
3  performance year?
4    A.  It was gross about 55, I believe, 55, 60.
5    Q.  And then do you recall what your bonus for the
6  performance year 2021 was?
7    A.  I don't.  I would have to go back and look.
8    Q.  Do you recall actually getting a bonus in 2021?
9    A.  I believe we did --
10   Q.  For the 2021 performance year?  I'm sorry.
11   A.  I believe we did, correct, yes.
12   Q.  Has there been a year since you started in 2014
13  that you did not get a bonus at Shell?
14   A.  I don't believe there's been a year.  I mean it
15  fluctuates, definitely, based on -- I mean, percentages
16  fluctuate, but I believe that every year I've been able
17  to receive a bonus.
18   Q.  Okay.  Do you know whether all of your
19  colleagues -- and I understand that that changed, like
20  the desk changed, right, from time to time.  But your
21  colleagues, do you know if they all received bonuses
22  generally since the time that you've been working at
23  Shell?
24   A.  Yes.
25   Q.  Do you know if they've received salary increases
```

NELL McCALLUM & ASSOCIATES, INC.

214

1    A.   No.

2    Q.   (BY MS. WILLIAMS)  And for your 2023 performance

3  review year, do you have any concerns about his review

4  of your performance for that year?

5    A.   No.

6    Q.   Did he say anything to you during his review of

7  your performance for 2023 that you think was not

8  reflective of your actual performance for that year?

9    A.   No.

10   Q.   Has anyone at Shell made any derogatory comments

11  to you about your race?

12   A.   No.

13   Q.   Has anyone at Shell made any derogatory comments

14  to you about your color?

15   A.   No.

16   Q.   And so I'm going to ask -- it's going to be

17  slightly different from what I just asked but may sound

18  the same.  Are you aware of any comments that anyone has

19  -- derogatory comments that anyone has made about your

20  race, even if it wasn't directly to you?

21   A.   Yes.

22   Q.   Okay.  And what was that?

23   A.   When Teri Olmen made the comment about persons of

24  color historically struggling to succeed at Shell.

25   Q.   Okay.  Anything else other than that?

NELL McCALLUM & ASSOCIATES, INC.

---

215

2    Q.   And has -- same question related to color.  Are

3  you aware of any derogatory comments that anyone at

4  Shell has made about your color?

5    A.   Yes, same, same response as Teri Olmen, "person

6  of color."

7    Q.   Other than that, anything else?

8    A.   No.

9    Q.   Do you believe that there is a specific person at

10  Shell who is making decisions about your compensation

11  based on your race?

12        MS. GIBSON:  Object to form.

13   A.   I think that Shell is complicit in not -- by not

14  following up, investigating, doing their due diligence

15  when claims are made about racial discrimination.

16   Q.   (BY MS. WILLIAMS)  Anyone in particular that you

17  hold responsible for that; or is that something that you

18  believe is attributable to the organization at large?

19   A.   I think it's attributable to the organization,

20  and Teri Olmen was just the person that had her day with

21  me.

22   Q.   Did you ever interact with Teri Olmen?

23   A.   No.  I could not point her out in a lineup.

24   Q.   If she walked in here, you wouldn't know who she

25  was, right?

NELL McCALLUM & ASSOCIATES, INC.

---

216

1    A.   That's correct.

2    Q.   Okay.  During any of your performance reviews

3  with Michael Tickle, did you ever raise any concerns

4  about your compensation?

5        MS. GIBSON:  Object to form.

6    A.   I can't pinpoint which ones or at what time, but

7  I always brought up compensation being part of my

8  motivation.  I just felt like being transparent when it

9  comes to that was okay.  Some folks don't like talking

10  about money, but I felt like I can talk about what my

11  worth and being compensated for it.

12   Q.   (BY MS. WILLIAMS)  You felt like you had the

13  ability to express your desire to make more money with

14  Michael if you -- if you wanted to?

15   A.   Correct.

16   Q.   And you did in fact do that?

17   A.   Correct.

18   Q.   Did you actually complain to him about the amount

19  of money you were making?

20   A.   I did not complain, no.

21   Q.   And the same thing with Patty Smith.  Did you

22  ever complain about the amount of money you were making,

23  with Patty Smith?

24   A.   I did not complain, no.

25   Q.   Did you talk to her about compensation the way

NELL McCALLUM & ASSOCIATES, INC.

---

217

1  you talked to Michael Tickle about compensation?

2    A.   She was only there for a shorter period.  I

3  discussed it with her, but not in detail that I would

4  have with Michael.

5    Q.   Okay.

6    A.   She was not our boss for a very long time so it

7  was a -- she came in and left pretty quickly.  So.

8    Q.   Did you ever discuss concerns or complaints you

9  had about your job grade with Patty Smith?

10   A.   I discussed wanting a job grade increase and just

11  asking how that works and how -- how can we possibly

12  make that happen.  Like steps I need to take to do that.

13   Q.   Did you actually complain about the job grade

14  that you have with her; or did you just express to her

15  your desire to move on to another job grade?

16   A.   Expressed my desire to.

17   Q.   Okay.  And then Jennifer Hartnett, did you ever

18  complain about the compensation you were making with

19  Jennifer Hartnett?

20   A.   No.

21   Q.   Did you ever complain about your job grade with

22  Jennifer Hartnett?

23   A.   No.

24   Q.   When you spoke to Michael Tickle about your

25  desire to make more money, what was his response?

NELL McCALLUM & ASSOCIATES, INC.

1  want it.

2          MR. WILEY:  Thank you.

3          MS. WILLIAMS:  You're welcome.

4      Q.  (BY MS. WILLIAMS)  Do you recognize this document

5  that I've marked as Exhibit 1?

6          MS. WILLIAMS:  And for folks on the phone,

7  it's ShellDedmon_65 through 67.

8      A.  Yes.

9      Q.  (BY MS. WILLIAMS)  What is that document?

10     A.  It's the EEOC file.  Complaint.  I'm not sure the

11  exact word you use for it.

12     Q.  Okay.  And it's -- it has three pages, right?

13     A.  Yes.

14     Q.  Not full, but -- yeah.  Did you prepare the text

15  that is reflected in the box that says The Particulars

16  Are on the first page of Exhibit 1, going onto the last

17  page of Exhibit 1?

18     A.  Where is that again?

19     Q.  So there's a -- the box at the very bottom of the

20  first page of Exhibit 1, it says The Particulars Are,

21  and it starts:  I believe Shell Exploration & Production

22  Company.

23          Do you see that?

24     A.  Right.  Did I write those words myself is what

25  you're asking?

1  Q.  Did you prepare the information that's in this

2  box which carries over onto the third page of the

3  exhibit?

4          MS. GIBSON:  Object to form.

5      A.  I can't remember if those are my exact words,

6  but -- I'm not sure what you mean by -- did I write that

7  in or type that in?

8      Q.  (BY MS. WILLIAMS)  Yeah.  Did you -- did you

9  write it, yourself?

10     A.  Honestly, I'm not a hundred percent sure.

11     Q.  Okay.  Do you recall reviewing this before it was

12  filed with the EEOC?

13     A.  Yes, because I had to sign it.

14     Q.  And you understood when you were signing it you

15  were signing it under oath?

16     A.  Yes.

17     Q.  Okay.  I just want to ask you a few questions

18  about -- about some of the information that you've

19  included here.  I want to go onto page -- the second

20  page of Exhibit 1.  And it is the second paragraph on

21  that page.  It starts:  Here is the story of what

22  happened.

23          Do you see that?

24     A.  Yes.

25     Q.  I think it's the third -- excuse me, the third

1  sentence.  It says:  Shell posts a job in Houston, Texas

2  at grade 5 and later offers this job at grade 5 to

3  someone who is not a black male.

4          Did I read that correctly?

5          MS. GIBSON:  Where are you?  You said third

6  sentence?

7          MS. WILLIAMS:  It's -- I think it's the

8  third sentence of the second paragraph, but maybe it's

9  not.  It just -- I mean I read how it started.  So Shell

10  posts a job in Houston.

11         MS. GIBSON:  I see.  I see.  Okay, sorry.

12     Q.  (BY MS. WILLIAMS)  Do you see that sentence that

13  I just read?

14     A.  Here is the story of what happened... Yes, I see

15  that there.

16     Q.  Okay.  And what information do you have that

17  indicated to you that Shell offered the position to

18  someone who was not a black male?

19     A.  I believe that was a discussion Sri and I had.

20     Q.  Okay.  Sri told you that it was someone who was

21  not a black male?

22     A.  I believe that was the discussion that Sri and I

23  had.

24     Q.  Okay.  You did not -- do you have any firsthand

25  knowledge that the job was offered to someone who was

1  not a black male?

2      A.  Now we have concrete knowledge that it was,

3  but --

4      Q.  That it was what?

5      A.  It was offered to I believe a white female, that

6  declined it.

7      Q.  Where -- where do you get that information?

8      A.  From the documents that was provided -- that were

9  provided to us by Shell.

10     Q.  What document did you see that said it was a

11  white female?

12         MS. GIBSON:  Object to form.

13     A.  It was a ton of emails that we went through that

14  Shell provided.  I don't know exactly what document

15  number.

16     Q.  (BY MS. WILLIAMS)  So there was a document that

17  you recall seeing in the context of this lawsuit that

18  says the position was offered to --

19     A.  Yes.

20     Q.  -- a white female?

21     A.  There's a -- sorry.  There's a female name

22  associated with the job that was offered.  I believe

23  that's what's in the email, the communications that I

24  saw.

25     Q.  And does it indicate it was a white female?

234

1    A.  I'm not for certain.  I can go back and look, but

2    I'm not a hundred percent certain.

3    Q.  And what's the name, do you recall?

4    A.  I don't recall the name.

5    Q.  Okay.  But you recall seeing an email where a

6    female's name was associated with being the person who

7    was offered the job grade 5 position?

8    A.  I believe so, yes.

9    Q.  Okay.  And then that person declines the offer.

10   Where did you get the information that that person

11   declined the offer?

12   A.  Conversations with Sri.

13   Q.  Okay.  You don't have firsthand knowledge about

14   what that person did or did not do with respect to an

15   offer?

16   A.  No.

17   Q.  Okay.

18       And then you also indicated that job grade 6 pays

19   less than job grade 5, which pays less than job grade

20   4 -- I'm sorry, in the following paragraph.  The

21   paragraph that starts:  Shell -- Shell then decides to

22   offer the job to me.

23       Do you see that, still on page 2?

24   A.  Yeah.

25   Q.  The last sentence says:  So job grade 6 pays less

235

1    than job grade 5, which pays less than job grade 4,

2    which pays less than job grade 3, and so on.

3        What information did you base it on that a job

4    grade 6 pays less than a job grade 5 and so on?

5    A.  Just common knowledge, after working at Shell,

6    that's how it works.

7    Q.  So it's your understanding that if you are a job

8    grade 6 that you will automatically be making less money

9    than someone who is a job grade 5?

10   A.  There are scales to where -- I believe it's like

11   80 to 120 percent, so there are -- I wouldn't say where

12   there are cases to where a 6, a high or low, however you

13   want to say it, 6 could be -- base salary could be more

14   than a 5.

15   Q.  It's your understanding that based on Shell's

16   compensation scales that somebody with a lower job grade

17   could actually be making more than somebody with a

18   higher job grade; is that right?

19   A.  That's a -- that's a possibility.

20   Q.  Okay.  And you were aware of that when you

21   started at Shell?

22   A.  I became aware of that as I was employed by

23   Shell.

24   Q.  Okay.  But before you filed the claim against

25   Shell, you became aware of that?

236

1    A.  By this time I did know that.

2    Q.  Okay.  Okay.  I think that's all I have for that

3    one.  At least for now.

4        Before -- before you experienced the panic attack

5    that you described experiencing in the fall of 2022, had

6    you ever experienced anything like that before?  In

7    connection with your work at Shell?

8    A.  No.

9    Q.  Had you ever experienced anything like that

10   before outside of your work at Shell?

11   A.  Nothing of that magnitude, no.  I -- I say I've

12   been nervous, a high level of nervousness before, but

13   nothing that made me feel sick.

14   Q.  Did you -- had you had panic attacks before that

15   incident?

16   A.  No.

17   Q.  In your work at Shell, have you ever been

18   demoted?

19   A.  No.

20   Q.  Have you ever been disciplined for anything

21   during your employment at Shell?

22   A.  No.

23   Q.  No counseling or writeups about your performance?

24   A.  Not that I'm aware of, no.

25   Q.  Do you participate in -- in training at Shell

237

1    related to your specific job functions?

2    A.  Shell has training that everyone has to take,

3    regulatory trainings -- what do you call them, like

4    security type trainings because, you know, you deal with

5    a lot of different companies, deal with companies

6    globally, you want to make sure that -- I'm trying to

7    find the right word -- it's just more antitrust type

8    trainings within Shell that everybody is assigned

9    throughout the year.

10   Q.  When you say everybody, are you talking about

11   your group specifically or employees generally?

12   A.  All of Shell.

13   Q.  Okay.  Are there specific -- is there any

14   specific training that you have to participate in

15   related to your job as an originator or in power sales?

16   A.  No training; but we do go to conferences to where

17   there are speakers who may be educating you on something

18   new.

19   Q.  Okay.

20   A.  I personally consider that training, but that's

21   not official training.  That's a conference where you're

22   actually learning material that could help you in your

23   current job.

24   Q.  Do you participate in those conferences from time

25   to time?

1  apply for the vacant team position that left the team
2  short one person.
3      What is the basis of your knowledge that there
4  were private communications that weren't disclosed to
5  you that took place with the only white employee on the
6  team who's not -- I mean who was at a job grade 5?
7          MS. GIBSON:  Object to form.
8      A.  After having a brief conversation with Michael
9  Deley, he made it very clear that he and Michael Tickle
10  talked about him applying for that role.  So there was
11  discussions that were had that were not -- clearly I
12  wasn't privy to, but discussions that contradict the
13  email that Tickle sent out.
14      Q.  (BY MS. WILLIAMS)  So when did you talk to
15  Michael Deley about this?
16      A.  I believe after he was hired.
17      Q.  After he applied for and was selected for the job
18  grade 4 role?
19      A.  Correct.  Correct.
20      Q.  And did you -- how did the conversation come up
21  about the job grade 4 role?
22      A.  Oh, I just flat out asked him, you know, what
23  made you apply for it, how is that process for you, just
24  conversation about what made him do it.
25      Q.  And what did he tell you what made him apply for

1  the job?
2      A.  I don't remember verbatim; but he did say he had
3  a conversation with Tickle about actually applying for
4  it before he did.
5      Q.  Did he tell you he went to Tickle or Tickle came
6  to him?
7      A.  He didn't tell me any direction.
8      Q.  And so you don't know whether he took the
9  initiative to go to Tickle or if Tickle actually reached
10  out to him about applying, you don't know one way or the
11  other?
12      A.  Correct.
13      Q.  Okay.  And so he had a conversation with Tickle
14  about applying, and then what else did he tell you?
15      A.  That he applied for it and subsequently got it.
16  I'm not sure if he was a hundred percent comfortable
17  even discussing that with me, but.
18      Q.  Did he say something where -- to indicate that he
19  wasn't comfortable?
20      A.  No.  It wasn't a long conversation, I mean.
21      Q.  Were you guys -- did you discuss this in person
22  at the office?
23      A.  I think we were on, what was it, Skype back then
24  or whatever the communication we were using at that
25  point.  It was a call.  Like a conversation over a --

1  not a conference call, but I believe I was at home.  He
2  might have been at the office, he could have been at
3  home, I'm not sure where he was; but you can dial in
4  from your IM and call somebody from IM.
5      Q.  Was this a meeting that you scheduled
6  specifically to talk to him about this or was it
7  something else?
8      A.  I just called and asked him about it.  It wasn't
9  anything formal.
10      Q.  Okay.  So you took the time and called Michael to
11  ask him, "Hey, what made you apply for this job"?
12      A.  Right.
13      Q.  And he shared with you that he had a conversation
14  with Michael Tickle and ended up applying?
15      A.  Correct.
16      Q.  Did he tell you anything about the application
17  process?
18      A.  Not that I can remember, no.
19      Q.  Okay.  Did he indicate to you whether he
20  interviewed or didn't interview for the role?
21      A.  I don't remember if he said he actually
22  interviewed.  I'm assuming that he did because every
23  process, when it comes to jobs, you have to interview.
24  Like that's part of it.
25      Q.  Okay.  Did he tell you whether or not there were

1  other candidates who were also being considered for the
2  position?
3      A.  Not that I'm aware of.
4      Q.  You're not aware of him telling you that?
5      A.  Yeah, I'm not sure if he knew or not.
6      Q.  Okay.  And I think you testified earlier you're
7  not aware if there were other candidates who applied for
8  the job?
9      A.  No, not aware.
10      Q.  And so you also wouldn't know if those people
11  were internal to Shell, external to Shell, or where they
12  came from?
13      A.  I wouldn't know.
14      Q.  And then you -- you also state that the Shell
15  defendants ultimately give that existing team member
16  permission to apply for the vacant position that left
17  the team short one person.
18      You're referring to Michael Deley getting
19  permission to apply for the position?
20      A.  Correct.
21      Q.  What did Michael Deley tell you that led you to
22  believe he needed permission to apply for the position?
23      A.  Based on the encouragement in the email that we
24  got that we're looking for somebody else.  So I'm
25  assuming at that point someone said, okay, it's okay for

1    you to apply for this position. We're not actually
2    looking for somebody else to come into our group, we're
3    going to transition somebody at this point.  So the
4    communication in the email was explicitly stating
5    finding a body to replace Ryan Kolkmann and all of his
6    job duties that came with it.
7        Q.  Uh-huh.
8        A.  So at that point, if I had applied for it, I
9    definitely would have to receive guidance on, okay, go
10   ahead and apply for it.
11       Q.  But Michael Deley told you that he was actually
12   given permission, or is that your interpretation, is I'm
13   trying to understand?
14       A.  He had a conversation with Tickle about applying
15   for the role.
16       Q.  And did he tell you "I got permission from
17   Michael Tickle to apply for this job"?
18       A.  I'm assuming after that conversation there was
19   access granted saying go ahead and apply.
20       Q.  Did he tell you, "I got permission to apply for
21   the job"?
22       A.  He didn't use those words.
23       Q.  Okay.  So these are your words describing what he
24   was telling to you and your understanding of that?
25       A.  Correct.

**NELL McCALLUM & ASSOCIATES, INC.**

1    Q.  Do you know for a fact that he needed permission
2    to apply for the job?
3        A.  No.
4        Q.  Do you know whether you needed permission to
5    actually apply for the job?
6        A.  No.
7        Q.  Okay.  And then later you say if a job --
8            MS. GIBSON:  Object to form.
9        Q.  (BY MS. WILLIAMS)  In your complaint, if a job
10   grade increase with no new hire could, quote, fill the
11   empty team spot, then the Shell defendants should have
12   considered Robert.
13       What do you mean by that?
14       A.  My job qualifications, my skill set at that point
15   definitely fit a job grade 4 role.  So I should have
16   been considered for it.  If it was going to be we're
17   going to move somebody into this spot versus outsourcing
18   from internal Shell or external Shell, if the decision
19   was made, okay, who currently is a 5 who do we promote
20   into 4, I feel like I should have been that candidate.
21       Q.  But you didn't apply for the job, right?
22           MS. GIBSON:  Object to form.
23       A.  Correct.
24       Q.  (BY MS. WILLIAMS)  How would you have been
25   considered for the job without you applying for the job?

**NELL McCALLUM & ASSOCIATES, INC.**

1    A.  You don't have to apply for a job to be
2    considered, in my opinion.  There are plenty of jobs
3    that people are told about or get or are considered
4    candidates before they actually apply.  You can --
5    several up -- looking on LinkedIn, this person hasn't
6    applied for a job, but look at their skill set.  I may
7    consider them a candidate for the job and they haven't
8    necessarily applied for it.
9        Q.  But then they apply and then they're considered,
10   right?
11       A.  At some point, yes, they would have to apply for
12   a --
13       Q.  Okay.
14       A.  -- final separation to be made -- decision be
15   made.
16       Q.  Okay.  So when you say if a job grade -- if a job
17   grade increase with no new hire could fill the empty
18   team spot then the Shell defendants should have
19   considered Robert, are you saying that they should have
20   given you the job without an application?
21           MS. GIBSON:  Object to form.
22       A.  I should have been made explicitly aware of the
23   process and that they would actually consider one of us
24   in the current group to apply for it.
25       Q.  (BY MS. WILLIAMS)  Okay.  But you didn't make any

**NELL McCALLUM & ASSOCIATES, INC.**

1    inquiries about that, correct?
2        A.  After we received the email, no, I was actually
3    looking for someone else.
4        Q.  Okay.
5        A.  As we were kind of, you know, asked to do.
6        Q.  Did you ever recommend anyone else?
7        A.  No.
8        Q.  Did you -- have you ever referred any individuals
9    to apply for jobs at Shell?
10       A.  I haven't been on record, because Shell does have
11   a referral program, but I've had people reach out and
12   ask me about jobs.  I'm not sure if they subsequently
13   applied or not.
14       But the latest person who I did talk to about a
15   job was a guy by the name of Robert Bynoe, who is now a
16   member of Shell.  We talked maybe once or twice about
17   something he was applying for at Shell.  So I've talked
18   to people about roles at Shell before.
19       Q.  Are they roles in different groups or in your
20   group or?
21       A.  This role was in the power settlements group.  So
22   settlements confirmation type stuff, team.
23       Q.  Did you encourage him to apply for a position at
24   Shell?
25       A.  I don't think I gave him any thumbs up, thumbs

**NELL McCALLUM & ASSOCIATES, INC.**

262

1    down.  He was just asking questions about the actual

2    role and what I knew about it.  Did I know members of

3    the team.  Or I think Robert explicitly asked me about

4    somebody he was interviewing with, did I know them.

5        Q.  What is Robert's race?

6        A.  Robert is black.  He's from somewhere in the

7    Caribbean, I believe.

8        Q.  Okay.  Have you, other than Robert Bynoe, have

9    you spoken to anyone else about applying -- about them

10   applying for positions at Shell?

11       A.  Not that I can recall.

12       Q.  Would you encourage individuals to apply for jobs

13   at Shell?

14       A.  Knowing what I know now, no.

15       Q.  Okay.  When did you have the conversation with

16   Robert Bynoe?

17       A.  That was recent.  And that's why I didn't

18   encourage or discourage him.

19       Q.  Okay.

20       A.  I'm not trying to take food off anybody else's

21   table.  If that's what he wants to do, if it fits his

22   financials, considering what he wants, by all means.

23       Q.  You mentioned in passing that you are on blood

24   pressure medication or that you currently are on blood

25   pressure medication.  Are you on any other medication

NELL McCALLUM & ASSOCIATES, INC.

263

1    today other than your blood pressure medication?

2        A.  I --

3            MS. GIBSON:  Whoa, whoa.  Are you done with

4    the question?

5        Q.  (BY MS. WILLIAMS)  That might affect your ability

6    to -- your ability to recall information or to provide

7    truthful testimony?

8        A.  No.

9        Q.  Do you hold any license, professional licenses or

10   certificates in connection with the work that you do?

11       A.  No.

12       Q.  Are you a member of any professional

13   organizations?

14           MS. GIBSON:  Object.  Object to form.

15           Were you done?  Were you done?

16           MS. WILLIAMS:  I was done.

17           MS. GIBSON:  Okay.

18       A.  Regarding, like, my work at Shell?

19       Q.  (BY MS. WILLIAMS)  Yes.

20       A.  Nothing explicitly for me.  I think as a group

21   we're a part of certain organizations but just under the

22   Shell umbrella.  We're part of like the GCPA, that's a

23   common -- Gulf Coast Power Association.  We all have

24   access to be members of that.

25       Q.  Okay.  Did you ever serve in the military?

NELL McCALLUM & ASSOCIATES, INC.

264

1        A.  No.

2        Q.  Are you a member of any fraternities?

3        A.  Yes.

4        Q.  What -- more than one or one?

5        A.  Just one.

6        Q.  Okay.  What fraternity?

7        A.  Can't be two.

8        Q.  Well, there are different kinds of fraternities.

9    But what fraternity are you a member of?

10       A.  Kappa Alpha Psi.

11       Q.  Okay.  I don't know that we discussed this

12   specifically and I apologize if I'm repeating it.  What

13   is Michael Tickle's race?

14       A.  White.

15       Q.  Patrick Frnka's race?

16       A.  White.

17       Q.  Susan's race?

18       A.  White.

19       Q.  Doug --

20       A.  White.

21       Q.  -- Hund.

22           (Pause.)

23       A.  Michael Deley?

24       Q.  Thank you.

25       A.  White.

NELL McCALLUM & ASSOCIATES, INC.

265

1        Q.  Michael Deley's race is white?

2        A.  Yes.

3        Q.  And then you mentioned Chris Riley?  I'm sorry.

4        A.  White.

5        Q.  Jennifer Hartnett?

6        A.  White.

7        Q.  You mentioned -- have we -- have I identified or

8    we identified all of your colleagues currently?

9        A.  Not the two new -- Jim Barker is white.

10       Q.  Okay.

11       A.  He's been employed at Shell for a while.  Thomas

12   Jones is white.

13       Q.  Okay.

14       A.  Ken Ueng is Asian.

15       Q.  How do you spell Ken's last name, if you know?

16       A.  U-E-N-G.

17       Q.  Okay.  Does that cover all your colleagues

18   currently?

19       A.  Yeah.

20       Q.  Okay.  Have any -- we talked about Shawn Matthews

21   and I -- and I -- we talked about Luis Lugo as well.

22   Have any -- apart from those individuals, have any

23   African-American employees or colleagues at Shell shared

24   with you any complaints they have about their

25   experiences at Shell?

NELL McCALLUM & ASSOCIATES, INC.

310

1    story. But so are you saying that part of the reason
2    you're standing up to Shell is your dad felt like he
3    couldn't back then without risking your life?
4       A. And I don't want my daughters to ever have the
5    feeling that I had about -- I don't ever want them to
6    feel like I'm not their Superman. I don't want to feel
7    like Clark Kent.
8       Q. And you also had talked about another reason why,
9    as far as speaking up for other people: The community.
10       A. After talking to Shawn and Luis, and those guys
11    made way more money than I did and they still didn't
12    push the envelope for change. And I'm assuming they
13    struggle with not making that decision to push forward.
14    But for those guys, for guys that come after me, for
15    people who are sitting right now with their employer
16    dealing with something that they're scared to speak up
17    about because now you got to deal with if I lose my job,
18    what happens to my family?
19       I'm the breadwinner in my family. Will I get
20    blacklisted? The energy industry is small, so the
21    second something comes out about me suing Shell, no one
22    is going to touch me. Falling on the sword for all the
23    folks who didn't stand up for themselves, I'm -- that's
24    who I'm doing it for. Hey, this should not happen to
25    anybody again and I'm going to make sure it doesn't.

**NELL McCALLUM & ASSOCIATES, INC.**

311

1       Q. And staying at Shell and then investing in some
2    newer businesses, do you have a family to take care of?
3       A. Yeah.
4       Q. All right.
5       A. Got college tuition around the corner.
6       Two girls, two dogs.
7       A. Correct, yes.
8       Q. And the social worker wife, Brooke?
9       A. Yes.
10       Q. Who probably thinks you need more treatment.
11       A. Yes.
12       Q. Is she the one?
13       A. Yes.
14       Q. Okay. You know, talking about when Ms. Williams
15    was asking -- I'm sorry, I'm sorry. Take your time.
16       A. (Crying.) I should be enjoying life right now, I
17    should be enjoying my daughters. But I stay up a lot,
18    talking to my best friend, my wife. And she's pushing
19    me, hey, your mental health is the most important thing,
20    you have to take care of it.
21       (Pause.)
22       I'm good.
23       Q. Okay. God gave us tears for a reason.
24       All right. So Ms. Williams was asking you some
25    questions like are other people good at their jobs. Do

**NELL McCALLUM & ASSOCIATES, INC.**

312

1    you remember that -- on your team?
2       A. Yes.
3       Q. Are you trying to take money away from them?
4       A. Not at all.
5       Q. Okay.
6       A. I like them. I like them. Like, that's the --
7    it adds to why. I don't have a problem with them.
8       Q. Right.
9       A. Like, no problem at all.
10       Q. Right. You were just saying given how good you
11    are, there is no reason you should be so significantly
12    underpaid?
13       A. Correct.
14       Q. And the only -- once you eliminate the other
15    reasons, the only reason is race --
16       MS. WILLIAMS: Object --
17       Q. (BY MS. GIBSON) -- that Shell is doing this?
18       MS. WILLIAMS: Objection, form.
19       A. Correct.
20       Q. (BY MS. GIBSON) Okay. Now, I know you talked
21    about, like, they can have the money, I know the
22    betrayal is the hardest part, but does Shell need to pay
23    a hundred percent for what it did --
24       A. Yes.
25       Q. -- to help deter this in the future? Okay.

**NELL McCALLUM & ASSOCIATES, INC.**

313

1       A. Yes.
2       Q. I know you talked about different ranges and
3    different numbers. So are you aware we just got the
4    first pay data other than you in 2014 like at the end of
5    this February?
6       A. Yes.
7       Q. And we still don't have all the pay data.
8       MS. WILLIAMS: Objection, form.
9       Q. (BY MS. GIBSON) But once we do, will you run
10    what those damages look like more precisely?
11       A. Correct, yes.
12       Q. Okay. When Ms. Williams was asking you about
13    Mr. Tickle and if you had any concerns about what he
14    said on performance reviews, were you talking about what
15    he said orally during performance meetings?
16       A. Correct.
17       Q. Okay. And were his comments to you orally during
18    these meetings positive?
19       A. Yes.
20       Q. Okay. Do you remember being asked some questions
21    about job grades, like 6 pays less than 5, pays less
22    than 4, et cetera?
23       A. Yes.
24       Q. And that theoretically, hypothetically, someone
25    at, say, job grade 6 could make more than someone at job

**NELL McCALLUM & ASSOCIATES, INC.**

```
 1    THE STATE OF TEXAS )
      COUNTY OF HARRIS   )
 2

 3                     REPORTER'S CERTIFICATION
              VIDEOTAPED DEPOSITION OF ROBERT DEDMON
 4                     TAKEN APRIL 2, 2024

 5
          I, ROBIN GROSS, Certified Shorthand Reporter in and
 6    for the State of Texas, hereby certify to the following:

 7        That the witness, ROBERT DEDMON, was duly sworn by
      the officer and that the transcript of the oral
 8    deposition is a true record of the testimony given by
      the witness;
 9
          That the deposition transcript was submitted on
10    _____ to the witness or the attorney for the
      witness for examination, signature and return to Nell
11    McCallum & Associates, by _____;

12        That the amount of time used by each party at the
      deposition is as follows:
13
          MS. AMY E. GIBSON - 1:05
14        MS. MARLENE C. WILLIAMS - 6:13

15        I further certify that I am neither counsel for,
      related to, nor employed by any of the parties in the
16    action in which this proceeding was taken, and further
      that I am not financially or otherwise interested in the
17    outcome of the action.

18        Certified to by me this 4th day of April, 2024.

19

20

21

22    _____
      ROBIN GROSS CSR, TEXAS CSR NO. 9015
23    Expiration Date:  07-31-25
      Nell McCallum & Associates, Inc.
24    Firm Registration No. 10095
      Expiration Date:  01-31-2025
25    718 Westcott
      Houston, Texas 77007
      (713) 861-0203/Fax(713) 861-2324
```