## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **ROBERT DEDMON,** | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | **4:21-cv-03371** |
| **SHELL EXPLORATION &** | § | |
| **PRODUCTION COMPANY AND** | § | |
| **SHELL TRADING SERVICES** | § | |
| **COMPANY,** | § | **JURY DEMANDED** |
| **Defendants** | § | |

## <u>APPENDIX OF LEGAL AUTHORITIES</u>

<u>**Case(s)**</u>                                                                                       <u>**Tab(s)**</u>

*Blasingame v. Eli Lilly and Co.*,
 2013 WL 5707324 (S.D. Tex., Oct. 18, 2013) ............................................................ A

*Chamblee v. Miss. Farm Bureau Fed'n*,
 551 Fed. App'x. 757 (5th Cir. 2014) ........................................................................... B

*Drew v. McGriff Ins. Serv. Inc.*,
 2024 WL 1096568 (S.D. Tex., Mar. 13, 2024) ............................................................ C

*Foster v. United Rentals* (North America), Inc., No. 2:16-cv-114,
 2018 WL 1474186 (S.D. Tex. March 9, 2018) ............................................................ D

*Hamic v. Harris County WC & ID No. 36*,
 184 Fed. App'x 442 (5th Cir 2006) ............................................................................. E

*Igwe v. Menil Foundation*,
 2020 WL 7024374 (S.D. Tex., Nov. 30, 2020) ............................................................ F

*Li v. Univ. of Tex. Rio Grande Valley, No 7:15-cv-00534*,
 2018 WL 706472 (S.D. Tex. Feb. 2, 2018) ................................................................. G

*Obasogie v. Harris Cty. Hosp. Dist.*,
 2013 WL 6916246 (S.D. Tex. Dec. 31, 2013) ............................................................. H

*Teamah v. Applied Materials, Inc.*,
   715 Fed. App'x 343 (5th Cir. 2017) ............................................................... I

*Warren v. City of Tupelo*,
   332 Fed. App'x 176 (5th Cir. 2009) ............................................................... J

*Washington v. Hemphill Indep. Sch. Dist., C.A.08-cv-1032009*,
   2009 WL 749198 (E.D. Tex., Mar. 19, 2009) ........................................... K

# Tab A

2013 WL 5707324
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Patti A. BLASINGAME, Plaintiff,
v.
ELI LILLY AND COMPANY, Defendant.

Civil Action No. H–11–4522.
|
Oct. 18, 2013.

**Attorneys and Law Firms**

John Bruster Loyd, Jones Gillaspia Loyd LLP, Houston, TX, for Plaintiff.

John V. Jansonius, Lauren E. Mutti, Jackson Walker LLP, Dallas, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

SIM LAKE, District Judge.

**\*1** Plaintiff, Patti A. Blasingame, brings this action against defendant, Eli Lilly and Company, for sex discrimination in employment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, the Texas Commission on Human Rights Act ("TCHRA"), as codified in the Texas Labor Code 29, § 21.001, *et seq.,* and the Lilly Ledbetter Fair Pay Act of 2009 ("LLFPA"), 42 U.S.C. § 2000e–5(e)(3)(A). Pending before the court is Defendant's Motion for Summary Judgment (Docket Entry No. 22). For the reasons stated below, defendant's motion for summary judgment will be granted and this action will be dismissed.

### I. *Undisputed Facts*

Plaintiff was hired by defendant in 1992 as a pharmaceutical sales representative. In 2001 plaintiff received a promotion when Wesley Sackrule selected her from a list of company-approved candidates to serve as a District Sales Managers ("DSM") under his supervision. In October of 2010, following an interim review of her 2010 performance, plaintiff complained about Sackrule's

allegedly discriminatory conduct to Sackrule's immediate supervisor, Grady Grant. [1] Rebecca Savikas in defendant's Human Resources ("HR") Department investigated plaintiff's complaint. [2] In November of 2010 Sackrule was reassigned "to an individual contributor role ... because Savikas' investigation led [defendant] to conclude that Sackrule was not well suited to manage other employees." [3] Following Sackrule's reassignment plaintiff reported directly to Grant. [4] On January 1, 2011, Ashley Diaz–Granados assumed Sackrule's former position. [5] In March of 2011 plaintiff received a "Low Successful" performance rating for 2010. [6] Diaz–Granados delivered the "Low Successful" performance rating to plaintiff, but Grant rated plaintiff's performance for 2010. [7]

[1] Appendix in Support of Defendant's Motion for Summary Judgment ("Appendix"), attached to Docket Entry No. 22, p. 58 (Plaintiff's Deposition, p. 279).

[2] Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 11 (citing Appendix at 620–55 (Sackrule Investigation)).

[3] *Id.*

[4] Appendix at 61 (Plaintiff's Deposition, p. 282) and 217 (Declaration of Grady Grant).

[5] *Id.* at 5 (Plaintiff's Deposition, p. 26) and 217 (Declaration of Grady Grant).

[6] *Id.* at 61 (Plaintiff's Deposition, p. 282) and 217–18 (Grant Declaration, pp. 2–3).

[7] *Id.* at 62 (Plaintiff's Deposition, p. 283). *See also id.* at 217 (Grant Declaration, p. 2).

Following receipt of her "Low Successful" rating, plaintiff complained of retaliation to defendant's HR Department. [8] On August 26, 2011, plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission, Number 460–2011–03748. [9] Diaz–Granados rated plaintiff's 2011 performance as "Low Successful." [10] Plaintiff does not disagree with her 2011 performance rating, but believes that she "would not have been low successful had [she] not been through ten years of discrimination, emotional abuse, hostile

work environment and all those things." [11] Plaintiff remains employed by defendant and has a positive work relationship with Diaz–Granados. [12]

[8]     *Id.* at 68. *See also id.* at 619 (Participant Activity Information).

[9]     Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 13.

[10]    Appendix at 71–72 (Plaintiff's Deposition, pp. 313, 315).

[11]    *Id.* at 72 (Plaintiff's Deposition, p. 315:20–23).

[12]    *Id.* at 3–5 (Plaintiff's Deposition, pp. 17–18 and 26).

## II. *Standard of Review*

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. *Fed.R.Civ.P. 56(c).* Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Supreme Court has interpreted the plain language of *Rule 56(c)* to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc ) (per curiam) (quoting *Celotex,* 106 S.Ct. at 2553–2554).

**\*2** If the moving party meets this burden, *Rule 56(c)* requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Id.* (citing *Celotex,* 106 S.Ct. at 2553–2554). In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson*

*Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). Unsubstantiated assertions are not competent summary judgment evidence. *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994). The nonmovant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Id. at 1537.* District courts are under no duty "to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id.* (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915–16 & n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)). Factual controversies are to be resolved in favor of the nonmovant, "but only when ... both parties have submitted evidence of contradictory facts." *Little,* 37 F.3d at 1075.

## III. *Analysis*

Plaintiff alleges that defendant discriminated against her on the basis of sex by providing her unequal compensation and promotional opportunities provided to her male peers, and retaliating against her for complaining of sex discrimination by evaluating her 2010 performance as "Low Successful" in violation of both federal law (Title VII and the LLFPA) and state law (TCHRA). Defendant argues that it is entitled to summary judgment on all of plaintiff's claims either because they are time-barred or because plaintiff is unable to cite evidence capable of establishing that she has been subjected to sex discrimination or retaliation.

### A. Defendant Is Entitled to Summary Judgment on Plaintiff's Claims for Unequal Compensation and Failure to Promote

Plaintiff alleges in her Original Complaint that

> 11. ... despite her exceptional performance she has, on numerous occasions, witnessed male employees that performed the same job she and other females did, had fewer responsibilities, less experience, and lesser performance, paid more than her and her female peers, promoted more rapidly, and praised and recognized much more frequently, receiving additional bonuses and compensation as a result.

> 12. Favored treatment toward males evidences Defendant's discriminatory practices. However, the gap between male and female compensation, benefits, recognition and promotion is further widened by Defendant's long-term

2013 WL 5707324

discriminatory technique of giving Plaintiff and other females lower performance ratings in annual reviews than comparable or lesser male performers, causing further separation between what females are paid versus males, despite superior performance history that can be objectively measured.

...

**\*3** 15. Plaintiff's being denied promotions and pay while other male employees with equal or lesser performance, tenure, or any other standard of measurement in the workplace, were and are awarded them—caused Plaintiff to be more vocal in her complaints of disparate treatment.

16. Her complaints led to retaliation ...

...

20. Plaintiff sought help within Eli Lilly to be treated equally, but her complaints did not draw any investigation, but only further retaliation. In early 2011, as her relationship with Defendant's upper management continued to erode, Plaintiff was eligible for a bonus of tens of thousands of dollars. She had performed at an outstanding level and was clearly qualified to receive it. However, her manager made sure she did not by delivering her a poor review.

21. The poor review was given solely because Plaintiff had consistently complained about her mistreatment and the mistreatment of other women inside Eli Lilly & Company. [13]

[13]   Plaintiff's Original Complaint, Docket Entry No. 1, pp. 3–6 ¶¶ 11–12, 15–16, 20–21.

Defendant argues that it is entitled to summary judgment on claims that plaintiff has asserted for unequal compensation and promotional opportunities or failure to promote because all claims based on discrete acts that occurred before October 28, 2010, i.e., over 300 days before plaintiff filed her administrative charge of discrimination, are time-barred. Alternatively, defendant argues that it is entitled to summary judgment because plaintiff cannot establish a *prima facie* case for unequal compensation, unequal promotion opportunities, or failure to promote.

1. *Applicable Law*

(a) Title VII and TCHRA

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C. § 2000e–2(a) (1). The TCHRA similarly prohibits employers from discriminating against an employee on the basis of sex. Tex. Lab.Code §§ 21.051, 21.055. Claims brought pursuant to Title VII and the TCHRA are governed by the same legal and evidentiary standards. See *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 439 (5th Cir.2012) (citing *Mission Consolidated Independent School District v. Garcia,* 372 S.W.3d 629, 633–34 (Tex.2012)). See also *Waffle House, Inc. v. Williams,* 313 S.W.3d 796, 804 (Tex.2010) (recognizing that "[o]ne express purpose of the [TCHRA] is to 'provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments.' "). A claim of employment discrimination can be proven through direct or circumstantial evidence. *Russell v. McKinney Hospital Venture,* 235 F.3d 219, 222 (5th Cir.2000). If there is no direct evidence of discrimination, courts apply the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,* 482 F.3d 408, 411 (5th Cir.2007). The *McDonnell Douglas* framework requires the plaintiff to demonstrate a *prima facie* case of discrimination; then shifts the burden to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action at issue; and, if the defendant meets its burden of production, shifts the burden back to the plaintiff to cite evidence capable of creating a genuine issue of material fact that the employer's reason is a pretext for discrimination. *Id.* at 411.

(b) Exhaustion of Administrative Remedies, Limitations, and the Lilly Ledbetter Fair Pay Act

**\*4** A Title VII plaintiff must exhaust administrative remedies by filing a charge of discrimination with the EEOC within 180 days of learning of the unlawful conduct. 42 U.S.C. § 2000e–5(e)(1); *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2070, 153 L.Ed.2d 106 (2002); *Huckabay v. Moore,* 142 F.3d 233, 238 (5th Cir.1998). Because Texas has a state agency for civil rights complaints, the Texas Workforce Commission Civil Rights Division, it is a "deferral state" in which Title VII extends the charge filing period for discrimination claims to 300 days. 42 U.S.C. § 2000e–5(e)(1); *Huckabay,* 142 F.3d at 238. Filing a timely administrative charge "is a precondition to

filing suit in district court." *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 379 (5th Cir.2002), *cert. denied,* 537 U.S. 1200, 123 S.Ct. 1287, 154 L.Ed.2d 1041 (2003) (quoting *Dao v. Auchan Hypermarket,* 96 F.3d 787, 789 (5th Cir.1996)). Like Title VII, "a TCHRA action requires an exhaustion of administrative remedies that begins with filing a complaint with the Texas Workforce Commission [C]ivil [R]ights [D]ivision." *Waffle House,* 313 S.W.3d at 804. In light of worksharing agreements between the agencies and the desire to avoid duplication of efforts, courts consider the filing of a charge with the EEOC as satisfaction of state administrative exhaustion requirements. *See Burgmann Seals America, Inc. v. Cadenhead,* 135 S.W.3d 854, 857 (Tex.App.-Houston [1st Dist.], 2004) ("We hold that providing the name of the TCHR and checking the box for simultaneous filing is the equivalent of filing with the TCHR.").

In 2009 the LLFPA added the following language to Title VII's provision governing time limits for filing administrative charges:

> For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this subchapter, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

42 U.S.C. § 2000e–5(3)(A). Congress enacted the LLFPA in response to the Supreme Court's decision in *Ledbetter v. Goodyear Tire & Rubber Co., Inc.,* 550 U.S. 618, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007), which held that a plaintiff's wage discrimination claim was untimely because the administrative charge was filed more than 300 days following the pay-setting decision. *Id.* at 622. The LLFPA was enacted to extend the accrual period for asserting claims based on discriminatory compensation decisions. The LLFPA

ensures that the period during which a plaintiff may file a charge of discrimination renews each time an employee is subjected to a discriminatory wage decision, i.e., by receiving a paycheck that reflects the discriminatory decision. The LLFPA addresses the problem identified by the dissent in *Ledbetter,* that the 300–day annual limitation strips a plaintiff of a remedy because a plaintiff is often unaware that discrimination motivated a compensation decision until it is too late. *See Almond v. Unified School District No. 501,* 665 F.3d 1174, 1182–83 (10th Cir.2011), *cert. denied,* —– U.S. —–, 133 S.Ct. 317, 184 L.Ed.2d 155 (2012) (the dissent in *Ledbetter* argued that the better rule is "to trigger the accrual of a compensation discrimination claim not only when employers intentionally discriminate in pay-setting decisions, but also when they discriminate in other ways that cause a discriminatory pay disparity"). The LLFPA deems each paycheck issued pursuant to a discriminatory pay structure an independent, actionable employment practice. *Id.* at 1180. *See also Wang v. Prudential Insurance Co. of America,* 2010 WL 1640182, *4 (N.D.Tex. April 2, 2010) ("The Ledbetter Act simply renews a plaintiff's cause of action each time the plaintiff receives a discriminatory paycheck.").

**\*5** The LLFPA also explicitly provides for "recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to the unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge." 42 U.S.C. § 2000e–5(e)(3)(B). The LLFPA does not exempt a plaintiff from pursuing claims based upon discrete acts that do not directly impact compensation. *See Tillman v. Southern Wood Preserving of Hattiesburg, Inc.,* 377 Fed.Appx. 346, 350 n. 2 (5th Cir.2010) (citing *Harris v. Auxilium Pharmaceuticals, Inc.,* 664 F.Supp.2d 711, 745–46 (S.D.Tex.2009), *vacated as to FLSA findings only,* 2010 WL 3817150 (S.D.Tex. Sept.28, 2010)). *See also Morgan,* 122 S.Ct. at 2072 (identifying "discrete acts" as easily identifiable incidents, such as refusal to hire, termination, failure to promote, and denial of transfer); *Moore v. Napolitano,* Civil Action No. 07–2666, 2009 WL 4723169 *10 n. 6 (E.D.La. Dec.3, 2009) (stating that the LLFPA did not disturb the Supreme Court's holding in *Morgan,* 122 S.Ct. at 2072, that a plaintiff may not file an administrative charge with respect to discrete acts, e.g., failure to promote claims, that did not occur within the appropriate limitations period).

The LLFPA does not act to extend the time for filing claims under the TCHRA. In *Prairie View A & M University v.*

*Chatha,* 381 S.W.3d 500, 507–09 (Tex.2012), the Texas Supreme Court held that the TCHRA does not incorporate the LLFPA's definition of when a discriminatory act occurs because the Texas legislature has not passed an analogous amendment to the TCHRA.

2. *Application of the Law to the Facts*

(a) Claims for Failure to Promote and Unequal Compensation Arising from Discrete Acts that Occurred Before October 28, 2010, Are Time–Barred

Discrete acts that occurred outside the 300–day, charge-filing period cannot form the basis of discrimination claims for purposes of Title VII or the TCHRA. Plaintiff does not dispute defendant's assertion that since she filed her EEOC charge on August 26, 2011, the 300–day period extends back to October 28, 2010. Plaintiff's claims arising from discrete acts that occurred before that date are time-barred because the LLFPA does not save such claims. *Tillman,* 377 Fed.Appx. at 350 n. 2 (citing *Harris,* 664 F.Supp.2d at 745–46, for its holding that the LLFPA does not apply to discrete acts); *Chatha,* 381 S.W.3d at 507–09 (holding that the TCHRA does not incorporate the LLFPA's definition of when a discriminatory act occurs because the Texas legislature has not passed an analogous amendment to the TCHRA).

**(1) Failure to Promote Claims Are Time–Barred**

Many courts, including others in this district, have concluded that the LLFPA does not affect the statutory period for filing discrimination claims arising from discrete acts such as the failure to promote. In *Harris* the court explained,

> **\*6** A number of other district courts have distinguished failure to promote claims from compensation claims and found that, even after the enactment of the [LL]FPA, the failure to promote claims are still time-barred if the plaintiff does not file an EEOC complaint within 300 days of the discriminatory action ... [T]he Court finds that, in the instant case, [plaintiff's] failure to promote claims do not challenge a "compensation decision" as contemplated by the [LL] FPA ... The Court finds that the 300

day statute of limitations applies to [plaintiff's] failure to promote claims.

664 F.Supp.2d at 745–46. In *Tillman,* 377 Fed.Appx. at 349–50, the Fifth Circuit cited *Harris* in support of its conclusion that the LLFPA did not exempt the plaintiff from pursuing claims based on the discrete acts that were at issue in that case, i.e., a reprimand, a pay-raise exclusion, and denials of weekend overtime.

The court, therefore, concludes that any claim that plaintiff has asserted or attempted to assert based on a failure to promote that occurred before October 28, 2010, is time-barred and not saved by the LLFPA because a failure to promote is an act identified by the Supreme Court in *Morgan,* 122 S.Ct. at 2072, as an easily identifiable, discrete discriminatory act. *See Hernandez v. City of Corpus Christi,* 820 F.Supp.2d 781, 795 (S.D.Tex.2011) (300–day statute of limitations applied to plaintiff's failure to promote claims); *Tryals v. Altairstrickland, LP,* No. H–08–3653, 2010 WL 743917, *7 (S.D.Tex. Feb.26, 2010) ("The rule set out in *Ledbetter* and prior cases—that 'current effects alone cannot breathe new life into prior, uncharged discrimination,' *Ledbetter,* [127 S.Ct. at 2169]—is still binding law for Title VII disparate treatment cases involving discrete acts other than pay."); *Chatha,* 381 S.W.3d at 507–09 (TCHRA does not incorporate the LLFPA's definition of when a discriminatory act occurs).

**(2) Unequal Compensation Claims Are Time–Barred**

Recent district court decisions have held that if an employee's compensation during the charge filing period is affected by a discrete discriminatory act that occurred outside the charge filing, the LLFPA applies to the claim, allowing the clock to begin running each time an employee's payment is dispersed. *See, e.g., Vuonq v. New York Life Insurance Co.,* No. 03–Civ.–1075(TPG), 2009 WL 306391, at *8–*9 (S.D.N.Y. Feb.6, 2009). In *Vuonq* an employee brought a Title VII discrimination claim after his employer decided to allocate a lesser percentage of the company's performance-related compensation to him than to the employee's co-Managing Partner. The employee argued that the LLFPA applied to his claim because each paycheck compensated him less than it would have had the discriminatory decision not occurred. *Id.* at *9. The court agreed with the employee's argument and held that the employee's claim was the type of claim that "is expressly declared to be timely by virtue of the [LLFPA]." *Id.* For the LLFPA to apply to plaintiff's

2013 WL 5707324

claim for unequal compensation arising from performance evaluations that occurred before October 28, 2010, plaintiff must present evidence capable of establishing that the allegedly discriminatory performance evaluations that she received before October 28, 2010, affected the compensation that she received within the 300–day charge filing period.

**\*7** The only evidence of unequal pay that plaintiff has presented consists of year-end pay stubs for 2008 showing that she received approximately \$80,000 less that John Crawford. [14] Plaintiff has not presented any evidence of unequal promotional opportunities. Although plaintiff has also submitted a chart or "dashboard," which she contends shows that over the decade she was supervised by Sackrule she received lower evaluations than Crawford even in years when her sales performance was better than Crawford's, [15] missing from plaintiff's response to defendant's motion for summary judgment is a citation to any evidence capable of establishing that either the compensation or promotional opportunities she received during the charge filing period —i.e., up to 300 days before she filed her formal charge of discrimination—were, as she alleges, less than the compensation or promotional opportunities received by Crawford or any other male peer. Also missing is a citation to evidence capable of establishing that plaintiff's receipt of less compensation or promotional opportunities than Crawford or other male peers during the charge filing period was caused by performance evaluations that predate that period. Absent such evidence plaintiff is unable to raise a Title VII claim for unequal compensation based on performance evaluations that she received prior to the charge filing period. Even if plaintiff were able to present such evidence her TCHRA claim for unequal compensation would be time-barred because the TCHRA does not incorporate the LLFPA's definition of when a discriminatory act occurs. The court concludes, therefore, that any claim that plaintiff is asserting for unequal compensation in 2008 or for unequal compensation arising from performance evaluations that she received outside the charge filing period, i.e., before October 28, 2010, is time-barred. *See Wang,* 2010 WL 1640182, at \*4 ("[T]he Ledbetter Act ... only has significance where a plaintiff alleges a series of discriminatory payments.... The Ledbetter Act simply renews a plaintiff's cause of action each time the plaintiff receives a discriminatory paycheck."); *Chatha,* 381 S.W.3d at 507–09 (holding that the TCHRA does not incorporate the LLFPA's definition of when a discriminatory act occurs because the Texas legislature has not passed an analogous amendment to the TCHRA).

[14]   Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 34–1, p. 18 (citing Docket Entry No. 31, Exhibit 5, pp. 1–2).

[15]   *See* Docket Entry No. 31, Exhibit 5, p. 3.

(b) Plaintiff Unable to Raise Fact Issue for Trial on Unequal Compensation and Failure to Promote Claims

For the reasons explained in § III.A.2(a), above, the court has concluded that defendant is entitled to summary judgment on plaintiff's Title VII and TCHRA claims for unequal compensation and promotional opportunities, or failure to promote arising from performance evaluations that she received before the charge filing period because such claims are time-barred. The court also concludes that the defendant is entitled to summary judgment on these claims because plaintiff is unable to present direct or circumstantial evidence capable of raising a genuine issue of material fact on any of them.

**(1) No Direct Evidence of Gender Discrimination**

**\*8** "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *West v. Nabors Drilling USA, Inc.,* 330 F.3d 379, 384 n. 3 (5th Cir.2003) (quoting *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897 (5th Cir.2002), *cert. denied,* 539 U.S. 926, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003)). "In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face." *Portis v. First National Bank of New Albany, Mississippi,* 34 F.3d 325, 328 (5th Cir.1994). *See also Rubinstein v. Administrators of Tulane Educational Fund,* 218 F.3d 392, 402 (5th Cir.2000), *cert. denied,* 121 S.Ct. 1393 (2001) (finding that a dean's testimony that he denied a professor a pay raise because the professor filed a discrimination suit against the university "could be no more direct on the issue of retaliation"), and *Fabela v. Socorro Independent School District,* 329 F.3d 409, 415 (5th Cir.2003) (describing direct evidence as "any statement or document which shows on its face that an improper criterion served as the basis—not necessarily the sole basis, but a basis—for the adverse employment action"). However, if an inference or presumption is required for the evidence to be probative as to an employer's discriminatory animus, the evidence is circumstantial, not direct. *West,* 330 F.3d at 384 n. 3 (citing *Sandstad,* 309 F.3d 897). "A plaintiff who can offer sufficient direct evidence of intentional discrimination should prevail,

just as in any other civil case where a plaintiff meets his burden." *Nichols v. Loral Vought Systems Corp.,* 81 F.3d 38, 40 (5th Cir.1996) (citing *Portis,* 34 F.3d at 328 n. 6).

> When a plaintiff presents credible direct evidence that discriminatory animus in part motivated or was a substantial factor in the contested employment action, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have been made regardless of the forbidden factor. Direct evidence is evidence which, if believed, proves the fact without inference or presumption.

*Brown v. East Mississippi Electric Power Assoc.,* 989 F.2d 858, 861 (5th Cir.1993).

Asserting that her immediate supervisor, Wesley Sackrule, made disparaging and discriminatory statements about women, plaintiff argues that Sackrule's statements constitute direct evidence that the disparate treatment and retaliation she suffered were motivated by discriminatory animus for her gender. [16] As evidence of Sackrule's allegedly discriminatory comments, plaintiff cites excerpts from her own deposition that she argues shows "trouble from the start" of her career as a DSM reporting to Sackrule. [17] Plaintiff testified that during her first year as a DSM reporting to Sackrule, i.e., at the end of 2001, her sales team finished fourth or fifth in the nation, but despite this exceptional performance, Sackrule told her she would not be credited for it because she had only been in the DSM position since July 1, 2001, and, therefore, was not responsible for her team's performance. [18]

[16]     Plaintiff's Response, Docket Entry No. 30, pp. 9–10 (citing Plaintiff's Original Complaint, Docket Entry No. 1, pp. 4–5). Although plaintiff also points to discrepancies between the amounts of pay that she and a male colleague received in 2008 as direct evidence of sex discrimination, *id.* at 19–21, discrepancies such as this are not direct but, instead, circumstantial evidence that is analyzed under the standard established by the Supreme

Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

[17]     Plaintiff's Response, Docket Entry No. 34–1, pp. 15–17.

[18]     *Id.* at 16 (citing Plaintiff's Deposition, Docket Entry No. 30–3, p. 96).

**\*9** Plaintiff testified that in 2002 her team finished fourteenth out of forty-two teams, i.e., in the top third, she served as "Actos champ," and she was selected by her peers as "Champ" and "MVP" in recognition of her leadership, ability, and teamwork, but that instead of rating her "High Successful," Sackrule rated her "Successful." [19] When plaintiff protested her "Successful" rating, Sackrule responded, "Well, yeah, your results were good; but look at these one or two things that weren't." [20] When plaintiff pressed Sackrule about his decision to rate her "Successful" instead of "High Successful," he explained to her that her rating was relative to that of her peers, and that if she needed more money then her husband should go back to work. [21]

[19]     *Id.* (citing Plaintiff's Deposition, Docket Entry No. 30–3, pp. 103–05).

[20]     Plaintiff's Deposition, Docket Entry No. 30–3, p. 104:23–25.

[21]     *Id.* at 105:2–106:2.

Plaintiff also testified that in 2005, 2007, or 2008—she could not remember exactly when—Sackrule told a room full of people that she was "having one of her moments." [22] Plaintiff argues that "[t]his is a common derogatory expression used in reference to women, intended to be humorous, but inappropriate in the workplace, particularly when spoken by a manager to one his reports in front of her peers on numerous occasions." [23]

[22]     Plaintiff's Response, Docket Entry No. 34–1, p. 18 (citing Plaintiff's Deposition, Docket Entry No. 30–3, p. 155).

[23]     *Id.*

In addition, plaintiff states in her declaration that

> [i]t was common for Sackrule to comment on my family situation and how Sackrule believed it interfered with my ability to do my job. For most of the time Sackrule managed

me, my husband did not work and stayed at home to care for the children. Sackrule criticized this arrangement frequently.

Other frequent comments were "Unless you sacrifice family for a role as a manager you will never be all that you can be," and "men make better employees." [24]

[24]     *Id.* (citing Blasingame Declaration, Docket Entry No. 30–1, p. 2).

The Fifth Circuit has explained that workplace remarks may constitute direct evidence of discrimination if they are

> 1) related [to the protected class of persons of which the plaintiff is a member]; 2) proximate in time to the [complained-of adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue.

*Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655 (5th Cir.1996). If the comments fail to meet these criteria, e.g., if they are vague and remote in time, the speaker has no authority or influence over the employment decisions, or the remarks are not related to the employment decision at issue, then the remarks are merely stray remarks that are insufficient to establish discrimination. *See Jackson v. Cal–Western Packaging Corp.,* 602 F.3d 374, 377 (5th Cir.2010) ("Jackson has not shown that the comment was proximate in time to the termination or related to the employment decision, and thus the comment cannot qualify as direct evidence."). Although the Fifth Circuit no longer uses the four-prong *CSC Logic* test when remarks are submitted as evidence of pretext in cases based on indirect, circumstantial evidence, the Fifth Circuit continues to use this four-prong test "when a remark is presented as direct evidence of discrimination apart from the *McDonnell Douglas* framework." *Laxton v. Gap, Inc.,* 333 F.3d 572, 583 n. 4 (5th Cir.2003) (citing *Auguster v. Vermilion Parish School Board,* 249 F.3d 400, 404–05 (5th Cir.2001)).

 **\*10**  Accepting plaintiff's assertions that the statements Sackrule made in 2001 and 2002 were made in the context of rating her performance, they are not direct evidence of unequal compensation based on gender discrimination

because plaintiff has failed to cite any evidence showing that either the compensation or opportunities for promotion that she received during those years was unequal to the compensation and opportunities for promotion received by her male peers. Plaintiff has failed to differentiate herself from her male peers, and has presented no evidence of any male coworker who was better compensated than she during these years despite having had similar or worse performance.

The only evidence of unequal pay that plaintiff has presented consists of year-end pay stubs for 2008 showing that she received less pay than John Crawford. [25] But the statements that plaintiff attributes to Sackrule do not constitute direct evidence that differences between the compensation that plaintiff and Crawford received in 2008 were attributable to discrimination because the 2001 and 2002 comments that plaintiff cites are remote in time, and the comments that plaintiff says may have been made in 2005, 2007, or 2008 (i.e., when Sackrule told a room full of employees that plaintiff was "having one of her moments") were neither indicative of gender bias nor made in the context of rating plaintiff's performance. Sackrule's allegedly frequent statements that plaintiff would never be all that she could be unless she sacrificed her family for her role as a manager is not direct evidence of discrimination because it is gender neutral and defendant has submitted undisputed evidence that Sackrule made the same comment to at least one of plaintiff's male peers. [26]

[25]     *Id.* (citing Docket Entry No. 31, Exhibit 5, pp. 1–2).

[26]     Appendix at 579 (stating that on June 24, 2010, Clayton McCoy shared concerns regarding Sackrule's leadership style and stated, *inter alia,* that Sackrule "questions his commitment to the business and believes he does this b/c [he] has a large family (5 kids)").

The only statement of Sackrule's that could conceivably constitute direct evidence of gender bias is the statement that "men make better employees." [27] Accepting plaintiff's contention that this statement demonstrates discriminatory animus that caused the discrepancy in pay evidenced by the 2008 pay stubs that plaintiff has attached to her response in opposition to the defendant's motion for summary judgment, defendant is still entitled to summary judgment because any claim based on unequal pay in 2008 is time-barred even if the LLFPA is applied to plaintiff's claims. The LLFPA only provides for "recovery of back pay for up to two

years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to ... [those] that occurred outside the time for filing a charge." 42 U.S.C. § 2000e–5(e)(3)(B). Because plaintiff filed her charge of discrimination in August of 2011, any claim for unequal compensation occurring before August of 2009 would be time-barred regardless of whether the LLFPA applies to her claims.

27    Plaintiff's Response, Docket Entry No. 34–1, p. 18 (citing Blasingame Declaration, Docket Entry No. 30–1, p. 2).

Moreover, absent an evidentiary connection between Sackrule's comments and his evaluation of plaintiff's job performance, a factfinder would have to infer or presume that Sackrule's comments evidence an animus towards women that manifested itself in his evaluation of plaintiff's performance, and that Sackrule's evaluations of plaintiff's performance caused plaintiff to receive compensation and promotional opportunities that were unequal to those received by her male peers. Because direct evidence of discrimination is evidence that does not require inferences or presumptions to connect allegedly discriminatory conduct with a plaintiff's protected characteristics, the statements that plaintiff attributes to Sackrule are not direct evidence that Sackrule's annual ratings of her performance were motivated by animus for her gender. See West, 330 F.3d at 384 n. 3 (citing Sandstad, 309 F.3d 897) (recognizing that if an inference or presumption is required for the evidence to be probative as to an employer's discriminatory animus, the evidence is circumstantial, not direct).

**(2) No Circumstantial Evidence of Discrimination**

*11   Circumstantial evidence is presented using the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that analysis the plaintiff must present evidence establishing a prima facie case. Id. at 1824. If a prima facie case is established, a presumption of discrimination arises and the burden of production shifts to the defendant to offer evidence of a legitimate, non-discriminatory reason for the action at issue. Id. If the defendant meets this burden, the presumption created by the prima facie case disappears, and the plaintiff must then cite substantial evidence showing that each of the employer's proffered reasons was a pretext for discrimination. Id. at 1825. See also Reeves, 120 S.Ct. at 2106; Wallace v. Methodist Hospital System, 271 F.3d 212, 220 (5th Cir.2001), cert. denied, 535 U.S. 1078, 122 S.Ct.

1961, 152 L.Ed.2d 1022 (2002). The plaintiff may meet his burden by citing evidence either that the defendant's proffered nondiscriminatory reasons are false or, if true, that his protected characteristic was, nevertheless, the motivating factor for the adverse employment action. See Reeves, 120 S.Ct. at 2112.

[T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff.... The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason ... is correct." ... In other words, "[i]t is not enough ... to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."

Id. at 2107–08 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 2756, and 2754, 125 L.Ed.2d 407 (1993)).

Defendant argues that it is entitled to summary judgment because plaintiff cannot establish a prima facie case for her unequal compensation, unequal promotion opportunities, or failure to promote claims and cannot establish that defendant's legitimate, non-discriminatory reasons for her performance evaluations and failure to be promoted were pretexts for gender discrimination. To establish a prima facie case of discrimination based on disparate treatment a plaintiff must show that she is a member of a protected class, is qualified for the job she held or sought, suffered an adverse employment action, and received less favorable treatment than a similarly situated individual outside her protected class. See McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir.2007). Defendant does not dispute that plaintiff belongs to a protected class, was qualified for her position as District Sales Manager, and suffered adverse employment actions in the form of unfavorable performance evaluations. Instead, defendant argues that plaintiff is unable to establish the fourth prong of a prima facie case for unequal compensation, unequal promotion opportunities, or failure to promote because plaintiff cannot cite evidence capable of establishing that she was treated less favorably than any male peer in a nearly identical situation who was paid more, promoted, or provided more favorable opportunities for promotion than she.

*12   Plaintiff disputes defendant's argument that she has failed to establish the fourth prong of a prima facie case as

simply not true. Blasingame will not publicly disclose any information about her male peer herein, but has filed with her reply under seal as Exhibit 5, three pages of documents ... The first of the documents reveals BLASINGAME's total compensation for 2008. (*Id.*) The second page of the document reveals her male peer's total compensation for 2008. (*Id.*) The third page is a ten (10) year "dashboard," an internal tool of Lilly, that reflects Blasingame and her peer's ten year, totally objective sales performance rankings. (*Id.*) These are the hard numbers of actual sales by each employee and reveal their respective rankings. (*Id.*) These ratings show the observer, at the very least, three interesting, material facts that leave unanswered questions of material fact for the jury. (*Id.*) Blasingame and her peer are nearly identical in their status and tenure at Lilly. The mere fact they are ranked together on an internal Lilly chart for the last 10 years confirms such. The respective pages showing the compensation of the two have a line item termed "performance award". (*Id.*) For BLASINGAME, the amount is $41,200.88. (*Id.*) For her male counterpart the amount is $67,382.72. (*Id.*) What is the significance of this? These amounts are based on 2007 performance alone that paid in 2008, as reflected on these two documents. (*Id.*) However, the "dashboard" reveals that Blasingame outperformed her male peer in objective sales numbers in 2007. (*Id.*) Her final ranking was number 5, putting her in the top 3%. (*Id.*) Her male counterpart's final ranking number 32, putting him in the top 21%. (*Id.*) Yet, the male was paid more than $26,000 more

than Blasingame. (*Id.*) In addition, the reader will note, despite Blasingame's superior objective sales performance in 2007, her male peer received an "E" rating, which is the highest rating and stands for "Exemplary" while Blasingame received the lesser rating of "S" which stands for "Successful".

(*Id.*)[28]

[28]     *Id.* at 20.

In order to establish the fourth prong of her *prima facie* case, i.e., that others similarly situated were treated more favorably, plaintiff and her alleged comparator must be similarly situated with respect to their job titles, job duties, responsibilities, qualifications, and experience. *Berguist v. Washington Mutual Bank,* 500 F.3d 344, 353 (5th Cir.2007), *cert. denied,* 552 U.S. 1166, 128 S.Ct. 1124, 169 L.Ed.2d 950 (2008). Plaintiff does not dispute that Crawford held a different job title, i.e., Senior District Sales Manager instead of District Sales Manager, that the difference in job title entailed differences in qualifications and experience that made Crawford eligible for higher raises,[29] or that Crawford's performance was better than hers.[30] Plaintiff has not presented evidence capable of establishing that Crawford or any other male peer received promotion opportunities that surpassed those she received. Moreover, defendant has presented undisputed evidence that several male District Sales Managers had performance ratings similar to plaintiff's, yet received less compensation than she.[31] In light of this undisputed evidence and plaintiff's inability to cite any evidence capable of establishing that she and John Crawford were similarly situated for purpose of her discrimination claims, the court concludes that defendant is entitled to summary judgment on plaintiff's claims for unequal compensation and promotional opportunities, or failure to promote because plaintiff has failed to satisfy the fourth prong of a *prima facie* case for such claims.

[29]     Appendix at 209 (Deposition of Kendall Nichols at p. 61:7–21 (acknowledging that promotion from Sales Manager to Senior Sales Manager was a "within-job promotion" so that "the person's job doesn't change but their title changes and they are on a ... potentially different pay scale")).

30    *Id.* at 25 (Plaintiff's Deposition, p. 111:17–20 (acknowledg-in that Crawford's performance was at times better than her performance)).

31    Defendant's Motion for Summary Judgment, Docket Entry No. 22, p. 8 (citing Appendix at 9, 455–515.4).

## B. Defendant Is Entitled to Summary Judgment on Plaintiff's Retaliation Claim

**\*13**  Defendant argues that it is entitled to summary judgment on plaintiff's claim that the "Low Successful" performance evaluation she received in March of 2011 represents retaliation for having complained of gender discrimination because plaintiff is unable to establish a *prima facie* case. Alternatively, defendant argues that it is entitled to summary judgment because it had legitimate, nondiscriminatory reasons for evaluating plaintiff's 2010 performance as "Low Successful," and that plaintiff has failed to cite evidence from which a reasonable fact-finder could conclude that its nondiscriminatory reasons were pretexts for retaliation.

### 1. *Applicable Law*

Title VII makes it unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice ... or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e–3(a). The TCHRA similarly provides that

> [a]n employer ... commits an unlawful employment practice if the employer ... retaliates or discriminates against a person who, under this chapter: 1) opposes a discriminatory practice; 2) makes or files a charge; 3) files a complaint; or 4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

Tex. Lab.Code § 21.055. The Texas Supreme Court has recognized that "[t]he TCHRA was enacted to address the specific evil of discrimination and retaliation in the workplace, as well as to coordinate and conform with

federal anti-discrimination and retaliation laws under Title VII." *City of Waco v. Lopez,* 259 S.W.3d 147, 153–55 (Tex.2008). "Although [Texas courts] consider the TCHRA's plain language and state precedent in interpreting the statute, [they] also look to federal law for interpretive guidance to meet the legislative mandate that the [TCHRA] is intended to 'provide for the execution of the policies of Title VII ... and its subsequent amendments.' " *Crutcher v. Dallas Independent School District,* —— S.W.3d ——, 2013 WL 4517002, *2 (Tex.App.-Dallas, Aug.26, 2013) (quoting Tex. Lab.Code § 21.001(1)). Absent direct evidence of retaliation, both federal and state courts apply the *McDonnell Douglas* burden shifting analysis. *See McCoy,* 492 F.3d at 556–57; *Crutcher,* —— S.W.3d at ——, 2013 WL 4517002 at *2–*3.

To establish a *prima facie* case of retaliation plaintiff must show that (1) she engaged in an activity protected by Title VII; (2) she experienced an adverse employment action following the protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action. *McCoy,* 492 F.3d at 556–57; *Crutcher,* —— S.W.3d at ——, 2013 WL 4517002, at *3. Establishment of a *prima facie* case gives rise to an inference of retaliation. *Montemayor v. City of San Antonio,* 276 F.3d 687, 692 (5th Cir.2001). This inference, in turn, shifts the burden of production to the defendant who must then articulate a legitimate, nonretaliatory reason for the challenged employment action. *McCoy,* 492 F.3d at 557; *Crutcher,* ——S.W.3d at ——, 2013 WL 4517002, at *3. Once a defendant articulates such a reason the inference of retaliation raised by the *prima facie* showing drops from the case. *Montemayor,* 276 F.3d at 692. At this juncture the plaintiff bears the burden of establishing that the employer's stated reason is a pretext for the real retaliatory purpose. *McCoy,* 492 F.3d at 557; *Crutcher,* ——S.W.3d at ——, 2013 WL 4517002, at *3. If the employee fails to prove, or raise a genuine dispute of material fact that the employer's stated reason is a pretext for retaliatory conduct, the defendant is entitled to summary judgment. *See McCoy,* 492 F.3d at 561–62. *See also Crutcher,* —— S.W.3d at ——, 2013 WL 4517002 (granting defendant's motion for summary judgment upon concluding that plaintiff failed to establish a causal connection between her protected activity and the defendant's adverse employment action).

### 2. *Application of the Law to the Facts*

**\*14**  Defendant argues that it is entitled to summary judgment on plaintiff's retaliation claim because plaintiff has failed to present any evidence capable of establishing that

there is a causal connection between her protected activity and the "Low Successful" evaluation that she received for her 2010 performance. Citing her own declaration, plaintiff responds that she

> complained to Lilly Human Resources about her Director, Sackrule, in October 2010.... Lilly gave Blasingame a Low Successful rating shortly thereafter.... Lilly's proffered reason Blasingame was given a Low Successful rating for her 2010 performance, was her "lackluster Cymbalta sales." ... Their proffered reason is simply a pretext for retaliation. All of the area teams had lackluster Cymbalta sales in 2010. (See Defendant's dashboard ranking for the area team's Cymbalta sales results and rankings attached hereto under seal as Exhibit 6 and Blasingame Declaration at p. 2.) Blasingame managed the Houston Team listed therein....

> In 2010, in this area of the country, only one district made its Cymbalta goal at 102%.... Two districts finished at 99% and two districts, including Blasingame's, finished at 98%.... Five of the districts finished at 97%.... This means only one district met target, Tulsa, OK.... Blasingame's team finished number four out of ten in 2010 for Cymbalta sales in the area.... All of the District Sales Managers who tied with Blasingame, or finished under her, on Cymbalta performance did not receive Low Successful, or lower, ratings.... The only other person to receive a Low Successful rating was Clayton McCoy and he finished below Blasingame in Cymbalta sales and overall sales.... Regarding overall sales goals for 2010, only one district in Blasingame's area met that goal by finishing at 101%.... The next three districts finished at 99%, including Blasingame's, and six districts finished below that.... Therefore, Blasingame's district tied for second place out of ten districts in 2010 for overall sales.

> This pure data establishes a significant material question of fact that precludes summary judgment on Blasingame's retaliation claim. [32]

[32] Plaintiff's Response, Docket Entry No. 34–1, pp. 21–22 (citing Declaration of Patti A. Blasingame, Docket Entry No. 30–1, p. 2). *See also* Docket Entry No. 31, Exhibit 5.

Defendant replies that

> there is no admissible evidence that other managers failed to meet their Cymbalta goals. While Plaintiff

submits records purporting to demonstrate other managers' Cymbalta sales, such records are not authenticated, are not proper evidence, and in any case are immaterial to the overall reasons for Blasingame's 2010 performance rating ... Lilly objects to the Court's consideration of this alleged "evidence" of other managers' sales.

...

Plaintiff fails to address each of Lilly's stated reasons for her "Low Successful" rating in 2010, such as her attitude toward failure to meet her Cymbalta quota. Plaintiff instead focuses on just one aspect of her 2010 performance and ignores the other considerations relevant to her overall job performance.

**\*15** Specifically, in the Response, Plaintiff mischaracterizes Lilly's reason for her "Low Successful" rating as being due solely to her failure to hit her sales target for Cymbalta. As Grady Grant's uncontroverted declaration makes clear, however, Plaintiff's "Low Successful" rating was a result not only of her failure to meet target on Cymbalta, it was also a result of her failure to meet overall sales targets and her *laissez-faire* attitude towards her failure to make her quota. (APP 217). Thus, she cannot show that any alleged retaliation was a "but for" cause for her "Low Successful" rating, and Lilly is entitled to summary judgment. [33]

[33] Defendant's Supplemental Reply Brief in Support of Defendant's Motion for Summary Judgment, Docket Entry No. 37, pp. 11–12 (citing Declaration of Grady Grant, Appendix at p. 217).

(a) Plaintiff Has Established Causal Connection Element of a *Prima Facie* Case

A plaintiff alleging retaliation may satisfy the causal connection element of a *prima facie* case by showing "[c]lose timing between an employee's protected activity and an adverse action against him." *McCoy,* 492 F.3d at 562. *See also Crutcher,* —— S.W.3d at ——, 2013 WL 4517002, at \*7 ("temporal proximity between a protected act and an adverse employment action may be evidence of a causal connection 'when they are separated by weeks, as opposed to months or years' ") (quoting *Perry v. University of Houston,* No. 01–08–00807–CV, 2009 WL 3152166, at \*5 (Tex.App.-Houston [1st Dist.] Oct. 1, 2009, no pet.). "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as

Blasingame v. Eli Lilly and Co., Not Reported in F.Supp.2d (2013)

2013 WL 5707324

sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.' " *Clark County School District v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001). The Fifth Circuit has found that " 'a time lapse of up to four months' may be sufficiently close," *Feist v. Louisiana, Department of Justice, Office of the Attorney General,* —— F.3d ——, 2013 WL 5178846, *3 (5th Cir. Sept.16, 2013) (citing *Evans v. Houston,* 246 F.3d 344, 354 (5th Cir.2001)), but that "a five month lapse is not close enough without other evidence of retaliation." *Id.* (citing *Raggs v. Mississippi Power & Light Co.,* 278 F.3d 463, 472 (5th Cir.2002)). Other evidence of retaliation may include an employment record that does not support the adverse action at issue, or an employer's departure from typical policies and procedures. *Id.* (citing *Schroeder v. Greater New Orleans Federal Credit Union,* 664 F.3d 1016, 1024 (5th Cir.2011)). Here, the temporal proximity between plaintiff's complaint of discrimination to defendant's human resource department in October of 2010, and defendant's issuance of plaintiff's "Low Successful" performance evaluation for 2010 in March of 2011 is somewhere between four and five months. The court concludes that this temporal proximity is close enough to establish a *prima facie* case of retaliation under both Title VII and the TCHRA.

(b) Plaintiff Has Not Raised Fact Issue as to Pretext

**\*16** The court concludes that defendant is entitled to summary judgment on plaintiff's retaliation claim because plaintiff has failed to cite admissible evidence capable of raising a fact issue as to whether defendant's stated reasons for her "Low Successful" evaluation were pretexts for retaliation. Plaintiff argues that the "Low Successful" evaluation she received in March of 2011 was a pretext for retaliation because other District Sales Managers with worse sales records received higher evaluations, and the only other person to receive a "Low Successful" evaluation finished below her in both Cymbalta and overall sales. In support of this argument plaintiff cites a table or "dashboard" that purports to show comparative sales figures for plaintiff and some of her peers for the years 2001–2010 that is included in Exhibit 5 to the response she filed to defendant's motion for summary judgment.[34] Defendant argues that the "dashboard" and the sales figures reflected on it are inadmissible because they are unauthenticated and, therefore, unreliable.

Federal Rule of Evidence 901(a) provides that, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Documents that are not properly authenticated are not admissible and should not be considered in connection with a motion for summary judgment. *See Orthodontic Centers of Texas, Inc. v. Wetzel,* 410 Fed.Appx. 795, 799 n. 1 (5th Cir.2011) (per curiam) (citing *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 192 (5th Cir.1991), for its holding that documents submitted as summary-judgment evidence must be authenticated). The Federal Rules of Evidence do not require conclusive proof of authenticity, but the proponent of a document must present "evidence sufficient to support a finding that the item is what the proponent claims" as a prerequisite to admission. *Cramer v. NEC Corp. of America,* 496 Fed.Appx. 461, 464 (5th Cir.2012) (citing *McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 562 (5th Cir.1998)). "It is within the court's discretion to exclude evidence that has not been properly authenticated." *Id.* (citing *R.R. Management Co., L.L.C. v. CFS La. Midstream Co.,* 428 F.3d 214, 217 (5th Cir.2005)).

The "dashboard" of sales figures on which plaintiff relies as evidence that defendant's reasons for her "Low Successful" evaluation are pretextual is not authenticated and bears no indicia of reliability. For example, the "dashboard" is not on a page that includes any mention of the defendant, e.g., logo, letterhead, etc., and the last names of several of the people listed in the first column are missing. Although plaintiff restates the sales figures reflected on the "dashboard" in her sworn declaration,[35] plaintiff has failed to cite any evidence from which a fact-finder could reasonably conclude either that she has personal knowledge of the Cymbalta and/or general sales figures that she attributes to other District Sales Managers, or that a person in her position would have such personal knowledge. Accordingly, the court concludes that neither the "dashboard" of comparative sales figures included in Exhibit 5 to plaintiff's response to defendant's motion for summary judgment nor plaintiff's restatement of the sales figures reflected on the "dashboard" in her declaration is admissible evidence for purposes of ruling on the defendant's motion for summary judgment. *See* Fed.R.Evid. 901(a).

[35] Declaration of Patti A. Blasingame, Docket Entry No. 30–1, p. 2.

**\*17** Apart from the evidence of sales figures and annual ratings contained in the "dashboard," plaintiff has failed to

[34] *See* Docket Entry No. 31, Exhibit 5, p. 3.

cite any evidence showing that she was treated differently than her male peers with regard to the rating she received for her 2010 performance. Nor has plaintiff presented any evidence capable of refuting defendant's evidence that her 2010 rating was made by Grant, not by Sackrule—the manager she contends harbored discriminatory animus towards women. Without such evidence plaintiff is unable to raise a genuine issue of material fact for trial on her retaliation claim.

Moreover, even if the court were to consider the sales figures reflected on the "dashboard" as admissible, the court would still conclude that plaintiff has failed to raise a genuine issue of material fact for trial on her retaliation claim.

Plaintiff's contention that the "Low Successful" evaluation that she received for 2010 was retaliatory is based solely on the fact that her 2010 rank, i.e., sales figures, were the same as John Crawford's, but Crawford received an "Exemplary" rating while she received a "Low Successful" rating. But for the reasons stated in § III.A.2(b)(2), above, the court has already concluded that plaintiff has failed to cite evidence capable of establishing that she and John Crawford were similarly situated. Moreover, plaintiff's argument fails

to acknowledge that defendant has presented undisputed evidence that the annual rating about which she complains was not based solely on rank, i.e., sales figures, but' also on other criteria for which plaintiff fails to offer any evidence capable of establishing that her performance was similar to that of John Crawford's performance. Nor has plaintiff cited any evidence showing what, if any, disparity in pay between her and John Crawford was caused by their disparate 2010 ratings. Because plaintiff has failed to offer evidence capable of establishing that defendant's stated reasons for rating her 2010 performance as "Low Successful" were pretexts for retaliation, the court concludes that defendant is entitled to summary judgment on the retaliation claims that plaintiff has asserted under both Title VII and the TCHRA.

### IV. *Conclusions*

For the reasons explained above, Defendant's Motion for Summary Judgment (Docket Entry No. 22) is **GRANTED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5707324

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Tab B

551 Fed.Appx. 757
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

Paul CHAMBLEE, Plaintiff–Appellant

v.

MISSISSIPPI FARM BUREAU FEDERATION;
Randy Knight, Individually and in Their Official
Capacity; David Waide, Individually and in
Their Official Capacity, Defendants–Appellees.

No. 13–60272
|
Summary Calendar
|
Jan. 6, 2014.

**Synopsis**
**Background:** Employee of Mississippi affiliate of national
farm organization brought action against affiliate, alleging
discrimination in violation of Age Discrimination in
Employment Act (ADEA), and asserting various Mississippi
state law claims. The United States District Court for the
Southern District of Mississippi, Tom S. Lee, J., 2013 WL
1194730, granted affiliate's motion for summary judgment.
Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] proffered reason for employee's termination, i.e.,
employee's involvement in political process of election for
affiliate's president, was not unworthy of credence, and thus
was not pretext for age discrimination, and

[2] supervisor's alleged assertion that there was "ample
evidence" to support employee's termination, if proven, was
not defamatory.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (5)

[1] **Civil Rights** ⚖ Motive or intent;  pretext

Reason proffered by Mississippi affiliate of
national farm organization for employee's
termination, i.e., employee's involvement in
political process of election for affiliate's
president, was not unworthy of credence, and
thus was not pretext for age discrimination in
violation of ADEA; even if employee was not
in fact involved in political process, affiliate had
reasonable belief that employee was involved,
based on candidate's having inside information
that could only have come from ten people at
affiliate's office, including employee, instances
when candidate and employee were observed
speaking excitedly together for extended lengths
of time, and existence of at least 50 phone calls or
text messages between candidate and employee
during election season. Age Discrimination in
Employment Act of 1967, § 2 et seq., 29
U.S.C.A. § 621 et seq.

6 Cases that cite this headnote

[2] **Civil Rights** ⚖ Disparate impact

Even if plan for restructuring of office
of Mississippi affiliate of national farm
organization adversely affected employee of
affiliate, there was no violation of ADEA
through disparate impact, absent facially neutral
policy that had adverse effect on a protected
class. Age Discrimination in Employment Act of
1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

1 Case that cites this headnote

[3] **Workers' Compensation** ⚖ Willful or
deliberate act or negligence

Terminated employee's claim against employer
for negligent infliction of emotional distress
under Mississippi law was barred by Mississippi
Worker's Compensation Act (MWCA), which
was exclusive means of relief for employee's

claim based on employer's negligent conduct.
West's A.M.C. § 71–3–9.

6 Cases that cite this headnote

[4]     **Libel and Slander**      Employees
Under Mississippi law, supervisor's alleged
assertion that there was "ample evidence" to
support employee's termination by Mississippi
affiliate of national farm organization, if proven,
was not defamatory, as there was at least some
evidence that employee was involved in political
process for election of president of affiliate, as
forbidden by affiliate's policy.

[5]     **Labor and Employment**      Particular cases
Under Mississippi law, employer was not liable
to terminated employee for breach of contract
or wrongful termination, since employee was at-
will employee who could be terminated at any
time.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*758** John Martin Mooney, Jr., Esq., Law Offices of John M.
Mooney, Jr., P.L.L.C., Madison, MS, for Plaintiff–Appellant.

Robin Banck Taylor, Esq., Attorney, Timothy Wayne
Lindsay, Esq., Ogletree Deakins, P.C., Ridgeland, MS, for
Defendants–Appellees.

Appeal from the United States District Court for the Southern
District of Mississippi, USDC No. 3:11–CV–655.

Before WIENER, OWEN, and HAYNES, Circuit Judges.

**Opinion**

PER CURIAM: [*]

[*]     Pursuant to 5th Cir. R. 47.5, the court has
determined that this opinion should not be
published and is not precedent except under the
limited circumstances set forth in 5th Cir. R. 47.5.4.

Paul Chamblee appeals the district court's grant of
Mississippi Farm Bureau Federation ("Farm Bureau"), Randy
Knight and David Waide's (collectively, the "Defendants")
motion for summary judgment concerning Chamblee's
Age Discrimination in Employment Act ("ADEA") claim
and various state-law claims. Because Chamblee did not
demonstrate that the Defendants' nondiscriminatory basis
**\*759** for his termination was pretextual and otherwise failed
to assert cognizable state-law claims for relief, we AFFIRM.

I. Factual and Procedural Background

Chamblee worked as a regional manager in Farm Bureau's
state-wide office in Mississippi until he was terminated at
age fifty-five. He was an at-will employee who reported to
the president of the state-wide office, an elected position.
After Waide announced that he would not seek reelection
as president, Knight, who was vice-president at the time,
announced his candidacy for the position. Two additional
candidates ran for president, including Ken Middleton.
The parties do not dispute that during Waide's presidency,
Farm Bureau prohibited employees from participating in
the politics of elections and provided that violation of this
policy could result in termination. Farm Bureau instituted
this policy to encourage cohesiveness and trust between
the president and regional managers because the regional
managers work on behalf of the president and serve as his or
her representatives in the field.

Knight won the election and, shortly after assuming the
position of president, terminated Chamblee for his alleged
involvement in the election and support of his opponent,
Middleton. Knight also terminated another regional manager,
Greg Shows, for his support of Middleton. Chamblee sued,
alleging that he was terminated as a result of his age in
violation of the ADEA and asserting various state-law claims,
including negligent and intentional infliction of emotional
distress, invasion of privacy, defamation, breach of contract,
unlawful termination, and civil conspiracy. The district court
granted summary judgment for the Defendants on all of
Chamblee's claims, and Chamblee appealed.

II. Standard of Review

We review the district court's grant of summary judgment
*de novo. LeMaire v. La. Dep't of Transp. & Dev.,* 480 F.3d
383, 386 (5th Cir.2007). Summary judgment is appropriate

Chamblee v. Mississippi Farm Bureau Federation, 551 Fed.Appx. 757 (2014)

when, after considering the pleadings, discovery materials, and affidavits, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *see also LeMaire,* 480 F.3d at 387. We must take all the facts and evidence in the light most favorable to Chamblee, the non-moving party. *See LeMaire,* 480 F.3d at 387.

III. Age–Discrimination Claim

Because Chamblee does not present direct evidence of age discrimination, we analyze his ADEA claim under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Jackson v. Cal–W. Packaging Corp.,* 602 F.3d 374, 378 (5th Cir.2010). This analysis requires "[a] plaintiff relying on circumstantial evidence [to] put forth a *prima facie* case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision." *Berquist v. Wash. Mut. Bank,* 500 F.3d 344, 349 (5th Cir.2007). Once the employer satisfies its burden, the plaintiff is then afforded an opportunity to rebut the employer's explanation by showing that its reason for termination is merely pretextual. *Moss v. BMC Software, Inc.,* 610 F.3d 917, 922 (5th Cir.2010). The plaintiff may establish pretext by demonstrating, *inter alia,* that the employer's "explanation is unworthy of credence." *Wallace v. Methodist Hosp. Sys.,* 271 F.3d 212, 220 (5th Cir.2001) (citation and internal quotation marks omitted).

The parties agree that Chamblee has presented a *prima facie* case and that the **\*760** Defendants have satisfied their burden of providing a nondiscriminatory reason for terminating Chamblee. They dispute whether Chamblee has produced sufficient evidence establishing that the Defendants' proffered reason for terminating him was pretext for age discrimination.

 **[1]** Chamblee seeks to establish pretext by arguing that the Defendants' reason for his termination is false or unworthy of credence because he was not in fact involved in the political process surrounding the election. However, our analysis of whether an alleged violation of an employer's policy is a pretext for discrimination does not turn on whether the employee in fact violated the policy, but rather whether the employer reasonably believed the employee violated the policy and acted based on that belief. *See Waggoner v. City of Garland, Tex.,* 987 F.2d 1160, 1165 (5th Cir.1993);

*see also Jackson v. Watkins,* 619 F.3d 463, 468 n. 4 (5th Cir.2010) (noting that at the summary judgment stage an employer need "not provide any examples, experiences, or facts to support" its legitimate, nondiscriminatory reason for termination (citation and quotation marks omitted)); *Little v. Republic Ref. Co., Ltd.,* 924 F.2d 93, 97 (5th Cir.1991) (explaining that "even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason" for termination).

The Defendants presented uncontroverted evidence that Middleton benefited from "inside information" throughout the election campaign. Specifically, Waide and Knight testified that the nature of information that Middleton discussed during campaign speeches demonstrated that he received information that could only come from ten people at the Farm Bureau statewide office, which included Chamblee. Knight also explained that "numerous people" warned him that "Middleton had people on the inside working for him." Indeed, one of the regional managers testified that Middleton approached him to request his support and when he declined to become involved in the campaign, Middleton informed her that other regional managers were supporting and assisting him. Further, Knight testified that he observed Chamblee and Middleton "speaking excitedly" for "extended lengths of time" whenever they were together. The investigation performed by Farm Bureau's attorney revealed, *inter alia,* that there were at least fifty phone calls or text messages between Chamblee and Middleton during the election season.

 **[2]** In contrast, while Chamblee maintains that he was not involved in the campaign, he presented no evidence to contradict the Defendants' evidence supporting Knight's conclusion that Chamblee participated in the election by assisting Middleton.[1] Faced with the Defendants' uncontroverted evidence, Chamblee has not brought forth facts showing that the proffered reason was "unworthy of credence." Nor did he otherwise show a discriminatory animus motivating the decision. Accordingly, the district court did not err in granting summary judgment relief on **\*761** Chamblee's ADEA claim.[2] *See Moss,* 610 F.3d at 922.

[1]  Despite Chamblee's arguments, he cannot establish pretext based on the fact that Knight and Waide did not investigate other regional managers apart from himself and Shows because he fails to demonstrate that he was similarly situated with the other regional managers. Indeed there is no evidence

to suggest that the Defendants had any reason to investigate the other regional managers for possible political involvement. *See Wyvill v. United Cos. Life Ins. Co.,* 212 F.3d 296, 304 (5th Cir.2000) ( "To establish a claim of disparate treatment, [the employee] must show that [the employer] gave preferential treatment to a younger employee under 'nearly identical' circumstances.").

2    To the extent Chamblee seeks to establish a violation of the ADEA through disparate impact based on the Defendants' restructuring of the state-wide office, his claim is not properly before the court because he did not present it in his EEOC charge. *See Pacheco v. Mineta,* 448 F.3d 783, 792 (5th Cir.2006). Although Chamblee argues that the Defendants waived this exhaustion defense, the Defendants pleaded exhaustion as an affirmative defense in their answer and presented arguments concerning this defense in their reply brief following Chamblee's assertion of disparate impact. Moreover, even if Chamblee had exhausted his administrative remedies, he does not allege a valid disparate treatment claim. Specifically, while he asserts that the restructuring plan adversely affected him, he fails to satisfy his burden of identifying any facially-neutral policy that has an adverse impact on a protected class. *See Smith v. City of Jackson,* 544 U.S. 228, 241, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005); *Hebert v. Monsanto Co.,* 682 F.2d 1111, 1116 (5th Cir.1982).

### IV. State–Law Claims

**[3]**    As the district court recognized, Chamblee's state-law claims also fail. Chamblee does not present a cognizable claim for intentional infliction of emotional distress because apart from asserting that this is "not your ordinary employment dispute," he fails to present evidence to suggest that the Defendants' conduct was outrageous or extreme enough to entitle him to relief on this claim. *See Starks v. City of Fayette,* 911 So.2d 1030, 1036 (Miss.Ct.App.2005) ("To prevail in a claim for intentional infliction of emotional distress, the alleged conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency."); *see also Lee v. Golden Triangle Planning & Dev. Dist., Inc.,* 797 So.2d 845, 851 (Miss.2001) ("A claim for intentional infliction of emotional distress will not ordinarily lie for mere employment

disputes."). Chamblee's claim for negligent infliction of emotional distress also fails as it is barred by the Mississippi Worker's Compensation Act ("MWCA"), which provides the exclusive means of relief for an employee's claim based on his employer's negligent conduct. *See* MISS. CODE. ANN. § 71–3–9 (West 2011); *see also Miller v. McRae's, Inc.,* 444 So.2d 368, 371 (Miss.1984) (observing that the MWCA's exclusivity provision prevents employees from raising common-law negligence claims).

**[4]**    Chamblee's claims for invasion of privacy and defamation similarly fail. As the district court observed, he presented no evidence to support his claim that the Defendants disclosed to other Farm Bureau employees that the reason for his termination was his support of Middleton during the campaign. Further, his defamation claim based on Knight's assertion that there was "ample evidence" to support his termination cannot give rise to a defamation claim because there is at least some evidence of Chamblee's involvement in the political process and characterizations of the amount of evidence merely reflect opinions that cannot give rise to a defamation claim. *See Roussel v. Robbins,* 688 So.2d 714, 723 (Miss.1996) ("[T]he relevant inquiry is whether the statement could be reasonably understood as declaring or implying a provable assertion of fact." (citation and internal quotation marks omitted)); *see also Ferguson v. Watkins,* 448 So.2d 271, 276 (Miss.1984) ("Opinion statements are actionable only if they clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion."). Also, Farm Bureau's response to Chamblee's charge of discrimination to the EEOC cannot give rise to a defamation claim because such statements were made within the scope of the Defendants' qualified privilege, and Chamblee has not overcome **\*762** his burden of demonstrating that these statements were not made in good faith. *See Smith v. White,* 799 So.2d 83, 86 (Miss.2001) ("A communication made in good faith and on a subject-matter in which the person making it has an interest, or in reference to which he has a duty, is privileged if made to a person or persons having a corresponding interest or duty." (citation and quotation marks omitted)); *see also Stockstill v. Shell Oil Co.,* 3 F.3d 868, 872 (5th Cir.1993) (explaining that an employer has a duty to cooperate in EEOC investigations and an interest in defending itself against an employee's charge).

**[5]**    Further, Chamblee's claims for breach of contract and wrongful termination are without merit as he was an at-will employee who could be terminated at any time.[3] *See Jones v. Fluor Daniel Servs. Corp.,* 959 So.2d 1044,

1046 (Miss.2007). Finally, Chamblee's claim based on civil conspiracy fails because he presents no evidence to suggest that Knight and Waide conspired to "accomplish[ ] an unlawful purpose or a lawful purpose unlawfully." *See Shaw v. Burchfield,* 481 So.2d 247, 255 (Miss.1985).

3      Chamblee's reliance on Farm Bureau's employee handbook is misplaced. He does not identify any term in the employee handbook that modifies his status as an at-will employee, and any alleged violation of the manual's ethical rules by Knight is an issue separate from his employment relationship with Farm Bureau.

### V. Conclusion

Because Chamblee fails to establish pretext with respect to his ADEA claim and does not assert any cognizable state-law claims,[4] the district court's grant of the Defendants' motion for summary judgment is AFFIRMED.

4      Chamblee also challenges the district court's denial of two of his discovery motions. However, the district court did not abuse its discretion in denying Chamblee's motion to strike Knight's declaration based on the court's conclusion that Chamblee failed to establish that the declaration contradicted Knight's deposition testimony. *See Gomez v. St. Jude Med. Daig Div. Inc.,* 442 F.3d 919, 927 (5th Cir.2006) ("Discovery and evidentiary rulings are reviewed under a deferential abuse of discretion standard."). The district court also acted within its discretion to the extent that it did not reopen discovery to allow Chamblee to depose Farm Bureau's general counsel because the court concluded that the Defendants were not "contending that Chamblee was terminated on advice of counsel." *See id.*

**All Citations**

551 Fed.Appx. 757

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tab C

2024 WL 1096568
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

John DREW, Plaintiff,

v.

MCGRIFF INSURANCE SERVICES, INC., Defendant.

Civil Action No. 4:22-cv-3340

|

Signed March 13, 2024

**Attorneys and Law Firms**

Jay R. Aldis, Gray Reed & McGraw LLP, Houston, TX, for Plaintiff.

John M. Barcus, Gary David Eisenstat, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Dallas, TX, for Defendant.

## ORDER

Andrew S. Hanen, United States District Judge

**\*1** Pending before the Court is Defendant McGriff Insurance Services, Inc.'s ("Defendant" or "McGriff") motion for leave to file amended answer (Doc. No. 13) and motion for summary judgment (Doc. No. 29). Plaintiff John Drew ("Plaintiff" or "Drew") filed responses thereto (Doc. Nos. 17, 30), and McGriff replied. (Doc. Nos. 19, 31). Drew also filed a sur-reply to the summary judgment motion. (Doc. No. 32). Having considered the briefing, summary judgment evidence, and applicable law, the Court hereby GRANTS McGriff's motion for leave to file an amended answer (Doc. No. 13) and GRANTS McGriff's motion for summary judgment. (Doc. No. 29).

## I. Background

This case involves allegations of age-based discrimination against Drew by his employer, McGriff, a large insurance business. Drew joined McGriff's Dallas office as a "Producer" in 2002. In 2004, Drew headed the Dallas office, where he oversaw all of the Dallas-based producers, and was responsible for recruiting new talent and retaining the existing producers.

In 2008, McGriff formally announced a new producer compensation program (the "Program") with several components, including the new forgivable producer loans at issue here. Drew was 65 years old at the time. (Doc. No. 29-1, at 91). Under this component of the Program, once a producer reached a certain threshold based upon the size of his or her "book of business," the Producer became eligible to participate in the Program. McGriff would give the producer a forgivable loan, the amount of which was correlated to the size of the producer's "book of business." At a book size of $1 million, the producer would be eligible for a $200,000 loan. At each increase of $500k in book size, the producer would be eligible for an additional $100K loan. For example, a producer with a book size of $3.2 million would be eligible for a loan of up to $600K. [1] (Doc. No. 29, Ex. B). According to McGriff, one key point of the program was that "not every producer eligible for a loan [would] receive a loan." (*Id*). Each loan was evidenced by a promissory note. If the producer met certain criteria, including continued employment, the loan would be forgiven at the rate of 10% per year over the next ten years. Several years later, McGriff reduced the forgiveness period to between five and seven years.

[1]     This example is taken from McGriff's 2008 memorandum announcing the Program. (Doc. No. 29, Ex. B).

Drew learned about the Program when it was announced in 2008. At that time, he was not selected for participation in the Program and did not receive a forgivable loan. It is undisputed that in 2008, Drew's book of business exceeded the $1 million threshold. Drew testified that his book size was $2.7 million, which would permit him to receive a loan of up to $500K. He repeatedly complained to McGriff's senior management team about his not being selected to receive the forgivable loan. Each time, Drew was told that he had not been and would not be selected to participate in the forgivable loan aspect of the Program. Drew concedes that no one mentioned his age in these conversations, though there does not appear to be any evidence of any other reason given by McGriff for its failure to select Drew.

**\*2** In 2015, Drew was still concerned about McGriff's failure to include him in the forgivable loan Program. He flew down to Houston to discuss the Program with Tommy Ebner—the CEO for McGriff Texas. Ebner told Drew that Drew's inclusion in "Book Equity" rather than inclusion in the loan Program, was what Ebner thought was best for Drew. [2] After

2024 WL 1096568

this meeting with Drew, Ebner sent an email to CFO Tommy Lambers with a subject line "john Drew." The email stated:

> John is following up on the meeting we (he and I) had in the summer about not getting a loan like the others, still in the game supporting company, having great years in new etc. You and I discussed what we might be able to do as a one off and deferred discussion etc. John has followed up today and I just told him it was "on the list." Please put this on your Christmas/year end list as well. Thanks.

(Doc. No. 30, Ex. F).

2      The record contains limited evidence on this "Book Equity" program and there is no explanation as to why it might have been more beneficial for Drew than the forgivable loan program.

Lambert responded with some suggestions (none of which included offering Drew full participation in the loan Program) and on April 18, 2016, Lambert send Drew an email regarding the Program. The email stated that Drew had been selected to receive a producer loan; however, the loan amount was only $50,000. (*Id.*). This was a fraction of the loan amount promised to others by the Program. Disappointed, but accepting that $50,000 was probably all he would receive from the Program, Drew "ceased any further efforts to be included in the program." (Doc. No. 30, at 12). The $50,000 loan was to be paid in five installments through May 1, 2021. (Doc. No. 32, at **2**).

In 2021, Drew spoke with another employee who had not received a forgivable loan, and came to the conclusion that his non-inclusion in the program was likely due to his age. Accordingly, in September of 2021, Drew filed his first and only Charge of Discrimination with the EEOC alleging age discrimination based upon McGriff's decision to exclude him from the Program. On August 11, 2022, Drew then initiated this lawsuit in Texas state court alleging violations of the Age Discrimination in Employment Act ("ADEA") and the Texas Labor Code. McGriff filed a general denial on September 19, 2022, and then promptly removed the case.

On July 6, 2023, nearly eleven months after the case was first filed, McGriff filed a motion for leave to file its first amended answer. (Doc. No. 13). This amended answer would replace the general denial on file and would include affirmative defenses, including statute of limitations and failure to exhaust administrative remedies. Several months later, on November 14, 2023, McGriff filed its motion for summary judgment (Doc. No. 29). These two motions are currently pending before the Court.

According to the record, Drew remains employed by McGriff as an Executive Vice President and Producer as of the time that the above motions were filed.

## II. Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

**\*3** Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara*, 353 F.3d at 405. It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

2024 WL 1096568

### III. Analysis

As an initial matter, this Court must decide whether to grant McGriff leave to file its First Amended Answer, which was filed July of 2023. (Doc. No. 13). This amended answer would replace McGriff's general denial that is currently on file from before this case was removed to federal court. Importantly, the proposed amended answer would also introduce new affirmative defenses—statute of limitations and failure to exhaust.

These defenses are key to this case because the timing of Plaintiff's filing presents the central issue on summary judgment. That is because the ADEA and Texas Labor Code both impose a requirement for plaintiffs to exhaust their administrative remedies by timely filing a charge of discrimination with the proper agency.

Section 626(d)(1) of the ADEA provides that "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed (A) within 180 days after the alleged unlawful practice occurred; or (B) in a case to which section 633(b) of this title applies, [3] within 300 days after the alleged unlawful practice occurred[.]" 29 U.S.C. § 626(d)(1)(A)-(B). So, under the ADEA, Drew had 300 days from the occurrence of a discriminatory act to file a charge.

[3]    This refers to "dual-filing" states like Texas.

Similarly, Section 21.201 of the Texas Labor Code also requires the filing of a "written complaint"—Texas' statutory language for what is commonly referred to as a charge of discrimination—and further provides that, except with respect to sexual harassment complaints, "a complaint under this subchapter must be filed not later than the 180th day after the alleged unlawful employment practice occurred." Tex. Lab. Code § 21.202 (titled "Statute of Limitations"). The Texas Labor Code does not have an expanded definition of "occurrence" for compensation discrimination claims. Indeed, the Texas Labor Code does not define "occurrence" at all. Prairie View A & M Univ. v. Chatha, 381 S.W.3d 500, 506-507 (Tex. 2012). Case law provides that an "occurrence" happens, and the limitations period begins to run, when the employee is informed of the allegedly discriminatory employment decision. Id. (citing Specialty Retailers, Inc. v. DeMoranville, 933 S.W.2d 490, 493 (Tex. 1996)).

The complaint is to be filed with the Texas Workforce Commission, and by law, "the commission shall dismiss an untimely complaint." Id. The Fifth Circuit has held that this 180-day filing deadline, while not jurisdictional, is "mandatory." Hinkley v. Envoy Air, Inc., 968 F.3d 544, 553 (5th Cir. 2020). Thus, failure to timely satisfy the administrative-exhaustion requirement bars recovery and warrants dismissal of any civil action not preceded by a timely written complaint. Id. at 552, 555.

#### A. Failure to Plead Statute of Limitations or Exhaustion Defense

**\*4**  Considering that the key issue on summary judgment is whether Drew timely exhausted his administrative remedies, the Court must decide whether McGriff's failure to plead a statute of limitations or exhaustion defense constitutes a waiver of this requirement, and if so, whether to permit McGriff to amend its answer.

In his summary judgment response, Drew argues that McGriff failed to plead any limitations or exhaustion defense and therefore has waived the issue. Drew contends that Rule 8(c) of the Federal Rules of Civil Procedure requires a defendant to affirmatively plead a limitations/exhaustion defense. Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including ... statute of limitations ..."); see also Razo v. State Farm Lloyds, No. 7:17-CV-00352, 2017 WL 6209608, at *2 (S.D. Tex. Dec. 8, 2017) ("Rule 8(c) requires a defendant to affirmatively plead its limitations defense, and thus the general rule is that such a failure constitutes waiver of the defense."). Drew argues that because McGriff did not file for leave to amend its answer until nearly eleven months after the original petition was filed, McGriff has waived the exhaustion requirement. Drew, therefore, urges the Court to deny McGriff's motion for leave to amend.

By contrast, McGriff urges the Court to grant it leave to amend its answer because Drew has not been prejudiced by a delay and has been on notice since July that McGriff intended to rely on this defense. Additionally, McGriff appears to argue that even without an affirmative defense in its pleadings, McGriff should still win summary judgment on the timing issue because the lawsuit was filed thirteen years after any damage was incurred.

Thus, the Court must determine (1) whether the administrative exhaustion is an affirmative defense that must

be pled or else is waived, and (2) whether McGriff has waived the defense or adequately preserved it by filing for leave to amend in July of 2023.

First, the Court agrees with Drew that administrative exhaustion is an affirmative defense that must be pled. When examining Title VII's analogous administrative exhaustion requirement, the Fifth Circuit stated that "[f]ailure to exhaust is an affirmative defense that should be pleaded." *Davis v. Fort Bend Cnty.*, 893 F.3d 300 (5th Cir. 2018), *aff'd sub nom. Fort Bend Cnty., Tex. v. Davis*, 139 S. Ct. 1843, 204 L. Ed. 2d 116 (2019) (emphasis added); *see also Flagg v. Stryker Corp.*, 819 F.3d 132, 142 (5th Cir. 2016) (en banc) (Haynes, J., concurring) ("Absent a jurisdictional nature to 'failure to exhaust,' we treat such failures to exhaust as affirmative defenses, not jurisdictional prerequisites."). In *Davis*, the Fifth Circuit found that the defendant had waived the issue of administrative exhaustion because it "waited five years and an entire round of appeals all the way to the Supreme Court before it argued that [the plaintiff] failed to exhaust. On these facts, it is abundantly clear that [the defendant] has forfeited its opportunity to assert this claim." *Davis*, 893 F.3d at 307. Therefore, the Court finds that the administrative exhaustion at issue here is an affirmative defense can be waived if not adequately pleaded or otherwise preserved.

Despite this general conclusion, however, the Court finds that McGriff has not waived the exhaustion defense and hereby grants McGriff's motion for leave to amend its answer (Doc. No. 13). There are several reasons for this ruling. First, this case is clearly distinguishable from *Davis* above. In *Davis*, the defendant never raised the issue of exhaustion at the district court, instead choosing to only raise the issue on appeal five years later. By contrast, here, McGriff raised the defense before the close of discovery and before the dispositive motion deadline.

 **\*5** Additionally, there is no surprise, prejudice, or delay in granting McGriff's motion for leave to amend. *See Morgan v. Chapman*, 969 F.2d 238, 248 (5th Cir. 2020) (courts should freely grant leave to amend absent a "substantial reason" for denial, like surprise or prejudice); *Dueling v. Devon Energy Corp.*, 623 F. App'x 127, 130 (5th Cir. 2015) (delay can be considered prejudicial, but only if it would hinder the opposing party's ability to respond to the proposed amendment or to prepare for trial). While Drew argues that he would need additional discovery on the limitations/ exhaustion defense, Drew was able to conduct discovery, including depositions, after the July filing. He had notice

of the proposed affirmative defenses at that time and could have conducted discovery accordingly. Moreover, Drew was able to fully brief the issue of exhaustion in his response to summary judgment. Accordingly, the Court hereby GRANTS McGriff's motion for leave to amend its answer. (Doc. No. 13). Finally, the facts at issue date back to 2008, and Drew was and is well aware of them. Additional discovery would not change this.

As such, McGriff pleaded its affirmative defenses that Drew failed to timely exhaust his administrative remedies and that the statute of limitations has run. (Doc. No. 13-2 at 5). The Court will therefore consider the merits of these defenses.

### B. *Timeliness of Drew's EEOC Charge*

As noted above, Drew filed his charge with the EEOC in September of 2021 alleging age-based discrimination. Thus, the traditional lookback period would encompass any discriminatory act within 300 or 180 days of September 9, 2021 (essentially, earlier in 2021 and the end of 2020). Drew contends that his filing with the EEOC is timely under the Lilly Ledbetter Fair Pay Act ("the Ledbetter Act") because McGriff's discrimination in compensation taints every payment Drew could and should have received, making each failure to provide Drew compensation an unlawful act. McGriff disagrees, and contends that the Ledbetter Act is inapplicable because the alleged discrimination here is a **one-time** harm (not receiving a ~$500,000 loan in 2008) rather than the typical compensation discrimination (involving paying different wages or providing different benefits to similarly situated employees).

The Ledbetter Act amended the ADEA to read:

> For purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this chapter, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation

is paid, resulting in whole or in part from such a decision or other practice.

29 U.S.C.A. § 629(d)(3). Thus, each time a person is "affected by application of a discriminatory compensation decision or other practice," the cause of action renews or resets.

The Ledbetter Act does not apply to "discrete acts" such as "termination, failure to promote, denial or transfer, and refusal to hire." *Niwayama v. Tex. Tech Univ.*, 590 Fed. App'x. 351, 356 (5th Cir. 2014); *See Almond v. Unified Sch. Dist. No. 501, 665* F.3d 1174, 1181 (10th Cir. 2011) (holding that "hiring, firing, promotion, demotion, and transfer decisions, though often touching on pay, should and do accrue" as soon as the employee is aware of the decision); *See also Lohrasbi v. Bd. of Trustees of the Univ. of Illinois*, 147 F. Supp. 3d 746 (C.D. Ill. 2015) ("Unlike the further issuance of paychecks based on a discriminatory compensation system, which are subsequent affirmative discriminatory acts taken by the employer, the denial of emeritus status, though related to compensation, is a singular, discrete action. Therefore, the 300-day time-limit does not restart each day that Plaintiff is deprived of Professor Emiritus status.").

**\*6** The Court finds that here, denial of a forgivable loan from the Program, though related to compensation, is a singular discrete action. While Drew contends that his discrimination continued through May 1, 2021 (the date of the last installment of his $50,000 loan), this was the last installment of a loan amount made to Drew in 2016. In 2016 Drew was aware that he would only be receiving $1/10^{th}$ of the loan amount he claims that he should have received pursuant to the program. Thus, the discriminatory act of giving him a mere $1/10^{th}$ may be traced to the specific day he received the email regarding the $50,000 amount from McGriff executives. Because the denial of the full loan amount was a singular, discrete action, the Ledbetter Act is inapplicable. Hence, Plaintiff's cause of action did not renew "every time McGriff paid ... other similarly situated but younger employees pursuant to the Program" as he argues. (Doc. No. 30 at 14).

The Fifth Circuit has addressed a similar timing issue related to the continuing violation doctrine. *Henson v. Bell Helicopter Textron, Inc.*, 128 Fed. App'x 387, 391 (5th Cir. 2005). There, the Circuit discussed the continuing violation doctrine, under which "a plaintiff is relieved of establishing that all of the alleged discriminatory conduct occurred within the actionable

period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Henson*, 128 Fed. App'x at 391 (5th Cir.2005) (citing *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002)). A continuing violation "involves repeated conduct," and "cannot be said to occur on any particular day." *Id.* It instead "occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 115 (2002). When the employer's conduct consists of a series of "discrete discriminatory acts," the fact that one or more falls within the actionable time period does not save related claims that would otherwise be time-barred. *Id.*

The continuing violation doctrine does not apply when "the relevant discriminatory actions alleged in the complaint '[are] the sort[s] of discrete and salient event[s] that should put an employee on notice that a cause of action has accrued.' " *Windhauser v. Bd. of Supervisors for Louisiana State Univ. & Agr. & Mech. Coll.*, 360 Fed. App'x 562, 566 (5th Cir. 2010) (quoting *Huckaby v. Moore*, 142 F.3d 233, 240 (5th Cir. 1998)) (alteration in original).

After examining the briefing and summary judgment evidence, the Court agrees with McGriff that the alleged discriminatory act—denying Plaintiff participation in the forgivable loan Program—was a discrete act that cannot be brought into Plaintiff's actionable period by the continuing violation doctrine or the Ledbetter Act. When the program was introduced in 2008, Drew was 65 years old, and thus was age-protected under both the ADEA and Sections 21.051 and 21.001 of the Texas Labor Code. While the denial occurred multiple times, each instance was a "discriminatory act" that would have been actionable on its own. There are specific dates in the record in which Drew was told that he would not qualify for participation. For example, in 2016, Drew received a $50,000 forgivable loan that was a fraction of the loan amount promised by the Program. Giving Drew this smaller sized loan was a discrete act, occurring on a specific day, that could have been an actionable discriminatory act. Even using this 2016 date, which is the *last* date of discrimination alleged, Drew's September 2021 charge is still untimely as it was brought five years after the employment decision.

Moreover, because the discriminatory act alleged in Drew's 2021 EEOC charge occurred in 2008 (2016 at the latest), the Court finds that Drew failed to comply with the exhaustion requirement because the charge was not filed within 300 days of the employment practice. Stated differently, applying

the 300-day lookback period would not bring in the alleged discriminatory act. Accordingly, McGriff's motion for summary judgment (Doc. No. 29) is hereby GRANTED because the claims are administratively barred as being untimely.

### C. Applicability of Equitable Estoppel and Equitable Tolling

**\*7** Notwithstanding the above, Drew contends that McGriff should be estopped from relying upon a limitations/exhaustion defense due to its "continued concealment and misrepresentation of facts to lull Drew into failing to timely file a charge of discrimination." (Doc. No. 30 at 17).

Drew argues that like statute of limitations, filing a charge of discrimination is subject to waiver, estoppel, equitable tolling or the discovery rule. *Granger v. Aaron's, Inc.*, 636 F.3d 708, 711 (5th Cir. 2011). Equitable estoppel prevents a defendant from asserting that a discrimination charge was untimely as a defense where the defendant concealed facts or misled the plaintiff thereby causing the plaintiff to not assert his rights within the limitations period. *See Rhodes v. Guiberson Oil Tools Div.*, 927 F.2d 876, 878-79 (5th Cir. 1991); *see also Pruet Prod. Co. v. Ayles*, 784 F.2d 1275, 1280 (5th Cir. 1986) ("An employer's misrepresentations or wrongful concealment of facts necessary to support a discrimination charge have given rise to estoppel where they prevented an employee from asserting his rights timely."). "An essential element of equitable estoppel is that the party asserting must have reasonably relied on the statement or the conduct of the party sought to be estopped." *Tomlin v. Signal Intern.*, No. 1:11-CV-3, 2012 WL 3984517, at \*5 (E.D. Tex. Aug. 9, 2012).

Drew similarly argues that equitable tolling should apply "Equitable tolling is to be applied sparingly." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 880 (5th Cir. 2003) (quoting *Nat'l RR Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). As the plaintiff, Drew bears the burden of demonstrating that equitable tolling should apply. *Manning*, 332 F.3d at 880. "Equitable tolling is appropriate if the defendants concealed facts relating to their wrongdoing, which prevented the plaintiffs from learning the facts necessary to pursue their claims within the limitations period." *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 652 (S.D. Tex. 2011) (citing *Manning*) (emphasis added). The Fifth Circuit has explained that the difference between equitable tolling and equitable estoppel is the following: "Equitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act. Equitable estoppel, in contrast,

examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights." *Rhodes*, 927 F.2d at 878 (quoting *Felty v. Graves–Humphreys, Co.*, 785 F.2d 516, 519 (4th Cir.1986)).

While the Court is sympathetic to Drew's position and understands that he might not have suspected the worst in his colleagues, there is no evidence that McGriff concealed or misconstrued facts regarding Drews' denial into the program. For years, starting in 2008, Drew followed up and tried to get a forgivable loan, and for years McGriff refused. While McGriff employees may have dodged the question or offered excuses, the facts remain that McGriff *never selected Drew for the Program*, and he knew that he was not selected. Therefore, despite McGriff's failure to give a reason for its refusal to consider him, McGriff's alleged "wrongdoing" was apparent each year that Drew continued to grow his book of business and did not receive a forgivable loan.

**\*8** Other than McGriff's allegedly discriminatory *reasoning*, Drew has put forward no *specific concealed facts* that prevented him from learning facts necessary to pursue his claim earlier. From the record, it does not appear that anything changed in Drew's position from 2016 to 2021 or that any new information was uncovered. He was continuously denied access to the program from 2008 until the filing of this lawsuit. These are the "facts necessary to pursue [his] claim" today, and these facts were known or ascertainable by Drew the first time he was not given a loan while his colleagues were.

As such, equitable tolling and equitable estoppel do not apply here, and Drew's claim remains administratively barred. Drew did not need to know about the discriminatory motive in order to know the "facts necessary to pursue his claims." The case law is clear that "[t]he date of the discriminatory act controls, not some later date when the employee discovers the act is discriminatory." *Abbott v. Rankin*, No. 06-07-00149-CV, 2008 WL 5156453, at \*3 (Tex. App.—Texarkana Dec. 10, 2008, pet. denied) (emphasis added).

### IV. Conclusion

Having considered the motions, summary judgment evidence, and applicable law, the Court hereby GRANTS McGriff's motion for summary judgment (Doc. No. 29). McGriff's motion for leave to file an amended answer (Doc. No. 13) is also granted. This matter is hereby dismissed with prejudice.

**Drew v. McGriff Insurance Services, Inc., Slip Copy (2024)**

2024 WL 1096568

**All Citations**

Slip Copy, 2024 WL 1096568

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tab D

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 33 of 93

Foster v. United Rentals (North America), Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1474186

KeyCite Yellow Flag - Negative Treatment
Supplemented by Foster v. United Rentals (North America), Inc.,
S.D.Tex., March 29, 2018

2018 WL 1474186
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Corpus Christi Division.

Clinton S. FOSTER, Plaintiff,

v.

UNITED RENTALS (NORTH AMERICA),
INC.; dba United Rentals, Inc., Defendants.

Civil Action No. 2:16–CV–114
|
Signed 03/09/2018

**Attorneys and Law Firms**

William Robert Anderson, III, Douglas Dewitt McLallen,
Sr., Michelle Kay Ostrye, Anderson Lehrman et al, Corpus
Christi, TX, for Plaintiff.

Karen Coomer Denney, Haynes And Boone LLP, Fort Worth,
TX, for Defendants.

**MEMORANDUM AND RECOMMENDATION**

Jason B. Libby, United States Magistrate Judge

*\*1* Plaintiff Clinton Foster alleges that Defendant United
Rentals (North America), Inc., his former employer,
unlawfully discriminated against him in violation of the Age
Discrimination in Employment Act ("ADEA") and the Texas
Commission on Human Rights Act ("TCHRA") during his
employment because of his age and in retaliation for engaging
in protected activity. Plaintiff also asserts claims for breach
of contract, quantum meruit, promissory estoppel and negligent
misrepresentation. (D.E. 10). On December 29, 2017, United
Rentals filed the pending Motion for Summary Judgment.
(D.E. 55). Plaintiff filed a response on January 18, 2018. (D.E.
58). United Rentals filed a reply on January 22, 2018. (D.E.
60). For the reasons stated below, the undersigned respectfully
recommends Defendant's Motion for Summary Judgment be
**GRANTED**.

**I. JURISDICTION**

Plaintiff filed suit against Defendant in the 319th Judicial
District Court of Nueces County, Texas on March 2, 2016.
Defendant filed a Notice of Removal on April 8, 2016,
asserting this Court has both diversity and federal question
jurisdiction. 28 U.S.C. §§ 1331 and 1332. (D.E. 1). This case
has been referred to the undersigned United States Magistrate
Judge pursuant to 28 U.S.C. § 636.

**II. SUMMARY JUDGMENT STANDARD**

Summary judgment is proper if there is no genuine issue as to
any material fact and the moving party is entitled to judgment
as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue exists
"if the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986). The Court must examine
"whether the evidence presents a sufficient disagreement to
require submission to a jury or whether it is so one-sided that
one party must prevail as a matter of law." Id. at 251–52. In
making this determination, the Court must consider the record
as a whole by reviewing all pleadings, depositions, affidavits,
and admissions on file, and drawing all justifiable inferences
in favor of the party opposing the motion. Caboni v. Gen.
Motors Corp., 278 F.3d 448, 451 (5th Cir. 2002).

The Court may not weigh the evidence, or evaluate the
credibility of witnesses. Id. Furthermore, affidavits shall be
made on personal knowledge, shall set forth such facts as
would be admissible in evidence, and shall show affirmatively
that the affiant is competent to testify to the matters stated
therein. Fed. R. Civ. P. 56(c); see also Cormier v. Pennzoil
Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir.
1992) (refusing to consider affidavits that relied on hearsay
statements); Martin v. John W. Stone Oil Distrib., Inc., 819
F.2d 547, 549 (5th Cir. 1987) (stating that courts cannot
consider hearsay evidence in affidavits and depositions).
Unauthenticated and unverified documents do not constitute
proper summary judgment evidence. King v. Dogan, 31 F.3d
344, 346 (5th Cir. 1994).

The moving party bears the initial burden of showing the
absence of a genuine issue of material fact. Celotex Corp. v.
Catrett, 477 U.S. 317, 323. The evidence must be evaluated
under the summary judgment standard to determine whether
the moving party has shown the absence of a genuine issue
of material fact. "[T]he substantive law will identify which
facts are material. Only disputes over facts that might affect
the outcome of the suit under the governing law will properly
preclude the entry of summary judgment." Anderson, 477
U.S. at 248. If the moving party demonstrates an absence

Case 4:21-cv-03371  Document 33-5  Filed on 09/24/24 in TXSD  Page 34 of 93

Foster v. United Rentals (North America), Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1474186

of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

**\*2** To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson,* 477 U.S. at 248. The nonmovant may not rely merely on allegations, denials in a pleading or unsubstantiated assertions that a fact issue exists, but must set forth specific facts showing the existence of a genuine issue of material fact concerning every element of its cause(s) of action. *Morris v. Covan World Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni,* 278 F.3d at 451.

## III. BACKGROUND

Plaintiff was employed at United Rentals as an outside sales representative from approximately 1996 until his termination on May 5, 2015. (D.E. 55–1, Pages 9 and 64). Plaintiff was 46 years old at the time of his termination. (D.E. 10, Page 2 and D.E. 55–3, Page 113). Prior to his termination, Plaintiff alleges his sales territory and number of accounts were reduced which led to a reduction in his pay and commissions earned. (D.E. 10, Page 2). Plaintiff further alleges when he complained about these changes, he was terminated because of his age and in retaliation for his complaints. (D.E. 10, Page 2). Additionally, Plaintiff alleges United Rentals failed to pay him for all of his earned commissions. (D.E. 58, Pages 8). On or about November 27, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") based on age and retaliation and received a Dismissal and Notice of Right to Sue letter on December 7, 2015. (D.E. 10, Page 3 and D.E. 55–3, Page 113). He filed a state court action on March 2, 2016 which was removed to this Court on April 8, 2016. (D.E. 1).

Plaintiff sues United Rentals for (1) age discrimination and retaliation in violation of the ADEA and the TCHRA; (2) breach of contract; (3) quantum meruit; (4) promissory estoppel; and (5) negligent misrepresentation. Defendant moves for summary judgment on all of Plaintiff's claims.

## IV. AGE DISCRIMINATION AND RETALIATION

### A. TIMELINESS [1]

[1] "Employment discrimination plaintiffs must first exhaust administrative remedies before pursuing claims in federal court." *Champlin v. Manpower, Inc.,* No. 4:16–cv–2987, 2018 WL 572997, at \*3 (S.D. Tex. Jan. 24, 2018) (citing *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378–79 (5th Cir. 2002) ). Under the ADEA, the limitations period for filing an age discrimination and retaliation charge with the EEOC is 300 days from the adverse act. *Id.* (citation omitted). "However, filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Granger v. Aaron's, Inc.,* 636 F.3d 708, 711 (5th Cir. 2011) (citation omitted). However, a plaintiff, under the TCHRA, must file a charge of discrimination and retaliation within 180 days of the date of the alleged discrimination and this filing requirement is "mandatory and jurisdictional" and not subject to equitable tolling. *Champlin,* 2018 WL 572997, at \*5; *Graham v. JPMorgan Chase Bank, Nat. Ass'n,* No. 4:13–cv–1410, 2015 WL 4431199, at \*3 (S.D. Tex. July 17, 2015) (citation omitted).

It appears the parties agree Plaintiff's age discrimination and retaliation allegations under the TCHRA are barred as both alleged adverse actions took place before May 31, 2015, outside the 180 day TCHRA limitations period. [2] Therefore, the undersigned recommends Plaintiff's age discrimination and retaliation claims under the TCHRA are barred. The parties also agree Plaintiff's ADEA discrimination and retaliation claims related to his May 5, 2015 termination are not barred by limitations.

[2] In its motion, Defendant asserts Plaintiff's TCHRA age discrimination and retaliation claims are barred. (D.E. 55, Page 11). Plaintiff, in his response, does not respond to this assertion, instead focusing his argument on his claims under the ADEA and its 300 day limitations deadline. (D.E. 58).

**\*3** However, Plaintiff and United Rentals dispute the start date from which to compute the limitations deadline for any complaint related to the reduction in Plaintiff's assigned accounts. Plaintiff was advised on or before January 29, 2015

Foster v. United Rentals (North America), Inc., Not Reported in Fed. Supp. (2018)

2018 WL 1474186

that his accounts were going to be changed. (D.E. 55–1, Pages 129 and 188 and D.E. 55–3, Pages 115–116). Specifically, Plaintiff was notified that beginning in April 2015, he was going to be assigned seven [3] accounts. (D.E. 55–1, Pages 66, 129–131 and 188 and D.E. 55–3, Pages 115–116). These accounts changes were subsequently enacted in April 2015. (D.E. 55–1, Pages 66–68, 70, 72 and 188). United Rentals argues informing Plaintiff on or before January 29, 2015 of future changes to his account assignments started the 300 day limitations period. (D.E. 55, Pages 11–12); *Ajayi v. Walgreen Co.*, 562 Fed.Appx. 243, 246 (5th Cir. 2014) ("[I]t is well established in this circuit that in age discrimination cases the limitations period begins to run when the plaintiff knows of the discriminatory *act*, not when he first perceives a discriminatory motive.") (emphasis in original) (citation omitted); *Merrill v. S. Methodist Univ.*, 806 F.2d 600, 605 (5th Cir. 1986) (Limitations period starts running on the date the discriminatory *act* occurs) (emphasis in original) (citing *Delaware State Coll. v. Ricks*, 449 U.S. 250 (1980) ). Accepting Defendant's argument would mean Plaintiff's claims related to the change in his accounts would be barred because they accrued in excess of 300 days before he filed his EEOC charge. Plaintiff counters that the limitations period began to run only after the account changes were actually made in April 2015, not when he was notified about them in January 2015. (D.E. 58, Pages 8–9).

[3]     Plaintiff stated he was assigned five accounts at the time he was terminated: Valero, Flint Hills, Turner Industries, JV Industrial and Diamond Shamrock–Three Rivers. (D.E. 55–1, Page 66).

The undersigned recommends Defendant's argument is supported by the relevant case law. The 300 day limitations period beings to run once the plaintiff "knows or should have been aware of the unlawful employment action." *Champlin*, 2018 WL 572997 at *5 (citations omitted). " '[A]wareness' for accrual purposes does not mean actual knowledge; rather, all that must be shown is the existence of 'circumstances [that] would lead a reasonable person to investigate further.' " *Id.* (citation omitted). Plaintiff was notified of, and complained to his supervisors about, the reassignment of his accounts in an email dated January 29, 2015. (D.E. 55–3, Pages 115–116). Plaintiff was then told the same day that the reassignment decision was final. (D.E. 55–3, Page 115). Therefore, the limitations period began to run when Plaintiff was notified of the adverse employment action, specifically when he was informed his accounts were going to be reassigned, not when they were

actually changed in April 2015. *See Chapman v. Homco, Inc.*, 886 F.2d 756, 758 (5th Cir. 1989) ("When a plaintiff alleges an unlawful discharge, the statute of limitations begins to run when the plaintiff is *notified* that his employment is terminated.") (emphasis added) (citation omitted); *see also McIver v. Am. Eagle Airlines, Inc.*, 413 Fed.Appx. 772, 777 (5th Cir. 2011) ("The 300–day time period begins to run 'when the employee receives notice of the allegedly discriminatory decision, not when the employment actually ceases.' ") (citation omitted); *see also Stith v. Perot Sys. Corp.*, No. 3:02–cv–1424–D, 2004 WL 690884, at *3 (N.D. Tex. Mar. 12, 2004) ("To decide when the employer notified the employee, the court uses an objective standard that 'focus[es] upon when the employee knew, or reasonably should have known, that the adverse employment decision had been made.") (citations omitted). Further, Plaintiff has not asserted any argument that he is entitled to equitable tolling. Therefore, the undersigned addresses below only Plaintiff's claims for age discrimination and retaliation under the ADEA related to Plaintiff's termination. [4]

[4]     Plaintiff, in his response, alleges for the first time that "Defendant diverted several of Plaintiff's earned commissions to other sales representatives during the 300–day limitations period, so that claim is timely." (D.E. 58, Page 8). However, this allegation was not included in either Plaintiff's EEOC charge or in his amended complaint as part of his age discrimination claim. (D.E. 55–3, Page 113 and D.E. 10). In short, other than this one sentence in his response, Plaintiff has offered no details sufficient to support this allegation as it relates to age discrimination. Therefore, the undersigned recommends this alleged adverse employment action is not properly before this Court relating to Plaintiff's age discrimination claim.

**B. RELEVANT LAW AND ANALYSIS**

**\*4**  Under the ADEA, it is unlawful for an employer to discharge or otherwise discriminate against an employee because of the employee's age. *See* 29 U.S.C. § 623(a)(1). Plaintiff must present direct or circumstantial evidence of age discrimination. *Id.* (citation omitted). "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (citation omitted). When there is no direct evidence of age discrimination, a plaintiff must rely on circumstantial

2018 WL 1474186

evidence to prove discrimination and the claim is analyzed under the burden-shifting framework outlined in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Cases in which a plaintiff alleges retaliation for engaging in activity protected by the ADEA are also analyzed under the burden-shifting framework established in *McDonnell Douglas*. *Paulissen v. MEI Tech., Inc.*, 942 F. Supp. 2d 658, 672 (S.D. Tex. 2013) (citation omitted).

Plaintiff must first establish a *prima facie* case of discrimination and/or retaliation, the elements of which are further discussed below. If Plaintiff successfully establishes a *prima facie* case, a presumption of discrimination and/ or retaliation arises and the burden shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the employment action taken against the Plaintiff. *See Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002) (*citing McDonnell Douglas*, 411 U.S. at 802); *Paulissen*, 942 F. Supp. 2d at 672. If Defendant satisfies this burden, the burden shifts back to the Plaintiff who must prove "the legitimate reasons offered by the Defendant were not its true reasons, but were a pretext for discrimination." *Crawford v. Formosa Plastics Corp., Louisiana*, 234 F.3d 899, 902 (5th Cir. 2000) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 139 (2000) ); *Paulissen*, 942 F. Supp. 2d at 672.

In this case, Plaintiff does not specifically refer in his pleadings to any direct evidence of age discrimination or retaliation. Nor does he identify any such competent evidence in the summary judgment record. In order to establish a *prima facie* case of age discrimination under the ADEA, in the absence of direct proof of discrimination, Plaintiff must establish he is (1) within a protected class (i.e. over 40 years old); (2) qualified for the position; (3) suffered an adverse employment decision; and (4) was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age. *Kean v. Jack Henry & Assoc., Inc.*, 577 Fed.Appx. 342, 349 (5th Cir. 2014) (citing *Jackson v. Cal–W. Packaging Corp.*, 602 F.3d 374, 379 (5th Cir. 2010) ); *See also Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005).

While Plaintiff is (1) over the age of 40, (2) qualified for the position, and (3) was terminated from his employment, he has failed to establish he was (4) replaced by someone outside the protected class, younger than him, or otherwise discharged because of his age. The parties agree Plaintiff, at the time he was terminated, was 46 years old and those employees who received his accounts after he was fired were, respectively,

42, 44, 54, and 56 years old. (D.E. 55, Page 12; D.E. 55–1, Pages 8, 103–106 and 142; D.E. 55–2, Pages 85–87 and D.E. 58, Page 9). Contrary to Plaintiff's argument that as long as the replacement is younger, whether Plaintiff has established a *prima facie* case of age discrimination is an issue of fact for the jury that cannot be decided on summary judgment, both Supreme Court and Fifth Circuit precedent establish otherwise. (D.E. 23, Page 13); *Leal v. McHugh*, 731 F.3d 405, 411 (5th Cir. 2013) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312–13 (1996) ) (The replacement must be "substantially younger" than the plaintiff in order for the plaintiff to create an inference that an employment decision was based on age discrimination). The Fifth Circuit has not determined what age difference qualifies as substantially younger such that an inference may be made to establish a *prima facie* case of age discrimination. *Irvin v. Ascension Par. Sch. Bd.*, No. 15–518–JWD–EWD, 2017 WL 354854, at *11 (M.D. La Jan. 24, 2017) (citations omitted). Plaintiff, at 46, is at most approximately four years older than the youngest of his replacements, who was 42. *See Earle v. Aramark Corp.*, 247 Fed.Appx. 519, 523 (5th Cir. 2007) (Plaintiff's 40 year old replacement was "only four years younger than [Plaintiff]-an insignificant age difference that is not sufficient to support a *prima facie* case of age discrimination"); *see also Keller v. Coastal Bend Coll.*, 629 Fed.Appx. 596, 600 (5th Cir. 2015) (citing same). Further, two of Plaintiff's four replacements, at 54 and 56, were eight and ten years older than Plaintiff. Additionally, all of Plaintiff's replacements were above the age of 40 and Plaintiff has not submitted any competent evidence he was otherwise discharged because of his age. Therefore, the undersigned recommends Plaintiff has failed to establish a *prima facie* case of age discrimination.

**\*5** Even assuming Plaintiff could meet his burden to establish a *prima facie* case of age discrimination, Plaintiff has failed to demonstrate Defendant's proffered reason for his termination is pretext for age discrimination. *Crawford*, 234 F.3d at 902. Defendant asserts Plaintiff was discharged, not because of his age, but for allegedly being dishonest to his branch manager. (D.E. 55–2, Pages 4–15). In his response, Plaintiff does not address this issue. (D.E. 58). Upon review of the record, there is nothing to demonstrate that Defendant's proffered reason for Plaintiff's termination is mere pretext. Further, all of Plaintiff's replacements were Defendants' employees performing similar duties as Plaintiff at the time Plaintiff was terminated and all were also over the age of 40, in the same protected class as Plaintiff. The only evidence to support his complaint is Plaintiff's own subjective belief that the motivation for his termination was his age.

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 37 of 93

Foster v. United Rentals (North America), Inc., Not Reported in Fed. Supp. (2018)
2018 WL 1474186

However, Plaintiff's subjective opinion does not support an inference of discrimination under the ADEA and is unavailing as summary judgment evidence. *Celotex,* 477 U.S. at 325; *See Vasquez v. Nueces Cnty.,* 551 Fed.Appx. 91, 94 (5th Cir. 2013) (Plaintiff cannot discharge his burden by offering subjective beliefs, vague allegations and legal conclusions) (citation omitted).

Further, Defendant asserts Plaintiff never engaged in any protected activity prior to his termination and therefore, Plaintiff's claim of retaliation should also be summarily dismissed. (D.E. 55, Page 15 and D.E. 60, Page 6). In his response to the pending motion, Plaintiff does not address his retaliation claim. (D.E. 58). In order to establish a *prima facie* case of retaliation under the ADEA, Plaintiff must show that he engaged in protected activity, was subjected to an adverse employment action and there is a causal connection between the protected activity and the adverse employment action. *McDaniel v. Nat'l R.R. Passenger Corp.,* 705 Fed.Appx. 240, 245 (5th Cir. 2017); *see also Paulissen,* 942 F. Supp. 2d at 672. The record does not contain, nor does Plaintiff cite to, any evidence that Plaintiff engaged in protected activity prior to his May 5, 2015 termination. *Skaggs v. Van Alstyne Indep. Sch. Dist.,* No. 4:16–cv–227–CAN, 2017 WL 77825, *16 (E.D. Tex. Jan. 9, 2017) ("An employee engages in a protected activity where she opposes an activity she reasonable believes constitutes unlawful discrimination.") (citations omitted). As noted by Defendant, Plaintiff stated he never complained to his supervisors at United Rentals that he was being treated differently based on his age or made any age discrimination complaint to anyone at United Rentals. (D.E. 55–1, Pages 84–87).

Further, for the same reasons stated above, even if Plaintiff had engaged in protected activity and could establish a causal connection, he has not shown Defendant's proffered reason for his termination, i.e. his alleged dishonesty, was mere pretext as he does not address the retaliation claim in his response to the pending motion.

For the foregoing reasons, the undersigned recommends summary judgment be granted as to Plaintiff's age discrimination and retaliation claims under the ADEA.

## V. BREACH OF CONTRACT, QUANTUM MERUIT, PROMISSORY ESTOPPEL AND NEGLIGENT MISREPRESENTATION
Plaintiff asserts a claim for breach of contract alleging United Rentals failed to pay him earned commissions owed

to him pursuant to a 2012 and 2013 Commission Policy and Commission Policy Acknowledgement and Agreement ("Commission Policy"). (D.E. 55–1, Pages 144–60). [5] Alternatively, Plaintiff seeks to recover these commissions under the theories of quantum meruit, promissory estoppel and/or negligent misrepresentation. (D.E. 10, Page 2–8).

[5]     In his amended complaint, Plaintiff alleged Defendant breached the parties' oral employment contract by which Defendant would compensate Plaintiff for selling Defendant's goods and services and would provide Plaintiff with certain sales territories and other tools to perform his sales job. (D.E. 10, Page 3). Plaintiff alleged Defendant breached this employment contract by "stripping him of sales territory and making it impossible for him to successfully perform the functions of a salesman as per the parties' agreement." (D.E. 10, Page 4). However, Plaintiff now acknowledges he was employed at-will and Defendant could change his accounts and commission structure at any time. (D.E. 55–1, Pages 18, 25 and 44). Further, Plaintiff testified he could not identify any contract with Defendant he contends Defendant breached regarding his United Rentals changing his assigned accounts or commission structure. (D.E. 55–1, Pages 114–116). In his response the pending motion, Plaintiff now contends that "Defendant failed to pay him earned commissions by erroneously or falsely coding contracts to other sales representatives" which breached the Commission Policy. (D.E. 58, Page 2).

### A. BREACH OF CONTRACT
 **6** Under Texas law, Plaintiff, as an at-will employee, can recover for breach of contract if United Rentals promised him compensation and failed to pay him in accordance with the Commission Policy. *Marquis v. Omniguide, Inc.,* 714 F. Supp. 2d 640, 646 (N.D. Tex. 2010); *see Schwager v. Telecheck Serv., Inc.,* No. 14–01–99–CV, 2002 WL 31995012 (Tex. App.–Hous. [14th Dist.] Dec. 19, 2002) (not designated for publication). The essential elements of a breach of contract claim in Texas are (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Miller v. CitiMortgage, Inc.,* 970 F. Supp. 2d 568, 579 (N.D. Tex. 2013) (citing *Mullins v. TestAmerica, Inc.,* 564 F.3d 386, 418 (5th Cir. 2009) ).

2018 WL 1474186

Defendant asserts it did not breach the terms of the Commission Policy as Plaintiff was paid all commissions which were coded to him on contracts as of the invoice date. (D.E. 55, Page 17). Plaintiff contends he was not paid all of the commissions to which he is entitled as a large number of contracts were coded incorrectly. (D.E. 58, Pages 4–5). In support of his argument, Plaintiff relies on his own testimony, his own affidavit and the affidavit of W. Scott Turner, a certified public accountant who was retained by Plaintiff to calculate Plaintiff's damages in this lawsuit. (D.E. 58, Pages 4–5; D.E. 58–2 and D.E. 58–3).

Plaintiff testified he "generated business that I created revenue from that were supposed to be coded to me that got paid to another salesperson, so that, they owe me that money." (D.E. 55–1, Page 117). Plaintiff further testified he brought this issue to his supervisors and was told "there was nothing they could do about it and that the only thing I could do was stay on top of my business by running open contract reports and catching the ones that were miscoded incorrectly and submitting them for correction," which he did. (D.E. 55–1, Pages 76–77 and 118–122). In his own affidavit, Plaintiff avers Defendant failed to pay him all of the commissions he earned in accordance with the Commission Policy. (D.E. 58–2, Page 1). However, Plaintiff's testimony and his conclusory statement in his own self-serving affidavit —lacking in any details as to the dates, specific contracts, or amounts of the commissions allegedly not paid—fail to create a genuine issue of material fact. *See Sanchez v. Dallas/Fort Worth Intern. Airport Bd.*, No. 10–10939, 2011 WL 3667435, at *3 (5th Cir. Aug. 22, 2011) ("[A] self-serving affidavit, without more evidence, will not defeat summary judgment.") (citation omitted).

Mr. Turner avers "Defendant failed to pay Mr. Foster in accordance with Defendant's commissions policies and procedures." (D.E. 58–3, Page 2). Mr. Turner further avers he has "reviewed Defendant's document production purporting to be records of commissions paid by Defendant to its Sales Representatives, including Mr. Foster. Defendant failed to pay Mr. Foster earned commissions for at least 1,000 transactions for which commissions were payable and were procured by Mr. Foster. The amount of Mr. Foster's unpaid commissions is at least $100,000. Using [the Commission Policy], and Defendant's purported commission records, I have calculated the amount of commissions Mr. Foster earned but Defendant failed to pay." (D.E. 58–3, Pages 2–3). However, "affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion

for summary judgment and [w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Crayton v. Amadeo Rossi, S.A.*, 384 Fed.Appx. 330, 331 (5th Cir. 2010) (quoting *Orthopedic & Sports Injury Clinic v. Wang Lab., Inc.*, 922 F.2d 220, 225 (5th Cir. 1991) ) (other citations omitted). "To be considered on summary judgment, an expert's affidavit must include materials upon which the expert based his opinion, as well as an indication of the reasoning process underlying the opinion." *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 358 (5th Cir. 2001) (abrogation on other grounds); *Zidell v. Morris*, No. 4:11–cv–845–A, 2013 WL 704325, at *9 (N.D. Tex. Feb. 26, 2013) ("The court may properly disregard an expert witness's affidavit where it is conclusory and fails to give insight into the expert's reasoning process.") (citation omitted). Mr. Foster's affidavit does not provide any information about which commissions Plaintiff was allegedly not paid or what methodology he used in his reasoning process to reach his conclusions. Therefore, this affidavit does not satisfy Plaintiff's burden at this stage.

**\*7** In short, Plaintiff has not submitted sufficient competent summary judgment evidence demonstrating he was not paid in accordance with the Commission Policy. Accordingly, the undersigned recommends Plaintiff has failed to present sufficient evidence creating a genuine dispute of material fact regarding his breach of contract claim.

## B. REMAINING CLAIMS

Plaintiff additionally alleges claims for quantum meruit, promissory estoppel and negligent misrepresentation. (D.E. 10). The underlying premise for all three claims is the same as his breach of contract claim, namely that he was not paid commission for contracts he alleges were incorrectly coded to other employees. (D.E. 58, Pages 7–10). However, as with his breach of contract claim, Plaintiff has not directed the Court to any sufficient evidence to support these allegations, such as when Plaintiff's commissions were diverted, to who and for what accounts. In sum, Plaintiff has not provided any competent evidence that he was not paid in full in accordance with the Commission Policy. Therefore, as Defendant asserts Plaintiff was paid in accordance with the Commission Policy and Plaintiff has failed to submit any sufficient evidence to the contrary, the undersigned recommends these remaining claims should also be summarily dismissed.

Further, even if Plaintiff had provided competent evidence, "[i]f a valid contract covers the services provided, the party generally cannot recover under a quantum meruit theory."

2018 WL 1474186

*Allamon v. Acuity Specialty Prod., Inc.*, 877 F. Supp. 2d 498, 522 (E.D. Tex. 2012) (citation omitted). The Commission Policy covers the dispute at issue and therefore, Plaintiff's quantum meruit claim is barred as a matter of law. *Id.* The same is true for Plaintiff's claim under promissory estoppel and negligent misrepresentation. *Allen v. Horizon Software Intern., LLC.*, No. 3:14–cv–1947–N, 2015 WL 4191315, at *4 (N.D. Tex. July 2, 2015) ("However, because the Sales Commission Plan governs the terms of the commissions Plaintiff seeks, Plaintiff cannot raise a claim of promissory estoppel) (citation omitted); *Seghers v. Woodward*, No. 3:06–cv–810, 2008 WL 351237, at *7 (N.D. Tex. 2008) ("As [Plaintiff's] claim for negligent misrepresentation is based upon a breach of the contract rather than an independent injury, it fails as a matter of law). Lastly, while Plaintiff asserts a negligent misrepresentation claim arguing Defendant, by way of its Commission Policy, promised to pay him his earned commissions and would adjust commissions as necessary for any errors, there is no summary judgment evidence that United Rentals made any misrepresentation to Plaintiff of an existing fact rather than a promise of future conduct.

*Allamon*, 877 F. Supp. 2d at 524 ("To establish [her] negligent misrepresentation claim, [Plaintiff] must also prove that [Defendant] misrepresented an existing fact rather than a promise of future conduct.") (citations omitted); *Seghers*, 2008 WL 351237 at *7. Plaintiff has presented no evidence that United Rentals did not intend to abide by the Commission Policy at the time the parties agreed to it. *Id.* at 525 (Plaintiff must prove Defendant "misrepresented an existing fact, not one of future performance").

## VI. CONCLUSION

For the reasons stated above, the undersigned respectfully recommends Defendant's Motion for Summary Judgment be **GRANTED**.

Respectfully submitted this 9th day of March, 2018.

## All Citations

Not Reported in Fed. Supp., 2018 WL 1474186

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tab E

184 Fed.Appx. 442
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

Eric HAMIC, Plaintiff–Appellant,
v.
HARRIS COUNTY W.C. & I.D.
NO. 36, Defendant–Appellee.

No. 05–20236.
|
Decided June 12, 2006.

**Synopsis**
**Background:** Former employee of water district filed state
court action for breach of employment contract. Action
was removed to federal court, where employee amended
complaint to add federal hostile work environment and
retaliation claims under Title VII. District moved for
summary judgment. The United States District Court for the
Southern District of Texas entered take-nothing judgment on
breach of contract claim and later on federal discrimination
claims. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] water district did not breach its contract to employ general
manager, and

[2] district court properly refused to apply continuing
violations doctrine to manager's retaliation claim.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary
Judgment.

West Headnotes (6)

[1] **Federal Courts** 🔑 Summary judgment

Court of Appeals reviews grant of summary
judgment de novo, applying the same standard as
the district court. Fed.Rules Civ.Proc.Rule 56(c),
28 U.S.C.A.

[2] **Public Employment** 🔑 Selection by officers

**Water Law** 🔑 Officers, employees, and
agents

Texas water district did not breach its contract
to employ general manager with "full authority"
of that position and title; water board's decision
to participate in hiring process was not breach
as board retained ultimate authority to manage
district, nor was manager's authority breached
by any acts of individual board members that
undermined his authority because they did not
prevent him from doing his job, but simply made
it more difficult. Vernon's T.W.C.A. § 49.056(a,
b).

[3] **Limitation of Actions** 🔑 Labor and
Employment

The "continuing violations doctrine" is an
equitable doctrine that extends the limitations
period on otherwise time barred claims when
the unlawful employment practice in question
manifests itself over time, rather than as a series
of discrete acts.

9 Cases that cite this headnote

[4] **Civil Rights** 🔑 Continuing violations; serial,
ongoing, or related acts

Discrete discriminatory acts are not actionable if
time barred, even when they are related to acts
alleged in timely filed charges. Civil Rights Act
of 1964, § 706(e)(1), 42 U.S.C.A. § 2000e–5(e)
(1).

2 Cases that cite this headnote

**[5]    Civil Rights** 🗝 Continuing violations; serial, ongoing, or related acts

Employment discrimination claims based on discrete acts are timely only where such acts occurred within the limitations period, and claims based on hostile environment are only timely where at least one act occurred during the limitations period. Civil Rights Act of 1964, § 706(e)(1), 42 U.S.C.A. § 2000e–5(e)(1).

6 Cases that cite this headnote

**[6]    Civil Rights** 🗝 Continuing violations; serial, ongoing, or related acts

Continuing violations doctrine did not apply to retaliation claim by general manager for Texas water district since retaliation was, by definition, a discrete act rather than a pattern of behavior. Civil Rights Act of 1964, § 704(a), 42 U.S.C.A. § 2000e–3(a).

19 Cases that cite this headnote

**Attorneys and Law Firms**

**\*443**  Larry Michael Champion, Law Offices of Larry M. Champion, Houston, TX, for Plaintiff–Appellant.

F. Barham Lewis, Jr., James R. Staley, Ogletree, Deakins, Nash, Smoak & Stewart, Houston, TX, Defendant–Appellee.

Appeal from the United States District Court for the Southern District of Texas (4:04–CV–1327).

Before DeMOSS, BENAVIDES, and PRADO, Circuit Judges.

**Opinion**

PER CURIAM: [*]

[*]    Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**\*\*1**  Eric Hamic ("Hamic") appeals two decisions of the district court: (1) an order granting summary judgment in favor of Appellee Harris County W.C. & I.D. No. 36 ("District No. 36") on Hamic's claim that District No. 36 breached its employment contract with him and (2) an order granting summary judgment in favor of District No. 36 on Hamic's claim that District No. 36 unlawfully discriminated and retaliated against him in violation of **\*444** 42 U.S.C. § 2000e for refusing a direct order that Hamic alleges was unlawful under that section. We affirm both decisions.

I.

On March 29, 2000, Hamic and District No. 36 entered into an employment contract (the "Contract") under which Hamic was employed to serve as the General Manager of District No. 36 for a term of five years. One provision of the Contract states, "Hamic shall have the full authority of his position and title." Hamic alleges that this provision gave him "the full authority to hire and fire, [to] evaluate performance and award raises or issue constructive reviews, and [to] manage the day-to-day operations of the water district," authority that was allegedly undermined by the Board of Directors of District No. 36 (the "Board"), as described below. The "full authority" provision forms the heart of the contract dispute.

On December 20, 2000, Geraldo Parra, a member of the Board, allegedly gave Hamic a direct order to fire a non-Hispanic employee so that an Hispanic employee could be hired. Hamic refused, and, according to Hamic, relations between himself and three members of the Board (Geraldo Parra, Eladio Ayala, and Mike Black) subsequently deteriorated. Hamic makes the following allegations regarding what occurred after he refused Parra's order: (1) on various occasions, members of the Board "attempted to coerce, order, and otherwise induce [Hamic] to hire only Hispanics and ... made remarks ... show [ing] an animus toward[s] 'white' or Caucasian persons"; (2) on various occasions, members of the Board "expressly usurped the authority of [Hamic] to hire and fire Water District employees and hired employees without the consent or approval of [Hamic]"; (3) on various occasions, members of the Board made false accusations to third parties about Hamic's expertise, managerial abilities, and managerial decisions and falsely attributed various problems to him; (4) members of the Board removed Hamic's business telephone; (5) members of the Board "instructed employees to, and allowed employees to, refuse to follow [Hamic's] directions in

his capacity as General Manager"; (6) on various occasions, Mike Black ordered Hamic "to perform irregular and suspect acts in an attempt to exacerbate the already hostile working environment and interfere with [Hamic's] ability to do his job," namely, he ordered Hamic "to make a report of every conversation that [Hamic] had during the day to include any conversation with his wife" and issued "numerous burdensome 'to do' lists that were not approved by a quorum of the Board"; (7) members of the Board engaged in general daily harassment; and (8) Eladio Ayala testified that as part of a "'plan,'" he, Geraldo Parra, and Mike Black "'slowly ... made things more difficult for [Hamic] by giving him trouble with everything he did, by undermining his authority with the employees, and taking away his duties such as hiring and firing, so that he eventually became just a figurehead.'" Hamic alleges that these conditions created a hostile work environment and constituted retaliation for his refusal to comply with Parra's direct order. These conditions form the basis of Hamic's employment discrimination charge (as well as the factual basis for his breach of contract claim).

**2** Hamic reported the above conditions to the Board and to the attorney for District No. 36, but, according to Hamic, conditions did not improve. On June 26, 2002, Hamic filed a charge of discrimination with the Texas Commission on Human Rights ("TCHR") and the Equal Employment Opportunity **445** Commission ("EEOC"), and on July 17, 2002, Hamic voluntarily resigned from his position as general manager, a resignation he characterizes as constructive discharge. [2] The EEOC issued Hamic a Right to Sue Letter on February 19, 2003, and the U.S. Department of Justice issued a Right to Sue Letter on June 27, 2003. [3]

[2]     Hamic's resignation was not effective until August 17, 2002.

[3]     The TCHR does not appear to have issued a Right to Sue Letter, but that is irrelevant here where Hamic only appeals his federal employment discrimination cause of action.

On July 16, 2002, Hamic filed suit in Texas state court, claiming that District No. 36 had violated its employment contract. District No. 36 removed the case to federal court, where Hamic amended his complaint to add an employment discrimination charge under federal law, specifically, a hostile environment claim under 42 U.S.C. § 2000e–2 and a retaliation claim under § 2000e–3. [4] District No. 36 moved for summary judgment on both issues, breach of contract and

employment discrimination. On August 6, 2004, the district court granted District No. 36's motion in part, ruling that Hamic take nothing on his breach of contract claim. Hamic moved for reconsideration. The district court denied Hamic's motion and ordered District No. 36 to file another motion for summary judgment, which it did. This motion, which addressed Hamic's employment discrimination charge and argued that some of the acts alleged in support thereof were time barred, was denied. However, the district court later vacated the denial, entered the opposite ruling, and ordered Hamic to take nothing on his employment discrimination charge after reconsidering the parties' submissions and hearing arguments from both parties as to whether the continuing violations doctrine [5] applied in Hamic's case to save any time barred acts (the court decided it did not). The court entered final judgment in favor of District No. 36, and Hamic timely appealed, arguing that a material question of fact exists regarding his breach of contract claim that precludes summary judgment and that the district court erred in refusing to apply the continuing violations doctrine to his § 2000e–3 retaliation claim.

[4]     The case was removed on federal question grounds pursuant to a § 1983 claim that Hamic later dropped. Hamic tried to remand the case after dropping his § 1983 claim, but the court ruled that remand was not proper because of the federal employment discrimination charge Hamic brought in his amended complaint.

[5]     See, e.g., Pegram v. Honeywell, Inc., 361 F.3d 272, 279–80 (5th Cir.2004) (describing the continuing violations doctrine).

II.

[1]     This Court reviews a grant of summary judgment de novo, applying the same standard as the district court. Wheeler v. BL Dev. Corp., 415 F.3d 399, 401 (5th Cir.2005). Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). The Court views the evidence in the light most favorable to the non-movant. Wheeler, 415 F.3d at 401–02. The non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial to avoid summary judgment. Id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A genuine

issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id.* (citing **\*446** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Summary judgment is appropriate, however, if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (quoting *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548).

A.

**\*\*3** **[2]**   With respect to Hamic's breach of contract claim, the district court held that District No. 36 did not breach its contract to employ Hamic as general manager with the full authority of that position and title. It reasoned that because the Board, by law, delegates authority to the general manager in its discretion and because the Board's delegation defines the position, the general manager's "full authority" is whatever the Board says it is.[6] Moreover, the court found that neither the Water Code nor the Contract describes Hamic's specific authority; rather, they explain how Hamic's authority is to be determined: by the Board. Thus, the court determined that Hamic's authority as general manager under the Contract was not breached by the Board's decision to participate in the hiring process because the Board retained the ultimate authority to manage the district; nor was Hamic's authority breached by any acts of individual members of the Board that undermined Hamic's authority because the acts did not prevent him from doing his job, they simply made his job more difficult. Having carefully reviewed the record and the parties' briefs, we affirm the district court's decision ordering Hamic to take nothing on his breach of contract claim essentially for the reasons stated by the district court.

[6]   *See* TEX. WATER CODE ANN. § 49.056(a) (Vernon 2000) ("The board may employ or contract with a person to perform such services as general manager for the district as the board may from time to time specify. The board may delegate to the general manager full authority to manage and operate the affairs of the district subject only to orders of the board."); *see also id.* § 49.056(b) (describing the board's discretion to delegate personnel decisions to the general manager).

B.

With respect to Hamic's employment discrimination charge, the district court held that (1) the charge was not subject to the continuing violations doctrine; (2) the order to fire an Hispanic person was outside the limitations period and could not support any acts that occurred in 2002; and (3) any acts that occurred in 2002 did not otherwise illustrate ethnic retaliation or discrimination.[7] Hamic only appeals the district court's decision to the extent that it failed to apply the continuing violations doctrine to his retaliation claim. We affirm the district court's decision in that respect.

[7]   Unfortunately, the district court did not publish a written decision, so we have had to piece together its holding from the transcript of a hearing the judge held on February 15, 2005. We have previously urged courts to provide findings of fact and conclusions of law when granting summary judgment, and we do so again here. *See Thomas v. N.A. Chase Manhattan Bank,* 994 F.2d 236, 241 n. 6 (5th Cir.1993) (citing *Wildbur v. ARCO Chem. Co.,* 974 F.2d 631, 644 (5th Cir.1992); *Williamson v. Tucker,* 645 F.2d 404, 411 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Boazman v. Economics Lab., Inc.,* 537 F.2d 210, 213 n. 5 (5th Cir.1976)).

**[3]** **[4]** **[5]**   A plaintiff, like Hamic, who initially institutes proceedings with an appropriate state agency must file a Title VII employment discrimination charge with the EEOC within 300 days of the challenged discrimination. *See* 42 U.S.C. § 2000e–5(e)(1); *see also Frank v. Xerox Corp.,* 347 F.3d 130, 136 (5th Cir.2003). The continuing violations doctrine is an equitable doctrine that extends the limitations **\*447** period on otherwise time barred claims when the unlawful employment practice in question manifests itself over time, rather than as a series of discrete acts. *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 279 (5th Cir.2004). Previously, a plaintiff was relieved of establishing that all alleged discriminatory conduct occurred within the actionable period if he could show a series of related acts, one or more of which fell within the limitations period. *Id.* However, the Supreme Court has clarified that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). The Fifth Circuit states the rule as follows: "claims based on discrete acts are timely only where such acts occurred within the limitations period, and ... claims based

on hostile environment are only timely where at least one act occurred during the limitations period." *Id.* at 279–80.

 **\*\*4**  **[6]**   Hamic argues on appeal that the district court should have applied the continuing violations doctrine to his § 2000e–3 retaliation claim. He asserts that the actions taken against him were not discrete acts, but rather an ongoing pattern of retaliation, subject to the continuing violations doctrine. However, retaliation is, by definition, a discrete act, not a pattern of behavior. *See Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 705–07 (5th Cir.1997). It requires an adverse employment action, which has been defined in this Circuit as an ultimate employment decision, such as " 'hiring, granting leave, discharging, promoting, and compensating.' " *See id.* at 707 (quoting *Dollis v. Rubin,* 77 F.3d 777, 781–82 (5th Cir.1995)). Accordingly, post-*Morgan,* a plaintiff can only recover for retaliation to the extent that it occurred within the limitations period, that is, the continuing violations doctrine does not apply to retaliation. *See Pegram,* 361 F.3d at 279–80. Therefore, Hamic's argument that the district court should have applied the continuing violations doctrine to his retaliation claim must fail.

Hamic does not otherwise appeal the district court's decision. [8] Accordingly, we affirm the district court's decision that Hamic take nothing on his employment discrimination charge.

[8]     Hamic urges in his reply brief that, contrary to the district court's decision, he was demoted, he resigned as a result of a hostile environment, and he was constructively discharged. However, we do not consider arguments raised for the first time in a reply brief. *Wallace v. County of Comal,* 400 F.3d 284, 292 (5th Cir.2005).

III.

For the foregoing reasons, we AFFIRM the decisions of the district court granting summary judgment in favor of District No. 36.

**All Citations**

184 Fed.Appx. 442, 2006 WL 1675178

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tab F

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 47 of 93

Igwe v. Menil Foundation Inc, Not Reported in Fed. Supp. (2020)

2020 WL 7024374

2020 WL 7024374
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Anthony O. IGWE, Plaintiff,

v.

MENIL FOUNDATION INC, Defendant.

Civil Action No. 4:17-cv-03689
|
Signed 11/30/2020

**Attorneys and Law Firms**

Lucy Nkechinyelumka Hilda Chukwurah, NLC Law Group, PLLC, Houston, TX, for Plaintiff.

Ashlee Cassman Grant, Courtney Brooke Warren, Baker & Hostetler LLP, Houston, TX, for Defendant.

**MEMORANDUM AND OPINION GRANTING MOTION FOR SUMMARY JUDGMENT**

CHARLES ESKRIDGE, United States District Judge

**\*1** The motion for summary judgment by Defendant Menil Foundation, Inc is granted. Dkt 41.

### 1. Background

Plaintiff Anthony Igwe is a Nigerian man who worked as a gallery attendant for the Menil Foundation from October 2009 until his resignation in December 2017. Dkt 21-1 at ¶¶ 6, 16. He was responsible for guarding the museum, welcoming guests, and providing security for special events. Dkt 41-2.

Igwe alleges several instances of discrimination on the basis of his race, national origin, and color, along with retaliation for his pursuit of those claims. Dkt 21-1 at ¶¶ 17–34. He filed a charge of discrimination with the Equal Employment Opportunity Commission in April 2013. Dkt 41-3. He alleged that the Menil Foundation denied him a promotion, paid him unequal bonus payments, disciplined him, and negatively reviewed his performance because of his race, national origin, and color and in retaliation for raising complaints. Ibid. He received a notice of right to sue from the EEOC but didn't

pursue litigation at that time. Dkt 21-1 at ¶ 7; see also Dkt 41-4.

Suzanne Maloch is the director of human resources at the Menil Foundation. Getachew Mengesha is a gallery supervisor and was Igwe's immediate superior. Igwe sent complaints to Maloch on three instances between October 2013 and May 2014. He alleged that Mengesha (who is Ethiopian) criticized him while at work and gave negative performance reviews on the basis of his Nigerian ancestry. Dkts 41-6, 41-8, and 41-10. Maloch investigated each claim and determined that they couldn't be substantiated. Dkts 41-7, 41-9, and 41-11.

Glenn Shepherd is the director of safety and security at the Menil Foundation. He told the gallery attendants at a staff meeting on September 25, 2016 that he would hold supervisor training for interested employees. Dkt 41-21 at 3. Three gallery attendants expressed interest—Latisha Gilbert, Mirazma Sisic, and Eric Valdez. Shepherd and Mengesha began their training promptly. Dkts 41-14 and 41-15. Valdez resigned shortly after the training began and isn't further related to this dispute. Dkt 41 at 13 n 1.

Igwe didn't originally express interest. Dkt 41-14. He then told Shepherd on October 1st that he wanted to receive the supervisor training. Dkt 41-21 at 3. Shepherd directed him to speak to Mengesha, who would decide who (if at all) to promote to supervisor. Ibid. Igwe then sent Mengesha a cryptic email on October 15th. Dkt 41-13 at 2. He stated that Shepherd directed him to contact Mengesha, but that Mengesha should "not mistake this email that I am asking you," while also asking whether Mengesha was training other employees. Ibid. Mengesha responded that he recommended Gilbert, Sisic, and Valdez at Shepherd's request and had begun training them. Id at 2.

Igwe submitted a complaint to Maloch on October 19th, alleging that Mengesha and Shepherd "deliberately refused to include [his] name in a supervisory role that was made available to every employee." Dkt 41-21 at 4. Maloch investigated the complaint and determined that Igwe wasn't selected because he didn't timely inform Mengesha of his interest. Dkt 41-22 at 2. Maloch further found that Igwe wasn't trained after the initial selections because the other two gallery attendants were performing in satisfactory fashion and no additional help was required. Ibid.

Igwe v. Menil Foundation Inc, Not Reported in Fed. Supp. (2020)

2020 WL 7024374

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 48 of 93

**\*2** Igwe filed a charge of discrimination with the Texas Workforce Commission Civil Rights Division on October 23, 2016. Dkt 41-23. He alleged that he was denied the opportunity to participate in supervisory training and repeated his previous allegations of discrimination. The TWC dismissed this because the complaint didn't allege the basis for his discrimination. Dkt 41-24. Igwe filed a separate charge of discrimination with the EEOC on January 21, 2017. Dkt 41-25. He raised the same allegations as in his TWC complaint but also stated that the Menil Foundation took these actions because of his race, national origin, and color. The EEOC eventually issued Igwe a notice of right to sue on September 6, 2017. Dkt 41-26. Meanwhile, an assistant gallery supervisor had retired in February 2017. Dkt 41-27 at 2. Gilbert and Sisic were the only employees to apply to fill the vacancy and were each promoted. Dkts 41-18 to 41-20.

Igwe resigned on November 15, 2017. Dkt 41-28. He filed suit on December 6th. He asserted a constructive discharge claim in his original complaint. See Dkt 1 at ¶¶ 28–29. Judge Ewing Werlein dismissed that claim with prejudice prior to the reassignment of the case to this Court. Dkt 12 at 6–8.

Igwe continues to assert claims for violations of Title VII of the Civil Rights Act of 1964 and 42 USC § 1981. Specifically, he alleges that the Menil Foundation discriminated against him on several occasions in 2012, 2013, and 2014 on the basis of his race, color, and national origin. This included denial of pay raises, merit bonuses, and overtime; improper discipline for abuse of sick leave; negative job performance reviews; and criticism while at work. Dkt 21-1 at ¶¶ 8, 20. He also alleges discrimination in 2016 and 2017, asserting that the Menil Foundation prohibited him from participating in supervisory training. Id at ¶¶ 12–15, 19.

Igwe also asserts a claim for violations of Chapter 21 of the Texas Labor Code pursuant to the Texas Commission on Human Rights Act. Specifically, he alleges that the Menil Foundation ceased accepting applicants for supervisor training in retaliation for his filing complaints with human resources and charges with the TWC and the EEOC. Dkt 21-1 at ¶¶ 29–34.

The Menil Foundation moved for summary judgment on these three, remaining claims. Dkt 42.

### 2. Legal Standard

Rule 56(a) of the Federal Rules of Civil Procedures requires a reviewing court to grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is *material* if it "might affect the outcome of the suit under the governing law ...." *Anderson v Liberty Lobby, Inc*, 477 US 242, 248 (1986); see also *Smith v Harris County, Texas*, 956 F3d 311, 316 (2010). And a dispute is *genuine* if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 US at 248. The function of the trial court at the summary judgment stage isn't to weigh the evidence and determine the truth of the matter, but rather, "to determine whether there is a genuine issue for trial." Id at 249; see also *Smith*, 956 F3d at 316; *Conversion Properties LLC v Kessler*, 994 SW2d 810, 813 (Tex App—Dallas 1999, pet ref'd) (affirming summary judgment in lien seniority dispute).

A court reviewing a motion for summary judgment must draw all reasonable inferences in the light most favorable to the nonmoving party. *Connors v Graves*, 538 F3d 373, 376 (5th Cir 2008). The moving party also typically bears the entire burden to demonstrate the absence of a genuine issue of material fact. *Nola Spice Designs LLC v Haydel Enterprises, Inc*, 783 F3d 527, 536 (5th Cir 2015) (citation omitted); see also *Celotex Corp v Cartrett*, 477 US 317, 323 (1986). But when a motion for summary judgment by a defendant presents a question on which the plaintiff bears the burden of proof at trial, the burden shifts to the plaintiff to proffer summary judgment proof establishing an issue of material fact warranting trial. *Nola Spice*, 783 F3d at 536 (citations omitted).

**\*3** The party opposing summary judgment must also identify specific evidence in the record and articulate precisely how that evidence supports his or her claim. *Willis v Cleco Corp*, 749 F3d 314, 317 (5th Cir 2014) (citations omitted). It isn't enough to simply file an undifferentiated collection of exhibits. "If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search." *Hernandez v Yellow Transportation Inc*, 670 F3d 644, 654 (5th Cir 2012) (citations omitted).

### 3. Analysis

#### a. Failure of summary judgment opposition

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 49 of 93

Igwe v. Menil Foundation Inc, Not Reported in Fed. Supp. (2020)

2020 WL 7024374

Igwe devotes a substantial portion of his response to argument regarding constructive discharge. See Dkt 42 at 5–7. Those arguments needn't be addressed. That claim has already been dismissed. Dkt 12 at 6–8.

Igwe also entirely fails to point to specific evidence in the record in support of his opposition to summary judgment. Indeed, the sole instance of record citation is this final sentence of his response brief: "As shown by Plaintiff's Charges of Discrimination, and attached exhibits (Ex. A1-G1, J1), there are fact issues for a jury to consider." Dkt 42 at 11. The Fifth Circuit is clear that arguments lacking specific record citations are insufficient to resist summary judgment. *Willis*, 749 F3d at 317 (citations omitted). Failure to rebut the movant's factual assertions with countering citations to record evidence is fatal to claims attacked under Rule 56. For example, see *Jackson v Brennan*, 2019 WL 5964508, *5 (SD Tex).

Summary judgment is granted on this basis alone. Even so, the merits of certain arguments are addressed further below.

### b. Technical bars

The Menil Foundation correctly argues that aspects of Igwe's claims are barred by applicable statutes of limitations and failure to exhaust administrative remedies. The following timeline provides helpful context:

- *July 2012:* Mengesha disciplined Igwe for abusing sick leave. Dkt 41-29.

- *October 2013:* Mengesha denied Igwe overtime. Dkt 41-30.

- *February 2014:* Mengesha disciplined Igwe for fanning himself while working. Dkt 41-31.

- *May 2014:* Igwe received an improperly low merit bonus because Mengesha gave Igwe low scores on performance review. Dkt 41-10.

- *October 2016 through 2017:* Mengesha denied Igwe participation in the supervisor training. Dkt 21-1 at ¶¶ 10–11.

*As to Title VII claims.* A plaintiff must file a charge of discrimination with the EEOC under Title VII within 180 days of a discrete alleged discriminatory act—or 300 days in a so-called deferral state. 42 USC § 2000(e)–5(e)(1); see *Carter v Target Corp*, 541 F Appx 413, 419 (5th Cir 2013). Texas is a deferral state. *Mennor v Fort Hood National Bank*, 829 F2d 553, 554 (5th Cir 1987). The statute of limitations thus bars all claims except those concerning the denial of training.

Igwe doesn't really dispute this. He instead responds that all of the events included in his 2017 charge are timely under the continuing-violation doctrine. Dkt 42 at 7–8. But that doctrine applies only when "the unlawful employment practice manifests itself over time, rather than as a series of discrete acts." *Pegram v Honeywell, Inc*, 361 F3d 272, 279 (5th Cir 2004), quoting *Frank v Xerox Corp*, 347 F3d 130, 136 (5th Cir 2003). A discrete discriminatory act "occurred on the day it happened." *National Railroad Passenger Corp v Morgan*, 536 US 101, 110 (2002). It is one in which the unlawful character is determined by a "single occurrence." *Id at 111*. By contrast, a continuing violation is unlawful only by reference to a pattern of behavior. See *Hamic v Harris County WC & ID No 36*, 184 F Appx 442, 447 (5th Cir 2006).

**\*4** For instance, a discriminatory denial of disability benefits is a discrete act because "a single act"—that is, the denial —forms "the basis for the alleged wrongful discrimination." *Berry v Allstate Insurance Co*, 84 F Appx 442, 444 (5th Cir 2004). On the other hand, minor insults and the imposition of workplace inconveniences are only actionable when they occur repeatedly over a prolonged period of time. It is for this reason that the continuing-violation doctrine is regularly asserted by a plaintiff who brings a hostile work environment claim. For example, see *Heath v Board of Supervisors for Southern University and Agricultural and Mechanical College*, 850 F3d 731, 735–36, 740–71 (5th Cir 2017).

Each of the allegations above is a discrete instance of discrimination by these standards. As such, each one is subject to the limitations period, regardless of whether "they are related to acts alleged in timely filed charges." *Pegram*, 361 F3d at 279, citing *Morgan*, 536 US at 113. The statute of limitations bars all allegations of discrete instances of discrimination that occurred prior to the 300th day before the charge filed by Igwe with the EEOC, viz, March 27, 2016.

Not all of Igwe's claims are clearly specified. For instance, he appears to assert that he was discriminatorily denied promotion. The Menil Foundation also argues that such claim (if asserted) is barred for failure to exhaust administrative remedies. See Dkt 41 at 17–18. This is so, it says, because the promotions occurred after Igwe filed his charge with the EEOC, and he didn't file a new or amended charge. Id at 18.

Case 4:21-cv-03371  Document 33-5  Filed on 09/24/24 in TXSD  Page 50 of 93

Igwe v. Menil Foundation Inc, Not Reported in Fed. Supp. (2020)
2020 WL 7024374

The Fifth Circuit is indeed clear that district courts aren't to consider claims that weren't made to the EEOC unless they "can reasonably be expected to grow out of the charge of discrimination." *Chhim v University of Texas at Austin*, 836 F3d 467, 472 (5th Cir 2016), quoting *Pacheco v Mineta*, 448 F3d 783, 788–89 (5th Cir 2006). To the extent Igwe asserts a failure-to-promote claim, it is barred for failure to exhaust administrative remedies.

*As to § 1981 claims*. The statute of limitations requires that claims under § 1981 be brought within four years. 28 USC § 1658(a); see *Jones v RR Donnelley & Sons Co*, 541 US 369, 383– 85 (2004). Igwe filed this suit on December 6, 2017. The statute of limitations thus bars those claims that accrued before December 6, 2013.

c. Discrimination claims; merits

Igwe brings two discrimination claims that survive the statute of limitations. He asserts as to Title VII that Mengesha refused to train him as a supervisor. And he asserts as to § 1981 that Mengesha improperly disciplined him while at work, gave him low scores on his performance review leading to an improperly low merit bonus, and refused to train him as a supervisor.

A *prima facie* case for racial discrimination requires a plaintiff to show that:

- *First,* he is a member of a protected class;

- *Second,* he was qualified for the position;

- *Third,* he was subject to an adverse employment action; and

- *Fourth,* he was replaced by someone outside the protected class, or, in the case of disparate treatment, shows that other similarly situated employees were treated more favorably.

*Bryan v McKinsey & Co*, 375 F3d 358, 360 (5th Cir 2004) (citations omitted). The summary judgment analysis is the same for Title VII and § 1981. *Davis v Dallas Area Rapid Transit*, 383 F3d 309, 316 (5th Cir 2004).

The Menil Foundation doesn't dispute that Igwe meets the first two elements. It argues that Igwe fails to establish the third and fourth. Dkt 41 at 10, 12. As to the fourth,

Igwe clearly fails to present evidence of a similarly situated employee outside the protected class that received preferential treatment.

**\*5** The Fifth Circuit instructs that a similarly situated employee must present "nearly identical circumstances" to the plaintiff. *Lee v Kansas City Southern Railroad Co*, 574 F3d 253, 260 (5th Cir 2009) (citations omitted). For the discipline claim, this means that Igwe must identify an employee who behaved similarly and wasn't disciplined to the same extent. For the claim related to performance scores, he must identify an employee of comparable competency that received either a higher performance score or a higher bonus (or both). And for the training claim, he must identify an employee that was allowed participation in supervisor training without a timely expression of interest in such training. A plaintiff's subjective belief that he was subject to discrimination doesn't satisfy this element. *Vasquez v Nueces County*, 551 F Appx 91, 94 (5th Cir 2013); see also *Alkhawaldeh v Dow Chemical Co*, 851 F3d 422, 426–27 (5th Cir 2017).

Igwe fails to identify any such employees. The Menil Foundation points out that one of the individuals selected for training (Gilbert) is the same race and color as Igwe. Dkt 41 at 12, citing Dkt 41-1 at 10. It also observes, "The only evidence Igwe has that he was treated less favorably is his own subjective, conclusory statements." Id at 22. That accurately reflects the state of the record. Igwe admitted in his deposition that he had no personal knowledge either of performance appraisal scores or merit bonuses of other gallery attendants, or of whether they were subjected to the same type of scrutiny for sick leave or fanning themselves in the gallery. See ibid (collecting deposition citations). In the cited deposition testimony, Igwe at best testified that Mengesha discriminated against him for two reasons. The first was because Ethiopians "are known to be hateful towards Nigerians." Dkt 41-1 at 24. And the second was because Mengesha supervised his own wife (who was also as a Menil Foundation employee), which Igwe complained was a conflict of interest and violated company policy. Id at 21. These subjective types of allegations are insufficient to satisfy the element requiring evidence of a similarly situated employee outside the protected class. *Vasquez*, 551 F Appx at 94.

d. Retaliation claim; merits

Igwe v. Menil Foundation Inc, Not Reported in Fed. Supp. (2020)

2020 WL 7024374

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 51 of 93

Igwe asserts that his denial of training was retaliation for engaging in protected activity in violation of state law. Court decisions in Texas under the Texas Commission on Human Rights Act with respect to retaliation parallel federal cases construing and applying Title VII or other, similar federal statutes. *Alamo Heights Independent School District v Clark*, 544 SW3d 755, 781 (Tex 2018); see also *Shackleford*, 190 F3d at 403 n 2.

A *prima facie* case for this claim requires Igwe to show that:

- *First,* he engaged in activity protected by Title VII;

- *Second,* the Menil Foundation took an adverse employment action against him; and

- *Third,* a causal connection exists between the protected activity and the adverse employment action.

*Zamora v City of Houston*, 798 F3d 326, 331 (5th Cir 2015) (citations omitted).

The Menil Foundation contests the second and third elements. Dkt 41 at 28–29. As to the third, Igwe clearly fails to show a causal connection between the protected activity and his denial of training. The burden is on Igwe to establish that his protected activity was a *but for* cause of the alleged adverse action by the Menil Foundation. *Zamora*, 798 F3d at 331, quoting *University of Texas Southwestern Medical Center v Nassar*, 570 US 338, 362 (2013). And again, the Fifth Circuit holds that a subjective belief by the plaintiff in this regard

is insufficient. *Vasquez*, 551 F Appx at 94, citing *Baltazor v Holmes*, 162 F3d 368, 377 n 11 (5th Cir 1998).

Igwe fails to meet his burden. He points to no specific evidence establishing causation in his response. He at best attaches as exhibits his charges filed with the TWC and the EEOC, together with a statement of his work following those charges. Dkt 42 at 11. But these exhibits do nothing more than place in some semblance of temporal proximity the charges and his subsequent work history. In that sense, they assert only a subjective belief that the Menil Foundation denied training because Igwe filed his complaints with human resources and charges with the TWC and the EEOC. See Dkt 41-1 at 15–16 (deposition). This is insufficient.

### 4. Conclusion

**\*6** The motion for summary judgment by the Menil Foundation, Inc is GRANTED. Dkt 41.

The claims against the Menil Foundation are DISMISSED WITH PREJUDICE.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7024374

---

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Tab G

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 53 of 93

Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)

2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

2018 WL 706472
United States District Court, S.D. Texas, McAllen Division.

JUNFEI LI, Plaintiff,
v.
The UNIVERSITY OF TEXAS RIO
GRANDE VALLEY, Defendant.

Civil Action No. 7:15–CV–00534
|
Signed 02/02/2018

**Attorneys and Law Firms**

Katie Pearson Klein, William Daniel Mount, Jr., Dale Klein
LLP, McAllen, TX, for Plaintiff.

Drew L. Harris, Office of the Attorney General, Austin, TX,
for Defendant.

## OPINION

Micaela Alvarez, United States District Judge

**\*1** The Court now considers The University of Texas Rio
Grande Valley's ("UTRGV" and "Defendant") motion for
summary judgment. [1] After duly considering the record and
relevant authorities, the Court **GRANTS** the motion.

[1]      Dkt. No. 25.

## I. BACKGROUND

### A. *Factual History*

Dr. Junfei Li ("Plaintiff") earned his bachelors and masters
degrees in electrical engineering in China, and his doctorate
from the University of Texas at Austin. [2] He worked as an
Assistant Professor at the University of Texas Pan–American
("UTPA") beginning in 2002, and applied for tenure in
2007. [3] The College Tenure and Promotion Committee gave
a "negative" recommendation, but Plaintiff appealed and
received tenure anyway in 2008. [4]

[2]      Dkt. No. 25–1 p. 10.

[3]      *Id.* pp. 19 & 47.

[4]      *Id.*

After receiving tenure, Plaintiff's research activity decreased
substantially. For example, while working for UTPA from
2002–2007, before receiving tenure, Plaintiff published
eighteen various articles and conference proceedings. [5]
However, from 2008–2015, after receiving tenure,
Plaintiff published only one conference proceeding. [6]
Even so, Henrich Foltz ("Foltz")—the Chair of
UTPA's Electrical Engineering Department—attests that
"[c]onference proceedings are not given much weight;
tenured professors are expected to publish peer-reviewed
journal articles and to obtain research funding grants." [7]
Thus, Foltz attests that Plaintiff's "research and productivity
dropped tremendously in the period after he received
tenure." [8]

[5]      *Id.* pp. 51–52.

[6]      *Id.* pp. 19 & 51.

[7]      *Id.* p. 91.

[8]      Dkt. No. 25–1 p. 91.

Plaintiff underwent post-tenure review in 2014. [9] Under
normal circumstances, and "[i]f the dean and the department
committee conclude[s] that the faculty member is meeting
his or her academic responsibilities, no further action will be
taken...." [10] This was not the case for Plaintiff, who instead
received a letter from Havidán Rodríguez ("Rodríguez")
—UTPA's Provost at the time—indicating that "several
important concerns emerged in your review...." [11] These
concerns included: significant variation in student evaluation
scores; failure to publish *any* peer-reviewed journal articles
since 2007, before Plaintiff received tenure; and failure to
obtain externally-funded research grants. [12]

[9]      *Id.* p. 45.

[10]      *Id.*

[11]      *Id.*

[12]      *Id.*

More generally, the letter strongly suggested that Plaintiff's
post-tenure years were defined by "insufficient professional

**Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)**

2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

achievement." [13]  Consequently, UTPA required Plaintiff to develop "a research plan," and expected "significant and positive improvements in the area of scholarship...." [14] Failure to do so would prevent Plaintiff from being promoted "to the next rank." [15]  The letter concluded by noting that "this review has raised *significant* concerns regarding your professional achievements, which must be addressed through the action plan requested by the Dean." [16]

[13]   *Id.*

[14]   Dkt. N. 25–1 p. 45.

[15]   *Id.*

[16]   *Id.* (emphasis added).

UTPA was independently abolished by legislative decree— along with Plaintiff's tenured employment—on August 31, 2015, [17] and UTRGV was created. Tenured faculty from UTPA could apply to UTRGV during its "Phase I" hiring cycle, and would often "receive offers" so long as they "met certain criteria," such as no previous disciplinary action. [18] This hiring cycle, although available to UTPA tenured faculty, was not available to the general public. [19]  UTRGV extended a tenured employment offer to Plaintiff during the Phase I hiring cycle on October 6, 2014. [20]  Plaintiff's starting salary would be $92,971.00, but the offer "will expire at 5:00 p.m. on October 17, 2014." [21]  Plaintiff did not timely accept the offer.

[17]   Dkt. No. 19 p. 37.

[18]   Dkt. No. 25–1 p. 91, ¶ 3.

[19]   *Id.* The Court infers this proposition from Foltz's attestation that UTRGV's Phase II hiring cycle was open to the general public.

[20]   *Id.* p. 84.

[21]   *Id.* p. 85.

**\*2**  Leading up the offer's expiration date, and on October 14, 2014, UTRGV sent a reminder email: "[Y]our offer for a faculty position at UTRGV will expire at **5:00 p.m. on October 17, 2014**." [22]  UTRGV sent similar reminder emails on October 15 and 16, 2014. [23]  Ultimately, Plaintiff attempted to accept the offer on October 19, 2014—two

days after the offer had expired. [24]  He admits: "I missed the deadline," [25] while noting that "[t]his semester has been very busy." [26]  Although UTRGV did not accept Plaintiff's untimely response, Plaintiff was invited to apply to UTRGV during its "Phase II" hiring cycle, [27] which was open to the general public.

[22]   *Id.* p. 87 (emphasis in original).

[23]   *Id.* pp. 88–89.

[24]   Dkt. No. 25–1 pp. 81–82.

[25]   *Id.* p. 82.

[26]   *Id.*

[27]   *Id.* pp. 81–82.

Plaintiff thereafter applied for a tenured UTRGV faculty position during its Phase II hiring cycle. [28]  UTRGV received twenty-three applications for this particular position, and a search committee (having conducted telephone screenings and interviews) created a "final short list" consisting of two applicants—Plaintiff and Dr. Nantakan Wongkasem ("Wongkasem"). [29] The latter earned her masters and doctoral degrees from the University of Massachusetts, Lowell. [30]  Her masters grade point average (GPA) was 4.0, while her overall doctoral GPA was 3.97, and her major-specific doctoral GPA was 4.0. [31]

[28]   *Id.* p. 47.

[29]   *Id.* p. 70.

[30]   Dkt. No. 25–1 p. 56.

[31]   *Id.*

Foltz, who served as the interim chair of UTRGV's Electrical Engineering Department, initially "considered the relative strengths of the two candidates to make a hiring recommendation to [Dean] Miguel Gonzalez." [32]  After personally interviewing Wongkasem, and "being satisfied with her teaching approach and experience," [33] Foltz recommended to Dean Gonzalez that Wongkasem be hired instead of Plaintiff, and Dean Gonzalez agreed with the recommendation. [34]

Junfei LI v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)
Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 55 of 93
2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

32    *Id.* p. 92, ¶ 5.

33    *Id.*

34    *Id.* pp. 68–69 (Foltz's recommendation letter to Dean Gonzalez); *Id.* p. 92, ¶ 6.

Wongkasem was hired instead of Plaintiff because, as Foltz notes, "Wongkasem had a far better publication and funding track record in recent years." [35] The evidence supports this conclusion. In its briefing, Defendant provides a graph similar to the following, which is both helpful and supported by the evidence: [36]

35    Dkt. No. 25–1 p. 92, ¶ 5.

36    *Compare* Dkt. No. 25–1 pp. 56–65 (Wongkasem's curriculum vitae, publication list, and research interests) *with id.* pp. 49–54 (Plaintiff's curriculum vitae and publications list).

| | Wongkasem | Plaintiff |
|---|---|---|
| *Peer-reviewed journal publications between 2008–2015* | 11 publications | None |
| *Conference proceeding publications between 2008–2015* | 18 publications | 1 publication |
| *Patents* | 8 patents | None |
| *Research funding between 2008–2015* | 8 grants obtained as primary investigator, maintaining funding since 2008 | No grants obtained after 2008 as primary investigator, and prior grants ran out in 2011 |

Because of these differences, Dean Gonzalez believed that Wongkasem had "a higher potential for long[-]term success...." [37]

37    Dkt. No. 25–1 p. 67.

Dean Gonzalez recommended to Rodríguez in a memorandum dated May 22, 2015 that Wongkasem be hired for the tenured position. [38] Rodríguez adopted the recommendation on June 4, 2015, [39] and Wongkasem was offered the job on July 1, 2015. [40] She accepted the offer on July 2, 2015. [41] Thereafter, UTRGV assembled a research start-up package for Wongkasem that included an "ADVANCE" grant which paid $1,000.00 for conference travel and $10,000.00 for a research assistant. [42] The ADVANCE grant is funded by the National Science Foundation and "designed to attract more females to the science and technology fields." [43]

38    *Id.* p. 66.

39    *Id.* (*See* Rodríguez's signature and the date hand written above the "Approve and Date" column).

40    *Id.* p. 92, ¶ 6.

41    *Id.*

42    *Id.*

43    Dkt. No. 25–1 p. 92, ¶ 6.

**\*3**  Notwithstanding this purpose, and according to Foltz: "UTRGV spends the bulk of the money from the ADVANCE grant on workshops, speakers, and leadership development programs that are open to both male[s] and females." [44] Moreover, "[t]he $11,000 from ADVANCE did not directly benefit the Electrical Engineering Department or provide any additional motivation to hire [Wongkasem]. The start-up package was created after the decision to recommend for hire was already made, and it played no role in the decision to hire [Wongkasem]." [45]

44    *Id.*

45    *Id.*

Plaintiff was informed on July 6, 2015 that Wongkasem got the Phase II tenured faculty position, and that he did not. [46] Nevertheless, Plaintiff was offered a non-tenured Senior Lecturer position at UTRGV with a salary of approximately $70,000.00 [47]—$22,000.00 less than he would have made had he been hired for the tenured position. [48] In sum, Plaintiff failed to timely accept his Phase I offer, was not selected during Phase II for a tenured position ostensibly due to stiff competition, and ultimately received a lower-pay, non-tenured position at UTRGV, where he teaches to this day.

46    *Id.* p. 92, ¶ 7; *Id.* p. 90 (an email setting up the meeting in which Plaintiff was informed he did not get the job).

47    Dkt. No. 19 p. 7, ¶ 36.

48    *See* Dkt. No. 25–1 p. 67 (indicating Wongkasem's salary would be $92,000).

## B. *Procedural History*

Plaintiff sued Guy Bailey, Rodríguez, UTPA, The University of Texas System ("UT System"), and UTRGV in state court

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 56 of 93

Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)
2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

on August 31, 2015. [49] Plaintiff alleged Fifth and Fourteenth Amendment due process violations, [50] and also requested declaratory relief announcing the same. [51] The case was thereafter removed to federal court, and the defendants filed a Federal Rule of Civil Procedure ("Rule") 12(c) dismissal motion. [52] Plaintiff's response embedded a motion for leave to amend. [53] Plaintiff inexplicably filed another motion for leave to amend, [54] and then yet another motion for leave to amend, [55] all in an attempt to add a Title VII sex discrimination claim, [56] as well as a request for equitable relief. [57]

[49]   Dkt. No. 1–3 p. 5.

[50]   *Id.* p. 10.

[51]   *Id.* p. 13.

[52]   Dkt. No. 4.

[53]   Dkt. No. 5 p. 13.

[54]   Dkt. No. 7.

[55]   Dkt. No. 11.

[56]   *See* Dkt. No. 11–1 p. 14.

[57]   *See id.* p. 13.

The Court issued an opinion denying Plaintiff's motions for leave to amend in all respects except with regard to Plaintiff's proposed Title VII claim—and only as against UTRGV. [58] The Court otherwise granted the defendants' Rule 12(c) dismissal motion with regard to all other pending claims: "All of Plaintiff's claims other than the Title VII claim against UTRGV are hereby **DISMISSED WITH PREJUDICE.**" [59] Nevertheless, Plaintiff proceeded to *blatantly ignore* the Court's opinion in its amended complaint by (1) renaming Guy Bailey, Rodríguez, UTPA, and UT System as Defendants, even though all claims against them had been dismissed with prejudice, and (2) repleading his due process claims, as well as his coordinate requests for declaratory and equitable relief. [60]

[58]   Dkt. No. 18 p. 12.

[59]   *Id.* (emphasis in original).

[60]   *See* Dkt. No. 19.

Defendant filed the instant motion for summary judgment on December 15, 2017, and Plaintiff timely responded, [61] rendering the instant motion ripe for review. The Court now turns to its analysis.

[61]   Dkt. No. 26.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is proper when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [62] A fact is material "if its resolution could affect the outcome of the action," [63] while a genuine dispute is present "only if a reasonable jury could return a verdict for the non-movant." [64] As a result, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." [65]

[62]   Fed. R. Civ. P. 56(a).

[63]   *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007) (internal quotation marks and citation omitted).

[64]   *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006) (citation omitted).

[65]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**\*4** The movant bears the initial burden of showing the absence of a genuine issue of material fact, [66] but is freed from this initial burden on matters for which the non-movant would bear the burden of proof at trial; in that event, the movant's burden is reduced to merely pointing to the absence of evidence. [67] The non-movant must then affirmatively demonstrate the existence of a genuine issue of material fact. [68] This demonstration must specifically indicate facts and their significance, [69] and cannot consist solely of "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation[.]" [70]

[66]   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

67        *See id.* at 323–25; *see also Transamerica Ins. Co.
          v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995).

68        *See Celotex Corp.*, 477 U.S. at 323.

69        *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455,
          458 (5th Cir. 1998).

70        *U.S. ex rel. Farmer v. City of Hous.*, 523 F.3d 333,
          337 (5th Cir. 2008) (citing *TIG Ins. Co. v. Sedgwick
          James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)).

In conducting its analysis, the Court may consider evidence
from the entire record, viewed in the light most favorable to
the non-movant. [71] Rather than combing through the record
on its own, however, the Court looks to the motion for
summary judgment and response to present the evidence
for consideration. [72] Parties may cite to any part of the
record, or bring evidence in the motion and response. [73] By
either method, parties need not proffer evidence in a form
admissible at trial, [74] but must proffer evidence substantively
admissible at trial. [75]

71        *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871,
          874 (5th Cir. 2000) (citations omitted).

72        *See* Fed. R. Civ. P. 56(e).

73        *See* Fed. R. Civ. P. 56(c).

74        *See Celotex Corp.*, 477 U.S. at 324 ("We do
          not mean that the nonmoving party must produce
          evidence in a form that would be admissible at trial
          in order to avoid summary judgment.").

75        *See Bellard v. Gautreaux*, 675 F.3d 454, 460
          (5th Cir. 2012) ("[T]he evidence proffered by the
          plaintiff to satisfy [her] burden of proof must be
          competent and admissible at trial.").

## III. ANALYSIS

As an initial matter, the Court only authorized Plaintiff to
include a single Title VII claim against UTRGV in his
amended complaint, and all other claims were dismissed
with prejudice. [76] Thus, insofar as Plaintiff has pled *anything*
beyond a Title VII claim against UTRGV in his amended
complaint, those claims have been dismissed and that portion
of the complaint is hereby **STRICKEN**. This said, Defendant
contends that Plaintiff's Title VII claim is untimely, [77] and

that it fails on the merits. [78] The Court ultimately agrees with
both contentions.

76        *See* Dkt. No. 18.

77        Dkt. No. 25 p. 10, ¶ 25.

78        Dkt. No. 25–1 pp. 12–15.

### A. *Plaintiff's Title VII claims are untimely*

Before bringing a Title VII claim, and in order to
exhaust administrative relief, [79] a claimant "shall" file a
charge of discrimination with the EEOC "within three
hundred days after the alleged unlawful employment practice
occurred...." [80] The term "shall" "makes the act of filing
a charge within the specified time period mandatory," [81]
creating an "obligation impervious to judicial discretion." [82]
Interestingly, timeliness "is not a jurisdictional prerequisite to
suit in federal court," but rather functions "like a statute of
limitations...." [83] The clock generally begins ticking when the
plaintiff learns of the "discriminatory acts" in question, [84] not
when "the consequences of the acts became most painful," [85]
or "on some future date at which the plaintiff discovers
that the act may have been motivated by discriminatory
animus." [86]

79        *See Patton v. Jacobs Eng'g Group, Inc.*, 874 F.3d
          437, 443 (5th Cir. 2017); *Lavigne v. Cajun Deep
          Foundations, L.L.C.*, 654 Fed. Appx. 640, 643 (5th
          Cir. 2016), cert. denied, 137 S. Ct. 1328 (2017).

80        42 U.S.C.A. § 2000e–5(e)(1) (West); *see Griffin v.
          City of Dallas*, 26 F.3d 610, 612 (5th Cir. 1994)
          (applying this provision in the Title VII context).

81        *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.
          101, 109 (2002).

82        *Lexecon Inc. v. Milberg Weiss Bershad Hynes &
          Lerach*, 523 U.S. 26, 35 (1998).

83        *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510,
          521 (5th Cir. 2008) (emphasis added); *Zipes v.
          Trans World Airlines, Inc.*, 455 U.S. 385, 393
          (1982).

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 58 of 93

Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)
2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

[84]   *Pacheco v. Rice*, 966 F.2d 904, 906 (5th Cir. 1992) (citing *Merrill v. Southern Methodist University*, 806 F.2d 600, 605 (5th Cir.1986) for the proposition that the EEOC-charge clock begins to tick "when a plaintiff knows or reasonably should know that the discriminatory act has occurred, not when he or she first perceives that a discriminatory motive caused the act.").

[85]   *Delaware State Coll. v. Ricks*, 449 U.S. 250, 258 (1980).

[86]   *Bradley v. Phillips Petroleum Co.*, 527 F. Supp. 2d 661, 684 (S.D. Tex. 2007) (citing *Pacheco*, 966 F.2d at 906; *Merrill*, 806 F.2d at 605), aff'd sub nom. *Bradley v. Phillips Chem. Co.*, 337 Fed. Appx. 397 (5th Cir. 2009).

**\*5** Here, the clock began ticking no later than July 6, 2015—the date Plaintiff was made aware that Wongkasem received the UTRGV Phase II tenured position, and that he did not. [87] Three-hundred days after July 6, 2015 was May 1, 2016. Thus, Plaintiff cannot bring the instant Title VII claim unless he filed an EEOC discrimination charge by May 1, 2016. He did not. Instead, he filed an EEOC intake questionnaire nearly two months later, on June 24, 2016. [88] Thus, even assuming the EEOC intake questionnaire constituted an EEOC "charge," Plaintiff's Title VII claim is untimely.

[87]   Dkt. No. 25–1 p. 90; *id.* p. 92 (an email setting up the meeting in which Plaintiff was informed he did not get the job).

[88]   *See* Dkt. No. 25–1 p. 75.

Plaintiff argues that the 300–day clock did not begin ticking until September 1, 2015 because it was not until this date that UTRGV became "operational," and thus, the discriminatory act could not have occurred any earlier. [89] However, this argument fails because it confuses the date Plaintiff was made aware of the alleged discriminatory act (i.e., when Plaintiff was told Wongkasen got the tenured position) and the time at which "the consequences of the acts bec[a]me most painful," [90] (i.e. the date Plaintiff would have started working for UTRGV as a tenured professor had he gotten the position). The former is legally relevant, while the latter is not.

[89]   Dkt. No. 26 p. 8, ¶ 37.

[90]   *Ricks*, 449 U.S. at 258.

Plaintiff contends in the alternative that "the doctrines of equitable tolling, equitable estoppel, fraudulent concealment and the discovery rule should apply" because Plaintiff declares he "did not become aware until after September 1, 2015...that the other candidate...did not have the qualifications for the job posting and that gender was a consideration." [91] Put differently, Plaintiff did not know until after September 1, 2015 that the adverse employment action against him might have been unlawfully *motivated*. Thus, Plaintiff appears to argue the discovery rule applies to his Title VII claim. Yet, the Supreme Court has "declined to address whether Title VII suits are amenable to a discovery rule." [92] However, the Fifth Circuit has expressly rejected the notion that a Title VII discrimination claim—and its attendant pre-suit requirements periods— begins to accrue when the plaintiff learns of discriminatory intent, as opposed to the discriminatory act itself. [93] Furthermore, Plaintiff offers only his conclusory allegation that after September 1, 2015 he learned "that gender was a consideration." Even were the Court to consider the discovery rule, this conclusory allegation fails to raise a genuine issue of material fact on this issue.

[91]   Dkt. No. 26 p. 9, ¶ 41.

[92]   *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 642 (2007) (internal citations omitted), overturned on other grounds due to legislative action (Jan. 29, 2009); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 124 (2002).

[93]   *Pacheco*, 966 F.2d at 906; *Merrill*, 806 F.2d at 605.

Otherwise, Plaintiff provides—*literally*—no argument explaining how or why equitable tolling, equitable estoppel or fraudulent concealment apply. While equitable tolling may, in some instances, toll an otherwise time-barred claim, Plaintiff fails to present evidence to support the claim. The Fifth Circuit has noted that "[e]quitable tolling is to be applied 'sparingly.' " [94] The Fifth Circuit has also recognized that a "Plaintiff's unawareness of facts giving rise to the claim because of the Defendant's intentional concealment of them" may warrant equitable tolling. [95] Here, Plaintiff does not supply evidence that Defendant committed any wrongdoing or concealed any relevant facts. Rather, the evidence establishes that Plaintiff was told, in July 2015 that Wongkasan had been hired. [96] Plaintiff does not rebut this.

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 59 of 93

Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)

2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

94    *Granger v. Aaron's, Inc.*, 636 F.3d 708, 712 (5th Cir. 2011).

95    *Id.*

96    Dkt. No. 25–1, Exhibit 10.

**\*6** Even if Plaintiff did not actually learn until September 1, 2015 that Wongkasen's gender was a consideration, he had eight months thereafter to timely file his EEOC charge. Even if Plaintiff himself was unfamiliar with the filing requirements of Title VII, he was represented by counsel as of August 31, 2015 and was actually suing UTRGV for its failure to hire him. It is well established that "[o]ne who fails to act diligently cannot invoke equitable principles to excuse his lack of diligence." [97] Finally, Plaintiff offers no evidence for finding that equitable estoppel or fraudulent concealment should save his claim. Thus, Plaintiff's equitable tolling, equitable estoppel, fraudulent concealment, and discovery rule contentions fail. Ultimately, Plaintiff's Title VII claim is untimely.

97    *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984).

### B. *Plaintiff's Title VII claim fails on the merits*

Even considering the Title VII claim on the merits, it fails. Title VII provides: "It shall be an unlawful employment practice for an employer...to refuse to hire...any individual...because of such individual's...sex..." [98] Plaintiff contends that Defendant violated this provision by hiring a female for the tenured position rather than him. [99] Thus, Plaintiff alleges that Defendant discriminated against him by *failing to hire him on the basis of his sex*. [100]

98    42 U.S.C.A. § 2000e–2(a) (West).

99    Dkt. No. 26 p. 5, ¶ 19.

100   *See id.* ¶ 17.

The manner in which the Court proceeds at this juncture depends upon whether direct evidence exists that Plaintiff was discriminated against on the basis of his sex. Here, Plaintiff has proffered some direct evidence of discrimination, but it is not *cognizable* because it is substantively inadmissible hearsay with no obvious exception. The Fifth Circuit has held

that substantively inadmissible hearsay cannot be employed at the summary judgment stage of litigation. [101] The Fifth Circuit has also held that district courts have the power to *sua sponte* reject hearsay evidence at the summary judgment stage, even when, as here, it was not objected to. [102]

101   *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 508 (5th Cir. 2008) ("[T]he affidavit clearly contained hearsay...and, under normal summary judgment procedures, is not admissible.").

102   *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012).

Plaintiff stated during his deposition that (1) Dr. Chen ("Chen")—Chair of the Computer Science Department—told Plaintiff that (2) Dean Gonzalez told Chen: "*What can I do? She's a female.*" [103] Plaintiff sets forth this statement specifically to prove that "[Wongkasem] was hired because she was female." [104] *Insofar* as the quoted statement tends to indicate this, it is hearsay. [105] Since the statement is allegedly relayed first from Dean Gonzalez to Dr. Chen, and then from Dr. Chen to Plaintiff, we are dealing with double hearsay, and *both* layers need hearsay exceptions for the statement to be substantively admissible. [106]

103   Dkt. No. 26–7 p. 13 (emphasis added); *see also* Dkt. No. 26–8 p.14.

104   *See* Dkt. No. 26 p. 7, ¶ 30 ("[Plaintiff] testified the dean said she was hired because she was female.").

105   *See* Fed. R. Evid. 803.

106   *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

There are no obvious hearsay exceptions for both layers here. Even if some sort of exception applies to Dean Gonzalez's alleged statement, there is no such exception for Chen's iteration of the statement to Plaintiff. Chen is not named as an opposing party in this suit and did not ostensibly recall Dean Gonzalez's statement in a representative capacity on behalf of Defendant. Moreover the statement was not an expression of *Chen's* then-existing state of mind (it was simply a rehashing of *Dean Gonzalez's* previous alleged statement). No other

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 60 of 93

**Junfei LTV University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)**
2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

exceptions have any potential application. Thus, insofar as Dean Gonzalez's alleged statement "What can I do? She's a female" indicates Wongkasem was hired because she is a female, it constitutes inadmissible hearsay, and will be disregarded for purposes of this motion. Insofar as this statement does *not* mean Wongkasem was hired because she is a female, it is incapable of supporting Plaintiff's Title VII claim.

**\*7** Because there is no cognizable direct evidence of unlawful discrimination, the *McDonnell Douglas* burden shifting framework governs. [107] Under this framework, the plaintiff bears the initial burden to establish a *prima facie* claim of discrimination. [108] In the failure-to-hire context, a *prima facie* Title VII discrimination claim has the following essential elements: (1) the claimant is a member of a protected class, (2) is qualified for the position in question, (3) was not hired for the position, and (4) the position was given to a person outside the claimant's protected class. [109] Satisfaction of these elements results in a presumption of unlawful discrimination, thus shifting the burden to the defendant to set forth legitimate, nondiscriminatory reasons for its decision not to hire the claimant. [110]

[107]   *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005).

[108]   *Id.*

[109]   *See Henderson v. AT & T Corp.*, 933 F. Supp. 1326, 1337 (S.D. Tex. 1996); *see also Brown v. AT & T Services Inc.*, 236 F. Supp. 3d 1000, 1006 (S.D. Tex. 2017); *Chhim v. City of Houston*, 2012 WL 6020296, at \*2 (S.D. Tex. Dec. 3, 2012); *Sanders v. Anadarko Petroleum Corp.*, 108 Fed. Appx. 139, 142 (5th Cir. 2004); *Brown v. Outsource Specialist, Inc.*, 273 F.3d 1108 (5th Cir. 2001).

[110]   *Septimus*, 399 F.3d at 609.

If the defendant sets forth legitimate, nondiscriminatory reasons for its decision, then "any presumption of discrimination raised by the plaintiff's *prima facie* case vanishes," [111] and the burden shifts back to the plaintiff to prove that each proffered reason was a mere pretext for unlawful discrimination. In doing so, a "plaintiff must put forth evidence rebutting *each* of the nondiscriminatory reasons the employer articulates." [112] To carry this burden, "the plaintiff must produce substantial evidence of pretext"—

effectively by a preponderance of the evidence. [113] The Fifth Circuit clarifies that "[o]ur job as a reviewing court conducting a pretext analysis is not to engage in second guessing of an employer's business decisions." [114]

[111]   *Id.*

[112]   *Brown*, 236 F. Supp. 3d at 1006 (emphasis added).

[113]   *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001).

[114]   *Hernandez v. Metro. Transit Auth. of Harris County*, 673 Fed. Appx. 414, 419 (5th Cir. 2016).

Here, Plaintiff establishes a *prima facie* discrimination claim. Defendant does not dispute that the first three elements are met. The *first* element—being a member of a protected class—is satisfied because Plaintiff is a male, [115] and Title VII protects both males and females from sex discrimination. [116] The *second* element—being qualified for the position in question—is also satisfied. During Phase I, Plaintiff was offered a tenured faculty position at UTRGV that paid approximately the same as the tenured position at UTRGV he did not receive during Phase II. [117] Moreover, Plaintiff made the final short list out of twenty-three applicants for the Phase II tenured position at UTRGV. [118] Even in Dean Gonzalez's recommendation to Rodríguez that Wongkasem be hired, he noted that Plaintiff "should be considered a well-qualified candidate." [119] The *third* element—not being hired for the position—is satisfied because there is direct evidence that Plaintiff was not hired for the tenured position at UTRGV during its Phase II hiring cycle. [120]

[115]   Dkt. No. 26 p. 5, ¶ 17; Dkt. No. 26-2 p. 11.

[116]   *See* 42 U.S.C.A. § 2000e–2(a) (West).

[117]   Dkt. No. 25–1 p. 84.

[118]   *Id.* 70.

[119]   *Id.* p. 67.

[120]   Dkt. No. 25–1 p. 92, ¶ 7; Dkt. No. 25–1 p. 90 (an email setting up the meeting in which Plaintiff was informed he did not get the job).

Finally, the *fourth* element—someone outside the claimant's protected class was hired— is satisfied because Wongkasem,

Junfei LI v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 61 of 93

2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

a female,[121] was hired instead of Plaintiff, a male. Defendant does not dispute this fact. Instead, Defendant attempts to attack the fourth element by misconstruing the applicable legal standard. In particular, Defendant cites *Earle v. Aramark Corp.*[122] for the proposition that the fourth element is satisfied by proof that "similarly situated employees outside the protected class were treated more favorably under nearly identical circumstances."[123] Defendant then argues that Plaintiff and Wongkasem are not similarly situated.[124] However, plaintiff omits an important *alternative* method of satisfying the fourth element which is specifically listed in *Earle v. Aramark Corp.*—being "replaced by someone outside [his] protected class...."[125] Satisfaction in this manner in the failure-to-hire context is well-established.[126] Thus, Plaintiff has established a *prima facie* discrimination claim, creating a presumption of unlawful discrimination and shifting the burden to Defendant to set forth legitimate, nondiscriminatory reasons for not hiring Plaintiff.

[121] Dkt. No. 25–1 p. 56 (a picture of Wongkasem).

[122] 247 Fed.Appx. 519, 523 (5th Cir. 2007).

[123] Dkt. No. 25 p. 12 (quoting *Earle*, 247 Fed.Appx. at 523).

[124] *Id.* pp. 12–13.

[125] *Earle*, 247 Fed. Appx. at 523.

[126] *See Henderson v. AT & T Corp.*, 933 F. Supp. 1326, 1337 (S.D. Tex. 1996) (the fourth element can be satisfied with proof that "the position was given to a person outside the protected class."); *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005); *Chhim v. City of Houston*, 2012 WL 6020296, at *2 (S.D. Tex. Dec. 3, 2012).

**\*8** Defendant carries its burden by setting forth specific evidence that Wongkasem was more qualified than Plaintiff for the job. In particular, Foltz recommended Wongkasem to Dean Gonzalez because Wonkasem "had a far better publication and funding track record in recent years."[127] Foltz noted that Wongkasem published her scholarly articles in "high impact journals in the field, such as the *Journal of Optics*," and also that Wongkasem "had developed new courses in her field."[128] In turn, Dean Gonzalez recommended Wongkasem to Rodríguez because she was distinguished from Plaintiff in "professional achievement"

and thus had "a higher potential for long term success."[129] Thus, Wongkasem was the overall "top candidate for the position."[130] There is also substantial evidence, as previously noted, that Plaintiff's research productivity declined substantially for seven years after receiving tenure. Consequently, Defendant has carried its burden and any presumption of discrimination in Plaintiff's favor has vanished. The burden shifts back to Plaintiff to bring forth "substantial" evidence that each of these proffered reasons were pretext for unlawful sex discrimination. He does not carry his final burden.

[127] Dkt. No. 25–1 p. 92, ¶ 5.

[128] *Id.*

[129] *Id.* pp. 66–67.

[130] *Id.* p. 67.

Plaintiff does *not* contest that since Plaintiff received tenure in 2008, Wongkasem was far superior with regards to the number and prestige of scholarly publications, external research funding, and development of new courses in the relevant field. Thus, he fails to rebut "each" proffered legitimate, nondiscriminatory reason for Defendant's decision not to hire Plaintiff. For this reasons alone, Plaintiff fails to carry his burden.

Instead, Plaintiff attempts, in scattershot fashion, to poke holes in Wonkgasem's qualifications and Defendant's motivations in hiring her by inviting the Court to second-guess Defendant's internal business decisions and predicate underlying workings. Plaintiff's attempts to prove pretext fail, even putting aside the fundamental impropriety of this approach. *First*, Plaintiff states that Defendant "needed to hire the female candidate to improve [its] diversity."[131] The only cited evidence to support this is Foltz's statement that when UTRGV was deciding who to hire, the electrical engineering department had one female faculty member, and eight male faculty members.[132] This naked numerical difference, although explaining how there might have been room for more diversity, does not alone support Plaintiff's contention that UTRGV "needed" to improve its diversity. Moreover, the Court cannot help but notice the following (highly relevant) portion of Foltz's deposition that Plaintiff *attempted* to blot out with black marker:

Q: And so you would agree that it was important to bring in [Wongkasem] in

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 62 of 93

Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)

2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

order to increase the female representation within the electrical department for females?

A. I did not view our numbers as a problem at the time, and I still don't.

Q. So you don't view the numbers as being a problem that there are only two female electrical engineering professors in the electrical engineering department at this time, and there are eight male associate professors?

[131]    Dkt. No. 26 p. 6, ¶ 23.

[132]    Dkt. No. 26–3 p. 5.

A. No one views it as a...problem that needs to be solved, no. [133] Thus, Plaintiff's own evidence directly and decisively disproves his first pretext argument.

[133]    *Id.*

Plaintiff's *second* argument is that the National Science Foundation's ADVANCE grant somehow motivated UTRGV to hire Wongkasem instead of Plaintiff. [134] Indeed, Foltz notes that this grant is "designed to attract more females to the science and technology fields." [135] Moreover, the ADVANCE grant is also briefly referenced in the EEO statement portion of the Phase II UTRGV job posting. [136]

[134]    Dkt. No. 26 p. 6, ¶ 24.

[135]    Dkt No. 25–1 p. 92, ¶ 6.

[136]    Dkt. No. 26–3 p. 19.

However, Plaintiff does not point to any evidence that the ADVANCE grant funds at UTRGV's disposal were in any way dependent upon UTRGV hiring Wongkasem, or women generally for that matter. Foltz states that most ADVANCE funds are spent on programs available to both men and women, and also that the ADVANCE grant "did not directly benefit the Electrical Engineering Department or provide any additional motivation to hire [Wongkasem]." [137] Foltz also notes that $11,000.00 in ADVANCE funds were only packaged and awarded to Wongkasem *after* she had been hired. [138] Lastly, although the EEO statement in UTRGV's Phase II job posting does reference the ADVANCE grant, it also explicitly states that UTRGV "strives to hire

without regard to...sex...." [139] Thus, Plaintiff's second pretext argument fails.

[137]    Dkt. No. 25–1 p. 92, ¶ 6.

[138]    *Id.*

[139]    Dkt. No. 26–3 p. 19.

**\*9**  Plaintiff's *third* argument is that Wongkasem was "not qualified" for the job in the first instance, and thus, her qualifications could not be the basis for choosing her over Plaintiff. [140] However, the overwhelming weight of the record indicates the exact opposite. Out of twenty-three candidates, Wongkasem was selected as a final short-list candidate by UTRGV's search committee. [141] Her masters and doctoral academic credentials are *nearly flawless*, having received 4.00 and 3.97 GPAs in electrical engineering respectively from the University of Massachusetts, Lowell. [142] Indeed, Wongkasem graduated *first* in her class when receiving her masters degree, and thus received the "Graduate Dean's Gold Metal." [143] She was also named the "Outstanding Graduate Student" in her doctoral class. [144] Thus, Wongkasem was the posterchild of success in the Electrical Engineering Department at The University of Massachusetts, Lowell.

[140]    Dkt. No. 26 pp. 6–7, ¶¶ 26–31.

[141]    Dkt. No. 25–1 p. 70.

[142]    *Id.* p. 56.

[143]    *Id.* p. 59.

[144]    *Id.*

A brief look at the rest of Wongkasem's curriculum vitae indicates that she was not only ostensibly qualified for the position, but that she was, frankly, an *astonishing* candidate. She served as a lecturer for the University of Khon Kaen, Thailand, while completing her masters degree (in the United States), [145] and thereafter served as a teaching and research assistant at the University of Massachusetts, Lowell, which required her to lecture and supervise students. [146] During her doctoral studies, Wongkasem developed, among other things, a novel approach— "Group theory"—to categorize magnetoelectric materials. [147]

Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)
2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685
Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 63 of 93

145     *Id.* p. 58.

146     *Id.*

147     Dkt. No. 25–1 p. 58.

Wongkasem founded and directed MetaSolver Research Laboratory in Tailand, [148] and since 2007 served as an Associate Professor in the Electrical Engineering Department at the University of Khon Kaen, Tailand. [149] During that time, she supervised doctoral and masters theses. [150] Since 2008, Wongkasem authored three textbooks, [151] received eight patents, [152] obtained eight grants, and also enjoyed the publication of eleven peer-reviewed journal pieces and eighteen conference proceedings, many published by prestigious sources such as the *Journal of Optics*. [153]

148     *Id.*

149     *Id.*

150     *Id.* p. 56.

151     *Id.* p. 63.

152     *Id.*

153     Dkt. No. 25–1 pp. 60–63.

In an effort to overcome this tidal wave of evidence, Plaintiff contends that Wongkasem was not qualified because she had never previously worked in the United States, [154] was not previously tenured in the United States or in Thailand (where there is no tenure), [155] and had no external funding record. [156] These arguments fail. The evidence indicates Wongkasem *did* previously work in the United States as an intern, teaching assistant, and research assistant. [157] Moreover, if, as Plaintiff contends, there is no tenure in Thailand, then Wongkasem's failure to obtain (non-existent) tenure in Thailand is meaningless and says nothing about her qualifications, one way or the other.

154     Dkt. No. 26 p. 7, ¶ 29.

155     *Id.* ¶ 27.

156     *Id.* ¶ 31.

157     Dkt. No. 25–1 p. 58.

Furthermore, according to Plaintiff's own testimony, the significance of tenure in the United States is its indication that the person in question has six years of teaching experience and a track record of research activity. [158] Here, Wongkasem *did* teach for more than six years (seven to eight in fact), [159] and also had a vibrant research track record. [160] Thus, her previous lack of tenure in the United States has little import— she had the ostensible characteristics of a tenured professor. Finally, Plaintiff's assertion that Wongkasem had no track record of external funding is directly belied by documentary evidence indicating she had a robust track record of external funding since 2008. [161]

158     Dkt. No. 26–7 pp. 10–11.

159     *See* Dkt. No. 25–1 p. 56 (indicating Wongkasem taught as an Associate Professor at Khon Kaen University since 2007).

160     Dkt. No. 25–1 pp. 57–65.

161     *Id.* p. 57.

**\*10** Plaintiff also argues that Wongkasem "had never...developed undergraduate and graduate courses in electrical engineering." [162] However, the supporting evidence shows that this statement has either been conditionalized into meaningless oblivion, or is simply false. Foltz testifies that Wongkasem *did* develop "new courses in her field." [163] This was no doubt one of his considerations in determining to recommend her for the job. Wongkasem did not develop new courses *in her capacity as a professor in the United States.* [164] Nevertheless, this does not nullify the fact that she did develop new courses in her field before she became a professor in the United States.

162     *Id.* p. 7, ¶ 28.

163     *Id.* p. 82, ¶ 5.

164     Dkt. No. 26–6 pp. 5–6.

Finally, Plaintiff reintroduces Dean Gonzalez's alleged statement "What can I do? She's a female" and Chen's alleged rehashing of that statement to Plaintiff. [165] As previously noted, insofar as this statement may indicate Wongkasem was hired because she is female, it is inadmissible hearsay. Insofar as it does *not* indicate Wongkasem was hired because she is

**Junfei Li v. University of Texas Rio Grande Valley, Not Reported in Fed. Supp. (2018)**

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 64 of 93

2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

female, then it does nothing to establish pretext, as Plaintiff must. Thus, Plaintiff's final pretext argument fails.

[165]    Dkt. no. 26 pp. 7–8, ¶¶ 32.

In sum, Plaintiff's Title VII claim fails on the merits. Although he proves up a *prima facie* discrimination claim, Defendant has provided legitimate, nondiscriminatory explanations for its decision to hire Wongkasem instead of Plaintiff. In particular, Wongkasem was a more qualified applicant with a higher professional trajectory, while Plaintiff's research and external funding productivity had declined rapidly after receiving tenure in 2008. Plaintiff fails to rebut this explanation by (1) failing to establish the particular facts *underlying* this explanation (that Wongkasen did not in fact publish numerous articles in prestigious journals et cet.), (2) failure to provide substantial evidence of pretext casting meaningful doubt on Defendant's true motives, and (3) all the while inviting the Court to second guess Defendant's business decisions— something the Fifth Circuit expressly prohibits in pretext analysis. [166] Summary judgment in Defendant's favor is warranted.

[166]    *Hernandez v. Metro. Transit Auth. of Harris County*, 673 Fed. Appx. 414, 419 (5th Cir. 2016).

## IV. HOLDING

Plaintiff's Title VII claim against Defendant is untimely and fails on the merits. Thus, Defendant's motion for summary judgment is **GRANTED**, and Plaintiff's Title VII claim is **DISMISSED WITH PREJUDICE**. This being the last remaining claim, and in accordance with Rule 58, a final judgment will be issued separately.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 2nd day of February, 2018.

## All Citations

Not Reported in Fed. Supp., 2018 WL 706472, 2018 Fair Empl.Prac.Cas. (BNA) 37,685

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Tab H

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 66 of 93

Obasogie v. Harris County Hosp. Dist., Not Reported in F.Supp.2d (2013)

2013 WL 6916246

2013 WL 6916246
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

Peter OBASOGIE, Plaintiff,
v.
HARRIS COUNTY HOSPITAL DISTRICT, Defendant.

Civil Action No. 4:12–cv–3172.
|
Dec. 31, 2013.

**Attorneys and Law Firms**

Peter Obasogie, Houston, TX, pro se.

L. Sara Thomas, Houston, TX, for Defendant.

***MEMORANDUM AND ORDER***

KEITH P. ELLISON, District Judge.

**\*1** Pending before the Court in this employment discrimination suit is Defendant Harris County Hospital District's ("HCHD") Motion for Summary Judgment. ("Motion"; Doc. No. 22.) After considering all of the parties' filings, all responses and replies thereto, all of the evidence presented, and the applicable law, the Court is not persuaded that HCHD is entitled to judgment as a matter of law based on the undisputed facts concerning Plaintiff Peter Obasogie's failure to promote claim. The Court is persuaded, however, that Mr. Obasogie has failed to establish a prima facie case of discrimination with respect to his wrongful termination claim. Accordingly, the Court finds that Defendant's motion should be **DENIED IN PART** and **GRANTED IN PART**.

**I. BACKGROUND** [1]

[1] The facts reported here are uncontested.

This age discrimination dispute arises from Mr. Obasogie's employment at HCHD's Lyndon B. Johnson General Hospital ("LBJ"). Mr. Obasogie began to work at LBJ as a Clinical Clerical Technician ("CCT") in 2007. In 2011, the CCT position was eliminated and replaced with the Patient Care Assistant I ("PCA I") and Patient Care Assistant II ("PCA II") positions. Mr. Obasogie was re-classified as a PCA I

on May 8, 2011. He was not promoted to PCA II; Mr. Obasogie, who was 61 years old at the time, claims that two younger employees were so promoted, even though he is more qualified for the position. Pl.'s Amended Response to Mot. for Summ. J. at 9 ("Plaintiff's Amended Response"; Doc. No. 27). Thereafter, in March 2012, following an arrest and several missed days of work, HCHD terminated Mr. Obasogie's employment. Mr. Obasogie alleges that he was replaced by a much younger employee. *Id.*

Some months later, Mr. Obasogie brought this lawsuit in the 11th District Court of Harris County under the federal Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e–17. *See* Doc. No. 1–1. Proceeding pro se, Mr. Obasogie alleges that HCHD discriminated against him because of his age both in its failure to promote him to the PCA II position, and in its subsequent termination of his employment. HCHD removed the case to this court (Doc. No. 1), and this Motion followed.

**II. LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Importantly, "the mere existence of *some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires that the fact dispute be *genuine* and *material.*" *Willis v. Roche Biomed. Lab.,* 61 F.3d 313, 315 (5th Cir.1995). Material facts are those whose resolution "might affect the outcome of the suit under the governing law ...." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson,* 477 U.S. at 248). A court may consider any evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c) (1)(A). However, conclusory affidavits will not suffice to create or negate a genuine issue of fact. *Reese v. Anderson,* 926 F.2d 494, 498 (5th Cir.1991); *Shafer v. Williams,* 794 F.2d 1030, 1033 (5th Circ.1986); *see* Fed.R.Civ.P. 56(c)(4).

**\*2** The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 67 of 93

Obasogie v. Harris County Hosp. Dist., Not Reported in F.Supp.2d (2013)

2013 WL 6916246

not negate the elements of the nonmoving party's case. Fed.R.Civ.P. 56(a); *Willis,* 61 F.3d at 315 (citing *Celotex,* 477 U.S. at 322–23); *Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir.2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. However, "[i]f the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency,* 537 F.3d 504, 507 (5th Cir.2008) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc)).

Once the moving party has met its burden, the nonmoving party must come forward with specific evidence to raise a genuine issue of material fact. *Baranowski v. Hart,* 486 F.3d 112, 119 (5th Cir.2007). Simply resting on the allegations in the pleadings will not suffice. Neither will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.' " *Boudreaux,* 402 F.3d at 540 (quoting *Little,* 37 F.3d at 1075). In deciding a summary judgment motion, the court must draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Connors v. Graves,* 538 F.3d 373, 376 (5th Cir.2008).

## III. **STATUTORY FRAMEWORK**

The ADEA makes it unlawful for an employer "to fail or to refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." [2] 29 U.S.C. § 623(a)(1). "To establish an ADEA claim, '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.' " *Moss v. BMC Software, Inc.,* 610 F.3d 917, 922 (5th Cir.2010) (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 2351, 174 L.Ed.2d 119 (2009)). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp., L.P.,* 427 F.3d 987, 992 (5th Cir.2005) (citing *Brown v. E. Miss. Elec. Power Ass'n,* 989 F.2 d 858, 861 (5th Cir.1993)). However, "[i]f an inference is required for the evidence to be probative as to an employer's discriminatory animus in terminating the former employee,

the evidence is circumstantial, not direct." *Sandstad v. CB Richard Ellis, Inc.,* 309 F.3d 893, 897–98 (5th Cir.2002).

[2]     Mr. Obasogie brings suit under both the ADEA and Title VII, but only claims discrimination based on age. *See* Fourth Plaintiff Amended Employment Discrimination Complaint ("FAC"; Doc. No. 12). Consequently, as Title VII provides no cause of action for age discrimination, the Court will proceed under the ADEA alone.

Courts in the Fifth Circuit analyze cases alleging circumstantial evidence of discrimination according to the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *Jackson v. Cal–W. Packaging Corp.,* 602 F.3d 374, 378 (5th Cir.2010). First, a plaintiff must establish a prima facie case of discrimination. This requires a plaintiff to demonstrate that: 1) the plaintiff was a member of a protected class; 2) the plaintiff was qualified for the position in question; 3) the plaintiff suffered an adverse employment action; and, 4) the plaintiff "was either i) replaced by someone outside the protected class, ii) replaced by someone younger, or iii) otherwise discharged because of his age." *Id.* (quoting *Berquist v. Wash. Mut. Bank,* 500 F.3d 344, 349 (5th Cir.2007)). The protected class is defined by the ADEA as "individuals at least 40 years of age." 29 U.S.C. § 631(a). It is undisputed both that Mr. Obasogie, at age 61, was a member of the protected class at the time the challenged employment actions were taken, and that those employment actions—failure to promote and termination—were adverse.

**\*3** If the plaintiff is able to establish a prima facie case, the defendant must then come forward with a legitimate, non-discriminatory reason for the challenged employment action. *Moss,* 610 F.3d at 922. If the defendant produces this evidence, the burden shifts back to the plaintiff, who must then produce evidence to show that the defendant's reason is merely pretextual. *Id.* A plaintiff may show pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or unworthy of credence." *Id.* (quoting *Jackson,* 602 F.3d at 378–79) (internal quotation marks omitted).

However, when a plaintiff presents direct evidence of discrimination, "the *McDonnell Douglas* test is 'inapplicable.' " *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 309 (5th Cir.2004) (quoting *Mooney v. Aramco Serv. Co.,* 54 F.3d 1207, 1216–17 & n. 11 (5th Cir.1995)); *see Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613,

**Obasogie v. Harris County Hosp. Dist., Not Reported in F.Supp.2d (2013)**

2013 WL 6916246

621–22, 83 L.Ed.2d 523 (1985). The Fifth Circuit uses a four-part test to determine whether comments offered as direct evidence are sufficient to overcome summary judgment: the comments must be "1) age related; 2) proximate in time to the [adverse employment decision]; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 655–56 (5th Cir.1996); *see Laxton v. Gap,* 333 F.3d 572, 583 n. 4 (5th Cir.2003) (explaining that, after *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Fifth Circuit applies the *Brown* test to direct evidence only). By contrast, the Fifth Circuit employs a "more flexible" two-part test for comments offered as circumstantial evidence in the context of the *McDonnell Douglas* analysis. *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 441 (5th Cir.2012). In such a situation, a plaintiff need only show "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Id.* (citing *Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 226 (5th Cir.2000); *see Laxton,* 333 F.3d at 583 (citing *Russell,* 235 F.3d at 226).

## IV. ANALYSIS

### A. Evidentiary Objections

Mr. Obasogie has lodged several objections to the summary judgment evidence submitted by HCHD. *See* Doc. Nos. 21, 24, 25, 28, 31. HCHD has not contested any of the evidence offered by Mr. Obasogie. Many of Mr. Obasogie's objections are to the effect that various documents have been forged. Because Mr. Obasogie provides the Court with no reason to doubt the authenticity of these documents, the Court overrules these objections. The business records entered as exhibits fourteen through sixteen to HCHD's Motion for Summary Judgment are properly authenticated by Lou V. Gould, HCHD's custodian of records, and are thus appropriately considered by the Court. *See* Fed.R.Evid. 803(6); Doc. No. 22–14. This includes the 2011 Employee Annual Performance Review and the 2011 Student Training History Report included therein (Doc. Nos.22–15—22–16), [3] as well as the 2010 Employee Annual Performance Review (Doc. No. 22–15). The Court also sees no reason not to credit the transcript of Mr. Obasogie's deposition (Doc. No. 22–1). [4]

[3]     Mr. Obasogie lodges some of his most strenuous objections to this document, but the Court is

not persuaded. The Court finds relevant the evidence supporting the fact, alleged by HCHD, that Mr. Obasogie obtained a score of 240 on his 2011 Annual Performance Review. Chiefly, Mr. Obasogie concedes that even the version of the performance review that he believes is authentic reports the same score. *See* Deposition of Peter Obasogie at 59–62, Aug. 5, 2013 ("Obasogie Deposition"; Doc. No. 22–1).

[4]     Mr. Obasogie also asks the Court to strike the Employee Schedule covering the period from February 12, 2012 to March 24, 2012, but the Court was unable to locate such a submission by HCHD; only Mr. Obasogie provided the Court with this document. *See* Ex. I, Doc. No. 20. In addition, Mr. Obasogie asks the Court to strike the "Employee Data" submitted by HCHD, but it is unclear to which document Mr. Obasogie refers.

**\*4** In addition, Mr. Obasogie objects to the Time Card Report for the period covering February 26, 2012 to March 10, 2012 (submitted as part of the "Certified EEOC Documents," Doc. No. 22–12), and to an email from Monica Valdes–Rodriguez to Frank Baldwin, dated January 24, 2012 (Doc. No. 22–6). As an initial matter, the Court notes that the "Certified EEOC Documents" filed by HCHD along with its Motion for Summary Judgment are actually accompanied by no certification, or, for that matter, any authentication whatsoever. However, Mr. Obasogie does not allege that they are not the documents submitted to the Equal Employment Opportunity Commission ("EEOC"), and they otherwise appear to be authentic. For example, they are numbered consecutively, and contain materials that do appear to be from the EEOC. Accordingly, the Court will credit them as the documents submitted to the EEOC.

However, Mr. Obasogie does not contend that the Time Card Report was not submitted to the EEOC, but, rather, that it was forged. Mr. Obasogie provides nothing to substantiate this allegation. The Court is satisfied that the Time Card Report is authentic: it is a computer-generated report stamped with the dates of its creation and printing, and is substantially similar to another Time Card Report which Mr. Obasogie does not contest. *See* HCHD Time Card Report for Pay Period 03/11/2012—03/24/2012. (Doc. No. 22–12.) The Court will also credit the email from Monica Valdes–Rodriguez to Frank Baldwin. It contains a statement concerning a series of events, and was submitted as part of an exhibit attached to Mr. Obasogie's deposition. Mr. Obasogie appears to have

2013 WL 6916246

acknowledged receiving it from HCHD. *See* Obasogie Depo. at 113. However, the email was not submitted either under penalty of perjury or as part of a sworn affidavit, nor was any authenticating declaration or affidavit submitted along with it. To the extent that it contains statements, they may also be hearsay, although Mr. Obasogie does not raise this objection. Nevertheless, the Court will credit the email for the non-hearsay purpose of showing what evidence Mr. Baldwin relied upon in taking the employment action documented in the form to which the email is attached. *See Johnson v. Spohn,* 334 F. App'x 673, 678 (5th Cir.2009); *Brauninger v. Motes,* 260 F. App'x 634, 636–37 (5th Cir.2007).

In addition, Mr. Obasogie challenges the affidavit submitted by Frank Baldwin ("Baldwin Affidavit"; Doc. No. 22–13) as containing several untruths. However, the Court is satisfied that Mr. Baldwin's declaration is proper: it was made on personal knowledge, sets out facts otherwise admissible as evidence, and concerns matters to which Mr. Baldwin appears competent to testify. *See* Fed.R.Civ.P. 56(c)(4). Mr. Obasogie raises several challenges to Mr. Baldwin's credibility, but, particularly at the summary judgment stage, the Court is not to resolve such disputes. Mr. Obasogie also disagrees with Mr. Baldwin's account of the facts of this case. This too does not discredit Mr. Baldwin's affidavit. Mr. Obasogie's objections are overruled.

### B. **Failure to Promote**
**\*5** Mr. Obasogie argues that he was not promoted from the PCA I position to the PCA II position because of his age. In support of his discrimination claim, Mr. Obasogie claims that, when he asked his supervisor, Frank Baldwin, why he had not been promoted, Mr. Baldwin told him that he was "too old" and that he was "not comfortable" as Mr. Obasogie's manager because Mr. Obasogie was "too much older than him." Obasogie Depo. at 63–65, 67–68, 120–21. According to Mr. Obasogie, this exchange occurred on two separate occasions, the first in December 2011 and the second in January 2012. *Id.* at 63–68. It is undisputed that two employees, Natasha Bridges, and Rose Kuyatsemi, who are both younger than Mr. Obasogie, were promoted to the PCA II positions. *See* Mot. at 7. HCHD argues that Mr. Obasogie was not qualified for the PCA II position because his annual evaluation score was not high enough. *Id.* at 6. HCHD argues that, by contrast, both Ms. Bridges and Ms. Kuyatsemi were qualified for the promotions, as their annual evaluation scores were high enough. *Id.* at 7.

There is a dispute as to whether Frank Baldwin actually made those comments: Mr. Obasogie, when deposed, claimed he did, while Mr. Baldwin has submitted a sworn affidavit stating the contrary. *See* Obasogie Depo. at 63–68, 120; Baldwin Aff. ¶ 8. Thus, the Court is faced with the initial question of whether the alleged comments from Mr. Baldwin would be sufficient to overcome summary judgment. If the alleged statements are insufficient to defeat summary judgment, then this factual dispute is immaterial.

The issue of how to assess the comments turns on whether they are properly considered direct or circumstantial evidence. Mr. Obasogie's filings are not terribly clear on this point. He appears to offer them as direct evidence, and yet he utilizes the *McDonnell Douglas* framework to analyze his claim, suggesting that he is relying on circumstantial evidence only. Therefore, particularly as Mr. Obasogie proceeds pro se, the Court will conduct an independent inquiry into whether the comments are properly treated as direct or circumstantial evidence.

The Court believes that the comments could constitute direct evidence of discrimination, if Mr. Baldwin did, in fact, make them. If Mr. Obasogie's account is true, no inference or presumption is required to prove discriminatory animus or motivation: Mr. Obasogie twice asked why he was not promoted, and twice Mr. Baldwin responded that he was not comfortable supervising individuals "too much older" than he, like Mr. Obasogie. Mr. Obasogie asked these questions and received these answers shortly after he became eligible for promotion, while he was still eligible for promotion. Treating the comments as direct evidence of discrimination is entirely appropriate. HCHD points to a string of Fifth Circuit cases in which various comments were found to be "stray remarks" or otherwise insufficient to stand as direct evidence of discrimination. Def.'s Reply at 2–4 (Doc. No. 29). None of them, however, squarely address the situation here: a direct and unambiguous discriminatory statement from a supervisor with authority to promote, which was offered by that supervisor to explain his temporally proximate failure to promote. Such a statement requires no inferences or presumptions to demonstrate either discriminatory animus or that the employment action was taken because of that animus.

**\*6** Accordingly, in determining whether the comments are sufficient to defeat summary judgment, the four-part *Brown* test is applicable. The Court believes that the alleged comments satisfy the *Brown* factors. First, they are indisputably and explicitly age related. Second, they are

Case 4:21-cv-03371 Document 33-5 Filed on 09/24/24 in TXSD Page 70 of 93

Obasogie v. Harris County Hosp. Dist., Not Reported in F.Supp.2d (2013)

2013 WL 6916246

temporally proximate to the failure to promote. According to HCHD, Mr. Obasogie became eligible for promotion on August 2011, *see* Baldwin Aff. ¶ 6, and he went to speak to Mr. Baldwin about the reasons he had not yet been promoted in December 2011 and January 2012, when he was still eligible for, and seeking, the promotion. Third, Mr. Baldwin was Mr. Obasogie's direct supervisor with the power to recommend or prevent Mr. Obasogie's promotion; neither party even suggests that Mr. Baldwin lacked such authority. Fourth, and finally, just as there can be no question that the alleged comments were age-related, there can equally be no question that they were also related to the failure to promote Mr. Obasogie: Mr. Baldwin allegedly made them to explain to Mr. Obasogie why he had not been promoted to the PCA II position. The Court concludes that Mr. Obasogie has presented evidence that, if true, would constitute direct evidence of discrimination.

HCHD responds to this evidence by arguing that Mr. Obasogie was unqualified for the promotion because his annual performance review scores were not high enough. HCHD claims employees needed a score of 250 or higher on the 2011 Employee Annual Performance Review in order to meet the conditions for promotion to the PCA II position. Baldwin Aff. ¶¶ 6–7. HCHD presents evidence that Mr. Obasogie received a score of 240 on that employee performance review. 2011 Employee Annual Performance Review (Doc. Nos.22–15—22–16). As noted above, although Mr. Obasogie challenges the performance review as forged, he does not dispute that his score was 240. Obasogie Depo. at 59–62. Thus, if HCHD's policy really was to promote only those with performance review scores over 250, then HCHD would prevail.

However, it is unclear exactly what HCHD's policy included. Much like the alleged comments, Mr. Baldwin claims that the policy requires a performance review score over 250, Baldwin Aff. ¶ 6, while Mr. Obasogie claims that it does not, Obasogie Depo. at 50. Mr. Baldwin claims that he informed Mr. Obasogie of this requirement, Baldwin Aff. ¶ 6, and Mr. Obasogie claims that he never did, Obasogie Depo. at 49–50. In support of their claims, both parties filed similar PCA II qualifications documentation. *Compare* HCHD Job Description, Patient Care Technician II, submitted by HCHD (Doc. Nos.22–10–22–11),[5] *with* Job Description, Patient Care Assistant II, submitted by Mr. Obasogie (Ex. B, Doc. No. 23). The Court has been unable to locate a performance review requirement in the official HCHD documents that the parties have submitted. The promotion paperwork for both

Ms. Bridges and Ms. Kuyatsemi does note that they each had a performance review score over 250. (Doc. No. 22–16.) While this is consistent with Mr. Baldwin's version of the facts, it is not necessarily determinative of this issue; it remains the case that HCHD's official job qualifications for the PCA II position —the only undisputed job qualifications requirements now before the Court—are silent as to whether or not a particular performance review score is required.

[5]     The Court notes some confusion regarding the titles HCHD uses to refer to the PCA II position. HCHD has submitted the job qualifications for a "Patient Care Technician II," but it refers to them as the qualifications for the "Patient Care Assistant II" position. *See* Mot. at 5.

**\*7** Consequently, it is not at all clear that Mr. Obasogie was unqualified or would not have been promoted regardless of whether or not Mr. Baldwin made the comments. Indeed, if Mr. Baldwin made the comments, they very well could be enough for a jury to conclude that discriminatory animus was the "but-for" cause of HCHD's failure to promote Mr. Obasogie. In light of this, the Court concludes that HCHD has not met its burden, and summary judgment should be denied as to Mr. Obasogie's failure to promote claim. Without more conclusive documentary or other evidence, it is essentially Mr. Baldwin's word against Mr. Obasogie's, and the summary judgment mechanism cannot resolve such a basic credibility dispute.

### C. Employment Termination

Mr. Obasogie's employment with HCHD was terminated in March 2012, and Mr. Obasogie contends that this termination of employment was also the result of age discrimination. In support of this claim, Mr. Obasogie again points to the comments he alleges Mr. Baldwin made in December 2011 and January 2012. Pl.'s Am. Resp. at 8. In response, HCHD provides evidence purporting to demonstrate that Mr. Obasogie's employment would have been terminated, regardless of any alleged age discrimination, because of several absences without notification, due to an arrest in March 2012. Mot. at 9–11. Mr. Obasogie claims, however, that his attorney did notify Mr. Baldwin of his absence, and provides an affidavit from her attesting as much. Pl.'s Am. Resp. at 6; Doc. No. 22–9.

Because Mr. Obasogie again relies exclusively on alleged discriminatory comments, the threshold question is again whether those comments constitute direct or circumstantial evidence. The Court believes that, with respect to this

Case 4:21-cv-03371  Document 33-5  Filed on 09/24/24 in TXSD  Page 71 of 93

Obasogie v. Harris County Hosp. Dist., Not Reported in F.Supp.2d (2013)

2013 WL 6916246

employment termination context, the comments are properly considered circumstantial evidence. Mr. Baldwin allegedly made the comments in response to Mr. Obasogie's demands to know why he had not been promoted. Evidence that Mr. Obasogie was not at one time *promoted* because of age discrimination does not necessarily demonstrate that his employment was later *terminated* for the same reason. Thus, if the comments are taken as true, an inference is required to show discrimination regarding termination of employment: one must infer that the animus displayed in the comments motivated the termination also, extending beyond the failure to promote.

Accordingly, *McDonnell Douglas* provides the appropriate framework under which to analyze Mr. Obasogie's termination of employment claim. According to this analysis, Mr. Obasogie must first establish a prima facie case of discrimination, which he fails to do. There is no dispute that he was a member of the protected class, nor is there any dispute either that he was qualified for the PCA I position he held when his employment was terminated, or that he suffered an adverse employment decision. In order to satisfy the fourth prong, Mr. Obasogie claims that HCHD filled his position with a "Ms. Daisy," who is "in her 20s." Pl.'s Am. Resp. at 9. HCHD does not directly dispute this assertion, but the Court will not accept an unsubstantiated allegation in a filing as evidence sufficient to defeat summary judgment. *See Waggoner v. City of Garland, Tex.,* 987 F.2d 1160, 1166 (5th Cir.1993).

**\*8** Nevertheless, the fourth prong can be satisfied with a showing that the plaintiff was "otherwise discharged because of his age." *Jackson,* 602 F.3d at 378 (quoting *Berquist v. Wash. Mut. Bank,* 500 F.3d 344, 349 (5th Cir.2007)). Mr. Obasogie has offered only the comments allegedly made by Mr. Baldwin as evidence of discrimination. To be probative of discrimination in this context, comments offered as circumstantial evidence "alongside other alleged discriminatory conduct" must show "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant

decisionmaker." *Reed,* 701 F.3d at 441. The alleged comments satisfy these criteria: they reveal discriminatory animus and were made by Mr. Obasogie's direct supervisor. While they may show animus, though, *without more,* they do not necessarily show motivation. By themselves, then, these comments are insufficient evidence to establish that Mr. Obasogie was *discharged* "because of" his age. *Jackson,* 602 F.3d at 378 (emphasis added); *see also Palasota v. Haggar Clothing Co.,* 342 F.3d 569, 577 (5th Cir.2003). Mr. Obasogie thus has failed to establish a prima facie case of discrimination with respect to his wrongful termination claim; summary judgment is warranted as to this claim.

## V. CONCLUSION

For the reasons stated in this memorandum, Defendant's summary judgment motion is **DENIED IN PART** and **GRANTED IN PART.** Summary judgment as to Mr. Obasogie's failure to promote claim is denied, as the Court cannot resolve the credibility issues at the heart of that dispute. Summary judgment as to Mr. Obasogie's termination claim is granted, because Mr. Obasogie has failed to establish the required prima facie case of discrimination.

The Court notes that Mr. Obasogie has complained that he has not received many of HCHD's filings. The Court notes further that the required Certificates of Service attached to HCHD's filings generally state that HCHD has relied upon the Court's electronic filing system to effect service upon Mr. Obasogie. HCHD must ensure that Mr. Obasogie has been and will be served with copies of all documents and materials it has filed or will file in this case, consistent with its obligations under Federal Rule of Civil Procedure 5. As a pro se party, Mr. Obasogie is not subject to service via the Court's electronic filing system.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6916246

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tab I

715 Fed.Appx. 343
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

John A. TEAMAH, Plaintiff-Appellant

v.

APPLIED MATERIALS,
INCORPORATED, Defendant-Appellee

No. 17-50364
|
Summary Calendar
|
Filed November 3, 2017

**Synopsis**

**Background:** African-American employee filed suit against employer alleging discrimination on the basis of race, age, and disability, in violation of Title VII, Americans with Disabilities Act (ADA), and Age Discrimination in Employment Act (ADEA), retaliation, in violation of Title VII, and violation of Racketeer Influenced and Corrupt Organizations Act (RICO). The United States District Court for the Western District of Texas dismissed. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] Title VII and ADA claims were time barred;

[2] ADEA claim was time barred;

[3] two-year limitations period for personal injury under Texas law applied to § 1981 claim; and

[4] RICO claim was time barred.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss.

West Headnotes (4)

**[1]    Civil Rights** 🔑 Time for proceedings;
limitations

Ninety-day time period for African-American employee to file suit against his employer for discrimination based on race and disability, in violation of Title VII and ADA, began to run on date he received right to sue letter from the Equal Opportunity Employment Commission (EEOC). Americans with Disabilities Act, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

2 Cases that cite this headnote

**[2]    Civil Rights** 🔑 Time for proceedings;
limitations

Ninety-day time period for employee to file suit against his employer for violations of ADEA began to run upon his receipt of Equal Opportunity Employment Commission's (EEOC) notice of dismissal of his claim. Age Discrimination in Employment Act of 1967 § 7, 29 U.S.C.A. § 626(d).

3 Cases that cite this headnote

**[3]    Civil Rights** 🔑 Employment practices

**Federal Courts** 🔑 Civil rights and
discrimination cases

Two-year statute of limitations period for personal injury actions under Texas law applied to African-American employee's § 1981 action filed against his employer alleging racial discrimination, as it was the most closely analogous state-law limitations period for the claim. 42 U.S.C.A. § 1981.

5 Cases that cite this headnote

**[4]    Limitation of Actions** 🔑 Nature of harm or
damage, in general

Four-year limitations period for employee to file civil Racketeer Influenced and Corrupt

Organizations Act (RICO) action against employer began to run once employee knew or should have known of the facts supporting his claim that employer had "rigged" an internal investigation that led to his dismissal. 18 U.S.C.A. § 1961 et seq.

**\*344** Appeal from the United States District Court for the Western District of Texas, USDC No. 1:16-CV-1261

**Attorneys and Law Firms**

John A. Teamah, Pro Se

Geoffrey D. Weisbart, Sara Janes, Matthew Carlton Wood, Weisbart Springer Hayes, L.L.P., Austin, TX, for Defendant-Appellee

Before DAVIS, CLEMENT, and COSTA, Circuit Judges.

**Opinion**

PER CURIAM: [*]

[*]     Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

John Teamah ("Teamah") challenges the district court's dismissal of his action against his former employer under Title VII of the Civil Rights Act of 1964 ("Title VII"), the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment **\*345** Act ("ADEA"), and 42 U.S.C. § 1981. The district court held that Teamah had not exhausted his administrative remedies and that, in any event, his claims were time barred. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Applied Materials, Inc. ("Applied") hired Teamah in 1994. Teamah worked for the company in various capacities until his termination in November of 2012. Prior to his termination, Teamah filed a charge with the Equal Employment Opportunity Commission ("EEOC") complaining that Applied unlawfully discriminated against him on the basis of race, age, and disability. He received a notice of right-to-sue on these charges in November of 2012 but did not file suit until November 30, 2016.

His complaint echoed the allegations in the 2012 EEOC charge: namely, that Applied discriminated against him on the basis of race, age, and disability. He also claimed that Applied demoted and terminated him in retaliation for filing multiple EEOC complaints during his employment. Finally, Teamah alleged state-law claims of intentional infliction of emotional distress and fraud, as well as a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). [1]

[1]     18 U.S.C. § 1964 et seq.

Applied filed a 12(b)(6) motion to dismiss, which the district court granted because it found that all of Teamah's claims were subject to the defenses of either limitations or failure to exhaust.

## II. STANDARD OF REVIEW

We review this dismissal de novo. [2] Because Teamah proceeds pro se, we hold his complaint "to less stringent standards than formal pleadings drafted by lawyers." [3] However, he still must "plead 'enough facts to state a claim to relief that is plausible on its face.' " [4] "[C]onclusory allegations or legal conclusions masquerading as factual conclusions [do] not suffice." [5]

[2]     Sw. Bell Tel., LP v. City of Hous., 529 F.3d 257, 260 (5th Cir. 2008).

[3]     Miller v. Stanmore, 636 F.2d 986, 988 (5th Cir. Unit A Feb. 1981).

[4]     Sw. Bell, 529 F.3d at 260 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[5]     Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 284 (5th Cir. 1993).

## III. DISCUSSION

### A. Teamah's Title VII and ADA Claims

Under Title VII and the ADA, plaintiffs must comply with strict exhaustion and limitation requirements. [6] Exhaustion

occurs when the plaintiff files a timely charge with the EEOC, the EEOC dismisses the charge, and the EEOC informs the plaintiff of his right to sue.[7] The plaintiff must then file suit within ninety days or else his claim is barred.[8]

[6]  *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002); *Julian v. City of Houston, Tex.*, 314 F.3d 721, 725–727 (5th Cir. 2002).

[7]  *Id.*

[8]  *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–89 (5th Cir. 1996).

[1]  Here, Teamah received a right-to-sue notice on his Title VII and ADA claims in 2012, but he did not file suit until 2016. Therefore, these claims are time barred.

**B. Teamah's ADEA Claims**

In order to exhaust ADEA claims, plaintiffs must timely file an EEOC charge, but **\*346** can file suit sixty days later regardless of whether the EEOC has issued a right-to-sue notice.[9] However, if the EEOC dismisses the charge, the plaintiff must file suit within ninety days of receiving a notice of dismissal.[10]

[9]  *Julian*, 314 F.3d at 725–727.

[10]  *Id.*; *see also* 29 U.S.C. § 626(d).

[2]  Teamah did not specifically allege in his complaint whether he received a notice of dismissal. He alleged only that he "exhausted all administrative remedies." Even if Teamah properly exhausted his ADEA claims, they are time barred because he did not file suit until over four years after termination and his dealings with the EEOC ceased.[11]

[11]  29 U.S.C. § 626(d) (noting a 90-day limitations period after receipt of notice of dismissal); *see also* *Julian*, 314 F.3d at 725–727.

**C. Teamah's § 1981 Claims**

Teamah also alleged that Applied violated his rights under 42 U.S.C. § 1981. It is unnecessary to reach the merits of this allegation because the limitations period has run.

[3]  Because § 1981 lacks an express statute of limitations, courts adopt the most closely analogous state-law limitations

period.[12] Accordingly, "where a section 1981 claim is brought in Texas, the two year statute of limitations for personal injury actions in Texas controls."[13] Here, the limitations period for Teamah's § 1981 claims began running, at the latest, on November 26, 2012. He filed suit on November 30, 2016. The district court properly dismissed these claims on limitations grounds.

[12]  *Jones v. ALCOA, Inc.*, 339 F.3d 359, 364 (5th Cir. 2003).

[13]  *Id.* Even though 1981 claims generally adopt state limitations periods, "if the plaintiff's claim against the defendant was made possible" by the 1991 revisions to the statute, then a four-year statute of limitations applies. *Fonteneaux v. Shell Oil Co.*, 289 Fed.Appx. 695, 698 (5th Cir. 2008) (quoting *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004)). Even if the four-year period applied, Teamah's 1981 claims would be time barred.

**D. Teamah's RICO Claim**

[4]  Civil RICO claims have a four-year limitations period beginning from the date the plaintiff knew or should have known of the alleged RICO violation.[14] Teamah's RICO claim arises out of an allegedly rigged Applied internal investigation in 2011. Teamah admits he learned of Applied's actions before his termination in November of 2012—over four years before Teamah filed the instant suit. Therefore, this claim is also time barred.

[14]  *Rotella v. Wood*, 528 U.S. 549, 553–54, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000)

**E. Teamah's State Law Claims**

Lastly, Teamah makes vague allegations that Applied intentionally inflicted emotional distress and perpetrated fraud upon him at several times during his employment. Teamah failed to present any argument in support of these claims in his brief, and inadequately briefed claims are generally "deemed abandoned."[15] In any event, these claims are time barred because Teamah did not file suit until over four years after the alleged conduct occurred.[16]

15 *Hall v. Cont. Airlines, Inc.*, 252 Fed.Appx. 650, 654 (5th Cir. 2007); *see also Sammons v. Tex. State Bd. of Med. Exam.*, 251 F.3d 157 (5th Cir. 2001).

16 *See Doe v. Catholic Diocese*, 362 S.W.3d 707, 717 (Tex. App. 2011) (noting that intentional infliction of emotion distress claims are subject to a two-year limitations period); *Williams v. Khalaf*, 802 S.W.2d 651, 658 (Tex. 1990) (noting that fraud claims are subject to a four-year limitations period).

**\*347  F. Continuing Violation and Equitable Tolling**

Teamah attempts to evade the time bar by invoking equitable tolling and the "continuing violation" doctrine. [17] We find that both of these doctrines are unavailable because Teamah does not call our attention to any affirmative "trick or contrivance," [18] nor does he connect a timely discriminatory act to an ongoing unlawful employment practice. [19]

17 *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

18 *See State of Tex. v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988) (quoting *Crummer Co. v. Du Pont*, 255 F.2d 425, 432 (5th Cir. 1958)).

19 *Morgan*, 536 U.S. at 117–18, 122 S.Ct. 2061. Additionally, Teamah asserts the "continuing violation" doctrine for the first time on appeal. This court generally does "not consider an issue that a party fails to raise in the district court." *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999); *see also Sw. Bell*, 529 F.3d at 263.

**IV. CONCLUSION**

For these reasons, we agree with the district court that properly dismissed all claims and therefore AFFIRM its judgment.

**All Citations**

715 Fed.Appx. 343, 130 Fair Empl.Prac.Cas. (BNA) 919

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tab J

332 Fed.Appx. 176
This case was not selected for
publication in the Federal Reporter.
Not for Publication in West's Federal Reporter See Fed.
Rule of Appellate Procedure 32.1 generally governing
citation of judicial decisions issued on or after Jan.
1, 2007. See also Fifth Circuit Rules 28.7, 47.5.3,
47.5.4. (Find CTA5 Rule 28 and Find CTA5 Rule 47)
United States Court of Appeals,
Fifth Circuit.

James WARREN, Plaintiff–Appellant

v.

CITY OF TUPELO MISSISSIPPI, Defendant–Appellee.

No. 08–60916.
|
June 3, 2009.

**Synopsis**
**Background:** City employee, an electrical worker, brought action against city, alleging age discrimination in violation of Age Discrimination in Employment Act (ADEA). The United States District Court for the Northern District of Mississippi, Michael P. Mills, Chief District Judge, 2008 WL 4450291, granted summary judgment in favor of city. Employee appealed.

**[Holding:]** The Court of Appeals held that employee failed to demonstrate that city's justification for not selecting him for promotion was pretextual.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (2)

**[1]    Civil Rights    👉 Motive or Intent;  Pretext**

City electrical employee's alleged qualification for foreman position with city was insufficient to demonstrate that city's justification for not selecting employee for promotion, based on fact that he was not a lead lineman, was

pretext for age discrimination; even assuming that employee was minimally qualified for the job, he was not "clearly better qualified" than other employees, since he was not working as a lineman day to day, but was only doing so "on call" about five to ten times a year. Age Discrimination in Employment Act of 1967, § 4(a)(1), 29 U.S.C.A. § 623(a)(1).

15 Cases that cite this headnote

**[2]    Civil Rights    👉 Motive or Intent;  Pretext**

Even if department manager did not use ratings forms correctly or disregarded them, in not selecting city electrical employee for promotion to foreman position, there was no evidence that manager did so in a discriminatory manner with regard to age, as required to demonstrate pretext under Age Discrimination in Employment Act (ADEA). Age Discrimination in Employment Act of 1967, § 4(a)(1), 29 U.S.C.A. § 623(a)(1).

8 Cases that cite this headnote

**Attorneys and Law Firms**

**\*176** Jim D. Waide, III, Luther Calvin Fisher, IV, Waide & Associates, Tupelo, MS, for Plaintiff–Appellant.

Berkley Neal Huskison, Mitchell, McNutt & Sams, Columbus, MS, for Defendant–Appellee.

Appeal from the United States District Court for the Northern District of Mississippi, Eastern Division, No. 1:07–CV–70.

**\*177** Before KING, GARWOOD, and DAVIS, Circuit Judges.

**Opinion**

PER CURIAM: *

*    Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

**1** Plaintiff-appellant James Warren, an electrical worker in the city of Tupelo, Mississippi, was not promoted to the position of Foreman in the Tupelo Water & Light Department. Dwayne Daniel and Bill West were chosen even though they did not have the ten years of lineman experience listed in the job description. Warren had such experience, though he had not actively done such work since 1995 and lacked other qualifications. Warren timely filed a charge with the United States Equal Employment Opportunity Commission, alleging that he was denied the promotion because of his age. The Commission issued a Notice of Right to Sue, and Warren subsequently filed suit in the United States District Court for the Northern District of Mississippi, alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* The district court granted summary judgment in favor of the city, ruling that Warren had failed to show a prima facie case of age discrimination. In the alternative, it also ruled that Warren did not create an issue of material fact in rebutting the legitimate, nondiscriminatory reasons that the city advanced for its hiring decision. For the following reasons, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background

In 1968, plaintiff-appellant James Warren joined the Tupelo Water & Light Department (the "department") in Tupelo, Mississippi ("the city"). After working for several years, he began doing "lineman" work-climbing electric poles, working in the air of poles, and working out of a bucket truck. In 1995, Warren switched to working on the operations service truck and no longer primarily did lineman work, though he still did such work while "on call" five to ten times per year. When attending to line problems on call, Warren never needed the assistance of a Foreman or lineman. Warren was never classified as "Lead Lineman," was not aware of this category, and always thought of himself as a "top lineman." [1]

[1]
Though Warren sometimes describes the "Foreman" position as "lead lineman/foreman," we will refer to it as "Foreman." The level below that is "Lead Lineman," the level below that is "Lineman II" (the highest level that Warren attained), and the lowest level is "Lineman I." Additionally, we agree with the district court that Warren's argument—that the "Lead Lineman" title is a distinction without a difference—"does not negate the qualification" and

that "[t]he consistent deposition testimony of other Tupelo employees show[s] that lead lineman is a step above Warren's terminus on the lineman career path." *Warren v. City of Tupelo, Miss.,* No. 1:07–CV–70, 2008 WL 4450291, at *2 (N.D.Miss. Sept. 29, 2008).

In April 2006, the department posted openings for two Foreman positions. Johnny Timmons, the department's manager, considered the applications of six applicants: Warren (age 61), Chad Cobb (age 33), Britt Curbow (age 33), Dwayne Daniel (age 36), Joseph Edwards (age 42), and Bill West (age 31). As part of the evaluation process, Timmons asked Ricky Loden (electrical superintendent), Alvin Jones (Foreman) and Gary Hatfield (Foreman) to evaluate each of the six applicants using "interview rating forms." Each of these three separately evaluated the applicants, **178** without interviews, and based on his knowledge of each applicant's work history. The three evaluators filled out ratings on a scale from 1 to 10 in the categories of: appearance, poise and confidence, verbal communication and skills, comprehension, public and employee relations, ability to present ideas, job knowledge and skills, work expectations, and a general rating of the "candidate's overall ability to fulfill the position being sought." Spencer Gunn, a Foreman, was not asked to fill out any evaluation forms regarding Warren's promotion, even though he was familiar with Warren's work and "thought highly" of him. [2]

[2]
The parties dispute whether Timmons had previously used this rating system. Timmons told Warren that this rating system had been used in 2004 to promote Gunn to the Foreman position. However, neither Hatfield nor Loden recall being asked to use such a system before. Gunn stated that if he had been rated, no one ever told him about it. Members of the city's human resources department also do not recall such a rating system being used.

**2** In a personal meeting, Warren pointed out to Timmons that Daniel and West did not have the requisite ten-year experience for a "general lineman." In response, Warren threw the rating forms down on the table and said, "what do you want me to do, kick them off the list?" Warren later learned from Cassandra Moore and Contanna Purnell of the city's human resources department that Timmons and his secretary had attempted to have the ten-year requirement removed from the Foreman job listing.

The three evaluators rated Warren lower than other candidates. For example, Loden stated that Warren lacked knowledge and experience working on power lines, doing "hot work" (i.e., working on energized lines), and doing transformer banking. Jones noted that Warren had worked on a service truck for most of the twenty-two years that Jones had been with the department, whereas other candidates were working with crews daily. Hatfield was also aware that Warren was not working on a line crew but instead had been operating in the operations serviceman job for many years.

Timmons interviewed three candidates—Britt Curbow, Dwayne Daniel, and Bill West—but did not interview Warren. Timmons promoted Daniel and West on May 15, 2006. Timmons believed that Daniel and West had the requisite experience and knowledge of electrical systems and electrical work, such as transformer banking, primary metering, and setting poles. Daniel had risen from Lineman I to Lineman II and finally to Lead Lineman in seven years, and had been working on a line crew for five years before that. West had worked on a line crew since 1992, and also moved from Lineman I to Lineman II and then to Lead Lineman. Warren, by contrast, had never applied to be promoted from Lineman II to Lead Lineman. He had been working as an operations serviceman since October 1995 and, though still at the lineman level, had not worked on a day-to-day basis with a crew since 1995 and was only performing line work "on call."

Warren later questioned Timmons about the qualifications listed on the job posting. Warren stated that he was the only candidate with a minimum of ten years of experience as a lineman. Timmons agreed with this, but also noted that the job descriptions were optional and that there were other criteria for the job, such as having the necessary "Class A Commercial Driver's License" and prior experience as a Lead Lineman.

Finally, Warren puts forward many facts regarding the ratings system that allegedly demonstrate that he should not **179** have been rated as low as he was. He notes that Hatfield rated him lower than West in the "verbal communication and skills" category because he knew of West's experience using "hot stuff" and did not know of Warren's experience in this category. Hatfield also stated that he "don't [sic] have no [sic] idea" why he rated Warren lower than West in the category of comprehension. Jones had "no idea" what Warren's experience was before 1987 and rated Warren a 3 out of 10 in "public and employee relations" because of alleged problems with other employees at some point in the distant past, though he did not know exactly what these problems were. Loden rated Warren lowly because he thought that Warren was not a good lineman and because generally Loden can "tell a guy by his actions whether he knows what he's doing or not," though he could not claim a single time where Warren behaved incorrectly when working on lines.

**B. Procedural background**

**\*\*3** Warren timely filed a charge with the United States Equal Employment Opportunity Commission (the "EEOC"), alleging that he was denied promotion because of his age. The EEOC issued a Notice of Right to Sue, and Warren subsequently filed suit in the United States District Court for the Northern District of Mississippi, alleging age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* The district court granted the city's motion for summary judgment, ruling that Warren was unable to create an issue of material fact to make out a prima facie case of discrimination because he could not show that he was qualified for the position of Foreman. It noted that the listed job qualifications were amorphous and that none of the candidates met all of those listed. Nonetheless, it reasoned that Warren was never a Lead Lineman and that all of the Foremen had been promoted from that level. It thus ruled that Warren's application failed because this rendered him unqualified.

In the alternative, the district court also ruled that Warren did not adequately create an issue of material fact to rebut the city's legitimate, nondiscriminatory reasons for not promoting him.[3] First, the court rejected Warren's reassertion of his qualifications because he did not meet all of the job requirements. Second, though the court acknowledged that the objectivity of the interview ratings forms was disputable, it ruled that there was "no evidence that the use of the process was designed to impermissibly discriminate against Warren or anyone else." *Warren,* 2008 WL 4450291, at *3. Third, the court ruled that the exclusion of Gunn from the hiring process, though possibly detrimental to Warren because Gunn thought highly of Warren, was likewise not evidence of discrimination. Finally, the court stated that Warren's argument that Timmons had earlier denied him a "right of way foreman" position was unavailing because Warren "offer[ed] nothing to show that the decision was due to age" and because Warren did not "indicate who else applied for the position." *Id.* at *4. Warren timely appealed.

3      The district court did not specify the "multiple reasons" that the city gave, but instead focused only on the fact that Warren was not qualified because he had not been Lead Lineman.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *LeMaire v. La. Dep't of Transp. & Dev.,* 480 F.3d 383, 386 (5th Cir.2007). Summary judgment is appropriate when "the pleadings, the discovery **\*180** and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *Breaux v. Halliburton Energy Servs.,* 562 F.3d 358, 364 (5th Cir.2009). "A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir.2008). "All the facts and evidence must be taken in the light most favorable to the non-movant." *Breaux,* 562 F.3d at 364.

## III. DISCUSSION

### A. The *McDonnell–Douglas* framework

Under the ADEA, it is "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court first established the overall three-step evidentiary framework for a court to evaluate discrimination claims. [4] *See Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1089–90 (5th Cir.1995). Under this procedure, the complainant "carr[ies] the initial burden under the statute of establishing a prima facie case of ... discrimination." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Once the complainant has done this, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* If the employer has articulated such a reason, then the complainant is given "a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext." *Id.* at 804, 93 S.Ct. 1817.

4      The *McDonnell Douglas* case dealt with racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* not age

discrimination under the ADEA. The Supreme Court has never "squarely addressed" whether this framework similarly applies to ADEA actions. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Nonetheless, the Court applied the framework to the ADEA in *Reeves,* stating that "[b]ecause the parties do not dispute the issue, we shall assume, *arguendo,* that the *McDonnell Douglas* framework is fully applicable here." *Id.* This court similarly "analyze[s] employment discrimination claims under a three-step, burden-shifting framework." *Medina v. Ramsey Steel Co., Inc.,* 238 F.3d 674, 681 (5th Cir.2001) (applying the three-step framework to an ADEA claim); *see also, e.g., Lindsey v. Prive Corp.,* 987 F.2d 324, 326 (5th Cir.1993) (same); *Thornbrough v. Columbus & Greenville R. Co.,* 760 F.2d 633, 638–39 & n. 4 (5th Cir.1985) (same).

**\*\*4** The plaintiff always has the "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Tex. Dep't of Comty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In light of this, a court may consider "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer[ ]." *Reeves,* 530 U.S. at 149, 120 S.Ct. 2097. Since discrimination may be difficult to prove by direct evidence, "the strength of the circumstantial evidence supporting the plaintiff's prima facie case and showing the defendant's proffered reason is false may be enough to create an inference of discrimination." *Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 900 (5th Cir.2000) (citing *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097, and *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 449 (5th Cir.1996)).

### B. Warren's claim of age discrimination under the ADEA

Warren first argues that the district court erred when it ruled that he did not **\*181** create an issue of material fact regarding a prima facie case of age discrimination. For the purposes of the present case, we assume, *arguendo,* that Warren made a prima facie case of age discrimination.

At the second step of the *McDonnell* test, an employer's burden is satisfied "if he simply explains what he has done or produces evidence of legitimate nondiscriminatory reasons."

*Bd. of Trs. of Keene State College v. Sweeney,* 439 U.S. 24, 25 n. 2, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (internal quotation marks and alterations omitted). In the present case, the city satisfied its burden of providing a nondiscriminatory reason for not promoting Warren when it stated that "Warren was not a lead lineman" and that the city "chose[ ] candidates that were promoted sequentially through the ranks." *Warren,* 2008 WL 4450291, at *2.

The burden thus shifts to Warren to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. At this stage, Warren first argues that he was qualified for the Foreman position. Second, he contends that the interview rating forms were used as a ruse in order to discriminate against him based on age. Third, he claims that the district court essentially used a "pretext plus" standard when considering his evidence rebutting the city's reasons.

In order to rebut a defendant's showing of legitimate, nondiscriminatory reasons for its actions, "[i]t is not enough ... to *dis* believe the employer." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Instead, "the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Id.* In a promotion discrimination claim, a plaintiff may rebut a defendant's showing "by providing evidence that he was 'clearly better qualified' than the employee selected for the position at issue." *Celestine v. Petroleos de Venezuela SA,* 266 F.3d 343, 357 (5th Cir.2001) (quoting *Scott v. Univ. of Miss.,* 148 F.3d 493, 508 (5th Cir.1998)). The question for the trier of fact thus becomes "whether the employer's selection of a particular applicant over the plaintiff was motivated by discrimination, and evidence of the plaintiff's superior qualification is thus probative of pretext." *Id.* Notably, "the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.' " *Id.* (quoting *Deines v. Tex. Dept. of Protective & Regulatory Servs.,* 164 F.3d 277, 280–81 (5th Cir.1999)).

**5 Furthermore, an employer's "disregard of its own hiring system does not prove racial discrimination absent a showing that discrimination was a motive in the action taken." *See Sanchez v. Tex. Comm'n on Alcoholism,* 660 F.2d 658, 662

(5th Cir.1981); *see also Lerma v. Bolger,* 689 F.2d 589, 592 (5th Cir.1982). For example, in *Risher v. Aldridge,* a procurement agent alleged that the Air Force committed sex discrimination when it failed to promote her. 889 F.2d 592, 594–95 (5th Cir.1989). Risher alleged that the Air Force had failed to consider written performance appraisals required by the Air Force Personnel Manual and Civil Service Reform Act. *Id.* at 597. This court reasoned that "even if [the Air Force] did erroneously fail to 'use' the objective appraisals in his promotion decisions, there was absolutely no evidence presented that [it] did so in a sexually discriminating manner." *Id.*

**\*182** **[1]** First, Warren's assertion of his qualifications does not create a question of material fact that the city's reason for not hiring him was pretext. Even assuming that Warren is minimally qualified for the job under the first prong of the *McDonnell Douglas* framework, he does not meet the required burden of showing that he was "clearly better qualified" than Daniel and West. As the city notes in its brief, Warren was not working as a lineman day-to-day, but was only doing so "on call" about five to ten times a year. He also had never worked as a Lead Lineman and did not have the same up-to-date knowledge as Daniel and West, who were currently involved in line work. Thus, Warren's qualifications argument fails because the difference between his qualifications and those of Daniel and West were not "of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Daniel and West] over [Warren] for the job in question." *Deines,* 164 F.3d at 280–81.

**[2]** Second, Warren's argument about the "completely arbitrary and subjective" ratings forms is unavailing. It is true that there is some ambiguity regarding how the interview ratings form worked and whether Timmons even followed such objective criteria in making his decision. However, as in *Risher,* even if Timmons did not "use" the forms correctly or disregarded them, there was no evidence that he did so in a discriminatory manner with regard to age. In fact, Warren has not offered any evidence on rebuttal that age motivated how Timmons distributed the ratings forms or interpreted the results, nor how Warren's age affected Gunn's exclusion from the ratings form process. Notably, in a deposition, Warren stated the following:

> Q. Why do you believe that you were discriminated against on the basis of your age?

A. Well, I think that I was well qualified for the position. And it's apparent these two young guys got it. So if it wasn't that, what was it?

Q. But you don't—as you sit here today, you don't know their qualifications for the job?

**\*\*6** A. No sir. But I know mine.

Q. The reason that you believe it was age was because two other guys younger than you got it?

A. Yes sir.

Q. Any other reason?

A. No sir.

(R. at 311.) Since this argument is unavailing, we conclude that "[Warren's] evidence to rebut the non-discriminatory reasons offered by [the city] is not so persuasive so as to support an inference that the real reason was discrimination." *See Rubinstein v. Adm'rs of Tulane Educ. Fund,* 218 F.3d 392, 400 (5th Cir.2000); *see also Crawford,* 234 F.3d at 904.

Finally, Warren is incorrect in arguing that the district court essentially used a "pretext plus" standard in assessing his argument that the city's stated reasons were pretextual. He argues that the district court required "further, specific evidence that any discrimination that may have been involved was age discrimination" and that the court therefore contravened *Reeves,* which he states held that "the jury may find intentional age discrimination if it finds that the City's purported, 'legitimate, non-discriminatory reasons' for not promoting Warren are not worthy of credence."[5] This argument both misconstrues **\*183** the district court's reasoning and the legal thrust of *Reeves.* The district court in fact stated that "[d]eviation from normal hiring procedures does not conclusively establish improper discrimination or pretext" and that here "there [wa]s no evidence that the use of the process was designed to impermissibly discriminate against Warren or anyone else." *Warren,* 2008 WL 4450291, at \*3. It was thus not holding Warren to a "pretext plus" standard, but was only adhering to this court's oft-articulated rule that evidence may founder when it "has no probative value with respect to the ultimate question before the jury of whether there was discrimination," in this case age discrimination. *Vadie v. Miss. State Univ.,* 218 F.3d 365, 373 (5th Cir.2000). *Reeves* itself requires a plaintiff to "attempt to establish that he was the victim of *intentional discrimination.*"

530 U.S. at 143, 120 S.Ct. 2097 (emphasis added). Warren has not done so here.

[5]  In his reply brief, Warren draws his main pretext standard from the Eleventh Circuit case *Jackson v. State of Alabama State Tenure Commission,* 405 F.3d 1276, 1289 (11th Cir.2005), which states that a "district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* (internal quotation marks omitted). This language is taken from a paragraph in *Burdine* in which the Supreme Court stated that a plaintiff must act "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." 450 U.S. at 256, 101 S.Ct. 1089. Warren thus suggests that he has two options at the third step of the *McDonnell Douglas* test: either show intentional discrimination or disprove the city's reason for not promoting him. Warren contends that he has done both in this appeal. As explained above, he has not succeeded in showing the former option.

Furthermore, the second option is not available to Warren because both the Supreme Court and this circuit have rejected it as a misstated "inadvertence" in dicta. In *St. Mary's Honor Center,* the Court quoted the above language from *Burdine,* then stated that "the dictum ... must be regarded as an inadvertence, to the extent that it describes disproof of the defendant's reason as a totally independent, rather than an auxiliary, means of proving unlawful intent." 509 U.S. at 517–18, 113 S.Ct. 2742 (internal citations omitted). This court has acknowledged the Supreme Court's rejection of the "unworthy of credence" statement. *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 151 n. 7 (5th Cir.1995) ("As the Court made abundantly clear in *St. Mary's,* the employee at all times has the burden of proving, not only that the employer's stated reasons were false, but also that those reasons were a pretext for unlawful discrimination." (internal citation omitted)).

In sum, we conclude that Warren did not meet his "ultimate burden of persuading the trier of fact" that the city "intentionally discriminated against" him. *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Considering "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence" that supports the city, *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097, we affirm the district court's grant of summary judgment in favor of the city.

### V. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

332 Fed.Appx. 176, 2009 WL 1560022

---

**End of Document**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Tab K

Case 4:21-cv-03371   Document 33-5   Filed on 09/24/24 in TXSD   Page 86 of 93

2009 WL 749198
Only the Westlaw citation is currently available.
NOT FOR PRINTED PUBLICATION
United States District Court,
E.D. Texas,
Lufkin Division.

Jordan WASHINGTON, Plaintiff,
v.
HEMPHILL INDEPENDENT
SCHOOL DISTRICT, Defendant.

No. 9:08-CV-103.
|
March 19, 2009.

**Attorneys and Law Firms**

Curtis Bradley Stuckey, Stuckey Garrigan & Castetter, Nacogdoches, TX, for Plaintiff.

Kelli Hamm Karczewski, Feldman & Rogers, Nacogdoches, TX, for Defendant.

***ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT***

RON CLARK, District Judge.

**\*1** Plaintiff Jordan Washington claims that the failure of Defendant Hemphill Independent School District ("HISD") to place him in the position of middle school principal, counselor/district testing coordinator, or coach/director of student conduct discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq;* 42 U.S.C. § 1981; and 42 U.S.C. § 1983. HISD now moves for summary judgment on all of Mr. Washington's claims.

Mr. Washington cannot make out a prima facie case of racial discrimination as to the counselor/district testing coordinator or coach/director of student conduct positions because he did not apply for them, and was not qualified for counselor/ district testing coordinator position. Mr. Washington did apply for the position of middle school principal. He did not possess the qualifications listed on the job notice, but, viewing the facts in the light most favorable to Mr. Washington, the court concludes that he is at least minimally

qualified for the position. However, assuming that Mr. Washington has made out a prima facie case as to any of the positions, he cannot demonstrate that HISD's legitimate, non-discriminatory reasons for failing to select him, namely that the candidates selected had superior qualifications, were pretextual. HISD's motion is granted.

**I. Background**

The following facts are undisputed, unless otherwise stated.

A. *Three Individuals Apply for the Middle School Principal Position*
In March 2007, HISD's middle school principal resigned, effective at the conclusion of the school year. HISD posted this open position in the District's administrative offices, each of the three campus offices, on the District's website, and on the Region VII Educational Service Center's website. Three existing employees expressed interest-Mr. Washington, Paula Pruitt, and Monica Butler-and all were interviewed on May 14, 2007 by a committee consisting of four middle school teachers, both the girls' and boys' athletic coordinators, the elementary school principal, and the high school principal. With the exception of the girls' athletic coordinator, who is African-American, the remaining members of the committee are white.

B. *Mr. Washington's Qualifications*
Mr. Washington, who is African-American, had twelve years of teaching experience at the high school level at that time and was employed as a high school economics teacher and in-school suspension teacher during the 2006-07 school year. He has a Bachelor's degree in Marketing Management and a Master's degree in Agriculture Economics. In 1999, Mr. Washington received his mid-management certification, which is required by the Texas State Board for Educator Certification to be a principal.[1] He has administered the TAKS test[2] only once in his career, during the 2007-08 school year, which occurred after the incidents complained of in this case. With the exception of one business communications class he taught in the middle school, he has spent his entire career at the high school level.

---

1      Tex. Educ.Code § 21.046(b)-(d) permits the Board to establish the qualifications for certification as a principal. The Board requires that an

individual serving in a principal or assistant principal position in Texas public schools hold a Lifetime Mid-Management, Standard Mid-Management, or Standard Principal certificate. The Lifetime and Standard Mid-Management certificates are no longer issued. *See* 19 Tex. Admin. Code §§ 241 *et seq;* State Beoard for Educator Certification: Certificate Renewal Requirement Information, available at http:// www.sbec.state.tx.us/SBECOnline/certinfo/ certren.asp.

2   The "TAKS," or Texas Assessment of Knowledge and Skills, tests are used in primary and secondary schools in Texas to assess students' reading, writing, math, science, and social studies skills as required under Texas education standards. Texas high school seniors cannot graduate until they pass exit-level TAKS tests in several subjects, namely math; English language arts; science; and social studies. *See* "High School Graduation Requirements-Texas Education Agency," *available at* http:// www.tea.state.tx.us/student.assessment/ resources/grad/. English language arts is added at the high school level, to replace the reading and writing tests given at the elementary and junior high levels. "Texas Education Agency-Revised TAKS Information Booklets," available at htt p:// www.tea.state.tx.us/index3.aspx?id=3693 & menu_id3=793.

### C. *Mr. Washington was Rated "Below Expectations"*

*2  In Mr. Washington's 2006-07 professional evaluation, he received the second lowest rating ("below expectations") in three of the eight categories. He received a rating of "proficient" in the remaining five. Mr. Washington disagreed with the results, and requested a second evaluation. On this evaluation, administered by the then-middle school principal Mario Osby, who is African-American, Mr. Washington received a rating of "below expectations" in four domains. He was on a "professional growth plan" as a result of his evaluations at the time he was being considered for the middle school principal position. Mr. Washington asserts that his unfavorable evaluations were not accurate reflections of what was happening in his classroom, but does not dispute that these negative evaluations were available for consideration by the interview committee and superintendent.

### D. *Ms. Pruitt's Qualifications*

Ms. Pruitt, a white female, was employed by HISD as a first grade teacher during the 2006-07 school year. At that time, she had eighteen years of teaching experience, the majority at the intermediate/middle school level. She has a Master's of Education degree in Curriculum and Instruction. While she had not yet received her principal certification at the time of the interview, she had already completed the required course work and received her certification before the 2007-08 school year commenced as required by her hiring contract. In her 2006-07 professional evaluation, Ms. Pruitt received the highest rating ("exceeds expectations") in all eight categories.

### E. *Ms. Butler's Qualifications*

Ms. Butler, a white female, was employed as high school math and business teacher during the 2006-07 school year. At the time of the interview, she had fourteen years of teaching experience at both the middle and high school levels, and possessed a Master's degree in Educational Leadership. Ms. Butler is certified in secondary mathematics, secondary business, and as a principal. Her entire educational career has been spent teaching math, which is a subject area tested on the TAKS test. Ms. Butler received training on the TAKS test and administered it a number of times. In her 2006-07 professional evaluation, Ms. Butler received the highest rating ("exceeds expectations") in five of the eight categories and was rated "proficient" in the remaining three.

### F. *The Interview Committee Rated Mr. Washington the Lowest*

Each individual committee member awarded one score to every applicant. These scores were tabulated at the conclusion of all interviews, and the applicant with the highest overall score was recommended for hire by the committee. The District's interim superintendent, Glen Pearson, also interviewed each candidate individually and ranked them as well. Ms. Pruitt received 384 cumulative points, Ms. Butler received 362, and Mr. Washington received 210. Mr. Pearson recalculated the scores, deleting the highest and lowest ranked score for each candidate, but the rankings remained the same. Mr. Pearson recommended Ms. Pruitt to the District Board of Trustees, and she was ultimately hired for the position.

### G. *Two Positions for Which Mr. Washington did not Apply*

*3  HISD also sought to fill two other positions in preparation for the 2007-08 school year. One was the dual

position of counselor/district testing coordinator, which was originally posted as two separate positions. The other was coach/director of student conduct. It is undisputed that Mr. Washington did not apply for either dual component. According to him, this is because neither component of the positions that would have interested him-namely the district testing coordinator and director of student conduct-was ever posted. Mr. Pearson disputes this, stating that, like the middle school principal position, the counselor, district testing coordinator, and coach openings were posted in the District's administrative office, in each of the three campus offices, on the District's website, and on the Region VII Educational Service Center's website. It is undisputed that the director of student conduct position was never posted independently.

With respect to the counselor/district testing coordinator position, HISD did not receive any applications from candidates with a counseling certification. Ms. Butler expressed interest in the testing coordinator component of the job. No interviews were conducted specifically for this position, since Ms. Butler was apparently the only interested candidate and had already been interviewed for the middle school principal position. Ms. Butler was given the testing coordinator job, and the counselor component of the position remained open. Mr. Washington testified at deposition that he recalled seeing the counselor posting in May 2007, but that he did not remember seeing the district testing coordinator component on that posting. Def. Mot. Sum. J., Ex. A, at p. 167, l. 23-p. 168, l. 16 [Doc. # 11].

As to the coach/director of student conduct position, the District posted an open coaching position on the Texas High School Coaching website in May 2007. Mr. Pearson subsequently decided to hire one person to serve as both coach and director of student conduct, with the director position created in order to assist all three school principals with discipline on their respective campuses without having to hire an assistant principal. Mr. Washington testified at deposition that he saw the coaching position posting but did not apply for it because he was not interested in coaching. Def. Mot. Sum. J., Ex. A, at p. 54, ll. 5-14. He had previously been employed as a coach at HISD for one year, but was relieved of his coaching duties by the Athletic Director. *Id.* at p. 28, l. 11-p. 29, l. 7.

According to Mr. Washington, he did not see a posting for director of student conduct. *Id.* at p. 54, ll. 2-4. Mr. Pearson stated that this was true, because the main position was

the coaching job, and the director of student conduct was a supplementary duty. Pl. Resp., Ex. 3, at p. 19, ll. 13-23 [Doc. # 12]. Nevertheless, Mr. Pearson also stated that he considered Mr. Washington as a potential candidate for this position because of his prior coaching experience, and that Mr. Washington was not interested. Def. Mot. Sum. J., Ex. B, at p. 31, ll. 11-16. The District ultimately hired Kyle Bolyard to fill this position. Mr. Bolyard, who is white, had twenty years of experience in education and was employed at Woodville Independent School District ("WISD") as a coach and special education teacher when he was hired by HISD. While employed at WISD, Mr. Bolyard was involved in the "PASS Program"-"Positive Approach to Student Success"-and had duties similar to those of the director of student conduct at HISD. Mr. Bolyard was previously employed at HISD as a teacher and coach between 2000 and 2003.

### H. *Mr. Washington Files Suit*

**\*4** Mr. Washington filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 1, 2007 and was issued a Right-to-Sue letter on June 3, 2008. He timely commenced this suit on June 11, 2008.

### II. Standard of Review

The party moving for summary judgment under Fed.R.Civ.P. 56 has the initial burden of demonstrating that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Movant may show that the undisputed material facts affirmatively establish a right to judgment. Alternatively, movant may establish that the other party has the burden of proof at trial, and has failed to "make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2522 (1986)).

In order to avoid summary judgment, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 1335 (1986); *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475

U.S. at 586, 106 S.Ct. at 1356. Fed.R.Civ.P. 56 requires that the nonmoving party set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Only a genuine dispute over a material fact (a fact which might affect the outcome of the suit under the governing substantive law) will preclude summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party on the issue. *Id.* If the factual context renders a claim implausible (for example if the claim simply makes no economic sense) nonmovants "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

Fed.R.Civ.P. 56(c) requires the court to look at the full record, including the pleadings, depositions, answers to interrogatories, admissions, and affidavits. All reasonable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, and any doubt must be resolved in its favor. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. However, only *reasonable* inferences in favor of the nonmoving party can be drawn from the evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 468, 112 S.Ct. 2072, 2083, 119 L.Ed.2d 265 (1992).

### III. Discussion

HISD moves for summary judgment on the grounds that Mr. Washington cannot establish a prima facie case of race discrimination and, even if he could, HISD has presented a legitimate, non-discriminatory reason for failing to promote that Mr. Washington has not rebutted.

A. *Applicable Law*

1. ***Title VII, Section 1981, and Section 1983***

 **\*5** Title VII prohibits an employer from discriminating against its employees on the basis of race. 42 U.S.C. § 2000e-2(a). 42 U.S.C. § 1981 provides that all persons in the United States will have the same contractual rights that white citizens have. "Claims of racial discrimination brought under [Section] 1981 are governed by the same evidentiary framework applicable to claims of employment discrimination brought under Title VII." *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 448 n. 2 (5th Cir.1996) (citing

*Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377-78, 105 L.Ed.2d 132 (1989)).

To state a claim under Section 1983, Mr. Washington must (1) allege a violation of rights secured by the Constitution or the laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Lauderdale v. Tex. Dep't Crim. Justice,* 512 F.3d 157, 165 (5th Cir.2007). With respect to the first element, Section 1983 and Title VII claims are parallel causes of action. *Id.* at 166 ("[T]he inquiry into intentional discrimination is essentially the same for individual actions brought under sections 1981 and 1983, and, Title VII."). The following law and analysis regarding discrimination therefore applies to Mr. Washington's Title VII, Section 1981, and Section 1983 claims.

2. ***Shifting burden of proof***

Mr. Washington bears the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). To establish a prima facie case of discrimination in a failure to promote case, Mr. Washington must show four elements: (1) he is a member of the protected class; (2) he sought and was qualified for the position; (3) he was rejected for the position; and (4) the position was given to someone outside the protected class. *Septimus v. Univ. of Houston,* 399 F.3d 601, 609 (5th Cir.2005).

Once Mr. Washington has established a case of prima facie discrimination, the burden of production shifts to HISD, which must articulate a legitimate and non-discriminatory reason for the employment action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1817. If HISD comes forward with such a reason which, if believed, supports a finding that the employment action was non-discriminatory, the inference Mr. Washington has raised disappears from the case. *LaPierre,* 86 F.3d at 448; *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 n. 10, 101 S.Ct. 1089, 1094-95 n. 10, 67 L.Ed.2d 207.

"The focus then shifts to the ultimate question of whether the defendant intentionally discriminated against the plaintiff." *LaPierre,* 86 F.3d at 448 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 210-11, 113 S.Ct. 2742, 749, --- L.Ed.2d ----, ---- - ---- (1993)). Mr. Washington must then offer

sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed motives alternative).[3]

3    Mr. Washington appears to argue only that HISD's reason for failing to promote him was a pretext, rather than a mixed motive. *See, e.g.,* Pl. Resp. at p. 26 [Doc. # 11]. For the reasons discussed below, Mr. Washington cannot carry his burden on this point regardless of whether he argues under a pretext or mixed motive theory.

**\*6** *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir.2004). If Mr. Washington can demonstrate that race was a motivating factor in the adverse employment decision, the burden falls to HISD to show that the same employment action would have been made regardless of the "discriminatory animus." *Id.* at 312-13.

B. *Analysis*

1. ***Mr. Washington cannot demonstrate a prima facie case***

a. **Elements one, three, and four**
HISD does not dispute elements one and three, namely that Mr. Washington is a member of a protected class, and that he was not promoted to any of the positions.

For element four, Mr. Washington must show that HISD promoted applicants outside of the protected class. HISD argues that because the District chose to promote applicants with superior qualifications, Mr. Washington cannot make out this element. This element of Mr. Washington's prima facie case does not require him to demonstrate that he was better qualified than the individuals promoted. That inquiry does not come into play until the third stage of the *McDonnell Douglas* analysis when Mr. Washington is

required to present evidence rebutting HISD's proffered non-discriminatory explanation for its hiring decision. *See Celestine v. Petroleos de Venezuella* [sic] *SA,* 266 F.3d 343, 356 (5th Cir.2001). All Mr. Washington must do at this stage to make out a prima facie case on this element is demonstrate that Ms. Pruitt, Ms. Butler, and Mr. Bolyard, who were given the positions in question, are not members of his protected class, and he has done so.

b. **Element two**
For this element, Mr. Washington is required to demonstrate that he applied for positions for which he was qualified. *McDonnell-Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Fields v. Hallsville Ind. Sch. Dist.,* 906 F.2d 1017, 1021 (5th Cir.1990). It is undisputed that Mr. Washington applied for the middle school principal position.

i. *Middle school principal*
HISD argues that even though he sought the middle school principal position, Mr. Washington was not qualified for it. The job vacancy posting lists as the first qualifying requirement that the applicant possess a "Master's degree in educational administration." Def. Mot. Sum. J., Ex. M [Doc. # 11]. Mr. Washington's Master's degree is in Agriculture Economics. However, neither of the other candidates, Ms. Pruitt and Ms. Butler, possess the degree listed on the job posting. Both women do hold a Master's degree in a related field of education-Ms. Pruitt in Curriculum and Instruction and Ms. Butler in Educational Leadership. The District's posting did not specify a "Master's degree in educational administration or an equivalent degree in the field of education." It is a little late for HISD to now claim this precise degree was an absolute necessity, especially since Mr. Washington was interviewed notwithstanding the fact that his advanced degree is in Agriculture Economics.

**\*7** The posted description also required applicants to have a "working knowledge of curriculum and instruction." Def. Mot. Sum. J., Ex. M. Mr. Washington taught only one middle school class during a single academic year over the course of his entire career. It is difficult to imagine how an individual who both lacks an advanced degree in any educational field and has almost no experience at the middle school level could be considered to meet the qualifications for the job. However, the District chose not to include a minimum number of years of recent experience in its job vacancy, so it cannot rely on that requirement when arguing about the prima facie case.

2009 WL 749198

The fact that Mr. Washington has a mid-management certificate means that he meets the minimum qualifications set by the Texas State Board for Educator Certification. Possession of a state certification would not be a valid substitute for all of the requirements listed in a carefully drafted job description for this position. However, the more general job notice in this case cuts against HISD's argument that Mr. Washington does not present a mere prima facie case as to his qualifications for the position. The question is close, but the court will assume that Mr. Washington has made out a prima facie case for purposes of the *McDonnell Douglas* burden shifting analysis.

#### ii. *Coach/Director of student conduct*

Mr. Washington argues that, taking the evidence in the light most favorable to him, there is a question as to whether HISD posted the testing coordinator and director of student conduct positions. However, Mr. Pearson testified, without contradiction, that the duties of the director of student conduct position were considered supplementary to the main position of coach. As already noted, it is undisputed that the coach position was posted; that Mr. Washington saw it; and that he displayed no interest in it. Failing to indicate any interest whatsoever in an opening, despite full awareness of its existence, is the antithesis of actually applying for a position. *See Kolpakchi v. Principi,* 113 Fed. App'x 633, 637-38 (5th Cir.2004) (unpublished).

Mr. Washington does not suggest that he failed to apply because it would have been futile to do so, nor does he offer any evidence of a "known and consistently enforced policy of discrimination" that such a theory would require. *Shackleford v. Deloitte & Touch, LLP,* 190 F.3d 398, 406 (5th Cir.1999) (failure to apply for a position does not bar a discrimination claim if Plaintiff can demonstrate that applying would have been a futile gesture, which usually requires a showing that Plaintiff was deterred by a known and consistently enforced policy of discrimination). Because Mr. Washington simply cannot expect HISD to read his mind and somehow discern that "no" really means "yes," he cannot demonstrate this element of his prima facie case.

#### iii. *Counselor/district testing coordinator*

With respect to the district testing coordinator job, even crediting Mr. Washington's argument that he would have applied had he known of this opening and that this is somehow the fault of HISD, Mr. Washington was again not qualified for the position. Even a brief examination of the

duties of the district testing coordinator strongly supports this conclusion. Mr. Washington neither administered, nor had any involvement in, the TAKS test prior to the 2007-08 school year. There is no evidence that Mr. Washington was qualified to "supervise administration of TAKS" (duty no. 13); be "responsible for security of TAKS" (duty no. 14); and perform on-line assessments of the TAKS test (duty no. 17). Def. Mot. Sum. J., Ex. N, at p. 2. Again, Mr. Washington has failed to make out this element of his prima facie case for the counselor/district testing coordinator position.

#### 2. *HISD has a legitimate, non-discriminatory reason for failing to promote Mr. Washington*

**\*8** As to the position of middle school principal, Mr. Washington presents a prima facie case, although it is a close question. However, assuming for the purpose of analysis that Mr. Washington has established a prima facie case as to all three positions, he does not dispute that HISD has articulated a legitimate, non-discriminatory reason for failing to promote him, namely that better qualified individuals were chosen.

#### 3. *No evidence of pretext or mixed motive*

Under the *McDonnell Douglas* framework, the burden then shifts back to Mr. Washington to refute HISD's reason for failing to promote him by coming forward with sufficient evidence to demonstrate that the reason is either a pretext or that, even if the reason was true, race was a motivating factor in the promoting decision. Mr. Washington cannot carry this burden.

Mr. Washington has put forth no evidence, other than the fact that Ms. Pruitt, Ms. Butler, and Mr. Bolyard are outside the protected class and his own subjective belief that his qualifications were superior, to refute HISD's reason for failing to hire him.[4] A Plaintiff may be able to demonstrate that an employer's claim to have promoted the better qualified employee is a pretext by showing that his own qualifications are superior. *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 457, 126 S.Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006) (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 187-88, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)). However, subjective belief in the superiority of one's own qualifications is not sufficient. Even the fact that one individual's qualifications are equal to, or even slightly better than, another's does not establish a pretext for discrimination. *Celestine,* 266 F.3d at 357 (holding that differences in qualifications are generally not probative of discrimination); *see also Deines v. Texas Dep't of Protective & Regulatory Servs.,* 164

F.3d 277, 279 (5th Cir.1999) ("differences in qualifications between job candidates are generally not probative evidence of discrimination unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue.").

4    This conclusion is reinforced by Mr. Washington's own deposition testimony:

Q: So the only evidence that you have that the motivation for you not receiving these three positions is the fact that you happen to be African-American?

A. I feel I wasn't highly considered because of that.

Q. Just because you happen to be African-American?

A. Yes.

Q. There's not some other piece of evidence out there: Have you heard of anyone talk about your race being a factor in your employment?

A. Not to my face, no.

Q. What do you mean by that?

A. I haven't heard anyone talking about that, no.

Q. Have you seen anything in writing that's indicated that your race played a role in the decision not to hire you or place you in these positions?

A. No.

Def. Mot. Sum. J., Ex. A, p. 88, l. 25-p. 89, l. 15 [Doc. # 11].

In this case, Mr. Washington's qualifications are not clearly superior to those of the individuals hired or promoted-if anything, they are clearly inferior. His 2006-07 professional evaluation indicates that he performed "below expectations" in three out of eight categories. Upon reevaluation by an African-American-who also happened to be the middle school principal at that time [5] -he was rated "below expectations" in four out of eight categories. Ms. Pruitt, on the other hand, received the highest possible rating ("exceeds expectations") in all eight categories. Mr. Washington can complain that he should have been rated higher, but he did not file a complaint with the EEOC or with any court on that ground. Mr. Washington, Ms. Pruitt, and Ms. Butler's professional evaluation ratings were before the middle school principal interview committee and Mr. Pearson, and they were entitled to factor the ratings into their rankings of these three candidates.

5    Deposition of Jordan Washington, Pl. Resp., Ex. 2, at p. 141, ll. 8-9 [Doc. # 12].

*9 Setting aside Mr. Washington's evaluation, which is abysmal for one expecting to be a principal, all three individuals promoted or hired for the open positions were still better qualified than Mr. Washington for these jobs. Mr. Washington spent his entire teaching career at the high school level, with the exception of a single middle school class taught during one school year. While he did have a mid-management certification, his background was not in education; rather, his degrees are in marketing management and agriculture economics. He had never administered a TAKS test at the time the positions were being filled, nor had he even taught a subject on the TAKS test.

On the other hand, the candidate chosen for the middle school principal position, Ms. Pruitt, had a Master's of Education degree in Curriculum and Instruction; spent most of her career teaching at the middle school level; and received the highest possible scores on her most recent professional evaluation. While Ms. Pruitt did not have her mid-management certification in hand at the time she was hired as Mr. Washington did, she had completed the necessary course work and her contract required she obtain the certification before the 2007-08 school year began.

Ms. Butler, the candidate chosen for the testing coordinator position, possessed a Master's degree in Educational Leadership; had spent her entire career teaching a TAKS subject (math); had undergone training on the TAKS test; administered the test a number of times; and received the highest possible rating in five of the eight categories on her most recent professional evaluation. Finally, Mr. Bolyard had a greater amount of overall teaching experience (twenty years to Mr. Washington's twelve); significant experience as a coach, which was the primary function of the individual filling the coach/director of student conduct position; and was involved in the PASS Program at WISD with duties similar to the director of student conduct at HISD. In short, Mr. Washington cannot show, or even plausibly claim, that his background and experience are superior to Ms. Pruitt's; Ms. Butler's; or Mr. Bolyard's. Manning v. Chevron Chemical Co., 332 F.3d 874, 882 (5th Cir.2003).

Mr. Washington's argument that HISD relied on subjective criteria during the middle school principal interview, such as how well each candidate did during the interview process, also fails. See Todd v. Natchez-Adams Sch. Dist., 160

Fed. App'x. 377, 380 (5th Cir.2005) (unpublished). Courts are not human resources managers, and should not be in the business of micro-managing an employer's hiring or promoting decisions. *See Furnco Construction Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978) ("Courts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it.").

Consider HISD's position if the school board had selected Mr. Washington as the middle school principal, with his lack of middle school teaching experience, no advanced degree in the field of education, marginal professional evaluations, and the lowest combined interview score. What legitimate, non-discriminatory reason could HISD have offered to Ms. Pruitt, an intermediate school teaching veteran with a Master's of Education in Curriculum and Instruction, the highest possible professional evaluation ratings, and a combined interview score 82% higher than that received by Mr. Washington? We want to keep the most highly qualified individuals in the classroom and promote marginal performers to be their supervisors?

 **\*10** Finally, the court notes that Mr. Washington's claims of race discrimination are undermined by the fact that he was already employed by HISD, and remains employed there to this day. Because Mr. Washington was a member of this protected class when he was first hired by HISD, it is somewhat strained to now argue that his race was the reason HISD failed to promote him in 2007. *See, e.g., Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996). It is also difficult to credit any suggestion that HISD has a policy against promoting African-Americans to administrative positions like middle school principal, because the middle school principal at the time of Mr. Washington's 2006-07 professional evaluation was, by Mr. Washington's own admission, African-American.

Viewing the facts in the light most favorable to Mr. Washington, the record is devoid of sufficient evidence to refute HISD's legitimate, non-discriminatory contention that it hired Ms. Pruitt, Ms. Butler, and Mr. Bolyard because they were better qualified.

IT IS THEREFORE ORDERED that Defendant Hemphill Independent School District's Motion for Summary Judgment [Doc. # 11] is GRANTED.

So **ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 749198

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.