UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Dedmon, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 4:21-cv-03371 |
| | § | |
| vs. | § | **Jury** |
| | § | |
| Shell Exploration & Production | § | |
| Company and Shell Trading | § | |
| Services Company, | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF ROBERT DEDMON'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

COVER ........................................................................................................... 1

TABLE OF CONTENTS ............................................................................................

INDEX OF AUTHORITIES .......................................................................................

INTRODUCTION .....................................................................................................

NATURE AND STAGE OF PROCEEDING ......................................................................

STATEMENT OF FACTS ..........................................................................................

DEFENSE MISSTATEMENT OF FACTS .......................................................................

STATEMENT OF ISSUES .........................................................................................

STANDARD OF REVIEW ..........................................................................................

SUMMARY OF ARGUMENT ......................................................................................

ARGUMENT AND AUTHORITIES ...............................................................................

A.    A reasonable juror could find Robert Dedmon's claims are timely ...................

  1.   Equitable estoppel [Title VII and Section 1981]: A reasonable jury could find that defendants misrepresented to Robert Dedmon, or concealed, the real reason for lower pay [discrimination]—and if they do, equitable estoppel *must* apply ...............

    a.   An employer's representation or concealment can be unintentional—completely innocent—and still estop an employer from using limitations .........

    b.   Equitable estoppel is a question of fact and law—the facts are for a jury and application is post-verdict because issues are intertwined ............................

    c.   The Fifth Circuit requires estoppel when the reason given an employee seems credible, but a jury finds discrimination and diligence in learning of it ......

    d.   A reasonable juror could find concealment or misrepresentation ...................

e.   A reasonable juror could find Robert Dedmon subjectively lacked awareness of *race discrimination* at the time—and his lack was objectively reasonable because of what Shell was telling him...................................................

2.  [Title VII]: Under the Lilly Ledbetter Fair Pay Restoration Act ("FPA"), a reasonable juror could find Robert Dedmon's pay discrimination claim is timely ...........................................................................................................

3.  [Section 1981]: Under the Supreme Court's *Bazemore* rule, a reasonable juror could find a facially discriminatory pay structure being implemented with each check—each marking a new violation within the limitations period.......

B.    A reasonable juror could find race discrimination .............................................

1.  There is direct evidence which, if believed, shows race discrimination ............

2.  There is also indirect evidence which, if believed, shows race discrimination ..

a.  A "*prima facie* case" is not a strict formula—an end unto itself—it is just a way of putting the issue in play so a court can assess if a jury is warranted .......

b.  There is a prima facie case of pay discrimination ...........................................

c.  There is a prima facie case of pay discrimination in Shell's selection of candidates for job grade raises........................................................................

d.  No LNDR: Defense neither articulates a "clear and reasonably specific" legitimate non-discriminatory reason nor does so with any *admissible* evidence ..

(1)  "[B]ecause of issues in the group unrelated to Dedmon" is neither a clear nor reasonably specific reason for its pay decisions at issue. ..................

(2) Defense fails to support its proffered reasons with *admissible* evidence ....

e.  Pretext: Though defense does not meet their burden of production, even its unsupported, unclear reasons are pretextual...........................................

(1) Exhibiting racial animus is evidence of pretext .........................................

(2) Discriminatory culture and other acts of discrimination ...........................

(3) Departure from policies and practices ......................................................

(4) The jobs were comparable the pay differed.............................................

C.  2021: The JG 4 claim is prosecuted under Section 1981—not Title VII ..............

CONCLUSION...........................................................................................

RELIEF REQUESTED .................................................................................

SIGNATURE OF COUNSEL ........................................................................

CERTIFICATE OF COMPLIANCE ...............................................................

CERTIFICATE OF SERVICE.........................................................................

# INDEX OF AUTHORITIES

## Cases

*Albemarle Paper Co. v. Moody,*
    422 U.S. 405 (1975)................................................................................

*Alvarado v. Texas* Rangers,
    492 F.3d 605 (5th Cir. 2007) ................................................................

*Bazemore* v. *Friday,*
    478 U.S. 385 (1986)................................................................................

*Brown v. E. Miss. Elec. Power Ass'n,*
    989 F.2d 858 (5th Cir. 1993)................................................................

*Boudreau v. Nokia of Am. Corp.,*
    No. 3:19-CV-01623 (N.D. Tex. Dec 18, 2020)....................................

*Bomba v. W. L. Belvidere, Inc.,*
    579 F.2d 1067 (7th Cir. 1978) .............................................................

*Box v. A & P Tea Co.,*
    772 F.2d 1372 (7th Cir. 1985)...............................................................

*Cmty. House, Inc. v. Boise,*
    468 F.3d 1118 (9th Cir. 2006)..............................................................

*Coke v. General Adjustment Bureau, Inc.,*
    640 F.2d 584 (5th Cir. 1981) (en banc) ..............................................

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962)...............................................................................

*E.E.O.C. v. Metal Serv. Co.,*
    892 F.2d 341 (3rd Cir. 1990)................................................................

*Ellerbrook v. City of Lubbock,*
    465 Fed. Appx. 324 (5th Cir. 2012) .....................................................

*Elmenayer v. ABF Freight Sys., Inc.*,
318 F.3d 130 (2nd Cir. 2003) ................................................................................

*Equal Emp't Opportunity Comm'n v. Skanska USA Bldg., Inc.*,
80 F. Supp.3d 766 (W.D. Tenn. 2015) ..................................................................

*Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C,*
778 F.3d 473 (5th Cir. 2015) ................................................................................

*Fabela v. Socorro Indep. Sch. Dist.*,
329 F.3d 409 (5th Cir. 2003) ................................................................................

*Fierros v. Tex. Dep't of Health*,
274 F.3d 187 (5th Cir. 2001) ................................................................................

*Ford v. Securitas Security Services USA, Inc.*,
338 F. App'x 483 (6th Cir. 2009) ........................................................................

*Glus v. Brooklyn Eastern District Terminal,*
359 U.S. 231 (1959) ..............................................................................................

*Grant v. Bethlehem Steel Corp.*,
635 F.2d 1007 (2nd Cir. 1980) ............................................................................

*Groesch v. City of Springfield, Ill.*,
635 F.3d 1020 (7th Cir. 2011) ............................................................................

*Hawkins v. Frank Gillman Pontiac*,
102 F.App'x 394 (5th Cir. 2004) ........................................................................

*Jones v. Robinson Property Group, L.P.*,
427 F.3d 987 (5th Cir. 2005) ................................................................................

*Kellogg v. Ball State Univ.*,
984 F.3d 525 (7th Cir. 2021)................................................................................

*Laxton v. Gap, Inc.*,
333 F.3d 572, 583 (5th Cir. 2003) ......................................................................

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*,
550 U.S. 618 (2007) ..............................................................................................

*Lindsley v. TRT Holdings, Inc.*,
   984 F.3d 460 (5th Cir. 2021) .................................................................

*Lorance v. At Technologies, Inc.*,
   490 U.S. 900 (1989) ............................................................................

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)...........................................................................

*McMullin v. Miss. Dep't of Pub. Safety*,
   782 F.3d 251 (5th Cir. 2015) ...............................................................

*Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*,
   273 F.3d 30 (1st Cir. 2001) ..................................................................

*Niwayama v. Tex. Tech Univ.*,
   No. 13-11225 (5th Cir. Nov 10, 2014) ...................................................

*Ott v. Midland-Ross Corp.*,
   600 F.2d 24 (6th Cir. 1979) .................................................................

*Patrick v. Ridge*,
   394 F.3d 311 (5th Cir. 2004) ...............................................................

*Patterson v. McLean Credit Union*,
   491 U.S. 164 (1989), *superseded by statute in part on other grounds*,
   42 U.S.C. § 1981(b)............................................................................

*Paugh v. Lockheed Martin Corp.*,
   No. 21-50472, 2023 U.S. App. LEXIS 2061 (5th Cir. Jan. 26, 2023).....................

*Pittman v. Hattiesburg Mun. Separate Sch. Dist.*,
   644 F.2d 1071 (5th Cir. 1981) .............................................................

*Polanco v. City of Austin*,
   78 F.3d 968 (5th Cir. 1996)................................................................

*Portis v. First Nat'l Bank*,
   34 F.3d 325 (5th Cir. 1994) ................................................................

*Pruitt v. Dallas Indep. Sch. Dist.*,
No. 3-04-CV-0554,
2006 U.S. Dist. LEXIS 33054 (N.D. Tex. Apr. 21, 2006) ...................................

*Reeb v. Economic Opportunity Atlanta, Inc.*,
516 F.2d 924 (5th Cir. 1975) ..................................................................

*Reed v. Neopost USA, Inc.*,
701 F.3d 434 (5th Cir. 2012) ..................................................................

*Reeves v. Sanderson Plumbing Products, Inc.*,
530 U.S. 133 (2000) ..............................................................................

*Rhodes v. Guiberson Oil Tools Div.*,
927 F.2d 876 (5th Cir. 1991) ..................................................................

*Roberts v. Gadsden Mem'l Hosp.*,
835 F.2d 793 (11th Cir. 1988), *opinion amended on reh'g*,
850 F.2d 1549 (11th Cir. 1988) ..............................................................

*Robinson v. Jackson State Univ.*,
714 Fed. Appx. 354 (5th Cir. 2017) .........................................................

*Russell v. McKinney Hospital Venture*,
235 F.3d 219 (5th Cir. 2000) ..................................................................

*Scarborough v. Atlantic Coast Line R. Co.*,
202 F.2d 84 (4th Cir. 1953) ....................................................................

*Smith v. Trane US, Inc.*,
No. 6:11-cv-00036 (S.D. Ga. Oct. 17, 2011)............................................

*Sprint/United Mgmt. Co. v. Mendelsohn*,
552 U.S. 379 (2008) ..............................................................................

*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)...............................................................................

*Teamsters v. United States*,
431 U.S. 324 (1977) ..............................................................................

*Tex. Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981) ...............................................................................................

*Tucker v. United Parcel Service*,
    657 F.2d 724 (5th Cir. 1981) .................................................................................

*Turner v. Kansas City S. Ry. Co.,*
    675 F.3d 887 (5th Cir. 2012), as revised (June 22, 2012) ......................................

*TWA v. Thurston*,
    469 U.S. 111 (1985) ...............................................................................................

*Tyler v. Union Oil Co. of California*,
    304 F.3d 379 (5th Cir. 2002) .................................................................................

*USPS Bd. of Governors v. Aikens*,
    460 U.S. 711 (1983) ...............................................................................................

*Vaughn v. Woodforest Bank*,
    665 F.3d 632 (5th Cir. 2011) .................................................................................

*Wallace v. Performance Contractors, Inc.*,
    57 F.4th 209 (5th Cir. 2023) ..................................................................................

**Rules and Statutes**

42 U.S.C. § 1981(b) ........................................................................................................

42 U.S.C. § 2000e–5(e)(3)(A) .........................................................................................

# INTRODUCTION[1]

This is an unlawful employment practices case. It involves claims for race and color discrimination under (1) Title VII of the Civil Rights Act of 1964 ("Title VII") and (2) 42 U.S.C. § 1981 ("Section 1981"). It involves a systemic unlawful pay practice based on race and ongoing discrimination concerning pay and job grades. It involves discrimination in the application process and outcome for a 2021 job grade 4. It involves harm — such as panic attacks — that independently interferes with benefits, privileges, terms, or conditions of employment.

A Shell hiring manager testifies that a 2014 downgrade in job grade and pay scale is because Dedmon is black. Shell gives Dedmon a false reason for the situation, on which Dedmon relies. It is undisputed that pay and job grade disparities continue for Dedmon versus white peers every year through resignation last month. It is undisputed that the 2021 "application" process for a 2021 job grade 4 spot involves a white team member who gets a better job grade but does not actually take over the role for which he applies.

---

[1] Unless otherwise noted, Dedmon's attorneys have (1) supplied all emphases, (2) omitted from quoted passages in legal authority all internal quotation marks, internal citations, and internal footnotes, and (3) omitted from citations to legal authority all citing and quoting references.

The attached *Appendix in Support of Plaintiff Robert Dedmon's Response to Defendants' Motion for Summary Judgment* is sequentially bates-numbered and includes supporting evidence. It is cited as "App.," followed by the appendix bates number and any applicable paragraph or line number.

## NATURE AND STAGE OF PROCEEDING

Dedmon does not dispute the procedural history, other than the following. Discovery remains open per agreement of the parties as permitted under the Scheduling Order. ECF No. 29, p. 3. Depositions are to take place once Shell provides certain documents that it has not yet provided. *See id.* at 7-8. The complaint concerning the 2021 job grade increase includes the "lead-up to giving the white team member a job upgrade, not just the job upgrade or any 'filled' position." ECF Doc. 14, p. 21 ¶ 44. The motion seeks judgment on all claims but does not address the harm — such as panic attacks — that independently interferes with benefits, privileges, terms, or conditions of employment. *See generally* ECF Doc. 33.

STATEMENT OF FACTS

**A.      Dedmon — race, education, employment dates**

Dedmon is a black male. App., p. 5 ¶ 4. His race is visually obvious:



*Id.*; *see also* basic personal knowledge and other information at App., p. 4 ¶¶ 1-3.

Dedmon has a BBA in Management and an MBA with a concentration in energy finance. App., p. 6 ¶ 6. Before starting with Shell, he amasses more than a decade of relevant experience in energy trading and energy retail sales. *Id.* & Dedmon Dec. Exh. 1 at App., pp. 25-27.

On August 19, 2014, Dedmon starts work with Shell. App., p. 6 ¶ 4; *see also* App., p. 6 ¶ 5. On October 22, 2024 — a little over a decade later — he resigns. App., p. 6 ¶ 4.

**B.      Shell — pre-hire including false representations to Dedmon**

A Shell employee tells Dedmon about a sales representative job opening, and Dedmon applies. App., p. 6 ¶ 7. Shell interviews Dedmon on February 18, 2014. *Id.* at p. 6 ¶ 8 & Dedmon Dec. Exh. 2 at App., pp. 28-30. The next month, the Shell employee who told him about the opening says Dedmon went from 1st to 2nd and that Shell extended an offer:

**Robert Dedmon** <r.dedmon@gmail.com>                                                                                                  Thu, Mar 13, 2014 at 9:33 PM
To: "<Carl.A.Williams@shell.com>" <Carl.A.Williams@shell.com>

Although this one is going to sting I'm a firm believer that everything happens for a reason.  Hopefully I will get an official response from HR and maybe a reason as to why they went in a different direction.  A package deal doesn't sound too bad.  On the bright side we closed on our home today and will be busy all weekend moving in.  Lets keep in touch and if you have time in the next two weeks knock out a happy hour.

Have a great weekend and thanks for taking me under your wing.

On Thu, Mar 13, 2014 at 2:24 PM, <Carl.A.Williams@shell.com> wrote:

Robert, apologies for not getting back brotha. Not sure how/why you went from 1st to 2nd – I think it's stupid, but my opinion aside, that's how its playing out. They've extended an offer – cant guess what'll happen next. Let's keep talking bud…..who knows, we'll probably do a pkg deal somewhere else ☺

Stay up my man – nothing is ever given to us, even when we've earned it. We'll talk !

Carl

App., pp. 6-7 ¶ 9.

At the time, Dedmon does not who received the offer or anything about the person who received the offer. App., p. 7 ¶ 9. He still does not know who received the offer. *Id.* He does not learn anything about the person who received the offer until more than 6 years later. *Id.*

The next month, Shell recruiter Tyler Allie tells Dedmon there are some internal changes being made to the group and they haven't locked down the pay grade for the position. App., p. 7 ¶ 10. He says Dedmon is the likely candidate but no final decision has been made:



**Robert Dedmon** <r.dedmon@gmail.com>                                                    Wed, Apr 23, 2014 at 12:04 PM
To: "<Carl.A.Williams@shell.com>" <carl.a.williams@shell.com>

In short ( I finally got Tyler on the phone):  There are some internal changes being made to the group and they haven't locked down the pay grade for the position.  He informed me that I'm the likely candidate but no final decision has been made.

In other news, we are about 2 weeks out from finishing up the pool at our home.  My oldest does a walk through everyday after school to check the progress.  She noted that they didn't do anything different on Sunday and I had to remind her that they crew was off work for Easter. Future Project Manager?  HAHA

Have a great week.

—
Robert Dedmon

*Id.* & Dedmon Dec. Exh. 3 at App., pp. 31-32; *see also id.* at pp. 7-8 ¶ 11 (person who told Dedmon about opening is getting only cryptic responses to his queries).

On June 19, 2014, Shell asks Dedmon about meeting with the team on June 30th for the sales representative position. App., p. 8 ¶ 12. Dedmon asks if he is reapplying and interviewing again:



*Id.*

Shell says yes, as it has reposted the position after an internal evaluation with revised requirements:



App., p. 9 ¶ 13 & Dedmon Dec. Exh. 4 at App., pp. 33-43.

Shell invites Dedmon to apply. App., p. 9 ¶ 14 & Dedmon Dec. Exh. 5 at App., pp. 45-46. It interviews Dedmon again on June 30, 2014. App., p. 9 ¶ 14 & Dedmon Dec. Exh. 6 at App., pp. 47-49.

Shell offers Dedmon the sales representative position, and Dedmon orally accepts:



App., pp. 9-10 ¶ 16 & Dedmon Dec. Exh. 7 at App., pp. 50-51. It sends a written offer letter, and Dedmon lets Shell know he notices the offer letter pay grade says it is a 6 but he was told it was a 3. App., p. 10 ¶ 17 & Dedmon Dec. Exh. 8 at App., pp. 52-54. The "3" is a mistake and should have said "5." App., p. 10 ¶ 17. Shell does not respond about the pay grade. *Id.* at ¶ 18. Dedmon signs the offer letter. *Id.* & Dedmon Dec. Exh. 9 at App., pp. 55-59.

Shell recruiter Tyler Allie informs Dedmon that he will receive a "regret" for the 4089BR sales representative position and that this has nothing to do with anything:



App., p. 10 ¶ 19 & Dedmon Dec. Exh. 10 at App., pp. 60-61.

The code 4089BR is on the sales representative interview confirmation from February 2014. App., p. 10 ¶ 20. A different code, 8401BR, is on the sales representative application invitation from June 2014 where he was to reapply and interview again. *Id*. Again, Shell had (1) informed Dedmon in April 2014 that there were some internal changes made to the group and they had not locked down the pay grade for the position and (2) informed Dedmon in June 2014 "we have reposted the position after the internal evaluation with the revised requirements." *Id*.

Dedmon starts August 19, 2014. App., p. 11 ¶¶ 21-22 & Dedmon Dec. Exh. 11 at App., pp. 62-63.

**B.      Reliance on false representations**

Dedmon trusts and believes what Shell told him about the job: (1) that there were some internal changes made to the group and they had not locked down the pay grade for the position and then (2) "we have reposted the position after the internal evaluation with the revised requirements." App., p. 11 ¶ 23. He thinks this was a formality due to some type of internal reorganization or reshuffle in the group. *Id*. He had no clue that the position had been downgraded based on race. *Id*. He had no clue that Shell had earlier offered the position to a white female at a better job grade. *Id*. He had no reason to believe that what happened was anything like a demotion or pay cut, much less due to race. *Id*.

Had Dedmon known the truth — that Shell downgraded the job based on race —, he would have promptly taken action to pursue his legal rights. App., p. 11 ¶ 24. An important reason he decided to stand up to Shell and pursue his legal rights is for his daughters. *Id*. at ¶ 25. And the same would have been true in 2014 even with his daughters' young age at the time and even with the race-based downgrading happening during the hire process. *Id*.

That strong desire stems from a childhood incident. *Id*. at ¶ 26. A neighborhood kid who is white comes up to him saying things like *stupid niggers* and tries to push a bike down to get to him. *Id*. at ¶¶ 26-27. Handlebars slice a finger and he bleeds. *Id*. at ¶ 27. The kid runs to his house yelling to his dad that Dedmon is trying to fight him, which is a lie. *Id*.

Dedmon tells his dad, and his dad does nothing other than comfort him. App., p. 12 ¶ 28. At the time, Dedmon does not understand and feels angry and deeply hurt. *Id*. Dedmon now knows his dad felt helpless and defenseless. *Id*. His dad had to think through what might happen if he went to the neighbor's house. *Id*. As a black man in a mostly white neighborhood, his dad could get arrested or shot without wrongdoing. *Id*. Or retaliation might cause harm or loss of life. *Id*.  So, his dad considered those risks and could not risk something that might cause him to lose a father, a mother, a sister, or his own life. *Id*.

So, Dedmon wants to be that voice for his daughters. App., p. 12 ¶ 29. The voice his dad could not be for him. *Id*. He never wants his daughters to feel like there is not someone there to defend them. *Id*. Most of all, he wants his daughters to have the confidence to stand up for themselves and others, without guilt, when someone is wronged but has done nothing wrong. *Id*. Pursuing this case is part of all of the above for his daughters. *Id*. And this helps explain why Dedmon is so confident that, had he known the truth about the discrimination earlier, he would have promptly pursued his legal rights rather than letting it go, turning the other cheek, or just moving on. *Id*.

## C.    Revelation of the truth — summer 2020

Summer 2020 is the first summer of the pandemic and the summer of George Floyd. App., p. 12 ¶ 30. In the wake of George Floyd's murder and Shell forums to discuss race relations and what happened, Sri Rangan — a Shell manager — contacts Dedmon. *Id*. at pp. 12-13 ¶¶ 30-32. Sri tells Dedmon start to finish about how Shell human resources

downgraded his starting job grade because of his race. *Id*. at 13 ¶¶ 33-37. She tells Dedmon that what Shell told him was not the truth. *Id*. at 13 ¶ 33.

That conversation takes place sometime between May 26, 2020 — the day after George Floyd dies — and June 7, 2020 — the date of this text:



App., p. 14 ¶ 38.

Shell never tells Dedmon it made any effort to correct the pay disparity. App., p. 14 ¶ 39. He is not aware of any effort to correct the pay disparity. *Id*. He does not learn his JG6 position was first offered to a white female at JG5 until sometime during the lawsuit. *Id*. at ¶ 40.

## D.      Prompt action after learning the truth

After learning of the race-based job downgrade, Dedmon searches for legal representation and files a Charge of Discrimination with the EEOC on October 16, 2020. App., pp. 14-15 ¶ 41 & Dedmon Dec. Exh. 12 at App., pp. 64-67 (charge).

## E.      Shell confirmation of discriminatory pay policy

A former Shell manager involved in the hiring process for Dedmon — Sri Rangan — confirms the discriminatory pay policy of downgrading job grades because of race. *See generally* App., pp. 79-85 ¶¶ 1-21 (note that signature is in an email following signature page). Sri emails about it:

For this role we had  made an offer to one external experienced candidate, and were unable to come to agreement due to their salary requirements.  We asked HR last week to make an offer to another experienced candidate.  The idea of changing the Job grade in the middle of the process is unreasonable.
**Anything you can do to support my efforts to keep this role as a JG5 would be greatly appreciated.**

App., p. 162 (ShellDedmon 706).

Sri Rangan is friends with Shell HR Manager Teri Olmen and speaks face-to-face with Olmen about why the job grade suddenly lowered. We ultimately accepted a compromise, and I asked the Sales Manager to offer the role to Robert Dedmon at JG6. I requested to Shell Human Resources that Robert Dedmon be paid at the higher end of the salary grade and expressed my concern again about different treatment of a POC.Olmen says, historically, people like this do not do well at Shell, and so we are giving him a lower job grade. *Id*. at p. 82 ¶ 11. Sri asks what *people like this* means. *Id*. Olmen says minorities. *Id*. Sri understands Olmen is saying the job grade needs to be

lowered to JG6 because Dedmon is African American. *Id*. In a later conversation, Olmen again stays "firm and [does] not change her stance on her original comments around minorities and success at Shell and so lowering the job grade because candidate [] Dedmon was African American." *Id*.

Yet, there is absolutely no difference in the tasks required:



**From:** Rangan, Sri SENA-STE/34
**Sent:** Monday, March 31, 2014 8:14 AM
**To:** Bowman, Beth A SENA-STE/3
**Cc:** Rozelle, Megan B SENA-HRUA/AUSS; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** FW: Open Power Sales position

Beth
GM!  Please read below.  Is this something you support and approved?  We posted two jobs as JG 5, filled one and this is the second one.   There is absolutely no difference in the tasks required of the two roles – They are both for the South Power ANT and require skills to market and sell in the ERCOT market  - one where we are trying to grow.

   1)  I have concerns around our ability to fill this role as a JG 6, based on the skillset/experience we require in the market
   2)  Why would we post two roles that require the same exact tasks in different JG?  What happens if we hire a female or POC candidate in this role vs. Patrick Frnka that we hired in the 1st open JG 5 role?  Would we inadvertently be creating differences in JG & compensation that now becomes gender & other criteria specific for doing the same job?  For example the person we want to make an offer to now is African American male.

Again, I am expressing strong discomfort in suddenly lowering the JG after we have identified the candidate, who we know from our interview process is POC.  Please advise if you are willing to move forward to lowering the JG at this point.

Thanks

Sri

App., p. 162 (ShellDedmon 706); *see also id*. for additional emails.

In light of the lowered job grade, Sri Rangan requests that Dedmon be paid at the higher end of the salary range. App., p. 83 ¶ 17; *see also* App., p. 169 (ShellDedmon 716). She again expresses concern:

> I again want to document my discomfort in offering a job to a POC candidate at a lower JG when we have just offered the same exact role (same region/product) to a non POC candidate at a higher JG just a month ago. It has been frustrating for me that we allow a strict adherence to broad processes to cloud our judgment calls on how we apply our business principles around people. I apologize if my frustration has been visible and generated any discomfort or ill-will. I do not apologize for my frustration and will continue to express them every time I experience this disconnect. **However, with Beth's guidance and above considerations, I request we proceed.**

App., p. 169 (ShellDedmon 716).

Knowing Dedmon is black, Shell HR starts questioning his qualifications for the job at all, even though his qualifications were *already checked and approved*:



**From:** Bowman, Beth A SENA-STE/3
**Sent:** Thursday, April 24, 2014 9:29 AM
**To:** Olmen, Teri M SENA-HRUA/AUSS; Sutton, Robyn L SENA-HRD/S
**Subject:** FW: Power Sales Representative

You both had said this candidate does not have sales experience. Jennifer and Sri believe this candidate is well qualified with that experience.

Should we discuss this further?

**From:** Sutton, Robyn L SENA-HRD/S
**Sent:** Thursday, April 24, 2014 9:38 AM
**To:** Bowman, Beth A SENA-STE/3; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** RE: Power Sales Representative

Please show me this demonstrated from his resume and from the interview notes.   By the way, again the only position we have available for Inside Sales is JG 6.

**Robyn L. Sutton**
Trading & Supply HR Manager - Shell Energy Trading, Excellence & US HR Trading & Supply Operations
1000 Main Street, Houston, TX 77010, USA

App., pp. 171, 173-74. The hiring team expresses frustration. App., pp. 178, 176, 180-81 (ShellDedmon 725, 732, 736-736).

| | |
|---|---|
| **From:** | Hartnett, Jennifer R SENA-STE/34 [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+HA0P] |
| **Sent:** | 4/24/2014 9:48:36 AM |
| **To:** | Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **Subject:** | FW: Power Sales Representative |

OMG

App., p. 178 (ShellDedmon 725).

Teri

GM!  For our awareness, could you articulate the process?  I thought we have been through all this and arrived at the candidate and then worked through the JG.  Are we going back to candidate assessment again? What is the "determination" you refer to below?  Please advise as it is confusing to follow along the plot line anymore ☺.  What would be the approximate timeline for us to work through this – days, weeks etc?

Thanks

Sri

App., p. 176 (ShellDedmon 732).

Shell HR starts to question whether any offer will be made to the black candidate at all.

App., p. 183 (ShellDedmon 738). Sri Rangan responds, highlights Dedmon's "extensive"

knowledge and experience, and points out disparate treatment:

> Also want to point out that over the past few years (up until last month) we have hired a few people without direct sales experience—Jimmy promubol, Jesse Park, recently Patrick Frnka, JD Steele—all from Operations. Michael Tickle came from Credit team. Essentially, the primary skill set we are lookng for is (ERCOT) market expertise, capability to learn and engagement style.

App., p. 185 (ShellDedmon 751); *see also* App., p. 160, p. 83 ¶ 16.

Sri testifies that the downgrade impacts salary, bonuses, and career trajectory. App., pp. 80-81 ¶ 5. She also reports the discrimination to Shell EO at the time. *Id*. at pp. 83-84 ¶¶ 19-20.

## F.   Shell inside sales team — team, supervisor, job, geographical market

Dedmon works on a team, all of whom are inside salespeople reporting to the same supervisor. App., p. 15, ¶¶ 42-43. With the exception of Susan Smith, they all work from a Houston, Texas base operation. *Id*. at ¶ 43. The team covers a geographical area known as *East*, even though that includes most of the Texas geographical area. *Id*. at ¶ 44.

The team sells power and gas to energy retailers, who in turn sell to consumers like individual Texas residents and companies like Texas Instruments. *Id*. at ¶ 44; *see also id*. at ¶¶ 45-47.

## G.   Shell inside sales team — same basic job, and a word about titles

Each inside sales team job shares the same basic duties. App., p. 16, ¶ 48. The overall process is the same to sell energy to an energy retailer, no matter the customer. *Id*. The inside salespeople change titles over time and are called things like mid marketer, originator, inside sales, power sales, sale representative, etc. App., p. 16, ¶ 49. The name changes do not reflect job duty changes. *Id*.

On this team, there is no "step up" in job duties other than to be the supervisor of the team. *Id*. Team members including Dedmon cover for each other when someone is out of

the office. *Id*.; see also id. at ¶ 50 & Dedmon Dec. Exh. 13 at App., pp. 68-75. Sri Rangan also confirms the jobs are basically the same. App., p. 81 ¶ 7.

## H.   Inside sales team — accounts, work with traders

Dedmon's accounts are comparatively more difficult than other accounts on the team. App., p. 17 ¶¶ 51-53. He is the only person who joins the team with established customer relationships. *Id*. Despite difficulty of accounts, he produces millions in gross margin for Shell. *Id*. at ¶ 53. For example, his sales produce more than $16 million in gross margin in 2021 and more than $38 million in gross margin in 2022. *Id*.

The team works closely with the Shell energy trading teams. App., p. 17 ¶ 54. The overall group — inside sales and energy trading — is sometimes called Shell Trading. *Id*. The inside salespeople interact daily with energy traders, other than off-work days. *Id*.

## I.   Inside sales team — demographics, basic background

During 10+ years at Shell, Dedmon is the only black person on the inside sales team, except Raif Rucker, who does not last long. App., p. 18 ¶ 55. During 10+ years at Shell, the team never has a supervisor who is black. *Id*. During 10+ years at Shell, Dedmon only recalls one black energy trader and one Hispanic energy trader. *Id*.

The people listed below are listed in order of who joined the inside sales team earliest. App., p. 18 ¶¶ 56-57.

1 Michael Tickle
White — no experience in inside sales when he joins team, comes from credit group, becomes team supervisor
still team supervisor as of October 22, 2024

2 Susan Smith
White — no experience in inside sales when she joins team
still on team as of October 22, 2024

3 Patrick Frnka
White — no experience in inside sales when he joins team, comes from credit group
still on team as of October 22, 2024

4 Robert Dedmon
Black — prior experience in inside sales before joining team
resigns October 22, 2024

5 Mike Deley
White — no experience in inside sales when he joins team, joins team as part of grad-
uate rotation program out of college and stays with team
still on team as of October 22, 2024

6 Doug Hund
White — has some sales experience but with different group before joining team
still on team as of October 22, 2024

7 Ryan Kolkmann
White— has relevant experience as energy trader before joining team
no longer on team as of October 22, 2024

8 Logan Luzzi
White — no experience in inside sales when he joins team, comes with experience as
commercial operator then analyst
no longer on team as of October 22, 2024

9 Ken Ueng
Asian — prior experience in inside sales before joining team
still on team as of October 22, 2024

10 Jim Barker
White — not sure about prior experience other than not at my level of experience on
joining team
still on team as of October 22, 2024

11 Thomas Jones
White — no experience in inside sales when he joins team, part of graduate rotation
program out of college and stays on team
still on team as of October 22, 2024

App., pp. 18-19.

## J.    Inside sales team — pay, job grades

Shell pay decisions are largely a black box. App., p. 19 ¶ 58; *see also* App., pp. 87-90.

Shell employees do not have a lense into other team members' salary or bonus. App., p. 19

¶ 58. They do not have a window into other team members' assigned job grade, with limited exceptions. *Id*. Pay decisions are made annually. *Id*. at p. 20 ¶ 60.

### K. Decade of pay disparity based on race, and non-pay terms and conditions of employment

Dedmon earns less than his white counterparts in each years. Here is a comparison by year:

| Employee | Race | 2015 |
|---|---|---|
| Robert Dedmon | **black** | $ 118,599.52 |
| Patrick Frnka | white | $ 144,985.93 |
| Ryan Kolkmann | white | $ 366,360.69 |
| Susan Smith | white | $ 146,566.61 |

| Employee | Race | 2016 |
|---|---|---|
| Robert Dedmon | **black** | $ 131,528.40 |
| Patrick Frnka | white | $ 137,441.67 |
| Ryan Kolkmann | white | $ 249,416.43 |
| Susan Smith | white | $ 145,183.28 |

| Employee | Race | 2017 |
|---|---|---|
| Robert Dedmon | **black** | $ 131,170.39 |
| Patrick Frnka | white | $ 153,704.99 |
| Ryan Kolkmann | white | $ 195,849.57 |
| Susan Smith | white | $ 158,077.76 |

| Employee | Race | 2018 |
|---|---|---|
| Robert Dedmon | **black** | $ 132,271.97 |
| Patrick Frnka | white | $ 155,991.04 |
| Ryan Kolkmann | white | $ 240,034.11 |
| Susan Smith | white | $ 159,066.82 |

| Employee | Race | 2019 |
|---|---|---|
| Robert Dedmon | **black** | $ 152,262.71 |
| Michael Deley | white | $ 156,877.78 |
| Patrick Frnka | white | $ 240,994.60 |
| Ryan Kolkmann | white | $ 193,044.44 |
| Susan Smith | white | $ 249,428.60 |

| Employee | Race | 2020 |
|---|---|---|
| Robert Dedmon | **black** | $ 164,880.42 |
| Michael Deley | white | $ 147,227.97 |
| Patrick Frnka | white | $ 244,157.12 |
| Ryan Kolkmann | white | $ 186,100.31 |
| Susan Smith | white | $ 247,348.41 |

| Employee | Race | 2021 |
|---|---|---|
| Robert Dedmon | **black** | $ 159,805.57 |
| Michael Deley | white | $ 169,123.72 |
| Patrick Frnka | white | $ 218,907.36 |
| Susan Smith | white | $ 233,958.94 |

| Employee | Race | 2022 |
|---|---|---|
| Robert Dedmon | **black** | $ 169,767.95 |
| Michael Deley | white | $ 197,054.50 |
| Patrick Frnka | white | $ 221,247.53 |
| Susan Smith | white | $ 230,545.94 |

| Employee | Race | 2023 |
|----------|------|------|
| Robert Dedmon | **black** | $ 212,765.87 |
| Michael Deley | white | $ 345,501.16 |
| Patrick Frnka | white | $ 309,118.87 |
| Susan Smith | white | $ 268,237.14 |
| Jim Barker | white | $ 197,233.34 |

| Employee | Race | 2024 |
|----------|------|------|
| Robert Dedmon | **black** | $ 131,528.86 |
| Michael Deley | white | $ 294,088.66 |
| Patrick Frnka | white | $ 229,851.16 |
| Susan Smith | white | $ 187,753.33 |
| Jim Barker | white | $ 189,148.49 |

*See* App., pp. 93-97. These people are all members of same team:



Witnesses corroborate the discrimination involved in the disparities — detailing specific facts to support that conclusion. *See* App., pp. 87-92 ¶¶ 1-24; p. 20 ¶ 59; p. 24 ¶¶ 78-80. Dedmon also suffers harm, such as panic attacks, the independently alter the terms and conditions of his employment. *See* App., p. 23 ¶¶ 72-77.

## I.      Shell 2021: Mike Deley taking JG4

Job grades are important to overall career and pay. *See* App., p. 20 ¶ 61. But on the inside sales team, a better job grade is a paper promotion, even though a better job grade may sometimes be called a promotion. *Id*. Because it does not change the team member's job duties. *Id*.

Again, Michael Tickle supervises the inside sales team. *See* App., p. 20 ¶ 62. Dedmon regularly addresses with Michael desire to move to JG4, be included in a bigger bonus pool, and earn a higher salary. *Id*. He repeatedly asks what he needs to do to get a JG4. *Id*. Michael repeatedly tells him he just needs a JG4 to open up. *Id*.

Early September 2021, Michael Tickle informs the team that Ryan Kolkmann is leaving the team to accept a new role in Oklahoma. *See* App., p. 21 ¶¶ 63-64. He tells the team that we are going to be down a person on the team. *Id*. We discuss how to divide up the accounts and workload that Ryan will leave behind, but just until we find someone to replace Ryan. *Id*. It is crystal clear that the plan is to fill the empty spot on the team — meaning, fill Ryan Kolkmann's role on the inside sales team. *Id*.

On September 14, 2021, Michael Tickle emails the team on the subject *Potential Addition*. *See* App., p. 21 ¶ 65. He asks the team to let him know if they are aware of anyone who might be a good fit for our team:



*Id.* & Dedmon Dec. Exh. 14; *see also* ¶¶ 66-67.

At some point that fall 2021 in communicating to the team, Michael Tickle congratulates Mike Deley on being selected to fill Ryan Kolkmann's role. *See* App., p. 22 ¶ 67. But what really happens is this: Mike Deley takes on a better job grade at JG4 but does not actually take on the job. *Id.* In other words, Deley does *not* fill Ryan's role or job duties. *Id.* Instead, the entire inside sales team has to do extra work to cover the job duties Ryan handled before he left. *Id.* Deley takes the job grade increase and keeps on doing what he was already doing.  Id. at ¶ 67; *see also* ¶ 68-70.

## DEFENSE MISSTATEMENT OF FACTS

**A.    Regarding the 2014 initial positions, Shell states:**

❌ Robert "initially believed that the JG5 position was offered to a white female." Motion Doc 33, pg. 3 at ¶ 2.

❌ Robert believed "the original offer at the higher job grade was first made to a 'white female.'" *Id.*, pg. 19 at ¶ 2.

❌ "On this record, there is no question that Dedmon was completely aware of the fact that he was being offered and accepted the position at a lower job grade, which was different than what he believed had been offered to another candidate of a different race." *Id.*, pg. 19 at ¶ 2.

Shell knows Dedmon testified to learning the prior 2014 candidate's race *only after* his conversation with Sri Rangan in 2020, and definitively *after* documents were produced in this lawsuit years later:

16   Q. Okay.  And what information do you have that
17   indicated to you that Shell offered the position to
18   someone who was not a black male?
19     A. I believe that was a discussion Sri and I had.
20   Q. Okay.  Sri told you that it was someone who was
21   not a black male?
22     A. I believe that was the discussion that Sri and I
23   had.
24   Q. Okay.  You did not -- do you have any firsthand
25   knowledge that the job was offered to someone who was
1   not a black male?
2     A. Now we have concrete knowledge that it was,
3   but --
4   Q. That it was what?
5     A. It was offered to I believe a white female, that
6   declined it.
7   Q. Where -- where do you get that information?
8     A. From the documents that was provided -- that were
9   provided to us by Shell.[2]

STATEMENT OF ISSUES

**Issue.** The issue before the Court is whether to deny summary judgment and permit Robert Dedmon to have his day in Court before a jury of his peers—so they can decide whether the named defendants have violated his civil rights to be free of race discrimination as a motivating factor in paying him for the work he performs.

---

[2] Robert Dedmon deposition 232:16-233:9.

### STANDARD OF REVIEW

On summary judgment:[3]

1.  the "evidence of the nonmovant is to be believed," *Tolan v. Cotton*, 572 U.S. 650, 651 (2014);

2.  courts "must draw all reasonable inferences in favor of" the nonmovant, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000);

3.  courts "must disregard all evidence favorable to the [movant] that the jury is not required to believe," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000);

4.  courts must not make credibility determinations, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000);

5.  courts must not weigh the evidence, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

It is error to disregard important evidence favorable to the nonmovant.[4] And courts may only give credence to evidence favoring the movant if that evidence is (1) "uncontradicted

---

[3] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("the standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same.").

[4] *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 152 (2000) ("… [T]he Court of Appeals misapplied the standard of review dictated by Rule 50. Again, the court disregarded critical evidence favorable to petitioner …."); *id.* at 150 (noting that the "standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law [under Rule 50], such that 'the inquiry under each is the same.'"); *see also Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) ("In articulating the factual context of the case, the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.' … For that reason, we vacate its decision ….").

and unimpeached" *and* (2) "comes from disinterested witnesses [or, presumably, the op-posing party]."[5]

---

[5] *Laxton v. Gap Inc.*, 333 F.3d 572, 577 (5th Cir. 2003) ("The court gives credence to evi-dence supporting the moving party that is uncontradicted and unimpeached if that evi-dence comes from disinterested witnesses."); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("... [T]he court should give credence to the evidence favor-ing the nonmovant as well as that 'evidence supporting the moving party that is uncontra-dicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'").

### ARGUMENT AND AUTHORITIES

**A.   A reasonable juror could find Robert Dedmon's claims are timely.**

**1.   Equitable estoppel [Title VII and Section 1981]: A reasonable jury could find that defendants misrepresented to Robert Dedmon, or concealed, the real reason for lower pay [discrimination]—and if they do, equitable estoppel *must* apply.**

> [T]he statute does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.
>
> — *Reeb v. Economic Opportunity Atlanta, Inc.*,
> 516 F.2d 924, 930 (5th Cir. 1975)

An employer may neither conceal nor misrepresent facts necessary to support a claim of discrimination then use limitations as a defense.[1]  The Fifth Circuit has repeatedly reversed trial courts misapplying this doctrine in discrimination cases. In *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 925-26 (5th Cir. 1975), it reversed a limitations dismissal when an employer fired a woman—telling her the reason was inadequate funds, and she later learned she was replaced by a man. In *Coke v. General Adjustment Bureau, Inc.*, 640 F.2d 584, 595 (5th Cir. 1981) (en banc) it reversed a limitations summary judgment when an employer repeatedly told a demoted older employee he would be reinstated but did not do so. In *Tucker v. United Parcel Service*, 657 F.2d 724, 725 (5th Cir. 1981), it reversed a limitations dismissal where an employer said no seasonal employees would be recalled then recalled white ones. In *Rhodes v. Guiberson Oil Tools Div.*, 927 F.2d 876, 880 (5th Cir. 1991), it

---

[1]  *See Glus v. Brooklyn Eastern District Terminal,* 359 U.S. 231, 232-33 (1959) (Black, J.) (applying maxim that "no man may take advantage of his own wrong" to limitations ).

reversed dismissal and ruled estoppel was *required* when an employer fired an older employee and told him it was a reduction in force, but he later learned he was replaced.

In *Reeb*, *Tucker*, *Coke*, and *Rhodes*, the employee was aware of the act but the employer masked the real reason for the act [discrimination]—via misrepresentation or concealment: The employees in *Reeb* and *Rhodes* knew they were fired, in *Tucker* they knew they were not recalled, and in *Coke*, the employee knew he was demoted. While the employees' lack of direct knowledge of the employer's subjective discriminatory purpose did not warrant estoppel, the employer masking awareness that the treatment was discriminatory did.[2]  Here, just like in *Reeb* and *Rhodes*, a reasonable factfinder could conclude that the employer communicated to the employee a reason that was not the real reason for acting—inducing inaction. If so, defense is estopped from using limitations to any claims here.

### a.    An employer's representation or concealment can be unintentional— completely innocent—and still estop an employer from using limitations.

Equitable estoppel does not hinge on intentional misconduct on the defendant's part. Rather, the issue is whether the defendant's conduct, innocent or not, reasonably induced the plaintiff not to file suit within the limitations period.

> — *Tyler v. Union Oil Co. of California*,
> 304 F.3d 379, 391 (5th Cir. 2002)
> (affirming estoppel in discrimination case)

---

[2]  *See Boudreau v. Nokia of Am. Corp.*, No. 3:19-CV-01623 (N.D. Tex. Dec 18, 2020), ECF No. 43, at pp. 9, PageID 603 (limitations tolled until time of filing charge where employer "reasonably misled her about the facts supporting her claim.").

The representation or concealment can be innocent—design to cause delay, maliciousness, etc., is immaterial.[3]  Reasonableness and apparency are at the core of these cases. I.e., whether discrimination would be apparent to a reasonably prudent person or whether an employer's acts made it unapparent at the time: Classic jury questions.

### b.  Equitable estoppel is a question of fact and law—the facts are for a jury and application is post-verdict because issues are intertwined.

The equitable estoppel inquiry involves questions of fact and law. Questions such as whether the employer misled the employee are questions of fact.... The district court correctly concluded that the evidence was sufficient to support *the jury's finding* that [employer]'s conduct induced [employees] from timely filing their claims.

— *Tyler v. Union Oil Co. of California*,
304 F.3d 379, 391 (5th Cir. 2002)

In *Coke*, the *en banc* Fifth Circuit notes the importance of deciding estoppel post-verdict—after an employee has the benefit of developing facts at trial.[4]  For good reason: Proof of concealment or misrepresentation includes the ultimate fact issue of discrimination: If a reason communicated to an employee for an act [e.g., firing, demotion, pay, etc.] was not

---

[3]  *See Bomba v. W. L. Belvidere, Inc.*, 579 F.2d 1067, 1071 (7th Cir. 1978) (does not have to be designed to mislead or delay).

[4]  *Coke*, 640 F.2d at 595 (discussing case posture and lack of opportunity to develop facts at trial).

the real reason [i.e., discrimination was], an employee might reasonably refrain from filing.[5]

The factual issues on which equitable estoppel relies are ultimate ones for a jury to decide.[6]

### c. The Fifth Circuit requires estoppel when the reason given an employee seems credible, but a jury finds discrimination and diligence in learning of it.

Under equitable estoppel, an employer is estopped from asserting the filing period if the employer misrepresented or concealed 'facts necessary to support a discrimination charge.'

— *Rhodes v. Guiberson Oil Tools Div.*,
927 F.2d 876, 878-79 (5th Cir. 1991)

In *Rhodes*, the Fifth Circuit ruled that estoppel *should* apply: It reversed a trial court for not applying it.[7]  The employee had reason to believe the employer's explanation [reduction in force]. The employee knew he was in a protected class [age] and suffered an adverse act [firing]. That was insufficient to put him on notice of discrimination. And there was no showing of lack of diligence.[8]  So estoppel was not just available, it was *required* as a matter

---

[5]  *See Rhodes*, 927 F.2d at 882 (employer concealed fact it was going to replace employee).

[6]  *See, e.g., Ott v. Midland-Ross Corp.*, 600 F.2d 24, 34 (6th Cir. 1979) (saying issue uniquely suited to jury); *Scarborough v. Atlantic Coast Line R. Co.*, 202 F.2d 84, 86 (4th Cir. 1953) ("This issue should be squarely left to the jury...."); *see also Melendez-Arroyo v. Cutler-Hammer de P.R. Co.*, 273 F.3d 30, 38 (1st Cir. 2001) (concealment regarding limitations issues are "archetypal factual issues fit for jury resolution" and "intertwined with merits issues of 'what happened here.'"); *see also Tyler*, 304 F.3d at 385, 391 (5th Cir. 2002) (issue submitted to jury).

[7]  *See Rhodes*, 927 F.2d at 881 ("We hold that equitable estoppel should apply.").

[8]  *See id.* at 882 ("There is no showing of lack of diligence").

of law: Otherwise, an employer benefits from misrepresenting to employees [or concealing] reasons for its act.[9]

### d.    A reasonable juror could find concealment or misrepresentation.

Here, a reasonable juror could find: First, that defendants *know* in 2014 they are setting Robert Dedmon's pay offer—changing the salary range of the position itself—because of his race. (SOF). Second, that defendants *conceal* discrimination from Robert Dedmon—a cover-up. (SOF). Third, that defendants *lied* to Robert Dedmon about the reason for setting his starting pay. (SOF).

### e.    A reasonable juror could find Robert Dedmon subjectively lacked awareness of *race discrimination* at the time—and his lack was objectively reasonable because of what Shell was telling him.

What a person believed, when, and whether it was reasonable are classic jury questions. Here, a reasonable juror could find Robert Dedmon had no more reason to suspect discrimination at the time than the employees in *Reeb*, *Coke*, *Tucker*, or *Rhodes*. A reasonable jury could believe him when he says he was unaware—and that his belief was reasonable. And that defense is wrong when they say he knew *at the time* that a white female had been offered

---

[9]   *See Rhodes*, 927 F.2d at 882 ("[Employer] cannot properly assert the bar of the statutory filing period when it clearly misled [employee]. The company is estopped from claiming that the limitations period began to run until [employee] discovered the misrepresentations, ....").

the same spot at a better job grade. *See* Motion Doc. 33 at p. 13. He denies it. It is a disputed issue of material fact.

**2.    [Title VII]: Under the Lilly Ledbetter Fair Pay Restoration Act ("FPA"), a reasonable juror could find Robert Dedmon's pay discrimination claim is timely.**

> [A]n unlawful employment practice occurs ... when an individual is affected by application of a discriminatory compensation decision or other practice, including *each time wages, benefits, or other compensation is paid*, resulting in whole or in part from such a decision or other practice.

> — 42 U.S.C. § 2000e–5(e)(3)(A)

The FPA resets the limitations period with each paycheck related to past compensation discrimination. For this reason, in *Niwayama v. Tex. Tech Univ.*, No. 13-11225 (5th Cir. Nov 10, 2014), the Fifth Circuit reversed a limitations summary judgment: a female employee alleged a male colleague—hired during the same year and at the same salary—received increasingly higher compensation than her during each successive year of employment. Likewise, in *Kellogg v. Ball State Univ.*, 984 F.3d 525, 529 (7th Cir. 2021), the Seventh Circuit reversed summary judgment after concluding that pay disparity resulting from a discriminatorily depressed starting salary about *a decade* earlier is "precisely the kind of decision covered by the Ledbetter Act." Here, there is evidence from which a reasonable juror could discrimination affected Robert Dedmon's pay throughout his career. (SOF).

**3.    [Section 1981]: Under the Supreme Court's *Bazemore* rule, a reasonable juror could find a facially discriminatory pay structure being implemented with each check—each marking a new violation within the limitations period.**

[Under *Bazemore* v. *Friday*, 478 U.S. 385 (1986)] when an employer adopts a facially discriminatory pay structure that puts some employees on a lower scale because of race, *the employer engages in intentional discrimination whenever it issues a check to one of these disfavored employees.* An employer that adopts and intentionally retains such a pay structure can surely be regarded as intending to discriminate on the basis of race as long as the structure is used.... *Bazemore* stands for the proposition that an employer violates Title VII and triggers a new EEOC charging period *whenever the employer issues paychecks using a discriminatory pay structure.*

— *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*,
550 U.S. 618, 634, 637 (2007)

Though *Ledbetter* did not survive the FPA, this *Bazemore* rule survived both: For limitations, a facially discriminatory pay structure discriminates every time it is applied—with each check.[10]  This *Bazemore* rule, sometimes called the paycheck accrual rule, is an outgrowth of the continuing violation doctrine.[11]  It applies to Section 1981 claims.[12]  *Bazemore* recognizes "periodic implementation of an adverse decision previously made."[13]  So, "a new cause of action for pay discrimination ar[ises] every time a plaintiff receive[s] a

---

[10]  *See Lorance v. At Technologies, Inc.*, 490 U.S. 900, 912 n.5 (1989) (facially discriminatory sytem discriminates "each time it is applied."); *Cmty. House, Inc. v. Boise*, 468 F.3d 1118, 1123 (9th Cir. 2006) (defining facially discriminatory policy).

[11]  *See Groesch v. City of Springfield, Ill.*, 635 F.3d 1020, 1024 (7th Cir. 2011).

[12]  *Cf. Smith v. Trane US, Inc.*, No. 6:11-cv-00036 (S.D. Ga. Oct. 17, 2011), ECF No. 20, at p. 6 (continuing violations theory arose under Title VII but been applied to Section 1981).

[13]  *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 134 (2nd Cir. 2003).

paycheck resulting from an earlier discriminatory compensation practice occurring outside the statute of limitations period."[14]

On *existence*, a reasonable juror could find the Shell Defendants have a facially discriminatory pay structure. (SOF). And that the manner in which critical information was meted out about the JG4 salary upgrade in 2021 is also evidence of such a pay structure.[15]  On *use*, a reasonable juror could also find that paychecks issued to Robert Dedmon within the Section 1981 limitations period used such a pay structure. (SOF). Like with equitable estoppel, the *Bazemore* rule depends on factual findings and there are disputed issues of material fact here.

## B.    A reasonable juror could find race discrimination.

### 1.    There is direct evidence which, if believed, shows race discrimination.

Direct evidence is evidence which, if believed, proves the fact without inference or presumption.

> — *Brown v. E. Miss. Elec. Power Ass'n*,
> 989 F.2d 858, 861 (5th Cir. 1993).

---

[14] *Groesch*, 635 F.3d at 1027.

[15] *See Paugh v. Lockheed Martin Corp.*, No. 21-50472 (5th Cir. Jan. 26, 2023) (reversing summary judgment—genuine issue of material fact on whether critical hiring information was meted out discriminatorily).

"[D]irect evidence includes any statement or document which shows on its face that an improper criterion served as a basis, not necessarily the sole basis, but *a* basis, for the adverse employment action."[16]   Repeatedly, the Fifth Circuit has reversed summary judgment because direct evidence of discrimination was alleged.[17]   Olmen's statemens, if believed, "clearly and explicitly indicates that decision makers [at Shell] used race as a factor in employment decisions, which is by definition direct evidence of discrimination."[18]

## 2.   There is also indirect evidence which, if believed, shows race discrimination.

The burden-shifting approach set of *McDonnell Douglas* is inapplicable where the plaintiff presents direct evidence of discrimination.[19]   But if the evidence presented here were not *direct* evidence, it does not vanish: It can still be indirect.

### a.   A "*prima facie* case" is not a strict formula—an end unto itself—it is just a way of putting the issue in play so a court can assess if a jury is warranted.

The prima facie case method established in *McDonnell Douglas* was never intended to be rigid, mechanized, or ritualistic.

---

[16]   *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 415 (5th Cir. 2003).

[17]   *See Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 220 (5th Cir. 2023); *Etienne v. Spanish Lake Truck & Casino Plaza, L.L.C,* 778 F.3d 473, 476 (5th Cir. 2015); *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 993 (5th Cir. 2005); *Hawkins v. Frank Gillman Pontiac*, 102 F.App'x 394 (5th Cir. 2004); *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 195 (5th Cir. 2001); *Portis v. First Nat'l Bank*, 34 F.3d 325, 329 (5th Cir. 1994).

[18]   *Jones,* 427 F.3d at 993.

[19]   *TWA v. Thurston*, 469 U.S. 111, 121 (1985).

— <em>USPS Bd. of Governors v. Aikens</em>, 460 U.S. 711, 715, (1983)

Though formulas are attractive, from inception a prima facie case is flexible. <em>See McDonnell Douglas Corp. v. Green</em>, 411 U.S. 792, 802 n.13 (1973). Rigid application contravenes the very point of <em>McDonnell Douglas</em>: A prima facie case is just "evidence adequate to create an inference of discrimination.[20]

### b.    There is a <span style="color:blue">prima facie case</span> of pay discrimination.

Less pay than those of a different race for substantially same responsibility suffices.[21] In <em>Lindsley v. TRT Holdings, Inc.</em>, 984 F.3d 460, 467 (5th Cir. 2021), the Fifth Circuit reversed a prima facie case summary judgment because differing pay among employees who held plaintiff's same job sufficed. This kind of evidence exists here too. (SOF).

### c.    There is a <span style="color:blue">prima facie case</span> of pay discrimination in Shell's selection of candidates for job grade raises.

A relaxation of [prima facie elements] is especially appropriate when the hiring process itself, rather than just the decision-making behind the process, is implicated in the discrimination claim or is otherwise suspect.

— <em>E.E.O.C. v. Metal Serv. Co.</em>,<br/>892 F.2d 341, 349 (3rd Cir. 1990)

---

[20]  <em>Teamsters v. United States</em>, 431 U.S. 324, 358 (1977).

[21]  <em>See Pittman v. Hattiesburg Mun. Separate Sch. Dist.</em>, 644 F.2d 1071, 1074 (5th Cir. 1981).

In *Paugh v. Lockheed Martin Corp.*, No. 21-50472, 2023 U.S. App. LEXIS 2061, at *11 (5th Cir. 2023), the Fifth Circuit reversed a rigid prima facie case summary judgment—an employee met her prima facie burden "even though she did not apply for an 'available' position." She was not tipped off (as were her male counterparts) to which job vacancies were real and which were illusory.[22]  Citing sister-circuits, the Fifth Circuit saw it did not matter whether an employee actually applied for the position at the prima facie stage.[23] Here, there is evidence of a system that meets *Paugh*. (SOF).

### d.   No LNDR: Defense neither articulates a "clear and reasonably specific" legitimate non-discriminatory reason nor does so with any *admissible* evidence.

[Employee] was paid less than all three men who preceded her [in her job]. *If there is a good explanation for that disparity, [employer] is required to put one forth if it wishes to prevail in this litigation. [Employer] failed to do so. Yet the district court granted summary judgment to [employer] anyway. That was wrong ....*

— *Lindsley v. TRT Holdings, Inc.,*
984 F.3d 460, 464 (5th Cir. 2021)

---

[22]  *Id.* at *11.

[23]  *Id.* at *11 n.5 (citing *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 349 (3rd Cir. 1990);   *see also Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793, 797 (11th Cir. 1988), *opinion amended on reh'g*, 850 F.2d 1549 (11th Cir. 1988); *Box v. A & P Tea Co.*, 772 F.2d 1372, 1377 (7th Cir. 1985); *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007, 1017 (2nd Cir. 1980).

To overcome a prima facie case, an employer must proffer *admissible* evidence of a legitimate non-discriminatory explanation for its acts.[24]  It must be admissible, clear, and reasonably specific.[25]  Vague and conclusional explanations do neither.[26]  Argument of counsel in briefs is insufficient.[27]  Just reciting that an employer has a reason, without "discussion, explanation, or elaboration," is insufficient.[28]  The admissible evidence must explain— who *actually* made the decision and *why* they did so.[29]

### (1)   "[B]ecause of issues in the group unrelated to Dedmon" is neither a clear nor reasonably specific reason for its pay decisions at issue.

On starting Robert Dedmon's pay at a JG6 salary grade [rather than JG 5], defense states it was "because of organizational issues in the group unrelated to Dedmon." Motion Doc. 33 at p. 24. This is neither clear nor specific. On its face, it fails to identify *any* specific

---

[24] *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981); *Ford v. Securitas Security Services USA, Inc.*, 338 F. App'x 483, 488-89 (6th Cir. 2009); *Equal Emp't Opportunity Comm'n v. Skanska USA Bldg., Inc.*, 80 F. Supp.3d 766, 776 (W.D. Tenn. 2015).

[25] *See Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981); *Alvarado v. Texas Rangers*, 492 F.3d 605, 616 (5th Cir. 2007).

[26] *See Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004).

[27] *See Burdine*, 450 U.S. at 255 n.9.

[28] *See McMullin v. Miss. Dep't of Pub. Safety*, 782 F.3d 251, 260 (5th Cir. 2015) (reversing summary judgment—employer recited that it had an explanation without "discussion, explanation, or elaboration of its purported legitimate reason.").

[29] *See Turner v. Kansas City S. Ry. Co.,* 675 F.3d 887, 902-03 (5th Cir. 2012), as revised (June 22, 2012) (reversing summary judgment on LNDR issue).

organizational issue or articulate what it was. This fails *Burdine*. On continuing pay disparity, defense fails to address it at all. All this fails *Burdine* and *Turner*.

### (2)   Defense fails to support its proffered reasons with *admissible* evidence.

Ostensibly, though defense leaves the Court to guess, the organizational issues may be a reference to a HR Manager Teri Olmen email dated April 2, 2014. *See* Motion Doc. 33 at p. 4. Aside from its form being inadmissible hearsay, insufficient under *Burdine*, defense also fails to proffer admissible evidence that any of this was true. Or that any of this *was* the real reason to change the pay structure from JG5 to JG6 *after* defendants knew a black man was applying. Or that this *was* the reason for offering Robert Dedmon pay at JG6 instead of JG5—after previously offering the same role to a white woman at the better salary grade. Or even who made that decision. This all fails *Burdine* and *Turner*.

Similarly, on denial of the JG4 raise in 2021, defense proffers only this reason: "Dedmon never applied for the position and the person selected did apply and was determined to be the most qualified." Motion Doc. 33 at p. 28. This is just argument of counsel—no *admissible* evidence is proffered that *this* was the real reason. A supervisor saying "I wasn't sure why you didn't apply" fails to explain *who* made the decision and *why* they did so. This too fails *Burdine* and *Turner*.

### e.   Pretext: Though defense does not meet their burden of production, even its unsupported, unclear reasons are pretextual.

Evidence of pretext "may take a variety of forms."[30]  Pretext evidence it that from which a reasonable juror could believe a "proffered explanation is false or unworthy of credence."[31] "[T]his rebuttal evidence, *when viewed as a whole* and in the light most favorable to [employee], casts doubt on [employer's] proffered non-discriminatory reasons . . . and undermines its credibility."[32]

Pretext evidence can be a statement showing decision-maker animus,[33] culture or other acts of discrimination,[34] a departure from policies or procedures,[35] ignoring prevention

---

[30] *Patterson v. McLean Credit Union*, 491 U.S. 164, 187 (1989), *superseded by statute in part on other grounds*, 42 U.S.C. § 1981(b); *accord Robinson v. Jackson State Univ.,* 714 Fed. Appx. 354, 362 (5ᵗʰ Cir. 2017) (per curiam) (unpublished) ("Evidence of pretext 'may take a variety of forms.'"); *Ellerbrook v. City of Lubbock*, 465 Fed. Appx. 324, 333 (5ᵗʰ Cir. 2012) (per curiam) (unpublished).

[31] *Vaughn v. Woodforest Bank*, 665 F.3d 632, 637 (5ᵗʰ Cir. 2011)

[32] *Id.* at 639.

[33] *Laxton*, 333 F.3d at 583 (statement exhibiting animus by a decision-maker); *Russell v. McKinney Hospital Venture,* 235 F.3d 219, 225-26 (5ᵗʰ Cir. 2000) (statements ).

[34] *See McDonnell Douglas,* 411 U.S. at 805; *Sprint/United Mgmt. Co. v. Mendelsohn,* 552 U.S. 379, 388 (2008); *Polanco v. City of Austin,* 78 F.3d 968, 979 (5ᵗʰ Cir. 1996) (affirming jury verdict for the employee who presented evidence of a pervasive discriminatory culture and evidence of discrimination against others).

[35] *See, e.g., Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 224 (5ᵗʰ Cir. 2000) (reversing judgment—employer did not followe its own corrective action plan process); *Robinson v. Jackson State Univ*., 714 Fed. Appx. 354, 362 (5ᵗʰ Cir. 2017) (per curiam) (unpublished) ("changing explanations, departure from termination protocol, and temporal proximity."); *Pruitt v. Dallas Indep. Sch. Dist*., No. 3-04-CV-0554, 2006 U.S. Dist. LEXIS 33054 * at 21 (N.D. Tex. Apr. 21, 2006) (failure to investigate under own policy is pretext evidence).

practices,[36] or just that the reason proffered is false.[37] Though addressed separately below, as noted in a different context: "[P]laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."[38]

### (1) Exhibiting racial animus is evidence of pretext

After *Reeves v. Sanderson Plumbing Products, Inc.*,[39] the Fifth Circuit ruled statements exhibiting animus show pretext—even if not direct evidence of discrimination under prior precedent.[40] So, a statement demonstrating decisionmaker animus can show pretext regardless of whether it also qualifies as direct evidence of discrimination. A reasonably juror could find animus via Shell HR Manager Teri Olmen's statements (SOF) "[T]he jury is permitted to infer discriminatory animus from [such] remark[s]."[41]

### (2) Discriminatory culture and other acts of discrimination

---

[36] *Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975).

[37] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517 (1993).

[38] *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

[39] 530 U.S. 133 (2000).

[40] *See Laxton v. Gap, Inc.,* 333 F.3d 572, 583 (5th Cir. 2003); *Russell v. McKinney Hospital Venture,* 235 F.3d 219, 225-26 (5th Cir. 2000) (statements that may not be direct evidence of discrimination may still prove pretext); *see also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 441 (5th Cir. 2012).

[41] *Laxton,* 333 F.3d at 583.

Here, there is evidence from which a reasonable juror could find a culture of discrimination—and other acts of it, like from Mr. Lugo. (SOF). And that race discrimination was a publicly-known and reported-on historical problem at Shell. (SOF).

### (3)   Departure from policies and practices

Shell has published "fair pay" promises that "Pay in Shell is free from bias." Shell also promises to limit bias through:

- ▪ "internal processes to ensure consistent treatment e.g. job evaluation, pay structures."

- ▪ "a standard, automated approach for salary increase and bonus"

- ▪ "regular equal pay audits"

(SOF).

### (4)   The jobs were comparable the pay differed.

Disparity is clear. But Shell's reasons for it are not [no proffer]. And a reasonable juror could find mid marketers on Robert Dedmon's team performing substantially the same work, regardless of job grade and pay. Sri Rangan brought this up in 2014:

> Why would we post two roles that require the same exact tasks in different JG?  What happens if we hire a female or POC candidate in this role vs. Patrick Frnka that we hired in the 1st open JG 5 role?  Would we inadvertently be creating differences in JG & compensation that now becomes gender & other criteria specific for doing the same job?  For example the person we want to make an offer to now is African American male.

(SOF).

Mr. Dedmon also testified that when his job grade changed in 2015, he had the same title, same responsibilities, and same bonus structure. (SOF, Dedmon Depo. at 84:23-85:6). Shell's own organization chart dated January of 2020 indicates that each person had the same title ("mid marketer"), and that the mid marketers were equal in the Shell hierarchy of responsibility. (SOF, ShellDedmon 1094).

Mr. Dedmon also testified that his tasks and responsibilities [at a JG5] were identical to those of Shell Mid Marketer Patrick Frnka [at a JG4]. (SOF, Dedmon Depo. at 196:11-25). And each mid marketer under Michale Tickle is evaluated against each other on an annual basis. (SOF, ShellDedmon 1081). A reasonable juror could find the distinction between job grades makes zero difference in actual job duties. A reasonable jury could find that these employees held the same responsibilities. It is undisputed that Shell paid Robert less than the majority of white peers on his team for roughly 10 years. (SOF).

## C. 2021: The JG 4 claim is prosecuted under Section 1981—not Title VII.

Robert Dedmon did not file a second Charge of Discrimination with the EEOC regarding the JG 4 post-lawsuit continuing unlawful practice referenced in his Amended Complaint [ECF No. 14, at ¶¶ 40-44]. For clarity, he pursues that claim solely under Section 1981 rather than Title VII. So, the motion is moot as it concerns that claim under Title VII.

### CONCLUSION

There are disputed issues of material fact that warrant a jury trial.

**RELIEF REQUESTED**

Robert Dedmon respectfully requests that the Court deny Defendants' summary judgment motion and grant such other and further relief to which he may show himself entitled.

Respectfully submitted,

*/s/ Amy Gibson*

_____

Ms. Amy E. Gibson
Attorney-in-Charge
Texas State Bar No. 00793801
Southern District Bar No. 20147
amy@gwfirm.com

Mr. David L. Wiley
Of Counsel
Texas State Bar No. 24029901
Southern District Bar No. 34134
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126

      *and*

Ms. Amanda C. Hernandez
Of Counsel
Texas State Bar No. 24064411
Southern District Bar No. 1531045
amanda@ahfirm.com

AH Law, PLLC
5718 Westheimer, Suite 1000
Houston, Texas 77057
T: (713) 588-4359
F: (281) 572-5370

*Attorneys for Robert Dedmon*

## CERTIFICATE OF COMPLIANCE

The following is based on the word-count tool in the most current version of Microsoft®

Word for Mac. The undersigned certifies that *Plaintiff Robert Dedmon's Response to*

*Defendants' Motion for Summary Judgment* contains <mark>XXX</mark> words, excluding the case caption,

table of contents, table of authorities, signature block, and certificates.

*/s/ Amy Gibson*

_____

Amy E. Gibson

**CERTIFICATE OF SERVICE**

The undersigned certifies that, on November 8, 2024, she filed *Plaintiff Robert Dedmon's Response to Defendants' Motion for Summary Judgment* with the United States District Court for the Southern District of Texas through the CM/ECF system, such that the Shell Defendants should be served with a copy of the filed document as follows:

**VIA CM/ECF SYSTEM**
Ms. Marlene C. Williams
marlene.williams@ogletree.com
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
500 Dallas Street #3000
Houston, Texas 77002

*Attorneys for Shell Defendants*

*/s/ Amy Gibson*

Amy E. Gibson