UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Dedmon, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO. 4:21-cv-03371 |
| | § | |
| vs. | § | Jury Demand |
| | § | |
| Shell Exploration & Production | § | |
| Company and Shell Trading | § | |
| Services Company, | § | |
| | § | |
| *Defendants*. | § | |

**APPENDIX IN SUPPORT OF ROBERT DEDMON'S RESPONSE
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INDEX OF EXHIBITS**

1   DECLARATION OF ROBERT DEDMON……………………………………………..3

2   DECLARATION OF SRIKALA "SRI" RANGAN………………………………..78

3   DECLARATION OF LUIS LUGO…………………………………………………86

4   DECLARATION OF AMANDA HERNANDEZ……………………………………93

5   EXCERPTS FROM ROBERT DEDMON'S DEPOSITION…………………………..98

6   ROBERT DEDMON 2014 EMAIL COMMUNICATIONS WITH SHELL……………119

7   PATRICK FRNKA LINKEDIN PAGE………………………………………………115

8   SHELL 2014 JOB GRADE 5 & 6 PAY RANGE……………………………………157

9  SHELL 2014 EMAILS ABOUT HIRING ROBERT DEDMON…………………..…159

10 SHELL 2014 OFFER TO ROBERT DEDMON……………………………………196

11 SHELL COUNSEL LETTER ABOUT MISSING DOCUMENTS……………………201

12 SHELL GLOBAL HELPLINE PRIVACY POLICY…………………………………208

13 SHELL 2020 MID MARKETER ORGANIZATIONAL CHART……………………214

14 EXCERPT FROM SHELLDEDMON 1081—TICKLE 2019 RANKING……………216

15 PATRICK FRNKA SELECTED PAY RECORDS…………………………………..218

16 ROBERT DEDMON SELECTED PAY RECORDS…………………………………228

17 SUSAN SMITH SELECTED PAY RECORDS……………………………………..234

18 JIM BARKER SELECTED PAY RECORDS………………………………………..237

19 SHELL 2014 JOB GRADE RANKING EMAIL……………………………………240

20 SHELL 2015 JOB GRADE TRANSFER FORM……………………………………245

21 1996 NEW YORK TIMES ARTICLE………………………………………………248

22 RODRIGUEZ V. SHELL CHARGE OF DISCRIMINATION………………………..253

23 SHEIKH V. SHELL CHARGE OF DISCRIMINATION…………………………….256

24 SHELL FAIR PAY POLICY………………………………………………………260

25 SHELL'S EEOC POSITION STATEMENT……………………………………..262

26 SECTION 1981………………………………………………………………...267

27 TITLE VII………………………………………………………………………269

# Exhibit 1

# Declaration of Robert Dedmon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Dedmon, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 4:21-cv-03371 |
| | § | |
| vs. | § | Jury Demand |
| | § | |
| Shell Exploration & Production | § | |
| Company and Shell Trading | § | |
| Services Company, | § | |
| | § | |
| *Defendants.* | § | |

**DECLARATION OF ROBERT DEDMON**

1.      My name is Robert Dedmon. The facts and statements that I make in this declaration are true and accurate to the best of my recollection. Unless otherwise stated or apparent from my testimony, I have personal knowledge of the facts and statements that I make in this declaration. I was informed that "personal knowledge" means that I personally witnessed or experienced something using one or more of my senses, like sight, hearing, smell, or touch. I was also informed that "personal knowledge" includes how I feel.

2.      When I talk about accurate copies of documents, photos, or images in this declaration, I'm talking about the documents, photos, or images without these things that I understand an attorney or law firm might add: (1) letters and numbers at the bottom — what I'm told are called "bates-labels" or "bates-numbers," (2) redactions, (3) highlighting, and (4) blue boxes around text, photos, or images. Unless otherwise stated or apparent from my testimony, any bates-labels, redactions, highlighting, or blue boxes were not part of the originals.

3.      One of my attorneys added the captions and typeface in this declaration. The captions are not part of my testimony.

**basics: race, employment, education, experience**

4.     I am a black male. My race is visually obvious. Below are accurate images from (1) a headshot of me taken during my employment with Shell, (2) a family picture, (3) a picture of me at a Shell event, and (4) a family picture:



**Appendix 005**

On August 19, 2014, I start work with Shell. On October 22, 2024 — a little over a decade later — I submit to Shell my resignation and two weeks' notice. I explain later in my testimony the reasons I felt I had to resign.

5.    I use *Shell* in my testimony to refer to the company we worked for because (1) that was the brand name and how we talked about who we worked for and (2) the Shell working groups had different names, even when those groups worked together on the same team, or worked together on different teams, or had a similar hierarchy.

6.    I earn a BBA in Management from Texas State University in 2003. I earn an MBA with a concentration on energy finance from Texas Southern University in 2011. Before starting work with Shell, I amass more than a decade of relevant experience in energy trading and energy retail sales, including developed knowledge and experience in the ERCOT energy market. Attached as exhibit 1 is an accurate copy of my resume at the time I applied for work with Shell.

### Shell: pre-hire

7.    I learn about a potential job opening as an inside sales representative with Shell. If I recall correctly, I learn of the potential job opening at a business meeting with Carl Williams, who worked for Shell but not in inside sales. Carl and I did not know each other outside of being business acquaintances, but he helped me through the process of pursuing the job opening at Shell. Carl is a black male. On January 25, 2014, Shell acknowledges my application for the job opening.

### February 2014

8.    Shell has a call with me. It informs me on February 6, 2014 that (1) the position is a little under my current compensation for base salary but has a bigger bonus potential up to 50% of base and (2) if I am still interested, it would like to proceed with a face-to-face interview. I respond that I am still highly interested and would like to proceed with the interview. Shell interviews me on February 18, 2014. Attached as exhibit 2 is an accurate copy of the interview confirmation.

### March 2014

9.    Carl Williams informs me on March 13, 2014 that I went from 1st to 2nd and that Shell extended an offer. On the next page is an accurate image of the March 13, 2014 emails on that issue [the email string is from a document numbered Dedmon 000802]:

**Appendix 006**



At the time, I do not who received the offer or anything about the person who received the offer. I still do not know who received the offer. As explained later in my testimony, I do not learn anything about the person who received the offer until more than 6 years later.

## April 2014

10.   Sometime on or around April 23, 2014, Shell recruiter Tyler Allie tells me there are some internal changes being made to the group and they haven't locked down the pay grade for the position. He informs me that I'm the likely candidate but no final decision has been made. This is an accurate image of an April 23, 2014 email from me to Carl Williams on this issue [the email is from a document numbered Dedmon 000766]:



11.   Carl Williams responds to me the same day and says he got cryptic responses to his queries. On the next page is an accurate image of an email from Carl Williams to me on this issue [the email is from a document numbered Dedmon 000766]:

**Appendix 007**



Attached as exhibit 3 is an accurate copy of an email string that contains the above email exchange.

June 2014

12.   On June 19, 2014, Shell asks me about meeting with the team on June 30th for the sales representative position. I ask if I am reapplying and interviewing again. This is an accurate image of an email exchange on this issue [the emails are from documents numbered Dedmon 000838 & Dedmon 000839]:



Appendix 008

13.   Shell tells me yes, as it has reposted the position after an internal evaluation with revised requirements. This is an accurate image of that email response on this issue [the email is from a document numbered Dedmon 000839]:



Attached as exhibit 4 is an accurate copy of an email string that contains the email exchanges addressed in this and the prior paragraph.

14.   I receive an application invitation from Shell on June 22, 2014. Attached as exhibit 5 is an accurate copy of the invitation.

15.   Shell interviews me on June 30, 2014. Attached as exhibit 6 is an accurate copy of the interview confirmation.

July 2014

16.   Shell offers me the sales representative position. On July 9, 2014, I leave a voicemail with Shell recruiter Tyler Allie accepting the position. This is an accurate image of my email to Tyler on this issue [the email is from a document numbered Dedmon 000798]:



**Appendix 009**

Attached as exhibit 7 is an accurate copy of the email string that contains this email.

17.  On July 11, 2014, Shell sends me a written offer letter, conditioned on satisfying pre-employment requirements. The same day, I email Shell to let it know I noticed the offer letter pay grade says it is a 6 but I was told it was a 3. The "3" in the email is a mistake and should have said "5." Attached as exhibit 8 is an accurate copy of that email string.

18.  Shell does not respond to me about the pay grade. I sign the offer letter on July 13, 2014. Attached as exhibit 9 is an accurate copy of the signed offer letter.

19.  Shell recruiter Tyler Allie informs me on July 14, 2014 that I will receive a "regret" for the 4089BR sales representative position and that this has nothing to do with anything. This is an accurate image of the email from Tyler on this issue, but without the full email signature [the email is from a document numbered Dedmon 000803]:



Attached as exhibit 10 is an accurate copy of that email.

20.  The code 4089BR is on my sales representative interview confirmation from February 2014 [exhibit 2 to my declaration]. A different code, 8401BR, is on the sales representative application invitation from June 2014 where I was to reapply and interview again [exhibit 5 to my declaration]. Again, Shell had (1) informed me in April 2014 that there were some internal changes made to the group and they had not locked down the pay grade for the position and (2) informed me in June 2014 "we have reposted the position after the internal evaluation with the revised requirements." Those emails are exhibits 3 and 4 to my declaration.

21.   Shell informs me on July 24, 2014 that preemployment screening is cleared and complete and that my start date will be August 19, 2014. Attached as exhibit 11 is an accurate copy of that email notice.

## August 2014

22.   On August 19, 2014, I start work with Shell as an inside sales representative.

## Reliance

23.   I trusted and believed what Shell told me about the job: (1) that there were some internal changes made to the group and they had not locked down the pay grade for the position and then (2) "we have reposted the position after the internal evaluation with the revised requirements." I thought this was a formality due to some type of internal reorganization or reshuffle in the group. I had no clue that the position had been downgraded based on my race. I had no clue that Shell had earlier offered the position to a white female at a better job grade. I had no reason to believe that what happened was anything like a demotion or pay cut, much less due to my race.

24.   Had I known the truth — that Shell downgraded the job based on my race —, I would have promptly taken action to pursue my legal rights. I did promptly take action to pursue my legal rights once I learned the truth years later, as explained later in my testimony.

25.   An important reason I decided to stand up to Shell and pursue my legal rights is for my daughters. And the same would have been true in 2014 even with my daughters' young age at the time and even with the race-based downgrading happening during the hire process. I have two daughters, one born July 31, 2008 and one born October 6, 2010. In 2014, my daughters turned 6 years old and 4 years old.

26.   My strong desire to stand up and pursue my legal rights for my daughters, and myself, stems from a childhood incident. This is the story of that incident. I'm in elementary school and have the same route home from school as another kid who goes to the same school, is in the same grade, and lives in the same neighborhood as me. The other kid is white and routinely yells racial slurs at me and my best friend, who is also black and usually with me on the way from school to one of our homes. The slur that sticks with me to this day is the white kid calling us *stupid niggers*.

27.   One day, my best friend and I are on our way home from school and walking our bikes to try and stay behind, and so avoid, this neighborhood kid who is again yelling racial slurs at us. As we get near the home of that kid, he comes up to me still saying things like *stupid niggers* and tries to push my bike down to get to me. I'm trying to keep my bike between us

# Appendix 011

to protect myself. He is pushing and yanking on my bike until the handlebars slice my finger and I start bleeding. He runs to his house yelling to his dad that I am trying to fight him, which is a complete lie. He is the aggressor and the *only* aggressor. His dad comes outside and yells at us, defending his son. I still carry a small scar on my finger from this incident.

28.   I feel handicapped with zero protection and no way to present how I feel to someone who will believe me, except my parents. I tell my dad, and my dad does nothing other than comfort me. At the time, I do not understand and feel angry and deeply hurt that he does nothing more to stand up for me. As an adult, I now know — from my own experience as a dad and from speaking with my dad — that my dad felt helpless and defenseless. At the time, my dad had to think through what might happen if he went to the neighbor's house, if he escalated things even in a calm, polite manner. At the time, as a black man in a mostly white neighborhood, he could get arrested or shot without wrongdoing. He could lose his life. Or retaliation might cause harm or loss of life to my mom, to me, or to my sister. That was the reality of the environment back then. So, dad considered those risks and could not risk doing something that might cause me to lose a father, a mother, a sister, or my own life.

29.   So, I want to be that voice for my daughters. The voice that my dad could not be for me, though for understandable reasons at the time. I never want my daughters to feel like there is not someone there to defend them. I want my daughters to be confident that I have their back. Most of all, I want my daughters to have the confidence to stand up for themselves and others, without guilt, when someone is wronged but has done nothing wrong. And so pursuing this case, which seeks remedies for me and other people, is part of all of the above for my daughters. And this helps explain why I am so confident that, had I known the truth about the discrimination earlier, I would have promptly pursued my legal rights rather than letting it go, turning the other cheek, or just moving on.

### Revelation of the truth — summer 2020

30.   Summer 2020 is the first summer of the pandemic. Summer 2020 is the summer of George Floyd. Video captures the murder of George Floyd and some of his last words calling out for his mama and saying *I can't breathe*. Video evidence goes viral.

31.   In the days after, Shell has a call — open to all employees — to discuss race relations and give people an open forum to speak about what happened. The call is similar to a zoom call with people having the option to have their video on or video off but with name showing. I'm on the call. I get the impression most people on the call are black. As people talk, I'm hoping people don't call and just say something like *we're with you* and not really invoke change.

DECLARATION OF ROBERT DEDMON

# Appendix 012

32.    Shortly after the call ends, Sri Rangan — a Shell manager — contacts me on the company instant messaging system and asks me to give her a call. I'm hoping this will not be some empty *we got your back* call. But we are friends, I trust her, and I call her. I can tell right away something is bothering her.

33.    Sri Rangan is emotional, sounds tearful, as she talks to me. She tells me she has been holding a secret. She tells me start to finish about how Shell human resources downgraded me because of my race. She tells me that what Shell told me was not the truth. We go back and forth during the conversation. She says if I decide to push forward with this, she is with me and will not abandon me. She apologizes for keeping me in the dark for so many years and putting this on my plate now. She says she feels like she should have pulled me in and let me know as soon as it happened.

34.    This is the gist of what Sri Rangan tells me during that conversation. Sri is involved as a hiring manager in the process of hiring me. Shell Human Resources — Teri Olmen at the time — communicates the final, new-hire, job grades that set salary range. Shell posts a job grade 5 — JG5 — position in Houston, Texas and later offers this job at JG5 to someone who is not a black male. That person declines the job offer.

35.    This continues the gist of what Sri tells me during that conversation. Shell then decides to offer the job to me. Before Shell communicates the offer to me, Shell Human Resources changes the job grade from 5 to 6, which lowers the job grade and salary. Sri opposes this downgrade and questions Teri Olmen about the sudden downgrade. Teri Olmen responds along the lines of this: *People of color struggle at being successful [hence the lower job grade]. He needs to prove that he is capable of handling a role of this significance, or we would be setting him up for failure.*

36.    This continues the gist of what Sri tells me during that conversation. Sri reports to a supervisor that this downgrade is happening because the new hire is black. The Shell supervisor thinks perhaps this is a misunderstanding. So, Sri follows up with Teri Olmen and says something along the lines of this: *I understood that you wanted me to offer this at a lower-paying job grade because he is black.* Teri Olmen confirms yes, responding along the lines of this: *Historically, minorities do not do well at Shell, so we do not want to set him up to fail by starting him at a higher [ranked, paying] job grade.*

37.    This continues the gist of what Sri tells me during that conversation. Sri complies with the directive but formally reports her opposition internally. Shell tells her an internal investigation will happen. Shell later tells her it has closed the matter and will not be telling her the results.

DECLARATION OF ROBERT DEDMON

**Appendix 013**

38.   That conversation between Sri Rangan and me took place sometime between May 26, 2020 and June 7, 2020. Tuesday, May 26, 2020 is the day after George Floyd died and when video started to go viral. Sunday, June 7, 2020 is the date of the following text exchange with Sri Rangan after we already had that conversation [the document is numbered Dedmon 002822]:



39.   Shell never informed me that it made any effort to correct the pay disparity.  I am not aware of any effort to correct the pay disparity.

40.   I do not learn my JG6 position was initially offered to a white female at a JG5 until sometime during the lawsuit when Shell provided internal emails showing this. This should be obvious, but I am not copied on those emails.

**Prompt action after learning the truth**

41.   Again, I learn of the job downgrade on hire through Sri Rangan sometime between May 26, 2020 and June 7, 2020. I then search for an attorney and come to David Wiley and Amy Gibson through a referral from an attorney in Houston. I sign a Charge of Discrimination on October 16, 2020. Attached as exhibit 12 is an accurate copy of the Charge of

Discrimination that I signed, with the exception of the October 16, 2020 "received" stamps and number in the upper right corner that starts with 460, which I am told are from the EEOC.

## Shell: employment

### Inside sales team — team, supervisor, job, geographical market

42.   Again, I start work as a Shell inside salesperson on August 19, 2104.

43.    The following applies to my entire tenure as a Shell employee. I work on a team, all of whom are inside salespeople reporting to the same supervisor. The supervisor changes over the years, as did the inside sales team. But we all work on the same team reporting to the same supervisor at any given time. With the exception of Susan Smith, we all work from a Houston, Texas base operation.

44.   The following applies to my entire tenure as a Shell employee. We — the team — cover a geographical area known as *East*, even though we cover most of the Texas geographical area. We sell power and gas to energy retailers, who in turn sell to consumers like individual Texas residents and companies like Texas Instruments. The potential customer base is energy retailers in deregulated markets who can compete on price with power and gas sellers that compete with Shell — like BP, Engie, some banks, and even entities we *sell* energy to like NRG.

45.   This paragraph explains terminology used during my employment. Shell uses the terms *power* and *gas*. And Shell sometimes uses the terms *electricity* and *power* interchangeably. Of course, gas can provide power and electricity. And people may talk about an electric stove versus a gas stove. This can get confusing. But it is all energy that ultimately supplies consumers with what they need on a day-to-day basis for things like heat, air conditioning, lights, etc.

46.   This paragraph also explains terminology used during my employment. Shell — and the market for this industry — use the term *deregulated* for some markets, even when those markets have some oversight. The term *deregulated* just differentiates markets that have consumer choice on who supplies their energy, as opposed to markets like San Antonio where consumers must use a specific energy retailer.

47.   The following applies to my entire tenure as a Shell employee. The *East* geographical markets include ERCOT, MISO, NYISO, and PJM. ERCOT means Electric Reliability Council of Texas. It is also shorthand for a market that covers most counties in Texas. MISO means Midcontinent Independent System Operator. It is also shorthand for a market

**Appendix 015**

that covers certain areas in the central United States, like Indiana. NYISO means New York Independent System Operator. PJM means Pennsylvania-New Jersey-Maryland Interconnection.

### Inside sales team — same basic job, and a word about titles

48.   The following applies to my entire tenure as a Shell employee. Each inside sales team job — the inside sales team I worked on — shared the same basic duties. The overall process is the same to sell energy to an energy retailer, no matter the customer. Some accounts are easier than others, as explained later in my testimony, but the job and process to get to sale are the same, whether easier or harder to get to the sale.

49.   The following applies to my entire tenure as a Shell employee. The inside salespeople on my team change titles over time and are called things like mid marketer, originator, inside sales, power sales, sale representative, etc. The name changes do not reflect job duty changes. On this team, there is no "step up" in job duties other than to be the supervisor of the team. We all — people on my inside sales team — cover for each other when someone is out of the office, perhaps with the exception of less experienced team members who do not have the skill or experience to 100% cover someone else's duty or customer. I handled other team members' work and customers when they were off work.

50.   For example, a job description that Shell provided in this case lists the position title as *Energy Retailers Mid Marketer*. That title represents anyone on our inside sales team at any time during my tenure. The same job description lists the place in the organization as *Sales and Origination - East Retail*. That describes what our team does, regardless of wording, at any given time during my tenure. And the general position description matches what we each did on the team:

> Mid-Marketing position within the Energy Retailers Origination group.  Position will work with Retail Energy companies, maximizing transactions and margin.

The overall description repeats that theme. Attached as exhibit 13 is an accurate copy of the job detail I am talking about and that Shell produced in this case [the document is numbered Shell Dedmon 001088 through 001093].

DECLARATION OF ROBERT DEDMON

Appendix 016

## Inside sales team — accounts

51.    The following applies to my entire tenure as a Shell employee. My accounts are comparatively more difficult than other accounts on the team. I believe I am the only person who joins the team with established customer relationships. But even then, everyone needs some parity on accounts *if* those account results are going to impact pay and career.

52.    Here is an example. Inside salesperson Patrick Frnka is handed structured customer accounts. Structured customer accounts either (1) already require the retailer customer to purchase through Shell or (2) already require the retail customer to pay Shell if they "sleeve" purchases through another company. And these accounts tend to generate comparatively high gross margin. Because Shell often provides these customers with support services that these customers cannot manage on their own. So, the price tends to be higher to account for that. Our inside sales team is not providing those support services.

53.    This continues the example. In contrast, my customers and target customers are not structured customer accounts and so not required to purchase through Shell or pay Shell if they purchase through another company. My customers also tend to have a better ability to negotiate price in general among competitors and handle on their own the services that Shell provides to structured customer accounts. In short, (1) getting the sales and keeping the customers is more difficult with accounts like mine, and (2) my accounts tend to have lower gross margin because those customers have greater freedom to negotiate price and do not tend to need the support services that Shell provides to structured customer accounts. Nonetheless, I produced millions in gross margin for Shell. Here are some examples in recent years. My sales produced more than $16 million in gross margin in 2021 and more than $38 million in gross margin in 2022.

## Inside sales team — work with energy traders

54.    The following applies to my entire tenure as a Shell employee. Our team works closely with the Shell energy trading teams. The overall group — inside sales and energy trading — is sometimes called Shell Trading as the umbrella term. The inside salespeople act as a kind of middleman between the energy traders and the retail customer. The inside salespeople interact daily with energy traders, other than off-work days. The inside salespeople get pricing for customer sales from the energy traders. And the teams work together in other ways, like sharing market intelligence, attempting to sell at a certain price on behalf of a trader, discussing sales and market strategy, etc.

**Appendix 017**

Inside sales team — demographics, basic background

55.    The following is based on my personal observation. During the 10+ years of my tenure with Shell, I am the only black person on the inside sales team, with the exception of Raif Rucker, who joins the team at some point but does not last long on the team. During the 10+ years of my tenure with Shell, I never have a supervisor who is black. During the 10+ years of my tenure with Shell, I only recall one black energy trader and one Hispanic energy trader.

56.    The following is based on my personal observation and developed knowledge about team members' experience before joining our inside sales team. The people listed below are listed in order of who joined the inside sales team earliest. The same number indicates that those people joined the team around the same time. I list each person's race. I note a little about each person as far as experience or role. I note whether the person is still on the team as of the time I resign from Shell on October 22, 2024.

57.    I exclude those who were only inside sales supervisors or were only peers for a short time before becoming supervisor, such as Priscilla Partida, Patricia Smith, and Jennifer Hartnett. I exclude those for whom I am told Shell has not provided promised pay data, such as Meredith Lilly, Raif Rucker, Justin Mody, and Jim Promubol.

> 1 Michael Tickle
> White — no experience in inside sales when he joins team, comes from credit group, becomes team supervisor
> still team supervisor as of October 22, 2024
>
> 2 Susan Smith
> White — no experience in inside sales when she joins team
> still on team as of October 22, 2024
>
> 3 Patrick Frnka
> White — no experience in inside sales when he joins team, comes from credit group
> still on team as of October 22, 2024
>
> 4 Robert Dedmon
> Black — prior experience in inside sales before joining team
> resigns October 22, 2024

Appendix 018

5 Mike Deley
White — no experience in inside sales when he joins team, joins team as part of graduate rotation program out of college and stays with team
still on team as of October 22, 2024

6 Doug Hund
White — has some sales experience but with different group before joining team
still on team as of October 22, 2024

7 Ryan Kolkmann
White— has relevant experience as energy trader before joining team
no longer on team as of October 22, 2024

8 Logan Luzzi
White — no experience in inside sales when he joins team, comes with experience as commercial operator then analyst
no longer on team as of October 22, 2024

9 Ken Ueng
Asian — prior experience in inside sales before joining team
still on team as of October 22, 2024

10 Jim Barker
White — not sure about prior experience other than not at my level of experience on joining team
still on team as of October 22, 2024

11 Thomas Jones
White — no experience in inside sales when he joins team, part of graduate rotation program out of college and stays on team
still on team as of October 22, 2024

## Inside sales team — pay, job grades

58.   The following applies to my entire tenure as a Shell employee. Shell pay decisions are largely a black box. The phrase *black box* is often used if talking about pay decisions at Shell. As a Shell employee, I do not have a window into what other team members are paid in salary or bonus. As a Shell employee, I do not have a window into what other team members are assigned as far as job grade, with limited exceptions like Ryan Kolkmann being open about his JG4 and Mike Deley getting that JG4 when Ryan leaves.

DECLARATION OF ROBERT DEDMON

**Appendix 019**

59.   I learn about pay differences and some job grades only through Sri Rangan's revelation to me in summer 2020 and documents provided during this lawsuit. In now seeing the pay disparities and some job grades as between me and white team members, it is clear to me that starting my career at JG6 due to my race has handicapped my career in terms of pay and job grade. In seeing the pay disparities now between me and white team members, it is clear to me that there is no merit-based or performance-based explanation for the pay differences. In now seeing the pay disparities and some job grades as between me and white team members, it is clear to me that there is no merit-based or performance-based explanation for the job grade differences. There is also no personality conflict that would explain the pay or job grade differences. Through the process of elimination on any logical explanation of pay and job grade differences, the only logical explanation is race. And Sri Rangan informed me directly that my hire position was downgraded based on race.

60.   At least in the last several years of my employment, Shell (1) each year, implements salary raises in late December or early January, and (2) each year, pays bonuses around March 1.

### Shell 2021: Mike Deley taking JG4

#### Inside sales team — job grades as paper promotions

61.   The following applies to my entire tenure as a Shell employee and is based on my personal observations and developed knowledge at Shell. Job grades are important to overall career and pay. For example, at some level of job grade, performance-based stock benefits become part of the compensation package. But on the inside sales team, a better job grade is a paper promotion, even though a better job grade may sometimes be called a promotion. A better job grade is a paper promotion for the inside sale team because it does not change the team member's job duties. For example, when Shell moves me from JG6 to JG5, my job duties do not change. In short, a job grade change does not mean someone is stepping up into a different job role and so differs from a more traditional "promotion."

#### Inside sales team — supervisor discussions about moving up to JG4

62.   Again, Michael Tickle supervises the inside sales team at Shell. I regularly address with Michael my desire to move to JG4, be included in a bigger bonus pool, and earn a higher salary. We discuss this during our 1 on 1 meetings that are supposed to take place every two weeks. We discuss this in other conversations about *where do you see yourself* heading career-wise, short-term and long-term plans, and short-term and long-term goals. I make my desire for JG4, being part of bigger bonus pool, and earning a higher salary very clear to Michael. I repeatedly ask what I need to do to get a JG4. Michael repeatedly tells

**Appendix 020**

me he just needs a JG4 to open up. Michael Tickle absolutely knows before 2021 about my strong desire for JG4, a bigger bonus pool, and higher salary.

### Inside sales team — man down, need to replace team member

63.    Sometime in or around early September 2021, Michael Tickle informs our team that Ryan Kolkmann is leaving the team to accept a new role in Oklahoma. This happens around the time Shell moves to a return-to-office plan after work-from-home during the pandemic. Ryan tells me he does not want to return to the office full-time and that is why he is resigning from the inside sales team.

64.    So, Michael Tickle tells our team that we are going to be a down a person on the team. We discuss how to divide up the accounts and workload that Ryan will leave behind, but just until we find someone to replace Ryan. We discuss the need to backfill the empty spot on the inside sales team and how to do so. It is crystal clear that the plan is to fill the empty spot on the team — meaning, fill Ryan Kolkmann's role on the inside sales team.

65.    On September 14, 2021, Michael Tickle emails the team on the subject *Potential Addition*. He asks us to let him know if we are aware of anyone who might be a good fit for our team. The email does not mention Ryan Kolkmann but is referring to the empty spot that Ryan will leave on the team, and so the need to fill the spot with someone outside the team. This is an accurate image of the email from Michael on this issue [the email is from a document numbered Shell Dedmon 001073]:



## Appendix 021

Attached as exhibit 14 is an accurate copy of that email as provided to us by Shell in this case.

66.   Michael Tickle makes it clear that he is asking us to look for someone outside the team. He asks us to keep any eye out for anyone who matches Ryan Kolkmann's skillset and could backfill the role. At no time does Michael Tickle say, imply, or even hint that a team member can fill the role. He consistently says in different ways that we have an extra space and we need to fill that extra space.

Inside sales team — team member Deley takes JG4 but does *not* take over role

67.   At some point that fall 2021 in communicating to the team, Michael Tickle congratulates Mike Deley on being selected to fill Ryan Kolkmann's role. But what really happens is this: Mike Deley takes on a better job grade at JG4 but does not actually take on the job. In other words, Deley does *not* fill Ryan's role or job duties. Instead, the entire inside sales team has to do extra work to cover the job duties Ryan handled before he left. Ryan's accounts and workload are spread around the inside sales team to add to our existing workload. I remember team member Doug Hund getting backed up on gas customers because of the additional workload. Deley takes the job grade increase and keeps on doing what he was already doing.

68.   I am stunned and upset. I address the issue with Michael Tickle. During our discussion, he tells me anyone could apply for the role, he expresses surprise at me not applying for the role, and says everyone had the opportunity to apply. I remind him that he knew I was looking for a better job grade and that he made it clear he was looking for someone from outside the team to fill the role. I tell him I thought he would have at least given me a heads up if I could apply.

69.   None of what Michael Tickle says during that conversation makes sense or reflects the truth of what happened. The emphasis on the application process is a deceit. Mike Deley applies for a job he never takes over. He just takes the JG4. Had I known the JG4 was just going to be handed out to a team member rather than used to draw needed outside help to replace an empty spot on the team, I would have applied and otherwise requested a job grade increase. This is all another level of betrayal.

70.   I also now know from information learned in this case that other white peers on our inside sales team had already been moved to JG4. Again, there is no merit-based or other legitimate justification to keep me at a JG5 all these years.

### Shell: employment benefits, privileges, terms, and conditions other than pay

72.   For years as a Shell employee while oblivious to race-based pay and job grade differentials, I am all in for Shell. I wear the Shell logo shirts as a regular wardrobe almost every day. I carry the Shell swag. Even after Sri Rangan reveals the truth to me, I work hard. Even after the JG4 is given to Deley, I work hard. I enjoy the kind of work I do.

73.   In summer 2020, I learn from Sri Rangan about the race-based career handicap. In fall 2021, I learn about JG4 given to Mike Deley. In this case, I learn about the job grade, salary, and bonus disparities compared to white peers. But the worst harm is the betrayal that all happened behind my back.

74.   Once we return to the office post-pandemic — after many delays and revised return-to-work plans since fall 2021 —, I have a panic attack for the first time in my life. I am at work in-person at the office when it happens. At the time, I do not recognize this as a panic attack. I can normally lock in and focus on work for hours at a time without even looking up. But I could not focus for more than about 3 or 4 minutes at a time. My heart starts racing. My palms start sweating. I start to feel nauseous. My heart starts to feel like it is going to jump out of my chest. I wonder if this is what Covid feels like.

75.   A healthcare provider gives me a diagnosis of panic attacks. I realize working in-person at the office with some of the very people who betrayed me behind my back is causing panic attacks. Working in-person at the office with some of the very people who betrayed me behind my back also causes my body to be in a persistent state of high alert. I am reacting with a kind of fight or flight response when I have to be around, or may run into, the people who betrayed me.

76.   The panic attacks and persistent state of high alert are severe. So severe that I end up having to take medical leave sometime around May 2023 or June 2023. The panic attacks initially happen on a regular basis. The panic attacks slowly improve over time but do not entirely go away entirely. The persistent state of high alert is initially frequent and daily when I am working in-person in the office. It leaves me exhausted. Blood pressure is high and sometimes at levels for stroke risk. The persistent state of high alert slowly improves once I decide I do not have to stick it out at Shell.

77.   The panic attacks and persistent state of high alert are part of a work environment where I do not feel safe or protected after the backdoor betrayals. They interfere with my ability to do my job as well as before, as explained here. First, I obviously cannot work well while in the middle of a panic attack. Second, I cannot work well with such high blood pressure or the distraction or exhaustion of that persistent state of high alert. Third, these conditions required me to take medical leave time off work.

<div align="right">DECLARATION OF ROBERT DEDMON</div>

**Appendix 023**

**Other important issues: another example of discrimination, why not resign earlier, JG6 to JG5**

78.   The following is based on my personal observations. Raif Rucker, who is black and once worked on the inside sales team, does not get the same kind of early support and assistance as Patrick Frnka, who is white. Both start without any experience in inside sales. But I personally observe that Patrick gets a lot more support and help than Raif. For example, easier sales are given to Patrick and more learn-the-ropes mentorship is provided to Patrick. Based on my observations, Shell seems to have set Raif up to fail. I try to help Raif and stay late and arrive early to do so. But I cannot make up the difference in treatment on my own. This is just an example of observed discriminatory treatment at Shell.

79.   Why didn't I just resign earlier if things were that bad? I did not resign earlier for several reasons. First, I needed to financially take care of the amazing family I love so much — one woman, two daughters, and two dogs. I am the primary income earner for our family, although my wife also works and contributes financially and in so many other ways. Second, I felt resigning earlier would be a win for Shell when it comes to discrimination … the black employee is gone. Third, I was not unhappy with the work I did. I was just unhappy with the discrimination at work. I ultimately felt I had to resign due to the toll on my health and my wife repeatedly pleading with me to prioritize that health because I was not okay.

80.   To say that moving me from JG6 to JG5 eliminates the harm is just false. I have now seen the ongoing pay disparities as compared to my white peers on the team. I have now seen the ongoing job grade disparities as compared to my white peers on the team. I suffered emotionally including panic attacks, persistent state of high alert, and having to take medical leave, as explained above. To say that JG5 is the exact job grade and pay increase I wanted all along is condescending, insulting, untrue, and wrongly minimizes the harm here. What I want is a fair playing field in which I am judged on performance and skill, not treated differently for no reason other than my race. What I want is the ability to rightfully trust my employer and trust my employer not to betray that trust.

**My name is Robert Dedmon. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my recollection. Executed on November 8, 2024.**

_11-8-24_

Robert Dedmon

DECLARATION OF ROBERT DEDMON

# Dedmon Declaration

# Exhibit 1

ROBERT L. DEDMON
834 DESERT ROSE DR, MISSOURI CITY, TEXAS, 77459
713-899-9486 ● r.dedmon@gmail.com

## EDUCATION

BBA-Management – Texas State University-May 2003
MBA-Energy Finance- Texas Southern University- August 2011
*China Global Study Abroad* -Studied Financial Energy & Global Financial Sectors - July /August 2010

## WORK EXPERIENCE

**AP Gas & Electric**  May 2012- current
*Manager-Pricing, Supply & Mid-Marketing*
- Report and maintain daily changes in the position and valuation of the portfolio
- Generate positive P&L through execution of physical and financial power  trading
- Responsible for valuing, structuring, and managing of the PJM pricing models
- Prepare and analyze financial operating reports/data for the portfolio and develop systems to support reporting needs
- Research discrepancies impacting revenue and cost forecasts
- Assist load manager with load data quality issues
- Produce monthly settlement invoices and reconcile discrepancies with various ISOs
- Perform analysis on mark to market values and load data to refine pricing and operations model inputs
- Develop risk mitigation solutions and ensure risks are appropriately reflected in pricing
- Train customer care representatives on regional product knowledge

**GDF SUEZ Energy Resources North America** October 2007- April 2012
*Senior Retail Supply Analyst-PJM Portfolio Management*
- Report and maintain daily changes in the position and valuation of the portfolio
- Responsible for valuing, structuring, and managing of the PJM REC portfolio.  Work closely with legal team to complete annual renewable compliance retirements for each PJM state.
- Prepare and analyze financial operating reports/data for the portfolio and develop systems to support reporting needs
- Assist regional pricing manager in maintaining various inputs to the pricing process and support the design and analysis of wholesale products used to risk manage the portfolio of load obligations
- Research discrepancies impacting revenue and cost forecasts
- Assist load manager with load data quality issues
- Analyze risk associated with serving full requirements retail transactions
- Perform analysis on mark to market values and load data to refine pricing and operations model inputs
- Collaborate with Information Technology, among other groups, on development, maintenance and testing of application platforms, such as load analysis, settlement and pricing systems and customer information management systems
- Train customer care representatives on regional product knowledge

**GDF SUEZ Energy Resources North America** June 2005- October 2007
*Senior Retail Pricing Analyst-, PJM, NY, and ISO-NE*
- Perform pricing of retail sales transactions using standard and customized systems/models
- Generate and maintain forward pricing curves including hourly energy, basis, ancillary services, renewables and other fees
- Work directly with Sales, Business Services and Marketing staff members to put together attractive electricity supply offerings to existing and prospective customers
- Assist regional portfolio manager in maintaining various inputs to the pricing process and support the design and analysis of wholesale products used to risk manage the portfolio of load obligations
- Perform analysis on market price and load data to refine pricing and operations model inputs
- Responsible for coordinating with scheduling, accounting and regulatory groups to ensure obligations are fulfilled and maintained in the transaction management systems
- Manage pricing of retail sales transaction activities in deregulated markets in PJM, New York, and/or ISO-NE
- Analyze risk associated with serving full requirements retail transactions
- Work closely with customers, sales personnel, pricing analysts, and portfolio managers to structure custom electricity and natural gas products for retail customers
- Collaborate with Marketing to structure new products that may be effectively priced, risk managed and delivered

**Appendix 026**

ShellDedmon_000766

- Collaborate with Information Technology, among other groups, on development, maintenance and testing of application platforms, such as load analysis, settlement and pricing systems and customer information management systems
- Conduct recruitment and training with Supply Pricing Group

**Dynegy Power Marketing and Trade, Inc.**  March 2004- May 2005
*Trader-ERCOT Real Time Desk*
- Prepared, communicated and documented pre-schedule and real-time schedules for electric purchases, sales, transactions, including real-time schedule cuts
- Evaluated and conducted commercial transactions
- Collaborated with Real Time Marketing to maximize the profitability of intra-day generation
- Monitored and controlled the real time operations of two power plants to ensure accurate delivery volumes to retail and wholesale customers
- Optimized ERCOT generation portfolio
- Coordinated between Risk Control and Accounting to ensure accurate trading guidelines are applied to all accounts
- Collaborated with plant personnel regarding shutdown and return of units, reactive output and assignment of capacity reserves as required
- Formulated and maintained ERCOT portfolios ensuring accurate spreadsheet formulas, as well as utilization of the correct pricing tools
- Submitted ancillary service bids and supplemental increases/decreases into the ISO specified plants
- Entered and allocated all trades daily
- Submitted resource plans and other sensitive data to the ISO
- Developed rapports with the staff of the company's plants, gas desks, the ISO, transmission operations and other organizations that are necessary to optimally and dependably dispatch the generation portfolio
- Served as a liaison between plants, trading desk, gas desk and ISO

**Dynegy Power Marketing and Trade, Inc.**  September 2003- February 2004
*Confirmation/Contract Analyst (Contractor for Venturi Staffing)*
- Confirmed all power, gas, financial trades
- Ensured proper contract execution of trades
- Coordinated with other energy companies to resolve discrepancies in trades
- Prepared executed trades for scanning

## COMPUTER SKILLS
Microsoft Office, People Soft, Documentum, Siebel, eSuite, SAP

**Appendix 027**

# Dedmon Declaration

# Exhibit 2

![Gmail logo] Robert Dedmon <r.dedmon@gmail.com>

---

## Shell Final Assessment - Robert Dedmon - Sales Representative (4089BR) - Please Reply All

**Robert Dedmon** <r.dedmon@gmail.com>                                                    Fri, Feb 14, 2014 at 2:52 PM
To: Gabriel.Konigsberg@shell.com
Cc: Tyler.Allie@shell.com, "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

This email confirms my attendance.


Regards,


On Fri, Feb 14, 2014 at 1:34 PM, <Gabriel.Konigsberg@shell.com> wrote:

Dear Robert,


Thank you for your continued interest in Shell as a potential employer.  We are pleased to invite you to a final assessment for the position of **Sales Representative (4089BR)**.  The details are:



Date:             18, February, 2014
Time:             9:00am – 11:00am CST **(Please arrive 15 minutes early for check in with security)**

Location:      Shell Trading Services Company

1000 Main Street (12 $^h$ floor security)

Houston, TX  77002


Upon arrival, please check in with the receptionist and let them know you are there to meet with **Tyler Allie**.  You will need a **valid picture ID** and will receive a visitor's badge.


**Travel**

I understand you are local to the area and will not require travel accommodations.  Please let me know if this changes.  Attached is our Candidate Expense Claim Form for any charges incurred during this recruiting experience.  If you plan to drive over 75 miles to any destination en route to this interview, please contact me to discuss viable travel options.  For any questions regarding travel logistics or itinerary, I will be your point of contact.  I can be reached on my office line at  **713-241-2953** and mobile at **713-591-8906.**


**Parking**

You may park in the nearby parking garage:

McKinney Parking Garage – This is one building north of the tower, enter via McKinney (accepts cash and credit card)

OTM parking garage – Entrance via Travis and/or McKinney (accepts cash and credit card)


**Participants**

You will meet with the following individuals for some or your entire interview:

- Jennifer Hartnett, Supervisor Sales
- Christopher Riley, Sr Originator Aggregator
- Michel Tickle, Sr Sales Representative


**Enclosures**

- Candidate Information Pack
- Candidate Expense Claim Form

**Appendix 029**

**Important Safety Information**

Dedmon 000830

We care about your safety and are committed to ensuring that HSSE features as a key element of our recruitment events. The following advice is provided with this in mind, please take a moment to read Candidate Safety Information.

Please confirm your attendance by replying back to this email. If you have any questions, please do not hesitate to call me or your recruiter, **Tyler Allie**. We truly look forward to your visit.

**Summary of Benefits**

www.shell.us/benefits

**Shell is an Equal Opportunity Employer**

If you require special accommodations, any reasonable adjustments or special assistance for the final assessment, please contact me.

Sincerely,

Gabriel Konigsberg

**Candidate Coordinator**

**US Recruitment**

910 Louisiana

Houston, Texas 77002

Office: 713-241-2953

Mobile: 713-591-8906

Gabriel.Konigsberg@shell.com

**CONFIDENTIALITY.** The information contained in this transmission is advice intended exclusively for the proper use by the intended addressees and may contain confidential and/or privileged material. Any views expressed in this transmission are those of the individual sender, except where the transmission states otherwise and the sender being authorised appropriately. Any review, dissemination and other use of this information, as well as any action in reliance upon this information by persons and/or entities other than the intended addressees is prohibited. If you received this information in error, please note that no confidentiality or privilege is waived or lost by any miss-transmission. You are requested to inform the sender and/or addressee immediately and permanently delete and/or destroy the material.

--
Robert Dedmon

**Appendix 030**

# Dedmon Declaration

# Exhibit 3

Robert Dedmon <r.dedmon@gmail.com>

**(no subject)**
2 messages

---

**Robert Dedmon** <r.dedmon@gmail.com>                                    Wed, Apr 23, 2014 at 12:04 PM
To: "<Carl.A.Williams@shell.com>" <carl.a.williams@shell.com>

In short ( I finally got Tyler on the phone):  There are some internal changes being made to the group and they haven't locked down the pay grade for the position.  He informed me that I'm the likely candidate but no final decision has been made.

In other news, we are about 2 weeks out from finishing up the pool at our home.  My oldest does a walk through everyday after school to check the progress.  She noted that they didn't do anything different on Sunday and I had to remind her that they crew was off work for Easter. Future Project Manager?  HAHA

Have a great week.

--
Robert Dedmon

---

**Carl.A.Williams@shell.com** <Carl.A.Williams@shell.com>                Wed, Apr 23, 2014 at 12:11 PM
To: r.dedmon@gmail.com

Certainly better than no info at all. Got cryptic responses to my queries (……which I have no patience for). Congrats on the pool – love that the little one's immersed in the outcome. Got a leader there in the making ! Still need to catch-up over beers – will do so soon.


Carl


---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Wednesday, April 23, 2014 12:04 PM
**To:** Williams, Carl A SENA-STE/32
**Subject:**


In short ( I finally got Tyler on the phone):  There are some internal changes being made to the group and they haven't locked down the pay grade for the position.  He informed me that I'm the likely candidate but no final decision has been made.


In other news, we are about 2 weeks out from finishing up the pool at our home.  My oldest does a walk through everyday after school to check the progress.  She noted that they didn't do anything different on Sunday and I had to remind her that they crew was off work for Easter. Future Project Manager?  HAHA


Have a great week.


--
Robert Dedmon

---

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

Dedmon 000766

**Appendix 032**

# Dedmon Declaration

# Exhibit 4

 Gmail

## ***Invitation to Apply
8 messages

---

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                    Thu, Jun 19, 2014 at 6:28 PM
To: r.dedmon@gmail.com

Hello Robert,


The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.


Sales Representative - Houston, TX


Best Regards,


**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:**  713.241.1094

**Email:** kendra.williams@shell.com



Disclaimer:

This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and therefore Shell does not accept legal responsibility for the contents of  his message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing this email

---

**Robert Dedmon** <r.dedmon@gmail.com>                    Thu, Jun 19, 2014 at 6:58 PM
To: "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon
Sent from my iPhone

**Dedmon 000838**

On Jun 19, 2014 ~~ams@shell.com> wrote:

**Appendix 034**

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

<image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email:** kendra.williams@shell.com

<image002.png>

Disclaimer:
This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and  herefore Shell does not accept legal responsibility for  he contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing  his email

---

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                                        Thu, Jun 19, 2014 at 7:08 PM
To: r.dedmon@gmail.com

Thank you, Robert for your prompt reply. Yes, as we have reposted the position after the internal evaluation with the revised requirements, we will require your formal application. The team will only meet with you for a 1 hour assessment, in lieu of the 2 hour assessment as previously conducted. This will also allow the time for you to ask any questions that you may have of the team regarding the role.

Best Regards,

Kendra Williams

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Thursday, June 19, 2014 6:58 PM
**To:** Williams, Kendra J SHLOIL-HRT/RA
**Subject:** Re: ***Invitation to Apply

Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Dedmon 000839

# Appendix 035

Thanks,

Robert Dedmon

Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

<image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email: kendra.williams@shell.com**

<image002.png>

Disclaimer:

This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and  herefore Shell does not accept legal responsibility for  he contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing  his email

---

**Robert Dedmon** <r.dedmon@gmail.com>                                                    Thu, Jun 19, 2014 at 9:19 PM
To: "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

Yes, I'm available to come in on June 30th at 1 pm.  I will submit my application this evening.

Thanks,

Robert Dedmon

On Thu, Jun 19, 2014 at 6:58 PM, Robert Dedmon <r.dedmon@gmail.com> wrote:
Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon
Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

**Appendix 036**                                              Dedmon 000840

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

<image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:**  713.241.1094

**Email: kendra.williams@shell.com**

<image002.png>

Disclaimer:
This e-mail, and any attachment and response string are confiden ial. If you are not the intended recipient, please telephone or e-mail  he sender and delete this message and any attachment immediately. Internet communications are not secure and therefore Shell does not accept legal responsibility for the contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing this email

--
Robert Dedmon

---

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                                    Fri, Jun 20, 2014 at 8:37 AM
To: r.dedmon@gmail.com

Hello Robert,

Before you submit an application, Carl Williams has to list you as a referral through our gateway, then an automated link will be sent over to you. So, please do not send a formal application until the automated link is sent over to you.

Best Regards,

Kendra Williams

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Thursday, June 19, 2014 3:29 PM

**Appendix 037**

Dedmon 000841

Yes, I'm available to come in on June 30th at 1 pm.  I will submit my application this evening.

Thanks,

Robert Dedmon

On Thu, Jun 19, 2014 at 6:58 PM, Robert Dedmon <r.dedmon@gmail.com> wrote:

Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon

Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

<image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email:** kendra.williams@shell.com

<image002.png>

Disclaimer:
This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and  herefore Shell does not accept legal responsibility for  he contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing  his email

Dedmon 000842

**Appendix 038**

--
Robert Dedmon

---

**Robert Dedmon** <r.dedmon@gmail.com>                                    Fri, Jun 20, 2014 at 10:33 AM
To: "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

Ok, I will keep an eye out for that email.

On Fri, Jun 20, 2014 at 8:37 AM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

Before you submit an application, Carl Williams has to list you as a referral through our gateway, then an automated link will be sent over to you. So, please do not send a formal application until the automated link is sent over to you.

Best Regards,

Kendra Williams

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Thursday, June 19, 2014 9:20 PM

**To:** Williams, Kendra J SHLOIL-HRT/RA
**Subject:** Re: ***Invitation to Apply

Yes, I'm available to come in on June 30th at 1 pm.  I will submit my application this evening.

Thanks,

Robert Dedmon

On Thu, Jun 19, 2014 at 6:58 PM, Robert Dedmon <r.dedmon@gmail.com> wrote:

Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon

Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

Dedmon 000843

**Appendix 039**

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come at 1 pm on that date? The below phase listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

<image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email: kendra.williams@shell.com**

<image002.png>

Disclaimer:
This e-mail, and any attachment and response string are confiden ial. If you are not the intended recipient, please telephone or e-mail he sender and delete this message and any attachment immediately. Internet communications are not secure and therefore Shell does not accept legal responsibility for the contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

🌲 Please consider the environment before printing this email

--
Robert Dedmon

--
Robert Dedmon

---

**Robert Dedmon** <r.dedmon@gmail.com>                                    Fri, Jun 20, 2014 at 4:01 PM
To: "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

Should I be expecting that email today?  I don't want to let it slip by me over the weekend.

Thanks,

On Fri, Jun 20, 2014 at 8:37 AM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

Before you submit an application, Carl Williams has to list you as a referral through our gateway, then an automated link will be sent over to you. So, please do not send a formal application until the automated link is sent over to you.

Dedmon 000844

**Appendix 040**

Best Regards,

Kendra Williams

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Thursday, June 19, 2014 9:20 PM

**To:** Williams, Kendra J SHLOIL-HRT/RA
**Subject:** Re: ***Invitation to Apply

Yes, I'm available to come in on June 30th at 1 pm.  I will submit my application this evening.

Thanks,

Robert Dedmon

On Thu, Jun 19, 2014 at 6:58 PM, Robert Dedmon <r.dedmon@gmail.com> wrote:

Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon

Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

<image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email: kendra.williams@shell.com**

<image002.png>

**Appendix 041**

Dedmon 000845

Disclaimer:
This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail he sender and delete this message and any attachment immediately. Internet communications are not secure and therefore Shell does not accept legal responsibility for the contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing this email

--
Robert Dedmon

--
Robert Dedmon

---

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                    Sat, Jun 21, 2014 at 9:42 AM
To: r.dedmon@gmail.com

Good Morning Robert,

If you have not received the link by Wednesday of next week, then I will have you to directly apply to the position.

Best Regards,

Kendra Williams

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Friday, June 20, 2014 4:02 PM
**To:** Williams, Kendra J SHLOIL-HRT/RA
**Subject:** Re: ***Invitation to Apply

Should I be expecting that email today?  I don't want to let it slip by me over the weekend.

Thanks,

On Fri, Jun 20, 2014 at 8:37 AM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

Before you submit an application, Carl Williams has to list you as a referral through our gateway, then an automated link will be sent over to you. So, please do not send a formal application until the automated link is sent over to you.

Dedmon 000846

**Appendix 042**

Best Regards,

Kendra Williams

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Thursday, June 19, 2014 9:20 PM

**To:** Williams, Kendra J SHLOIL-HRT/RA
**Subject:** Re: ***Invitation to Apply

Yes, I'm available to come in on June 30th at 1 pm.  I will submit my application this evening.

Thanks,

Robert Dedmon

On Thu, Jun 19, 2014 at 6:58 PM, Robert Dedmon <r.dedmon@gmail.com> wrote:

Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon

Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

<image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:**  713.241.1094

**Email: kendra.williams@shell.com**

<image002.png>

**Appendix 043**

Dedmon 000847

Disclaimer:
This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and  herefore Shell does not accept legal responsibility for  he contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing  his email

--
Robert Dedmon

--
Robert Dedmon

# Dedmon Declaration

# Exhibit 5

Robert Dedmon <r.dedmon@gmail.com>

## Invitation from carl williams for a job opportunity at Shell
1 message

**Shell** <donotreply@trm.brassring.com>                                              Sun, Jun 22, 2014 at 8:17 PM
Reply-To: Shell <donotreply@trm.brassring.com>
To: r.dedmon@gmail.com

Message from carl williams

Dear Robert Dedmon,

As I was browsing through our job opportunities at Shell I thought of you. I believe your skills and experience would fit nicely with our organisation and I'd like you to consider submitting your interest for: Sales Representative - Houston, TX 8401BR

To find out what it is like working for Shell and how you could become part of the team, please visit www.youtube.com/watch?v=HcXZKJVz23o.

In order for this to be a successful referral you need to apply using the link provided in this email. Please click here to start. Please note that by applying to this position via the link you agree with the fact that I will be informed about your progress within the application process. There will be no exchange of personal information whatsoever, just information on when you move from one recruitment status to the next.

If you do not wish to share this type of information, please visit www.shell.com/careers to search and apply to available opportunities, or to sign up for updates on future job opportunities and the latest developments in your field of interest.

Good luck!
carl williams

Please note this is an auto-generated email.

Dedmon 000810

**Appendix 046**

# Dedmon Declaration

# Exhibit 6

M Gmail

Robert Dedmon <r.dedmon@gmail.com>

**Shell Final Assessment - Robert Dedmon**

1 message

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>
To: r.dedmon@gmail.com

Mon, Jun 30, 2014 at 8:05 AM

Good Morning Robert,

Thank you for your continued interest in Shell as a potential employer.  We are pleased to invite you to a final assessment for the position of **Sales Representative - Houston, TX.**  The details are:

| | |
|---|---|
| Date: | Monday, June 30, 2014 |
| Time: | 1:00pm – 2:00pm CST   **(Please arrive 15 minutes early for check in with security)** |
| Location: | Shell Trading Services Company |
| | 1000 Main |
| | Houston, TX 77002 |

Upon arrival to **12th floor Security**, inform them you are there to meet with **Jennifer Hartnett**.  You will need a **valid picture ID** and will receive a visitor's badge.

-

**Travel**

I understand you are local to the area and will not require travel accommodations.  Please let me know if this changes.  Attached is our Candidate Expense Claim Form for any charges incurred during this recruiting experience.  If you plan to drive over 100 miles to any destination en route to this interview, please contact me to discuss viable travel options.  For any questions regarding travel logistics or itinerary, I will be your point of contact (Office:  713 241-8274 / Mobile: 832 846-1496).

**Parking**

You may park in the nearby parking garage:

McKinney Parking Garage – This is one building north of the tower, enter via McKinney (accepts cash and credit card)

Macy's parking garage – This is located just southwest of our tower. Enter via Travis (Cash only)

OTM parking garage – Entrance via Travis and/or McKinney (accepts cash and credit card)

**Participants**

You will meet with the following individuals for some or your entire interview:

- Jennifer Hartnett – Supervisor Sales
- Christopher Riley – Sr. Originator Aggregator
- Michael Tickle – Sr. Sales Representative

**Enclosures**

- Candidate Information Pack
- Candidate Expense Claim Form

-

**Important Safety Information**

**Appendix 048**

Dedmon 000832

We care about your safety and are committed to ensuring that HSSE features as a key element of our recruitment events.  The following advice is provided with this in mind; please take a moment to read Candidate Safety Information.

Please confirm your attendance by replying to this email.  If you have any questions, please do not hesitate to call me or your recruiter, **Tyler Allie**.  We truly look forward to your visit.

**Summary of Benefits**

www.shell.us/benefits

**Shell is an Equal Opportunity Employer**

If you require special accommodations, any reasonable adjustments or special assistance for the final assessment, please contact me.

Best Regards,



**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:**  713.241.1094

**Email:** kendra.williams@shell.com



Disclaimer:

This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and therefore Shell does not accept legal responsibility for the contents of  his message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing this email

# Dedmon Declaration

# Exhibit 7

 Gmail

Robert Dedmon <r.dedmon@gmail.com>

---

**Follow up : Information for Review**
4 messages

---

**Tyler.Allie@shell.com** <Tyler.Allie@shell.com>                                     Wed, Jul 9, 2014 at 1:44 PM
To: rdedmon@gmail.com

Here you go! For your review this evening,

**Tyler**



**Tyler Allie**

Shell Recruitment

1000 Main St

Houston, TX 77002

Phone: +1 713-230-3774

Cell: +1 281-536-3193

Email: tyler.allie@shell.com
Shell Careers Page

https://twitter.com/Shell_Careers

---

**4 attachments**

 **2014_Summary_of_Benefits[1] - Copy.pdf**
96K

 **Annual Enrollment 2014.pdf**
764K

 **Benefits 2014 - Copy.pdf**
1658K

**Wealth 2014.pdf**
584K

---

**Robert Dedmon** <r.dedmon@gmail.com>                                     Wed, Jul 9, 2014 at 4:17 PM
To: Tyler.Allie@shell.com

Tyler,

I just left you a voice mail officially accepting the position. I know we discussed a potential sign on bonus before the base salary was set. Is that still up for discussion as I'm leaving about 75-80% of my 2014 STI on the table when I resign.

Thanks again and I'm excited about joining the team.

Dedmon 000798

# Appendix 051

# Dedmon Declaration

# Exhibit 8



**Robert Dedmon <r.dedmon@gmail.com>**

---

### CONFIDENTIAL: Your Employment Documentation Package - Robert Dedmon

**Robert Dedmon** <r.dedmon@gmail.com>                                      Fri, Jul 11, 2014 at 2:03 PM
To: Lisa.Billington@shell.com

Lisa,

I noticed one small item.  The pay grade says its a 6 but I was informed it was a 3.  I will get these documents back to you asap.

Thanks,

On Fri, Jul 11, 2014 at 12:47 PM, <Lisa.Billington@shell.com> wrote:

Dear Robert,

Congratulations on accepting our offer of employment. I will be your key focal point throughout your journey until you arrive on your first day in Shell. If you have questions about the process at any point in time, please contact me and I will try my best to help and guide you. In order to meet our targeted start date that you have discussed with our recruiter it is important to keep to any stated timelines to ensure a smooth process.

Please find attached the package details as outlined by your Recruiter.

***Please review the offer carefully.  Your full name should be the same as it appears on your legal identifying documents, such as social security card, passport, transcripts, etc. Please cross out and make any necessary corrections, and initial next to your changes.***

The following documents are attached:

- Welcome to Shell Guide
- Offer of Employment (Please sign and return all pages)
- Shell/Motiva Consent Form (Please complete and return)
- Applicant background check instruction sheet
- Summary of Benefits – click here
- Shell Code of Conduct – click here

*We would like you to read, sign and complete the documents as required, and return them to us per the deadline in the offer letter.
Please return all signed documents to: SHLOIL-Experienced-Hire-SFP@shell.com and lisa.billington@shell.com or by fax to 281-582-6253.

**What will be the next steps after this?**

To help you prepare, please review the attached documents. Below I would like to bring some other useful information to your attention, regarding the process and next steps:

Dedmon 000479

Appendix 053

| Step 1 | •Introduction Email/Offer Package<br>•To be returned to your SFP for processing |
|---|---|
| Step 2 | •Offer Acceptance Email<br>•You will be notified within 24 hours that your offer has been received |
| Step 3 | •HireRight<br>•This is our 3rd party screening vendor; background checks can take 10 - 15 days to complete |
| Step 4 | •Policy Counseling for Relocation & Immigration *(If Applicable)*<br>•You will be contacted by a Shell Colleague to discuss relocation/immigration relocation benefits |
| Step 5 | • Medical Questionnaire<br>•All potential Shell employees are required to complete this once their background check is cleared. You will receive an email from your SFP with instructions |
| Step 6 | •Fit To Work Exam *(If Applicable)*<br>•A Shell Health Employee will reach out to you if a physical is required of you |
| Step 7 | •Finalization of Start Date<br>•Once you have cleared Medical, your SFP will reach out via phone or email to finalize your start date |
| Step 8 | •Pre-Employment Completion<br>•Your SFP will send out an email to you along with your Recruiter, Hiring Manager, and HR Team to let everyone know the final start date |
| Step 9 | •Report To Work Details<br>•You will receive this email from your SFP 1 - 2 weeks before your start date, detailing first day instructions |
| Step 10 | •TALX<br>•The final step before your first day is to complete your new hire paperwork and first part of the I-9 using our online system called TALX |

If you have any questions, please don't hesitate to contact me by phone or e-mail.

**Lisa Billington**
HR Single Focal Point

Shell Exploration & Production Company

150 North Dairy Ashford

Houston, TX 77079

**Tel:** 832-337-1298

**Email:** Lisa.Billington@Shell.com

**Fax:** 281-582-6253

**Internet:** http://www.shell.us/careers

CONFIDENTIALITY. The information contained in this transmission is advice intended exclusively for the proper use by the intended addressees and may contain confidential and/or privileged material. Any views expressed in this transmission are those of the individual sender, except where the transmission states otherwise and the sender being authorised appropriately. Any review, dissemination and other use of this information, as well as any action in reliance upon this information by persons and/or entities other than the intended addressees is prohibited. If you received this information in error, please note that no confidentiality or privilege is waived or lost by any miss-transmission. You are requested to inform the sender and/or addressee immediately and permanently delete and/or destroy the material.

--
Robert Dedmon

Dedmon 000480

Appendix 054

# Dedmon Declaration

# Exhibit 9



**Shell Exploration & Production Company**
150 N Dairy Ashford
Houston, TX 77079
Tel  +1 832 337 1298
Fax +1 281 582 6253
**Email** lisa.billington@shell.com
**Internet** http://www.shell.com

Confidential
Robert Dedmon
1 Acosta Valley Dr.
Missouri City, TX 77459

July 11, 2014

Dear Robert,

Thank you for your interest in Shell. We appreciate you making time in your schedule to participate in our recruiting process and hope this experience provided you with a good opportunity to learn about our company. We are very excited we had the opportunity to get to know you, and believe you would be a great addition to our organization.

Therefore, it is with great pleasure that we formally extend a conditional offer of employment on behalf of Shell Trading Services Company ("Shell" or "Company"), Houston, TX. Details of the conditional offer, and other information that you may find helpful in your decision-making process, are enclosed with this letter.

We are confident that you will find Shell a challenging and rewarding environment in which to work, and we are equally confident that the entire organization will benefit from your experience and expertise.

Please feel free to contact your Candidate Single Focal Point Coordinator, Lisa Billington, who will be assisting you throughout your pre-employment process at 832-337-1298 or **SHLOIL Experienced Hire SFP SHLOIL-HRT/RO** if you have any questions.

Sincerely,
**Shell Exploration & Production Company**

Erin Verdon
HR Account Manager – Onshore Gas

**Appendix 056**

cc:     Jennifer Hartnett
        Andrew Phung
        Tyler Allie

Enclosures:

- o   Offer Details
- o   Summary of Benefits
- o   Shell Code of Conduct

ShellDedmon_000114

**Appendix 057**

**Offer Details**

To accept this conditional offer, please sign and return a scanned copy of this letter to **SHLOIL Experienced Hire SFP SHLOIL-HRT/RO** no later than July 15, 2014.

**Position and Salary**

Your starting base salary will be $8,333.33 per month, which is equivalent to $100,000.00 yearly for the position of Sales Representative at salary grade 6.

**Commercial Bonus Program**

As a full-time employee of Shell Trading Services Company, you will be eligible to participate in our benefit programs and incentive compensation plan in accordance with the guidelines of those programs. You are eligible to participate in the Commercial Bonus Program, which provides bonus opportunity that would typically range from 0 to 100% of your base salary in a year, or higher depending on the results of Shell Trading globally. The actual amount will be based upon individual performance. You will be eligible for a prorated bonus amount for 2014 which is payable in March 2015 or as determined by Company policy. Bonuses are performance based and are not guaranteed.

**Sign-on Bonus**

In addition to your basic salary (and any Allowance) you will receive a one time sign-on bonus of $5,000.00 which will be paid at the time of the first payment of your basic salary. By accepting this bonus payment, you promise to remain in the employment of the Company for a minimum continuous period of 12 months. If for any reason (other than listed below) your employment terminates before the end of the 12 month period, then you agree and promise to repay the bonus amount in full immediately on that termination. The Company reserves the right to deduct the amount of the bonus which is repayable in this way from any sum otherwise payable to you by reason of your employment with the Company or its termination. By signing this letter you consent to and authorize any such deduction. You or your estate will not be required to repay the bonus amount if the Company's needs change and your services are no longer required or you die while employed by the Company.

This payment is not benefits bearing and is not eligible for deferral. This payment is subject to federal and (if applicable) state and other income and employment tax withholding.

Your employment shall be on an "at-will" basis. Nothing in this letter constitutes a contract of employment.

**Vacation**

You are eligible for 160 hours of vacation per year, which will be pro-rated your first year. Future vacation eligibility will be determined in accordance with Company policy.

**Standard Benefits**

You will be eligible to receive the full range of benefits that are available to Shell employees in the U.S. in accordance with our normal policy. A summary of these benefits is included with this letter.

**Summary of Benefits**

www.shell.us/benefits

**Appendix 058**

ShellDedmon_000115

**Conditional Offer**

This employment offer is conditional upon your satisfying the pre-employment requirements of Shell. Those requirements include but are not limited to:

- Immediately completing the following documents and returning them by email and/or fax:
  - Entire copy of this conditional offer letter (with your signature)
  - Your social security # and date of birth – no documentation, just numbers
- Shell/ you obtaining any other governmental approval(s) or license(s) required for the job being offered.
- Successful completion of a background and screening that includes but is not limited to the verification of your education, employment history, social security number, and certification or licenses you have stated you possess. Upon your acceptance of our offer, you will be contacted with further instructions.
- Submission and successful completion of the pre-employment hair drug test.
- Being able to perform the essential functions of the job for which you receive an offer with or without a reasonable accommodation.
- Your successful screening against the Denied/Restricted Parties lists and Shell's ability to obtain any necessary licensing for your work on controlled technology per U.S. Export Control regulations or other related sanctions.
- Reading the following documents which you will be asked to complete and/or acknowledge at a later date:
  - Shell Code of Conduct
  - Summary of Benefits
- Providing documentation that you are lawfully authorized to work in the U.S. In accordance with the Immigration Reform and Control Act of 1986, we are required to examine original documents verifying that prospective employees are either United States citizens or are lawfully authorized to work in the U.S. Please note that this documentation requirement applies to both U.S. citizens and non-citizens. If you plan to present a Social Security card as part of your documentation, please note that laminated copies of Social Security cards will not be accepted if the cards state that they are "not valid if laminated." **In addition, when you report to work and we have examined your document(s), it will be necessary for you to sign an Employment Eligibility Verification form (Form I-9), attesting to the authenticity of the documents you provide. We will not be able to employ you until we have verified these documents. Failure to provide appropriate documents the day you report to work will delay your employment date until you can provide them. If they are not provided within a reasonable time period (i.e. no later than 3 days) after your expected employment date, it may be necessary to withdraw our offer of employment.**

Failure to provide appropriate documents the day you report to work will delay your employment date until you can provide them. If they are not provided within a reasonable time period (i.e. no later than 3 days) after your expected employment date, it may be necessary to withdraw our offer of employment.

**Please note: This Conditional Offer of Employment Letter, including the Offer Details, (and any attached or related documents and conversations) is not a contract of employment on the part of Shell, and your employment will be on an "at-will" basis. Furthermore, as a matter of routine, since this is a conditional offer of employment, we suggest that you not indicate plans to resign, move, sell property or begin any coordinating discussions for your replacement with any current employer until we notify you that all the pre-employment requirements have been met.**

---

**I accept this conditional offer of employment as presented herein.**

_signature_                                    7. 13. 14

**ROBERT DEDMON**                              Date

---

Confidential                                                                        4

**Appendix 059**

# Dedmon Declaration

## Exhibit 10

Robert Dedmon <r.dedmon@gmail.com>

---

## Heads up
1 message

---

**Tyler.Allie@shell.com** <Tyler.Allie@shell.com>　　　　　　　　　　Mon, Jul 14, 2014 at 5:44 PM
To: r.dedmon@gmail.com

You will see a "regret" for 4089BR Sales Rep. It has nothing to do with anything. No impact, no concerns.


All good,


**Tyler**





**Tyler Allie**

Shell Recruitment

1000 Main St

Houston, TX 77002

Phone: +1 713-230-3774

Cell: +1 281-536-3193


Email: tyler.allie@shell.com
Shell Careers Page

https://twitter.com/Shell_Careers

Dedmon 000803

**Appendix 061**

# Dedmon Declaration

# Exhibit 11

M Gmail

## Confirmation of Clearance - Robert Dedmon

**Lisa.Billington@shell.com** <Lisa.Billington@shell.com>                                                    Thu, Jul 24, 2014 at 10:53 AM
To: r.dedmon@gmail.com

Dear Robert,

Congratulations! This email serves as your written confirmation that your pre-employment screening is **CLEARED and COMPLETE**, and you have successfully satisfied Shell's requirements for employment per your signed conditional offer. We sincerely appreciate your cooperation throughout this process!

You are ready to start on **August 19.** Please make any necessary arrangements with your current employer to be able to start at that time.

Final Steps

I will email you final instructions for your first day within 1-2 weeks of your start date.  You will then have some online paperwork to complete before your first day which could take approximately one hour to complete.

Shell and Motiva want to ensure you are safe during an emergency. Access office closure information, staff alerts and disaster relief volunteer opportunities can be accessed via the below link: http://www.shell.us/aboutshell/us-media-center/storm-center.html.

**Lisa Billington**
HR Single Focal Point

Shell Exploration & Production Company

150 North Dairy Ashford

Houston, TX 77079

**Tel: 832-337-1298**

**Email:** Lisa.Billington@Shell.com

**Fax: 281-582-6253**

**Internet:** http://www.shell.us/careers

**CONFIDENTIALITY.** The information contained in this transmission is advice intended exclusively for the proper use by the intended addressees and may contain confidential and/or privileged material. Any views expressed in this transmission are those of the individual sender, except where the transmission states otherwise and the sender being authorised appropriately. Any review, dissemination and other use of this information, as well as any action in reliance upon this information by persons and/or entities other than the intended addressees is prohibited. If you received this information in error, please note that no confidentiality or privilege is waived or lost by any miss-transmission. You are requested to inform the sender and/or addressee immediately and permanently delete and/or destroy the material.

**Appendix 063**

# Dedmon Declaration

# Exhibit 12

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **460-2021-00333** |

| **Texas Workforce Commission Civil Rights Division** | and EEOC |
|---|---|
| State or local Agency, if any | |

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| **Mr. Robert L. Dedmon** | **(713) 899-9486** | **April 7, 1980** |

| Street Address | City, State and ZIP Code |
|---|---|
| **1 Acosta Valley Drive** | **Missouri City, Texas 77459** |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Shell Exploration & Production Company** | **> 15** | **(888) 467-4355** |

| Street Address | City, State and ZIP Code |
|---|---|
| **One Shell Plaza, 1000 Main Street, Level 12  Houston, Texas 77002** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☒ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                    Latest
**Continues**

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I believe Shell Exploration & Production Company violated and continues to violate Title VII of the Civil Rights Act of 1964 and the Texas Commission on Human Rights Act through discrimination in pay because of race and color [black]. The discrimination includes discrimination against me. It may include systemic discrimination that includes others.

CONFIDENTIAL
Appendix 10-A

I understand that Shell may have violated other laws as well, but that neither the United States Equal Employment Opportunity Commission nor the Texas Workforce Commission-Civil Rights Division enforces those other laws, such as 42 U.S.C. § 1981.

Here is the story of what happened. The Shell Vice President of Human Resources [Teri Olmen], at the time, communicates the final, new-hire, job grades that set salary range. Shell posts a job in Houston, Texas at grade 5 and later offers this job at grade 5 to someone who is not a black male. That person declines the job offer.

Shell then decides to offer the job to me. Before Shell communicates the offer to me, the Shell Vice President of Human Resources changes the job grade from 5 to 6, which lowers the salary. At Shell, the higher the job grade number, the lower the salary range. So, job grade 6 pays less than job grade 5, which pays less than job grade 4, which pays less than job grade 3, and so on.

A Shell hiring manager [Sri Rangan] opposes this downgrade and questions the Shell Vice President of Human Resources about this downgrade. The Shell Vice President of Human Resources responds along the lines of this: *People of color struggle at being successful [hence the lower job grade]. He needs to prove that he is capable of handling a role of this significance, or we would be setting him up for failure.*

The Shell hiring manager reports to a supervisor that this downgrade is happening because the new hire is black. The Shell supervisor thinks perhaps this is a misunderstanding. So, the Shell hiring manager follows up with the Shell Vice President of Human Resources and says something along the lines of this: *I understood that you wanted me to offer this at a lower-paying job grade because he is black.* The Shell Vice President of Human Resources responds along the lines of this: *Historically, minorities do not do well at Shell, so we do not want to set him up to fail by starting him at a higher [ranked, paying] job grade.*

The Shell hiring manager complies with the directive but formally reports her opposition internally. Shell tells her an internal investigation will happen. Shell later tells her it has closed the matter and will not be telling her the results.

The root cause of the pay discrimination at Shell is not clear. It could be that Shell had a formal or informal policy of starting black males [and perhaps other *people of color*] at lower-paying job grades. In other words, people higher up than the Vice President of Human Resources may have set the discriminatory policy or practice. It could also be that Shell did not properly train or supervise its human resources personnel or other decision-makers and so left the discrimination unchecked.

This summer, I learn for the first time about the pay discrimination. So, the factual information above is based on information provided by others. Shell never informed me that it made any effort to correct the pay

CONFIDENTIAL
ShellDedmon_000066

disparity. I am not aware of any effort to correct the pay disparity. I believe the discrimination continues with each paycheck because Shell started me [and perhaps others] at a lower pay rate due to race and color.

I understand that the Shell hiring manager [Sri Rangan] has recently informed Shell that she continues to oppose the discriminatory pay decision and that she would serve as a witness in any EEOC proceedings.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 10·16·20      _Charging Party Signature_ <br> Date | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) <br> 10\|16\|2020    ALOSHY MATHEW <br> Notary Public, State of Texas <br> Comm. Expires 06-22-2024 <br> Notary ID 132532534 |

CONFIDENTIAL

# Dedmon Declaration

## Exhibit 13

*Please review important Legal and Equal Opportunity requirements at the end of this broadcast*

**Broadcast identifier** _____ **Status:** Open
**Click on the section headers to access the various sections.**

**Contact details** ────────────────────────────────

**Contact for inquiries***

| | | | |
|---|---|---|---|
| Tickle, Michael | Michael.Tickle@shell.com | 713-230-2954 | |

**Broadcast Coordinator**

| | | | |
|---|---|---|---|
| Nallie, Elena | [ HYPERLINK "mailto:elena.nallie@shell.com" ] | +1 713 230 7512 | |

| **Selection Panel Delegates** | | **Application Notification** | |
|---|---|---|---|
| Tickle, Michael | Michael.Tickle@shell.com | 713-230-2954 | X |
| | | | |

**General Details** ────────────────────────────────

| | |
|---|---|
| Is US Law applicable for this job? | Yes |
| Broadcast Language | English |
| Generally Embargoed Country disclaimer needed? | No |
| Max number of positions available * | 1 |
| Shell People Position No * | _____ |
| Continuous Opportunity | No |

| | |
|---|---|
| Position Title * | Energy Retailers Mid Marketer |
| Organization Level 1 * | Downstream |
| Organization level 2 * | ST: Trading |
| Organization level 3 | US SHELL TRADING SERVICES COMPANY |
| Line Of Business | TR – Trader |
| Anticipated state of employment (if position is in the USA) | TX Texas |
| Anticipated country of employment * | US USA |
| Working Option * | Full Time |
| Include positions which are externally posted? | No |
| Candidate who meets requirements identified? | No |
| | |
| Batch ID | |
| Sub Batch | |
| Additional general comments | Shell Trading is the principal trading and shipping business within the Shell Group. With over 3100 staff in diverse locations, from London and Houston to Singapore and Barbados, Shell Trading integrates a worldwide trading network with an impressive global portfolio. Our organization trades approximately 13 million barrels of crude oil equivalent per day, spread over physical crude oil, refined products, natural gas, electrical power and chemicals.

Furthermore, we also provide marine expertise to over 40 operating units and manage a fleet of almost 50 gas and oil tankers. |

**Position information**

| | |
|---|---|
| Skill Pool Group * | Trading |
| | Trading |
| Additional Skill Pools | |
| Job Group * | 5-5 |
| | |
| Place in the organisation | Sales and Origination – East Retail |
| Reports to * | Michael Tickle |
| Work Location | HOU-OTM |

**Appendix 070**

| | |
|---|---|
| Work Pattern | 5/40 |
| Additional Comments on Position | |

**Timing**

| | |
|---|---|
| Broadcast date * | _____ |
| Closing date * | _____ |
| Starting date earliest * | _____ |
| Starting date latest * | _____ |
| Anticipated assignment length * | 4 years |
| Expected time needed to obtain Government /joint venture partner approval | |
| Anticipated selection date * | _____ |
| Additional Comments on timing | |

**Terms and conditions**

| | |
|---|---|
| Max terms & conditions * | Local Terms |
| Position for Local staff only | Yes |
| Additional Terms and Conditions | |

**General Position Definition**

| | |
|---|---|
| General Position Definition | Mid-Marketing position within the Energy Retailers Origination group.  Position will work with Retail Energy companies, maximizing transactions and margin. |

**Position description - Purpose**

| | |
|---|---|
| Purpose | This position has the responsibility to increase transaction flow and GM related to Energy Retailer relationships. |

**Appendix 071**

CONFIDENTIAL

**Position description - Accountabilities**

Accountabilities

Contribute to the delivery of Gross Margin and Economic Profit results related to Retail Energy supply in the North American market.

Must have the ability to sell creative commodity/risk products.

Maximize transactions with each counterparty.

Maximize $/MWh or $/MMBtu for every transaction

Maintain a productive relationship with Trade Desks.

The individual will need to have awareness related to business development, credit terms, account management and market / industry knowledge which will allow candidate to successfully create new market opportunities

Successfully add value to regional ANT efforts.

Build and maintain productive supply relationships with customers and prospects.

Critical to the success of the group is the ability of the individual to contribute effectively and collaboratively in multiple working teams.

**Position description - Dimensions**

Dimensions

Contribute to Team Goals (and related Individual Goals) such as:

- Group GM of ~$TBD + GM/OC
- Positive Economic Profitability (GM - Direct and Indirect Costs - Working Capital charge)
- Individual delivery of ~$5MM+; exact number TBD
- Volume and customer count growth
- Unit margin ($/MWh and $/MMbtu) and interest rate and fee income
- Deal closure rates
- Grow flow for Trade Desks by increasing business from new and existing relationships
- Enhance our value proposition with new offerings

**Appendix 072**

- Add value to multiple working teams

### Position description - Special Challenges

Special Challenges

The role will requires a broad spectrum of competencies, including relationship management, credit and contracting abilities, and the ability to juggle many competing priorities at once.  Individual will have to work constructively with many groups within the organization in order to accomplish the group's goals.

### Position description - Additional comments

Additional comments

- Energy Retailers provide a critical (predictable) short to the Trade desks. Sustaining, growing, and preserving this position is very important to the continued growth of the business.
- This is a highly demanding (yet rewarding) role in a dynamic and constantly evolving space of the commodity business.

### Experience and Qualifications required

Experience and Qualifications required

Bachelor's degree in engineering, business or other relevant field of study required.

5 years of combined energy, structuring, origination, and /or sales management experience required

Exposure to Energy Retail market is preferred

Exposure to electricity and/or natural gas commodity transactions is a must.

Additional comments

We are interested in attracting people to our business who share our core working values of honesty, integrity and have respect for others. We also want those who can build on our business vision,

**Appendix 073**

CONFIDENTIAL

are prepared to accept accountability and can achieve great results through teamwork.

**Key Competences required**

| Competence | l |
|---|---|

Additional comments

We are interested in attracting people to our business that share our core working values of honesty, integrity and have respect for others. We also want those who can build on our business vision, are prepared to accept accountability and can achieve great results through teamwork.

**Equal Opportunity Statement** - It is the policy of Shell Oil Company to provide equal opportunity to all persons consistent with employment requirements and individual

**Appendix 074**

qualifications. Further, the policy prohibits discrimination in all employment practices for reasons of race, color, sex, national origin, age, religion, disability, sexual orientation, gender identity, protected veteran status, citizenship, genetic information, or other protected status under federal, state or local laws. Harassment for any of the above reasons, including any form of sexual harassment, is a discriminatory activity and is strictly prohibited. Supervisors, managers, and officers are responsible for implementing Shellâ€™s Equal Opportunity Policy. All employees are expected to support the policy and contribute to an environment of equal opportunity. Employees are encouraged to bring any questions or comments to managementâ€™s attention or, as appropriate, directly to the Human Resources organization.

**Export Compliance** - A manager, or his or her designee, broadcasting a job in the United States receiving an application from an employee working in a Generally Embargoed Country (GEC) or a person having nationality of any of the GECs, should contact Shell Legal Services - U.S. for guidance on how to properly handle the application. Currently, the following countries are classified as GEC: Cuba, Iran and Sudan. In addition Syria, Burma/Myanmar and North Korea are not GECs however have some special restrictions.

**Contract Staff and Fixed Term Employees** - Contractors in the U.S. (e.g., an independent contractor, a contract worker provided by another employer, or an employee of a service provider or vendor) and fixed term employees are not authorized to use this System. Applications from any contractors or fixed term employees either inside or outside of the United States through this system should not be considered for positions within Shell Companies in the U.S.

# Appendix 075

ShellDedmon_001093

# Dedmon Declaration

# Exhibit 14

Message

| | |
|---|---|
| **From:** | Tickle, Michael SENA-STX/A/32 [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f3c997de68a449799da5fa2802cf3217-USI+TIC1] |
| **Sent:** | 9/14/2021 2:32:22 PM |
| **To:** | Dedmon, Robert L SENA-STX/A/321 [robert.dedmon@shell.com]; Deley, Michael B SENA-STX/A/321 [michael.deley@shell.com]; Frnka, Patrick J SENA-STX/A/321 [patrick.frnka@shell.com]; Hund, Douglas R SENA-STX/A/321 [douglas.hund@shell.com]; Kolkmann, Ryan M SOPUS-PTC/D/MM [ryan.kolkmann@shell.com]; Smith, Susan E SENA-STX/A/321 [susan.e.smith@shell.com]; Tickle, Michael SENA-STX/A/32 [michael.tickle@shell.com] |
| **Subject:** | Potential Addition |

Team-

Let me know if you are aware of anyone that may be a good fit for our team.

Thanks,

**Michael Tickle**
**Shell Energy North America**
**Office:** 713.230.2954 / 832.730.6464 | **Mobile:** 713.392.8603 | **ICE:** Michael_Tickle_SENA
1000 Main Street, Level 12, Houston, TX 77002, USA
**E-mail:** michael.tickle@shell.com | **Web:** www.shell.com



---

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

# Exhibit 2

# Declaration of
# Srikala "Sri" Rangan

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Dedmon, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 4:21-cv-03371 |
| | § | |
| vs. | § | Jury Demand |
| | § | |
| Shell Exploration & Production | § | |
| Company and Shell Trading | § | |
| Services Company, | § | |
| | § | |
| *Defendants.* | § | |

**DECLARATION OF SRIKALA "SRI" RANGAN**

1.    My name is Srikala Rangan. I go by Sri. The facts and statements that I make in this declaration are true and accurate to the best of my recollection. Unless otherwise stated or apparent from my testimony, I have personal knowledge of the facts and statements that I make in this declaration. I was informed that "personal knowledge" means that I personally witnessed or experienced something using one or more of my senses, like sight, hearing, smell, or touch. I was also informed that "personal knowledge" includes how I feel.

2.    In 2013, I accepted a role as Manager of Sales Planning for the Shell Trading North America groups. This was my email signature block in 2014:

**Sri Rangan**
Manager - Sales Planning
Shell Trading North America

1000 Main, Houston, TX  77010
Work: 713.767.5311
Cell:   281.772.5559
Email:  srikala.rangan@shell.com
Internet: http://www.shell.com/trading

In 2016, I moved out of the Sales & Planning role and took on a role as Shell General Manager for Gas Operations. I left Shell in 2021 to accept a role as Vice President, Gas & Power Operations, at BP Energy. I retired from BP in June 2024.

3.    I am taking intermittent time out from a vacation in Africa to provide this testimony. I am not being compensated in any manner for my testimony.

4.    As part of my role for Shell as Manager of Sales & Planning, I had the gas and power inside sales team reporting to me through a sales supervisor. As part of this role, I participated in hiring decisions for the gas and power inside sales team, including the hiring decisions addressed in my testimony. At the time of the events I describe in my testimony, the sales supervisor for the gas and power inside sales team was Jennifer Hartnett. This was her email signature block in 2014:

Jennifer Hartnett
Sales Supervisor
Shell Energy North America
Jennifer.Hartnett@shell.com
Office: 713-767-5339
Cell: 713-855-1260

5.    During my employment as Manager of Sales & Planning, Shell had a numbered job grade system where the higher — meaning better — job grade (JG) had the lowest number. So, JG1 was the highest and best job grade within the numbered job grade system. JG5 was better and so considered "higher" than JG6. And JG4 was better and considered "higher" than JG5. And so on down to JG9. Job grades impact salary, bonuses, and career trajectory. Each job grade had a salary range, but there was no question at the time that a better job grade helped with compensation and career overall. Shell had letter job

**Appendix 080**

grades for executive-level positions that were higher than JG1, but my testimony involves the numbered job grades.

6.   The abbreviation "POC" in my emails during the hiring decision process for Robert Dedmon means *person of color* or *people of color*.  It has the same meaning in my testimony.

7.   In early 2014, there were two open jobs posted at JG5 for the gas and power inside sales team. We — the hiring team that included me — hired Patrick Frnka for one of those jobs at JG5. Patrick Frnka was a Scheduler from Shell Power Operations, had no sales experience, and was not a POC. We offered the 2nd open job posted at JG5 to an external candidate who was a Caucasian female, but we were unable to reach agreement on compensation. We then requested that human resources extend the offer to our 2nd choice candidate Robert Dedmon, who had relevant industry sales experience in addition to other qualifications like having an MBA with a focus in energy finance. As explained in my emails at the time, the two posted JG5 roles required the same tasks and were the same exact role because they involved the same region and same products.

8.   I received word that Shell Human Resources Account Manager Teri Olmen had indicated that the offer to the 2nd choice candidate — Robert Dedmon — should be made at JG6, which was one job grade lower than JG5. This was Teri Olmen's email signature block at the time:

**Teri Olmen**, SPHR, CCP
**Human Resources Account Manager**
Shell Trading
1000 Main Street, Ste. 16186B
Houston, TX  77002   USA

**Tel:** +1 713.230.7384
**Mobile:** +1 858.699.0883
**FAX:** +1 858.320.2608

Softphone: +1 858.678.2356
Email: Teri.Olmen@shell.com
Web: http://www.shell.com

9.   I felt I was friends with Teri Olmen at the time. I reached out to Teri Olmen to request clarification on why the job grade level suddenly changed to one level lower.

**Appendix 081**

10.  I was involved in email exchanges with my manager asking for support to keep the job grade level at JG5, as both roles posted at JG5 would perform the exact same accountabilities.

11.  I spoke face-to-face with Human Resources Manager Teri Olmen at some point during this process why the job grade level suddenly changed to one level lower. I said we needed to make a competitive offer at JG5. Teri Olmen communicated to me that historically, people like this do not do well at Shell, and so we are giving him a lower job grade. She said something like we do not want to set him up to fail by starting him off at a higher job grade. I asked what she meant with *people like this*. She said minorities. I was stunned. I understood that Teri Olmen was communicating to me that the job grade needed to be lowered to JG6 because Robert Dedmon was African American.

12.  I reached out to my manager Beth Bowman — General Manager of Sales & Origination — to share what Human Resources Manager Teri Olmen had told me and to ask for guidance. I expressed my concern about this — lowering the job grade because the candidate was an African American. I understand, from Beth Bowman, that my manager reached out to Teri Olmen to get clarification. Beth Bowman came back to me and let me know Teri Olmen had said the same thing to her.

13.  I expressed my concern and told my manager I will raise this with Shell EO as I felt obliged to, as I perceived it as discrimination based on race and against the Shell Code of Conduct. The advice I received was to do it with my eyes wide open. In other words, I would need to consider that there may be career consequences to me for reporting concerns about discrimination, lack of equal opportunity, to Shell EO.

14.  My manager and I continued to stay focused on getting the role filled throughout April 2014. I expressed my concern about lowering the job grade in multiple emails and also raised the issue of diverse candidacy we had and the optics of doing this. For example, I said this in an email dated April 22, 2014:

> I again want to document my discomfort in offering a job to a POC candidate at a lower JG when we have just offered the same exact role (same region/product) to a non POC candidate at a higher JG just a month ago.  It has been

15.  We — the hiring team including me that was pressing to keep this role at JG5 — eventually had to compromise in order to fill the role. We followed Shell Human Resources directives and filled the role at a lower job grade of JG6, bringing Robert Dedmon in to the Shell gas and power inside sales team.

**Appendix 082**

16.   The secondary reason Shell Human Resources provided for the lower job grade was that we had used up all our available JG5 across the organization and needed to equalize job grades. We had back & forth communications during which I disputed the secondary reason based on facts and logic. My bases for disputing the claimed secondary reason were true. And despite the secondary reason, Teri Olmen let me know the reason for the downgraded job grade was Robert Dedmon's race. Human Resources also questioned Robert Dedmon's qualifications for the role, even though his qualifications had already been vetted and the decision had already been made to offer him the JG5 role. I was involved in back & forth communications that accurately pointed out his qualifications.

17.   We ultimately accepted a compromise, and I asked the Sales Manager to offer the role to Robert Dedmon at JG6. I requested to Shell Human Resources that Robert Dedmon be paid at the higher end of the salary grade and expressed my concern again about different treatment of a POC.

18.  I had a follow-up conversation with Human Resources Manager Teri Olmen on May 1, 2014 to reinforce my understanding and to have an open dialogue on how I was reacting to her comments. She stayed firm and did not change her stance on her original comments around minorities and success at Shell and so lowering the job grade because candidate Robert Dedmon was African American.

19.   I then filed a Shell EO complaint through the Shell webform online. I received an email from Sean Banks at Shell EO asking me to notify my manager that I had filed this complaint. I did so. I received confirmation of my report to Shell EO. A Shell representative who was not Sean Banks spoke with me about my report. I ultimately received word that an investigation was completed, that there was a result, and that action would be taken. But I was told that the results [and action to be taken] could not be shared with me. I do not know what action was taken, but I do personally know that moving Robert Dedmon to JG5 months later was not part of that action.

20.  I was informed that Shell claims it cannot find my Shell EO complaint or documents about what happened concerning my Shell EO complaint. I was also informed that Shell has not provided emails or other written communications before March 31, 2014 about the hiring for the two posted JG5 open positions with inside sales and our request to offer the JG5 job to Robert Dedmon. I

**Appendix 083**

believe those documents should exist and would help me be more specific on the timeline of events addressed in my testimony.

21.   I did not inform Robert Dedmon about what happened with his hiring process — how he was downgraded from the start because of his race, or any of the above — until years later in the summer of 2020. I am not aware of anyone who informed Robert Dedmon about what happened with his hiring process — how he was downgraded from the start because of his race, or any of the above — until I did so in the summer of 2020. After a group phone call about police brutality and the need to stop racism, I decided I had to tell him. I told him I had been holding a secret, apologized for not letting him know earlier, and told him about his hiring job grade being downgraded because of his race.

**My name is Srikala Rangan. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my recollection. Executed on October 29, 2024.**

_____

Srikala Rangan

**Appendix 084**

**Subject:** Declaration.
**Date:** Tuesday, October 29, 2024 at 1:03:00 PM Central Daylight Time
**From:** Sri Rangan <srangan321@gmail.com>
**To:** Amy Gibson <amy@gwfirm.com>

Hi Amy,

I have reviewed my declaration — my testimony. I am in Zimbabwe without current access to a printer, scanner, laptop, or iPad type device. As a result, this email serves as my signature. My name is Srikala Rangan. I go by Sri. I declare under penalty of perjury under the laws of the United States of America that the testimony in the Declaration of Srikala "Sri" Rangan in the Dedmon lawsuit is true and correct to the best of my recollection. Executed on October 29, 2024.


Thank you!

Sri Rangan

1 of 1

**Appendix 085**

# Exhibit 3

# Declaration of Luis Lugo

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Dedmon, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 4:21-cv-03371 |
| | § | |
| vs. | § | Jury Demand |
| | § | |
| Shell Exploration & Production | § | |
| Company and Shell Trading | § | |
| Services Company, | § | |
| | § | |
| *Defendants.* | § | |

---

**DECLARATION OF LUIS LUGO**

---

1.     My name is Luis Lugo. The facts and statements that I make in this declaration are true and accurate to the best of my recollection. Unless otherwise stated or apparent from my testimony, I have personal knowledge of the facts and statements that I make in this declaration. I was informed that "personal knowledge" means that I personally witnessed or experienced something using one or more of my senses, like sight, hearing, smell, or touch. I was also informed that "personal knowledge" includes how I feel.

2.     I use *Shell* in this declaration to refer to the company I and others worked for because (1) that was the brand and how we spoke about who we worked for, (2) working groups had different names over time, even when these groups worked together and had a similar hierarchy, and (3) the working group names were often informal internal names or trade names — meaning not necessarily technical legal entity names.

**Appendix 087**

3.    I am a Latino male. This is an accurate image of my LinkedIn profile picture:



4.    I earned a degree in mechanical engineering from Texas A&M University in 2006. I earned an MBA with focus on energy finance from the University of Houston in 2010.

5.    I am Vice President and Head of ERCOT Trading for Mercuria Energy Trading.

6.    Before accepting that role, I worked for Shell for a little over 15 years in Houston, Texas. This is the basic timeline:

⬤ May 2006 — I start full-time work as a Shell rotating equipment engineer.

⬤ May 2008 — I start work as a Shell hardside production engineer — operations and reliability.

⬤ February 2011 — After earning an MBA with focus on energy finance, I start work as a Shell analyst in the Shell Trader Development Program.

⬤ March 2013 — I start work as a Shell ERCOT power trader.

⬤ January 2020 — I become a supervisor for the Shell South Power Trading Desk. The trading team that I manage is an ERCOT trading team.

⬤ July 2021 — I leave employment with Shell.

7.    ERCOT stands for Electric Reliability Council of Texas. It is the governing body for managing the power grid across most counties in Texas. But it does not actually own or operate assets on the power grid. I traded in the ERCOT electricity market. It is similar to trading corn, cotton, sugar, cattle, futures, but just a different commodity — electricity. Again, I worked almost 7 years as a power trader for Shell and worked about 1 ½ years as

**Appendix 088**

the supervisor for the Shell South Power Trading Desk team that focused on the ERCOT electricity market.

8.    The Shell inside sales team sells to power [electricity] and gas retailers, who in turn sell power and gas to consumers. Those retailers get competitive pricing from those who sell power and gas to them — like, Shell, BP, NRG, Engie, City Bank, etc. The Shell traders work with the Shell inside sales team. Here are some examples. Inside salespeople are often doing things at the direction of the traders. The traders rely on the inside sales team for things like customer feedback. Sometimes traders ask inside salespeople to try and sell electricity or gas on their behalf at a certain price. Inside salespeople always had to get pricing information from the traders. The traders and salespeople talk together about market intelligence, such as learning of upcoming power plant maintenance that is going to affect supply and demand.

9.    While Robert Dedmon and I both worked at Shell, I interacted with Robert on a daily basis, excluding times when one of us was off work on vacation or something like that. Robert was on the inside sales team and worked with our trading team. Through our work together over many years, I developed an understanding of Robert's work quality, skill level, work ethic, and attitude. With one exception, I also interacted regularly with other members of the inside sales team while I was on the trading team as a trader and then as a supervisor. The one exception is Susan Smith, who did not work out of Houston. I knew Susan but did not work with her much. For others whose inside sales tenure overlapped with my trader and trading supervisor tenure, I developed an understanding of their work quality, skill level, work ethic, and attitude. When I testify about performance, I mean all of things, which go to the ultimate performance level.

10.    When I talk about Robert Dedmon's inside sales counterparts in this paragraph, I am excluding Susan Smith as explained above. In short, I knew Robert Dedmon and his coun-terparts in inside sales while I was on the trading team as a trader and then as a supervisor — collectively covering many, many years. Some inside salespeople were not in the role long, like Raif Rucker, or were new at the time I left Shell. My testimony here addresses Michael Tickle, Patrick Frnka, Doug Hund, and Mike Deley.

11.    The following is based on my experience working with these people. Michael Tickle and Robert Dedmon were on the same level as far as performance, including the way they understood markets, the way they worked with traders to do the best job. Michael had more tenure and was the supervisor for the inside sales team. But Michael had been a peer of Robert at one time, and they were at the same level on performance. Michael was good but was *not* head and shoulders above Robert.

**Appendix 089**

12.   The following is also based on my experience working with these people. Doug Hund and Patrick Frnka were at roughly the same level on performance. Robert Dedmon was head and shoulders above this level of performance, including the way he understood markets, the way he worked with traders to do the best job. Mike Deley was at the lowest level on performance due to lack of experience and lack of market knowledge.

13.   The following is based on my experience working with Shell inside salespeople, my experience and observations while working at Shell, and my training on bias at Shell. The following also eliminates the first year of work, to allow for learning the Shell system. If Robert Dedmon was not consistently ranked as a high performer on his team — at least in the top 2 — then the ranking is totally off. I cannot deduce any legitimate reason that would make sense for a lower ranking. I got a lot of training at Shell on bias including unconscious bias. I observed an obvious racial bias when it came to Robert. People do not say racial slurs, but you can see the bias. Some may call it culture, but it was culture surrounding his race. Robert preferred basketball over golf in a mostly white, golf-loving culture at Shell. That is just one example of racial cultural "fit" issues and why Robert did not get the same consideration as others who were not black. Overall, Robert was unapologetically himself as a black man with different cultural interests than the largely white population of Shell employees he worked with.

14.   Throughout my employment, Shell was largely a black box on how it decided to pay employees. Compensation as a black box was especially true for employees below supervisor level. So, it would be difficult to see whether you were being paid less than some else, much less whether you were being paid less because of your race.

15.   Throughout my employment, Shell used a job grade system with a salary range for each job grade. Shell had certain job grades for executive positions and possibly other specialized groups. But my testimony on job grades is about the numbered job grades that applied to most employees. The better the job grade, the lower the job grade number. JG1 was the best job grade. At some point in the job grade system, performance-based stock benefits were possible and then became automatic.

16.   The following is based on my experience and observation while working at Shell. Job grades and salaries affected salary increase amounts, bonus amounts, whether you get performance-based stock benefits and the amount of those benefits, and overall career. So, the place you start can be a problem. If the place you start is lower than it should be — worse job grade or worse salary —, that makes it really hard to come back to where you should be. If you start lower, you have to outperform so much more than others to get ahead.

**Appendix 090**

17.   Here is an example of pay differential between races based on my personal experience at Shell. Before I joined the Shell trading team as an analyst, I worked in operations and reliability at a chemical plant known as Shell Deer Park. Me and a close friend started at about the same time at the same job grade. We were both high performers. My close friend is a white male. In comparing notes with him while we worked there, I learned that Shell was paying me less than it was paying my close friend. I could never reconcile that pay difference. There was no good reason, no justifiable reason, for Shell to pay me less than my friend who was white.

18.   When I joined the Shell trading team as an analyst, my new boss Tim Hood was confused over why Shell paid me so little. Tim is a white male and a good person. He told me something like *you are really underpaid*. He worked to convince Shell to increase my salary to where it needed to be — to more closely match my qualifications, experience, and performance.

19.   When I started supervising the Shell South Power Trading Desk team, I had a better lense into comparative pay. I could now see what Shell was paying the people on my team. And for certain roles, I could now see what Shell was paying people for the same roles. For example, I learned that a bonus I had received from Shell was less than 1/3 the bonus paid to white and Asian employees in the same role.

20.   Here is another example of pay differential between races based on my personal experience at Shell. Tim Hood had been the supervisor for the Shell South Power Trading Desk team but left Shell for a better opportunity. I replaced Tim as supervisor. Again, Tim is a white male. While I was supervising the Shell South Power Trading Desk team, we had a great year on gross margin for the team — hundreds of millions of dollars. This closely replicated a prior great year on gross margin from when Tim had supervised the Shell South Power Trading Desk team. I knew about the prior great year from Tim while Tim still worked at Shell. Yet, Shell paid me less than half the bonus it had paid to Tim. I knew from Tim — while Tim still worked at Shell — about that bonus paid to Tim. I addressed the bonus issue with Shell, and Shell mildly increased my bonus but did not come anywhere close to making up even half of what Shell paid him. The final gap was more than a million dollars. There was no good reason, no justifiable reason, for the disparity in bonus.

21.   The following is based on my experience and observation at Shell. Team supervisors did not set salary, salary increases, or job grades but could advocate on salary, salary increases, and job grades. The final word on salary, salary increases, and job grades came from human resources and higher-ups.

**Appendix 091**

22.   The following is based on my experience and observation at Shell. Individual rankings affect pay and career at Shell. Managers ranked individuals on their teams. For example, I ranked individuals on my team and was involved in sessions where we would discuss rankings on our trading team versus other trading teams. Managers had a lot of control over how they rank their teams — they could do that pretty unchecked. However, on occasion, once a manager turns in the rankings, the higher-ups move those rankings around without that manager knowing where the rankings ended up.

23.   The following is based on my experience and observation at Shell. Manager discretion in account assignments can make a big difference in an employee's individual gross margins.

24.   Based on all of my experience at Shell and everything I said above, and eliminating the first year of work to allow for learning the Shell system, there was no good reason, no justifiable reason, for Robert to be ranked less than top 2 on his team, have a job grade less than top 2 on his team, or have salary or bonuses less than top 2 on his team. Based on all of my experience at Shell and everything I said above, it is more likely than not that Robert's race was the reason for anything less.

**My name is Luis Lugo. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my recollection. Executed on November 7, 2024.**

_____  11/7/2024
Luis Lugo

**Appendix 092**

# Exhibit 4

# Declaration of Amanda Hernandez

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Robert Dedmon, | § | |
| | § | |
| *Plaintiff*, | § | CIVIL ACTION NO. 4:21-cv-03371 |
| | § | |
| vs. | § | Jury Demand |
| | § | |
| Shell Exploration & Production | § | |
| Company and Shell Trading | § | |
| Services Company, | § | |
| | § | |
| *Defendants*. | § | |

## DECLARATION OF AMANDA HERNANDEZ

1.     My name is Amanda Hernandez. The facts and statements that I make in this declaration are true and accurate to the best of my recollection. Unless otherwise stated or apparent from my testimony, I have personal knowledge of the facts and statements that I make in this declaration.

2.     I am an attorney of record in this case. I created the charts attached to this declaration. The charts were created as allowed under Federal Rule of Evidence 1006, in order to present and compare the total gross compensation for some of Defendants' employees from 2015 through 2024.

3.     The race listed for each employee are true and accurate reproductions of the testimony that Robert Dedmon provided in his deposition on page 264, lines 11 through 25; page 265, lines 1 through 9; and his declaration at paragraph 57.

4. The total gross compensation amounts listed in the charts are true and accurate reproductions of the amounts listed in each employee's year-end paystub for the years 2015 through 2023. Defendants provided all of the underlying paystubs. Defendants did not provide any paystubs for employees (other than Robert Dedmon) for the year 2014. For the

year 2024, the numbers reproduced are based off of the listed employees' gross compensation on their May 15, 2024 paystub (the most recent paystubs that Defendants provided). All of these documents are available for the Court's inspection should the Court deem it necessary.

6.    The underlying paystubs reflected in the charts are bates labeled documents:

ShellDedmon_001137, ShellDedmon_001615, ShellDedmon_002860,
ShellDedmon_003659, ShellDedmon_001160, ShellDedmon_001660,
ShellDedmon_002903, ShellDedmon_003700, ShellDedmon_001184,
ShellDedmon_001707, ShellDedmon_002931, ShellDedmon_003742,
ShellDedmon_001218, ShellDedmon_001776, ShellDedmon_002987,
ShellDedmon_003808, ShellDedmon_001245, ShellDedmon_001464,
ShellDedmon_001829, ShellDedmon_003032, ShellDedmon_003857,
ShellDedmon_001272, ShellDedmon_001491, ShellDedmon_001882,
ShellDedmon_003060, ShellDedmon_003910, ShellDedmon_001297,
ShellDedmon_001516, ShellDedmon_001931, ShellDedmon_003965,
ShellDedmon_001322, ShellDedmon_001541, ShellDedmon_001980,
ShellDedmon_004010, ShellDedmon_004720, ShellDedmon_004722,
ShellDedmon_004735, ShellDedmon_004727, ShellDedmon_004724,
ShellDedmon_004719, ShellDedmon_004721, ShellDedmon_004733,
ShellDedmon_004725, and ShellDedmon_004723.

5.    The charts are provided for a more efficient review and comparison of the listed employees' yearly compensation. The hope is that the charts remove the cumbersome task of individually reviewing each paystub for each employee, for roughly ten years.

**My name is Amanda Hernandez. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my recollection. Executed on November 8, 2024.**

_____
Amanda Hernandez

**Appendix 095**

# Hernandez Declaration

# Exhibit 1

## Total year end gross compensation

| Employee | Race | 2015 |
|---|---|---|
| Robert Dedmon | black | $ 118,599.52 |
| Patrick Frnka | white | $ 144,985.93 |
| Ryan Kolkmann | white | $ 366,360.69 |
| Susan Smith | white | $ 146,566.61 |

| Employee | Race | 2016 |
|---|---|---|
| Robert Dedmon | black | $ 131,528.40 |
| Patrick Frnka | white | $ 137,441.67 |
| Ryan Kolkmann | white | $ 249,416.43 |
| Susan Smith | white | $ 145,183.28 |

| Employee | Race | 2017 |
|---|---|---|
| Robert Dedmon | black | $ 131,170.39 |
| Patrick Frnka | white | $ 153,704.99 |
| Ryan Kolkmann | white | $ 195,849.57 |
| Susan Smith | white | $ 158,077.76 |

| Employee | Race | 2018 |
|---|---|---|
| Robert Dedmon | black | $ 132,271.97 |
| Patrick Frnka | white | $ 155,991.04 |
| Ryan Kolkmann | white | $ 240,034.11 |
| Susan Smith | white | $ 159,066.82 |

| Employee | Race | 2019 |
|---|---|---|
| Robert Dedmon | black | $ 152,262.71 |
| Michael Deley | white | $ 156,877.78 |
| Patrick Frnka | white | $ 240,994.60 |
| Ryan Kolkmann | white | $ 193,044.44 |
| Susan Smith | white | $ 249,428.60 |

| Employee | Race | 2020 |
|---|---|---|
| Robert Dedmon | black | $164,880.42 |
| Michael Deley | white | $ 147,227.97 |
| Patrick Frnka | white | $ 244,157.12 |
| Ryan Kolkmann | white | $ 186,100.31 |
| Susan Smith | white | $ 247,348.41 |

| Employee | Race | 2021 |
|---|---|---|
| Robert Dedmon | black | $ 159,805.57 |
| Michael Deley | white | $ 169,123.72 |
| Patrick Frnka | white | $ 218,907.36 |
| Susan Smith | white | $ 233,958.94 |

| Employee | Race | 2022 |
|---|---|---|
| Robert Dedmon | black | $ 169,767.95 |
| Michael Deley | white | $ 197,054.50 |
| Patrick Frnka | white | $ 221,247.53 |
| Susan Smith | white | $ 230,545.94 |

| Employee | Race | 2023 |
|---|---|---|
| Robert Dedmon | black | $ 212,765.87 |
| Michael Deley | white | $ 345,501.16 |
| Patrick Frnka | white | $ 309,118.87 |
| Susan Smith | white | $ 268,237.14 |
| Jim Barker | white | $ 197,233.34 |

| Employee | Race | 2024 |
|---|---|---|
| Robert Dedmon | black | $ 131,528.86 |
| Michael Deley | white | $294,088.66 |
| Patrick Frnka | white | $ 229,851.16 |
| Susan Smith | white | $ 187,753.33 |
| Jim Barker | white | $ 189,148.49 |

**Appendix 097**

# Exhibit 5

# Excerpts From Robert Dedmon's Deposition

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Robert Dedmon,                   )
         Plaintiff,              )
                                 )
VS.                              ) Civ. A. No. 4:21-cv-03371
                                 )
Shell Exploration &              ) Jury Demand
Production Company and           )
Shell Trading Services           )
Company,                         )
         Defendants.             )


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL AND VIDEOTAPED DEPOSITION OF ROBERT DEDMON
APRIL 2, 2024

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL AND VIDEOTAPED DEPOSITION OF ROBERT DEDMON,

produced as a witness at the instance of the Defendant

and duly sworn, was taken in the above styled and

numbered cause on Tuesday, April 2, 2024, from 9:35 a.m.

to 6:33 p.m., before ROBIN GROSS, CSR in and for the

State of Texas, reported by shorthand machine, at the

Offices of AH Law, PLLC, 5718 Westheimer, Suite 1000,

Houston, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record

herein.

SIGNATURE
COPY

NELL MCCALLUM & ASSOCIATES, INC.

**Appendix 099**

Page 82

1   in it?
2       A. Yes.
3       Q. And what did you tell her?
4       A. Not sure exactly what I told her, but definitely
5   I was interested in it, that if you guys want to give me
6   that promotion, I'm not going to tell you no.
7       Q. Did she give you any other details about the
8   position, with respect to compensation, for example?
9       A. I'm not sure if there were compensation
10  discussions at that point.
11      Q. At some point were there compensation
12  discussions?
13      A. Yeah, compensation was disclosed at that point --
14  some point, because you have to go in and -- the Shell
15  process is I had to actually apply for that job grade
16  electronically and then be awarded that promotion
17  electronically.
18      Q. And did you apply?
19      A. Yes. Or -- I clicked that I would accept that
20  role. I'm not sure the actual application process on
21  that, but it is a process as well.
22      Q. Do you recall participating in an interview for
23  that position?
24      A. I -- honestly, I don't believe I did at that
25  point. I believe it was just a promotion.

Page 83

1       Q. Do you know if other individuals were considered
2   for the position?
3       A. I don't.
4          Sorry. Correct, at that -- at that point, I did
5   not know that.
6       Q. At that point --
7       A. I had no idea if anybody was interviewing for it
8   or not.
9       Q. Did you later learn that other people interviewed
10  for it?
11      A. I believe it was disclosed that they had to go
12  through an interview process, I believe. Shell standard
13  procedure, if you post a job, you have to actually
14  interview for that job.
15      Q. You understand that to be a part of Shell's
16  procedure?
17      A. Policy, yes, correct. If a job is posted, it has
18  to be -- you have to interview for the job.
19      Q. How did you learn -- you said it was disclosed
20  that you had -- from whom was that disclosed?
21      A. Just through communication with the lawsuit
22  documentation, I believe it was -- I believe there was
23  names that people were interviewed for this role.
24      Q. Okay. So you're saying through information
25  you've seen in the lawsuit, you were aware that other

Page 84

1   individuals may have been interviewed for the role, but
2   you were not aware of that at that time?
3       A. Correct, I wanted to make that --
4       Q. Okay. Okay, yes.
5       A. -- distinction on those two.
6       Q. Okay. No, I appreciate that. So at the time you
7   didn't know whether other people were being interviewed
8   and considered or not; is that right?
9       A. Correct.
10      Q. Okay. Do you recall being officially offered the
11  promotion?
12      A. I believe I had to accept it electronically, yes.
13      Q. And you did that, correct?
14      A. Correct.
15      Q. Before you accepted it, were you aware of the
16  compensation for the role?
17      A. I believe I was told before that, yes, what the
18  compensation would be.
19      Q. And what was the compensation?
20      A. I believe it was one fourteen.
21      Q. That was the base salary?
22      A. Yes.
23      Q. Did -- did anything change about the -- was --
24  did the position also come with bonus opportunity?
25      A. Yeah, the same bonus structure.

Page 85

1       Q. Okay. Same bonus structure, okay.
2          And did the title of the position change?
3       A. No. Title did not change.
4       Q. Did any of your responsibilities change in the
5   role?
6       A. No.
7       Q. And then it was confirmed that it was a JG 5
8   position, correct?
9       A. Correct.
10      Q. Did you have any questions about the compensation
11  that was offered to you for this role?
12      A. Not that I can recall, no.
13      Q. Were you aware as to whether or not the $114,000
14  offer was within the range set for a JG 5 position?
15          MS. GIBSON: Object to form.
16      A. I don't believe I saw a range for that.
17      Q. (BY MS. WILLIAMS) Are you aware that there's a
18  range --
19      A. Yes.
20      Q. -- for job -- there's a compensation range for
21  job grades?
22      A. There is, yes, correct.
23      Q. When did you become aware of that?
24      A. Throughout my employment.
25      Q. And so you made no inquiries to determine where

22 (Pages 82 to 85)

NELL McCALLUM & ASSOCIATES, INC.

**Appendix 100**

Page 98

1  interview. The only thing I had was a -- it's called a
2  Get to Know You. So you figure out who works kind of in
3  that group, reach out just to have a lightweight
4  15-minute conversation about the group. It's like a
5  pre-screening, I would say, for both sides, for me to
6  get more information outside of just reading it, to hear
7  someone talk about; and for them to get a feel for who I
8  am. It's not an official interview by any stretch, just
9  a Get to Know You session.
10  Q. Is it virtual or in person?
11  A. Mine was on a call at that point because we were
12  still distancing ourselves. We weren't doing a lot of
13  face-to-face activity.
14  Q. Because of COVID?
15  A. Yeah.
16  Q. Okay. Do you recall who you visited?
17  A. I don't recall their name.
18  Q. Was it one person?
19  A. Yes, one person.
20  Q. And it was a woman?
21  A. Yes.
22  Q. Okay. Were you still interested in the job after
23  the get-together?
24  A. Yes.
25  Q. Okay. And so what happened next?

Page 99

1  A. I'm assuming they hired someone for that role. I
2  was -- I -- I just kind of at that point chalked it up
3  to I'm not a good fit for their group after the Get to
4  Know You. I'm not sure what they decided, but I never
5  got an interview so I didn't -- I didn't push any
6  further.
7  Q. Did you ever go back on Open Resourcing to see if
8  the job was still posted or what happened with the job?
9  A. They hired someone for the job because it was no
10  longer posted.
11  Q. So it's your understanding that if it's no longer
12  posted, that means they hired somebody, as opposed to
13  the position, for example, you know, just being closed?
14  A. It's my understanding that when it's removed,
15  someone is hired for it.
16  Q. Okay. Do you know who was hired?
17  A. No.
18  Q. Do you have any complaints in this lawsuit about
19  not getting that position?
20  A. Not that position, no.
21  Q. Okay. All right. So we were talking about other
22  jobs that you applied for, the jet fuel. Have there
23  been any other jobs that you've applied for since you've
24  been at Shell?
25  A. I have not officially applied for other jobs, no.

Page 100

1  Q. Have you unofficially applied for other jobs?
2  A. I've looked around for other jobs. I have not
3  applied for any jobs.
4  Q. What do you mean "looked around for other jobs"?
5  A. Just looking on Open Resourcing to see what's
6  available.
7  Q. Other than the jet fuel job, have there been
8  other jobs that you've seen on Open Resourcing that
9  you've been interested in?
10  A. There was a job grade 4 in our group. Once --
11  when Ryan -- actually, Ryan Kolkmann was a part of our
12  group at a point. He left and that job grade 4 became
13  available. It was emailed to us by Michael Tickle that
14  he wanted to replace that role and he needed our help
15  resourcing and finding someone that could be a good fit
16  for our group. So that was a job that was -- after the
17  fact, I became aware that it was available for me to
18  actually apply, but it was encouraged and made very
19  clear to us that we should be helping find someone to
20  come into our group and not just merely replacing that
21  role with one of us.
22  Q. Made clear by whom?
23  A. Michael Tickle.
24  Q. Okay. So but you initially saw the job on Open
25  Resourcing?

Page 101

1  A. I didn't officially see the job on Open
2  Resourcing, no.
3  Q. Was it on Open Resourcing, to your knowledge?
4  A. After -- after Michael Deley received the role,
5  yes, I was made aware that it was out there to be
6  resourced.
7  Q. So during the time that this JG 4 position was
8  posted, you had not been on Open Resourcing --
9  A. No.
10  Q. -- just kind of looking for possible positions?
11  A. I was not looking daily. It was maybe twice a
12  year. I'm not sure how many times I looked, but I was
13  not just Googling all day for jobs.
14  Q. Sure. But I mean had you -- had you gone to Open
15  Resourcing when it was posted, it's a job that you could
16  have seen there, right, because it was posted there?
17  A. Correct.
18  Q. Okay. Okay. And you said that Michael
19  encouraged and made it clear that he wanted you-all to
20  find someone to bring into the group?
21  A. Correct.
22  Q. What did he say specifically?
23  A. I don't have the email in front of me. But
24  he asked for us to find someone because we were about --
25  it's like the flow of our group, the culture of our

26 (Pages 98 to 101)

**Appendix 101**

Page 106

1    position that was open?
2        A. No.
3        Q. Okay. And then you said you found out after the
4    fact that -- I guess you found out that Michael Deley
5    actually got the JG 4 position that Kolkmann vacated in
6    your group, right?
7        A. Correct. We were notified via email to
8    congratulate Michael Deley on accepting a new role.
9        Q. Okay. And how did you respond to that?
10       A. I was -- I was really caught off guard because I
11   had made several attempts to let Michael Tickle know
12   that if something like that was available, that -- you
13   know, let's have a conversation about it. And if he was
14   the hiring manager and knew that I was looking and that
15   that's something I wanted to do, we could have that
16   conversation. And his response to me was "I wasn't sure
17   why you didn't apply."
18       Q. So he seemed confused that -- about the fact that
19   you didn't apply?
20       A. You can call it confusion if you -- I didn't call
21   it confusion.
22       Q. What was it, what --
23       A. To me --
24       Q. -- do you call it?
25       A. -- I felt like it was betrayal.

Page 107

1        Q. Okay.
2        A. Because if you know, based on several
3    conversations we had, that that's exactly what I was
4    looking for, that you would have spoken up that I could
5    have actually applied for it, because -- excuse me --
6    because you were the person hiring for that role.
7        Q. Do you know if he had any conversations with
8    Michael Deley where he spoke up to him and told him
9    directly to apply for the position?
10       A. I don't know if they had direct conversations
11   about it, no.
12       Q. Do you know if they had indirect conversations?
13       A. I'm not aware of any conversations they had.
14       Q. So you're -- you can't say that Michael Deley --
15   I'm sorry -- that Michael Tickle encouraged Michael
16   Deley to apply for that role because you're not aware if
17   that actually took place, right?
18       A. I'm not aware of that.
19       Q. And, in fact, Michael Deley may have just taken
20   the initiative to apply on his own, right, as far as you
21   know?
22       A. As far as I know.
23       Q. Did you communicate with Michael Tickle about
24   feeling betrayed after you learned that Michael Deley
25   got the position?

Page 108

1        A. My comment was "Had I known that that was an
2    option, I would have definitely applied."
3        Q. And what did he say?
4        A. And that was his response, like, "Hey, I'm not
5    sure why you didn't apply."
6        Q. Okay. Did you tell him specifically, "I think
7    you betrayed me"?
8        A. No, I didn't tell him that specifically, no.
9        Q. Do you think that Michael Tickle was motivated by
10   your race in connection with this position?
11       A. I think the entire discrimination from start to
12   finish, that's just another portion of how my race
13   played a role in it.
14       Q. Okay. But this particular role, the 2021 role
15   that Michael -- I'm sorry -- that Ryan Kolkmann left, do
16   you think that Michael's -- Michael Tickle's behavior
17   towards you with respect to that role was because of
18   your race?
19       A. Yes, I -- I believe that.
20       Q. Okay. And what makes you believe that?
21       A. Because there was, like I said, from start to
22   finish, when I was hired at a lower job grade and the
23   pay disparity begin -- started at the beginning. This
24   was another example of how that deception became clear.
25   It was -- he had every opportunity to inform me, after

Page 109

1    me questioning and asking on several occasions about
2    this role, to disclose it; and he chose not to disclose
3    it.
4        Q. But what about your race makes you think that he
5    didn't disclose it to you, like -- as opposed to
6    something else, for example?
7            MS. GIBSON: Object to form.
8            You said, "What about your race"?
9        Q. (BY MS. WILLIAMS) What about your race do you
10   think was a part of his role, like why do you think your
11   race factored into that decision, as opposed to, for
12   example, what if he thought maybe you weren't a top
13   performer. Is it possible he thought that and that
14   could be a reason that motivated him not to encourage
15   you to apply?
16       A. My reasoning is because, again, start to finish,
17   Shell has shown that it's common practice to use race to
18   make decisions on jobs.
19       Q. Okay. And I'm not talking about common practice
20   at Shell. I'm saying specifically with respect to your
21   relationship with Michael Tickle, what about -- what
22   about the way that he managed the decision for the JG 5
23   role makes you think that your race was a part of the
24   decision?
25       A. My understanding and my clear -- my understanding

Page 194

1  since you've been at Shell?
2      A. I know now yes, they have, yes.
3      Q. Okay. Do you know what their salary increases
4  have been?
5      A. I don't know percentages, but I have seen data
6  that shows what their current salaries are -- or a
7  portion of the data that has not been fully completed or
8  given to us by Shell; but I can see salary, job raise,
9  and bonuses.
10     Q. Okay. And do you recall any specific salaries
11  that you reviewed?
12     A. I recall just on the numbers that I saw, and this
13  is data provided by Shell, as we're asking for more
14  data, but I was about -- on base salary, I was about a
15  hundred thousand dollars lower than Patrick and Susan.
16  And that's when I stopped looking. Bonus was --
17  percentages were grossly off as well.
18     Q. Okay. So let me make -- let me break that down.
19  Based on what you've looked at, you -- your base salary
20  is about a hundred thousand dollars lower than Patrick
21  and Susan; is that right?
22     A. If the information that we received is correct,
23  yes.
24     Q. Okay. And then you said you also received a
25  lower bonus than Patrick and Susan?

Page 195

1      A. Correct.
2      Q. Do you recall what specific year you're
3  recalling?
4      A. I believe it was '22 or '23 data that we
5  received.
6      Q. And what -- I'm sorry, do you recall what job
7  grade Patrick is, currently?
8      A. Patrick is a 4.
9      Q. And what about Susan?
10     A. 4.
11     Q. How long has Patrick been with Shell, to your
12  knowledge?
13     A. He's been with Shell probably 16, 17 years,
14  maybe. I'm pushing 10, so, yeah, he's about 17, I
15  believe.
16     Q. Susan?
17     A. About the same, if not a year or two more.
18     Q. Were they both in the group before, at the time
19  that you joined in 2014?
20     A. Yes.
21     Q. Okay. Do you know what their job grades were
22  when they joined the group -- when you joined the group
23  in 2014?
24     A. I know now what their job grades were, yes,
25  correct.

Page 196

1      Q. What were they at that time?
2      A. 5.
3      Q. Both of them?
4      A. Yes.
5      Q. Okay. And do you believe you should be making as
6  much as Patrick?
7      A. Yes.
8      Q. Do you believe you should be making as much as
9  Susan?
10     A. Yes.
11     Q. And what is your basis for believing you should
12  be making as much as Patrick?
13     A. Our jobs --
14         MS. GIBSON: Object to form.
15         You can answer.
16     A. Our jobs are, I would say, 99.999 percent exactly
17  the same. Our requirements, our tasks, our day-to-day
18  duties are all identical. And then I'm combining that
19  with my experience dating back to 2014. I came in with
20  a level of experience that Patrick definitely did not
21  have. I'm not a hundred percent sure on Susan's
22  experience, but I know Patrick's background and it's
23  definitely -- it wasn't sales and what they were looking
24  for. So my experience definitely carried more value
25  when it came to this position. It still does.

Page 197

1      Q. (BY MS. WILLIAMS) Do you think Patrick is good
2  at his job?
3      A. Yes.
4      Q. Do you think Susan is good at her job?
5      A. Yes.
6      Q. Is there anyone else in your group that's making
7  more money than you either on, you know, as a salary
8  and/or bonus that you think should not be?
9      A. I'm not sure how to answer that question. I
10  don't -- I don't determine if someone should not be
11  getting paid what they're making. Like that's -- I can
12  only determine what I --
13     Q. Okay. Is there someone else in the group other
14  than Patrick and Susan who's making more money than you
15  that you think you should also be earning?
16     A. Yes, Michael Deley before he -- and his role is
17  kind of a hybrid role now, but when he was aligned with
18  us, his salary as well.
19     Q. The last part --
20     A. When he was aligned with us, we were all doing
21  the exact same thing, he's now like a month or two into
22  hybriding to a different role. But when we were all
23  aligned, yes, he's another one that I thought I should
24  be aligned with him financially.
25     Q. So before he transitioned to the hybrid role, are

Page 230

1    want it.
2         MR. WILEY:  Thank you.
3         MS. WILLIAMS:  You're welcome.
4    Q.  (BY MS. WILLIAMS)  Do you recognize this document
5    that I've marked as Exhibit 1?
6         MS. WILLIAMS:  And for folks on the phone,
7    it's ShellDedmon_65 through 67.
8    A.  Yes.
9    Q.  (BY MS. WILLIAMS)  What is that document?
10   A.  It's the EEOC file.  Complaint.  I'm not sure the
11   exact word you use for it.
12   Q.  Okay.  And it's -- it has three pages, right?
13   A.  Yes.
14   Q.  Not full, but -- yeah.  Did you prepare the text
15   that is reflected in the box that says The Particulars
16   Are on the first page of Exhibit 1, going onto the last
17   page of Exhibit 1?
18   A.  Where is that again?
19   Q.  So there's a -- the box at the very bottom of the
20   first page of Exhibit 1, it says The Particulars Are,
21   and it starts:  I believe Shell Exploration & Production
22   Company.
23        Do you see that?
24   A.  Right.  Did I write those words myself is what
25   you're asking?

Page 231

1    Q.  Did you prepare the information that's in this
2    box which carries over onto the third page of the
3    exhibit?
4         MS. GIBSON:  Object to form.
5    A.  I can't remember if those are my exact words,
6    but -- I'm not sure what you mean by -- did I write that
7    in or type that in?
8    Q.  (BY MS. WILLIAMS)  Yeah.  Did you -- did you
9    write it, yourself?
10   A.  Honestly, I'm not a hundred percent sure.
11   Q.  Okay.  Do you recall reviewing this before it was
12   filed with the EEOC?
13   A.  Yes, because I had to sign it.
14   Q.  And you understood when you were signing it you
15   were signing it under oath?
16   A.  Yes.
17   Q.  Okay.  I just want to ask you a few questions
18   about -- about some of the information that you've
19   included here.  I want to go onto page -- the second
20   page of Exhibit 1.  And it is the second paragraph on
21   that page.  It starts:  Here is the story of what
22   happened.
23        Do you see that?
24   A.  Yes.
25   Q.  I think it's the third -- excuse me, the third

Page 232

1    sentence.  It says:  Shell posts a job in Houston, Texas
2    at grade 5 and later offers this job at grade 5 to
3    someone who is not a black male.
4         Did I read that correctly?
5         MS. GIBSON:  Where are you?  You said third
6    sentence?
7         MS. WILLIAMS:  It's -- I think it's the
8    third sentence of the second paragraph, but maybe it's
9    not.  It just -- I mean I read how it started.  So Shell
10   posts a job in Houston.
11        MS. GIBSON:  I see.  I see.  Okay, sorry.
12   Q.  (BY MS. WILLIAMS)  Do you see that sentence that
13   I just read?
14   A.  Here is the story of what happened... Yes, I see
15   that there.
16   Q.  Okay.  And what information do you have that
17   indicated to you that Shell offered the position to
18   someone who was not a black male?
19   A.  I believe that was a discussion Sri and I had.
20   Q.  Okay.  Sri told you that it was someone who was
21   not a black male?
22   A.  I believe that was the discussion that Sri and I
23   had.
24   Q.  Okay.  You did not -- do you have any firsthand
25   knowledge that the job was offered to someone who was

Page 233

1    not a black male?
2    A.  Now we have concrete knowledge that it was,
3    but --
4    Q.  That it was what?
5    A.  It was offered to I believe a white female, that
6    declined it.
7    Q.  Where -- where do you get that information?
8    A.  From the documents that was provided -- that were
9    provided to us by Shell.
10   Q.  What document did you see that said it was a
11   white female?
12        MS. GIBSON:  Object to form.
13   A.  It was a ton of emails that we went through that
14   Shell provided.  I don't know exactly what document
15   number.
16   Q.  (BY MS. WILLIAMS)  So there was a document that
17   you recall seeing in the context of this lawsuit that
18   says the position was offered to --
19   A.  Yes.
20   Q.  -- a white female?
21   A.  There's a -- sorry.  There's a female name
22   associated with the job that was offered.  I believe
23   that's what's in the email, the communications that I
24   saw.
25   Q.  And does it indicate it was a white female?

NELL McCALLUM & ASSOCIATES, INC.

**Appendix 104**

Page 254

1  apply for the vacant team position that left the team
2  short one person.
3      What is the basis of your knowledge that there
4  were private communications that weren't disclosed to
5  you that took place with the only white employee on the
6  team who's not -- I mean who was at a job grade 5?
7      MS. GIBSON: Object to form.
8      A. After having a brief conversation with Michael
9  Deley, he made it very clear that he and Michael Tickle
10 talked about him applying for that role. So there was
11 discussions that were had that were not -- clearly I
12 wasn't privy to, but discussions that contradict the
13 email that Tickle sent out.
14     Q. (BY MS. WILLIAMS) So when did you talk to
15 Michael Deley about this?
16     A. I believe after he was hired.
17     Q. After he applied for and was selected for the job
18 grade 4 role?
19     A. Correct. Correct.
20     Q. And did you -- how did the conversation come up
21 about the job grade 4 role?
22     A. Oh, I just flat out asked him, you know, what
23 made you apply for it, how is that process for you, just
24 conversation about what made him do it.
25     Q. And what did he tell you what made him apply for

Page 255

1  the job?
2      A. I don't remember verbatim; but he did say he had
3  a conversation with Tickle about actually applying for
4  it before he did.
5      Q. Did he tell you he went to Tickle or Tickle came
6  to him?
7      A. He didn't tell me any direction.
8      Q. And so you don't know whether he took the
9  initiative to go to Tickle or if Tickle actually reached
10 out to him about applying, you don't know one way or the
11 other?
12     A. Correct.
13     Q. Okay. And so he had a conversation with Tickle
14 about applying, and then what else did he tell you?
15     A. That he applied for it and subsequently got it.
16 I'm not sure if he was a hundred percent comfortable
17 even discussing that with me, but.
18     Q. Did he say something where -- to indicate that he
19 wasn't comfortable?
20     A. No. It wasn't a long conversation, I mean.
21     Q. Were you guys -- did you discuss this in person
22 at the office?
23     A. I think we were on, what was it, Skype back then
24 or whatever the communication we were using at that
25 point. It was a call. Like a conversation over a --

Page 256

1  not a conference call, but I believe I was at home. He
2  might have been at the office, he could have been at
3  home, I'm not sure where he was; but you can dial in
4  from your IM and call somebody from IM.
5      Q. Was this a meeting that you scheduled
6  specifically to talk to him about this or was it
7  something else?
8      A. I just called and asked him about it. It wasn't
9  anything formal.
10     Q. Okay. So you took the time and called Michael to
11 ask him, "Hey, what made you apply for this job"?
12     A. Right.
13     Q. And he shared with you that he had a conversation
14 with Michael Tickle and ended up applying?
15     A. Correct.
16     Q. Did he tell you anything about the application
17 process?
18     A. Not that I can remember, no.
19     Q. Okay. Did he indicate to you whether he
20 interviewed or didn't interview for the job?
21     A. I don't remember if he said he actually
22 interviewed. I'm assuming that he did because every
23 process, when it comes to jobs, you have to interview.
24 Like that's part of it.
25     Q. Okay. Did he tell you whether or not there were

Page 257

1  other candidates who were also being considered for the
2  position?
3      A. Not that I'm aware of.
4      Q. You're not aware of him telling you that?
5      A. Yeah, I'm not sure if he knew or not.
6      Q. Okay. And I think you testified earlier you're
7  not aware if there were other candidates who applied for
8  the job?
9      A. No, not aware.
10     Q. And so you also wouldn't know if those people
11 were internal to Shell, external to Shell, or where they
12 came from?
13     A. I wouldn't know.
14     Q. And then you -- you also state that the Shell
15 defendants ultimately give that existing team member
16 permission to apply for the vacant position that left
17 the team short one person.
18     You're referring to Michael Deley getting
19 permission to apply for the position?
20     A. Correct.
21     Q. What did Michael Deley tell you that led you to
22 believe he needed permission to apply for the position?
23     A. Based on the encouragement in the email that we
24 got that we're looking for somebody else. So I'm
25 assuming at that point someone said, okay, it's okay for

**Appendix 105**

Page 262

1  down.  He was just asking questions about the actual
2  role and what I knew about it.  Did I know members of
3  the team.  Or I think Robert explicitly asked me about
4  somebody he was interviewing with, did I know them.
5      Q.  What is Robert's race?
6      A.  Robert is black.  He's from somewhere in the
7  Caribbean, I believe.
8      Q.  Okay.  Have you, other than Robert Bynoe, have
9  you spoken to anyone else about applying -- about them
10  applying for positions at Shell?
11      A.  Not that I can recall.
12      Q.  Would you encourage individuals to apply for jobs
13  at Shell?
14      A.  Knowing what I know now, no.
15      Q.  Okay.  When did you have the conversation with
16  Robert Bynoe?
17      A.  That was recent.  And that's why I didn't
18  encourage or discourage him.
19      Q.  Okay.
20      A.  I'm not trying to take food off anybody else's
21  table.  If that's what he wants to do, if it fits his
22  financials, considering what he wants, by all means.
23      Q.  You mentioned in passing that you are on blood
24  pressure medication or that you currently are on blood
25  pressure medication.  Are you on any other medication

Page 263

1  today other than your blood pressure medication?
2      A.  I --
3          MS. GIBSON:  Whoa, whoa.  Are you done with
4  the question?
5      Q.  (BY MS. WILLIAMS)  That might affect your ability
6  to -- your ability to recall information or to provide
7  truthful testimony?
8      A.  No.
9      Q.  Do you hold any license, professional licenses or
10  certificates in connection with the work that you do?
11      A.  No.
12      Q.  Are you a member of any professional
13  organizations?
14          MS. GIBSON:  Object.  Object to form.
15      Were you done?  Were you done?
16          MS. WILLIAMS:  I was done.
17          MS. GIBSON:  Okay.
18      A.  Regarding, like, my work at Shell?
19      Q.  (BY MS. WILLIAMS)  Yes.
20      A.  Nothing explicitly for me.  I think as a group
21  we're a part of certain organizations but just under the
22  Shell umbrella.  We're part of like the GCPA, that's a
23  common -- Gulf Coast Power Association.  We all have
24  access to be members of that.
25      Q.  Okay.  Did you ever serve in the military?

Page 264

1      A.  No.
2      Q.  Are you a member of any fraternities?
3      A.  Yes.
4      Q.  What -- more than one or one?
5      A.  Just one.
6      Q.  Okay.  What fraternity?
7      A.  Can't be two.
8      Q.  Well, there are different kinds of fraternities.
9  But what fraternity are you a member of?
10      A.  Kappa Alpha Psi.
11      Q.  Okay.  I don't know that we discussed this
12  specifically and I apologize if I'm repeating it.  What
13  is Michael Tickle's race?
14      A.  White.
15      Q.  Patrick Frnka's race?
16      A.  White.
17      Q.  Susan's race?
18      A.  White.
19      Q.  Doug --
20      A.  White.
21      Q.  -- Hund.
22      (Pause.)
23      A.  Michael Deley?
24      Q.  Thank you.
25      A.  White.

Page 265

1      Q.  Michael Deley's race is white?
2      A.  Yes.
3      Q.  And then you mentioned Chris Riley?  I'm sorry.
4      A.  White.
5      Q.  Jennifer Hartnett?
6      A.  White.
7      Q.  You mentioned -- have we -- have I identified or
8  we identified all of your colleagues currently?
9      A.  Not the two new -- Jim Barker is white.
10      Q.  Okay.
11      A.  He's been employed at Shell for a while.  Thomas
12  Jones is white.
13      Q.  Okay.
14      A.  Ken Ueng is Asian.
15      Q.  How do you spell Ken's last name, if you know?
16      A.  U-E-N-G.
17      Q.  Okay.  Does that cover all your colleagues
18  currently?
19      A.  Yeah.
20      Q.  Okay.  Have any -- we talked about Shawn Matthews
21  and I -- and I -- we talked about Luis Lugo as well.
22  Have any -- apart from those individuals, have any
23  African-American employees or colleagues at Shell shared
24  with you any complaints they have about their
25  experiences at Shell?

Page 278

1  said that they're kind of the same thing, but I just
2  wanted to be clear for the record.
3       A.  Yes.
4            MS. GIBSON:  Same objection.
5       Q.  (BY MS. WILLIAMS)  Have we discussed everything
6  related to your complaint that you did not get the
7  position in 2021 at Shell?
8            MS. GIBSON:  Ah...
9       Q.  (BY MS. WILLIAMS)  That forms the basis of your
10  complaint about not getting the position in 2021 at
11  Shell?
12            MS. GIBSON:  Object to form.
13       A.  Yes, I believe so.
14       Q.  (BY MS. WILLIAMS)  Do you have any other
15  complaints against Shell related to this lawsuit that we
16  have not discussed?
17       A.  You mean like in the lawsuit, actual
18  complaints --
19       Q.  Yes.
20       A.  -- I've made in the lawsuit?  No.
21       Q.  Have you been -- have any of your colleagues at
22  work talked about your lawsuit with you?
23       A.  No.
24       Q.  Have you talked about the lawsuit with any of
25  your colleagues?

Page 279

1       A.  No.
2            MS. WILLIAMS:  Okay.  I'll reserve the rest.
3  Pass.
4                  EXAMINATION
5  BY MS. GIBSON:
6       Q.  Okay.  Robert, really early on in the deposition
7  there was some discussion about traders being a separate
8  position.  Do you recall that?
9       A.  Yes.
10       Q.  Okay.  But when -- my question is when it --
11  well, before I ask the question, you've seen the term
12  "POC" in the documents that Shell provided, right?
13       A.  Yes.
14       Q.  And what does that stand for?
15       A.  Person of color.
16       Q.  Okay.  So my question is, when it comes to
17  punishing POCs on pay, whether through bonuses, salary,
18  or job grades, was that limited, that policy, was that
19  limited to the power sales group?
20            MS. WILLIAMS:  Objection, form.
21       A.  No.
22       Q.  (BY MS. GIBSON)  Okay.  Throughout the
23  deposition, especially earlier on, do you recall that
24  Ms. Williams was asking you a lot of questions about the
25  contents of documents, like emails and things like that?

Page 280

1       A.  Yes.
2       Q.  All right.  And dates, what they said, things of
3  that nature?
4       A.  Yes.
5       Q.  Okay.  At any point did she show you any of those
6  documents so that we could be accurate about them?
7            MS. WILLIAMS:  Objection, form.
8       A.  No.
9       Q.  (BY MS. GIBSON)  And so, for example, when it
10  comes to the exact number you gave Shell for your prior
11  salary, what they told you in the email from HR about
12  what this salary range would pay for the job on your
13  initial hire, that would be in the emails?
14            MS. WILLIAMS:  Objection, form.
15       A.  Yes.
16       Q.  (BY MS. GIBSON)  Okay.  There was a lot of talk
17  earlier in your deposition about 2014 the initial
18  position, the later position, the initial job, the later
19  job, the first interview, the second interviews, and
20  when you were told that the position ultimately you were
21  being hired for was JG 6.  You remember all of that?
22       A.  Yes.
23       Q.  Okay.  But today, based on the substance of the
24  job, was that two -- really two different jobs or one
25  job that was downgraded?

Page 281

1            MS. WILLIAMS:  Objection, form.
2       A.  It was the exact same job, just downgraded.
3       Q.  (BY MS. GIBSON)  All right.  Now, when you asked
4  about roles, though, back in 2014, did you know at that
5  point that it was all the same job and they had just
6  downgraded your pay because you're black?
7            MS. WILLIAMS:  Objection, form.
8       A.  I didn't know that, no.
9       Q.  (BY MS. GIBSON)  So in substance those were both
10  the same position in 2014?
11            MS. WILLIAMS:  Same objection.
12       A.  Correct.
13       Q.  (BY MS. GIBSON)  Okay.  And have you become aware
14  of at various times when someone is -- gets a, say, JG 4
15  position or JG 5 position, as far as your desk, your
16  team goes, were they actually doing a different job
17  after they got the -- the bump in job grade or pay?
18            MS. WILLIAMS:  Objection, form.
19       A.  No, they were all the same jobs.
20       Q.  (BY MS. GIBSON)  All right.  So -- go ahead.
21       A.  There could have been a task or two that we're
22  not aware of that they may be working on, or maybe a
23  side project, but nothing that deemed it to be a
24  different job.  We all had worked on other things that
25  we don't work on as a group together.  So nothing that

**Appendix 107**

## Page 282

1  deems the job being any different.
2  Q. So in some sense giving someone on your team a JG
3  4, for example, is like getting just a pay increase?
4  A. Correct.
5  MS. WILLIAMS: Objection, form.
6  Q. (BY MS. GIBSON) It's not necessarily like a
7  promotion to a new job?
8  MS. WILLIAMS: Same objection.
9  A. Correct.
10  Q. (BY MS. GIBSON) Okay. Based on everything you
11  know now, would anything have changed if you had dug
12  deeper, I mean like cored through the earth deeper with
13  Shell on the difference between JG 5 and JG 6 with
14  respect to the hiring position?
15  MS. WILLIAMS: Objection, form.
16  A. Would I have done anything different had I --
17  Q. (BY MS. GIBSON) No.
18  A. I'm not sure of the question.
19  Q. No, I'm sorry. My bad. Based on everything you
20  know now, would anything have changed as far as what --
21  ah, I see where I asked it wrong. Let me start over.
22  Based on everything you know now, would anything
23  have changed, as far as what Shell did, had you dug like
24  deep through the earth on questioning JG 5 versus JG 6?
25  MS. WILLIAMS: Objection, form.

## Page 283

1  A. I think Shell would have continued on had I -- if
2  I had not spoken up or raised more concern about it, I
3  think they would have just been business as usual.
4  Q. (BY MS. GIBSON) Spoken up, you mean now, the
5  charge in the lawsuit?
6  A. Correct.
7  Q. Okay. But even had you -- do you think that had
8  you just questioned Shell more in 2014, before you knew
9  what happened, do you think Shell would have changed
10  anything no matter how much you questioned on JG 5 and
11  6?
12  A. No.
13  MS. WILLIAMS: Objection, form.
14  Q. (BY MS. GIBSON) All right. Was Shell -- I know
15  Sri told you in 2020, but up until Sri told you, was
16  Shell ever open about its policy, at least as high as
17  human resources, to put black employees, no matter their
18  credentials, in a lower, lower-paying job grade?
19  MS. WILLIAMS: Objection, form.
20  A. No.
21  Q. (BY MS. GIBSON) How long did Shell cover it up?
22  MS. WILLIAMS: Objection, form.
23  A. For me, since 2014. But who knows how long they
24  covered it up for anyone else who's been affected by
25  this.

## Page 284

1  Q. (BY MS. GIBSON) And you're aware we've requested
2  pay audits in this case for the United States, right?
3  A. Correct.
4  Q. And you're aware we've been told there are none?
5  A. Correct.
6  Q. Were you aware that as early as the 1990s Shell
7  was aware that there were job grade problems with its --
8  some of its black employees?
9  A. No, not aware.
10  MS. WILLIAMS: Objection, form.
11  I'm sorry, what was his answer?
12  (Record read as requested.)
13  A. No, I was not aware.
14  Q. (BY MS. GIBSON) Ms. Williams asked you a whole
15  bunch of questions about organizational structure, the
16  management hierarchy, job grades, when people left, when
17  people came in. Remember that?
18  A. Yes.
19  Q. Okay. Shell should have all those documents,
20  correct?
21  A. Correct.
22  MS. WILLIAMS: Objection, form.
23  Q. (BY MS. GIBSON) And that -- would that be an
24  easier way to figure out exactly what happened there?
25  MS. WILLIAMS: Objection, form.

## Page 285

1  A. Correct.
2  Q. (BY MS. GIBSON) So at some point, after talking
3  about how Michael Tickle told everyone We're a team
4  member down, I need your help, like, recruiting people
5  in to fill that spot, in that context Ms. Williams asked
6  you some questions like, well, did Michael Tickle ever
7  say he would not support you. Remember that?
8  A. Yes.
9  Q. Okay. Well, I'm going to ask the flip. Did
10  Michael Tickle ever tell you, "I will support you" --
11  A. No.
12  Q. -- "to get JG 4"?
13  A. No.
14  Q. Okay. And so could be, we just don't know, at
15  least not yet, given the lack of documents provided --
16  MS. WILLIAMS: Objection, form, to the
17  argumentative nature of the question.
18  Q. (BY MS. GIBSON) -- what happened there could have
19  been all done behind your back just like they went
20  behind your back the first time when you were hired,
21  right?
22  MS. WILLIAMS: Objection, form.
23  A. Correct.
24  Q. (BY MS. GIBSON) So I want to go back to some of
25  the discussion about the reasons you believe what

NELL McCALLUM & ASSOCIATES, INC.

**Appendix 108**

Page 286

1   happened to you with respect to pay at Shell was
2   discrimination. First, I'm going to start at the end.
3        When Ms. Williams asked you questions, "Have we
4   discussed everything," did you take that to mean, like,
5   based on what you knew at this time?
6        A. Correct, yes.
7        Q. All right. But you're certainly aware your
8   attorneys are working on evidence, right?
9        A. Correct.
10       Q. And there are a whole lot of witnesses, or
11   potential witnesses that we've listed in this case?
12       A. Correct.
13       Q. And you know sometimes a jury trial can take
14   like, two weeks, on a single plaintiff case.
15           MS. WILLIAMS: Objection, form.
16       Q. (BY MS. GIBSON) Is there any way we can discuss
17   all of the evidence we would potentially put on at trial
18   in your deposition?
19           MS. WILLIAMS: Objection, form.
20       A. I don't think you can.
21       Q. (BY MS. GIBSON) So on the -- on some of the
22   reasons, sometimes it was referred to the lawsuit and no
23   response to that; but Exhibit I think 1, in front of
24   you, the EEOC charge that you filed, did you see the
25   response from Shell to that EEOC charge?

Page 287

1        A. I'm not sure if it was in response to this or the
2   lawsuit, but I did see the remarks about it being
3   without merit, giving a myriad of reasons, pages and
4   pages of reasons why it wasn't -- it was meritless.
5        Q. So that is their response to the EEOC charge.
6        A. Okay.
7        Q. So the EEOC charge happens before you file suit,
8   right?
9        A. Right, correct.
10       Q. And that gives the parties a chance to try and
11   work thing out or gives the defendant a chance to fix
12   things, right?
13           MS. WILLIAMS: Objection, form.
14       A. Correct.
15       Q. (BY MS. GIBSON) Okay. And Shell's response was
16   to brand your claim as lacking merit; is that right?
17       A. Correct.
18           MS. WILLIAMS: Objection, form.
19       Q. (BY MS. GIBSON) Did you -- did you see in that
20   response did Shell do any investigation before deciding
21   to brand this as meritless?
22           MS. WILLIAMS: Objection, form.
23       A. Zero investigation.
24       Q. (BY MS. GIBSON) To this day, have you received
25   any indication that Shell has made any effort, even a

Page 288

1   tiny bit, to correct the problems with a system of pay
2   disparity for black workers?
3           MS. WILLIAMS: Objection, form.
4        A. I haven't seen or heard anything at all.
5        Q. (BY MS. GIBSON) The -- the report that Sri made
6   to Shell, have -- have you seen any documents that Shell
7   produced --
8        A. No.
9        Q. -- that show her report? Okay.
10       A. Nothing from the complaint she reported.
11       Q. Have you seen any documents from Shell that show
12   that they investigated Sri's report back in 2014?
13       A. No.
14       Q. But did you have occasion to see whether after,
15   after Sri reported to Shell, Teri Olmen, did she keep
16   her job?
17           MS. WILLIAMS: Objection, form.
18       A. Yes. I believe she was employed until 2018 with
19   Shell.
20       Q. (BY MS. GIBSON) Okay. So for years.
21       A. Yeah.
22       Q. She kept her job. And I know there was some
23   discussion about whether the role had been offered to
24   someone else.
25           MS. GIBSON: So I'm -- just for

Page 289

1   Ms. Williams, I meant ShellDedmon_722 production.
2           MS. WILLIAMS: Okay.
3        Q. (BY MS. GIBSON) Despite all that --
4           MS. WILLIAMS: I'm sorry, one second. Are
5   you -- I don't have a copy of it.
6           MS. GIBSON: I don't -- I don't, either.
7   I'm looking at my computer. That's why I'm giving you
8   the Bates. You want to see it?
9           MS. WILLIAMS: Well, what's the number?
10          MS. GIBSON: 722.
11          MS. WILLIAMS: I don't have that one with
12   me, so yeah, I'll have to look at your computer.
13       Q. (BY MS. GIBSON) While she's looking at that, I'm
14   going to go back to the EEOC response.
15          Shell's -- Shell's excuse that they couldn't --
16          MS. WILLIAMS: Well, I can't -- I can't
17   review this and listen to your question in case I have
18   to object.
19          MS. GIBSON: Okay. Go ahead.
20          MS. WILLIAMS: Okay.
21          MS. GIBSON: Hang tight on that a sec and
22   I'll finish this, okay?
23       Q. (BY MS. GIBSON) Do you recall in the EEOC
24   response Shell saying that they couldn't talk to
25   witnesses who could corroborate the discrimination

73  (Pages 286 to 289)

**Appendix 109**

Page 290

```
1    because those people don't work at Shell anymore?
2    A. Yes.
3          MS. WILLIAMS: Objection, form.
4    Q. (BY MS. GIBSON) You're a Law and Order fan,
5    right?
6    A. Yes.
7    Q. Okay. How would Law and Order work if the police
8    always said we'd like to interview witnesses but they
9    don't work for the police department?
10         MS. WILLIAMS: Objection, form.
11   A. It wouldn't work.
12   Q. (BY MS. GIBSON) All right. Do you expect more
13   of Shell?
14         MS. WILLIAMS: Objection, form.
15   A. A lot more, yes.
16         MS. GIBSON: Okay. All right. Go ahead and
17   take a look at that. I'm just going to ask about the
18   box part.
19         MS. WILLIAMS: And I'm just -- is this the
20   very beginning of it? I'm sorry.
21         MS. GIBSON: I'm just going to ask about the
22   box part.
23         MS. WILLIAMS: Right, but I want to read the
24   whole thing. Is that the entire document?
25         MS. GIBSON: No.
```

Page 291

```
1          MS. WILLIAMS: I don't to scroll in case you
2    have something else above it, that's all I'm saying. So
3    it -- I don't know if there's any text above this, is
4    what I'm asking.
5          MS. GIBSON: There -- I don't know. Go
6    ahead and scroll. So you can't scroll -- it's not an
7    iPad.
8          MS. WILLIAMS: It's not -- okay, sorry.
9    Okay, that's what I'm trying to figure out. Okay.
10   Thank you.
11         MS. GIBSON: All right.
12         (Pause.)
13         MS. WILLIAMS: Okay. Thank you.
14         MS. GIBSON: All right.
15   Q. (BY MS. GIBSON) Okay. So Ms. Williams was
16   quizzing you about whether the same role had been
17   offered to a non-POC candidate before you. Do you
18   remember that?
19         MS. WILLIAMS: Objection, form.
20   A. Yes.
21   Q. (BY MS. GIBSON) Okay. And even though we don't
22   have -- Shell says it can't find the EEO complaint or
23   any investigation documents, Sri said -- and I'll give
24   you a chance to look at this, too.
25         (Reading) I again want to document my discomfort
```

Page 292

```
1    in offering a job to a POC candidate at a lower JG when
2    we have just offered the exact same role and same
3    region, same product, to a non-POC candidate at a higher
4    JG just a month ago.
5          I'm just -- can you confirm that I roughly read
6    that correctly, or in substance?
7    A. Yes.
8    Q. All right. And that corroborates what you were
9    talking about, about it being offered to someone else?
10   A. Correct.
11         MS. WILLIAMS: Objection, form.
12   Q. (BY MS. GIBSON) Okay. And in addition, I know
13   you talked about, I believe, Patrick Frnka?
14   A. Yes.
15   Q. Who had zero experience and came in at a job
16   grade 5 as a white person on your team?
17   A. Correct.
18   Q. Okay. But in addition to him, do you recall
19   seeing Sri document that over the past few years we have
20   hired a few people without direct sales experience,
21   Jimmy Promobul --
22         MS. GIBSON: Court reporter, I'll give you
23   spellings in a minute.
24   Q. (BY MS. GIBSON) Jesse Park. Recently Patrick --
25   is it Frnka?
```

Page 293

```
1    A. Frnka.
2    Q. Frnka. JD Steele. All from operations. Michael
3    Tickle came from the credit team.
4          MS. WILLIAMS: Same document, right?
5          MS. GIBSON: Sorry, no, I flipped. I
6    flipped.
7          MS. WILLIAMS: Okay.
8          MS. GIBSON: I'll show it to you, too.
9    Q. (BY MS. GIBSON) Do you see that?
10   A. Yes.
11   Q. All right. Does that, in addition to the things
12   I've gone over --
13         MS. WILLIAMS: Can I take a look at the
14   document?
15         MS. GIBSON: Yeah, yeah.
16         THE WITNESS: Sorry.
17         (Pause.)
18         MS. WILLIAMS: Okay.
19   Q. (BY MS. GIBSON) So does that, plus the things
20   we've just gone over, starting with your EEOC charge and
21   how they did nothing in response to that other than
22   brand you as meritless, also constitute some of the
23   reasons you believe what happened is race
24   discrimination?
25   A. Correct.
```

74 (Pages 290 to 293)

NELL McCALLUM & ASSOCIATES, INC.

**Appendix 110**

Page 294

1      MS. WILLIAMS: Objection, form.
2      Q. (BY MS. GIBSON) Okay. I'm going to keep going
3   through some additional things, but same line. Do you
4   know what a differential diagnosis is that doctors make?
5      A. No.
6      Q. Okay. That's okay.
7      A. No.
8      Q. Have you ever had to, like, look at what the
9   cause of the problem is, like with a car?
10     A. Yes.
11     Q. All right.
12     A. Yes.
13     Q. And so is one of the things you do kind of look
14  at different things and try to rule things out?
15     A. Correct. Yes.
16     Q. All right. Kind of like doctors might try to run
17  tests and rule certain things out to find the cause?
18     A. Correct.
19     Q. All right. When it comes to -- you've seen the
20  documents showing an ongoing pay disparity, right?
21     A. Correct.
22     MS. WILLIAMS: Objection, form.
23     Q. (BY MS. GIBSON) When it comes to that pay
24  disparity in job grades, in base salary, in bonuses and
25  total compensation, given your qualifications, skill

Page 295

1   set, and performance, is there any reason for that kind
2   of disparity for you other than race?
3      MS. WILLIAMS: Objection, form.
4      A. That's the troubling part. No.
5      Q. (BY MS. GIBSON) And in a case where Ms. Williams
6   is asking you about, you know, performance reviews and
7   performance, what did you see when you recently were
8   asked to look and go ahead and download your performance
9   reviews for both sides' attorneys in this case?
10     A. I couldn't find them. I was only able to find
11  one shortened version of what our performance review
12  was. I didn't see any other years. And I've been at
13  Shell since 2014. I can go back and find pay stubs from
14  2014, I can go back and find a lot of stuff from 2014.
15  I think I should be able to easily access, like I was
16  before, my performance reviews.
17     Q. So there's still -- there's still like a section
18  or a tab for you to look at performance reviews, right?
19     A. Correct.
20     Q. But the performance reviews that were there like
21  a few months ago are gone?
22     A. Correct.
23     Q. All right. So your performance reviews have
24  disappeared?
25     MS. WILLIAMS: Objection, form.

Page 296

1      A. I have no idea where they are, correct.
2      Q. (BY MS. GIBSON) And I'm going to ask you a
3   question about do you remember that Michael Tickle kind
4   of spreadsheet, with certain comparative data on it --
5      A. Correct.
6      Q. -- on your team?
7      Before I ask you the question, the abbreviation
8   "GM," what does that stand for?
9      A. Gross margin. We're talking about dollars.
10     Q. Okay. And what is -- what does gross margin,
11  like, mean in kindergarten terms?
12     A. The amount of money you make on a deal.
13     Q. Okay.
14     A. The margins.
15     Q. For Shell?
16     A. If you sell it at 50 and you add a penny to it,
17  your gross margin is that one cent times the amount of
18  megawatt hours you're selling. So anything above that
19  flat price is your margin, gross margin.
20     Q. Now, I realize you want to do a full, like,
21  investigation into this.
22     A. Correct.
23     Q. But did -- on that performance spreadsheet that
24  Tickle had for you, was your gross margin off compared
25  to actual numbers on internal Shell documents?

Page 297

1      A. Yes.
2      MS. WILLIAMS: Objection, form.
3      A. That was alarming that my gross margin was off by
4   several million.
5      Q. (BY MS. GIBSON) Several million dollars. Did
6   you also look to see if anyone else's gross margin was
7   off?
8      A. I checked everyone's for that year and everyone's
9   was dollars away from rounding, maybe, errors, but it
10  was not off -- I believe mine was 7 or 8 million.
11     Q. And when you talk about off by 7 or 8 million, do
12  you mean that Michael Tickle gave you credit for 7 or 8
13  million more than actual; or did he cut off 7 or 8
14  million that you actually earned for Shell?
15     MS. WILLIAMS: Objection, form.
16     A. It was reduced.
17     Q. (BY MS. GIBSON) And there may well be other
18  types of disparities; we're still looking, right?
19     A. Correct.
20     MS. WILLIAMS: Objection, form.
21     Q. (BY MS. GIBSON) All right. At any point in --
22  from 2014 when Sri reported that Shell, as high up as
23  the HR level, was paying black people, meaning POCs,
24  less, through today has anyone ever informed you that
25  Shell was going to do a pay audit and try to make this

75 (Pages 294 to 297)

**Appendix 111**

Page 298

1    right?
2        A. No.
3            MS. WILLIAMS: Objection, form.
4        Q. (BY MS. GIBSON) When you talk about seeking a
5    pay audit in this lawsuit, were you just seeking that
6    for you?
7        A. Seeking that for everyone. Everyone that has
8    been affected or could potentially be affected by this.
9        Q. And you talked at one point about UK showed a pay
10   disparity especially with black employees. Is -- can
11   you tell us what you mean by UK?
12       A. Shell United Kingdom. So the non-American
13   portion of Shell. Shell is global, so they operate as
14   separate entities. So Shell Americas is an entity,
15   Shell UK, you know, there are other countries that have
16   HR policies through Shell.
17       Q. And but Shell, Shell UK is like the top of --
18       A. Correct.
19       Q. -- the umbrella of all the companies?
20           MS. WILLIAMS: Objection, form.
21       A. Yes.
22       Q. (BY MS. GIBSON) Is that right?
23       A. Correct.
24       Q. Okay. When you talked about the email that
25   Michael Tickle sent out asking for recommendations to

Page 299

1    fill a spot because he didn't want the team to be a man
2    down, did you consider that to be encouraging you or
3    discouraging you from personally applying for that spot?
4        A. Discouraging.
5            MS. WILLIAMS: Objection, form.
6        Q. (BY MS. GIBSON) Have you seen the documentation
7    about how you got the JG 5 spot, where they compared
8    your qualifications to other candidates kind of in a
9    chart form? Like, do they have the skill, Y or N?
10       A. Regarding the -- the rankings?
11       Q. The 2015 JG 5 role that you got, do you remember
12   seeing a document seeing how you got that?
13       A. I don't recall.
14       Q. Okay. That's fine.
15           Have you seen any documentation as to how the
16   decision was made to give Deley the JG 4 position?
17       A. No.
18       Q. Did Deley start before you or after you on -- on
19   your team?
20       A. After.
21       Q. Okay. And how did he, based on your
22   understanding, how did he come onto your team, like what
23   was his level of experience?
24           MS. WILLIAMS: Objection, form.
25       A. I believe Deley is approximately ten years

Page 300

1    younger than me. He came in through the, I believe, a
2    grant program to where they did rotations through
3    certain business units within Shell and he landed with
4    us for a period of time, and then at some point after
5    his rotation was hired onto our desk full time.
6        Q. (BY MS. GIBSON) And to clarify, backing up, I'm
7    going back to the performance reviews, that's -- that's
8    on Shell's internal database?
9        A. Correct.
10       Q. Okay. Those are Shell documents that were there
11   and then suddenly recently are gone?
12       A. Correct.
13           MS. WILLIAMS: Objection, form.
14       Q. (BY MS. GIBSON) And then you talked about what
15   happened with Shawn Matthews as a trader and what
16   happened with Luis Lugo. Right?
17       A. Yes, correct.
18       Q. Okay. And is -- is all of this, including what
19   happened with Shawn and Luis, also part of the reason
20   you believe this is race discrimination?
21       A. Yes, correct.
22           MS. WILLIAMS: Objection, form.
23       Q. (BY MS. GIBSON) And then did you also notice
24   that on that -- one of the spreadsheets that has like
25   reviews from other people like not on your team but you

Page 301

1    work with?
2        A. Correct, yes.
3        Q. What did you notice about the people you
4    regularly work with?
5            MS. WILLIAMS: Objection, form.
6        A. They were not -- sorry. They were not a part of
7    my cross-peer evaluation.
8        Q. (BY MS. GIBSON) They were not on that list?
9        A. Correct.
10       Q. Okay. Have you also noticed some differences in
11   how Michael -- Mike Tickle, as leadership, supports
12   members of the team?
13       A. Yes.
14           MS. WILLIAMS: Objection, form.
15       Q. (BY MS. GIBSON) Can you tell us a little bit
16   about that?
17       A. In particular, Patrick Frnka and Mike Tickle have
18   been a part of Shell for a very long time. They both
19   came from the credit group, so they have an established
20   relationship. I understand that part.
21           But when it comes to our jobs in particular, I
22   can use an example of a customer visit. Michael Tickle
23   is nine out of ten times going to go with Patrick to
24   visit customers or to engage in customers, lunches,
25   happy hours; whereas, with me, it'll -- and I'm

Page 302

1   paraphrasing -- "Let me know if you want me to go with
2   you." It was not, "I'm going to support, I'll be there,
3   this is our game plan," which it clearly is with
4   Patrick. It's, "Holler if you need me" pretty much,
5   like, "If you need me to go, I'll go with you, but, you
6   know, go figure it out."
7       Q. And several times you talked about Shell policy
8   and then you got asked questions about which individuals
9   you believe participated. Do you view this more as a
10  case where it's the Shell policy, Shell system, that is
11  discriminatory; or like the situation where a particular
12  manager discriminates against people?
13      A. I believe --
14          MS. WILLIAMS: Objection, form.
15          I'm sorry. You can answer.
16      A. I believe it's a system. After reviewing all the
17  data and the documents, Shell missed a lot of steps.
18  They didn't do what I call basic due diligence, which
19  means they really don't care. The basic of due
20  diligence. Call Robert. Let's talk to him.
21      Let's follow up with Sri. She's not working
22  anymore. I can get her phone number off LinkedIn. I
23  know how to contact Sri.
24      I know how to contact Teri.
25      Sri's constant request for data that supported

Page 303

1   her complaint. Nothing.
2       Data that supported why you decided that persons
3   of colors -- color historically aren't successful. They
4   provided absolutely nothing.
5       That's not just one person. I mean, that one
6   person felt comfortable enough to say it and do it
7   because they felt supported in it. That's not the first
8   time. It's the first time someone pointed it out and
9   fought it.
10      Q. (BY MS. GIBSON) And even when it comes to Teri
11  Olmen, who is at human resources level, and that
12  discriminatory pay system that punished POCs, do you
13  believe that that was the result of just like was she
14  just a rogue Shell employee?
15          MS. WILLIAMS: Objection, form.
16      A. No, I don't...
17      Q. (BY MS. GIBSON) Tell me more about that.
18      A. To be able to -- not sure I'm putting words -- to
19  do something like that, you have to be supported. To be
20  so blatantly obvious about your discrimination and not
21  be corrected or reprimanded on it, you have to be
22  supported by that.
23      If it was one rogue individual, that red flag
24  would have been everywhere and that individual would
25  have been removed. Shell would have expected to be --

Page 304

1   do the right thing. But the years of nothing, after
2   request upon request for it to be
3   investigated, clearly show that this is not just her.
4   There's more people involved in why this continues to
5   happen.
6       Q. And if a company, you know, recognizes that it
7   has a problem and it doesn't try to get at what is the
8   cause of this and let's fix it, does it stop or does it
9   continue?
10      A. It continues.
11          MS. WILLIAMS: Objection, form.
12      Q. (BY MS. GIBSON) Has Shell made up for the pay
13  issue when you were moved up to JG 5 in 2015?
14          MS. WILLIAMS: Objection, form.
15      A. No.
16      Q. (BY MS. GIBSON) In fact, even Sri recommended
17  that you be on the high end of the job grade at the
18  hiring stage -- I'm sorry. I said that wrong. Strike
19  that.
20      Sri even said that you needed to at least be on
21  the high end of the pay scale on job grades even back in
22  2014 --
23      A. Correct.
24      Q. -- did that -- did that ever happen, though?
25          MS. WILLIAMS: Objection, form.

Page 305

1       A. Sorry. No.
2       Q. (BY MS. GIBSON) Okay. There was some discussion
3   about anxiety over the Shell lawsuit. Is part of that
4   because you are having to relive events?
5       A. 100 percent why.
6       Q. Okay. You're owed money, for sure. But what, to
7   you personally, is the biggest hurt?
8       A. The betrayal. There was nothing I could do to
9   stop Shell from designating me in that category. They
10  didn't know me, they didn't -- clearly didn't read my
11  qualifications, they didn't take recommendations on
12  people who hired me -- who wanted to hire me, and still
13  made a decision to categorize me in the level of lower
14  job grade and job pay strictly based on the color of my
15  skin and my race.
16      That level of betrayal, there's no compensation
17  amount that could -- you could create whatever equation
18  you wanted -- that could amount to the hurt, the pain.
19  I've worked, busted my ass, ten times harder, a thousand
20  times harder. Because my dad always told me, you got to
21  be smarter, got to work harder; and I always fought
22  back, nah, dad, it's going to be a level playing field.
23      No way. That's not how it works. And to get
24  married, start a family, excel in my career, and for
25  that to happen to me for no reason? No reason. The

Page 306

1  money doesn't fucking matter. Sorry. They can have the
2  money. Explain to me why... explain to me why that
3  happened. Explain to me why you allow that to happen.
4  Explain to me why you did nothing about it. We're two
5  years in. Nothing. Absolutely nothing but a bunch of
6  discrediting of me, which is even -- even worse. That's
7  all there's been, trying to discredit me. I've done
8  nothing to deserve this. Absolutely nothing.
9      Q. And when you started, do you -- what -- what
10  was -- what was kind of the phrase about Shell for like
11  how long you worked there, what was that phrase?
12      A. Shell lifer.
13      Q. And did you trust Shell until Sri told you the
14  truth about the cover-up?
15      A. One thousand percent.
16      Q. And did you wear all the Shell stuff?
17      A. I have a polo for -- I could wear a Shell polo
18  probably for a month straight without repeating.
19      Q. And you promoted them to the community?
20      A. (Shaking head.)
21      Q. And so I realize that you took medical leave and
22  you may have done some other things, but was being out
23  of that work environment part of kind of the treatment
24  you needed at the time?
25      A. That was a hundred percent necessary.

Page 307

1      Q. And have you been told that if you stood up to
2  Shell Oil over race discrimination you might lose your
3  career?
4          MS. WILLIAMS: Objection, form.
5      A. Yes.
6      Q. (BY MS. GIBSON) You did not know if you would be
7  blacklisted, right?
8      A. That's --
9          MS. WILLIAMS: Objection, form.
10      A. -- a major fear. A major fear. Working so
11  hard to get to a point in your career for it all to
12  crumble because you decided to stand up for what was
13  right.
14      Q. (BY MS. GIBSON) So -- so why do it? Why did
15  you -- I mean, you told us you want a pay audit for
16  everyone, you want the problem addressed, you want to be
17  paid what you're owed. But why put your -- you know,
18  why do that, why risk that?
19      A. For my family, for sure. For my dad. This isn't
20  new. This isn't the first time I've been, I consider, a
21  victim of racial discrimination. This happened when I
22  was a kid. And I watched my dad take the safe route,
23  which was just make sure, son, you get home, make sure
24  you're safe. Let me protect you from what could happen
25  long-term, if I, not as your dad, go out and fight for

Page 308

1  you. Because it's not guaranteed that you can walk back
2  through that door or I can walk back through that door.
3  As a fifth grader.
4      Q. So I know what you're talking about, but nobody
5  else does. So when you say that part of the reason
6  you're doing this is for your dad, tell us the story of
7  what happened and what your dad felt he had to do and
8  how that relates to why you're filing suit, why you're
9  standing up to Shell.
10      A. My dad is an alpha male, strong, hard worker.
11  Will give you the shirt off his back. Will work 80
12  hours a week to provide. My dad has always been my
13  Superman. Never a down day, never an off day. He's
14  always been solid, Superman for me.
15          I had a -- what I, now, what I deem an
16  altercation at school to where a white kid and I were
17  walking home. I live on his same street, several houses
18  down. He's calling me racial slurs, he's, you know,
19  jacking with my bike, trying to rattle me into a
20  physical altercation as me and my buddy Donte are trying
21  to merely just walk to my house. And I'm thinking in my
22  mind, what can I do to get out this situation, do I go a
23  different route, do I run? And I decided just to go
24  straight home the normal way I go home.
25          And as we were approaching his house, all the

Page 309

1  energy changed. He ran to his house screaming and
2  hollering, "They're trying to fight me, they're trying
3  to jump me, dad, they're attacking me." And his father
4  comes out. At that point I'm definitely afraid.
5  Definitely afraid.
6          And when I finally was able to get home and get
7  my dad involved, his first reaction was to fight fire
8  with fire to protect his son. But I could see in that
9  moment when everything changed. I could -- this is a
10  fifth grader, I can remember this vividly, how he -- a
11  calmness came down. He's like, "We can't go down
12  there" -- talking to my mom, "We can't go down there,
13  Karen, we can't do it. He's home. He's safe. Let's
14  figure out a way to prevent him from getting into that
15  situation."
16          As an adult now, that -- that wasn't Superman.
17  And that burns him to this day. We -- we've talked
18  about it. Throughout this case we've talked about -- I
19  pulled the Band-Aid off, and he remembers verbatim. He
20  cut me off mid sentence. And my dad is almost 70. With
21  a terrible memory. But remembers enough to cut me off
22  mid sentence about what I was about to say about the
23  situation.
24      Q. So, I know that's hard, so thanks for sharing it.
25  I won't -- I won't make you give more details on that

NELL MCCALLUM & ASSOCIATES, INC.

**Appendix 114**

Page 310

1    story. But so are you saying that part of the reason
2    you're standing up to Shell is your dad felt like he
3    couldn't back then without risking your life?
4        A. And I don't want my daughters to ever have the
5    feeling that I had about -- I don't ever want them to
6    feel like I'm not their Superman. I don't want to feel
7    like Clark Kent.
8        Q. And you also had talked about another reason why,
9    as far as speaking up for other people: The community.
10       A. After talking to Shawn and Luis, and those guys
11   made way more money than I did and they still didn't
12   push the envelope for change. And I'm assuming they
13   struggle with not making that decision to push forward.
14   But for those guys, for guys that come after me, for
15   people who are sitting right now with their employer
16   dealing with something that they're scared to speak up
17   about because now you got to deal with if I lose my job,
18   what happens to my family?
19       I'm the breadwinner in my family. Will I get
20   blacklisted? The energy industry is small, so the
21   second something comes out about me suing Shell, no one
22   is going to touch me. Falling on the sword for all the
23   folks who didn't stand up for themselves, I'm -- that's
24   who I'm doing it for. Hey, this should not happen to
25   anybody again and I'm going to make sure it doesn't.

Page 311

1        Q. And staying at Shell and then investing in some
2    newer businesses, do you have a family to take care of?
3        A. Yeah.
4        Q. All right.
5        A. Got college tuition around the corner.
6        Q. Two girls, two dogs.
7        A. Correct, yes.
8        Q. And the social worker wife, Brooke?
9        A. Yes.
10       Q. Who probably thinks you need more treatment.
11       A. Yes.
12       Q. Is she the one?
13       A. Yes.
14       Q. Okay. You know, talking about when Ms. Williams
15   was asking -- I'm sorry, I'm sorry. Take your time.
16       A. (Crying.) I should be enjoying life right now, I
17   should be enjoying my daughters. But I stay up a lot,
18   talking to my best friend, my wife. And she's pushing
19   me, hey, your mental health is the most important thing,
20   you have to take care of it.
21       (Pause.)
22       I'm good.
23       Q. Okay. God gave us tears for a reason.
24       All right. So Ms. Williams was asking you some
25   questions like are other people good at their jobs. Do

Page 312

1    you remember that -- on your team?
2        A. Yes.
3        Q. Are you trying to take money away from them?
4        A. Not at all.
5        Q. Okay.
6        A. I like them. I like them. Like, that's the --
7    it adds to why. I don't have a problem with them.
8        Q. Right.
9        A. Like, no problem at all.
10       Q. Right. You were just saying given how good you
11   are, there is no reason you should be so significantly
12   underpaid?
13       A. Correct.
14       Q. And the only -- once you eliminate the other
15   reasons, the only reason is race --
16           MS. WILLIAMS: Object --
17       Q. (BY MS. GIBSON) -- that Shell is doing this?
18           MS. WILLIAMS: Objection, form.
19       A. Correct.
20       Q. (BY MS. GIBSON) Okay. Now, I know you talked
21   about, like, they can have the money, I know the
22   betrayal is the hardest part, but does Shell need to pay
23   a hundred percent for what it did --
24       A. Yes.
25       Q. -- to help deter this in the future? Okay.

Page 313

1        A. Yes.
2        Q. I know you talked about different ranges and
3    different numbers. So are you aware we just got the
4    first pay data other than you in 2014 like at the end of
5    this February?
6        A. Yes.
7        Q. And we still don't have all the pay data.
8            MS. WILLIAMS: Objection, form.
9        Q. (BY MS. GIBSON) But once we do, will you run
10   what those damages look like more precisely?
11       A. Correct, yes.
12       Q. Okay. When Ms. Williams was asking you about
13   Mr. Tickle and if you had any concerns about what he
14   said on performance reviews, were you talking about what
15   he said orally during performance meetings?
16       A. Correct.
17       Q. Okay. And were his comments to you orally during
18   these meetings positive?
19       A. Yes.
20       Q. Okay. Do you remember being asked some questions
21   about job grades, like 6 pays less than 5, pays less
22   than 4, et cetera?
23       A. Yes.
24       Q. And that theoretically, hypothetically, someone
25   at, say, job grade 6 could make more than someone at job

## Page 314

```
 1   grade 5?
 2        A.  Yes.
 3        Q.  But I want to ask you, based on the data you have
 4   actually seen, how did it work?  Were the job grades 6
 5   paid less than 5, paid less than 4?
 6             MS. WILLIAMS:  Objection, form.
 7        A.  Correct, yes.
 8        Q.  (BY MS. GIBSON)  When it -- when it comes to the
 9   job grade 4, what's worse:  That they didn't put you
10   in -- they didn't bump you to job grade 4, or that they
11   didn't even give you a chance?
12             MS. WILLIAMS:  Objection, form.
13        A.  That I wasn't given a chance.
14        Q.  (BY MS. GIBSON)  You talked about someone on your
15   team -- is it Thomas Jones?
16        A.  Yes.
17        Q.  And he's black?
18        A.  Thomas is white.
19        Q.  White, okay.  I thought someone said he was
20   black.  When you were talking about Luis Lugo, you know,
21   "I made well more than Tim," I want to ask you, what do
22   you mean "I made"?  Like made in compensation, made for
23   Shell, what do you mean?
24        A.  Made for Shell.  So traders are -- if Tim made
25   $50 million, Lugo was insinuating "I made 60, 70, 80
```

## Page 315

```
 1   million dollars for Shell."  Which, very simply put,
 2   their bonuses and their structure is very clear:  If you
 3   make the most money, you're going to get paid the most
 4   money.
 5        So Lugo going into it, okay, well, I doubled down
 6   on his book, I should at least get 2.2.  He got 2.2 for
 7   less than what I made.  And I got 850.  That math doesn't
 8   add up.  And he was adamant about bringing that to their
 9   attention and he was only given an additional hundred
10   thousand dollars.
11        Q.  Is there any reason you're aware of that Shell
12   financially could not make this right if it wanted to?
13        A.  No.
14             MS. WILLIAMS:  Objection, form.
15        Q.  (BY MS. GIBSON)  You were asked about certain
16   forms of compensation like salary, bonus, and bonus
17   shares.  But isn't -- isn't there also like some type of
18   stock plan once you get higher up in the job grades?
19        A.  Yes, there are stock plans to where higher level
20   grades get shares.  They do.  Shell stock.
21        Q.  So, as you know, during breaks you and I do not
22   discuss -- or any of us discuss your testimony with you,
23   but you said you wanted to say something.  I don't know
24   what it is.  If you remember what it is, what did you
25   want to say?
```

## Page 316

```
 1        A.  It's today, and even by lunch time, I see why
 2   people are fearful for speaking up.  I didn't ask for
 3   this.  I didn't participate in this.  I didn't know this
 4   was going on.  Today I feel like a criminal.  I was made
 5   to feel like I was a criminal, having to prove myself as
 6   a person, my credibility, when it's very clear Shell did
 7   that exactly to me.  I did nothing to bring this on
 8   myself, but yet I'm trying to prove very obvious smoking
 9   guns.  Very obvious.  And it's sad.
10        And it's not a shot at Marlene, but they're
11   forcing -- putting an African-American woman in front of
12   me to tell me I'm a hundred percent wrong about what
13   happened to me.  And that's nothing to do with you at
14   all.  I think that's just part of the damning part about
15   this whole process.  Like, come on, Shell, it's there.
16   It's right there in front of you and you did absolutely
17   nothing to try to prevent it, fix it, even remotely
18   touch it.  You just dismissed it.  And I see why people
19   don't speak up.
20             MS. GIBSON:  Okay.  I may have some followup
21   if Ms. Williams has more questions of you, but otherwise
22   we'll remain -- we will reserve the remainder of our
23   questions for trial.
24             MS. WILLIAMS:  I do have a few followups.
25
```

## Page 317

```
 1             FURTHER EXAMINATION
 2   BY MS. WILLIAMS:
 3        Q.  Have I made you feel like a criminal today?
 4        A.  No.
 5        Q.  Okay.
 6        A.  That's why I was clear about this is not being
 7   you as a person.
 8        Q.  What information do you have to suggest that I
 9   was forced to represent Shell in this position as an
10   African-American woman?
11        A.  Not forced.
12        Q.  I think that's what you said.
13        A.  Right.  I'm just speaking from the heart about my
14   feelings.  I feel like they put you in place because I
15   was black.
16        Q.  Why do you feel like I was put in place?  Because
17   I'm African-American?  You're basing that on my skin
18   color, that they chose me because of my skin color?
19             MS. GIBSON:  You don't need to yell at the
20   witness, Ms. Williams.
21             MS. WILLIAMS:  I'm not yelling at him.
22             MS. GIBSON:  You are.  You're raising your
23   voice for sure.
24             MS. WILLIAMS:  If I were yelling, he'd know.
25        Q.  (BY MS. WILLIAMS)  Are you saying that Shell
```

NELL McCALLUM & ASSOCIATES, INC.

**Appendix 116**

Page 338

1    Q. (BY MS. WILLIAMS) Okay. And same question:
2    Based on the information you shared with me and then the
3    information you provided when your lawyer asked
4    questions, have you identified everything that forms the
5    basis of your color discrimination claims against Shell?
6        A. Up until --
7            MS. GIBSON: Object to form.
8        A. Up until this point, yes.
9        Q. (BY MS. WILLIAMS) Okay. What do you mean "up
10   until this point"?
11       A. There's still more data and documents and
12   discovery, you know. It's an ongoing case. So.
13       Q. Okay.
14       A. I may not be aware of something else that could
15   have potentially happened --
16       Q. Okay. But in terms of something that you
17   witnessed, identified, experienced personally, you're
18   not holding back on anything else that forms the basis
19   of your race and color discrimination claims against
20   Shell, are you?
21       A. Correct.
22           MS. WILLIAMS: Okay. I'll pass.
23           MS. GIBSON: Okay. Just a couple followups.
24   So first I'm going to show you ShellDedmon_64, which is
25   Shell's production to us, and first let you take a look

Page 339

1    at this 2014 salary range for job grades.
2            MS. WILLIAMS: Okay.
3            MS. GIBSON: All right.
4                FURTHER EXAMINATION
5    BY MS. GIBSON:
6        Q. So, Robert, I'm going to show you the same
7    document. Now, I realize it's confusing because the
8    date on the email is -- is like in the 2020s. But what
9    does the subject say on that email?
10       A. Oh, 2014 Tier 1 Structure.
11       Q. 2014 Tier 1 Structure?
12       A. Correct.
13       Q. All right. And what does that chart depict?
14       A. Job grade 5 and 6, potential min and max salary
15   ranges, 80 percent up to 120 percent.
16       Q. All right. And so does that refresh your
17   recollection as to whether you did in fact actually look
18   at and see the salary ranges and know that Shell did not
19   place you at the higher end?
20       A. This is the chart that I did review, correct.
21       Q. Okay. Now I'm going to show you ShellDedmon_802,
22   which is an email from Teri Olmen. It's part of a
23   string where she's responding to Sri, who calls her out
24   on paying people less because they're black.
25           MS. WILLIAMS: Objection, form.

Page 340

1            MS. GIBSON: So I am going to show this
2    first to Ms. Williams. And it's -- it's part of -- it's
3    part of a huge production set, but feel free to scroll
4    up or down on my computer to give you whatever context
5    you need or want, Ms. Williams.
6            MS. WILLIAMS: I was just checking to see if
7    I had a copy and I could...
8            (Examining document.)
9            MS. WILLIAMS: Okay.
10           MS. GIBSON: You ready?
11           MS. WILLIAMS: Uh-huh.
12           MS. GIBSON: Ms. Williams?
13           MS. WILLIAMS: Yep.
14       Q. (BY MS. GIBSON) Okay. All right, Robert, I'm
15   going to show you Teri Olmen's response. And feel free
16   to scroll up or down on my Mac to give you the context
17   you need. But I'm going to want you to read through
18   that email from Teri Olmen, her response to Sri calling
19   her out, and then let me know when you're done. I'm
20   going to ask you some followup questions.
21           MS. WILLIAMS: Objection, form.
22       A. (Examining document.)
23       Q. (BY MS. GIBSON) Okay. Take your time.
24       So in Teri Olmen's response, does she deny
25   anywhere in that response making the statements Sri said

Page 341

1    she did?
2            MS. WILLIAMS: Objection, form.
3        A. No, she does not deny it.
4        Q. (BY MS. GIBSON) And then, in fact, will you --
5    do you see the sentence where she says something about I
6    believe my statement, like, was consistent with Shell
7    practice and policy or something like that?
8        A. Yes.
9        Q. All right. Would you read just that sentence to
10   us?
11       A. (Reading) While it is my belief that my
12   explanation did follow Shell policies and practices, it
13   is clear from the various conversations that you've had
14   since that this is not how it was understood and I
15   apologize for that.
16       Q. Okay. So she doesn't deny, and she also says she
17   believes her statement was consistent with Shell
18   practice and Shell policy, right?
19           MS. WILLIAMS: Objection, form.
20       A. Correct.
21       Q. (BY MS. GIBSON) All right. And then do you
22   remember when Ms. Williams is basically telling you that
23   she gets to do what she gets to do today because you
24   filed a lawsuit?
25       A. Yes.

Page 342

1      Q.  What is the root cause of why we are here in a
2  lawsuit?
3          MS. WILLIAMS:  Objection, form.
4      A.  The root cause is the racial discrimination and
5  the pay disparity.  That's the root of why we're here.
6      Q.  (BY MS. GIBSON)  If Shell had addressed this and
7  fixed it, not just for you but for all its employees, at
8  any point between 2014 or earlier and the time you filed
9  your suit, would we be here?
10     A.  No.
11         MS. WILLIAMS:  Objection, form.
12         MS. GIBSON:  All right.  I may have followup
13  if Ms. Williams has some additional questions.
14  Otherwise, we will reserve the remainder of our
15  questions for trial.
16         MS. WILLIAMS:  We reserve as well.
17         MS. GIBSON:  All right.  Thank you.
18         THE VIDEOGRAPHER:  The time is 6:33 p.m.,
19  and we are off the record.
20         (Concluded at 6:33 p.m.)
21
22
23
24
25

Page 343

1              CORRECTION PAGE
2  WITNESS NAME: ROBERT DEDMON      DATE: 04/02/2024
3  PAGE LINE CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

Page 344

1            SIGNATURE PAGE
2
3      I, ROBERT DEDMON, have read the foregoing deposition
   and hereby affix my signature that same is true and
   correct, except as noted on the correction page.
4
5
6  _____
   ROBERT DEDMON
7
8
9  THE STATE OF TEXAS      )
   COUNTY OF _____  )
10
11   Before me _____ on this day personally
   appeared _____ known to me [or proved to
12  me on the oath of _____ or through
   _____ (description of identity card or
13  other document)] to be the person whose name is
   subscribed to the foregoing instrument and acknowledged
14  to me that he/she executed the same for the purposes and
   consideration therein expressed.
15   Given under my hand and seal of office this _____
   day of _____, 2024.
16
17
18 _____
   NOTARY PUBLIC IN AND FOR
19 THE STATE OF T E X A S
20
21
   My Commission Expires:
22
23
24 _____
25

Page 345

1  THE STATE OF TEXAS )
   COUNTY OF HARRIS  )
2
3       REPORTER'S CERTIFICATION
   VIDEOTAPED DEPOSITION OF ROBERT DEDMON
4            TAKEN APRIL 2, 2024
5
        I, ROBIN GROSS, Certified Shorthand Reporter in and
6  for the State of Texas, hereby certify to the following:
        That the witness, ROBERT DEDMON, was duly sworn by
7  the officer and that the transcript of the oral
   deposition is a true record of the testimony given by
8  the witness;
9
        That the deposition transcript was submitted on
10 _____ to the witness or the attorney for the
   witness for examination, signature and return to Nell
11 McCallum & Associates, by _____;
        That the amount of time used by each party at the
12 deposition is as follows:
13
   MS. AMY E. GIBSON - 1:05
14 MS. MARLENE C. WILLIAMS - 6:13
15   I further certify that I am neither counsel for,
   related to, nor employed by any of the parties in the
16 action in which this proceeding was taken, and further
   that I am not financially or otherwise interested in the
17 outcome of the action.
18   Certified to by me this 4th day of April, 2024.
19
20
21
22    ROBIN GROSS CSR, TEXAS CSR NO. 9015
      Expiration Date: 07-31-25
23    Nell McCallum & Associates, Inc.
      Firm Registration No. 10095
24    Expiration Date: 01-31-2025
      718 Westcott
25    Houston, Texas 77007

87  (Pages 342 to 345)

NELL MCCALLUM & ASSOCIATES, INC.

Appendix 118

# Exhibit 6

# Robert Dedmon 2014 email communications with Shell

**Appendix 119**

M Gmail

**(no subject)**
4 messages

---

**Robert Dedmon** <r.dedmon@gmail.com>                                      Fri, Jan 17, 2014 at 4:33 PM
To: "'Carl.A.Williams@shell.com'" <Carl.A.Williams@shell.com>

I just got to Gloria's. For once traffic wasn't bad on 59 entering downtown.

Robert Dedmon
Sent from my iPhone

---

**Carl.A.Williams@shell.com** <Carl.A.Williams@shell.com>                   Fri, Jan 17, 2014 at 4:34 PM
To: r.dedmon@gmail.com

Cool - taking off now.....see you in 10 mins....

-----Original Message-----
From: Robert Dedmon [mailto:r.dedmon@gmail.com]
Sent: Friday, January 17, 2014 4:34 PM
To: Williams, Carl A SENA-STE/32
Subject:

I just got to Gloria's. For once traffic wasn't bad on 59 entering downtown.

Robert Dedmon
Sent from my iPhone

_____

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

---

**Carl.A.Williams@shell.com** <Carl.A.Williams@shell.com>                   Wed, Jan 22, 2014 at 7:54 AM
To: r.dedmon@gmail.com

Hey Robert, job not posted yet. Will track and give you a heads up when its coming. Registered your interest w/ Jennifer as well.

Carl

-----Original Message-----
From: Robert Dedmon [mailto:r.dedmon@gmail.com]
Sent: Friday, January 17, 2014 4:34 PM
To: Williams, Carl A SENA-STE/32
Subject:

I just got to Gloria's. For once traffic wasn't bad on 59 entering downtown.

Robert Dedmon
Sent from my iPhone

_____

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

---

**Robert Dedmon** <r.dedmon@gmail.com>                                      Wed, Jan 22, 2014 at 7:56 AM
To: "'Carl.A.Williams@shell.com'" <Carl.A.Williams@shell.com>

Awesome.  I will send over my resume later this morning.

Thanks for all your help Carl,                                             Dedmon 000762

RD                          **Appendix 120**

page intentionally left blank

Robert Dedmon <r.dedmon@gmail.com>

### Invitation from carl williams for a job opportunity at Shell
1 message

**Shell** <donotreply@trm.brassring.com>                                                    Fri, Jan 24, 2014 at 11:29 AM
Reply-To: Shell <donotreply@trm.brassring.com>
To: rdedmon@gmail.com

Message from carl williams

Dear Robert Dedmon,

As I was browsing through our job opportunities at Shell I thought of you. I believe your skills and experience would fit nicely with our organisation and I'd like you to consider submitting your interest for: Sales Representative - Houston, TX 4089BR

To find out what it is like working for Shell and how you could become part of the team, please visit www.youtube.com/watch?v=HcXZKJVz23o.

In order for this to be a successful referral you need to apply using the link provided in this email. Please click here to start. Please note that by applying to this position via the link you agree with the fact that I will be informed about your progress within the application process. There will be no exchange of personal information whatsoever, just information on when you move from one recruitment status to the next.

If you do not wish to share this type of information, please visit www.shell.com/careers to search and apply to available opportunities, or to sign up for updates on future job opportunities and the latest developments in your field of interest.

Good luck!
carl williams

Please note this is an auto-generated email.

Dedmon 000811

**Appendix 122**

page intentionally left blank

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]

**To:** Williams, Carl A SENA-STE/32
**Subject:** Re: Robert Dedmon-Resume

I have a call with Jennifer tomorrow.  Its go time.

RD

On Fri, Jan 31, 2014 at 12:42 PM, <Carl.A.Williams@shell.com> wrote:

No problem Robert – we'll talk. Probably overqualified but go thru process, do a fit-check w/ $, then decide. Again, we'll talk. Good luck RD !

Carl

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Friday, January 31, 2014 11:16 AM

**To:** Williams, Carl A SENA-STE/32
**Subject:** Re: Robert Dedmon-Resume

Carl,

Thank you for guiding me in my new career journey.  Your words and industry knowledge have given me an entirely new and positive outlook on my path.  More importantly I appreciate you forwarding my name in consideration for the Sales Rep opportunity.   I am excited and feel 100% confident that with my tenacity, work ethic, and desire to succeed - I will be an asset to Shell.

Let me know if you think of any other next steps that I need to pursue in order to be equipped for a potential interview.  I have a good feel for what the position entails but I'm always looking for direction and relevant reading material to be well prepared.

Thanks again,

RD

On Fri, Jan 24, 2014 at 11:32 AM, <Carl.A.Williams@shell.com> wrote:

Hey Robert – you should be getting an email at your gmail address w/ application instructions. Pls call if there are questions.

.....Carl

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Thursday, January 23, 2014 2:41 PM

**To:** Williams, Carl A SENA-STE/32

**Subject:** Re: Robert Dedmon-Resume

# Appendix 124

Dedmon 000827

page intentionally left blank

M Gmail

Robert Dedmon <r.dedmon@gmail.com>

---

**Thank you for your application to Shell**
1 message

---

**SI-DONOTREPLY@SHELL.COM** <Enterprise@trm.brassring.com>                                    Sat, Jan 25, 2014 at 8:11 PM
Reply-To: SI-DONOTREPLY@shell.com
To: rdedmon@gmail.com

Your Ref No:16993894

Dear Robert,

Thank you for your interest in working for Shell and for taking the time to submit your application through our website.

We will give careful consideration to your application and review your details against the position criteria. You will receive separate notification of the outcome in due course. Please note that some roles have very specific minimum requirements. To ensure equal treatment for all, the system will automatically analyze your responses against the selection criteria. Only candidates who meet the minimum requirements will proceed in the selection process.

You can check the status of your application through our website www.shell.com/careers, by logging on as a returning user and clicking on the "Application Status" link.

If you would like to learn more about Shell, please visit our global website www.shell.com/careers or our local country careers sites.

Kind regards,

Shell Recruitment

Disclaimer
The term "Shell Recruitment" is used for convenience sake; it refers to the recruitment function within Shell and not to a specific legal entity. However, the corporate structure of Shell is a group of separate companies.

*Please do not reply to this email.

Dedmon 000834

**Appendix 126**

page intentionally left blank

On Sat, Feb 1, 2014 at 11:41 AM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

We have reviewed your application for the Sales Representative's position and would like to explore your experiences further. Would you have availability next week to speak with the hiring manager via teleconference for 30 minutes? Also, please supply the following information to ensure that is position is aligned with your expectations:

1) Your current base salary
2) Bonus (if applicable)
3) 2013 total compensation
4) 2014 anticipated total compensation
5) Your base salary expectation

Best Regards,



**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:**  713.241.1094

**Email:  kendra.williams@shell.com**

--
Robert Dedmon

---

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                                          Sat, Feb 1, 2014 at 8:53 PM
To: r.dedmon@gmail.com

Hello Robert,

The hiring manager, Jennifer Hartnett – Supervisor Sales will call you on Tuesday, February 4th at 12:30 pm at 713-899-9486.

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Saturday, February 01, 2014 2:28 PM
**To:** Williams, Kendra J SHLOIL-HRT/RA
**Subject:** Re: ***Sales Representative

Hello Kendra,    **Appendix 128**                                          Dedmon 000850

page intentionally left blank

Robert Dedmon <r.dedmon@gmail.com>

## Interview
6 messages

---

**Robert Dedmon** <r.dedmon@gmail.com>                                             Wed, Feb 19, 2014 at 9:41 AM
To: "<Carl.A.Williams@shell.com>" <carl.a.williams@shell.com>

Final assessment went well.  I honestly think I'm a perfect fit for the team.  Thanks again for all your help.  Tyler said they will make a decision in about 2 weeks so the waiting game begins.

--
Robert Dedmon

---

**Carl.A.Williams@shell.com** <Carl.A.Williams@shell.com>                          Wed, Feb 19, 2014 at 9:49 AM
To: r.dedmon@gmail.com

Apologies RD, I meant to check in with you b4/after. Glad to hear it went well. Will thread gently for info so there's no perception of impropriety on my part !

Will circle back.

.....Carl

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Wednesday, February 19, 2014 9:41 AM
**To:** Williams, Carl A SENA-STE/32
**Subject:** Interview

Final assessment went well.  I honestly think I'm a perfect fit for the team.  Thanks again for all your help.  Tyler said they will make a decision in about 2 weeks so the waiting game begins.

--
Robert Dedmon

---

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

---

**Carl.A.Williams@shell.com** <Carl.A.Williams@shell.com>                          Thu, Mar 13, 2014 at 2:24 PM
To: r.dedmon@gmail.com

Robert, apologies for not getting back brotha. Not sure how/why you went from 1st to 2nd – I think it's stupid, but my opinion aside, that's how its playing out. They've extended an offer – cant guess what'll happen next. Let's keep talking bud.....who knows, we'll probably do a pkg deal somewhere else 😊

Stay up my man – nothing is ever given to us, even when we've earned it. We'll talk !

Carl

Dedmon 000805

## Appendix 130

page intentionally left blank

Robert Dedmon <r.dedmon@gmail.com>

**Shell Final Assessment - Robert Dedmon**
1 message

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                                            Mon, Jun 30, 2014 at 8:05 AM
To: r.dedmon@gmail.com

Good Morning Robert,

Thank you for your continued interest in Shell as a potential employer.  We are pleased to invite you to a final assessment for the position of **Sales Representative - Houston, TX.**  The details are:

| | |
|---|---|
| Date: | Monday, June 30, 2014 |
| Time: | 1:00pm – 2:00pm CST   **(Please arrive 15 minutes early for check in with security)** |
| Location: | Shell Trading Services Company |
| | 1000 Main |
| | Houston, TX 77002 |

Upon arrival to **12th floor Security**, inform them you are there to meet with **Jennifer Hartnett**.  You will need a **valid picture ID** and will receive a visitor's badge.

-

**Travel**

I understand you are local to the area and will not require travel accommodations.  Please let me know if this changes.  Attached is our Candidate Expense Claim Form for any charges incurred during this recruiting experience.  If you plan to drive over 100 miles to any destination en route to this interview, please contact me to discuss viable travel options.  For any questions regarding travel logistics or itinerary, I will be your point of contact (Office:  713 241-8274 / Mobile: 832 846-1496).

**Parking**

You may park in the nearby parking garage:

McKinney Parking Garage – This is one building north of the tower, enter via McKinney (accepts cash and credit card)

Macy's parking garage – This is located just southwest of our tower. Enter via Travis (Cash only)

OTM parking garage – Entrance via Travis and/or McKinney (accepts cash and credit card)

**Participants**

You will meet with the following individuals for some or your entire interview:

- Jennifer Hartnett – Supervisor Sales
- Christopher Riley – Sr. Originator Aggregator
- Michael Tickle – Sr. Sales Representative

**Enclosures**

- Candidate Information Pack
- Candidate Expense Claim Form

-

**Important Safety Information**

Dedmon 000832

# Appendix 132

page intentionally left blank

Robert Dedmon <r.dedmon@gmail.com>

### ***Sales Representative

**Robert Dedmon** <r.dedmon@gmail.com>                                                                 Wed, Feb 12, 2014 at 8:26 AM
To: "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

Yes, that works perfect for my schedule.

Thanks,

RD

On Tue, Feb 11, 2014 at 8:56 PM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

Would you be able to come in for an interview on Tuesday, February 18th at 9 am for the Sales Representative position? Please advise at your earliest convenience.

Best Regards,



**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email: kendra.williams@shell.com**

--
Robert Dedmon

We care about your safety and are committed to ensuring that HSSE features as a key element of our recruitment events.  The following advice is provided with this in mind; please take a moment to read Candidate Safety Information.

Please confirm your attendance by replying to this email.  If you have any questions, please do not hesitate to call me or your recruiter, **Tyler Allie**.  We truly look forward to your visit.

**Summary of Benefits**

www.shell.us/benefits

**Shell is an Equal Opportunity Employer**

If you require special accommodations, any reasonable adjustments or special assistance for the final assessment, please contact me.

Best Regards,



**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:**  713.241.1094

**Email:** kendra.williams@shell.com



Disclaimer:

This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and therefore Shell does not accept legal responsibility for the contents of  his message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing this email

Dedmon 000833

**Appendix 135**

page intentionally left blank

Robert Dedmon <r.dedmon@gmail.com>

**Gmail**

---

## Thank you

---

**Robert Dedmon** <r.dedmon@gmail.com>                                                Wed, Feb 19, 2014 at 6:04 PM
To: Tyler.Allie@shell.com

Tyler,


Thank you for taking time to see me yesterday morning. It was a pleasure to meet you and I enjoyed learning more about Shell Trading . After speaking with Chris, Jennifer and Michael about the Sales Representative position I'm even more convinced my experience and skill-set would allow me to excel in this role and quickly contribute to the team's success.

If you need any additional information, please feel free to call me at 713-899-9486. In the meantime, I'll look forward to hearing from you regarding the status of my candidacy in the next 2 weeks.


Best Regards,


--
Robert Dedmon

**Appendix 137**

page intentionally left blank

M Gmail

**(no subject)**
2 messages

---

**Robert Dedmon** <r.dedmon@gmail.com>                                    Wed, Apr 23, 2014 at 12:04 PM
To: "<Carl.A.Williams@shell.com>" <carl.a.williams@shell.com>

In short ( I finally got Tyler on the phone):  There are some internal changes being made to the group and they haven't locked down the pay grade for the position.  He informed me that I'm the likely candidate but no final decision has been made.

In other news, we are about 2 weeks out from finishing up the pool at our home.  My oldest does a walk through everyday after school to check the progress.  She noted that they didn't do anything different on Sunday and I had to remind her that they crew was off work for Easter. Future Project Manager?  HAHA

Have a great week.

--
Robert Dedmon

---

**Carl.A.Williams@shell.com** <Carl.A.Williams@shell.com>                 Wed, Apr 23, 2014 at 12:11 PM
To: r.dedmon@gmail.com

Certainly better than no info at all. Got cryptic responses to my queries (......which I have no patience for). Congrats on the pool – love that the little one's immersed in the outcome. Got a leader there in the making ! Still need to catch-up over beers – will do so soon.


Carl


---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Wednesday, April 23, 2014 12:04 PM
**To:** Williams, Carl A SENA-STE/32
**Subject:**


In short ( I finally got Tyler on the phone):  There are some internal changes being made to the group and they haven't locked down the pay grade for the position.  He informed me that I'm the likely candidate but no final decision has been made.


In other news, we are about 2 weeks out from finishing up the pool at our home.  My oldest does a walk through everyday after school to check the progress.  She noted that they didn't do anything different on Sunday and I had to remind her that they crew was off work for Easter. Future Project Manager?  HAHA


Have a great week.


--
Robert Dedmon

---

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

Dedmon 000766

**Appendix 139**

page intentionally left blank

 Gmail

Robert Dedmon <r.dedmon@gmail.com>

## ***Invitation to Apply
8 messages

---

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>        Thu, Jun 19, 2014 at 6:28 PM
To: r.dedmon@gmail.com

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email: kendra.williams@shell.com**



Disclaimer:

This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and therefore Shell does not accept legal responsibility for the contents of his message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

 Please consider the environment before printing this email

---

**Robert Dedmon** <r.dedmon@gmail.com>        Thu, Jun 19, 2014 at 6:58 PM
To: "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon
Sent from my iPhone

On Jun 19, 2014, ~~liams@shell.com~~> wrote:

**Appendix 141**

Dedmon 000838

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,

 <image001.jpg>

**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email: kendra.williams@shell.com**

   <image002.png>

Disclaimer:
This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and  herefore Shell does not accept legal responsibility for  he contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

Please consider the environment before printing  his email

---

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                                      Thu, Jun 19, 2014 at 7:08 PM
To: r.dedmon@gmail.com

Thank you, Robert for your prompt reply. Yes, as we have reposted the position after the internal evaluation with the revised requirements, we will require your formal application. The team will only meet with you for a 1 hour assessment, in lieu of the 2 hour assessment as previously conducted. This will also allow the time for you to ask any questions that you may have of the team regarding the role.

Best Regards,

Kendra Williams

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Thursday, June 19, 2014 6:58 PM
**To:** Williams, Kendra J SHLOIL-HRT/RA
**Subject:** Re: ***Invitation to Apply

Just for clarity I'm reapplying and interviewing again? I want to be prepared.                    Dedmon 000839

# Appendix 142

Thanks,

Robert Dedmon

Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

Hello Robert,

The team along with Jennifer Hartnett would like to meet with you on June 30th at 1 pm for the Sales Representative position. Would you be available to come in at this date and time? Below, I have listed the Sales Representative link for your application. Please advise on whether you have any issues with submitting.

Sales Representative - Houston, TX

Best Regards,



**Kendra Williams**

Experienced Recruitment - Americas
Shell Oil Company, P O Box 2463
Houston, TX 77252-2463, USA
**Tel:** 713.241.1094

**Email:** **kendra.williams@shell.com**

<image002.png>

Disclaimer:

This e-mail, and any attachment and response string are confidential. If you are not the intended recipient, please telephone or e-mail the sender and delete this message and any attachment immediately. Internet communica ions are not secure and  herefore Shell does not accept legal responsibility for  he contents of this message as it has been transmitted over a public network. If you suspect the message may have been intercepted or amended, please call the sender. Thank you.

Please consider the environment before printing  his email

---

**Robert Dedmon** <r.dedmon@gmail.com>                                    Thu, Jun 19, 2014 at 9:19 PM
To: "<Kendra.Williams@shell.com>" <Kendra.Williams@shell.com>

Yes, I'm available to come in on June 30th at 1 pm.  I will submit my application this evening.

Thanks,

Robert Dedmon

On Thu, Jun 19, 2014 at 6:58 PM, Robert Dedmon <r.dedmon@gmail.com> wrote:
Just for clarity I'm reapplying and interviewing again? I want to be prepared.

Thanks,

Robert Dedmon
Sent from my iPhone

On Jun 19, 2014, at 6:28 PM, <Kendra.Williams@shell.com> wrote:

**Appendix 143**

page intentionally left blank

Robert Dedmon <r.dedmon@gmail.com>

M Gmail

**Shell Final Assessment - Robert Dedmon**
1 message

**Kendra.Williams@shell.com** <Kendra.Williams@shell.com>                     Mon, Jun 30, 2014 at 8:05 AM
To: r.dedmon@gmail.com

Good Morning Robert,


Thank you for your continued interest in Shell as a potential employer.  We are pleased to invite you to a final assessment for the position of **Sales Representative - Houston, TX.**  The details are:

| | |
|---|---|
| Date: | Monday, June 30, 2014 |
| Time: | 1:00pm – 2:00pm CST   **(Please arrive 15 minutes early for check in with security)** |
| Location: | Shell Trading Services Company |
| | 1000 Main |
| | Houston, TX 77002 |


Upon arrival to **12th floor Security**, inform them you are there to meet with **Jennifer Hartnett**.  You will need a **valid picture ID** and will receive a visitor's badge.

-
**Travel**

I understand you are local to the area and will not require travel accommodations.  Please let me know if this changes.  Attached is our Candidate Expense Claim Form for any charges incurred during this recruiting experience.  If you plan to drive over 100 miles to any destination en route to this interview, please contact me to discuss viable travel options.  For any questions regarding travel logistics or itinerary, I will be your point of contact (Office:  713 241-8274 / Mobile: 832 846-1496).


**Parking**

You may park in the nearby parking garage:

McKinney Parking Garage – This is one building north of the tower, enter via McKinney (accepts cash and credit card)

Macy's parking garage – This is located just southwest of our tower. Enter via Travis (Cash only)

OTM parking garage – Entrance via Travis and/or McKinney (accepts cash and credit card)


**Participants**

You will meet with the following individuals for some or your entire interview:

- Jennifer Hartnett – Supervisor Sales
- Christopher Riley – Sr. Originator Aggregator
- Michael Tickle – Sr. Sales Representative


**Enclosures**

- Candidate Information Pack
- Candidate Expense Claim Form

-
**Important Safety Information**

Dedmon 000832

# Appendix 145

page intentionally left blank

 Gmail

Robert Dedmon <r.dedmon@gmail.com>

---

**Follow up : Information for Review**
4 messages

---

**Tyler.Allie@shell.com** <Tyler.Allie@shell.com>                                           Wed, Jul 9, 2014 at 1:44 PM
To: rdedmon@gmail.com


Here you go! For your review this evening,


**Tyler**



**Tyler Allie**

Shell Recruitment

1000 Main St

Houston, TX 77002

Phone: +1 713-230-3774

Cell: +1 281-536-3193


Email: tyler.allie@shell.com
Shell Careers Page

https://twitter.com/Shell_Careers

---

**4 attachments**

 **2014_Summary_of_Benefits[1] - Copy.pdf**
96K

 **Annual Enrollment 2014.pdf**
764K

 **Benefits 2014 - Copy.pdf**
1658K

 **Wealth 2014.pdf**
584K

---

**Robert Dedmon** <r.dedmon@gmail.com>                                           Wed, Jul 9, 2014 at 4:17 PM
To: Tyler.Allie@shell.com

Tyler,

I just left you a voice mail officially accepting the position.  I know we discussed a potential sign on bonus before the base salary was set. Is that still up for discussion as I'm leaving about 75-80% of my 2014 STI on the table when I resign.

Thanks again and I'm excited about joining the team.

Dedmon 000798

**Appendix 147**

page intentionally left blank

--
Robert Dedmon

---

**Robert Dedmon** <r.dedmon@gmail.com>                                    Thu, Jul 10, 2014 at 2:26 PM
To: Tyler.Allie@shell.com

Good afternoon Tyler,

Will I be receiving a hard copy of the offer letter today for me to endorse?


RD

On Wed, Jul 9, 2014 at 4:27 PM, <Tyler.Allie@shell.com> wrote:

Just gave you a ring. I do have a response on this and you'll like it




**Tyler**


**Tyler Allie**

Shell Recruitment

1000 Main St.

Houston, TX 77002

Phone: +1 713-230-3774

Cell: +1 281-536-3193


Email: tyler.allie@shell.com
Shell Careers Page

https://twitter.com/Shell_Careers

---

**From:** Robert Dedmon [mailto:r.dedmon@gmail.com]
**Sent:** Wednesday, July 09, 2014 4:18 PM
**To:** Allie, Tyler C SHLOIL-HRT/RA
**Subject:** Re: Follow up : Information for Review


Tyler,


I just left you a voice mail officially accepting the position.  I know we discussed a potential sign on bonus before the base salary was set. Is that still up for discussion as I'm leaving about 75-80% of my 2014 STI on the table when I resign.


Thanks again and I'm excited about joining the team.

**Appendix 149**

page intentionally left blank

 Gmail

Robert Dedmon <r.dedmon@gmail.com>

---

**CONFIDENTIAL: Your Employment Documentation Package - Robert Dedmon**

---

**Robert Dedmon** <r.dedmon@gmail.com>
To: Lisa.Billington@shell.com

Fri, Jul 11, 2014 at 2:03 PM

Lisa,

I noticed one small item. The pay grade says its a 6 but I was informed it was a 3. I will get these documents back to you asap.

Thanks,

On Fri, Jul 11, 2014 at 12:47 PM, <Lisa.Billington@shell.com> wrote:

Dear Robert,

Congratulations on accepting our offer of employment. I will be your key focal point throughout your journey until you arrive on your first day in Shell. If you have questions about the process at any point in time, please contact me and I will try my best to help and guide you. In order to meet our targeted start date that you have discussed with our recruiter it is important to keep to any stated timelines to ensure a smooth process.

Please find attached the package details as outlined by your Recruiter.

***Please review the offer carefully. Your full name should be the same as it appears on your legal identifying documents, such as social security card, passport, transcripts, etc. Please cross out and make any necessary corrections, and initial next to your changes.***

The following documents are attached:

- Welcome to Shell Guide
- Offer of Employment (Please sign and return all pages)
- Shell/Motiva Consent Form (Please complete and return)
- Applicant background check instruction sheet
- Summary of Benefits – click here
- Shell Code of Conduct – click here

*We would like you to read, sign and complete the documents as required, and return them to us per the deadline in the offer letter.
Please return all signed documents to: SHLOIL-Experienced-Hire-SFP@shell.com and lisa.billington@shell.com or by fax to 281-582-6253.

**What will be the next steps after this?**

To help you prepare, please review the attached documents. Below I would like to bring some other useful information to your attention, regarding the process and next steps:

Dedmon 000479

**Appendix 151**

| Step 1 | •Introduction Email/Offer Package<br>•To be returned to your SFP for processing |
|---|---|
| Step 2 | •Offer Acceptance Email<br>•You will be notified within 24 hours that your offer has been received |
| Step 3 | •HireRight<br>•This is our 3rd party screening vendor; background checks can take 10 - 15 days to complete |
| Step 4 | •Policy Counseling for Relocation & Immigration *(If Applicable)*<br>•You will be contacted by a Shell Colleague to discuss relocation/immigration relocation benefits |
| Step 5 | • Medical Questionnaire<br>•All potential Shell employees are required to complete this once their background check is cleared.  You will receive an email from your SFP with instructions |
| Step 6 | •Fit To Work Exam *(If Applicable)*<br>•A Shell Health Employee will reach out to you if a physical is required of you |
| Step 7 | •Finalization of Start Date<br>•Once you have cleared Medical, your SFP will reach out via phone or email to finalize your start date |
| Step 8 | •Pre-Employment Completion<br>•Your SFP will send out an email to you along with your Recruiter, Hiring Manager, and HR Team to let everyone know the final start date |
| Step 9 | •Report To Work Details<br>•You will receive this email from your SFP 1 - 2 weeks before your start date, detailing first day instructions |
| Step 10 | •TALX<br>•The final step before your first day is to complete your new hire paperwork and first part of the I-9 using our online system called TALX |

If you have any questions, please don't hesitate to contact me by phone or e-mail.


**Lisa Billington**
HR Single Focal Point

Shell Exploration & Production Company

150 North Dairy Ashford

Houston, TX 77079


**Tel:** 832-337-1298

**Email:** Lisa.Billington@Shell.com

**Fax:** 281-582-6253

**Internet:** http://www.shell.us/careers

**CONFIDENTIALITY.** The information contained in this transmission is advice intended exclusively for the proper use by the intended addressees and may contain confidential and/or privileged material. Any views expressed in this transmission are those of the individual sender, except where the transmission states otherwise and the sender being authorised appropriately. Any review, dissemination and other use of this information, as well as any action in reliance upon this information by persons and/or entities other than the intended addressees is prohibited. If you received this information in error, please note that no confidentiality or privilege is waived or lost by any miss-transmission. You are requested to inform the sender and/or addressee immediately and permanently delete and/or destroy the material.


--
Robert Dedmon


Dedmon 000480

**Appendix 152**

page intentionally left blank


Robert Dedmon <rdedmon@gmail.com>

## First Day Instructions - Robert Dedmon
3 messages

**Lisa.Billington@shell.com** <Lisa.Billington@shell.com>              Thu, Aug 7, 2014 at 3:23 PM
To: r.dedmon@gmail.com
Cc: michael.tickle@shell.com, Adriana.Mier@shell.com, jennifer.hartnett@shell.com, Andrew.Phung@shell.com, Tyler.Allie@shell.com

Dear Robert,


We are delighted that you have decided to join us. This email serves as your confirmation of your Offer of Employment.

Your start date will be **Tuesday, August 19.**


The final step before your first day is to complete your new hire paperwork and I-9's  on our online system called TALX. This is a web based system that you can access from any computer with internet access. You should have already received login information in a separate email with the subject line "Your Shell New Hire Packet Info". All of your new hire paperwork must be completed prior to your start date. Please make sure to bring your I-9 documentation (see attachment) to your HR Contact on your first day of employment. If you plan to present a Social Security card as part of your documentation, please note that laminated copies of Social Security cards will not be accepted if the cards state that they are "not valid if laminated." If this applies to you, please start making arrangements now to get a new SSN card. Contact your SFP if you have any questions. A list of acceptable documents has been included for your review.


PLEASE NOTE THE FOLLOWING INFORMATION FOR YOUR FIRST DAY:

| | |
|---|---|
| **Report to Work Date:** | Tuesday, August 19 |
| **Arrival Time:** | 9:45, ask for Michael Tickle |
| **Location to report to:** | One Thousand Main (OTM)<br><br>1000 Main Street<br><br>Houston, Texas 77002<br><br>12th Floor Reception<br><br><br>*You will attend an HR On Boarding meeting with Adriana Mier at 10:00 am, OTM 16th floor.* |
| **Parking:** | Option #1 - McKinney Garage at the corner of Travis & McKinney (across from OTM)<br><br>Option #2 - One Thousand Main Parking Garage<br><br>Option #3 - You may also opt to carpool or bus in. (www.ridemetro.org)<br><br>*Please note parking will not be reimbursed. |
| **First Day Contact:** | Michael Tickle 713-230-2954 |
| **Line Manager:** | Jennifer Hartnett 713-767-5339 |
| **HR contact:** | Adriana Mier 713-230-4315 / Andrew Phung 713-230-1703 |
| **Required Attire:** | Business Casual |
| **What to Bring:** | Please remember to bring your supporting documents needed to complete I-9 paperwork<br><br>(see attachment for acceptable docs) |

Dedmon 000792

Shell recognizes the importance of ensuring a quality onboarding process for all new employees and has a well defined approach which covers the first week of your employment. The focus of your first week will be to provide you with as much of information to will

# Exhibit 7

# Patrick Frnka
# LinkedIn page



LinkedIn | Home | My Network | Jobs | Messaging | Notifications | Me ▾ | For Busin



### Patrick Frnka

Power & Natural Gas Sales at Shell Energy North America


Shell


The University of Texas at Austin

Katy, Texas, United States · Contact info

396 connections

**Connect**   Message   More

---

### Activity

393 followers

**Patrick hasn't posted yet**
Recent posts Patrick shares will be displayed here.

Show all activity →

---

### Experience

 **Shell**
17 yrs 11 mos

- **Mid Marketer - Energy Retailers**
  Apr 2014 – Present · 10 yrs 8 mos
  Houston, Texas Area

- **Scheduler**
  Nov 2010 – Apr 2014 · 3 yrs 6 mos
  Houston

- **Credit analyst**
  Jan 2007 – Oct 2010 · 3 yrs 10 mos

---

### Education

 **The University of Texas at Austin**

---

### Skills

---

**Appendix 156**

# Exhibit 8

# Shell 2014
# job grade 5 & 6
# pay range

Message

| From: | Frannea, Kerri A SHLOIL-HRN/AB [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E7F27718635D4BDD9223C98A1E5BE058-USI+FR0P] |
|---|---|
| Sent: | 4/20/2021 3:15:30 PM |
| To: | Hutnek, Sarah M SOPUS-HRN/GE [sarah.hutnek@shell.com] |
| Subject: | 2014 - Tier 1 Structure |

| | % | | | | | |
|---|---|---|---|---|---|---|
| | % | Rounded | | | | |
| Grade | Min | 80 | 90 | 100 | 110 | 120 |
| 5 | 93 | 102 | 114 | **127** | 140 | 152 |
| 6 | 77 | 85 | 95 | **106** | 116 | 127 |

**Appendix 158**

# Exhibit 9

# Shell 2014 emails about hiring Robert Dedmon

**From:** Hartnett, Jennifer R SENA-STE/34
**Sent:** Thursday, April 24, 2014 9:01 AM
**To:** Bowman, Beth A SENA-STE/3
**Cc:** Rangan, Sri SENA-STE/34
**Subject:** Power Sales Representative

Beth,

As discussed, the candidate we would like to offer the Power Sales Representative position to (Robert Dedmon) does have extensive Power Market experience. In his current role, he transacts with our own Power Sales Representatives (and with Marketers at other companies) purchasing power from them for his customers needs.  If he purchases too much he needs to negotiate pricing and sell the power back to us or other market participants. He will bring great insight to us on that side of the business which we do not currently have in the Northeast and ERCOT Power markets.
His experience also includes:

- Trading ERCOT power at Dynegy
- Trading PJM power at AP Gas & Electric
- Providing and negotiating power pricing for customers in PJM, NY and ISONE markets at GDF Suez
- Managing PJM Renewable products portfolio (selling and buying) at GDF SUEZ

I have attached his resume as a reference.

Regards,

Jennifer Hartnett
Sales Supervisor
Shell Energy North America
Jennifer.Hartnett@shell.com
Office: 713-767-5339
Cell: 713-855-1260

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

page intentionally left blank

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Monday, March 31, 2014 4:35 PM
**To:** Rangan, Sri SENA-STE/34
**Cc:** Rozelle, Megan B SENA-HRUA/AUSS; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** RE: Open Power Sales position

This should stay a JG 5.
I can be reached at 858 204 9183 if anyone would like to discuss.

---

**From:** Rangan, Sri SENA-STE/34
**Sent:** Monday, March 31, 2014 8:14 AM
**To:** Bowman, Beth A SENA-STE/3
**Cc:** Rozelle, Megan B SENA-HRUA/AUSS; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** FW: Open Power Sales position

Beth
GM! Please read below. Is this something you support and approved? We posted two jobs as JG 5, filled one and this is the second one. There is absolutely no difference in the tasks required of the two roles – They are both for the South Power ANT and require skills to market and sell in the ERCOT market  - one where we are trying to grow.

1) I have concerns around our ability to fill this role as a JG 6, based on the skillset/experience we require in the market
2) Why would we post two roles that require the same exact tasks in different JG? What happens if we hire a female or POC candidate in this role vs. Patrick Frnka that we hired in the 1st open JG 5 role? Would we inadvertently be creating differences in JG & compensation that now becomes gender & other criteria specific for doing the same job? For example the person we want to make an offer to now is African American male.

Again, I am expressing strong discomfort in suddenly lowering the JG after we have identified the candidate, who we know from our interview process is POC. Please advise if you are willing to move forward to lowering the JG at this point.

Thanks

Sri

---

**From:** Hartnett, Jennifer R SENA-STE/34
**Sent:** Monday, March 31, 2014 8:06 AM
**To:** Rangan, Sri SENA-STE/34
**Subject:** Open Power Sales position

I was told by HR Friday afternoon that the JG5 Power Sales position which I have been trying to fill externally now has to be changed to a JG6 and reposted as such internally. The role had already been approved as a JG5. The reason I was given is that since the time this position was initially posted, we have promoted Amanda Hardcastle so now we have one less JG6. HR claims that we need to keep the balance of JG5's and 6's the same.
For this role we had made an offer to one external experienced candidate, and were unable to come to agreement due to their salary requirements. We asked HR last week to make an offer to another experienced candidate. The idea of changing the Job grade in the middle of the process is unreasonable.
**Anything you can do to support my efforts to keep this role as a JG5 would be greatly appreciated.**
I would also like to discuss how we can change the balance of Sales positions from mostly 5s and 6's to be mostly 4's and 5's.


Jennifer Hartnett
Sales Supervisor

CONFIDENTIAL
**Appendix 162**

Message

| | |
|---|---|
| **From**: | Bowman, Beth A SENA-STE/3 [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+BOW2] |
| **Sent**: | 4/3/2014 8:26:26 AM |
| **To**: | Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **Subject**: | FW: Open Power Sales position |

Let's discuss.
We should take this to Frans.

---

**From:** Olmen, Teri M SENA-HRUA/AUSS
**Sent:** Wednesday, April 02, 2014 9:20 PM
**To:** Rangan, Sri SENA-STE/34; Bowman, Beth A SENA-STE/3
**Cc:** Rozelle, Megan B SENA-HRUA/AUSS
**Subject:** RE: Open Power Sales position

Sri & Beth,

I've tried to reach Beth by phone to discuss, but haven't been able to connect in the last couple of days, so responding via email.  Sri and I have discussed briefly, and we'll meet to review this and other staffing needs tomorrow.

As reviewed previously, the only available roles (currently) in Inside Sales are a JG6 in Houston and a JG6 in Calgary.  One of these was a result of a March 1 promotion, the other was a transfer to another Shell business.  Approval to upgrade these roles to JG5 lies with HR, not with the business.   Our organizational design was to have 2 roles of the 15 in this group at JG6.  That structure still remains.  This group has already been through a formal Shell Job Evaluation, and changing the structure puts our recent severance actions at risk.

So, we do not have a current JG5 Inside Sales position open and will not be making an immediate offer at that level.  If someone leaves the organization, then we can discuss this option.  Megan and I will meet with Sri tomorrow to plan next steps.

Thank you,
Teri

---

**From:** Rangan, Sri SENA-STE/34
**Sent:** Wednesday, April 02, 2014 10:43 AM
**To:** Bowman, Beth A SENA-STE/3; Rozelle, Megan B SENA-HRUA/AUSS; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** RE: Open Power Sales position

All:
Based on Beth's note below, we are ready to move forward with a JG 5 offer to Robert Dedmon.  Please advise next steps.

Beth:  **FYI -** We are short staffed on South/NE Power ANT desks and we are heading into critical summer period and have to get resources in place & trained up as fast as we can. As you know, Michael, Priscilla & Jimmy are already overloaded at that desk.  We are talking about $3-4 Mln in GM generation if we are smart about resource recruitment and training ahead of the peak summer period.

Thanks

Sri

CONFIDENTIAL
**Appendix 163**

page intentionally left blank

Message

| | |
|---|---|
| **From:** | Olmen, Teri M SENA-HRUA/AUSS [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USTOL3] |
| **Sent:** | 4/15/2014 9:10:28 AM |
| **To:** | Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **CC:** | Rozelle, Megan B SENA-HRUA/AUSS [megan.rozelle@shell.com] |
| **Subject:** | JG5 Sales Rep |

Sri,

I have given your request to make an offer to a JG5 Sales Rep in your JG6 box to Megan to work on. If I continued to work it, I won't have time to focus on it until during the week of April 28-May 2. I assumed you didn't want to wait that long. Since it's with regard to resourcing, it's falls nicely within Megan's scope. She also is still required to review information with me prior to taking it to Robyn. So, please understand, we do have your best interest in mind, but our scope to manage exception requests is somewhat limited as we are also working CEP Assessments, Trader Workshop, and a T&S HR Engagement this week.

I understand you have requested an answer by 10am this morning due to your leave. We will not be able to meet this deadline as Robyn, who needs to approve, is in the Trader Workshop today. We will do our best to reach a decision by Thursday. In your absence, we will communicate the results to Jennifer and work with her on any further action at that point.

We appreciate your understanding, and look forward to resolving this for you soon.

Thank you... and enjoy your break! ☺


**Teri Olmen**, SPHR, CCP
**Human Resources Account Manager**
Shell Trading
1000 Main Street, Ste. 16186B
Houston, TX  77002    USA

**Tel:** +1 713.230.7384
**Mobile:** +1 858.699.0883
**FAX:** +1 858.320.2608

**Softphone:** +1 858.678.2356
**Email:** Teri.Olmen@shell.com
**Web:** http://www.shell.com

*This e-mail may include data and attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorized persons and deleted after its legitimate use.*



page intentionally left blank

**From:** Olmen, Teri M SENA-HRUA/AUSS
**Sent:** Thursday, April 17, 2014 1:04 PM
**To:** Rangan, Sri SENA-STE/34
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS
**Subject:** JG5 Inside Sales

Sri,

Your request to make an offer to an external candidate for a JG5 Inside Sales Role has been denied.  The only available position you have currently for this group in the US is a JG6. We could begin to source the JG6 role immediately if you wish.  I understand that we have a potential daisy chain in process.  This may result in another open position on the Inside Sales team.  If this happens, we will be able to consider a JG5 candidate at that time.

I also recognize that you have an external candidate you are interested in for a JG5 level role.  It's my understanding that this candidate is interested in Shell and is currently employed.  We will work with Recruiting to keep him "warm", in other words, let him know that we have interest in him as well, but don't have an immediate role.  We'll also work with you on all of the daisy chain opportunities to see if we can find a viable option for the hire as quickly as possible.

It would be advisable to carefully watch your organization structure as you move forward.  Working closely with HR to plan your staff movements will be beneficial to assure you can accomplish the changes you'd like to make.  At this point, our ability to continue to make exceptions is quite limited.

Happy to talk further if needed.

Thank you,


**Teri Olmen**, SPHR, CCP
**Human Resources Account Manager**
Shell Trading
1000 Main Street, Ste. 16186B
Houston, TX  77002   USA

**Tel:** +1 713.230.7384
**Mobile:** +1 858.699.0883
**FAX:** +1 858.320.2608

**Softphone:** +1 858.678.2356
**Email:**  Teri.Olmen@shell.com
**Web:**  http://www.shell.com

*This e-mail may include data and attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorized persons and deleted after its legitimate use.*



page intentionally left blank

Message

---

**From:**     Rangan, Sri SENA-STE/34 [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USI+RANS]
**Sent:**      4/22/2014 2:28:45 PM
**To:**        Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com]
**Subject:**   FW: JG5 Inside Sales

For my records….

---

**From:** Rangan, Sri SENA-STE/34
**Sent:** Tuesday, April 22, 2014 2:28 PM
**To:** Olmen, Teri M SENA-HRUA/AUSS
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS; Bowman, Beth A SENA-STE/3
**Subject:** RE: JG5 Inside Sales

Teri:

GM!  Thanks for your patience. I had a chance to discuss with Beth next steps regarding role below.

1)   We would like to proceed with an offer to Robert Dedmon as a JG 6 with the following notes:

   a.   That we offer him compensation that is competitive to his skill set (possibly the higher end of JG 6
        range)
   b.   That we submit a promotion request for him when we are able to get a freed up JG 5 within Sales
        Planning.

I again want to document my discomfort in offering a job to a POC candidate at a lower JG when we have just offered
the same exact role (same region/product) to a non POC candidate at a higher JG just a month ago.  It has been
frustrating for me that we allow a strict adherence to broad processes to cloud our judgment calls on how we apply our
business principles around people.  I apologize if my frustration has been visible and generated any discomfort or ill-will.
I do not apologize for my frustration and will continue to express them every time I experience this
disconnect. *However, with Beth's guidance and above considerations, I request we proceed.*

As always we will continue to work through the mandated HR processes in filling our roles.

Thank you.  Please let us know if you need additional information to proceed.

Thank you!

**Sri Rangan**
Manager - Sales Planning
Shell Trading North America

1000 Main, Houston, TX  77010
Work: 713.767.5311
Cell:   281.772.5559
Email:  srikala.rangan@shell.com
Internet: http://www.shell.com/trading

**Appendix 169**

page intentionally left blank

Message

| | |
|---|---|
| **From**: | Olmen, Teri M SENA-HRUA/AUSS [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USTOL3] |
| **Sent**: | 4/23/2014 12:46:09 PM |
| **To**: | Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **CC**: | Hartnett, Jennifer R SENA-STE/34 [jennifer.hartnett@shell.com]; Foltz, Megan R SENA-HRUA/AUSS [megan.rozelle@shell.com]; Bowman, Beth A SENA-STE/3 [beth.bowman@shell.com] |
| **Subject**: | RE: JG5 Inside Sales |

Sri,

I've asked for additional information from Recruiting and will respond to your request by tomorrow.

Thank you,
Teri

**From:** Rangan, Sri SENA-STE/34
**Sent:** Tuesday, April 22, 2014 2:28 PM
**To:** Olmen, Teri M SENA-HRUA/AUSS
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS; Bowman, Beth A SENA-STE/3
**Subject:** RE: JG5 Inside Sales

Teri:

GM!  Thanks for your patience. I had a chance to discuss with Beth next steps regarding role below.

1) We would like to proceed with an offer to Robert Dedmon as a JG 6 with the following notes:

   a.  That we offer him compensation that is competitive to his skill set (possibly the higher end of JG 6 range)
   b.  That we submit a promotion request for him when we are able to get a freed up JG 5 within Sales Planning.

I again want to document my discomfort in offering a job to a POC candidate at a lower JG when we have just offered the same exact role (same region/product) to a non POC candidate at a higher JG just a month ago.  It has been frustrating for me that we allow a strict adherence to broad processes to cloud our judgment calls on how we apply our business principles around people.  I apologize if my frustration has been visible and generated any discomfort or ill-will. I do not apologize for my frustration and will continue to express them every time I experience this disconnect.  ***However, with Beth's guidance and above considerations, I request we proceed.***

As always we will continue to work through the mandated HR processes in filling our roles.

Thank you.  Please let us know if you need additional information to proceed.

Thank you!


**Sri Rangan**
Manager - Sales Planning
Shell Trading North America

1000 Main, Houston, TX  77010
Work: 713.767.5311
Cell:   281.772.5559

page intentionally left blank

Message

| | |
|---|---|
| **From:** | Bowman, Beth A SENA-STE/3 [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+BOW2] |
| **Sent:** | 4/24/2014 9:46:39 AM |
| **To:** | Hartnett, Jennifer R SENA-STE/34 [jennifer.hartnett@shell.com]; Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **Subject:** | FW: Power Sales Representative |

**From:** Sutton, Robyn L SENA-HRD/S
**Sent:** Thursday, April 24, 2014 9:38 AM
**To:** Bowman, Beth A SENA-STE/3; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** RE: Power Sales Representative

Please show me this demonstrated from his resume and from the interview notes.    By the way, again the only position we have available for Inside Sales is JG 6.

**Robyn L. Sutton**
Trading & Supply HR Manager - Shell Energy Trading, Excellence & US HR Trading & Supply Operations
1000 Main Street, Houston, TX 77010, USA
Click to call me on communicator

**Tel:** +01 713 230 7581
**Fax:** +01 713 230
**Email:** robyn.sutton@shell.com
**Internet:** http://www.shell.com



*This e-mail may include data and attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. While in your possession, it should be stored securely, not shared with unauthorized persons and deleted after it's legitimate use.*

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Thursday, April 24, 2014 9:29 AM
**To:** Olmen, Teri M SENA-HRUA/AUSS; Sutton, Robyn L SENA-HRD/S
**Subject:** FW: Power Sales Representative

You both had said this candidate does not have sales experience.  Jennifer and Sri believe this candidate is well qualified with that experience.

Should we discuss this further?

**From:** Hartnett, Jennifer R SENA-STE/34
**Sent:** Thursday, April 24, 2014 9:01 AM
**To:** Bowman, Beth A SENA-STE/3
**Cc:** Rangan, Sri SENA-STE/34
**Subject:** Power Sales Representative

Beth,

ShellDedmon_000730

As discussed, the candidate we would like to offer the Power Sales Representative position to (Robert Dedmon) does have extensive Power Market experience. In his current role, he transacts with our own Power Sales Representatives (and with Marketers at other companies) purchasing power from them for his customers needs.  If he purchases too much he needs to negotiate pricing and sell the power back to us or other market participants. He will bring great insight to us on that side of the business which we do not currently have in the Northeast and ERCOT Power markets. His experience also includes:

- Trading ERCOT power at Dynegy
- Trading PJM power at AP Gas & Electric
- Providing and negotiating power pricing for customers in PJM, NY and ISONE markets at GDF Suez
- Managing PJM Renewable products portfolio (selling and buying) at GDF SUEZ

I have attached his resume as a reference.

Regards,

Jennifer Hartnett
Sales Supervisor
Shell Energy North America
Jennifer.Hartnett@shell.com
Office: 713-767-5339
Cell: 713-855-1260

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

page intentionally left blank

Message

**From:** Rangan, Sri SENA-STE/34 [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USI+RANS]
**Sent:** 4/25/2014 7:43:59 AM
**To:** Olmen, Teri M SENA-HRUA/AUSS [teri.olmen@shell.com]
**CC:** Hartnett, Jennifer R SENA-STE/34 [jennifer.hartnett@shell.com]; Rozelle, Megan B SENA-HRUA/AUSS [megan.rozelle@shell.com]
**Subject:** RE: JG5 Inside Sales

Teri

GM!  For our awareness, could you articulate the process?  I thought we have been through all this and arrived at the candidate and then worked through the JG.  Are we going back to candidate assessment again? What is the "determination" you refer to below?  Please advise as it is confusing to follow along the plot line anymore ☺.  What would be the approximate timeline for us to work through this – days, weeks etc?

Thanks

Sri

**From:** Olmen, Teri M SENA-HRUA/AUSS
**Sent:** Thursday, April 24, 2014 5:58 PM
**To:** Rangan, Sri SENA-STE/34
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS; Bowman, Beth A SENA-STE/3; Sutton, Robyn L SENA-HRD/S
**Subject:** RE: JG5 Inside Sales

Sri,

The interview and selection notes for this role were already submitted to Central Recruiting.  We've requested they send them back for review, and expect to get them sometime next week.  After we've reviewed these notes, we'll be able to make a determination.

Thank you,
Teri

**From:** Olmen, Teri M SENA-HRUA/AUSS
**Sent:** Wednesday, April 23, 2014 12:46 PM
**To:** Rangan, Sri SENA-STE/34
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS; Bowman, Beth A SENA-STE/3
**Subject:** RE: JG5 Inside Sales

Sri,

I've asked for additional information from Recruiting and will respond to your request by tomorrow.

Thank you,
Teri

**From:** Rangan, Sri SENA-STE/34
**Sent:** Tuesday, April 22, 2014 2:28 PM
**To:** Olmen, Teri M SENA-HRUA/AUSS
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS; Bowman, Beth A SENA-STE/3
**Subject:** RE: JG5 Inside Sales

CONFIDENTIAL
**Appendix 176**

page intentionally left blank

Message

| | |
|---|---|
| **From**: | Hartnett, Jennifer R SENA-STE/34 [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+HA0P] |
| **Sent**: | 4/24/2014 9:48:36 AM |
| **To**: | Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **Subject**: | FW: Power Sales Representative |

OMG

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Thursday, April 24, 2014 9:47 AM
**To:** Hartnett, Jennifer R SENA-STE/34; Rangan, Sri SENA-STE/34
**Subject:** FW: Power Sales Representative

**From:** Sutton, Robyn L SENA-HRD/S
**Sent:** Thursday, April 24, 2014 9:38 AM
**To:** Bowman, Beth A SENA-STE/3; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** RE: Power Sales Representative

Please show me this demonstrated from his resume and from the interview notes.    By the way, again the only position we have available for Inside Sales is JG 6.

**Robyn L. Sutton**
Trading & Supply HR Manager - Shell Energy Trading, Excellence & US HR Trading & Supply Operations
1000 Main Street, Houston, TX 77010, USA
Click to call me on communicator

**Tel:** +01 713 230 7581
**Fax:** +01 713 230
**Email:** robyn.sutton@shell.com
**Internet:** http://www.shell.com



*This e-mail may include data and attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. While in your possession, it should be stored securely, not shared with unauthorized persons and deleted after it's legitimate use.*

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Thursday, April 24, 2014 9:29 AM
**To:** Olmen, Teri M SENA-HRUA/AUSS; Sutton, Robyn L SENA-HRD/S
**Subject:** FW: Power Sales Representative

You both had said this candidate does not have sales experience.  Jennifer and Sri believe this candidate is well qualified with that experience.

Should we discuss this further?

page intentionally left blank

Message

**From:** Hartnett, Jennifer R SENA-STE/34 [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+HA0P]
**Sent:** 4/25/2014 8:45:15 AM
**To:** Bowman, Beth A SENA-STE/3 [beth.bowman@shell.com]
**CC:** Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com]
**Subject:** RE: Power Sales Representative

Beth,

As requested by Robin, I have pulled the specific language from Robert's resume from his most recent position and will provide further explanation.  His resume is in black and my comments are in Red.
I have also pulled the language from the "Experience and Qualifications" section of our Job posting to relate his experience to this.

**AP Gas & Electric** May 2012- current This company is in the business of selling gas and power to commercial, industrial and residential customers.
*Manager-Pricing, Supply & Mid-Marketing*- The title 'Mid-Marketing' is used by some companies to refer to Sales Representatives
☐ Report and maintain daily changes in the position and valuation of the portfolio – Analyze complex data
☐ Generate positive P&L through execution of physical and financial power trading – Robert generates margin for the company by buying power from other Power Marketers (SENA for example) in order to have power to sell to AP's end use customers. As AP's customer sales volumes increase or decrease (due to customers moving from one provider to another) Robert needs to buy more power if they've gained customers or sell power if they have lost customers. Robert's experience doing this will provide valuable insight into the activities of all the Energy Retailers' that our Sales teams deal with.
☐ Responsible for valuing, structuring, and managing of the PJM pricing models – Robert is responsible for closely monitoring power market prices to effectively provide market based pricing for AP's customers. In order to do this effectively he needs to pay close attention to changes in power prices, which can change greatly in a matter of minutes at times.
☐ Prepare and analyze financial operating reports/data for the portfolio and develop systems to support reporting needs – Analyze data
☐ Research discrepancies impacting revenue and cost forecasts
☐ Assist load manager with load data quality issues
☐ Produce monthly settlement invoices and reconcile discrepancies with various ISOs
☐ Perform analysis on mark to market values and load data to refine pricing and operations model inputs – Analyze complex data
☐ Develop risk mitigation solutions and ensure risks are appropriately reflected in pricing – Robert develops different ways to hedge APs power positions (Sales and buys). He has to determine what type of power products to buy and sell to effectively minimize his risk to extremes in pricing.
☐ Train customer care representatives on regional product knowledge

In relating Roberts experience to the Experience and Qualifications which were listed in the  job posting I provide the flowing:

Bachelors Degree Required – in Marketing, Finance, Business or related field is preferred. Robert has a Bachelors in Management and an MBA in Finance
1 – 5 years of Gas & Power Industry experience required. Robert has 10 years of Power Industry experience
Prior experience in a customer facing role preferred. Robert has a 'customer' facing role in that he is buying and selling to other Power Marketers
Gas or Power Trading or Sales experience preferred. Robert has Power Trading and Sales experience
Ability to effectively communicate with customers and all internal stakeholders. Robert currently deals with our Power Sales Reps. They find him to be an effective communicator.
Ability to think outside the box in a fast paced environment to imaginatively resolve problems and issues.

Strong analytical skills with a high level of attention to detail and accuracy. Many of the tasks Robert currently performs demonstrate that he has strong analytical skills (see my comments above)
Must be self-motivated with a focus on customers and the creation of value.

Please let me know if you need any further information on this.

Regards,

Jennifer

---

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Thursday, April 24, 2014 9:47 AM
**To:** Hartnett, Jennifer R SENA-STE/34; Rangan, Sri SENA-STE/34
**Subject:** FW: Power Sales Representative

---

**From:** Sutton, Robyn L SENA-HRD/S
**Sent:** Thursday, April 24, 2014 9:38 AM
**To:** Bowman, Beth A SENA-STE/3; Olmen, Teri M SENA-HRUA/AUSS
**Subject:** RE: Power Sales Representative

Please show me this demonstrated from his resume and from the interview notes.   By the way, again the only position we have available for Inside Sales is JG 6.

**Robyn L. Sutton**
Trading & Supply HR Manager - Shell Energy Trading, Excellence & US HR Trading & Supply Operations
1000 Main Street, Houston, TX 77010, USA
Click to call me on communicator

**Tel:** +01 713 230 7581
**Fax:** +01 713 230
**Email:** robyn.sutton@shell.com
**Internet:** http://www.shell.com



*This e-mail may include data and attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. While in your possession, it should be stored securely, not shared with unauthorized persons and deleted after it's legitimate use.*

---

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Thursday, April 24, 2014 9:29 AM
**To:** Olmen, Teri M SENA-HRUA/AUSS; Sutton, Robyn L SENA-HRD/S
**Subject:** FW: Power Sales Representative

You both had said this candidate does not have sales experience.  Jennifer and Sri believe this candidate is well qualified with that experience.

**Appendix 181**

page intentionally left blank

Message

| | |
|---|---|
| **From:** | Olmen, Teri M SENA-HRUA/AUSS [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USTOL3] |
| **Sent:** | 4/25/2014 1:15:06 PM |
| **To:** | Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **CC:** | Hartnett, Jennifer R SENA-STE/34 [jennifer.hartnett@shell.com]; Rozelle, Megan B SENA-HRUA/AUSS [megan.rozelle@shell.com] |
| **Subject:** | RE: JG5 Inside Sales |

Sri,

We have some concerns about this particular candidate.  In this case, a bit more due diligence is warranted before we make an offer.  The "determination" is whether or not we will make an offer.  *IF* we do, it will be at JG6.  Timeline, I'm hoping, is days.  However, it's contingent on getting the interview data back from Recruiting and I don't have control over that, although we have expressed the urgent nature.  When we talk on Monday, I can share more around the reasons for our concern.

Thanks,
Teri

**From:** Rangan, Sri SENA-STE/34
**Sent:** Friday, April 25, 2014 7:44 AM
**To:** Olmen, Teri M SENA-HRUA/AUSS
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS
**Subject:** RE: JG5 Inside Sales

Teri

GM!  For our awareness, could you articulate the process?  I thought we have been through all this and arrived at the candidate and then worked through the JG.  Are we going back to candidate assessment again? What is the "determination" you refer to below?  Please advise as it is confusing to follow along the plot line anymore ☺.  What would be the approximate timeline for us to work through this – days, weeks etc?

Thanks

Sri

**From:** Olmen, Teri M SENA-HRUA/AUSS
**Sent:** Thursday, April 24, 2014 5:58 PM
**To:** Rangan, Sri SENA-STE/34
**Cc:** Hartnett, Jennifer R SENA-STE/34; Rozelle, Megan B SENA-HRUA/AUSS; Bowman, Beth A SENA-STE/3; Sutton, Robyn L SENA-HRD/S
**Subject:** RE: JG5 Inside Sales

Sri,

The interview and selection notes for this role were already submitted to Central Recruiting.  We've requested they send them back for review, and expect to get them sometime next week.  After we've reviewed these notes, we'll be able to make a determination.

Thank you,
Teri

ShellDedmon_000738

page intentionally left blank

Message

| | |
|---|---|
| **From:** | Rangan, Sri SENA-STE/34 [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USI+RANS] |
| **Sent:** | 4/29/2014 6:07:51 AM |
| **To:** | Olmen, Teri M SENA-HRUA/AUSS [teri.olmen@shell.com] |
| **Subject:** | summary of conversation |

Teri
Thanks for the taking the time to review IS organization & clarify compensation structure.  What I took away

Compensation:

1) Sales bonus structure is "commercial" bonus pool – which can range from 0% to 100% of base pay
2) Operations bonus structure is "top up" bonus pool – which includes Group bonus + top up which is at manager discretion

**NEXT STEPS:  No action**

Inside Sales
I have raised concerns with Beth over the past year around roles & responsibilities between JG 4,5 & 6 within Inside Sales.  Two levels of concerns

1) Over the past year, significant process improvements/automation delivered to where all sales staff are primarily focused on sales activities vs. administrative activities.  So there is no JG 6 support role within Inside Sales with reasonable difference in accountabilities vs. JG 5
2) Job scope/accountabilities are the same for JG 5 & 6 – customers are assigned to sales staff based on commodity/region (ANT model) and therefore are indistinguishable from a complexity perspective – resulting in JG 6 performing same job as JG 5

**NEXT STEPS:  Sri to submit business case to Beth, Jenn to engage directly with Megan on process to assess IS organization**

Robert Dedmon:

HR waiting on interview notes to assess fit for role. Just want to ensure that HR has clarity on what the business sees as value proposition with Robert.  He has extensive ERCOT market knowledge and has worked in buying & selling Power in the ERCOT market.  Jenn has detailed his experience in a prior note.  Note that most trade shops don't separate their sales and trade desks the way we do.  In many organization, the sales desk reports up through the trade desks.  Hence job titles and organization names would say "trader" or "trade desk".  Robert has worked directly with our sales staff in the current role he is in and therefore essentially has "sales" experience – buying & selling Power.

Also want to point out that over the past few years (up until last month) we have hired a few people without direct sales experience – Jimmy Promubol, Jesse Park, recently Patrick Fnka, JD Steele – all from Operations.  Michael Tickle came from Credit team.  Essentially, the primary skill set we are looking for is (ERCOT) market expertise, capability to learn and engagement style.

Hope this gives a bit more insight into our decision model.

**NEXT STEPS:  Sits with HR to get back to us on making an offer to Robert**

Thanks

Sri

CONFIDENTIAL
**Appendix 185**

page intentionally left blank

Message

___

**From**: Rangan, Sri SENA-STE/34 [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USI+RANS]
**Sent**: 5/1/2014 7:50:30 PM
**To**: Bowman, Beth A SENA-STE/3 [beth.bowman@shell.com]
**Subject**: Shell EO

___

Hi Beth

Wanted to follow up my call with a summary.  I submitted a report through Shell EO (Ethics & compliance site) today.  Paraphrased below is the summary of my concern.  This is regarding the open sales role and our request to put an offer out to Robert Dedmon, who is a POC candidate.

Per HR (Teri Olmen) statement to me, there is concern around Robert's fit for the role of sales rep in Houston, supporting South Power "because historically POC candidates have struggled to succeed in Shell".

My concern is that generalizing his ability to succeed based on his POC status does not afford him equal opportunity in the hiring process at Shell. You & I spoke about this on Tuesday.  I met with Teri again today after your conversation with her.  Her position & statements remain the same. As a result, following Shell Code of Conduct, I have reported this through Shell EO.

I received confirmation that my report has been successfully submitted.

Thanks!


**Sri Rangan**
Manager - Sales Planning
Shell Trading North America

1000 Main, Houston, TX  77010
Work: 713.767.5311
Cell:   281.772.5559
Email:  srikala.rangan@shell.com
Internet: http://www.shell.com/trading

ShellDedmon_000146

page intentionally left blank

Message

| | |
|---|---|
| **From:** | Olmen, Teri M SENA-HRUA/AUSS [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USTOL3] |
| **Sent:** | 5/12/2014 3:49:58 PM |
| **To:** | Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com] |
| **CC:** | Sutton, Robyn L SENA-HRD/S [robyn.sutton@shell.com]; Bowman, Beth A SENA-STE/3 [beth.bowman@shell.com]; Phung, Andrew SENA-HRUA/AUSS [andrew.phung@shell.com] |
| **Subject:** | Inside Sales Resourcing |

Sri,

We met twice in the last weeks to discuss various staffing topics, one of which was a role in your Inside Sales group. While it is my belief that my explanation did follow Shell's policies and practices, it is clear from the various conversations that you've had since that this is not how it was understood, and for that I apologize.

Shell's Equal Opportunity policy provides equal opportunity to all individuals, both employees and applicants, consistent with employment requirements and qualifications. Shell prohibits discrimination based on protected characteristics including race, color, sex, national origin, age, religion, disability, sexual orientation, gender identity, veteran status, citizenship, genetic information or other protected status. I have been and remain fully committed to supporting this policy.

A formal complaint was filed with Shell Ethics and Compliance with regard to this policy and our discussions, which requires an investigation. I have volunteered to remove myself from any resourcing activities for your team until the investigation is complete. Andrew Phung has been assigned to continue the resourcing activities for your team. Please contact him when you'd like to begin, and recognize he will need some time to evaluate the situation, get to know the parameters of the organization, and then will work with you on resourcing for this role in your business.

After this role is resourced, I would like to continue to provide additional HR support for your organization as needed. However, that will stay on hold until the investigation is completed. In the meantime, should you need support for other HR activities beyond this job placement and Megan is unavailable, please contact Robyn.

Thank you,

**Teri Olmen**, SPHR, CCP
**Human Resources Account Manager**
Shell Trading
1000 Main Street, Ste. 16186B
Houston, TX 77002   USA

**Tel:** +1 713.230.7384
**Mobile:** +1 858.699.0883
**FAX:** +1 858.320.2608

**Softphone:** +1 858.678.2356
**Email:** Teri.Olmen@shell.com
**Web:** http://www.shell.com

*This e-mail may include data and attachments containing confidential personal data, which should only be processed and used for the purpose of this communication. Whilst in your possession, it should be stored securely, not shared with unauthorized persons and deleted after its legitimate use.*

CONFIDENTIAL

**Appendix 189**

page intentionally left blank

Message

**From:**       Hartnett, Jennifer R SENA-STE/34 [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+HA0P]
**Sent:**       5/19/2014 6:28:56 PM
**To:**         Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com]
**Subject:**    Fw: Power Sales Representative JG6.docx
**Attachments:** Power Sales Representative JG6.docx

**Importance:**  High

I met with Andrew in HR today. They will post internally and externally. He said HR can reach out to any candidates from last round that we are still interested in and HR will explain that the other position closed and we are now filling a similar but lower job grade role to see if they're interested in reapplying.
There's no reason why they shouldn't contact Robert Dedmon, right?
Jen

**From:** Phung, Andrew SENA-HRUA/AUSS
**Sent:** Monday, May 19, 2014 05:44 PM
**To:** Mier, Adriana SENA-HRUA/AUSS; Hartnett, Jennifer R SENA-STE/34
**Cc:** Allie, Tyler C SHLOIL-HRT/RA
**Subject:** Power Sales Representative JG6.docx

Adriana – please create a position and post this job by tomorrow or Wednesday.  Please provide to Tyler the position number so he can help recruit externally (concurrently).

Jennifer – please provide to me the name(s) of the applicants who you would consider from the other posting so Tyler and I can follow up with them (offer them closure to the JG5 posting and/or direct them to apply to the JG6 role if applicable).

Thanks,

Andrew

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

page intentionally left blank

Message

| | |
|---|---|
| **From**: | Rangan, Sri SENA-STE/34 [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USI+RANS] |
| **Sent**: | 5/19/2014 9:10:31 PM |
| **To**: | Hartnett, Jennifer R SENA-STE/34 [jennifer.hartnett@shell.com] |
| **Subject**: | Re: Power Sales Representative JG6.docx |

We still cannot justify asking him to do the same tasks. Hr is asking us to post this role as analyst, right?  So he can't sell

Sri

Sent from my iPhone

On May 19, 2014, at 6:28 PM, "Hartnett, Jennifer R SENA-STE/34" <jennifer.hartnett@shell.com> wrote:

> I met with Andrew in HR today. They will post internally and externally. He said HR can reach out to any candidates from last round that we are still interested in and HR will explain that the other position closed and we are now filling a similar but lower job grade role to see if they're interested in reapplying. There's no reason why they shouldn't contact Robert Dedmon, right?
> Jen
>
> ---
>
> **From**: Phung, Andrew SENA-HRUA/AUSS
> **Sent**: Monday, May 19, 2014 05:44 PM
> **To**: Mier, Adriana SENA-HRUA/AUSS; Hartnett, Jennifer R SENA-STE/34
> **Cc**: Allie, Tyler C SHLOIL-HRT/RA
> **Subject**: Power Sales Representative JG6.docx
>
> Adriana – please create a position and post this job by tomorrow or Wednesday.  Please provide to Tyler the position number so he can help recruit externally (concurrently).
>
> Jennifer – please provide to me the name(s) of the applicants who you would consider from the other posting so Tyler and I can follow up with them (offer them closure to the JG5 posting and/or direct them to apply to the JG6 role if applicable).
>
> Thanks,
>
> Andrew
>
> ---

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

<Power Sales Representative JG6.docx>

page intentionally left blank

Message

---

**From**: Rangan, Sri SENA-STE/34 [/O=SHELL/OU=MSXSCC/CN=RECIPIENTS/CN=USI+RANS]
**Sent**: 6/4/2014 1:30:32 PM
**To**: Williams, Erica L SHLOIL-HRUA/AUSW [erica.l.hartman@shell.com]
**Subject**: question

Erica

As I mentioned, HR has helped us re-post the job as a JG 6.  At this point, HR is indicating they can speak to Robert Dedmon and offer the role to him with the transparency that this is a job that is graded lower than what he interviewed for.

is this ok?  Are we constrained in anyway by the investigation from proceeding on this?

Thanks

Sri

**Sri Rangan**
**Manager - Sales Planning**
**Shell Trading North America** 🔴
1000 Main Street
Houston, TX 77010
Office: (713) 767-5311
Mobile: (281) 772-5559
srikala.rangan@shell.com

# Exhibit 10

# Shell 2014 offer
# to Robert Dedmon



**Shell Exploration & Production Company**
150 N Dairy Ashford
Houston, TX 77079
Tel +1 832 337 1298
Fax +1 281 582 6253
**Email** lisa.billington@shell.com
**Internet** http://www.shell.com

Confidential
Robert Dedmon
1 Acosta Valley Dr.
Missouri City, TX 77459

July 11, 2014

Dear Robert,

Thank you for your interest in Shell. We appreciate you making time in your schedule to participate in our recruiting process and hope this experience provided you with a good opportunity to learn about our company. We are very excited we had the opportunity to get to know you, and believe you would be a great addition to our organization.

Therefore, it is with great pleasure that we formally extend a conditional offer of employment on behalf of Shell Trading Services Company ("Shell" or "Company"), Houston, TX. Details of the conditional offer, and other information that you may find helpful in your decision-making process, are enclosed with this letter.

We are confident that you will find Shell a challenging and rewarding environment in which to work, and we are equally confident that the entire organization will benefit from your experience and expertise.

Please feel free to contact your Candidate Single Focal Point Coordinator, Lisa Billington, who will be assisting you throughout your pre-employment process at 832-337-1298 or **SHLOIL Experienced Hire SFP SHLOIL-HRT/RO** if you have any questions.

Sincerely,
**Shell Exploration & Production Company**

Erin Verdon
HR Account Manager – Onshore Gas

**Appendix 197**

ShellDedmon_000113

cc:    Jennifer Hartnett
       Andrew Phung
       Tyler Allie

Enclosures:

- Offer Details
- Summary of Benefits
- Shell Code of Conduct

ShellDedmon_000114

**Appendix 198**

**Offer Details**

To accept this conditional offer, please sign and return a scanned copy of this letter to **SHLOIL Experienced Hire SFP SHLOIL-HRT/RO** no later than July 15, 2014.

**Position and Salary**
Your starting base salary will be $8,333.33 per month, which is equivalent to $100,000.00 yearly for the position of Sales Representative at salary grade 6.

**Commercial Bonus Program**
As a full-time employee of Shell Trading Services Company, you will be eligible to participate in our benefit programs and incentive compensation plan in accordance with the guidelines of those programs. You are eligible to participate in the Commercial Bonus Program, which provides bonus opportunity that would typically range from 0 to 100% of your base salary in a year, or higher depending on the results of Shell Trading globally. The actual amount will be based upon individual performance. You will be eligible for a prorated bonus amount for 2014 which is payable in March 2015 or as determined by Company policy. Bonuses are performance based and are not guaranteed.

**Sign-on Bonus**
In addition to your basic salary (and any Allowance) you will receive a one time sign-on bonus of $5,000.00 which will be paid at the time of the first payment of your basic salary. By accepting this bonus payment, you promise to remain in the employment of the Company for a minimum continuous period of 12 months. If for any reason (other than listed below) your employment terminates before the end of the 12 month period, then you agree and promise to repay the bonus amount in full immediately on that termination. The Company reserves the right to deduct the amount of the bonus which is repayable in this way from any sum otherwise payable to you by reason of your employment with the Company or its termination. By signing this letter you consent to and authorize any such deduction. You or your estate will not be required to repay the bonus amount if the Company's needs change and your services are no longer required or you die while employed by the Company.

This payment is not benefits bearing and is not eligible for deferral. This payment is subject to federal and (if applicable) state and other income and employment tax withholding.

Your employment shall be on an "at-will" basis. Nothing in this letter constitutes a contract of employment.

**Vacation**
You are eligible for 160 hours of vacation per year, which will be pro-rated your first year. Future vacation eligibility will be determined in accordance with Company policy.

**Standard Benefits**
You will be eligible to receive the full range of benefits that are available to Shell employees in the U.S. in accordance with our normal policy. A summary of these benefits is included with this letter.

**Summary of Benefits**
www.shell.us/benefits

**Appendix 199**

**Conditional Offer**

This employment offer is conditional upon your satisfying the pre-employment requirements of Shell. Those requirements include but are not limited to:

- Immediately completing the following documents and returning them by email and/or fax:
  - Entire copy of this conditional offer letter (with your signature)
  - Your social security # and date of birth – no documentation, just numbers
- Shell/ you obtaining any other governmental approval(s) or license(s) required for the job being offered.
- Successful completion of a background and screening that includes but is not limited to the verification of your education, employment history, social security number, and certification or licenses you have stated you possess. Upon your acceptance of our offer, you will be contacted with further instructions.
- Submission and successful completion of the pre-employment hair drug test.
- Being able to perform the essential functions of the job for which you receive an offer with or without a reasonable accommodation.
- Your successful screening against the Denied/Restricted Parties lists and Shell's ability to obtain any necessary licensing for your work on controlled technology per U.S. Export Control regulations or other related sanctions.
- Reading the following documents which you will be asked to complete and/or acknowledge at a later date:
  - Shell Code of Conduct
  - Summary of Benefits
- Providing documentation that you are lawfully authorized to work in the U.S. In accordance with the Immigration Reform and Control Act of 1986, we are required to examine original documents verifying that prospective employees are either United States citizens or are lawfully authorized to work in the U.S. Please note that this documentation requirement applies to both U.S. citizens and non-citizens. If you plan to present a Social Security card as part of your documentation, please note that laminated copies of Social Security cards will not be accepted if the cards state that they are "not valid if laminated." **In addition, when you report to work and we have examined your document(s), it will be necessary for you to sign an Employment Eligibility Verification form (Form I-9), attesting to the authenticity of the documents you provide. We will not be able to employ you until we have verified these documents. Failure to provide appropriate documents the day you report to work will delay your employment date until you can provide them. If they are not provided within a reasonable time period (i.e. no later than 3 days) after your expected employment date, it may be necessary to withdraw our offer of employment.**

Failure to provide appropriate documents the day you report to work will delay your employment date until you can provide them. If they are not provided within a reasonable time period (i.e. no later than 3 days) after your expected employment date, it may be necessary to withdraw our offer of employment.

**Please note: This Conditional Offer of Employment Letter, including the Offer Details, (and any attached or related documents and conversations) is not a contract of employment on the part of Shell, and your employment will be on an "at-will" basis. Furthermore, as a matter of routine, since this is a conditional offer of employment, we suggest that you not indicate plans to resign, move, sell property or begin any coordinating discussions for your replacement with any current employer until we notify you that all the pre-employment requirements have been met.**

---

I accept this conditional offer of employment as presented herein.

_[signature]_     7. 13. 14

**ROBERT DEDMON**     Date

---

Confidential     4

**Appendix 200**

ShellDedmonShellDedmon_000116

# Exhibit 11

# Shell counsel letter about missing documents

**Ogletree
Deakins**

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**

*Attorneys at Law*

One Allen Center
500 Dallas Street, Suite 3000
Houston, TX 77002
Telephone:  713-655-0855
Facsimile:  713-655-0020
www.ogletree.com

Marlene Williams
713-655-5769
marlene.williams@ogletree.com

March 11, 2024

**_Via Email: amy@gwfirm.com & david@gwfirm.com amanda@ahfirm.com_**

| | |
|---|---|
| Amy E. Gibson<br>David L. Wiley<br>GIBSON WILEY PLLC<br>1500 Jackson Street, #109<br>Dallas, Texas 75201-4923 | Amanda C. Hernandez<br>AH Law, PLLC<br>5718 Westheimer, Suite 1000<br>Houston, Texas 77057 |

RE:  Civil Action No: 4:21-cv-03371; *Robert Dedmon v. Shell Exploration & Production
Company and Shell Trading Services Company*; In the United States District Court
Southern District of Texas, Houston Division.

Dear Counsel:

In connection with our ongoing discussions regarding discovery, this letter addresses Defendants'
positions on their objections and production regarding Plaintiff's discovery requests.

**Plaintiff's First and Second Request for Production:**

| Request Number | Defendants' Position |
|---|---|
| Request No. 1 | Defendants stand on their objections and responses provided |
| Request No. 2 | Defendants stand on their objections |
| Request No. 3 | Defendants stand on their objections and responses provided |
| Request No. 4 | Defendants stand on their objections and responses provided, but have already supplemented their production to include job descriptions that have been located regarding the 2014 position and the 2021 position |
| Request No. 5 | Defendants stand on their objections and responses provided, but have produced a |

Atlanta ▪ Austin ▪ Berlin (Germany) ▪ Birmingham ▪ Boston ▪ Charleston ▪ Charlotte ▪ Chicago ▪ Cleveland ▪ Columbia ▪ Dallas ▪ Denver ▪ Detroit Metro ▪ Greenville ▪ Houston
Indianapolis ▪ Kansas City ▪ Las Vegas ▪ London (England) ▪ Los Angeles ▪ Memphis ▪ Mexico City (Mexico) ▪ Miami ▪ Milwaukee ▪ Minneapolis ▪ Montréal (Canada) ▪ Morristown
Nashville ▪ New Orleans ▪ New York City ▪ Oklahoma City ▪ Orange County ▪ Paris (France) ▪ Philadelphia ▪ Phoenix ▪ Pittsburgh ▪ Portland, ME ▪ Portland, OR ▪ Raleigh ▪ Richmond
St. Louis ▪ St. Thomas ▪ Sacramento ▪ San Antonio ▪ San Diego ▪ San Francisco ▪ Seattle ▪ Stamford ▪ Tampa ▪ Toronto (Canada) ▪ Torrance ▪ Tucson ▪ Washington

March 11, 2024
Page 2

| | responsive organization chart for Plaintiff's group |
|---|---|
| Request No. 6 | Defendants stand on their objections |
| Request No. 7 | Defendants stand on their objections |
| Request No. 8 | Defendants stand on their objections and have further confirmed that they have not located any responsive documents. |
| Request No. 9 | Defendants stand on their objections |
| Request No. 10 | Defendants stand on their objections, but have supplemented with limited responsive information for certain of the individuals listed to include their compensation records and performance information that Defendants have located |
| Request No. 11 | Defendants stand on their objections, but have supplemented with limited responsive information for certain of the individuals listed to include compensation records and performance information that Defendants have located |
| Request No. 12 | Defendants stand on their objections |
| Request No. 13 | Defendants stand on their objections, but have supplemented with limited responsive information for certain of the individuals listed to include compensation information; Defendants will supplement with any additional information for years that have not been produced yet |
| Request No. 14 | Defendants stand on their objections, but have supplemented with limited responsive information for certain of the individuals listed to include compensation information; Defendants will supplement with any additional information for relevant years that have not been produced yet |
| Request No. 15 | Defendants stand on their objections |
| Request No. 16 | Defendants stand on their objections, but have supplemented with limited responsive information for certain of the individuals listed to include performance information and compensation information; Defendants will supplement with any additional information for relevant years that have not been produced yet |

**Appendix 203**

March 11, 2024
Page 3

| Request No. 17 | Defendants stand on their objections but are searching for responsive information for a limited number of the individuals listed |
| --- | --- |
| Request No. 18 | Defendants stand on their objections, but have produced responsive information including performance reviews and compensation information for Plaintiff; Defendants will supplement production with information from any relevant years that have not been produced yet |
| Request No. 19 | Defendants stand on their objections, but have supplemented with responsive information including performance reviews for Plaintiff and certain email communications |
| Request No. 20 | Defendants stand on their objections, but have supplemented with responsive information including performance reviews for Plaintiff |
| Request No. 21 | Defendants stand on their objections, but have supplemented with responsive information related to Plaintiff including certain email communications |
| Request No. 22 | Defendants stand on their objections, but have supplemented with responsive information including certain email communications and other documents that have been located in Defendants' search |
| Request No. 23 | Defendants have supplemented with responsive information that has been located including certain email communications and correspondence with Plaintiff; Defendants have not located any additional information at this time |
| Request No. 24 | Defendants have supplemented to include responsive information that has been located including certain email communications to and from Rangan; Defendants have not located any additional information at this time |
| Request No. 25 | Defendants have supplemented to include responsive information that has been located including certain email communications to and from Rangan; Defendants have not located any additional information at this time |
| Request No. 26 | Defendants stand on their objections, but have supplemented with responsive information that |

**Appendix 204**

March 11, 2024
Page 4

| | has been located including certain email communications regarding the 2015 position |
|---|---|
| Request No. 27 | Defendants stand on their objections, but have supplemented with responsive information including documents submitted by the individuals who applied for the position |
| Request No. 28 | Defendants stand on their objections, but have supplemented with responsive information including documents submitted by the individuals who applied for the position |
| Request No. 29 | Defendants stand on their objections, but have supplemented with responsive information including documents submitted by the individuals who applied for the position |
| Request No. 30 | Defendants stand on their objections, but have supplemented with limited information that has been located regarding rankings for certain individuals listed |
| Request No. 31 | Defendants stand on their objections, but have supplemented with limited information that has been located regarding rankings for certain individuals listed |
| Request No. 32 | Defendants stand on their objections |
| Request No. 33 | Defendants stand on their objections |
| Request No. 34 | Defendants stand on their objections |
| Request No. 35 | Defendants stand on their objections |
| Request No. 36 | Defendants stand on their objections |
| Request No. 37 | Defendants stand on their objections, but have supplemented with responsive information |
| Request No. 38 | Defendants stand on their objections |
| Request No. 39 | Defendants stand on their objections |
| Request No. 40 | Defendants stand on their objections |
| Request No. 41 | Defendants stand on their objections |
| Request No. 42 | Defendants stand on their objections |
| Request No. 43 | Defendants stand on their objections |
| Request No. 44 | Defendants stand on their objections |
| Request No. 45 | Defendants stand on their objections |
| Request No. 46 | Defendants stand on their objections |
| Request No. 47 | Defendants stand on their objections, but have produced responsive information including policies and guidelines related to the compensation process |
| Request No. 48 | Defendants stand on their objections |

**Appendix 205**

March 11, 2024
Page 5

| Request No. 49 | Defendants have produced responsive information |
|---|---|
| Request No. 50 | Defendants stand on their objections |
| Request No. 51 | Defendants stand on their objections |
| Request No. 52 | Defendants stand on their objections and will supplement as needed |
| Request No. 53 | Defendants stand on their objections |
| Request No. 54 | Defendants stand on their objections |
| Request No. 55 | Defendants stand on their objections |
| Request No. 56 | Defendants stand on their objections |
| Request No. 57 | Defendants stand on their objections, but have supplemented with responsive documents related to Plaintiff's application to the positions at issue in 2014 and 2015 |
| Request No. 58 | Defendants stand on their objections |
| Request No. 59 | Defendants stand on their objections |
| Request No. 60 | Defendants stand on their objections, but have supplemented with responsive policies that have been located; Defendants is searching for any additional responsive information and will produce if located subject to Defendants' objections |
| Request No. 61 | Defendants stand on their objections, but have supplemented with responsive policies that have been located; Defendants is searching for any additional responsive information and will produce if located subject to Defendants' objections |
| Request No. 62 | Defendants stand on their objections, but have supplemented with responsive policies that have been located; Defendants is searching for any additional responsive information and will produce if located subject to Defendants' objections |
| Request No. 63 | Defendants stand on their objections |
| Request No. 64 | Defendants stand on their objections |
| Request No. 65 | Defendants stand on their objections |
| Request No. 66 | Defendants stand on their objections |
| Request No. 67 | Defendants stand on their objections |
| Request No. 68 | Defendants stand on their objections |
| Request No. 69 | Defendants stand on their objections |
| Request No. 70 | Defendants stand on their objections |
| Request No. 71 | Defendants stand on their objections |

**Appendix 206**

March 11, 2024
Page 6

| Amended Request No. 72 | Defendants stand on their objections, but have supplemented with responsive information for certain individuals listed |
| Request No. 73 | Defendants stand on their objections |
| Request No. 74 | Defendants stand on their objections |
| Request No. 75 | Defendants stand on their objections |
| Request No. 76 | Defendants stand on their objections and have not located any responsive documents |
| Request No. 77 | Defendants stand on their objections |

As we have discussed, the Parties appear to have a fundamental disagreement about the scope of certain items, including what constitutes "the trade/trading group," whether information for the entire "trade/trading group" is relevant to this lawsuit, what constitutes "the relevant business unit," whether information related to the entire "business unit" is relevant to this case, and whether Plaintiff is entitled to personnel and other information on a large number of other individuals who are not at issue in this lawsuit.

Additionally, as we discussed most recently last week, Shell has not been able to locate a number of requested documents due to scope of the time frame requested, including some material dating back to 2014 and 2015 (for example, the investigation report related to the report Sri Rangan made in or around May 2014; material related to the job posting and offers for the 2014 position). Shell has also searched for but not located any performance reviews outside of the performance review spreadsheet we have already produced. We are working on additional supplementation, including performance review information for 2022 and 2023, any missing pay periods in the compensation records we have produced, any additional relevant compensation and performance information that is located, document retention procedures/policies, and any known addresses for certain witnesses.

Sincerely,

*Marlene C. Williams*

Marlene Williams

MW:lc

**Appendix 207**

# Exhibit 12

# Shell global helpline privacy policy

 **DATA PRIVACY**
**SHELL GLOBAL HELPLINE**



**Privacy Notice**

**What does this Privacy Notice cover?**

This privacy notice provides information about personal data processed by companies within the Shell group of companies ("Shell" or "we") in relation to submissions to the Shell Global Helpline.

This privacy notice explains what personal data is processed, for which purposes, how long we hold the personal data for, how to access personal data and where to go for further information. This includes any personal data relating to the person making a report as well as personal data about those individuals against whom an allegation has been made or those who have been identified as having information about the allegation.

For further information about how Shell processes your personal data other than through the Helpline please refer to the relevant privacy notice on www.shell.com/privacy.html.

This privacy notice is always subject to applicable local law.

**What is the Shell Global Helpline ("Helpline")?**

The Shell Global Helpline is a way for employees, contract staff and external parties to report a suspected wrongdoing by or involving a Shell company, employee or contractor staff that is in violation of the Shell Code of Conduct and/or the Shell General Business Principles (https://www.shell.com/about-us/our-values.html).

Calls and on-line reports to the Helpline are received on behalf of Shell by an independent third-party specialist Helpline provider called Navex Global Inc. (Navex). Navex is based in the United States with servers located within various EU member states. We have taken the required organizational and contractual measures to ensure that any personal data gathered by Navex is adequately secured and processed for authorized Helpline purposes only (A link to the Navex Global Privacy Policy is available on the Helpline website for additional information).

**Appendix 209**

Dedmon 001331

**What personal data do we process?**

The personal data we collect through the Helpline will include:

a) names, contact details and location of the individual making the report, of potential witnesses or individuals otherwise involved in the allegation, and/or of the person against whom the allegations are made,

b) information that relates to the alleged behavior of an individual.

Unless prohibited by local law, individuals are encouraged to provide their name and personal contact details so that any submissions to the Helpline can be directly followed up on. Where you provide your name and personal contact details, your identity will be strictly confidential and will not be disclosed, to the person or people to whom the report relates unless you provide your consent. The only exceptions are where we are legally required to disclose your identity; where we are legally permitted to disclose your identity to protect or defend our rights or those of our employees, customers, suppliers or business partners, or; where we have determined that the allegations were malicious and were made in bad faith.

We collect information about the location of the individual making the submission and the location where the event took place so that any applicable local laws can be applied in gathering the information and undertaking any investigation.

*Sensitive personal data*

We may sometimes come into possession of sensitive personal data such as data relating to an individuals' health, racial or ethnic origin, religious or philosophical beliefs, or sexual orientation. This can occur where such data is included in a Helpline submission or where the data is strictly necessary as part of any investigation.

**For what purpose do we process your personal data?**

We may process your personal data:

- To administer the Helpline and assess and follow-up on submissions to the Helpline.
- To investigate alleged violations.
- To take any necessary follow up action upon the completion of an investigation.
- As part of the recruitment process for specific categories of high-risk positions, internal job applicants are screened against the application (enhanced personnel screening).
- To create anonymous reports for Shell management.

**Who is responsible for any personal data collected?**

Shell International B.V. is the data controller of the Helpline and has the Helpline operated on behalf of itself and its affiliates within Shell. Depending upon the location of the reporter, where the event is alleged

Data Privacy Shell Global Helpline

**Appendix 210**

Dedmon 001332

to have taken place and the nature of the allegation/s, an investigator from an affiliate within the Shell Group will be asked to carry out the investigation.

**Security of the personal data**

Personal data may be transferred to companies within Shell and/or authorized third party agents, service providers, or subcontractors located in countries outside of your location (including outside of the European Economic Area). Where that happens, we take organizational, contractual and legal steps to ensure that personal data is exclusively processed for the purposes mentioned above and that your data privacy rights continue to be protected. These steps include Binding Corporate Rules for transfer among the Shell Group and approved mechanisms for transfers to third parties in countries not deemed to provide adequate level of data protection as well as any additional local legal requirements. You can request a copy of these by contacting privacy-office-SI@shell.com.

We have implemented technology and policies with the objective of protecting your personal data from unauthorised access and improper use and will update these measures as new technology becomes available, as appropriate.

**Who has access to personal data?**

Personal data is collected for the purposes referred to above (or for secondary purposes where it is closely related, for example such as storing it) and will only be shared on a strict need-to-know basis with:

- designated Shell staff, responsible for administering the Helpline.
- Shell staff responsible for investigating alleged wrongdoings reported through the Helpline and/or for taking the required measures to follow up any investigation, such as instituting disciplinary proceedings or legal proceedings.
- public authorities, government, regulatory or fiscal agencies where it is necessary to comply with a legal or regulatory obligation to which the relevant Shell company is subject to as permitted by applicable local law;
- authorized third party agents, service providers and/or subcontractors of Shell (including Navex, Global Inc who administers the Helpline on behalf of and under the direction and control of Shell)

**How long do you hold the personal data for?**

Personal data collected in relation to a submission to the Helpline will be initially assessed to determine if the reported issue is within the scope of the Helpline or if referral to other Shell departments for follow-up is necessary (such as Customer Service Complaints for example).

Where a report has been assessed not to be in scope of the Helpline and referred to another Shell department, personal data will be deleted within 3 months of the referral.

**Appendix 211**

Dedmon 001333

Where a reported issue has been assessed to be in scope of the Helpline, the issue will be investigated and, with some exceptions required to comply with local legal requirements, information collected during an investigation will be held for no longer than 20 years after the conclusion of the investigation.

In all cases information will he held for

a) a longer period where there is a legal or regulatory reason to do so (in which case it will be deleted once no longer required for the legal or regulatory reason), or

b) a shorter period where an individual objects to the processing of personal data and there is no longer a legitimate purpose to retain it.

**Your rights in relation to your personal data**

We aim to keep our information about you as accurate as possible. You can request:

- access to your personal data;
- correction or deletion of your personal data (but only where they are no longer required for a legitimate business purpose);
- that the processing of your personal data is restricted; and/or
- that you receive personal data that you have provided to Shell, in a structured, digital form to be transmitted to another party, if this is technically feasible.

Please contact privacy-office-SI@shell.com.

When considering requests for access to personal data submitted in relation to the Helpline, Shell will consider the status of the requestor, the current stage of the investigation, and the nature of the information held as well as local legal requirements and restrictions.

**How you can contact us**

If you have any issues, queries or complaints regarding the processing of your personal data for the purposes of the Helpline you can contact Privacy-Office-SI@shell.com.

You may also contact the Shell Group Chief Privacy Officer at Shell International B.V. The Hague, The Netherlands - Trade Register, No. 27155369 Correspondence: PO Box 162, 2501 AN, The Hague.

If you are unsatisfied with the handling of your personal data by Shell, then you have the right to lodge a complaint to your local data protection authority (if there is one) or the Dutch Data Protection Authority whose address is Prins Clauslaan 60, 2595 AJ The Hague, The Netherlands. Please visit https://autoriteitpersoonsgegevens.nl/en for more information.

**Appendix 212**

Dedmon 001334

**Changes to this Privacy Notice**

This Privacy Notice may be changed over time. This Privacy Notice was last updated on 26 March 2021.

# Exhibit 13

# Shell 2020 mid marketer organizational chart

## Shell People Organisation Structure



**Supervisor**

Supervisor Energy Retailer Mid Marketing

**Michael Tickle**

| | |
|---|---|
| Company Code | Shell Trading Services Co |
| Country | United States |
| Ref Indicator | STX/A/32 |
| Cost Centre | 0000087070 |
| Personnel Area | HOUOTM    TX |
| Position ID | 52686583 |
| Supervised by | Christopher Riley |
| Managed by | Christopher Riley |
| E-mail address | MICHAEL.TICKLE@SHELL.COM |
| Phone | +1 713-230-2954 |



**Mid Marketer**

**Susan Smith**

| | |
|---|---|
| Company Code | Shell Trading Services Co |
| Country | United States |
| Ref Indicator | STX/A/32 |
| Cost Centre | 0000087070 |
| Personnel Area | Syracuse    NY |
| Position ID | 50286437 |
| Supervised by | Michael Tickle |
| Managed by | Christopher Riley |
| E-mail address | Susan.E.Smith@shell.com |
| Phone | +13154234817 |

**Mid Marketer**

**Robert Dedmon**

| | |
|---|---|
| Company Code | Shell Trading Services Co |
| Country | United States |
| Ref Indicator | STX/A/32 |
| Cost Centre | 0000087070 |
| Personnel Area | HOUOTM    TX |
| Position ID | 52487435 |
| Supervised by | Michael Tickle |
| Managed by | Christopher Riley |
| E-mail address | ROBERT.DEDMON@SHELL.COM |

**Mid Marketer**

**Douglas Hund**

| | |
|---|---|
| Company Code | Shell Trading Services Co |
| Country | United States |
| Ref Indicator | STX/A/32 |
| Cost Centre | 0000087070 |
| Personnel Area | HOUOTM    TX |
| Position ID | 52544177 |
| Supervised by | Michael Tickle |
| Managed by | Christopher Riley |
| E-mail address | |
| | DOUGLAS.HUND@SHELL.COM |
| Phone | +1 713-230-6236 |

**Mid Marketer**

**Patrick Frnka**

| | |
|---|---|
| Company Code | Shell Trading Services Co |
| Country | United States |
| Ref Indicator | STX/A/32 |
| Cost Centre | 0000087070 |
| Personnel Area | HOUOTM    TX |
| Position ID | 52620984 |
| Supervised by | Michael Tickle |
| Managed by | Christopher Riley |
| E-mail address | |
| | PATRICK.FRNKA@SHELL.COM |
| Phone | +1 713-230-7565 |

**Open position**

| | |
|---|---|
| Position | Mid Marketer |
| *Open position* | |
| Position ID | 52663594 |
| Supervised by | Michael Tickle |
| Managed by | Christopher Riley |

**Mid Marketer**

**Michael Deley**

| | |
|---|---|
| Company Code | Shell Trading Services Co |
| Country | United States |
| Ref Indicator | STX/A/32 |
| Cost Centre | 0000087070 |
| Personnel Area | HOUOTM    TX |
| Position ID | 52772343 |
| Supervised by | Michael Tickle |
| Managed by | Christopher Riley |
| E-mail address | |
| | MICHAEL.DELEY@SHELL.COM |

**Mid Marketer**

**Ryan Kolkmann**

| | |
|---|---|
| Company Code | Shell Trading Services Co |
| Country | United States |
| Ref Indicator | STX/A/32 |
| Cost Centre | 0000087070 |
| Personnel Area | HOUOTM    TX |
| Position ID | 52806913 |
| Supervised by | Michael Tickle |
| Managed by | Christopher Riley |
| E-mail address | |
| | RYAN.KOLKMANN@SHELL.COM |
| Phone | +1 713-230-7558 |

ShellDedmon_001094

# Exhibit 14

# Excerpt from Shell Dedmon 1081— Tickle 2019 ranking

| Rating | MM | JG |
|---|---|---|
| HIGHER | SS | 4 |
| HIGHER/STRONG | PF | 4 |
| HIGHER/STRONG | MD | 5 |
| STRONG- | RD | 5 |
| STRONG | RK | 4 |
| LOWER | DH | 5 |

**Appendix 217**

# Exhibit 15

# Patrick Frnka
# selected pay records

Shell Trading Services Co                              Check # : 00097969005020
                                                      Pay Period: 01.01.2015 - 15.01.2015

Frnka, Patrick J                        FEIN 76-0659593              Employee#.
                                        FED *DO NO Allowances: 01 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 4,762.51 | 3,363.91 | 699.87 | 1,979.68 | 2,082.96 |
| YTD : | 6,189.61 | 4,791.01 | 1,165.82 | 1,979.68 | |

Direct deposit        1.00
Direct deposit        1.00
Direct deposit        1.00
Direct deposit        1.00

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| PRegular | | | 1,587.50- | |
| PVacation | 49.60948 | 32.00 | 1,587.50 | |
| Regular | | | 4,329.55 | 4,329.55 |
| Holiday Pay Base | 54.11943 | 8.00 | 432.96 | 432.96 |
| GESPP Exercise | | | | 1,427.10 |
| Total Earnings | | | 4,762.51 | 6,189.61 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 8.93 | 8.93 |
| Total Imputed Income | | | 8.93 | 8.93 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 5.78 | 5.78 |
| Withholding Tax | 386.06 | 742.84 | Empl Life | 13.21 | 13.21 |
| EE Social Security Tax | 254.33 | 342.81 | IPI | 11.81 | 11.81 |
| EE Medicare Tax | 59.48 | 80.17 | Group Legal | 6.48 | 6.48 |
| | | | Dependent Life | 0.59 | 0.59 |
| Total Taxes  - Cum. | 699.87 | 1,165.82 | Plan Loan 1 | 121.78 | 121.78 |
| | | | Charity | 100.00 | 100.00 |
| | | | GESPP Post Tax | 312.50 | 312.50 |
| | | | Post-Tax Deductions -Cum. | 572.15 | 572.15 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 15.50 | 738.19 | MED Pre Tax | 295.02 | 295.02 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 43.59 | 43.59 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 738.19 | 738.19 |
| Company Provident Fund | 5.00 | 238.13 | FSA-Dependcare | 208.33 | 208.33 |
| GESPP Post Tax | | 312.50 | Acc Ins PreTax | 12.50 | 12.50 |
| | | | Vacation Buy Pre Tax | 109.90 | 109.90 |
| Company Provident Fund Current Amt | | 238.13 | Pre-Tax Deductions - Cum. | 1,407.53 | 1,407.53 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:     1

CONFIDENTIAL

**Appendix 219**

ShellDedmon_001572

Shell Trading Services Co                        Check # : 00097969005060
                                                 Pay Period: 16.01.2015 - 31.01.2015

Frnka, Patrick J                        FEIN 76-0659593          Employee#.
                                  FED *DO NO Allowances: 01 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 4,762.51 | 3,363.91 | 699.87 | 1,879.68 | 2,182.96 |
| YTD | 10,993.97 | 8,154.92 | 1,865.69 | 3,859.36 | |

| Direct deposit | 1.00 |
|---|---|
| Direct deposit | 1.00 |
| Direct deposit | 1.00 |
| Direct deposit | 1.00 |

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| Regular | | | 4,762.51 | 9,092.06 |
| Holiday Pay Base | | | | 432.96 |
| Shares Cash Balance | | | | 41.85 |
| GESPP Exercise | | | | 1,427.10 |
| Total Earnings | | | 4,762.51 | 10,993.97 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 8.93 | 17.86 |
| Total Imputed Income | | | 8.93 | 17.86 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 5.78 | 11.56 |
| Withholding Tax | 386.06 | 1,128.90 | Empl Life | 13.21 | 26.42 |
| EE Social Security Tax | 254.33 | 597.14 | IPI | 11.81 | 23.62 |
| EE Medicare Tax | 59.48 | 139.65 | Group Legal | 6.48 | 12.96 |
| | | | Dependent Life | 0.59 | 1.18 |
| Total Taxes - Cum. | 699.87 | 1,865.69 | Plan Loan 1 | 121.78 | 243.56 |
| | | | Charity | | 100.00 |
| | | | GESPP Post Tax | 312.50 | 625.00 |
| | | | Post-Tax Deductions -Cum. | 472.15 | 1,044.30 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 15.50 | 1,476.38 | MED Pre Tax | 295.02 | 590.04 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 43.59 | 87.18 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 738.19 | 1,476.38 |
| Company Provident Fund | 5.00 | 476.26 | FSA-Dependcare | 208.33 | 416.66 |
| GESPP Post Tax | | 625.00 | Acc Ins PreTax | 12.50 | 25.00 |
| | | | Vacation Buy Pre Tax | 109.90 | 219.80 |
| Company Provident Fund Current Amt | | 238.13 | Pre-Tax Deductions - Cum. | 1,407.53 | 2,815.06 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:    1

CONFIDENTIAL

**Appendix 220**

ShellDedmon_001597

Shell Trading Services Co                              Check # : 00097969005140
                                                      Pay Period: 01.03.2015 - 15.03.2015

Frnka, Patrick J                          FEIN 76-0659593              Employee#.
                                  FED *DO NO Allowances: 00 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 4,954.18 | 3,526.33 | 767.64 | 1,910.39 | 2,276.15 |
| YTD: | 50,856.51 | 43,733.45 | 12,356.08 | 9,590.53 | |

| | | | |
|---|---|---|---|
| Direct deposit | 1.00 | | |
| Direct deposit | 1.00 | | |
| Direct deposit | 1.00 | | |
| Direct deposit | 1.00 | | |

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| PRegular | | | 495.42- | |
| PPersonal Holiday | 61.92721 | 8.00 | 495.42 | |
| Regular | | | 4,954.18 | 23,459.18 |
| Performance Bonus PriorYR | | | | 14,655.00 |
| Perf Bon Non-BB | | | | 10,345.00 |
| Personal Holiday | | | | 495.42 |
| Holiday Pay Base | | | | 432.96 |
| Shares Cash Balance | | | | 41.85 |
| GESPP Exercise | | | | 1,427.10 |
| | | | | |
| Total Earnings | | | 4,954.18 | 50,856.51 |
| | | | | |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 9.39 | 45.57 |
| | | | | |
| Total Imputed Income | | | 9.39 | 45.57 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 5.78 | 28.90 |
| Withholding Tax | 439.13 | 8,721.29 | Empl Life | 13.74 | 67.11 |
| EE Social Security Tax | 266.24 | 2,945.84 | IPI | 12.28 | 59.99 |
| EE Medicare Tax | 62.27 | 688.95 | Group Legal | 6.48 | 32.40 |
| | | | Dependent Life | 0.59 | 2.95 |
| Total Taxes - Cum. | 767.64 | 12,356.08 | Plan Loan 1 | 121.78 | 608.90 |
| | | | Empl Life Adj | | 0.53 |
| | | | IPI Adj | | 0.47 |
| | | | Charity | | 100.00 |
| | | | GESPP Post Tax | 312.50 | 1,562.50 |
| | | | | | |
| | | | Post-Tax Deductions -Cum. | 473.15 | 2,463.75 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 15.50 | 3,780.08 | MED Pre Tax | 295.02 | 1,475.10 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 43.59 | 217.95 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 767.90 | 3,780.08 |
| Company Provident Fund | 5.00 | 1,952.14 | FSA-Dependcare | 208.33 | 1,041.65 |
| GESPP Post Tax | | 1,562.50 | Acc Ins PreTax | 12.50 | 62.50 |
| | | | Vacation Buy Pre Tax | 109.90 | 549.50 |
| Company Provident Fund Current Amt | | 247.71 | Pre-Tax Deductions - Cum. | 1,437.24 | 7,126.78 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:     1

CONFIDENTIAL
**Appendix 221**

ShellDedmon_001566

Shell Trading Services Co                    Check # : 00097969005230
                                             Pay Period: 16.03.2015 - 31.03.2015

Frnka, Patrick J                    FEIN 76-0659593              Employee#.
                                    FED *DO NO Allowances: 00 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 4,954.18 | 3,526.33 | 767.63 | 1,910.39 | 2,276.16 |
| YTD | 55,810.69 | 47,259.78 | 13,123.71 | 11,500.92 | |

| | | |
|---|---|---|
| Direct deposit | 1.00 | |
| Direct deposit | 1.00 | |
| Direct deposit | 1.00 | |
| Direct deposit | 1.00 | |

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| PRegular | | | 2,910.05- | |
| PVacation | 61.92721 | 40.00 | 2,477.09 | |
| PPersonal Holiday | 54.11943 | 8.00 | 432.96 | |
| Regular | | | 4,954.18 | |
| Performance Bonus PriorYR | | | | 25,503.31 |
| Perf Bon Non-BB | | | | 14,655.00 |
| Vacation | | | | 10,345.00 |
| Personal Holiday | | | | 2,477.09 |
| Holiday Pay Base | | | | 928.38 |
| Shares Cash Balance | | | | 432.96 |
| GESPP Exercise | | | | 41.85 |
| | | | | 1,427.10 |
| Total Earnings | | | 4,954.18 | 55,810.69 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 9.39 | 54.96 |
| Total Imputed Income | | | 9.39 | 54.96 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 5.78 | 34.68 |
| Withholding Tax | 439.13 | 9,160.42 | Empl Life | 13.74 | 80.85 |
| EE Social Security Tax | 266.24 | 3,212.08 | IPI | 12.28 | 72.27 |
| EE Medicare Tax | 62.26 | 751.21 | Group Legal | 6.48 | 38.88 |
| | | | Dependent Life | 0.59 | 3.54 |
| Total Taxes - Cum. | 767.63 | 13,123.71 | Plan Loan 1 | 121.78 | 730.68 |
| | | | Empl Life Adj | | 0.53 |
| | | | IPI Adj | | 0.47 |
| | | | Charity | | 100.00 |
| | | | GESPP Post Tax | 312.50 | 1,875.00 |
| | | | Post-Tax Deductions -Cum. | 473.15 | 2,936.90 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 15.50 | 4,547.98 | MED Pre Tax | 295.02 | 1,770.12 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 43.59 | 261.54 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 767.90 | 4,547.98 |
| Company Provident Fund | 5.00 | 2,199.85 | FSA-Dependcare | 208.33 | 1,249.98 |
| GESPP Post Tax | | 1,875.00 | Acc Ins PreTax | 12.50 | 75.00 |
| | | | Vacation Buy Pre Tax | 109.90 | 659.40 |
| Company Provident Fund Current Amt | | 247.71 | Pre-Tax Deductions - Cum. | 1,437.24 | 8,564.02 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:     1

CONFIDENTIAL

**Appendix 222**

Shell Trading Services Co.

Check # : 00097869007380
Pay Period: 01.10.2017 - 15.10.2017

Frnka, Patrick J

FEIN 76-0659593          Employee#.
FED *DO NO Allowances: 00 Addnl. W/H :     0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 5,141.68 | 3,490.03 | 757.07 | 2,252.15 | 2,132.46 |
| YTD : | 127,996.59 | 96,577.47 | 24,281.04 | 42,758.35 | |

| Direct deposit | 1.00 |
|---|---|
| Direct deposit | 1.00 |
| Direct deposit | 1.00 |
| Direct deposit | 1.00 |

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| Regular | | | 5,141.68 | 87,935.26 |
| Performance Bonus PriorYR | | | | 20,000.00 |
| Vacation | | | | 6,707.57 |
| Personal Holiday | | | | 934.85 |
| Holiday Pay Base | | | | 1,914.24 |
| Shares Cash Balance | | | | 68.29 |
| Service Award TA | | | | 250.00 |
| Wellness Reimbursement | | | | 250.00 |
| TMS - Mileage | | | | 371.56 |
| TMS EMP MEALS or Bus Mtg | | | | 35.00 |
| TxRslt SvcAward TA | | | | 121.19 |
| Performance Shares Grant | | | | 7,067.25 |
| GESPP Exercise | | | | 2,747.94 |
| Total Earnings | | | 5,141.68 | 127,996.59 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 9.84 | 186.24 |
| CGLI # FICA Only Adj | | | | 0.24 |
| Total Imputed Income | | | 9.84 | 186.48 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 10.15 | 192.85 |
| Withholding Tax | 429.11 | 15,736.85 | Empl Life | 25.06 | 474.70 |
| EE Social Security Tax | 265.79 | 6,924.70 | IPI | 14.04 | 265.95 |
| EE Medicare Tax | 62.17 | 1,619.49 | Group Legal | 6.48 | 123.12 |
| | | | Dependent Life | 0.65 | 12.35 |
| Total Taxes - Cum. | 757.07 | 24,281.04 | Plan Loan 1 | 121.78 | 2,313.82 |
| | | | Empl Life Adj | | 0.48 |
| | | | IPI Adj | | 0.27 |
| | | | Charity | 100.00 | 1,900.00 |
| | | | GESPP Post Tax | 312.50 | 5,937.50 |
| | | | Post-Tax Deductions -Cum. | 590.66 | 11,221.04 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 15.50 | 15,111.24 | MED Pre Tax | 356.67 | 6,776.73 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 48.00 | 912.00 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 796.96 | 15,111.24 |
| Company Provident Fund | 10.00 | 11,749.23 | FSA-Dependcare | 208.34 | 3,958.46 |
| GESPP Post Tax | | 5,937.50 | FSA-Healthcare | 106.25 | 2,018.75 |
| | | | Acc Ins PreTax | 12.50 | 237.50 |
| Company Provident Fund Current Amt | | 514.17 | Vision Pre Tax | 16.43 | 312.17 |
| | | | Vacation Buy Pre Tax | 116.34 | 2,210.46 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:     1

CONFIDENTIAL

**Appendix 223**

ShellDedmon_001675

Shell Trading Services Co.                                    Check # : 00097869007630
                                                             Pay Period: 01.02.2018 - 15.02.2018

Frnka, Patrick J                          FEIN 76-0659593          Employee#.

|  | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 5,304.18 | 3,773.56 | 535.63 | 2,032.32 | 2,736.23 |
| YTD : | 18,620.06 | 14,000.06 | 3,101.18 | 6,046.58 | |

| Direct deposit | 363.00 |
|---|---|
| Direct deposit | 2,369.23 |

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 15.50 | 2,416.07 | Pre-Tax Deductions - Cum. | 1,540.46 | 4,571.00 |
| Employee ProvFundAfterTax | 0.00 | | | | |
| Employee ProvFund Roth | 0.00 | | | | |
| Company Provident Fund | 10.00 | 1,558.76 | | | |
| GESPP Post Tax | | 937.50 | | | |
| Company Provident Fund Current Amt | | 530.42 | | | |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:    2

CONFIDENTIAL

**Appendix 224**

ShellDedmon_001737

Shell Trading Services Co.                          Check # : 000979369007690
                                                    Pay Period: 01.03.2018 - 15.03.2018

Frnka, Patrick J                    FEIN  76-0659593        Employee#. ██████

|         | GROSS      | TAXABLE    | TAXES     | DEDUCTIONS | NET PAY  |
|---------|------------|------------|-----------|------------|----------|
| Curr.:  | 5,833.34   | 4,221.09   | 874.23    | 2,115.61   | 2,843.50 |
| YTD :   | 45,157.58  | 37,395.49  | 9,276.91  | 10,197.05  |          |

| Direct deposit | 363.00   |
| Direct deposit | 2,476.50 |

| EARNINGS |  | RATE | HOURS | CURRENT | YEAR TO DATE |
|----------|--|------|-------|---------|--------------|

| TAXES |  | CURRENT | YEAR TO DATE | POST-TAX DEDS |  | CURRENT | YEAR TO DATE |
|-------|--|---------|--------------|---------------|--|---------|--------------|

| CONTRIBUTIONS/DEFERRALS |  | YEAR TO DATE | PRE-TAX DEDS |  | CURRENT | YEAR TO DATE |
|-------------------------|--|--------------|--------------|--|---------|--------------|
| Employee ProvFund Pre-Tax | 15.50 | 4,142.39 | Pre-Tax Deductions - Cum. | | 1,622.48 | 7,733.94 |
| Employee ProvFundAfterTax | 0.00 | | | | | |
| Employee ProvFund Roth | 0.00 | | | | | |
| Company Provident Fund | 10.00 | 4,212.51 | | | | |
| GESPP Post Tax | | 1,562.50 | | | | |
| Company Provident Fund Current Amt | | 583.33 | | | | |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:    2

CONFIDENTIAL

**Appendix 225**

ShellDedmon_001739

Shell Trading Services Co                        Check # : 00097869011170
                                                 Pay Period: 01.08.2022 - 15.08.2022

Frnka, Patrick J                    FEIN 76-0659593              Employee#.
                                    FED *DO NO Allowances: 00 Addnl. W/H :    0.00

|          | GROSS       | TAXABLE     | TAXES       | DEDUCTIONS  | NET PAY    |
|----------|-------------|-------------|-------------|-------------|------------|
| Curr.:   | 6,837.51    | 5,453.90    | 1,196.07    | 2,158.18    | 3,483.26   |
| YTD      | 146,581.92  | 125,936.23  | 31,016.26   | 31,589.80   |            |

| Direct deposit | 1.00 |
| Direct deposit | 1.00 |
| Direct deposit | 1.00 |
| Direct deposit | 1.00 |

| EARNINGS               | RATE     | HOURS  | CURRENT     | YEAR TO DATE |
|------------------------|----------|--------|-------------|--------------|
| PRegular               |          |        | 5,718.64-   |              |
| PVacation              | 77.69898 | 56.00  | 4,351.14    |              |
| PVacation              | 85.46888 | 16.00  | 1,367.50    |              |
| Regular                |          |        | 6,837.51    |              |
| Performance Bonus PriorYR |       |        |             | 89,922.44    |
| Perf Bon Non-BB        |          |        |             | 34,358.00    |
| Vacation               |          |        |             | 5,642.00     |
| Personal Holiday       |          |        |             | 9,240.99     |
| Holiday Pay Base       |          |        |             | 1,257.84     |
| Shares Cash Balance    |          |        |             | 1,191.38     |
| Service Award TA       |          |        |             | 11.62        |
| TxRslt SvcAward TA     |          |        |             | 375.00       |
| GESPP Exercise         |          |        |             | 158.05       |
|                        |          |        |             | 4,424.60     |
| Total Earnings         |          |        | 6,837.51    | 146,581.92   |
| Imputed Income         |          |        |             |              |
| CGLI - FICA Only       |          |        | 20.87       | 307.92       |
| CGLI # FICA Only Adj   |          |        |             | 1.71         |
| Total Imputed Income   |          |        | 20.87       | 309.63       |

| TAXES              | CURRENT  | YEAR TO DATE | POST-TAX DEDS           | CURRENT | YEAR TO DATE |
|--------------------|----------|--------------|-------------------------|---------|--------------|
| Federal            |          |              | Spouse Life             | 16.63   | 249.45       |
| Withholding Tax    | 710.85   | 20,371.59    | Empl Life               | 54.58   | 807.30       |
| EE Social Security Tax | 393.25 | 8,627.05   | IPI                     | 13.06   | 193.20       |
| EE Medicare Tax    | 91.97    | 2,017.62     | Group Legal             | 6.48    | 97.20        |
|                    |          |              | Dependent Life          | 0.67    | 10.05        |
| Total Taxes - Cum. | 1,196.07 | 31,016.26    | Plan Loan 1             | 121.78  | 1,826.70     |
|                    |          |              | Empl Life Adj           |         | 3.80         |
|                    |          |              | IPI Adj                 |         | 0.90         |
|                    |          |              | Parking                 | 65.00   | 325.00       |
|                    |          |              | Charity                 | 165.00  | 2,475.00     |
|                    |          |              | GESPP Post Tax          | 310.50  | 4,657.50     |
|                    |          |              | Post-Tax Deductions -Cum. | 753.70 | 10,646.10  |

| CONTRIBUTIONS/DEFERRALS       |       | YEAR TO DATE | PRE-TAX DEDS               | CURRENT | YEAR TO DATE |
|-------------------------------|-------|--------------|----------------------------|---------|--------------|
| Employee ProvFund Pre-Tax     | 13.00 | 13,209.70    | MED Pre Tax                | 231.51  | 3,522.65     |
| Employee ProvFundAfterTax     | 0.00  |              | DEN Pre Tax                | 43.34   | 650.10       |
| Employee ProvFund Roth        | 0.00  |              | Employee ProvFund Pre-Tax  | 888.88  | 13,209.70    |
| Company Provident Fund        | 10.00 | 13,597.05    | FSA-Healthcare             | 62.50   | 937.50       |
| GESPP Post Tax                |       | 4,657.50     | Acc Ins PreTax             | 15.00   | 225.00       |
|                               |       |              | Vision Pre Tax             | 16.43   | 246.45       |
| Company Provident Fund Current Amt | | 683.75  | Vacation Buy Pre Tax       | 146.82  | 2,202.30     |
|                               |       |              | MED Pre Adj                |         | 50.00-       |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:    1

CONFIDENTIAL

**Appendix 226**

ShellDedmon_001954

```
Shell Trading Services Co                    Check # . : 00097969012360
                                             Pay Period: 01.05.2024 - 15.05.2024

Frnka, Patrick J                    FEIN  76-0659593      Employee#.    97969
                                    FED *DO NO Allowances: 00 Addnl. W/H :    0.00
```

|  | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 7,587.50 | 5,963.98 | 910.34 | 2,447.23 | 4,229.93 |
| YTD : | 229,851.16 | 215,597.15 | 56,272.16 | 21,350.87 | |

```
Direct deposit          1.00
Direct deposit          1.00
Direct deposit          1.00
Direct deposit          1.00
```

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| Regular | | | 7,587.50 | 66,857.95 |
| Performance Bonus PriorYR | | | | 53,240.00 |
| Perf Bon Non-BB | | | | 106,760.00 |
| Holiday Pay Base | | | | 654.55 |
| Shares Cash Balance | | | | 44.91 |
| GESPP Exercise | | | | 2,293.75 |
| Total Earnings | | | 7,587.50 | 229,851.16 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 23.57 | 207.93 |
| CGLI # FICA Only Adj | | | | 1.40 |
| Total Imputed Income | | | 23.57 | 209.33 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 19.60 | 176.40 |
| Withholding Tax | 745.22 | 42,330.31 | Empl Life | 71.40 | 631.68 |
| EE Social Security Tax | | 10,453.20 | IPI | 15.10 | 133.59 |
| EE Medicare Tax | 165.12 | 3,488.65 | Group Legal | 6.48 | 58.32 |
| | | | Dependent Life | 0.78 | 7.02 |
| Total Taxes  - Cum. | 910.34 | 56,272.16 | Plan Loan 1 | 121.78 | 1,096.02 |
| | | | Empl Life Adj | | 3.64 |
| | | | IPI Adj | | 0.77 |
| | | | Parking | 65.00 | 325.00 |
| | | | Charity | 200.00 | 1,800.00 |
| | | | GESPP Post Tax | 300.00 | 2,700.00 |
| | | | Post-Tax Deductions -Cum. | 800.14 | 6,932.44 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 14.00 | 9,451.75 | MED Pre Tax | 207.70 | 1,869.30 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 49.48 | 148.44 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 1,062.25 | 9,451.75 |
| Company Provident Fund | 10.00 | 12,075.25 | FSA-Healthcare | 127.09 | 1,143.81 |
| GESPP Post Tax | | 2,700.00 | Acc Ins PreTax | 18.00 | 162.00 |
| | | | Vision Pre Tax | 16.43 | 147.87 |
| Company Provident Fund Current Amt | | 758.75 | Vacation Buy Pre Tax | 166.14 | 1,495.26 |

```
MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282
```

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

CONFIDENTIAL
**Appendix 227**

ShellDedmon_004733

# Exhibit 16

# Robert Dedmon
# selected pay records

Shell Trading Services Co.                                    Check # : 00235641000480
                                                       Pay Period: 16.03.2015 - 31.03.2015

Dedmon, Robert L                          FEIN  76-0659593          Employee#.
                              FED *DO NO Allowances: 04 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 4,750.00 | 4,459.92 | 862.15 | 364.49 | 3,523.36 |
| YTD : | 32,849.52 | 31,182.45 | 6,685.68 | 1,996.14 | |

Direct deposit        3,523.36

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| Regular | | | 4,750.00 | 25,222.89 |
| Performance Bonus PriorYR | | | | 6,658.00 |
| Perf Bon Non-BB | | | | 42.00 |
| Vacation | | | | 431.67 |
| Holiday Pay Base | | | | 378.79 |
| Shares Cash Balance | | | | 65.92 |
| GESPP Exercise | | | | 50.25 |
| Total Earnings | | | 4,750.00 | 32,849.52 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 7.08 | 41.49 |
| Total Imputed Income | | | 7.08 | 41.49 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Empl Life | 6.74 | 39.72 |
| Withholding Tax | 506.44 | 4,223.75 | Dependent Life | 0.59 | 3.54 |
| EE Social Security Tax | 288.29 | 1,995.29 | Empl Life Adj | | 0.24 |
| EE Medicare Tax | 67.42 | 466.64 | Shell Employee Club | 10.00 | 10.00 |
| | | | GESPP Post Tax | 50.00 | 300.00 |
| Total Taxes - Cum. | 862.15 | 6,685.68 | | | |
| | | | Post-Tax Deductions -Cum. | 67.33 | 353.50 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 4.00 | 999.68 | MED Pre Tax | 97.10 | 582.60 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 4.98 | 29.88 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 190.00 | 999.68 |
| Company Provident Fund | 2.50 | 817.30 | Vision Pre Tax | 5.08 | 30.48 |
| GESPP Post Tax | | 300.00 | | | |
| | | | Pre-Tax Deductions - Cum. | 297.16 | 1,642.64 |
| Company Provident Fund Current Amt | | 118.75 | | | |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:     1

CONFIDENTIAL
**Appendix 229**

ShellDedmon_001134

```
Shell Trading Services Co                      Check # : 002235641001680
                                                         00235641001680
                                               Pay Period: 01.01.2017 - 15.01.2017
```

Dedmon, Robert L                    FEIN  76-0659593          Employee#. ▮▮▮
▮▮▮▮▮▮▮▮                  FED *DO NO Allowances: 04 Addnl. W/H :   0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 4,841.67 | 4,578.90 | 890.11 | 481.03 | 3,470.53 |
| YTD : | 5,801.01 | 5,538.24 | 1,203.34 | 481.03 | |

Direct deposit      3,470.53   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| PRegular | | | 2,640.91- | |
| PVacation | 55.01894 | 48.00 | 2,640.91 | |
| Regular | | | 4,357.50 | 4,357.50 |
| Holiday Pay Base | 60.52083 | 8.00 | 484.17 | 484.17 |
| GESPP Exercise | | | | 959.34 |
| Total Earnings | | | 4,841.67 | 5,801.01 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 8.21 | 8.21 |
| Total Imputed Income | | | 8.21 | 8.21 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Empl Life | 10.75 | 10.75 |
| Withholding Tax | 528.71 | 768.55 | Retiremnt Life | 17.48 | 17.48 |
| EE Social Security Tax | 292.90 | 352.38 | Plan Loan 1 | 67.27 | 67.27 |
| EE Medicare Tax | 68.50 | 82.41 | Plan Loan 2 | 14.55 | 14.55 |
| | | | GESPP Post Tax | 100.00 | 100.00 |
| Total Taxes  - Cum. | 890.11 | 1,203.34 | | | |
| | | | Post-Tax Deductions -Cum. | 210.05 | 210.05 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 3.00 | 145.25 | MED Pre Tax | 113.62 | 113.62 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 5.81 | 5.81 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 145.25 | 145.25 |
| Company Provident Fund | 2.50 | 121.04 | Vision Pre Tax | 6.30 | 6.30 |
| GESPP Post Tax | | 100.00 | | | |
| | | | Pre-Tax Deductions - Cum. | 270.98 | 270.98 |
| Company Provident Fund Current Amt | | 121.04 | | | |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

CONFIDENTIAL

**Appendix 230**

ShellDedmon_001166

```
Shell Trading Services Co                      Check # : 00235641006750
                                                Pay Period: 01.08.2022 - 15.08.2022

Dedmon, Robert L                       FEIN 76-0659593           Employee#.
                                       FED *DO NO Allowances: 00 Addnl. W/H :    0.00
```

|  | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 5,700.00 | 5,622.96 | 1,394.99 | 597.28 | 3,707.73 |
| YTD : | 107,523.95 | 106,350.50 | 27,468.79 | 8,094.94 | |

```
Direct deposit        50.00
Direct deposit     3,657.73     [redacted]
```

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| Regular | | | 5,700.00 | 76,080.92 |
| Performance Bonus PriorYR | | | | 19,080.00 |
| Perf Bon Non-BB | | | | 920.00 |
| Vacation | | | | 6,632.72 |
| Personal Holiday | | | | 993.18 |
| Holiday Pay Base | | | | 993.18 |
| Shares Cash Balance | | | | 24.51 |
| GESPP Exercise | | | | 2,799.44 |
| Total Earnings | | | 5,700.00 | 107,523.95 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 11.18 | 164.82 |
| CGLI # FICA Only Adj | | | | 0.96 |
| Total Imputed Income | | | 11.18 | 165.78 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Empl Life | 20.18 | 298.44 |
| Withholding Tax | 960.47 | 19,268.18 | Dependent Life | 0.67 | 10.05 |
| EE Social Security Tax | 352.16 | 6,646.25 | Retiremnt Life | 20.55 | 303.99 |
| EE Medicare Tax | 82.36 | 1,554.36 | Plan Loan 2 | 152.66 | 2,289.90 |
| | | | Empl Life Adj | | 1.42 |
| Total Taxes  - Cum. | 1,394.99 | 27,468.79 | Retiremnt Life Adj | | 1.42 |
| | | | Parking | 65.00 | 325.00 |
| | | | GESPP Post Tax | 250.00 | 3,550.00 |
| | | | Post-Tax Deductions -Cum. | 509.06 | 6,780.22 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 1.00 | 847.00 | MED Pre Tax | 6.06 | 90.90 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 14.75 | 221.25 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 57.00 | 847.00 |
| Company Provident Fund | 5.00 | 5,189.00 | Acc Ins PreTax | 4.11 | 60.78 |
| GESPP Post Tax | | 3,550.00 | Vision Pre Tax | 6.30 | 94.50 |
| | | | Acc Ins Pre Adj | | 0.29 |
| Company Provident Fund Current Amt | 285.00 | | Pre-Tax Deductions - Cum. | 88.22 | 1,314.72 |

```
MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282
```

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:    1

CONFIDENTIAL

**Appendix 231**

ShellDedmon_001309

Shell Trading Services Co
Check # : 00235641008050
Pay Period: 01.05.2024 - 15.05.2024

Dedmon, Robert L
FEIN 76-0659593         Employee#.   235641
FED *DO NO Allowances: 00 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 6,195.83 | 5,975.67 | 1,457.18 | 996.91 | 3,741.74 |
| YTD : | 131,528.86 | 129,610.14 | 35,592.07 | 9,125.07 | |

Direct deposit        50.00
Direct deposit     3,691.74

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| Regular | | | 6,195.83 | 54,833.32 |
| Performance Bonus PriorYR | | | | 22,768.00 |
| Perf Bon Non-BB | | | | 51,232.00 |
| Holiday Pay Base | | | | 545.83 |
| Shares Cash Balance | | | | 30.86 |
| GESPP Exercise | | | | 2,118.85 |
| Total Earnings | | | 6,195.83 | 131,528.86 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 12.37 | 109.95 |
| CGLI # FICA Only Adj | | | | 0.46 |
| Total Imputed Income | | | 12.37 | 110.41 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Empl Life | 26.03 | 231.84 |
| Withholding Tax | 995.30 | 25,634.53 | Dependent Life | 0.78 | 7.02 |
| EE Social Security Tax | 374.33 | 8,070.16 | Retiremnt Life | 22.35 | 199.14 |
| EE Medicare Tax | 87.55 | 1,887.38 | Plan Loan 1 | 350.22 | 3,151.98 |
| | | | Plan Loan 2 | | 457.98 |
| Total Taxes  - Cum. | 1,457.18 | 35,592.07 | Plan Loan 1 Adj | | 152.36 |
| | | | Empl Life Adj | | 0.81 |
| | | | Retiremnt Life Adj | | 0.67 |
| | | | Parking | 65.00 | 325.00 |
| | | | GESPP Post Tax | 300.00 | 2,600.00 |
| | | | Post-Tax Deductions -Cum. | 764.38 | 7,126.80 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 1.00 | 553.80 | DEN Pre Tax | 15.00 | 45.00 |
| Employee ProvFundAfterTax | 0.00 | | Employee ProvFund Pre-Tax | 61.96 | 553.80 |
| Employee ProvFund Roth | 0.00 | | Acc Ins PreTax | 10.71 | 95.40 |
| Company Provident Fund | 10.00 | 7,814.70 | Vision Pre Tax | 6.30 | 56.70 |
| GESPP Post Tax | | 2,600.00 | Vacation Buy Pre Tax | 138.56 | 1,247.04 |
| | | | Acc Ins Pre Adj | | 0.33 |
| Company Provident Fund Current Amt | 619.58 | | Pre-Tax Deductions - Cum. | 232.53 | 1,998.27 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:      1

CONFIDENTIAL
**Appendix 232**

ShellDedmon_004719

```
Shell Trading Services Co                        Check # :  00235641007810
                                                 Pay Period: 16.12.2023 - 31.12.2023
```

```
Dedmon, Robert L                     FEIN 76-0659593         Employee#.    235641
                                 FED *DO NO Allowances: 00 Addnl. W/H :     0.00
```

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 6,004.17 | 5,923.73 | 1,145.96 | 642.93 | 4,215.28 |
| YTD : | 212,765.87 | 210,773.90 | 52,383.00 | 20,233.00 | |

```
Direct deposit        50.00
Direct deposit     4,165.28      ███████████████████
```

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| PRegular | | | 8,851.60- | |
| PVacation | 62.54344 | 8.00 | 500.34 | |
| PVacation | 68.22920 | 80.00 | 5,458.34 | |
| PVacation | 75.05213 | 24.00 | 1,801.25 | |
| PPersonal Holiday | 68.22920 | 16.00 | 1,091.67 | |
| Regular | | | 4,803.34 | 107,384.09 |
| Performance Bonus PriorYR | | | | 19,973.00 |
| Perf Bon Non-BB | | | | 46,727.00 |
| Vacation | | | | 14,186.46 |
| NonOcc Disab Full Pay | | | | 16,920.84 |
| Personal Holiday | | | | 1,091.67 |
| Holiday Pay Base | 75.05213 | 16.00 | 1,200.83 | 3,908.68 |
| Shares Cash Balance | | | | 66.57 |
| GESPP Exercise | | | | 2,507.56 |
| Total Earnings | | | 6,004.17 | 212,765.87 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 11.91 | 283.65 |
| CGLI # FICA Only Adj | | | | 0.73 |
| Total Imputed Income | | | 11.91 | 284.38 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Empl Life | 25.22 | 601.44 |
| Withholding Tax | 1,005.34 | 39,263.69 | Dependent Life | 0.80 | 19.20 |
| EE Social Security Tax | | 9,932.40 | Retiremnt Life | 21.68 | 516.93 |
| EE Medicare Tax | 140.62 | 3,186.91 | Plan Loan 1 | 350.22 | 7,004.40 |
| | | | Plan Loan 2 | 152.66 | 3,663.84 |
| Total Taxes  - Cum. | 1,145.96 | 52,383.00 | Empl Life Adj | | 1.28 |
| | | | Retiremnt Life Adj | | 1.13 |
| | | | Parking | | 715.00 |
| | | | GESPP Post Tax | | 5,500.00 |
| | | | Post-Tax Deductions -Cum. | 550.58 | 18,023.22 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 1.00 | 1,434.88 | MED Pre Tax | 6.06 | 145.44 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 14.75 | 354.00 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 60.04 | 1,434.88 |
| Company Provident Fund | 10.00 | 10,574.95 | Acc Ins PreTax | 5.20 | 123.99 |
| GESPP Post Tax | | 5,500.00 | Vision Pre Tax | 6.30 | 151.20 |
| | | | Acc Ins Pre Adj | | 0.27 |
| Company Provident Fund Current Amt | 600.42 | | Pre-Tax Deductions - Cum. | 92.35 | 2,209.78 |

```
MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282
```

```
Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept
```

CONFIDENTIAL
**Appendix 233**

ShellDedmon_004720

# Exhibit 17

# Susan Smith
# selected pay records

Shell Trading Services Co.
Check #  00059867007440
Pay Period: 02/01/2018 - 02/15/2018

Smith, Susan Elizabeth
FEIN  76-0659593
Employee#.
FED *DO NO Allowances: 00 Addnl. W/H :    0.00
NY  Marrie Allowances: 00 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 5,383.34 | 4,176.60 | 833.20 | 1,710.57 | 2,839.57 |
| YTD : | 15,666.68 | 12,099.64 | 3,045.49 | 5,078.53 | |

Direct deposit    2,839.57

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| PRegular | | | 428.47- | |
| PPersonal Holiday | 53.55910 | 8.00 | 428.47 | |
| Regular | | | 5,383.34 | 14,303.37 |
| NonOcc Disab Full Pay | | | | 467.42 |
| Personal Holiday | | | | 428.47 |
| Holiday Pay Base | | | | 467.42 |
| Total Earnings | | | 5,383.34 | 15,666.68 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 8.86 | 26.58 |
| Total Imputed Income | | | 8.86 | 26.58 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 7.13 | 21.39 |
| PWithholding Tax | 235.24- | | Empl Life | 16.42 | 49.26 |
| Withholding Tax | 472.65 | 1,323.33 | NYDBL/NYPFL State Disab | 4.87 | 14.61 |
| EE Social Security Tax | 295.66 | 857.02 | Group Legal | 6.48 | 19.44 |
| EE Medicare Tax | 69.14 | 200.43 | Dependent Life | 0.67 | 2.01 |
| State    New York | | | Retiremnt Life | 18.53 | 55.59 |
| Withholding Tax | 230.99 | 664.71 | Plan Loan 2 | 340.87 | 1,022.61 |
| | | | Charity | 20.00 | 60.00 |
| Total Taxes  - Cum. | 833.20 | 3,045.49 | GESPP Post Tax | 80.00 | 240.00 |
| | | | Post-Tax Deductions -Cum. | 494.97 | 1,484.91 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 11.00 | 1,723.33 | MED Pre Tax | 219.38 | 658.14 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 48.00 | 144.00 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 592.17 | 1,723.33 |
| Company Provident Fund | 10.00 | 1,566.67 | FSA-Dependcare | 125.00 | 375.00 |
| GESPP Post Tax | | 240.00 | FSA-Healthcare | 108.34 | 325.02 |
| | | | Acc Ins PreTax | 7.41 | 22.23 |
| Company Provident Fund Current Amt | | 538.33 | Vision Pre Tax | 16.43 | 49.29 |
| | | | Vacation Buy Pre Tax | 98.87 | 296.61 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:    1

CONFIDENTIAL

**Appendix 235**

ShellDedmon_003770

```
Shell Trading Services Co                    Check # :  00059867007500
                                             Pay Period: 03/01/2018 - 03/15/2018

Smith, Susan Elizabeth                   FEIN 76-0659593        Employee#.
                             FED *DO NO Allowances: 00 Addnl. W/H :      0.00
                             NY  Marrie Allowances: 00 Addnl. W/H :      0.00
```

|  | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 5,920.84 | 4,595.94 | 1,232.03 | 1,830.92 | 2,857.89 |
| YTD : | 46,570.86 | 39,692.52 | 12,748.15 | 9,604.06 | |

```
Direct deposit     2,857.89
```

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| PRegular | | | 2,990.74- | |
| PVacation | 74.76861 | 40.00 | 2,990.74 | |
| Regular | | | 5,920.84 | |
| Performance Bonus PriorYR | | | | 22,127.42 |
| Vacation | | | | 19,600.00 |
| NonOcc Disab Full Pay | | | | 2,990.74 |
| Personal Holiday | | | | 467.42 |
| Holiday Pay Base | | | | 917.86 |
| | | | | 467.42 |
| Total Earnings | | | 5,920.84 | 46,570.86 |
| | | | | |
| Imputed Income | | | | |
| Misc Pmt- NO TA | | | | 200.00 |
| CGLI - FICA Only | | | 9.38 | 45.34 |
| CGLI # FICA Only Adj | | | | 0.52 |
| Total Imputed Income | | | 9.38 | 245.86 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Spouse Life | 7.13 | 35.65 |
| Withholding Tax | 564.79 | 6,457.02 | Empl Life | 17.19 | 83.64 |
| EE Social Security Tax | 329.00 | 2,709.31 | NYDBL/NYPFL State Disab | 4.87 | 24.35 |
| EE Medicare Tax | 76.94 | 633.63 | Group Legal | 6.48 | 32.40 |
| State   New York | | | Dependent Life | 0.67 | 3.35 |
| Withholding Tax | 261.30 | 2,948.19 | Retiremnt Life | 19.43 | 94.45 |
| | | | Plan Loan 2 | 340.87 | 1,704.35 |
| Total Taxes  - Cum. | 1,232.03 | 12,748.15 | Empl Life Adj | | 0.77 |
| | | | Retiremnt Life Adj | | 0.90 |
| | | | Charity | 20.00 | 100.00 |
| | | | GESPP Post Tax | 80.00 | 400.00 |
| | | | Post-Tax Deductions -Cum. | 496.64 | 2,479.86 |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 12.00 | 4,006.00 | MED Pre Tax | 219.38 | 1,096.90 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 48.00 | 240.00 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 710.50 | 4,006.00 |
| Company Provident Fund | 10.00 | 4,657.08 | FSA-Dependcare | 125.00 | 625.00 |
| GESPP Post Tax | | 400.00 | FSA-Healthcare | 108.34 | 541.70 |
| | | | Acc Ins PreTax | 7.76 | 37.75 |
| Company Provident Fund Current Amt | | 592.08 | Vision Pre Tax | 16.43 | 82.15 |
| | | | Vacation Buy Pre Tax | 98.87 | 494.35 |

```
MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282
```

```
Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept
```

Page:    1

CONFIDENTIAL

**Appendix 236**

ShellDedmon_003772

# Exhibit 18

# Jim Barker
## selected pay records

```
Shell Trading Services Co                    Check # :  0028987100328O
                                             Pay Period: 01.05.2024 - 15.05.2024

Barker, Jim                          FEIN 76-0659593      Employee#.   289871
                                FED *DO NO Allowances: 02 Addnl. W/H :    0.00
```

|        | GROSS      | TAXABLE    | TAXES     | DEDUCTIONS | NET PAY  |
|--------|------------|------------|-----------|------------|----------|
| Curr.: | 6,620.83   | 5,229.26   | 589.42    | 1,816.39   | 4,215.02 |
| YTD :  | 189,148.49 | 174,299.00 | 45,634.01 | 18,418.11  |          |

```
Direct deposit      4,215.02
```

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|----------|------|-------|---------|--------------|
| PRegular |  |  | 300.95- |  |
| PPersonal Holiday | 75.23670 | 4.00 | 300.95 |  |
| Regular |  |  | 6,620.83 | 57,795.05 |
| Performance Bonus PriorYR |  |  |  | 31,118.00 |
| Perf Bon Non-BB |  |  |  | 98,882.00 |
| Personal Holiday |  |  |  | 601.90 |
| Holiday Pay Base |  |  |  | 573.86 |
| Service Award TA |  |  |  | 125.00 |
| TMS Travel Exp-TDE |  |  |  | 98.26 |
| TxRslt SvcAward TA |  |  |  | 52.68 |
| Total Earnings |  |  | 6,620.83 | 189,148.49 |
| Imputed Income |  |  |  |  |
| CGLI - FICA Only |  |  | 57.58 | 508.68 |
| CGLI # FICA Only Adj |  |  |  | 3.18 |
| Total Imputed Income |  |  | 57.58 | 511.86 |

| TAXES | CURRENT | YEAR TO DATE |
|-------|---------|--------------|
| Federal |  |  |
| Withholding Tax | 497.27 | 32,468.66 |
| EE Social Security Tax |  | 10,453.20 |
| EE Medicare Tax | 92.15 | 2,712.15 |
| Total Taxes  - Cum. | 589.42 | 45,634.01 |

| POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---------------|---------|--------------|
| Auto/Home | 302.24 | 2,731.76 |
| Parking | 65.00 | 325.00 |
| Post-Tax Deductions -Cum. | 367.24 | 3,056.76 |

| CONTRIBUTIONS/DEFERRALS |  | YEAR TO DATE |
|--------------------------|------|--------------|
| Employee ProvFund Pre-Tax | 17.00 | 12,745.74 |
| Employee ProvFundAfterTax | 0.00 |  |
| Employee ProvFund Roth | 0.00 |  |
| Company Provident Fund | 2.50 | 2,252.21 |
| GESPP Post Tax |  |  |
| Company Provident Fund Current Amt | 165.52 |  |

| PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|--------------|---------|--------------|
| MED Pre Tax | 195.20 | 1,756.80 |
| DEN Pre Tax | 49.48 | 148.44 |
| Employee ProvFund Pre-Tax | 1,125.54 | 12,745.74 |
| FSA-Healthcare | 62.50 | 562.50 |
| Vision Pre Tax | 16.43 | 147.87 |
| Pre-Tax Deductions - Cum. | 1,449.15 | 15,361.35 |

```
MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282
```

```
Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept
```

CONFIDENTIAL
**Appendix 238**

ShellDedmon_004723

Shell Trading Services Co                    Check # : 0028987l003060
                                             Pay Period: 16.12.2023 - 31.12.2023

Barker, Jim                        FEIN 76-0659593      Employee#.  289871
                          FED *DO NO Allowances: 02 Addnl. W/H :    0.00

| | GROSS | TAXABLE | TAXES | DEDUCTIONS | NET PAY |
|---|---|---|---|---|---|
| Curr.: | 6,312.50 | 4,959.37 | 560.11 | 1,693.67 | 4,058.72 |
| YTD : | 197,233.34 | 165,216.08 | 34,328.24 | 40,593.40 | |

Direct deposit      4,058.72

| EARNINGS | RATE | HOURS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|
| Regular | | | 5,050.00 | 136,567.25 |
| Performance Bonus PriorYR | | | | 21,126.00 |
| Perf Bon Non-BB | | | | 25,174.00 |
| Vacation | | | | 8,043.66 |
| Personal Holiday | | | | 1,578.13 |
| Holiday Pay Base | 78.90625 | 16.00 | 1,262.50 | 4,744.30 |
| TMS Travel Exp-TDE | | | | 3,154.95 |
| TMS - Mileage | | | | 130.20 |
| TMS Meals/Busmtg/Rec Awd | | | | 124.00 |
| Total Earnings | | | 6,312.50 | 197,233.34 |
| Imputed Income | | | | |
| CGLI - FICA Only | | | 54.40 | 1,296.81 |
| CGLI # FICA Only Adj | | | | 2.93 |
| Total Imputed Income | | | 54.40 | 1,299.74 |

| TAXES | CURRENT | YEAR TO DATE | POST-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Federal | | | Auto/Home | 286.14 | 6,496.40 |
| Withholding Tax | 473.55 | 21,655.45 | Parking | | 780.00 |
| EE Social Security Tax | | 9,932.40 | | | |
| EE Medicare Tax | 86.56 | 2,740.39 | Post-Tax Deductions -Cum. | 286.14 | 7,276.40 |
| Total Taxes  - Cum. | 560.11 | 34,328.24 | | | |

| CONTRIBUTIONS/DEFERRALS | | YEAR TO DATE | PRE-TAX DEDS | CURRENT | YEAR TO DATE |
|---|---|---|---|---|---|
| Employee ProvFund Pre-Tax | 16.00 | 23,776.28 | MED Pre Tax | 219.01 | 5,256.24 |
| Employee ProvFundAfterTax | 0.00 | | DEN Pre Tax | 43.34 | 1,040.16 |
| Employee ProvFund Roth | 0.00 | | Employee ProvFund Pre-Tax | 1,010.00 | 23,776.28 |
| Company Provident Fund | 2.50 | 4,301.43 | FSA-Healthcare | 118.75 | 2,850.00 |
| GESPP Post Tax | | | Vision Pre Tax | 16.43 | 394.32 |
| Company Provident Fund Current Amt | | 157.81 | Pre-Tax Deductions - Cum. | 1,407.53 | 33,317.00 |

MESSAGES:
Company Mailing Address
P.O. Box 4282
Houston, TX 77210-4282

Inquiries: For Hours, Contact your Timekeeper. For Benefits, Contact 1-800-30SHELL. For Pay, Contact your HR Dept

Page:    1

CONFIDENTIAL
**Appendix 239**

ShellDedmon_004724

# Exhibit 19

# Shell 2014 job grade ranking email

Message

**From**:  Bowman, Beth A SENA-STE/3 [/O=SHELL/OU=AG3-SHELL/CN=RECIPIENTS/CN=USI+BOW2]
**Sent**:  2/12/2015 10:59:48 AM
**To**:  Rangan, Sri SENA-STE/34 [srikala.rangan@shell.com]
**Subject**:  FW: Ranking by Job Grade

**From:** Rangan, Sri SENA-STE/34
**Sent:** Wednesday, November 26, 2014 11:20 AM
**To:** Bowman, Beth A SENA-STE/3
**Subject:** RE: Ranking by Job Grade

Beth
Sorry, yes, made a mistake there.. I have revised the list below.  Hope this works.

Thanks
Sri

| Name | Salary Group | IPF | RANKING |
|------|--------------|-----|---------|
| Best, Melanie | 7 | 0.8 | 1 |
| Rubio, Danira | 6 | 1.4 | 1 |
| Widner, Cory | 6 | 1.4 | 2 |
| Strain, Lisa | 6 | 1.3 | 3 |
| Jarjoura, Jane | 6 | 1.2 | 4 |
| Andrews, Jimmy | 6 | 1.2 | 5 |
| Koehler, Courtney | 6 | 1.2 | 6 |
| Renteria, Luz | 6 | 1.2 | 7 |
| Welcome, Sandra | 6 | 1.2 | 8 |
| Heimbigner-Moore, Lisa | 6 | 1.1 | 9 |
| Pineda, Joelyn | 6 | 1.1 | 10 |
| Nilova, Oksana | 6 | 1 | 11 |
| Macleod, Matt | 6 | 1 | 12 |
| Dey, Bali | 6 | 1 | 13 |
| Wallace, D'Andra | 6 | 0.9 | 14 |
| Dedmon, Robert | 6 | 0.9 | 15 |
| De Abaitua, Marc | 6 | 0.9 | 16 |
| Roth, Christopher | 6 | 0.9 | 17 |
| Kinney, Evelyn | 6 | 0.9 | 18 |
| Carrier, Andrea Greer | 6 | 0.9 | 19 |
| Park, Jesse | 6 | 0.8 | 20 |
| Kennedy, Lawrence | 6 | 0.8 | 21 |
| Jeffery, Leon | 6 | 0.8 | 22 |
| Closson, Lorrie | 6 | 0.8 | 23 |
| Garcia, Lisa | 6 | 0.8 | 24 |
| Partida, Priscilla | 5 | 1.4 | 1 |
| Mcgruddy, Michael | 5 | 1.3 | 2 |
| Armstrong, Shalena | 5 | 1.3 | 3 |

ShellDedmon_000863

| Name | | | |
|---|---|---|---|
| Smith, Courtney | 5 | 1.2 | 4 |
| Keele, Jarrett | 5 | 1.2 | 5 |
| Hardcastle, Amanda | 5 | 1.2 | 6 |
| Promubol, Jim | 5 | 1.1 | 7 |
| Bloedow, Sarah | 5 | 1.1 | 8 |
| Smith, Susan | 5 | 1.1 | 9 |
| Denby, Brett | 5 | 1.1 | 10 |
| Serpico, Nadine | 5 | 1 | 11 |
| Frnka, Patrick | 5 | 0.9 | 12 |
| St. Arnaud, Christian | 5 | 0.9 | 13 |
| Yazzolino, Diana | 5 | 0.9 | 14 |
| Garcia, Nancy | 5 | 0.8 | 15 |
| Parker, David | 5 | 0.8 | 16 |
| Hadnot, Bridgette | 5 | 0.8 | 17 |
| Scimmons, Janice | 5 | 0.7 | 18 |
| Williams, Sean | 5 | 0.7 | 19 |
| Hund, Douglas | 5 | 0.6 | 20 |
| Bollu, Deepthi | 4 | 1.3 | 1 |
| Tickle, Michael | 4 | 1.2 | 2 |
| Parr, Sheetal | 4 | 1 | 3 |
| Moore, Robert | 4 | 0.9 | 4 |
| Meilleur, Sean | 4 | 0.9 | 5 |
| To, Rosemary | 4 | 0.9 | 6 |
| McCain, Shelley | 3 | 1.3 | 1 |
| Yorgason, Karen | 3 | 1.2 | 2 |
| Hartnett, Jennifer | 3 | 1.2 | 3 |

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Wednesday, November 26, 2014 10:14 AM
**To:** Rangan, Sri SENA-STE/34
**Subject:** RE: Ranking by Job Grade

Clarification

Dee is ranked 16, yet has a .9--- should she be .8?

Christian is rankied 10, yet has a .9—should he have a higher ranking?

**From:** Rangan, Sri SENA-STE/34
**Sent:** Tuesday, November 25, 2014 3:16 PM
**To:** Bowman, Beth A SENA-STE/3
**Subject:** Ranking by Job Grade

Beth
Please see table below. I have ranked by JG and added the IPF as well for your review.  On Patrick Frnka, he had a target of $1 Mln which is very reduced as compared to the rest of his team (tickle – 12 M plan/20 M delivered, Priscilla – 12 M plan/20 M delivered) and his actual as of the date we ranked was 980K.  He is going through a steep learning curve in the sales side.  That explains his drop off from 1.2 to 0.9.

| Name | Salary Group | IPF | RANKING |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Best, Melanie | 7 | 0.8 | 1 |
| Rubio, Danira | 6 | 1.4 | 1 |
| Widner, Cory | 6 | 1.4 | 2 |
| Strain, Lisa | 6 | 1.3 | 3 |
| Jarjoura, Jane | 6 | 1.2 | 4 |
| Andrews, Jimmy | 6 | 1.2 | 5 |
| Koehler, Courtney | 6 | 1.2 | 6 |
| Renteria, Luz | 6 | 1.2 | 7 |
| Welcome, Sandra | 6 | 1.2 | 8 |
| Heimbigner-Moore, Lisa | 6 | 1.1 | 9 |
| Pineda, Joelyn | 6 | 1.1 | 10 |
| Nilova, Oksana | 6 | 1 | 11 |
| Macleod, Matt | 6 | 1 | 12 |
| Dey, Bali | 6 | 1 | 13 |
| Wallace, D'Andra | 6 | 0.9 | 14 |
| Dedmon, Robert | 6 | 0.9 | 15 |
| De Abaitua, Marc | 6 | 0.9 | 16 |
| Roth, Christopher | 6 | 0.9 | 17 |
| Kinney, Evelyn | 6 | 0.9 | 18 |
| Carrier, Andrea Greer | 6 | 0.9 | 19 |
| Park, Jesse | 6 | 0.8 | 20 |
| Kennedy, Lawrence | 6 | 0.8 | 21 |
| Jeffery, Leon | 6 | 0.8 | 22 |
| Closson, Lorrie | 6 | 0.8 | 23 |
| Garcia, Lisa | 6 | 0.8 | 24 |
| Partida, Priscilla | 5 | 1.4 | 1 |
| Mcgruddy, Michael | 5 | 1.3 | 2 |
| Armstrong, Shalena | 5 | 1.3 | 3 |
| Smith, Courtney | 5 | 1.2 | 4 |
| Keele, Jarrett | 5 | 1.2 | 5 |
| Hardcastle, Amanda | 5 | 1.2 | 6 |
| Promubol, Jim | 5 | 1.1 | 7 |
| Bloedow, Sarah | 5 | 1.1 | 8 |
| Smith, Susan | 5 | 1.1 | 9 |
| Denby, Brett | 5 | 1.1 | 10 |
| Serpico, Nadine | 5 | 1 | 11 |
| Frnka, Patrick | 5 | 0.9 | 12 |
| Garcia, Nancy | 5 | 0.8 | 13 |
| Parker, David | 5 | 0.8 | 14 |
| Hadnot, Bridgette | 5 | 0.8 | 15 |
| Yazzolino, Diana | 5 | 0.9 | 16 |
| Scimmons, Janice | 5 | 0.7 | 17 |
| Williams, Sean | 5 | 0.7 | 18 |
| St. Arnaud, Christian | 5 | 0.9 | 19 |
| Hund, Douglas | 5 | 0.6 | 20 |
| Bollu, Deepthi | 4 | 1.3 | 1 |
| Tickle, Michael | 4 | 1.2 | 2 |
| Parr, Sheetal | 4 | 1 | 3 |

**Appendix 243**

| | | | |
|---|---|---|---|
| Moore, Robert | 4 | 0.9 | 4 |
| Meilleur, Sean | 4 | 0.9 | 5 |
| To, Rosemary | 4 | 0.9 | 6 |
| McCain, Shelley | 3 | 1.3 | 1 |
| Yorgason, Karen | 3 | 1.2 | 2 |
| Hartnett, Jennifer | 3 | 1.2 | 3 |

**From:** Bowman, Beth A SENA-STE/3
**Sent:** Tuesday, November 25, 2014 1:47 PM
**To:** Rangan, Sri SENA-STE/34
**Subject:**

Can you give me rankings—1 to x for each job grade.
In other words, for your 1.0 people, how do they rank relative to each other.

Teri asked about Patrick Frnk.  He went from 1.2 to .9

Companies within the Shell Trading business may monitor and record communications for legal, regulatory and/or business purposes. Such communications will be controlled by Shell Energy North America (US) LP on behalf of all Shell Trading entities within the United States and by Shell International Trading and Shipping Company Ltd for all other Shell Trading entities. Personal data is handled and protected in accordance with applicable data protection laws and relevant Shell policies and rules. Personal data may be disclosed to other Shell companies and to third party organizations providing services to the relevant Shell Company or as required by law.

ShellDedmon_000866

# Exhibit 20

# Shell 2015 job grade transfer form



# Transfer Form

Request date:        21 Feb 2015 at 00:15:40
Shell People reference:  602432439

| Reference Customer | Contact Customer |
|---|---|
| Name: Dedmon, Robert | Name: Castro, JC |
| User ID: USRDFR | User ID: PHJCCH |
| Personnel Number: 00235641 | |
| Country: United States | |

## General Details

| Field | New value |
|---|---|
| Type of Transfer | Domestic Transfer |
| Type of Employee (after transfer occurs) | Local (Regular) |
| New Population Indicator | Not applicable |
| Employee Number | 00235641 |
| Employee Name | Dedmon, Robert L |
| New Position Number | 52487435 |
| Position Title | Sales Representative |
| New Supervisor | Hartnett Jennifer |
| Job Title | Marketing Oil, Gas and Power JG5 |
| Cost Centre | 0000087070 |
| Country of Employment | United States |
| Personnel Area | USAF - HOUTHC |
| Personnel Subarea | 1114 - Staff - Adm |
| Receiving Employing Company | 7247 - SHELL TRADING SERVICES COMPANY |
| Receiving Present (Host) Company | 7247 - SHELL TRADING SERVICES COMPANY |
| Work Location | HOU-OTM - Houston - One Thousand Main |
| Domestic Relocation | No |
| Receiving Line of Business (LoB) | TR - Trader |
| Desired First Day on Payroll (FDP) | 16 Mar 2015 |
| Anticipated Length of Assignment | 4 years |
| Secondment | Not applicable (no secondment) |
| Promotion on Transfer? | Yes |
| Pay Structure Change in Base Country? | No |
| Type of Pay Structure after Transfer | Range |

## Base Salary Details in Base Country

| Field | New value |
|---|---|
| Pay Type in Base Country after Transfer | 07 - Salaried Staff |
| Pay Area in Base Country after Transfer | A3 - Tier 1 |

CONFIDENTIAL

**Appendix 246**



## Transfer Form

Request date:          21 Feb 2015 at 00:15:40
Shell People reference: 602432439

| Field | New value |
|---|---|
| SG in Base Country after Transfer | 05 |
| SG Level in Base Country after Transfer | 00 |
| Eligible for Sales KPI Bonus (IT758) | R-Non-Sales |
| Current Base Salary in Base Country | 103 600.08000 |
| Current Base Salary in Base Cty Currency | USD5 – United States Dollar (5 Decimals) |
| Current Base Salary PIR (%) in Base Cty | 95.05 |
| Pay As You Go Applicable? | No |
| New Base Salary in Base Country | 114 000.00000 |
| New Base Salary in Base Country Currency | USD5 – United States Dollar (5 Decimals) |

## Other Details

| Field | New value |
|---|---|
| Market Competitive Allowances (MCA) | |
| Market Competitive Allowances (MCA) Curr | |
| Other Pensionable Allowances | |
| Other Pensionable Allowances Currency | |
| Other Pensionable Allowances Reason | |
| Other non Pensionable Allowances | |
| Other non Pensionable Allowances Curr | |
| Other non Pensionable Allowances Reason | |
| Work Schedule (days/hours/schedule) | USF58DAY |
| Staff Percentage (in %) | 100 |
| Open Resourced? | Yes - Broadcast |
| Receiving HR Contact Name | Castro, JC |
| Current HR Contact Name | Nallie, Elena |
| Confirm separate pay structure checked? | Yes |
| Additional Comments | |

**Appendix 247**

CONFIDENTIAL

# Exhibit 21

# 1996 New York Times Article

The New York Times

https://www.nytimes.com/1996/11/22/opinion/shell-oil-s-own-little-problem.html

**IN AMERICA**

# Shell Oil's Own Little Problem

**By Bob Herbert**

Nov. 22, 1996

See the article in its original context from November 22, 1996, Section A, Page 31    Buy Reprints

New York Times subscribers* enjoy full access to TimesMachine—view over 150 years of New York Times journalism, as it originally appeared.

<div style="border:1px solid #ccc; padding:1em; text-align:center">SUBSCRIBE</div>

*Does not include Crossword-only or Cooking-only subscribers.

*About the Archive*

*This is a digitized version of an article from The Times's print archive, before the start of online publication in 1996. To preserve these articles as they originally appeared, The Times does not alter, edit or update them.*

*Occasionally the digitization process introduces transcription errors or other problems; we are continuing to work to improve these archived versions.*

The Shell Oil Company and Texaco Inc. are contemplating a multibillion-dollar merger of their refining and marketing operations in the U.S. Last week, in a letter to employees, the president of a Shell subsidiary expressed concern about the race discrimination controversy swirling about Texaco.

"Compatibility in values and standards of integrity between two parties considering entering into a relationship are critically important," wrote Jim Morgan, president of the Shell Oil Products Company.

"I want to assure you," he said, "that we have no intention of entering into any relationship that is not based on high ethical standards and the utmost respect for individuals."

Mr. Morgan did not mention in his letter that the Shell Oil Company and Shell Oil Products are defendants in two Federal lawsuits alleging racial discrimination against black employees. The suits, one filed in San Francisco, the other in Houston, are scheduled for trial next year. The plaintiffs are all veteran Shell employees who claim that despite having worked hard and well for many years they have been permanently relegated to lower-paying, lower-prestige positions because of their color.

One employee, an engineer named Jimmy Hunter, asked his supervisor in 1988 why his career had stalled. He said the supervisor replied, "I don't know why you still have shackles around your ankles."

Each of the plaintiffs have stories of racially degrading comments and conduct by white supervisors and fellow employees. One plaintiff was greeted at a company reception with the remark, "We saved the watermelon for you."

At Shell, pay grades 5 through 12 cover starting to mid-level positions. Grades 13 and higher are senior and executive management slots. In the entire history of Shell Oil, only two African-Americans have ever been promoted to grade 13. The plaintiffs in the two lawsuits are all in retail marketing. No black employee in retail marketing has ever been promoted to Grade 13.

Mr. Hunter has been a Shell employee since 1979 and has twice won the company's top honor, the Laurel Society Award. The last time he won it was in 1989, when he was at grade 9.

**Appendix 250**

"Then he ran into the same thing as everybody else," said Christina Benitez Wilcox, one of the plaintiffs' attorneys. "He hit a dead end and has not received a promotion since."

Another plaintiff, Sharon Ambeaux, came up with a sales promotion scheme called "Crazy Days" that, according to her lawyer, was used by Shell for three years and made the company a great deal of money. But the lawyer, Dominique Shelton, said Ms. Ambeaux had never been properly recognized for her contribution and remains, like Mr. Hunter, stuck at the grade 9 level after 17 years. Other plaintiffs are mired in even lower grades.

A spokeswoman for Shell, in a prepared statement, said, "Our position is we believe there is no basis for the claims in these lawsuits." The company insisted it was committed to "equal opportunity" and described the plaintiffs as "valued employees."

The plaintiffs in the lawsuits against Shell are not troublemakers; they are people to whom trouble came unbidden. They have worked hard and all they have wanted was to be treated fairly. Instead, they have seen a succession of white employees come in behind them and zoom right past them. They look at the offices that line the corridors of power at Shell and the message they receive is that people of their color cannot go there.

I think the plaintiffs are heroes. In the vast majority of cases, black people and women, when they are unfairly discriminated against, hold their tongues, swallow their pride and silently endure the hurt, the rage and the humiliation inflicted upon them, thus encouraging their tormentors to do the same to others.

Very few people want to sign on to a discrimination suit. It is a long and, for the most part, unsatisfying experience -- extremely difficult, extremely ugly and extremely emotionally debilitating. But it is a way of fighting back, not just for oneself but for others in similar circumstances.

**Appendix 251**

It is a way of saying to people who wield their power wantonly and illegally: Back off, or you will pay a severe price. Texaco is learning, and so is the partner it hopes to share billions with.

A version of this article appears in print on , Section A, Page 31 of the National edition with the headline: Shell Oil's Own Little Problem

# Exhibit 22

## *Rodriguez v. Shell*
## Charge of Discrimination

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☑ FEPA<br>☑ EEOC | |

Texas Workforce Commission—Civil Rights Division                    and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.)<br>Sonia Rodriquez | HOME TELEPHONE (Include Area Code)<br>(832) 894-5396 | DATE OF BIRTH |
|---|---|---|

| STREET ADDRESS<br>3406 Danbury Chase Trail | CITY, STATE AND ZIP CODE<br>Fresno, Texas 77545 | |
|---|---|---|

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>Equilon Enterprises LLC d/b/a Shell Oil Products US | No. Employees, Members<br>Over 500 | Phone No. (include Area Code)<br>(713) 241-6161 |
|---|---|---|

| STREET ADDRESS<br>P.O. Box 4282 | CITY, STATE AND ZIP CODE<br>Houston, TX 77210-4282 | |
|---|---|---|

| NAME | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | |
|---|---|---|

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☑ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☑ RETALIATION   ☑ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **2013**    Latest **10/17**

☑ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I worked for Shell since 1992. In 2013, Sonja Gonzales became the HR Manager for the Global Functions Group. At the time, there were five African-Americans in the group. She forced out Debra McGregor, and terminated three others (Adrienne Guy, Joseyln Darby and Sherrell Davis) within the first year or two. Gonzales also discriminated against me and gave me poor Individual Performance Factor ratings that were not justified.

As part of my job duties as an HR Advisor, I told employees who were let go in a RIF about their terminations. Gonzales instructed me to tell such persons that they were not being replaced. But, they often were being replaced, and Gonzales knew that. When deciding whom to select for a RIF, Gonzales and Shell HR reviewed Demographic Sheets that included employees' ages, races, and the number of points they had towards their retirement pension, which is based on tenure and age. A large and seemingly disproportionate number of employees selected for RIFs were 50+ years old.                                    (continued on attached page)

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>X S. Ro~<br>**10 27 17**<br>Date        Charging Party (Signature) | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br><br>SIGNATURE OF COMPLAINANT<br>X S- Ro~<br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(Day, month, and year) |

EEOC FORM 5 (REV. 3/??)   RECEIVED

OCT 26 2017

HOUSTON
DISTRICT OFFICE
EEOC

Unofficial Copy from Harris County Burgess District Clerk

LISA M GREER
NOTARY PUBLIC-STATE OF TEXAS
COMM. EXP. 11-09-2019
NOTARY ID 12831803-7

CONFIDENTIAL

**EXHIBIT**
9

SHELL000326

(continuation of Charge)

I was the oldest employee in the group, and the only one over the age of 50. The other two HR Advisors in the group at the time of my termination were Cynthia Salazar and Laura Martinez, both of whom are Hispanic and significantly under the age of 40. I had been with Shell far longer than them. Yet, in 2014, Gonzales took work from me and gave it to Salazar, and then used that as a basis to promote Salazar to a job grade 6 position, while leaving me at the lower job grade 7.

I had never received any discipline during my 25+ years of employment with Shell. On Monday, October 9, 2017, Gonzales fired me on the false and pretextual basis that I had committed a Data Privacy breach. At the time I was fired, I was the sole remaining African-American employee in the group. Thus, with my termination, there are no more African-American employees in the group. I was not offered severance. I believe that Shell discriminated against me based on my race (African-American) and age (51 years old), in violation of the Texas Commission on Human Rights Act, Tex. Lab. Code Ann. § 21.001, Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and the Age Discrimination in Employment Act, 29 U.S.C. § 621.

RECEIVED

OCT 26 2017

HOUSTON
DISTRICT OFFICE
5500

CONFIDENTIAL SHELL000327

**Appendix 255**

# Exhibit 23

## *Sheikh v. Shell*
## Charge of Discrimination

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **460-2021-02915** |

| **TEXAS WORKFORCE COMMISSION CIVIL RIGHTS DIVISION** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)*<br>**MR. FAROOQ SHEIKH** | Home Phone<br>**(832) 732-0377** | Year of Birth |
|---|---|---|

Street Address
**15818 PEBBLE CREEK TRAIL, CYPRESS,TX 77433**
City, State and ZIP Code

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (*If more than two, list under PARTICULARS below.*)

| Name<br>**SHELL OIL PRODUCTS U.S.** | No. Employees, Members<br>**501+** | Phone No.<br>**(832) 337-4833** |
|---|---|---|

Street Address
**150 N DAIRY ASHFORD RD, HOUSTON, TX 77079**
City, State and ZIP Code

| Name | No. Employees, Members | Phone No. |
|---|---|---|

Street Address
City, State and ZIP Code

| DISCRIMINATION BASED ON *(Check appropriate box(es).)* | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☒ COLOR  ☐ SEX  ☒ RELIGION  ☒ NATIONAL ORIGIN<br>☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION<br>☐ OTHER *(Specify)* | Earliest **03-01-2016**  Latest **07-14-2021**<br>☒ CONTINUING ACTION |

THE PARTICULARS ARE (*If additional paper is needed, attach extra sheet(s)*):

**I. On or around Mar-Apr 2016, I began to be subjected to harassment while working in Singapore because of my race, skin color, national origin, and religion. This discriminatory treatment continued throughout my tenure in Singapore through Dec 2019, peaking in May 2019 with the Euro 5 project reset when there was a formal request for removing me from my job from Singapore based senior management, as communicated to me by my supervisor. I was subjected to significant workplace defamation with underlining discrimination, including Libel (written Euro 5 look back report). Respondent is an Oil business. I worked as a Business Opportunity Manager (job grade 1) at their refinery and office in Singapore (U.S. citizen expat).**

**II. Co-workers and senior management staff in Singapore addressed me in a condescending way, calling people of my ethnic origin 'scum of the planet,' and telling me 'you are not Dutch, but Indian.' They told me that they were 'not used to seeing dark-skinned people from India in senior positions teaching us here.' My religion (Islam) was targeted, falsely creating a Hindu-Muslim divide, and casting me negatively. My direct supervisor, Graham Fraser, a**

| I want this charge filed with both the EEOC and the State or Local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br><br>**Digitally signed by Farooq Sheikh on 07-16-2021 06:10 AM EDT** | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(*month, day, year*) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 460-2021-02915 |

| TEXAS WORKFORCE COMMISSION CIVIL RIGHTS DIVISION | and EEOC |
|---|---|
| *State or local Agency, if any* | |

**white male of British Nationality, repeatedly told me that I 'needed a name like Mike' to find a job with Respondent in the U.S., in response to my inquiring for a U.S. based job. This feedback from Graham was given repeatedly, including on internal Shell Skype (software) calls. On 5 July 2019, I filed an internal discrimination complaint on the company's online web portal, but Respondent's office in Singapore did not investigate (as confirmed by HR in Oct 2019). HR also did not intervene to address the workplace defamation as requested repeatedly by me. Instead, I was then retaliated against when I was rejected for 74 of the 75 internal jobs that I applied for during Nov 2019-Apr2020 when my department (Manufacturing Support & Excellence) restructured and I was told to apply for a new job or face termination on 31 May 2020. I was told by my direct supervisor 'it may not work in Shell based on direct recent feedback from Singapore, and that senior management has formed negative opinions about you' in response to my internal job applications.  I was also advised to look externally for a job. This was in stark contrast to my internal job applications previously in 2015 (Houston based) when I applied for 5 internal jobs and got 3 interviews, and 2 job offers, both a promotion at job group 1. In 2020, after returning from Singapore, the only job I got was commercial manager with Shell India, after I repeatedly pleaded with HR to avert a job loss for me. I accepted the role as I did not want to be terminated. However, it was a demotion to Job group 2, required me to relocate to India on a full time basis (leaving family with U.S. born children in Houston), and with a 75% net pay cut pending transfer to India. The other Business Opportunity Managers (my peers) were all able to get comparable jobs in Shell - Jan Huinink, Axel Ecke, Roland Spronk, Ker-Kuan Tan, Diana Van Eck, Eduard Geus, Michael Bilello, and Mike Mensik (last two are U.S. based). I was the only Business Opportunity manager denied hire for a comparable job in Shell. However, I had worked for the company for 10 years and had no problems until I complained about discrimination, and had strong rating written annual performance reviews. In Apr 2020, the company's office in Houston finally investigated my complaint and advised me in Aug 2020 that my allegations are unsubstantiated, while 'noting improvement opportunities' (quoting Shell HR verbatim). I then requested for mediation to address the adverse career impact which took place on Dec 4 2020 and company refused to take any concrete actions. In June, 2021, I was further retaliated against when I was advised that I could not apply under the global reorganization (reshape round 2) with 243 U.S. based job group 1 and 2 positions, out of which 8 preferred or required Business Opportunity Manager experience, a position I have directly worked in for 4 years with strong rating annual performance reviews. I had submitted a medical certificate to Respondent's health office in Houston, advising that my medical condition poses an elevated health risk for me moving to India on a full time basis with Covid, given the severity of the Covid spike in India in May-Jun 2021 (significant change in circumstances from early 2020 when I had accepted the India role), and requested approval to apply for internal U.S. based roles in June, 2021, given I am a U.S. citizen with Houston as my base location in Shell. This request was denied. I believe the Respondent is trying to make me quit.**
**III. I believe that I have been discriminated against because of race/ethnicity (Asian), dark skin color, national origin (Indian), and religion (Islam), and retaliated against, in violation of**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Farooq Sheikh on 07-16-2021 06:10 AM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

**Appendix 258**

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 460-2021-02915 |

**TEXAS WORKFORCE COMMISSION CIVIL RIGHTS DIVISION** and EEOC

*State or local Agency, if any*

**Title VII of the Civil Rights Act of 1964, as amended.**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Farooq Sheikh on 07-16-2021 06:10 AM EDT** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

**Appendix 259**

# Exhibit 24

# Shell
# fair pay policy

# FAIR PAY IN SHELL



At Shell we power lives and livelihoods by contributing to a diverse and inclusive society. We hire people from many different backgrounds and pay is an important part of the employee experience. We commit to deliver fair and competitive pay, so that all of our employees* are valued, respected and recognised for the work that they do.

## Pay in Shell is...

### Market Competitive

To attract and retain great talent we ensure that our pay is positioned competitively

- We pay competitively. We check our pay regularly against the market to ensure this.

### Free from bias

In line with our Group core values and Diversity & Inclusion standards

- We will not pay differently due to gender, ethnicity or other characteristics.
- We limit the opportunity for bias through:
  - Internal processes to ensure consistent treatment e.g. job evaluation, pay structures.
  - Line leader and HR training for key activities such as recruitment, performance calibration etc.
  - A standard, automated approach for salary increase and bonus.
  - Regular equal pay audits.

### Providing security

For the essential care and wellbeing of our employees and their families

- We provide a regular income through a base salary.
- To provide employees with peace of mind, we have the minimum global benefits standards in place for life/accident/disability cover, and maternity.
- We expect that our employees can meet their basic needs through the pay and benefits that we provide. We check living wage benchmarks to confirm this.

## For our employees we commit to...

### Clear performance expectations

We reward competitively for strong delivery, and offer higher rewards for top performers

- Our line leaders agree an employee's individual goals to help them succeed in their role.
- Annual pay and bonuses will be differentiated according to company delivery and individual contribution and performance.

### Opportunity to share in success

Leading in our industry relies on the power of each of us to outperform our competition, and for that, we can all share in success.

- When the company performs well, our employees financially benefit through:
  - A competitive Performance Bonus, linked to individual and business performance.
  - Where available, participation in employee share plan arrangements.
  - Since our senior employees are accountable for leading the delivery of Shell's strategic priorities, a large proportion of their pay is variable and dependant on that success.

### Transparency and accuracy

Access to information and clear communication of pay outcomes

- We assure timely delivery of pay and monitor payroll accuracy.
- Information can be accessed on Directors' Remuneration and CEO Pay Ratio in Shell's Annual Report.
- Our employees have the opportunity to share their thoughts on pay in Shell through the annual employee engagement survey.


"My pay is set in line with my skills/job level and the local country pay market"


"My line manager helped me to understand how bias is mitigated during performance calibration"


"Shell's global maternity standard enabled me to take paid leave to spend more time with my new family"


"My line leader and I agreed clear goals and for my delivery I received a competitive bonus"


"Each year I have a competitive bonus opportunity that is linked to group business results"


"I receive an annual reward statement and have access to Shell's pay policies to help me understand how my pay is determined"



* Some policies may vary for different employee groups, but all are subject to the same principles.

**Appendix 261**

Dedmon 001002

# Exhibit 25

# Shell's EEOC
# Position Statement



<div align="right">

Sarah Hutnek, HR Consultant
c/o Laura Moses, Employee Relations Advisor
150 N. Dairy Ashford
Houston, TX 77090

</div>

May 7, 2021

Rafael Rivera, EEOC Investigator
rafael.rivera@eeoc.gov
Re: EEOC/TWC Charge #: 460-2021-00333

Dear Investigator Rivera,

This Position Statement is in response to the above-referenced charge of race and color discrimination filed by Mr. Robert Dedmon ("Mr. Dedmon") against Shell Exploration & Production Company ("Shell" or the "Company") (referred to as "the Charge"). Mr. Dedmon's allegations that he was discriminated against based on race and color are without merit. As an initial matter, the Charge is untimely, as the Charge was filed in October 2020, which does not fall within 180 days of the date Mr. Dedmon was hired in April 2019. Even if the Charge is timely, the facts provided herein supports Shell's position that the its decision to grade Mr. Dedmon's position as a as a Job Grade 6 Sales Representative on the Marketing Oil, Gas and Power team was based on non-discriminatory, legitimate business reasons.

This Position Statement is based on Shell's current understanding of the facts, and the Company reserves the right to supplement, correct, modify, or change the Position Statement if new information becomes available.

**Employer Background Information:**

Our global trading network gives us a 24-hour market presence. We are active in most crude oil markets, sourcing from a wide range of suppliers and selling to a wide range of customers both within and outside Shell. The same global coverage applies to refined products and feedstocks, natural gas and power. Our 50 years of experience in the natural gas industry makes us one of the world's most experienced players: our supply portfolio includes access to significant volumes of equity LNG and gas-to-liquids products.

Shell Trading companies operate around the world, with the main trading and marketing locations comprising Houston, London, Dubai, Rotterdam and Singapore. Shell Energy Europe manages Shell's European gas and power marketing and trading business and CO2 trading globally. Shell Energy North America (US and Canada) markets Shell's North American natural gas production, which benefits from access to power generation and gas storage assets.

Our aim is to create value for Shell's shareholders, customers and counterparties across the globe by forging successful partnerships that generate mutually beneficial commercial opportunities.

**Equal Employment and Anti-harassment Policies:**

The Company is an equal opportunity employer that prohibits discrimination based on race, color, national origin, ancestry, religion, religious creed, age, disability, physical disability, mental disability, medical condition, marital status, sex, sexual orientation, gender, gender identity, gender expression, military and veteran status, citizenship, genetic information and any other protected status under federal, state or local laws. The Company maintains clear policies against discrimination and retaliation that are published annually, visibly posted in the workplace, and further communicated to employees via an internal website. Please see the Company's Equal Opportunity and Anti-Harassment Policies attached as **Exhibits A and B**.

The Company's Code of Conduct and General Business Principles are a common reference point for anyone who is unclear about what is expected of them in a specific situation and provides a definitive statement of the Company's response to

**Appendix 263**

many different issues and questions. Incorporated in the Code of Conduct is a "People" section, which reinforces our policies on equal opportunity and harassment.  All employees are expected to follow the Code of Conduct.  Employees have several methods available to them for reporting discrimination, harassment and related complaints, including a confidential hotline. A copy of this policy is attached as **Exhibit C**.

### Statement of Facts Concerning Mr. Dedmon's Allegations:

Mr. Robert Dedmon joined Shell on August 19, 2014 as a Job Grade 6 Sales Representative on the Marketing Oil, Gas and Power team. The role was created May 1, 2014 as a new position on the Marketing Oil, Gas, and Power team. Approximately 7 months after joining Shell, Mr. Dedmon applied for a Job Grade 5 Sales Representative role on the same team. After a comprehensive internal application process, Mr. Dedmon was determined to be the successful candidate in the Job Grade 5 role and moved into the role effective March 16, 2015. The role Mr. Dedmon left was filled by another internal candidate at a Job Grade 6 level. The organization reorganized effective January 1, 2017 and the Job Grade 6 role Mr. Dedmon, and later his successor, previously occupied was made redundant. Mr. Dedmon has since occupied a variety of roles at the Job Grade 5 level within the Shell Trading and Supply business.

### Response to Allegations

*Particular I:* "The Shell Vice President of Human Resources [Teri Olmen], at the time, communicates the final new-hire, job grades that set salary range."

> *Response:* Ms. Teri Olmen, during her time in Shell's Trading and Supply business, was not Vice President of Human Resources. Ms. Olmen's title was Human Resources Account Manager Oil/GP Trading and Shipping. At no point was Ms. Olmen the Vice President of Human Resources. All further references to her as such should be corrected to reflect her true title of Human Resources Account Manager Oil/GP Trading and Shipping.

> For Jobs Job Grade 6 and below, Shell managers set the Job Grade of the role and consider financial responsibility, autonomy, complexity of tasks, and the Hay methodology. For Jobs Job Grade 5 and above, the Job Evaluation team is involved in evaluating the role per the dimensions, responsibilities, and qualities of the role. In 2014, Human Resources Account Managers were not responsible for setting Job Grade, however, they would have worked with the hiring manager to ensure accuracy of Job Grade based on the hiring manager generated job descriptions. In addition, Shell's central US Compensation Team creates and sets the various salary structures for the multitude of roles at Shell based on competitive market data and comparative roles in the industry. Each salary structure is a range of salaries for each job grade. The Job Grade compensation structures do overlap, therefore meaning that part of the higher range of a Job Grade 6 would be the same or similar for the lower end of a Job Grade 5. For example, in 2014, the salary range for a Job Grade 6 was $77,000 to $127,000. A Job Grade 5 salary range was $93,000 to $152,000. The structures have been created in such a way to allow for competitive compensation growth and merit rewards within a role.

*Particular II:* "Shell posts a job in Houston, Texas at grade 5 and later offers this job at grade 5 to someone who is not a black male. That person declines the job offer."

> *Response:* Pursuant to Shell's record retention schedule and relevant legal requirements, Shell cannot verify the events as stated. Additionally, per Shell's practice, Job Grades are not advertised externally nor are they included in Job offers sent to candidates. However, the information regarding the job confirms that the business determined that the role was a Job Grade 6 role, as Mr. Dedmon and his predecessor both performed the role at a Job Grade 6 until the role was eliminated in 2017.

*Particular III:* "Shell then decides to offer the job to me. Before Shell communicates the offer to me, the Shell Vice President of Human Resources changes the job grade from a 5 to 6, which lowers the salary."

> *Response:* Pursuant to Shell's record retention schedule and relevant legal requirements, Shell cannot verify the events as stated. However, the Hiring Manager is the decision maker for the role responsibilities which then aligns to what Job Grade is most appropriate. A Human Resources Account Manager would not be able to unilaterally make the change to the job grade, but they could assist the hiring manager with adjusting role

responsibilities to ensure compliance with the existing Job Evaluation Job Grading Frameworks. In addition, the salary Mr. Dedmon was offered as a Job Grade 6 Sales Representative overlaps between the two job grades, 5 and 6. Therefore, it is possible that had the role been a Job Grade 5, he could have been offered the same salary. For example, in 2014, the salary range for a Job Grade 6 was $77,000 to $127,000. A Job Grade 5 salary range was $93,000 to $152,000. As Mr. Dedmon's starting salary was $100,000, his salary fell within both ranges.

_Particular IV:_ "A Shell hiring manager [Sri Rangan], opposes this downgrade and questions the Shell Vice President of Human Resources about this downgrade."

> _Response:_ Ms. Sri Rangan is no longer an employee with Shell, and therefore we are unable to verify this statement.

_Particular V:_ "The Shell Vice President of Human Resources responds along the lines of this: 'People of color struggle at being successful [hence the lower job grade]. He needs to prove that he is capable of handling a role of this significance, or we would be setting up for failure.'"

> _Response:_ The parties involved are no longer at Shell, therefore we are unable to verify if the events occurred as stated. However, as per the Equal Opportunity policy attached in Exhibit A, Shell is committed to Equal Opportunity in our hiring, job evaluation, and compensation practices.

_Particular VI:_ "The Shell Hiring Manager reports to a supervisor that this downgrade is happening because the new hire is black… So, the Shell hiring manager follows up with the Shell Vice President of Human Resources and says something along the lines of this: 'I understood that you wanted me to offer this at a lower-paying job grade because he is black.' The Shell Vice President of Human Resources responds along the lines of this: 'Historically, minorities do not do well at Shell, so we do not want to set him up to fail by starting him at a higher [ranked, paying] job grade.'"

> _Response:_ The parties involved are no longer at Shell, therefore we are unable to verify if the events occurred as stated. For the duration this position was active incumbents were all a Job Grade 6.  As noted above, this position remained a Job Grade 6 after Mr. Dedmon moved to another position on May 1, 2014 and continued to remain a Job Grade 6 until this position was eliminated in a 2017 re-organization.

_Particular VII:_ "The Shell Hiring Manager complies with the directive but formally reports her opposition internally. Shell tells her an investigation will happen. Shell later tells her it has closed the matter and will not be telling her the results."

> _Response:_ Shell could not verify any record of the alleged complaint or an investigation into the issue in the timeframe described (2014-2015). Shell Human Resources is committed to investigating any and all complaints of discrimination or violations of equal opportunity. As per the investigation process, Shell Human Resources professionals do not share specifics of investigations when they occur with the reporter in order to preserve confidentiality and anti-retaliation. However, Human Resources professionals may share the outcome of whether or not the claims were substantiated or not.

_Particular VIII:_ "It could be that Shell had a formal or informal policy of starting black males [and perhaps other people of color] at lower-paying job grades."

> _Response:_ Shell does not have any policies of starting people of color at lower paying job grades. Shell is committed to Equal Opportunity in our hiring, job evaluation, and compensation practices. Mr. Dedmon applied for the Sales Representative role that was determined to be a Job Grade 6 by the hiring manager and was ultimately the successful candidate. Mr. Dedmon was offered a salary that was within the Job Grade 6 salary structure range and he accepted the terms of the offer.

_Particular IX:_ "It could also be that Shell did not properly train or supervise its human resources personnel or other decision-makers and so left the discrimination unchecked."

**Appendix 265**

*Response:* Annually, all Shell employees are required to take trainings related to the Code of Conduct, which covers Equal Opportunity and anti-discrimination policies – including Shell Human Resources professionals. In addition, the Compensation team at Shell also conducts equity reviews as part of the annual compensation process.

*Particular X:* "This summer, I learn for the first time about the pay discrimination. So, the factual information above is based on information provided by others. Shell never informed me that it made any effort to correct the pay disparity… I believe the discrimination continues with each paycheck because Shell started me [and perhaps others] at a lower pay rate due to race and color."

*Response:* Shell asserts that the information provided to Mr. Dedmon via "others" is not a factual representation of the events. Mr. Dedmon applied to the role of Sales Representative at a Job Grade 6 level in 2014 and was offered a salary that was within the designated range of Job Grade 6 roles at Shell. This position remained a Job Grade 6 for all incumbents that were in this position, including Mr. Dedmon's successor, until the position was eliminated as part of a re-organization in 2017.  Additionally, seven months after joining Shell, Mr. Dedmon applied for a promotional role to a Job Grade 5 and was successful in obtaining that role. His salary increase was in accordance with Shell's policies related to salary progression and promotions, and Mr. Dedmon has received merit increases aligned with the rest of Shell yearly.

**Summary/ Conclusion:**

This Position Statement is only a summary of the evidence gathered by the Company to respond to this Charge. In the event of further proceedings, the Company reserves the right to provide further details underlying its position. Furthermore, this Position Statement is based on the Company's preliminary investigation conducted as of this date. In the event that further information or additional facts become available, the Company reserves the right to supplement or amend its explanation of the facts. Nevertheless, we believe that the information stated herein is accurate and more than sufficient to inform the Commission that the Charge of Discrimination is without merit.

Mr. Dedmon failed to file the Charge within 180 days of the alleged discriminatory action, as he was hired in 2014 and did not file the Charge until 2020. However, even if the Charge was timely filed, Shell found no facts to support Mr. Dedmon's alleged discrimination that his initial Job Grade was determined for any discriminatory reason. Instead, the facts indicate that Mr. Dedmon's allegations are without merit and that the role was designated as a Job Grade for legitimate business reasons.  Further, the Company has well-established policies prohibiting discrimination, harassment, and retaliation. Therefore, the Company respectfully requests this Charge be dismissed.

Regards,

*Sarah Hutnek*

Sarah Hutnek
HR Consultant

**Attachments:**
Exhibit A – Equal Opportunity Policy
Exhibit B – Anti-Harassment Policy
Exhibit C – Code of Conduct

**Appendix 266**

# Exhibit 26

# Section 1981

## *42 USCS § 1981, Part 1 of 4*

Current through Public Law 118-106, approved October 4, 2024.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164)  >
CHAPTER 21. CIVIL RIGHTS (§§ 1981 — 2000h-6)  >  GENERALLY (§§ 1981 — 1996b)*

## § 1981. Equal rights under the law

**(a) Statement of equal rights.**   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined.**   For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment.**   The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

## History

HISTORY:

R.S. § 1977; Nov. 21, 1991, *P. L. 102-166*, Title I, § 101, *105 Stat. 1071*.

United States Code Service
Copyright © 2024 All rights reserved.

**End of Document**

# Exhibit 27

# Title VII

## *42 USCS § 2000e-2, Part 1 of 8*

Current through Public Law 118-106, approved October 4, 2024.

*United States Code Service  >  TITLE 42. THE PUBLIC HEALTH AND WELFARE (Chs. 1 — 164)  >  CHAPTER 21. CIVIL RIGHTS (§§ 1981 — 2000h-6)  >  EQUAL EMPLOYMENT OPPORTUNITIES (§§ 2000e — 2000e-17)*

## § 2000e-2. Unlawful employment practices

**(a) Employer practices.**   It shall be an unlawful employment practice for an employer—

**(1)**  to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)**  to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**(b) Employment agency practices.**   It shall be an unlawful employment practice for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin, or to classify or refer for employment any individual on the basis of his race, color, religion, sex, or national origin.

**(c) Labor organization practices.**   It shall be an unlawful employment practice for a labor organization—

**(1)**  to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

**(2)**  to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

**(3)**  to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

**(d) Training programs.**   It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

**(e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin; educational institutions with personnel of particular religion.**   Notwithstanding any other provision of this title [*42 USCS §§ 2000e* et seq.], (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other

**Appendix 270**

educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

**(f) Members of Communist Party or Communist-action or Communist-front organizations.**   As used in this title [*42 USCS §§ 2000e* et seq.], the phrase "unlawful employment practice" shall not be deemed to include any action or measure taken by an employer, labor organization, joint labor-management committee, or employment agency with respect to an individual who is a member of the Communist Party of the United States or of any other organization required to register as a Communist-action or Communist-front organization by final order of the Subversive Activities Control Board pursuant to the Subversive Activities Control Act of 1950.

**(g) National security.**   Notwithstanding any other provision of this title [*42 USCS §§ 2000e* et seq.], it shall not be an unlawful employment practice for an employer to fail or refuse to hire and employ any individual for any position, for an employer to discharge any individual from any position, or for an employment agency to fail or refuse to refer any individual for employment in any position, or for a labor organization to fail or refuse to refer any individual for employment in any position, if—

    **(1)**  the occupancy of such position, or access to the premises in or upon which any part of the duties of such position is performed or is to be performed, is subject to any requirement imposed in the interest of the national security of the United States under any security program in effect pursuant to or administered under any statute of the United States or any Executive order of the President; and

    **(2)**  such individual has not fulfilled or has ceased to fulfill that requirement.

**(h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions.**   Notwithstanding any other provision of this title [*42 USCS §§ 2000e* et seq.], it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this title [*42 USCS §§ 2000e* et seq.] for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended (*29 U.S.C. 206(d)*).

**(i) Businesses or enterprises extending preferential treatment to Indians.**   Nothing contained in this title [*42 USCS §§ 2000e* et seq.] shall apply to any business or enterprise on or near an Indian reservation with respect to any publicly announced employment practice of such business or enterprise under which a preferential treatment is given to any individual because he is an Indian living on or near a reservation.

**(j) Preferential treatment not to be granted on account of existing number or percentage imbalance.**   Nothing contained in this title [*42 USCS §§ 2000e* et seq.] shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this title [*42 USCS §§ 2000e* et seq.] to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by an employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of

**Appendix 271**

persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

**(k) Burden of proof in disparate impact cases.**

    **(1)**

        **(A)**  An unlawful employment practice based on disparate impact is established under this title only if—

            **(i)**  a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

            **(ii)**  the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

        **(B)**

            **(i)**  With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.

            **(ii)**  If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.

        **(C)**  The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".

    **(2)**  A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this title.

    **(3)**  Notwithstanding any other provision of this title [*42 USCS §§ 2000e* et seq.], a rule barring the employment of an individual who currently and knowingly uses or possesses a controlled substance, as defined in schedules I and II of section 102(6) of the Controlled Substances Act (*21 U.S.C. 802(6)*), other than the use or possession of a drug taken under the supervision of a licensed health care professional, or any other use or possession authorized by the Controlled Substances Act or any other provision of Federal law, shall be considered an unlawful employment practice under this title only if such rule is adopted or applied with an intent to discriminate because of race, color, religion, sex, or national origin.

**(l) Prohibition of discriminatory use of test scores.**  It shall be an unlawful employment practice for a respondent, in connection with the selection or referral of applicants or candidates for employment or promotion, to adjust the scores of, use different cutoff scores for, or otherwise alter the results of, employment related tests on the basis of race, color, religion, sex, or national origin.

**(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices.**  Except as otherwise provided in this title [*42 USCS §§ 2000e* et seq.], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

**(n) Resolution of challenges to employment practices implementing litigated or consent judgments or orders.**

42 USCS § 2000e-2, Part 1 of 8

**(1)**

**(A)**  Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

**(B)**  A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws—

**(i)**  by a person who, prior to the entry of the judgment or order described in subparagraph (A), had—

**(I)**  actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

**(II)**  a reasonable opportunity to present objections to such judgment or order; or

**(ii)**  by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

**(2)**  Nothing in this subsection shall be construed to—

**(A)**  alter the standards for intervention under *rule 24 of the Federal Rules of Civil Procedure* or apply to the rights of parties who have successfully intervened pursuant to such rule in the proceeding in which the parties intervened;

**(B)**  apply to the rights of parties to the action in which a litigated or consent judgment or order was entered, or of members of a class represented or sought to be represented in such action, or of members of a group on whose behalf relief was sought in such action by the Federal Government;

**(C)**  prevent challenges to a litigated or consent judgment or order on the ground that such judgment or order was obtained through collusion or fraud, or is transparently invalid or was entered by a court lacking subject matter jurisdiction; or

**(D)**  authorize or permit the denial to any person of the due process of law required by the Constitution.

**(3)**  Any action not precluded under this subsection that challenges an employment consent judgment or order described in paragraph (1) shall be brought in the court, and if possible before the judge, that entered such judgment or order. Nothing in this subsection shall preclude a transfer of such action pursuant to *section 1404 of title 28, United States Code*.

## History

**HISTORY:**

July 2, 1964, *P. L. 88-352*, Title VII, § 703, *78 Stat. 255*; March 24, 1972, *P. L. 92-261*, § 8(a), (b), *86 Stat. 109*; Nov. 21, 1991, *P. L. 102-166*, Title I, §§ 105, 106, 107(a), 108, *105 Stat. 1074*–1076.

United States Code Service
Copyright © 2024 All rights reserved.

**End of Document**

**Appendix 273**