**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| Robert Dedmon, | § | CIVIL ACTION NO. |
|           Plaintiff, | § | 4:21-cv-03371 |
| | § | |
| | § | JUDGE CHARLES ESKRIDGE |
| vs. | § | |
| | § | Jury Demand |
| Shell Exploration & | § | |
| Production Company and | § | |
| Shell Trading Services | § | |
| Company, | § | |
|           Defendants. | § | |

**JOINT PRETRIAL ORDER**

1. **Appearance of counsel**

| | |
|---|---|
| **Plaintiff Robert Dedmon** | Ms. Amy E. Gibson<br>amy@gwfirm.com<br>Mr. David L. Wiley<br>david@gwfirm.com<br>1500 Jackson Street #109<br>Dallas, Texas 75201<br>(214) 522-2121<br><br>Ms. Amanda C. Hernandez<br>amanda@ahfirm.com<br>5718 Westheimer, Suite 1000<br>Houston, Texas 77057<br>(713) 588-4359 |
| **Defendants Shell Exploration & Production Company** *and* **Shell Trading Services Company** | Ms. Marlene C. Williams<br>marlene.williams@ogletree.com<br>500 Dallas Street #2100<br>Houston, Texas 77002<br>(713) 655-0855 |

2. **Statement of the case**

**No agreed statement of the case**

**Robert Dedmon statement of the case**
This is an unlawful employment practices case. It involves claims for race and color discrimination. The allegations include (1) a national unlawful pay practice dating back to at least 2014 and (2) ongoing discrimination concerning compensation and job grades. Shell disputes the allegations.

**Shell Defendants statement of the case**
This is a single-plaintiff race discrimination case brought under Title VII and Section 1981. Plaintiff alleges that Shell paid him less that certain of his White peers because of his race and denied him a promotion in 2021 because of his race. Shell denies Plaintiff's allegations in their entirety.

**Robert Dedmon contentions**
The Shell Defendants have multiple, long-standing system failures that result in pay discrimination based on race. They know about race discrimination problems within their ranks for decades before Mr. Dedmon starts work. They promise workplace equality including pay equity. But they continue to have

systemic problems resulting in race-based pay discrimination.

In the summer of 2020, in the wake of George Floyd's murder and a Shell open form to address race, a Shell manager reveals to Mr. Dedmon that Shell downgraded his 2014 starting job grade and pay scale because Mr. Dedmon is black. She reveals that, at the time, (1) Shell Human Resources wants her to offer him a lower-paying job grade because he is black and (2) Shell Human Resources tells her that, historically, minorities do not do well at Shell, so we do not want to set him up to fail by starting him at the better job grade. She reveals that, at the time, she files an EEO report but is not told of any results.

This lawsuit reveals that pay and job grade disparities continue in every year of his employment compared to his white co-workers on the inside sales team. This team sells power and gas to energy retailers, who in turn sell to consumers like individual residents and companies.

Those pay disparities continue despite the millions in gross margin — which means profits on contracts — that Mr. Dedmon generates. Pay disparities include, for example, higher pay for a new team member who is around 5 years out of college with an undergraduate degree, has no prior sales experience, is learning the market, and generates less gross margin. In comparison, Mr. Dedmon has an MBA with concentration in energy finance, has more than a decade of experience, understands the market, and generates more gross margin.

The Shell Defendants have some excuses. First, they claim the 2014 job grade decision was for business reasons. But behind the scenes and in contrast to what it says on paper, Shell Human Resources gives the true reason: that Mr. Dedmon is black. Documents and actions show additional problems with the paper excuse. For example, Shell Human Resources (1) makes its operations managers prove the qualifications of the already-vetted and already-selected candidate Mr. Dedmon, (2) says it may not offer *any* job to Mr. Dedmon, and (3) does these things while expressing concern about his race.

Second, the Shell Defendants claim Mr. Dedmon, at the time back in 2014, knows about the job grade downgrade and believes or suspects Shell previously offered the same job to a white female at better job grade and pay. The testimony and documents show this claim is false. Testimony and documents show Shell gave Mr. Dedmon a false reason for, and covered up, the downgrade. Documents also show this was *planned* — what to tell him that avoids the truth.

Third, the Shell Defendants imply that a 2015 move to a higher job grade made up for any earlier discrimination. A later job grade increase does not make up for past discrimination. And, again, documents show pay and job grade disparities in every year of his employment compared to his white co-workers on the

inside sales team.

Fourth, the Shell Defendants claim Mr. Dedmon did not receive a 2021 job grade increase because he did not apply. But they do not disclose a few things. The sales team is a man down and needs to fill the empty spot. The team manager asks team members if they are aware of anyone that may be a good fit for their team. In other words, outside hires. The manager then allows a back-door application process in which an existing white team member "applies" and gets the better job grade but does not actually have to take over the role or job duties.

The Shell Defendants have not provided pay data for the only other black person on the sales team in the last ten years. They have not provided any application or pay data for the white female who was initially offered the same job as Mr. Dedmon and then later joined the sales team with Mr. Dedmon. They have not provided the annual gross margin data that they track internally to assess each team member's performance. They claim the internal discrimination report is lost as well as documentation of investigation and results.

They have not provided the pay data needed to calculate economic losses. But the worst harm is the betrayal of trust that Mr. Dedmon placed in Shell and the consequences of that betrayal that included anxiety, panic attacks, and impact on health that ultimately led him to resign on October 22, 2024.

**Shell Defendants contentions**
Plaintiff is a former employee of Shell Trading. Shell categorically denies that it participated in any discrimination against Dedmon, including with respect to his initial hiring, his job grade and compensation, and any promotion decisions.

Dedmon initially applied for an open JG5 position on the Power Sales team at Shell in or around February 2014 but was not selected for the role. After negotiations with the selected candidate were not successful and additional changes in the department occurred affecting the overall balance of positions within the group, Shell decided to repost the position as a JG6. The decision to repost the job as a JG6 had nothing at all to do with Dedmon. In fact, the HR department were not even aware that the business group wanted to offer the open position to Dedmon when the job grade change was made.

The business group and HR had lengthy discussions regarding the job grade change, including HR's business reasons for the change and the business group's concerns about how job grades were distributed within the group – completely unrelated to Dedmon. One member of the business group, Sri Rangan (now former employee), additional expressed concerns about offering the position at a lower job grade to a person of color. Although the business

group tried to have HR reconsider the job grade for the open position, HR explained that they were unable to do so for business reasons.

Dedmon was eventually offered the JG6 position. He was aware of the change in job grade at the time and inquired about it but proceeded to accept the position as it was offered to him, even though he believed or suspected that it had been previously offered to a white woman at a higher job grade and salary. Shell did not do anything to islead Dedmon about the basis for the job change or to impede him in pursing any claims he believes he had regarding the job grade change.

Approximately six (6) months after the start of his employment, Dedmon was promoted to a JG5 and received a salary increase. Dedmon continued to receive salary increases throughout his employment and has had a higher salary and overall compensation that some of his White colleagues who are also classified as JG5s.

In or around the Summer of 2020, Sri Rangan told Dedmon that Olmen made comments that "POCs tend to struggle" and not do well at Shell. Rangan also wrongly lead Dedmon to believe that Shell changed the job grade and compensation for the 2014 open position because of Dedmon's race/color. Dedmon did not raise the issue internally but instead filed a charge of discrimination broadly claiming that he had been discriminated against throughout his entire employment. Dedmon later filed suit and amended his complaint to allege an additional claim for failure to promote related to a JG4 open position in his department for which he did not apply.

Shell contends that this is a single-plaintiff race discrimination case and not a pattern and practice case or a case about alleged national pay practices. Shell further contends that the evidence will show that the job grade change in 2014 was based purely on business reasons, as explained at the time to Rangan and others in the business group. Shell also contends that Dedmon has sufficient information in 2014 to bring a discrimination claim at the time, but failed to do so. Moreover, Shell contends that Dedmon received a job grade promotion and salary increase six months after the start of his employment in or around February 2015, which completely moots his claims based on the 2014 decision. In addition, Shell contends that Dedmon has not and cannot point to any evidence that ties the events in 2014 to any compensation payments he received during the relevant time period for which he can recover in this case. Shell also contends that Dedmon has consistently received salary increases based on his performance and that he has earned more than some of his White colleagues throughout the relevant time period. Shell further contends that Dedmon was aware of the JG4 job opening in 2021 and could have applied for it at the time. Moreover, Shell contends and Dedmon admits that no one prevented

or discouraged him from applying for the position and there is no evidence that it would have been futile for Dedmon to submit an application for the position. In addition, Shell contends that Dedmon was not selected for the JG4 position because he failed to apply for it.

Finally, Shell contends that Dedmon has not provided any evidence of his alleged damages in this case and has not disclosed a calculation of damages. Shell has produced thousands of pages of records related to Plaintiff's compensation and performance, including for the potential period of recovery, which should have allowed him to timely and properly calculate his alleged damages. Shell has objected to and contested Plaintiff's efforts to obtain data related to individuals who are not proper comparators and/or are not relevant to Dedmon's claims, including one or more other African American employees or other employees who work(ed) at Shell. Ultimately, Dedmon is not entitled to any recovery from Shell on any of his claims.

**Issues requiring resolution at trial**

**Robert Dedmon**
At trial, the jury must decide whether the Shell Defendants discriminated against Mr. Dedmon because of his race. This may include (1) whether the 2014 change in job grade and pay for Mr. Dedmon occurred because of race; (2) whether job grade and pay disparities continued because of race; (3) whether the 2021 application process for an empty team position excluded Mr. Dedmon from employment opportunities because of race; and (4) whether panic attacks independently interfered with the benefits, privileges, terms, or conditions of Mr. Dedmon's employment.

If the jury decides there was race discrimination, the jury must decide damages intended to compensate Mr. Dedmon. This includes (1) pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, harm to name and reputation, and other noneconomic losses, and (2) compensation losses.

If the jury decides there was race discrimination, the jury must also decide damages intended to punish. This includes (1) the requisite conduct for punitive damages and (2) the amount of punitive damages considering relevant factors.

If the jury decides there was race discrimination, the jury must also decide whether Shell (1) concealed that race played a role in the 2014 job grade or pay downgrade or (2) gave Mr. Dedmon a reason other than race for the 2014 job grade or pay downgrade that caused him not to pursue his legal rights until after he found out the truth.

**Defendants**
At trial, the jury must decide whether Defendants discriminated against Plaintiff because of his race, including with respect his job grade and compensation and the 2021 open position in his group to which he did not apply. If the jury finds that Defendants are liable to Plaintiff for race discrimination, the jury must decide whether to award damages and the amount of any damages.

### 3. Jurisdiction

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 [federal question jurisdiction].

Each defendant filed an answer and admits that the Court has jurisdiction over it in this matter.

There are no unresolved jurisdictional questions.

### 4. Motions

Defendants' motion for summary judgment [Doc. No. 33]

**Robert Dedmon**
Robert Dedmon anticipates seeking leave to file a sur-reply.

Robert Dedmon submitted a request to the Court on September 24, 2024 about lack of promised [agreed] discovery from defense and explaining that both parties agreed the discovery was material [citing a joint filing].

**Shell Defendants**
The Shell Defendants opposes any efforts by Dedmon to file a sur-reply to their pending Motion for Summary Judgment (Doc. No. 33).

The Parties have had extensive discussions about discovery issues in this case, including where Shell has informed Dedmon of its objections to the scope of some of his requests. Except for limited instances where Shell is working to fill in gaps related to missing pay or performance records for discrete times over the relevant time period, it is Shell's position that it has provided Dedmon the material discovery related to his claims and that his requests are objectionable for the reasons Shell has previously stated.

### 5. The parties' contentions

**Robert Dedmon**
The Shell Defendants both violated two federal laws prohibiting race and color discrimination: Section 1981 and Title VII. Defendants are estopped from asserting limitations on some of those violations, and other violations are within limitations. The violations caused Robert Dedmon both economic and non-pecuniary damage. The Shell Defendants' acted with malice or reckless indifference to his federally protected rights to be free from discrimination—and so, punitive damages are appropriate.

**Shell Defendants**
The Shell Defendants contend that they did not violate Title VII and Section 1981. Defendants also contend that Plaintiff's claims are time barred because he failed to timely pursue them within the applicable statute of limitations, and no equitable or other theories excuse Plaintiff's late claims. Defendants further contend that Plaintiff did not suffer and is not entitled to any damages in this case, economic or non-pecuniary. Defendants did not act with malice or reckless indifference to any of Plaintiff's rights and there is no basis for punitive damages in this case.

### 6. Admissions of fact

1. Shell Trading Services Company had more than 500 employees in each of 20 or more calendar weeks in each calendar year since 2013.

2. Shell Exploration & Production Company had more than 500 employees in each of 20 or more calendar weeks in each calendar year since 2013.

3. The Shell Defendants are both in the oil and gas business. They each operate from Houston, Texas.

4. The Shell Defendants use job grades with salary ranges for their respective employees in the United States. Within their respective systems, a lower job grade number generally indicates a higher job grade position.

5. A job opening for a Houston, Texas sales job was posted in or around 2014.

### 7. Contested issues of fact

**Robert Dedmon**
1. Whether the Shell Defendants discriminated against Mr. Dedmon because of race. This includes the 2014 downgrade in job grade and pay, the continued pay disparity compared to white peers in every year of employment, the application process to fill a vacant team spot in 2021, and panic attacks requiring

medical leave as due to discrimination and independently affecting terms, conditions, or privileges of employment.

2. Whether false statements, whether innocent or intentional, were made to Mr. Dedmon about the reason for the change from JG5 to JG6 in 2014;

3. Whether the reason for the change from JG5 to JG6 in 2014 was concealed;

4. The existence and amount of compensatory damages.

5. The existence and amount of compensation losses.

6. The existence and amount of punitive damages.

7. Whose acts, or failures to act, are deemed to be the acts, or failures to act, of a company itself.

**Shell Defendants**
The Shell Defendants do not believe there is a genuine issue as to any material fact in this case, as expressed in their pending Motion for Summary Judgment. Subject to that Motion, the following may be contested issues of fact at trial:

1. Whether Dedmon's job grade/compensation in 2014 was changed because of his race/color.

2. Whether Dedmon received a job grade promotion and compensation increase in 2015.

3. Whether Shell used Dedmon's race/color at any time during the relevant time period to set his job grade/compensation.

4. Whether Dedmon knew about the JG4 open position in his department in 2021.

5. Whether Dedmon was prevented or discouraged from applying for the JG4 open position in his department in 2021.

6. Whether it would have been futile for Dedmon to apply for the JG4 open position in his department in 2021.

7. Whether Teri Olmen made the comments alleged by Sri Rangan that "POCs at Shell tend to struggle" or not do well.

8. Whether Shell investigated a complaint from Sri Rangan in 2014 regarding alleged comments by Teri Olmen that "POCs at shell tend to struggle" or not do well.

9. Whether Dedmon was underpaid in comparison to any proper White comparators.

10. Whether Shell used Dedmon's race/color with respect to the JG4 open position in his department in 2021.

11. Whether Dedmon's claims are timely.

## 8. Agreed applicable propositions of law

1. The Civil Rights Act of 1866, 42 U.S.C. § 1981, prohibits discrimination because of race or skin color in the making and enforcing of contracts—which includes at-will employment.

2. Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against employees because of race or skin color—which includes at-will employment.

3. "[A]n unlawful employment practice occurs ... when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 U.S.C. § 2000e–5(e)(3)(A).

4. Both Title VII and Section 1981 permit recovery for damages caused by race and color discrimination, including punitive damages.

## 9. Contested issues of law.

**Robert Dedmon**
Robert Dedmon's attorneys believe most of the Shell Defendants' contested issues of law are fact issues and that most contested issues in this case are fact issues for the jury to decide. And even then, most contested issues of law depend on jury fact findings.

1. After jury findings on estoppel, whether or not defense is estopped from raising a statute of limitations defense.

2. Whether Mr. Dedmon's pleaded claim about the JG4 application process is a traditional failure to promote claim or instead a different kind of claim that

includes the application process itself under the United State Supreme Court opinion in *Muldrow v. City of St. Louis*.

3. Whether Mr. Dedmon's panic attacks requiring medical leave independently affected the terms, conditions, or privileges of employment under *Muldrow v. City of St. Louis*.

4. What law applies to questions of (a) supervisor status, (b) whose acts, or failures to act, are deemed to be the acts, or failures to act, of a company itself, and (c) conduct that effectively delegates supervisor status to those on whom an entity relies to make a decision.

**Shell Defendants**

The Shell Defendants believe that they are entitled to judgment as a matter of law, as expressed in their pending Motion for Summary Judgment. Subject to that Motion, the following may be contested issues of law at trial:

1. Whether Dedmon asserts a failure to promote claim under Title VII and whether it has been administratively exhausted.

2. Whether Dedmon's failure to promote claim is time barred under Title VII.

3. Whether Dedmon's pay discrimination claims under Title VII and/or Section 1981 are time barred.

4. Whether any equitable or other doctrines apply to excuse the untimeliness of Dedmon's claims, including the continuing violations doctrine, the discovery rule, estoppel, fraudulent concealment, and/or the Ledbetter law.

5. Whether Dedmon can prove that Shell discriminated against him on the basis of his race/color in violation of Title VII and/or Section 1981 based on his race/color with respect to the job grade/compensation decision made in 2014.

6. Whether the job grade/compensation decision Shell made in 2014 regarding Dedmon is tied to any compensation Dedmon received during any period for which he could recover in this case.

7. Whether Shell discriminated against Dedmon on the basis of his race/color in violation of Title VII and/or Section 1981 when it set his compensation and job grade.

8. Whether Shell discriminated against Dedmon on the basis of his race/color in violation of Title VII and/or Section 1981 when he was not selected for an open position in his department to which he did not apply in 2021.

9. Whether Dedmon is entitled to damages under Title VII and/or Section 1981 and/or any equitable theories of recovery.

10. Shell incorporates by reference their other affirmative defenses in their Answer on file.

## 10. Exhibits

The parties' separate amended exhibit lists are attached.

## 11.  Witnesses

The parties' separate amended witness lists are attached.

*"If any other witnesses will be called at the trial, their names, addresses, and the subject matter of their testimony will be reported to opposing counsel as soon as they are known. This restriction will not apply to rebuttal or impeachment witnesses, the necessity of whose testimony cannot reasonably be anticipated before trial."*

**Robert Dedmon:**
Mr. Dedmon's attorneys intend in good faith to call in their case in chief the witnesses that are included in the attached witness list. The topics cover the subject matter of testimony.

**Defendants:**
Defendants' attorneys intend in good faith to call in their case in chief the witnesses that are included in the attached witness list.  The topics cover the subject matter of testimony.

## 12.  Settlement

The parties mediated this case on December 31, 2024, before private mediator Gloria Portela in Houston, Texas. The mediation did not result in settlement. The parties have thereafter continued settlement negotiations through the mediator but at this time have not been able to reach an agreement to resolve the case.

## 13.  Trial

This is a jury trial.

Robert Dedmon's attorneys currently estimate 10 calendar days as the probable length of trial including jury selection and jury deliberation through verdict.

The Shell Defendants believe a more reasonable estimate for trial is 5 calendar days, exclusive of jury selection and jury deliberations.

Robert Dedmon's attorneys foresee no logistical problems other than the compelling of certain witnesses to trial — depending on the trial date. Known witness conflicts through at least April 2025 are listed below. Robert Dedmon's attorneys will provide more detailed information if the Court desires.

| **Keyani Adigun**<br><br>damages — before and after witness | Conflicts<br><br>• April 13-19 |
|---|---|
| **Brushaud Callis**<br><br>damages — before and after witness | Conflicts—out of town:<br><br>• March 1-7<br>• July 2025 |
| **Robert Dedmon**<br><br>plaintiff — but will cancel his participation in family vacation if needed for trial | Conflicts—out of town:<br><br>March 8-12 |
| **James Ledbetter**<br><br>liability<br>damages — before and after witness<br>damages — punitive damages predicate | Conflicts—out of town:<br><br>• Feb. 24-March 12<br>• March 24-April 5<br>• April 24-May 5 |
| **Luis Lugo**<br><br>liability including pay disparity — critical witness on discrimination | Conflicts—out of town:<br><br>• March 6-15 |

| | |
|---|---|
| **Sean Matthews**<br><br>liability including pay disparity — critical witness on discrimination | Conflicts—out of town:<br><br>• March 17-21 |
| **Srikala (Sri) Rangan**<br><br>liability including direct evidence of discrimination based on personal knowledge — critical witness on discrimination | Conflicts—Out of town/country:<br><br>• February 2025<br>• March 9-18<br>• June 5-11 |

One of Shell's witnesses (Jennifer Hartnett) has the following conflicts, depending on when trial is set: the week of March 17, 2025; March 31, 2025 to April 11, 2025; June 19, 2025 to June 20, 2025.

The parties' attorneys anticipate no unusual exhibits but may use physical [*i.e.,* not paper] demonstratives to help the jury understand concepts.

## 14. Juror comprehension initiatives

*Trial time limits*
The parties' attorneys agree to time limits for jury selection, opening, and closing. They request the following time:

(a) [change to Court Procedure 26(d)] 2 hours for attorney-led questioning for each side during jury selection, with the understanding that the Court may and should end questioning if at any point the Court believes we are wasting time or using jury selection in an improper manner

(b) 30 minutes for opening

(c) 1 hour for closing including the time set aside for rebuttal

The parties' attorneys believe the attorneys in this case are sufficiently experienced that time limits for direct and cross are not needed. The attorneys can feel when the jury has had enough or wants to move on.

*Preliminary substantive jury instructions*
The parties' attorneys agree to preliminary substantive jury instructions on the basic issues in the case but in more simplified language than the final jury charge, so jurors do not get sidetracked early in the case. Attorneys can then couple or tie the preliminary charge with the language of the final jury charge.

*Notetaking by jurors*
Robert Dedmon's attorneys agree that (1) jurors should be permitted to take notes if they wish to do so and (2) jurors should be permitted to take those notes with them to the jury room when deliberating.

Defendants do not agree to allowing jurors to take notes with them into the jury room when deliberating.

*Trial binders for jurors to include glossary of terms, cast of characters, chronology, and key exhibits*
Robert Dedmon's attorneys agree that the parties should provide trial binders with a glossary of terms, cast of characters — agreed photos and connection to the case, and key pre-admitted exhibits. They would also prefer a timeline if one is agreed.

Defendants' attorneys agree to trial binders that include pre-admitted exhibits and a list of witnesses, but do not agree to including terms, a cast of characters with connections to the case, or photos.

The parties' attorneys agree that the jurors may be provided before deliberation with an agreed index of exhibits, with exhibit numbers and a description of each exhibit.

*Questions by jurors during trial*
The parties' attorneys agree to permit jurors to ask questions and agree to the procedures outlined in the *Jury Innovation Project*, *Pilot Program Manual*, Part A.

They agree that the following is for the Court to decide, but they prefer:

(a) that the Court instruct jurors not to put their names on juror question forms;

(b) that each juror to have juror question forms in the jury box and that every juror pass down his or her juror question form to the bailiff at the end of the witness examination — even if the juror did not write a question on the form;

(c) that the Court remove the witness from the courtroom before allowing the parties to object to the question;

(d) that the Court allow the parties to ask the juror questions, as witnesses may be fearful, intimated, or uncomfortable with having a federal judge ask the questions.

### *Interim statements or argument to jury by counsel.*
Robert Dedmon's attorneys propose an alternative, which is to allow the attorneys to label the subject matter of witness testimony in a non-argumentative manner. Here are three examples. 1. Now, I am going to ask you about damages, and specifically $x$. 2. Let's shift gears to talk about the trust you placed in Shell. 3. We're going back now to 2014 and the hiring process.

Robert Dedmon's attorneys do not believe interim statements or arguments are necessary in a trial of this length if the attorneys can label subjects of testimony as requested above.

Defendants' attorneys do not agree to interim statements or argument to the jury by counsel, including the proposed examples described above, some of which run the risk of leading witnesses, which may be objectionable. Defendants' attorneys believe that counsel can identify topic shifts during examinations, which is common and requires no modifications to the rules governing trial.

### 15-1.  Motions in limine

The parties' separate motions in limine were previously filed. They are not attached but will be included in the paper courtesy copies. The parties are continuing to work together to limit the limine issues and jointly present agreed points, including consideration of the Court's limine form. They hope to have a joint submission filed before the pretrial conference.

### 15-2.  Proposed voir dire questions for the Court

The parties' separate proposed jury selection topics and questions for the Court were previously filed. They are not attached but will be included in the paper courtesy copies.

### 15-3.   Proposed jury charge

The parties' separate proposed jury charges were previously filed. They are not attached but will be included in the paper courtesy copies. The parties are continuing to work together to reach agreement on a joint submission. They hope to have a joint submission filed before the pretrial conference.

### 15-3.   Memorandum of law

Mr. Dedmon's memorandum of law is attached. The Shell Defendants defer filing a memorandum of law pending the Court's ruling on Defendants' Motion for Summary Judgment.

SO ORDERED.

Signed on _____, at Houston, Texas.

_____
Hon. Charles Eskridge
United States District Judge

Approved March 6, 2025:

*/s/ Amy Gibson*
_____
Ms. Amy E. Gibson
Attorney-in-Charge
Texas State Bar No. 00793801
Southern District Bar No. 20147
amy@gwfirm.com

Mr. David L. Wiley
Of Counsel
Texas State Bar No. 24029901
Southern District Bar No. 34134
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201-4923
T: (214) 522-2121
F: (214) 522-2126

    *and*

Ms. Amanda C. Hernandez
Of Counsel
Texas State Bar No. 24064411
Southern District Bar No. 1531045
amanda@ahfirm.com

AH Law, PLLC
5718 Westheimer, Suite 1000
Houston, Texas 77057
T: (713) 588-4359
F: (281) 572-5370

*Attorneys for Robert Dedmon*

*/s/ Marlene Williams by AGibson at the direction of Marlene*
_____
Ms. Marlene C. Williams
Attorney-in-Charge
Texas State Bar No. 24001872500
Federal ID No.: 22824
marlene.williams@ogletree.com

Ogletree, Deakins, Nash, Smoak
& Stewart, P.C.
500 Dallas Street #3000
Houston, Texas 77002
T: 713-655-0855
F: 713-655-0020

*Attorneys for Defendants*